No. 23-1328

---------------------------------------------------------------------
---------------------------------------------------------------------

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES,

Appellee,

v.

COREY DONOVAN,

Defendant- Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

## **APPELLANT'S JOINT APPENDIX**
### **Volume I**

Donna J. Brown, Esq.
First Circuit #1179586
Michael G. Eaton, Esq.
First Circuit #1194959
Wadleigh, Starr & Peters, P.L.L.C.
95 Market Street
Manchester, NH 03101
603-669-4140

# **TABLE OF CONTENTS**

1. United States District Court for District of New Hampshire
   Docket Report on case #: 1:21-cr-00088-PB-1……………………………...5

2. Indictment (Doc. 1)…………………………………………………………...27

3. Defendant's Motion to Grant a Key Defense Witness With Immunity
   (Doc. 27)……………………………………………………………………30

4. United States' Objection to Defendant's Request for Immunity (Doc. 31)..39

5. Defendant's Motion in Limine No. 1 (Doc. 36)……………………………52

6. United States' Response to Defendant's Motion in Limine (Doc. 37)…….60

7. Defendant's Proposed Limiting Instructions (Doc. 38)……………………74

8. United States' Response to Defendant's Proposed Limiting Instruction
   (Doc. 39)……………………………………………………………………77

9. October 12, 2021, Motion Hearing Transcript (Doc. 69)…………………..80

10. Jury Trial Day 2 Morning Session Transcript (Doc. 71)…………………147

11. Jury Trial Day 2 Afternoon Session Transcript (Doc. 67)………………..282

12. Jury Trial Day 3 Transcript (Doc. 73)……………………………………383

13. Jury Trial Day 4 Transcript (Doc. 68)……………………………………574

14. United States' Consolidated Sentencing Memorandum (Doc. 86)………706

15. Defendant's Sentencing Memorandum (Doc. 87)………………………..719

16. United States' Sentencing Reply Brief (Doc. 88)………………………..734

17. January 3, 2023, Sentencing Hearing Transcript Morning & Afternoon
    Part I (Doc. 115)…………………………………………………………..754

18. January 3, 2023, Sentencing Hearing Transcript Afternoon Part II
(Doc. 114)………………………………………………………………964

Respectfully submitted,

COREY DONOVAN

By his attorneys,

Wadleigh, Starr & Peters, P.L.L.C.


*/s/ Donna J. Brown, Esq.*
Donna J. Brown, Esq.
First Circuit #1179586
Michael G. Eaton, Esq.
First Circuit #1194959
Wadleigh, Starr & Peters, P.L.L.C.
95 Market Street
Manchester, NH 03101
603-669-4140
dbrown@wadleighlaw.com
meaton@wadleighlaw.com


## Certificate of Service

I HEREBY CERTIFY that the foregoing appendix has been e-filed to all counsel of record through CM/ECF on this 20th day of September 2023.

*/s/* Donna J. Brown
Donna J. Brown, Esq.
First Circuit #1179586

# Exhibit 1

APPEAL,CLOSED,FILE

# U.S. District Court
## District of New Hampshire (Concord)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00088-PB-1

Case title: USA v. Donovan

Date Filed: 05/17/2021

Date Terminated: 03/27/2023

Assigned to: Judge Paul J. Barbadoro

Appeals court case number: #23-1328 First
Circuit Court of Appeals

### Defendant (1)

**Corey Donovan**
*TERMINATED: 03/27/2023*

represented by **Donna J. Brown**
Wadleigh Starr & Peters PLLC
95 Market St
Manchester, NH 03101
603 669-4140
Email: dbrown@wadleighlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Matthew G. Stachowske**
Stachowske Law PLLC
634 Central Ave
Dover, NH 03820
603-343-1842
Email: matthew@stachowskelaw.com
*TERMINATED: 10/19/2021*
*Designation: CJA Appointment*

**Patrick J. Richard**
Richard Law Office
150 Westford Road, Suite 26
Tyngsborough, MA 01879
978-458-4279
Email: attyrichard@hotmail.com
*TERMINATED: 03/08/2022*
*Designation: CJA Appointment*

### Pending Counts

18 U.S.C. §§ 922(g)(1) - Possession of a
Firearm/Ammunition by a Prohibited
Person
(1)

### Disposition

Committed to the Bureau of Prisons to a
term of 110 months with recommendations.
This term of imprisonment shall run
consecutively to any term of imprisonment
that will be imposed on the defendants

supervised release violation 07-CR-00130-SM; Remanded to US Marshal custody; 3 years Supervised Release with Mandatory, Standard and Special Conditions; $100 Special Assessment due immediately; Fine waived due to inability to pay

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA**                    represented by    **Anna Z. Krasinski**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Email: anna.krasinski@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                  **Charles L. Rombeau**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Fax: 603 225-1470
Email: charles.rombeau@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2021 | 1 | **INDICTMENT as to Corey Donovan (1) count(s) 1. *Original document available in clerks office.*(vln)** (Entered: 05/18/2021) |
| 05/17/2021 | 3 | Praecipe for Warrant by USA as to Corey Donovan. (vln) (Entered: 05/18/2021) |

| 05/18/2021 | | Arrest Warrant Issued as to Corey Donovan. Original warrant and copies to US Marshal and US Probation.(vln) (Entered: 05/18/2021) |
|---|---|---|
| 05/18/2021 | 4 | Arrest Warrant Returned Executed on 5/18/2021 as to Corey Donovan.(vln) (Entered: 05/18/2021) |
| 05/19/2021 | | NOTICE OF HEARING as to Corey Donovan. Initial Appearance/Arraignment via video set for 5/24/2021 12:00 PM before Magistrate Judge Andrea K. Johnstone. (bt) (Entered: 05/19/2021) |
| 05/24/2021 | 5 | **PUBLIC ACCESS FINDINGS as to Corey Donovan. So Ordered by Magistrate Judge Andrea K. Johnstone. (bt)** (Entered: 05/24/2021) |
| 05/24/2021 | 6 | Consent to Video/Telephonic Conference and Waiver of Right to Appear in Person for Initial Appearance Fed. R. Crim. P. 5, Arraignment Fed. R. Crim. P. 10, as to Corey Donovan. (bt) (Entered: 05/24/2021) |
| 05/24/2021 | | **ENDORSED ORDER approving: 6 Consent to Video/Telephonic Conference Waiver to Appear in Person as to Corey Donovan. *Text of Order: Approved* So Ordered by Magistrate Judge Andrea K. Johnstone. (bt)** (Entered: 05/24/2021) |
| 05/24/2021 | 7 | MOTION to Appoint Counsel with Financial Declaration by Corey Donovan. (Attachments: # 1 Financial Affidavit) *Document available in clerks office.* (bt) (Entered: 05/24/2021) |
| 05/24/2021 | | **ENDORSED ORDER approving: 7 Motion to Appoint Counsel. Matthew Stachowske appointed in the case as to Corey Donovan (1). Assignment accepted on 5/24/2021. Appointment Nunc Pro Tunc to 5/18/2021. *Text of Order: Request Approved. Appoint Counsel.* So Ordered by Magistrate Judge Andrea K. Johnstone. (bt)** (Entered: 05/24/2021) |
| 05/24/2021 | | Minute Entry for proceedings held before Magistrate Judge Andrea K. Johnstone: INITIAL APPEARANCE and ARRAIGNMENT via video as to Corey Donovan (1) Count 1 held on 5/24/2021. Defendant consented to a hearing by video and waived an in-court hearing. Defendant advised of rights & charges, waived reading of indictment, and pled not guilty. Prosecutor's Brady disclosure obligations confirmed. Court approves financial affidavit. Defendant stipulated to detention without prejudice. Trial Date: 7/7/2021, 2-3 Days. (Court Reporter: Brenda Hancock) (Govt Atty: Charles Rombeau) (Defts Atty: Matthew Stachowske) (USP: Jacqulyne Santullo)(Total Hearing Time: 15 Minutes) (bt) (Entered: 05/24/2021) |
| 05/24/2021 | | **ENDORSED ORDER As to Corey Donovan: Pursuant to FRCrP 5. In compliance with the Due Process Protections Act, the court issues the following Order: Consistent with Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, the United States is ordered to disclose all exculpatory information, in a timely manner, to the defendant. This information includes, but is not limited to, evidence that is material and is favorable to the accused. The failure to discharge this obligation may result in consequences, including the reversal of any conviction, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings and/or sanctions by the court. So Ordered by Magistrate Judge Andrea K. Johnstone. (bt)** (Entered: 05/24/2021) |
| 05/24/2021 | 8 | STIPULATION TO DETENTION and WAIVER of Detention Hearing without prejudice as to Corey Donovan. Approved by Magistrate Judge Andrea K. Johnstone. (bt) (Entered: 05/24/2021) |
| 05/24/2021 | | TRIAL NOTICE: Jury Selection/Trial set for two week period beginning 7/7/2021 09:30 AM before Judge Paul J. Barbadoro. Final Pretrial Conference set for 6/23/2021 11:15 |

| | | |
|---|---|---|
| | | AM before Judge Paul J. Barbadoro. (vln) (Entered: 05/24/2021) |
| 05/27/2021 | | **ENDORSED ORDER. This case is scheduled for trial in July. On or before 6/7/2021, counsel shall file either a motion to continue or, if the case is ready to proceed to trial as scheduled, a Joint Trial Status Report. Counsel shall meet and confer, and defense counsel shall confer with the defendant, prior to making any submission pursuant to this order. The information provided in the Joint Trial Status Report will be used to assign this case priority on the July trial list. So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 05/27/2021) |
| 06/08/2021 | 9 | NOTICE OF ATTORNEY APPEARANCE Anna Z. Krasinski appearing for USA. Attorney Anna Z. Krasinski added to party USA(pty:pla).(Krasinski, Anna) (Entered: 06/08/2021) |
| 06/09/2021 | 10 | Assented to MOTION to Continue Trial for 90 days (Waiver of Speedy Trial to be filed conventionally) by Corey Donovan. (Stachowske, Matthew) (Entered: 06/09/2021) |
| 06/21/2021 | 11 | **ORDER granting: 10 Assented to MOTION to Continue Trial for 90 days as to Corey Donovan (1).** *So Ordered by Judge Paul J. Barbadoro. Final Pretrial Conference set for 9/24/2021 03:45 PM before Judge Paul J. Barbadoro. JERS Statement due 9/28/2021. Jury Trial set for two-week period beginning 10/5/2021 09:30 AM before Judge Paul J. Barbadoro. (bt) Modified on 6/21/2021 to add: ORDER (bt). (Entered: 06/21/2021)* |
| 09/01/2021 | | **ENDORSED ORDER. This case is scheduled for trial in October. Unless the case has been continued by 9/10/2021, counsel shall file a Joint Trial Status Report on or before that date. Counsel shall meet and confer, and defense counsel shall confer with the defendant, prior to making any submission pursuant to this order. The information provided in the Joint Trial Status report will be used to assist in scheduling the case.** <br> **The court is no longer using a monthly priority list for trial scheduling. The court anticipates scheduling this for trial in its two-week trial period.** <br> **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/01/2021) |
| 09/15/2021 | | NOTICE OF HEARING as to Corey Donovan. VIDEO Status Conference set for 9/20/2021 02:00 PM before Judge Paul J. Barbadoro. (vln) (Entered: 09/15/2021) |
| 09/20/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: STATUS CONFERENCE as to Corey Donovan held on 9/20/2021. Defendant's Motion to Suppress due 9/21/2021; Government's Response due by 9/23/2021. Clerk to set a hearing on the motion for 9/24/2021. (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 0:20)(CJA Time: 0:20) (vln) (Entered: 09/20/2021) |
| 09/20/2021 | | NOTICE OF HEARING as to Corey Donovan. Motion Hearing set for 9/24/2021 02:00 PM before Judge Paul J. Barbadoro. (vln) (Entered: 09/20/2021) |
| 09/21/2021 | 12 | MOTION to Suppress Evidence *and Franks Hearing* by Corey Donovan. **HEARING REQUESTED.**Follow up on Objection on 10/5/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Stachowske, Matthew) Modified on 9/23/2021 to restrict access (vln). (Entered: 09/21/2021) |
| 09/23/2021 | 13 | Government's Suppression Hearing Witness List by USA as to Corey Donovan (Krasinski, Anna) (Entered: 09/23/2021) |
| 09/23/2021 | 14 | FINAL WITNESS LIST by Corey Donovan.(Stachowske, Matthew) (Entered: 09/23/2021) |

| | | |
|---|---|---|
| 09/23/2021 | 15 | OBJECTION by USA as to Corey Donovan re 12 MOTION to Suppress Evidence *and Franks Hearing* . (Attachments: # 1 Exhibit 1-Federal Warrant Materials for 3 Locations at 33 Route 4A, # 2 Exhibit 2-Federal Warrant Materials for 5 Vehicles, # 3 Exhibit 3-Reports)(Krasinski, Anna) (Entered: 09/23/2021) |
| 09/23/2021 | 16 | MOTION to Seal Document 12 MOTION to Suppress Evidence *and Franks Hearing* at Level Iby USA as to Corey Donovan. (vln) (Entered: 09/24/2021) |
| 09/24/2021 | | **ENDORSED ORDER granting 16 Motion to Seal : 12 Motion to Suppress at Level I as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/24/2021) |
| 09/24/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: MOTION HEARING as to Corey Donovan held on 9/24/2021 re 12 MOTION to Suppress Evidence *and Franks Hearing*. Findings and rulings made with respect to the first warrant. Defendant's supplemental brief due 9/29/2021; Government's reply brief due 10/1/2021 (Court Reporter: Brenda Hancock) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 3:00)(CJA Time: 3:00) (vln) (Entered: 09/27/2021) |
| 09/24/2021 | 17 | FINAL EXHIBIT LIST by Corey Donovan. (vln) (Entered: 09/27/2021) |
| 09/24/2021 | 18 | EXHIBIT LIST by USA as to Corey Donovan. (Attachments: # 1 Exhibit List)(vln) (Entered: 09/27/2021) |
| 09/24/2021 | | **ORAL ORDER denying 12 MOTION to Suppress Evidence *and Franks Hearing* as to Corey Donovan (1).** *Motion denied for reasons explained on the record.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 10/28/2021) |
| 09/27/2021 | 19 | JUROR QUESTIONNAIRES: Access to this document is available to the Court and temporarily available to counsel for USA, Corey Donovan only. Note: This document contains questionnaires available at the time of filing. Any additional questionnaires collected will be provided to counsel of record by electronic supplement prior to jury selection.<br><br>**The retrieval or viewing of these questionnaires constitutes confirmation that you will adhere to L.R. 47.1, which requires that any individual given access to the questionnaires shall not disclose the questionnaires, or information contained therein, to anyone other than the attorneys, their agents, or the parties involved in trial. Violation of this rule may be treated as contempt of court.**(vln) (Entered: 09/27/2021) |
| 09/27/2021 | 20 | **Final Pretrial Order. Witness List due by 9/28/2021. Motions due by 10/12/2021. Jury Selection/Trial set for two week period beginning 10/5/2021 09:30 AM before Judge Paul J. Barbadoro. Jury Trial set for two-week period beginning 10/19/2021 09:00 AM before Judge Paul J. Barbadoro. So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 09/28/2021) |
| 09/27/2021 | 21 | **FILED IN ERROR. WRONG CASE. Final Pretrial Order. Exhibit List due by 10/4/2021. Witness List due by 9/28/2021. Motions due by 9/28/2021. Jury Selection/Trial set for 10/5/2021 09:30 AM before Judge Paul J. Barbadoro. So Ordered by Judge Paul J. Barbadoro. (vln)** Modified on 9/28/2021 to add:ERROR (vln). (Entered: 09/28/2021) |
| 09/28/2021 | 22 | ADDENDUM *(Procedure for Marking Exhibits & JERS Exhibit Naming Conventions)* re: 20 Final Pretrial Order, by Corey Donovan. (Attachments: # 1 JERS Exhibit Naming) (vln) (Entered: 09/28/2021) |

| 09/28/2021 | 23 | FINAL WITNESS LIST by USA as to Corey Donovan.(Rombeau, Charles) (Entered: 09/28/2021) |
|---|---|---|
| 09/28/2021 | 24 | FINAL WITNESS LIST by Corey Donovan.(Stachowske, Matthew) (Entered: 09/28/2021) |
| 09/29/2021 | 25 | JURY SELECTION LIST: Access to this document is available to the Court and temporarily available to counsel for USA, Corey Donovan only.<br><br>**Any individual given access to the list shall not disclose the information contained therein, to anyone other than the attorneys, their agents, or the parties involved in trial. Violation of this rule may be treated as contempt of court.**(vln) (Entered: 09/29/2021) |
| 09/29/2021 | 26 | MEMORANDUM in Support by Corey Donovan re 12 MOTION to Suppress Evidence *and Franks Hearing* . (Attachments: # 1 Exhibit Defendant's Exhibit O)(Stachowske, Matthew) (Entered: 09/29/2021) |
| 09/30/2021 | 27 | MOTION immunity for Kelley Finnigan by Corey Donovan. **HEARING REQUESTED.**Follow up on Objection on 10/14/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit Exhibit P) (Stachowske, Matthew) (Entered: 09/30/2021) |
| 10/01/2021 | 28 | MEMORANDUM in Opposition by USA as to Corey Donovan re 12 MOTION to Suppress Evidence *and Franks Hearing (Supplemental Memorandum)*. (Rombeau, Charles) (Entered: 10/01/2021) |
| 10/04/2021 | 29 | Proposed Jury Instructions by USA as to Corey Donovan.(Krasinski, Anna) (Entered: 10/04/2021) |
| 10/04/2021 | 30 | AMENDED WITNESS LIST by USA as to Corey Donovan.(Rombeau, Charles) (Entered: 10/04/2021) |
| 10/04/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: TRIAL STATUS CONFERENCE as to Corey Donovan held on 10/4/2021. (Court Reporter: Liza Dubois) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 0:35)(CJA Time: 0:35) (vln) (Entered: 11/02/2021) |
| 10/05/2021 | 31 | OBJECTION by USA as to Corey Donovan re 27 MOTION immunity for Kelley Finnigan . (Attachments: # 1 Exhibit 1-Email correspondence with defense counsel and deputy clerk re: appointing counsel, # 2 Exhibit 2-Email correspondence with appointed counsel)(Krasinski, Anna) (Entered: 10/05/2021) |
| 10/05/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY SELECTION/TRIAL **-** Day 1 as to Corey Donovan held on 10/5/2021. (Court Reporter: Susan Bateman) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 2:15)(CJA Time: 2:30) (vln) (Entered: 10/05/2021) |
| 10/05/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: MOTION HEARING as to Corey Donovan held on 10/5/2021 re 12 MOTION to Suppress Evidence *and Franks Hearing*. Defendant granted leave to file a supplemental brief; government to respond. (Court Reporter: Susan Bateman) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 1:00)(CJA Time: 1:00) (vln) (Entered: 10/05/2021) |
| 10/05/2021 | | TRIAL NOTICE: Jury Trial set for 10/13/2021 - 10/15/2021 at 09:00 AM before Judge Paul J. Barbadoro. (vln) (Entered: 10/05/2021) |

| 10/06/2021 | 32 | Statement Regarding Use of JERS During Trial by USA as to Corey Donovan.(Krasinski, Anna) (Entered: 10/06/2021) |
|---|---|---|
| 10/07/2021 | 33 | AMENDED WITNESS LIST by USA as to Corey Donovan.(Rombeau, Charles) (Entered: 10/07/2021) |
| 10/07/2021 | 34 | MOTION in Limine re: Prior Unrelated Jury Verdict by USA as to Corey Donovan.Follow up on Objection on 10/21/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Rombeau, Charles) (Entered: 10/07/2021) |
| 10/07/2021 | 35 | MOTION for Leave to File Pro Se Motion to Dismiss Indictment by Corey Donovan. (Attachments: # 1 Motion to Dismiss Indictment) (vln) (Entered: 10/08/2021) |
| 10/08/2021 | 36 | MOTION in Limine re: 404(b) evidence by Corey Donovan. **HEARING REQUESTED.**Follow up on Objection on 10/22/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Stachowske, Matthew) (Entered: 10/08/2021) |
| 10/11/2021 | 37 | OBJECTION by USA as to Corey Donovan re 36 MOTION in Limine re: 404(b) evidence . **Certain exhibit(s) maintained conventionally in Clerks Office.** (Attachments: # 1 Exhibit Notice of Conventional Filing, # 2 Exhibit No. 2, # 3 Exhibit Notice of Conventional Filing)(Krasinski, Anna) (Entered: 10/11/2021) |
| 10/12/2021 | | NOTICE OF HEARING ON MOTIONs as to Corey Donovan re: All pending motions in limine. Motion Hearing set for 10/12/2021 04:00 PM before Judge Paul J. Barbadoro. (vln) (Entered: 10/12/2021) |
| 10/12/2021 | | Minute Entry for HEARING ON PENDING MOTIONS held before Judge Paul J. Barbadoro: re 27 MOTION immunity for Kelley Finnigan ; 34 MOTION in Limine re: Prior Unrelated Jury Verdict ; 36 MOTION in Limine re: 404(b) evidence. (Court Reporter: Liza Dubois) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 1:35)(CJA Time: 1:40) (vln) (Entered: 10/12/2021) |
| 10/12/2021 | 38 | MOTION Defendant's proposed limiting instructions by Corey Donovan.Follow up on Objection on 10/26/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Stachowske, Matthew) (Entered: 10/12/2021) |
| 10/12/2021 | 39 | RESPONSE to Motion by USA as to Corey Donovan re 38 MOTION Defendant's proposed limiting instructions . (Rombeau, Charles) (Entered: 10/12/2021) |
| 10/13/2021 | | Jury Trial set to continue on 10/14/2021 09:00 AM before and 10/15/2021 09:00 AM as to Corey Donovan before Judge Paul J. Barbadoro. (vln) (Entered: 10/13/2021) |
| 10/13/2021 | 40 | Government's Supplemental Proposed Jury Instruction by USA as to Corey Donovan (Krasinski, Anna) (Entered: 10/13/2021) |
| 10/13/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 2 as to Corey Donovan held on 10/13/2021. Evidence introduced. Witnesses Appearing: John Cook, Kevin Kwiatkowski, Ricard Campbell, Timothy Merna, Jacob Hubbard. (Court Reporter: Liza Dubois (morning), Brenda Hancock (afternoon)) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 6:05)(CJA Time: 6:05) (vln) (Entered: 10/14/2021) |
| 10/13/2021 | | Subpoena Issued to Corey Donovan as to Kelley Finnigan.(vln) (Entered: 10/14/2021) |

| 10/14/2021 | [41](#) | Objection to Oral Motion to Introduce Hearsay Statement by USA as to Corey Donovan (Krasinski, Anna) (Entered: 10/14/2021) |
| 10/14/2021 | [42](#) | MOTION in Limine re: Statement Against Interest by Corey Donovan.Follow up on Objection on 10/28/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Stachowske, Matthew) (Entered: 10/14/2021) |
| 10/14/2021 | [43](#) | US Marshal Service of Process re: Subpoena Issued. Served on 10/13/2021, person served Kelley Finnigan.(vln) (Entered: 10/14/2021) |
| 10/14/2021 | [44](#) | TRANSCRIPT of Proceedings as to Corey Donovan for EXCERPT FROM DAY TWO OF TRIAL AFTERNOON SESSION DISCUSSION AFTER LUNCH RECESS BEFORE JURY ENTERED COURTROOM held on 10/13/2021. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 11/4/2021. Redacted Transcript Follow Up 11/15/2021. Release of Transcript Restriction set for 1/9/2022. (vln) (Entered: 10/14/2021) |
| 10/14/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 3 as to Corey Donovan held on 10/14/2021. Evidence introduced. Witnesses Appearing: John Forte, Mattheau Kelsh, Corey Donovan. (Court Reporter: Liza Dubois) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 5:25)(CJA Time: 5:25) (vln) (Entered: 10/14/2021) |
| 10/15/2021 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: JURY TRIAL - Day 4 as to Corey Donovan held on 10/15/2021. Evidence introduced. Witnesses Appearing: Corey Donovan, John Forte. Closing arguments. Court charges jury. Jury retires to deliberate. Jury deliberations. Jury returns verdict. (Court Reporter: Brenda Hancock) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Matthew Stachowske)(Total Hearing Time: 3:50)(CJA Time: 3:50) (vln) (Entered: 10/17/2021) |
| 10/15/2021 | [45](#) | JURY VERDICT as to Corey Donovan (1) Guilty on Count 1. (Attachments: # [1](#) Unredacted Jury Verdict Form) *Document available in clerks office.*(vln) (Entered: 10/17/2021) |
| 10/15/2021 | [46](#) | Attorney Certification of Electronic Exhibits Submitted for Presentation Using the Jury Evidence Recording System (JERS) (Attachments: # [1](#) JERS EXHIBITS)(vln) (Entered: 10/17/2021) |
| 10/15/2021 | [47](#) | DEFENDANT'S FINAL EXHIBIT LIST by Corey Donovan.(vln) (Entered: 10/17/2021) |
| 10/15/2021 | [50](#) | Court Instructions as to Corey Donovan.(vln) (vln). (Entered: 10/17/2021) |
| 10/15/2021 | [48](#) | GOVERNMENT'S FINAL EXHIBIT LIST by USA, as to Corey Donovan(vln) (Entered: 10/19/2021) |
| 10/17/2021 | | NOTICE OF HEARING as to Corey Donovan. Sentencing set for 1/31/2022 10:00 AM before Judge Paul J. Barbadoro.*The court has allotted 1 hour for the hearing. Please* |

| | | |
|---|---|---|
| | | *contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(vln) (Entered: 10/17/2021)** |
| 10/19/2021 | | **ENDORSED Order Appointing Counsel. Patrick Richard appointed as substitute counsel for Matthew Stachowske in the case. Assignment accepted on 10/19/2021. Counsel withdrawing from the case shall submit a completed CJA-20 through the CJA eVoucher system within 45 days from the date of substitution. The voucher will be held until the disposition of the case. Should counsel have grounds to justify payment prior to the final disposition of the case, such a request should be made as part of the CJA-20 voucher submission in eVoucher So Ordered by Judge Paul J. Barbadoro. (vln) (Entered: 10/19/2021)** |
| 10/27/2021 | | CJA 24 Payment Information as to Corey Donovan. Authorization given under the Criminal Justice Act to pay for transcript preparation. **Liza Dubois:** detention hearing in 07-cr-130, $485.05. (mp) (Entered: 10/27/2021) |
| 10/27/2021 | 49 | SUPPLEMENT to 35 MOTION for Leave to File Motion to Dismiss Indictment by Corey Donovan. (vln) (Entered: 10/28/2021) |
| 11/10/2021 | 51 | Assented to MOTION to Extend Time To Supplement Motion to Dismiss *until November 19, 2021* by Corey Donovan. (Richard, Patrick) (Entered: 11/10/2021) |
| 11/10/2021 | | **ENDORSED ORDER granting 51 Motion to Extend Time To Supplement Motion to Dismiss until November 19, 2021 as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (vln) (Entered: 11/10/2021)** |
| 11/18/2021 | 52 | Supplement to Defendant's Motion to Dismiss by Corey Donovan (Richard, Patrick) (Entered: 11/18/2021) |
| 11/19/2021 | | **ENDORSED ORDER re 35 MOTION for Leave to File Motion to Dismiss Indictment as to Corey Donovan (1).** *Text of Order: The government shall respond to the motion within 14 days.* **So Ordered by Judge Paul J. Barbadoro. (vln) (Entered: 11/19/2021)** |
| 11/23/2021 | 53 | Supplement to 35 MOTION for Leave to File Motion to Dismiss Indictment by Corey Donovan. (Attachments: # 1 Exhbits A - J)(vln) (Entered: 11/29/2021) |
| 11/30/2021 | 54 | OBJECTION by USA as to Corey Donovan re 35 MOTION for Leave to File Motion to Dismiss Indictment . (Krasinski, Anna) (Entered: 11/30/2021) |
| 12/07/2021 | 55 | NOTICE of Change of Address by Patrick J. Richard as to Corey Donovan to 150 Westford Road, Suite 26, Tyngsborough, MA 01879. (Richard, Patrick) (Entered: 12/07/2021) |
| 12/20/2021 | 56 | PRESENTENCE INVESTIGATION REPORT - DRAFT as to Corey Donovan sealed at Level 1 and available to US government and counsel for applicable party defendant ONLY. For instructions on how to view restricted electronic documents, click HERE. **Please note that sentencing letters, including victim sentencing letters, will be made available for public review following the sentencing hearing. United States v. Kravetz, 706 F.3d 47(1st Cir. 2013). Thus, sentencing letters should not contain personal information prohibited by Fed. R. Crim. P. 49.1 and filers should exercise caution in including other sensitive personal data such as medical history, employment history, financial information or information regarding cooperation with the government.** (Attachments: # 1 Letter to Counsel)(tjg) (Entered: 12/20/2021) |
| 12/28/2021 | | **ENDORSED ORDER granting 35 MOTION for Leave to File Motion to Dismiss Indictment as to Corey Donovan (1).** *Text of Order: I grant the defendant's motion for* |

| | | |
|---|---|---|
| | | *leave to file his motion to dismiss alleging violations of the Speedy Trial Act and his constitutional right to a speedy trial (doc. no. 35)* **but deny the motion to dismiss for the reasons stated in the governments objection.** **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 12/28/2021) |
| 01/11/2022 | [57](#) | Assented to MOTION to Continue Sentencing Hearing *for 60 Days* by Corey Donovan. (Richard, Patrick) (Entered: 01/11/2022) |
| 01/11/2022 | | **ENDORSED ORDER granting [57] Assented to MOTION to Continue Sentencing Hearing** *for 60 Days* **as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Sentencing set for 4/11/2022 11:00 AM before Judge Paul J. Barbadoro.** *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(vln)** (Entered: 01/12/2022) |
| 02/07/2022 | | RESCHEDULING NOTICE OF HEARING as to Corey Donovan. Sentencing set for 4/13/2022 11:00 AM before Judge Paul J. Barbadoro.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(js)** **(Entered: 02/07/2022)** |
| 02/22/2022 | | RESCHEDULING NOTICE OF HEARING as to Corey Donovan. Sentencing set for 4/27/2022 02:00 PM before Judge Paul J. Barbadoro. *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(js)** **(Entered: 02/22/2022)** |
| 02/24/2022 | [58](#) | MOTION for Status of Counsel by Corey Donovan. (js) (Entered: 02/25/2022) |
| 02/28/2022 | | **ENDORSED ORDER granting [58] MOTION for Status of Counsel as to Corey Donovan (1).** *Text of Order: I do not need to hold a hearing. The clerk shall appoint new counsel.* **So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/28/2022) |
| 03/04/2022 | [59](#) | WITHDRAWN MOTION for an Evidentiary Hearing by Corey Donovan. **HEARING REQUESTED.**Follow up on Objection on 3/18/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (js) Modified on 3/14/2022 to add: Withdrawn (js). (Entered: 03/04/2022) |
| 03/08/2022 | | NOTICE of Attorney Appointment- Donna Brown appointed in case as to Corey Donovan. (js) (Entered: 03/08/2022) |
| 03/14/2022 | [60](#) | Assented to MOTION to Withdraw Document [59] MOTION for Hearing by Corey Donovan. (Brown, Donna) (Entered: 03/14/2022) |
| 03/14/2022 | | **ENDORSED ORDER granting [60] Motion to Withdraw Document [59] Motion for Hearing as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 03/14/2022) |
| 03/14/2022 | | Terminate Motions PUBLIC [59] MOTION for Hearing filed by Corey Donovan. (js) (Entered: 03/14/2022) |
| 04/05/2022 | [61](#) | Assented to MOTION to Continue Sentencing Hearing by 60 days by Corey Donovan. (Brown, Donna) (Entered: 04/05/2022) |

| | | |
|---|---|---|
| 04/07/2022 | | **ENDORSED ORDER granting 61 Assented to MOTION to Continue Sentencing Hearing by 60 days as to Corey Donovan (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. Sentencing set for 6/29/2022 03:00 PM before Judge Paul J. Barbadoro.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(js) (Entered: 04/07/2022)** |
| 04/07/2022 | | RESCHEDULING NOTICE OF HEARING as to Corey Donovan. Sentencing set for 7/11/2022 11:00 AM before Judge Paul J. Barbadoro *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(js) (Entered: 04/07/2022)** |
| 04/21/2022 | 62 | TRANSCRIPT of Proceedings as to Corey Donovan for Motion Hearing held on October 5, 2021. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br>Redaction Request Follow Up 5/12/2022. Redacted Transcript Follow Up 5/23/2022. Release of Transcript Restriction set for 7/18/2022. (js) (Entered: 04/22/2022) |
| 04/21/2022 | 63 | TRANSCRIPT of Proceedings for Jury Trial Day One- Jury Selection held on October 5, 2021. Court Reporter: Susan Bateman, Telephone # 603-225-1453. At the discretion of the presiding judge, the transcript of jury selection may not be available for public inspection. To the extent the jury selection is available for public inspection at the Clerk's Office, it may not be copied or otherwise reproduced for a period of 90 days. Only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br>Redaction Request Follow Up 5/12/2022. Redacted Transcript Follow Up 5/23/2022. Release of Transcript Restriction set for 7/18/2022. (js) (Entered: 04/22/2022) |
| 04/25/2022 | | CJA 24 Payment Information as to Corey Donovan. Authorization given under the Criminal Justice Act to pay for transcript preparation. **Susan M. Bateman:** 10/5/21 motion hearing; 10/5/21 jury selection, $412.45. (mp) (Entered: 04/25/2022) |
| 04/26/2022 | 64 | **ORDER as to Corey Donovan RE 63 Transcript - Jury Selection. Having reviewed the transcripts, and consistent with the Judicial Conference Guidance approved in March 2009, the court orders that the potential juror names be redacted and that the original transcript be sealed at Level I. The court reporter is directed to prepare** |

| | | |
|---|---|---|
| | | **a redacted transcript in accordance with this order. So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 04/27/2022) |
| 04/27/2022 | <u>65</u> | REDACTED TRANSCRIPT of <u>63</u> Transcript - Jury Selection in case as to Corey Donovan. This redacted transcript is available at the clerk's office for viewing but may not be copied for 90 days from the date the original transcript was filed. (js) (Entered: 04/28/2022) |
| 05/06/2022 | <u>66</u> | TRANSCRIPT of Proceedings as to Corey Donovan for Motion Hearing held on September 24, 2021. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/27/2022. Redacted Transcript Follow Up 6/6/2022. Release of Transcript Restriction set for 8/1/2022. (js) (Entered: 05/06/2022) |
| 05/06/2022 | <u>67</u> | TRANSCRIPT of Proceedings as to Corey Donovan for Day Two of Jury Trial-Afternoon Session held on October 13, 2021. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/27/2022. Redacted Transcript Follow Up 6/6/2022. Release of Transcript Restriction set for 8/1/2022. (js) (Entered: 05/06/2022) |
| 05/06/2022 | <u>68</u> | TRANSCRIPT of Proceedings as to Corey Donovan for Day Four of Jury Trial held on October 15, 2021. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/27/2022. Redacted Transcript Follow Up 6/6/2022. Release of Transcript Restriction set for 8/1/2022. (js) (Entered: 05/06/2022) |

| 05/09/2022 | [69](#) | TRANSCRIPT of Proceedings as to Corey Donovan for MOTION HEARING HELD VIA VIDEOCONFERENCE on October 12, 2021. Court Reporter: Liza W. Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/31/2022. Redacted Transcript Follow Up 6/9/2022. Release of Transcript Restriction set for 8/4/2022. (js) (Entered: 05/10/2022) |
| 05/09/2022 | [70](#) | TRANSCRIPT of Proceedings as to Corey Donovan for Motion Hearing held on October 12, 2021. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/31/2022. Redacted Transcript Follow Up 6/9/2022. Release of Transcript Restriction set for 8/4/2022. (vln) (Entered: 05/10/2022) |
| 05/09/2022 | [71](#) | TRANSCRIPT of Proceedings as to Corey Donovan for JURY TRIAL DAY 2 - MORNING SESSION held on October 13, 2021. Court Reporter: Liza W. Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 5/31/2022. Redacted Transcript Follow Up 6/9/2022. Release of Transcript Restriction set for 8/4/2022. (js) (Entered: 05/10/2022) |
| 05/09/2022 | [72](#) | TRANSCRIPT of Proceedings as to Corey Donovan for Jury Trial - Day 2 (Morning Session) held on October 13, 2021. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. |

|  |  |  |
|---|---|---|
|  |  | **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/31/2022. Redacted Transcript Follow Up 6/9/2022. Release of Transcript Restriction set for 8/4/2022. (vln) (Entered: 05/10/2022) |
| 05/09/2022 | [73](#) | TRANSCRIPT of Proceedings as to Corey Donovan for JURY TRIAL DAY 3 held on October 14, 2021. Court Reporter: Liza W. Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/31/2022. Redacted Transcript Follow Up 6/9/2022. Release of Transcript Restriction set for 8/4/2022. (js) (Entered: 05/10/2022) |
| 05/09/2022 | [74](#) | TRANSCRIPT of Proceedings as to Corey Donovan for Jury Trial - Day 3 held on October 14, 2021. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 5/31/2022. Redacted Transcript Follow Up 6/9/2022. Release of Transcript Restriction set for 8/4/2022. (vln) (Entered: 05/10/2022) |
| 05/16/2022 |  | CJA 24 Payment Information as to Corey Donovan. Authorization given under the Criminal Justice Act to pay for transcript preparation. **Brenda K. Hancock:** 9/24/21 motion hg; 10/13/21 trial day 2 (p.m.); 10/15/21 trial day 4, $1,182.60. **Liza W. Dubois:** 10/12/21 motion hg; 10/13/21 trial day 2 (a.m.); 10/14/21 trial day 3, $1,412.55. (mp) (Entered: 05/16/2022) |
| 06/15/2022 | [75](#) | Assented to MOTION to Continue Sentencing Hearing by Corey Donovan. (Brown, Donna) (Entered: 06/15/2022) |
| 06/16/2022 |  | **ENDORSED ORDER granting [75](#) Assented to MOTION to Continue Sentencing Hearing as to Corey Donovan (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. Sentencing set VIA VIDEO CONFERENCE for 8/9/2022 02:00 PM before Judge Paul J. Barbadoro.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time. Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.*(js) (Entered: 06/16/2022)** |

| | | |
|---|---|---|
| 07/25/2022 | 76 | Assented to MOTION to Continue Sentencing Hearing by 60 days by Corey Donovan. (Brown, Donna) (Entered: 07/25/2022) |
| 07/26/2022 | | **ENDORSED ORDER granting 76 Assented to MOTION to Continue Sentencing Hearing by 60 days as to Corey Donovan (1).**<br><br>***Text of Order: Granted. No further continuances.* So Ordered by Judge Paul J. Barbadoro.**<br><br>**Sentencing set for 10/12/2022 02:00 PM before Judge Paul J. Barbadoro. *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.**(js) **(Entered: 07/26/2022)** |
| 09/19/2022 | | RESCHEDULING NOTICE OF HEARING as to Corey Donovan. Sentencing set VIA VIDEO CONFERENCE for 10/31/2022 02:00 PM before Judge Paul J. Barbadoro. *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.**(js) **(Entered: 09/19/2022)** |
| 09/27/2022 | 77 | MOTION to Dismiss *or for New Trial or New Franks Hearing* by Corey Donovan.Follow up on Objection on 10/11/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). **Certain exhibit(s) maintained conventionally in Clerks Office. (Attorney filers must submit conventional materials to the court within 72 hours.)** (Attachments: # 1 Exhibit July 27, 2022 Letter, # 2 Exhibit Fillion Plea Agreement, # 3 Notice ECF Notice of Conventional Filing Attachment 3, # 4 Notice ECF Notice of Conventional Filing Attachment 4, # 5 Notice ECF Notice of Conventional Filing Attachment 5, # 6 Notice ECF Notice of Conventional Filing Attachment 6, # 7 Exhibit Memo re call with Atty. Iacopino, # 8 Exhibit Affidavit of Ramalho, # 9 Exhibit 9/24/21 Discovery Production Letter, # 10 Exhibit Memo re call with Atty. Stachowske, # 11 Exhibit Report of March 2021 Surveillance, # 12 Exhibit Lab Report Disclosure) (Brown, Donna) (Entered: 09/27/2022) |
| 09/29/2022 | | NOTICE OF CONVENTIONAL FILING: Conventionally filed exhibits to 77 Motion to Dismiss received in clerk's office. (js) (Entered: 10/03/2022) |
| 10/11/2022 | 78 | Assented to MOTION to Extend Time to Object/Respond to 77 MOTION to Dismiss *or for New Trial or New Franks Hearing* to Oct. 14, 2022 by USA as to Corey Donovan. (Rombeau, Charles) (Entered: 10/11/2022) |
| 10/11/2022 | | **ENDORSED ORDER granting 78 Motion to Extend Time to Object/Respond to 77 MOTION to Dismiss or for New Trial or New Franks Hearing to Oct. 14, 2022 as to Corey Donovan (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.** (js) (Entered: 10/12/2022) |
| 10/14/2022 | 79 | OBJECTION by USA as to Corey Donovan re 77 MOTION to Dismiss *or for New Trial or New Franks Hearing* . (Attachments: # 1 Exhibit A (Memorandum of Understanding re: Discovery))(Rombeau, Charles) (Entered: 10/14/2022) |
| 10/17/2022 | 80 | PRESENTENCE INVESTIGATION REPORT - FINAL as to Corey Donovan sealed at Level 1 and available to US government and counsel for applicable party defendant ONLY. For instructions on how to view restricted electronic documents, click HERE. |

| | | |
|---|---|---|
| | | **Please note that sentencing letters, including victim sentencing letters, will be made available for public review following the sentencing hearing.** <u>United States v. Kravetz</u>, 706 F.3d 47(1st Cir. 2013). Thus, sentencing letters should not contain personal information prohibited by Fed. R. Crim. P. 49.1 and filers should exercise caution in including other sensitive personal data such as medical history, employment history, financial information or information regarding cooperation with the government. (Attachments: # <u>1</u> Addendum, # <u>2</u> Objection Letter from Government, # <u>3</u> Proposed Sentencing Options & Supervision Conditions with Acknowledgment Form)(wlf) (Entered: 10/17/2022) |
| 10/20/2022 | <u>82</u> | Assented to MOTION to Extend Time to Object/Respond to <u>79</u> Objection to Motion to October 24, 2022 by Corey Donovan. (Brown, Donna) (Entered: 10/20/2022) |
| 10/20/2022 | | **ENDORSED ORDER granting <u>82</u> Motion to Extend Time to Object/Respond as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 10/20/2022) |
| 10/20/2022 | <u>83</u> | Assented to MOTION to Continue Sentencing Hearing by Corey Donovan. (Brown, Donna) (Entered: 10/20/2022) |
| 10/20/2022 | | **ENDORSED ORDER granting <u>83</u> Assented to MOTION to Continue Sentencing Hearing as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Set for 11/28/2022 02:00 PM before Judge Paul J. Barbadoro.** *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(js) (Entered: 10/20/2022)** |
| 10/24/2022 | <u>84</u> | REPLY TO OBJECTION to Motion by Corey Donovan re <u>77</u> MOTION to Dismiss *or for New Trial or New Franks Hearing* . (Brown, Donna) (Entered: 10/24/2022) |
| 11/17/2022 | <u>85</u> | Assented to MOTION to Extend Time to File Sentencing Memorandum by Corey Donovan. (Brown, Donna) (Entered: 11/17/2022) |
| 11/17/2022 | | **ENDORSED ORDER granting <u>85</u> Assented to Motion to Extend Time to File Sentencing Memorandum as to Corey Donovan (1).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 11/17/2022) |
| 11/18/2022 | <u>86</u> | SENTENCING MEMORANDUM *in Connection with Consolidated Sentencing* by USA as to Corey Donovan. (Attachments: # <u>1</u> Exhibit 1 (Photo of Weapons), # <u>2</u> Exhibit 2 (Signed Admission Form), # <u>3</u> Exhibit 3 (Signed Weapons Prohibition Form))(Rombeau, Charles) (Entered: 11/18/2022) |
| 11/21/2022 | <u>87</u> | SENTENCING MEMORANDUM *, Objection to PSR and Motion for a Variance* by Corey Donovan. (Attachments: # <u>1</u> Exhibit 1 Hunting Licenses, # <u>2</u> Exhibit 2 Civil Complaint, # <u>3</u> Exhibit 3 BCSC Order, # <u>4</u> Exhibit 4 Letters of Support)(Brown, Donna) (Entered: 11/21/2022) |
| 11/23/2022 | <u>88</u> | SENTENCING MEMORANDUM - *Reply Memorandum to Defendant's Sentencing Filing (Dkt. No. 87)* by USA as to Corey Donovan. (Attachments: # <u>1</u> Exhibit 4 (ATF Lab Analysis of Silencers))(Rombeau, Charles) (Entered: 11/23/2022) |
| 11/23/2022 | <u>89</u> | MOTION to Dismiss *II* by Corey Donovan. **HEARING REQUESTED.** Follow up on Objection on 12/7/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Brown, Donna) (Entered: 11/23/2022) |

| | | |
|---|---|---|
| 11/23/2022 | | **ENDORSED ORDER as to Corey Donovan.** *Text of Order: Corey Donovan is scheduled to be sentenced on November 28, 2022. On November 21, 2022, defense counsel filed a sentencing memorandum asserting, for the first time, several objections to the presentence report that could affect the defendant's sentencing guideline calculation. The probation office has informed the court that it will not be able to respond to the objections unless the sentencing is continued. Counsel's delay in presenting her objections appears to violate LCrR 32.1(e) and LCrR 32.1(i). To give the probation office time to respond to counsel's arguments, the clerk shall continue the sentencing hearing for approximately 30 days. The government shall file a supplemental memorandum responding to the defendant's sentencing memorandum within 14 days.* **So Ordered by Judge Paul J. Barbadoro. (vln)** (Entered: 11/23/2022) |
| 11/23/2022 | | RESCHEDULING NOTICE OF HEARING as to Corey Donovan. Sentencing set for 1/3/2023 10:00 AM before Judge Paul J. Barbadoro.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* (vln) (Entered: 11/23/2022) |
| 12/21/2022 | 90 | FINAL WITNESS LIST by Corey Donovan.(Brown, Donna) (Entered: 12/21/2022) |
| 12/22/2022 | 91 | PRESENTENCE INVESTIGATION REPORT - FINAL REDISCLOSURE as to Corey Donovan sealed at Level 1 and available to US government and counsel for applicable party defendant ONLY. For instructions on how to view restricted electronic documents, click HERE. **Please note that sentencing letters, including victim sentencing letters, will be made available for public review following the sentencing hearing.** United States v. Kravetz, 706 F.3d 47(1st Cir. 2013). **Thus, sentencing letters should not contain personal information prohibited by Fed. R. Crim. P. 49.1 and filers should exercise caution in including other sensitive personal data such as medical history, employment history, financial information or information regarding cooperation with the government.** (Attachments: # 1 Second Addendum, # 2 Revised Proposed Sentencing Options and Supervision Conditions with Acknowledgement)(tjg) (Entered: 12/22/2022) |
| 12/29/2022 | | RESCHEDULING NOTICE OF HEARING as to Corey Donovan. TIME CHANGE ONLY TO 9:00 AM Sentencing set for 1/3/2023 09:00 AM before Judge Paul J. Barbadoro. (js) (Entered: 12/29/2022) |
| 12/31/2022 | 93 | FINAL WITNESS LIST by USA as to Corey Donovan.(Krasinski, Anna) (Entered: 12/31/2022) |
| 01/03/2023 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: SENTENCING held on 1/3/2023 for Corey Donovan (1) Sentenced on Count 1. Witnesses appearing: Ralph Demicco, Gregory Stimmel, Cynthia Wallace. Defendant addresses the court prior to sentencing. Fine waived due to inability to pay. Appeal rights to defendant. Motion to Dismiss II, doc. no. 89, denied without prejudice as untimely for reasons stated on the record. (Court Reporter: Liza Dubois AM and PM Part I, Brenda Hancock PM Part II) (Govt Atty: Charles Rombeau; Anna Krasiniski) (Defts Atty: Donna Brown) (USP: Jennafer McNutt)(Total Hearing Time: 5 hours 45 minutes)(CJA Time: 8 hours) (js) (Entered: 01/04/2023) |
| 01/03/2023 | | **ORAL ORDER denying without prejudice 89 Motion to Dismiss II as to Corey Donovan (1).** *Denied without prejudice for reasons stated on the record.* **So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 01/04/2023) |
| 01/03/2023 | 96 | ACKNOWLEDGMENT of Sentencing Options by Corey Donovan. (js) (Entered: 01/05/2023) |

| 01/03/2023 | 98 | AMENDED SENTENCING EXHIBIT LIST by USA as to Corey Donovan. (js) (Entered: 01/13/2023) |
|---|---|---|
| 01/03/2023 | 99 | AMENDED - DEFENDANT'S SENTENCING EXHIBIT LIST by Corey Donovan. (js) (Entered: 01/13/2023) |
| 01/04/2023 | 94 | Assented to MOTION to Admit Government's Sentencing Exhibit 1 by USA as to Corey Donovan. (Krasinski, Anna) (Entered: 01/04/2023) |
| 01/04/2023 | | Set Deadline(s) as to Corey Donovan: Supplemental Briefing due on 1/17/2023. (js) (Entered: 01/04/2023) |
| 01/04/2023 | | NOTICE OF HEARING ON MOTION as to Corey Donovan re: 77 MOTION to Dismiss *or for New Trial or New Franks Hearing*. Motion Hearing set for 2/13/2023 01:00 PM before Judge Paul J. Barbadoro. (js) (Entered: 01/04/2023) |
| 01/05/2023 | 95 | Assented to MOTION to Defer Judgment by Corey Donovan. (Brown, Donna) (Entered: 01/05/2023) |
| 01/06/2023 | 97 | TRANSCRIPT of Proceedings for Motion Hearing held in USA v. Brandon Dumont 22-cr-53-01-PB on November 14, 2022. Court Reporter: Liza Dubois, Telephone # 603-225-1442.

At the sentencing hearing held on 1/3/2023, Judge Barbadoro directed the transcript in USA v. Brandon Dumont be docketed in this case.

Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 1/27/2023. Redacted Transcript Follow Up 2/6/2023. Release of Transcript Restriction set for 4/6/2023. (js) (Entered: 01/08/2023) |
| 01/12/2023 | | **ENDORSED ORDER granting 94 Assented to MOTION to Admit Government's Sentencing Exhibit 1; 95 Assented to MOTION to Defer Judgment as to Corey Donovan (1). *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 01/12/2023) |
| 01/17/2023 | 100 | MEMORANDUM re 77 MOTION to Dismiss *or for New Trial or New Franks Hearing* (Attachments: # 1 Exhibit Notice of Conventional Filing- Dashcam Video)(Brown, Donna) (Entered: 01/17/2023) |
| 01/19/2023 | | NOTICE of Conventionally Filed Exhibit Received re 100 Memorandum by Corey Donovan. (js) (Entered: 01/19/2023) |
| 01/27/2023 | 101 | RESPONSE by USA as to Corey Donovan re 100 Memorandum. (Krasinski, Anna) (Entered: 01/27/2023) |
| 02/06/2023 | | RESCHEDULING NOTICE OF HEARING ON MOTION as to Corey Donovan re: 77 MOTION to Dismiss *or for New Trial or New Franks Hearing*. Motion Hearing set for 2/24/2023 10:00 AM before Judge Paul J. Barbadoro. (js) (Entered: 02/06/2023) |

| | | |
|---|---|---|
| 02/24/2023 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: MOTION HEARING as to Corey Donovan held on 2/24/2023 re 77 MOTION to Dismiss *or for New Trial or New Franks Hearing*. Hearing continued. Further evidentiary hearing to be held. 7 days prior to the hearing, parties shall file witnesses lists. Court orders Caitlin Fillion's testimony (direct and cross) in the US v. Adjutant trial, 21-cr-36-SM transcript be provided to the parties. (Court Reporter: Brenda Hancock) (Govt Atty: Charles Rombeau; Anna Krasinski) (Defts Atty: Donna Brown)(Total Hearing Time: 2 hours)(CJA Time: 2 hours) (js) (Entered: 02/24/2023) |
| 02/24/2023 | | **ORAL ORDER as to Corey Donovan. *The Court orders Caitlin Fillion's testimony (direct and cross) in the US v. Adjutant trial, 21-cr-36-SM transcript be provided to the parties.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/24/2023) |
| 02/24/2023 | | NOTICE OF HEARING as to Corey Donovan. Evidentiary Hearing set for 3/27/2023 09:00 AM before Judge Paul J. Barbadoro. (js) (Entered: 02/24/2023) |
| 02/24/2023 | 102 | EXHIBIT LIST from February 24th Hearing by Corey Donovan. (js) (Entered: 02/27/2023) |
| 02/24/2023 | 103 | EXHIBIT LIST from February 24th Hearing by USA as to Corey Donovan. (js) (Entered: 02/27/2023) |
| 03/14/2023 | | CJA 24 Payment Information as to Corey Donovan. Authorization given under the Criminal Justice Act to pay for transcript preparation. **Susan M. Bateman:** 21-cr-36, excerpt trial day 2 (morning session), $87.60. (mp) (Entered: 03/14/2023) |
| 03/17/2023 | 104 | FINAL WITNESS LIST by Corey Donovan.(Brown, Donna) (Entered: 03/17/2023) |
| 03/17/2023 | | CJA 24 Payment Information as to Corey Donovan. Authorization given under the Criminal Justice Act to pay for transcript preparation. **Liza W Dubois:** 21-cr-36, excerpt trial day 2 (afternoon session), $120.45. (mp) (Entered: 03/17/2023) |
| 03/20/2023 | 105 | FINAL WITNESS LIST by USA as to Corey Donovan.(Rombeau, Charles) (Entered: 03/20/2023) |
| 03/24/2023 | 106 | MOTION Notice of Supplemental Authority by Corey Donovan.Follow up on Objection on 4/7/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Brown, Donna) (Entered: 03/24/2023) |
| 03/27/2023 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro: EVIDENTIARY HEARING as to Corey Donovan re: MOTION to Dismiss *or for New Trial or New Franks Hearing* held on 3/27/2023. Witnesses Appearing: Matthew Stachowske. Motion denied. (Court Reporter: Liza Dubois) (Govt Atty: Charles Rombeau, Anna Krasinski) (Defts Atty: Donna Brown)(Total Hearing Time: 2 hours 5 minutes)(CJA Time: 2 hours 30 minutes) (js) (Entered: 03/27/2023) |
| 03/27/2023 | | **ORAL ORDER denying 77 Motion to Dismiss as to Corey Donovan (1). *Denied for reasons stated on the record at the hearing.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 03/27/2023) |
| 03/27/2023 | | **ORDER noted 106 MOTION Notice of Supplemental Authority as to Corey Donovan (1). So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 03/27/2023) |
| 03/27/2023 | 107 | AMENDED EXHIBIT LIST by USA as to Corey Donovan. (js) (Entered: 03/27/2023) |
| 03/27/2023 | 108 | **JUDGMENT as to Corey Donovan (1), Count 1- Committed to the Bureau of Prisons to a term of 110 months with recommendations. This term of imprisonment shall run consecutively to any term of imprisonment that will be imposed on the defendant's supervised release violation 07-CR-00130-SM; Remanded to US** |

| | | |
|---|---|---|
| | | Marshal custody; 3 years Supervised Release with Mandatory, Standard and Special Conditions; $100 Special Assessment due immediately; Fine waived due to inability to pay. So Ordered by Judge Paul J. Barbadoro. (js) (Entered: 03/27/2023) |
| 04/03/2023 | 109 | NOTICE OF APPEAL by Corey Donovan re 108 Judgment,,. (No fee paid, USA or IFP.). [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf (Brown, Donna) (Entered: 04/03/2023) |
| 04/04/2023 | 110 | Appeal Cover Sheet as to Corey Donovan re 109 Notice of Appeal. (js) (Entered: 04/04/2023) |
| 04/04/2023 | 111 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 108-111, as to Corey Donovan to USCA re 109 Notice of Appeal. A copy of the Notice of Appeal electronically mailed to all parties on 4/3/2023. (js) (Entered: 04/04/2023) |
| 04/04/2023 | | Appellate Case Number: First Circuit Court of Appeals #23-1328 for 109 Notice of Appeal filed by Corey Donovan. (js) (Entered: 04/04/2023) |
| 04/19/2023 | 112 | TRANSCRIPT of Proceedings as to Corey Donovan for Motion Hearing held on February 24, 2023. Court of Appeals Docket Number 23-1328. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.<br><br>Redaction Request Follow Up 5/10/2023. Redacted Transcript Follow Up 5/22/2023. Release of Transcript Restriction set for 7/18/2023. (js) (Entered: 04/20/2023) |
| 04/21/2023 | 113 | TRANSCRIPT of Proceedings as to Corey Donovan for Evidentiary Hearing held on March 27, 2023. Court of Appeals Docket Number 23-1328. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.<br><br>Redaction Request Follow Up 5/12/2023. Redacted Transcript Follow Up 5/22/2023. Release of Transcript Restriction set for 7/20/2023. (js) (Entered: 04/21/2023) |

| | | |
|---|---|---|
| 06/07/2023 | 114 | TRANSCRIPT of Proceedings as to Corey Donovan for CONTINUATION OF SENTENCING HEARING - MOTIONS (AFTERNOON SESSION - PART II, 3:57 P.M.) held on January 3, 2023. Court of Appeals Docket Number #23-1328. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/28/2023. Redacted Transcript Follow Up 7/10/2023. Release of Transcript Restriction set for 9/5/2023. (js) (Entered: 06/07/2023) |
| 07/07/2023 | 115 | TRANSCRIPT of Proceedings as to Corey Donovan for SENTENCING AND FINAL REVOCATION HEARING MORNING SESSION AND AFTERNOON SESSION PART I held on January 3, 2023. Court of Appeals Docket Number 23-1328. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 7/28/2023. Redacted Transcript Follow Up 8/7/2023. Release of Transcript Restriction set for 10/5/2023. (jwb) (Entered: 07/07/2023) |
| 08/17/2023 | | CJA 20 Payment Information as to Corey Donovan. Authorization given to pay counsel for representation under the Criminal Justice Act in the following amount. **Matthew Stachowske:** $30,069.23. **Patrick Richard:** $7,964.90. **Donna Brown:** $51,747.84. (mp) (Entered: 08/17/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/13/2023 10:53:05 | | | |
| **PACER Login:** | donnabrowngr | **Client Code:** | 57758 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00088-PB |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Exempt CJA |

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-88-PB-01 |
| | ) | |
| COREY DONOVAN | ) | |

_____

INDICTMENT

The Grand Jury charges:

COUNT ONE
[Possession of a Firearm/Ammunition by a Prohibited Person – 18 U.S.C. §§ 922(g)(1)]

On or about March 26, 2021, in the District of New Hampshire, the defendant,

COREY DONOVAN,

knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding

one year, did knowingly possess in and affecting interstate commerce, the following firearm and

ammunition: a Mossberg, Model 500, 20 gauge shotgun, bearing serial number V1051663; four

rounds of Brenneke 20 gauge shotgun ammunition; seventy-one rounds of Federal 20 gauge

shotgun ammunition; forty-eight rounds of Federal 28 gauge shotgun ammunition; eight rounds of

Huntego 20 gauge shotgun ammunition; four rounds of Remington 12 gauge shotgun

ammunition; and one casing of Federal .357 Magnum caliber ammunition,

All in violation of Title 18, United States Code, Section 922(g)(1).

NOTICE OF FORFEITURE

        Upon conviction of the offense alleged in Count One of this Indictment, the defendant

shall forfeit to the United States pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), any

firearms and ammunition involved in or used to commit, or to facilitate the commission of, the

charged offense.

                                        A TRUE BILL

Dated:  May 17, 2021

                                   /s/ Foreperson
                                   Foreperson

John J. Farley
Acting United States Attorney


        /s/ Charles L. Rombeau
By:      Charles L. Rombeau
          Anna Z. Krasinski
          Assistant U.S. Attorneys

# Exhibit 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **UNITED STATES OF AMERICA** } | |
| } | |
| **v.** } | **1:21-cr-00088-PB** |
| } | |
| **COREY DONOVAN** } | |

## DEFENDANT'S MOTION TO GRANT A KEY DEFENSE WITNESS, KELLEY FININGAN, WITH IMMUNITY

NOW COMES the defendant, Corey Donovan, by and through counsel, and requests this Honorable Court grant Kelley Finnigan immunity to testify at trial in this matter. In support of this, it is alleged as follows:

1.   The defendant, Corey Donovan, is presumed innocent and has asserted his innocence throughout this process. He is charged with one count of possession of a firearm/ammunition by a prohibited person contrary to 18 U.S.C. §§922(g)(1). Specifically, the indictment alleges, on or about March 26, 2021, Corey Donovan, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce, the following firearm and ammunition: a Mossberg Model 500, 20 gauge shotgun, […]four rounds of Brenneke 20 gauge shotgun ammunition, seventy-one rounds of Federal 20 gauge shotgun ammunition; forty-eight rounds of Federal 28 gauge shotgun ammunition; eight rounds of Huntego 20 gauge shotgun ammunition; four rounds of Remington 12 gauge shotgun ammunition; and one casing of Federal .357 Magnum caliber ammunition.

2.   The indictment is a result of the fruits of a search of the defendant's property where the defendant resides with his girlfriend, Kelley Finnigan.

3.   The firearm at issue, a Mossberg Model 500, 20-gauge shotgun, was seized from inside a

Jeep Wrangler during the execution of the extension of a search warrant[1] on March 26, 2021.

4.   On March 31, 2021, ATF Special Agent James Martin received a telephone call from

Kelley Finnigan. Ms. Finnigan said she wanted to claim an item seized at her property. *See*

*attached* Defendant's Exhibit P, REPORT OF INVESTIGATION (Investigation No: 762095-21-

0046, Report No. 12). Special Agent Martin reported he asked Ms. Finnigan to provide details

about the item or items of the seizure. *Id*. Ms. Finnigan asked S/A Martin to hold on. *Id*. After

several seconds, Ms. Finnigan said the item was a .20 gauge shotgun. *Id*. Ms. Finnigan also said

she may be looking for an Officer John. *Id*. S/A Martin asked if Ms. Finnigan could provide the

manufacturer information or any other details. *Id*. Again, Ms. Finnigan paused for several

seconds. Id. Ms. Finnigan then said she would have to look at the paperwork. *Id*. S/A Martin

reviewed the caller identification option on the phone and observed that the caller information

showed the call came from Kelley Finnigan [telephone number redacted]. *Id*. The duration of the

call was 1 minute and 57 seconds. *Id*.

5.   On April 26, 2021, Attorney Donald Kennedy was appointed to represent Kelley

Finnigan as stand by counsel to ensure her rights were protected given her involvement. *See*

Docket No. 1:07-cr-00130-SM(Where Donovan is charged with violations of his supervised

release under these same facts).

6.   A search warrant for Kelley Finnigan's DNA was authorized on September 28, 2021. *See*

Docket No. 1:21-mj-00256-AJ. The Government intends to compare this DNA against that

allegedly found on the shotgun.

7.   To sustain a conviction under 18 U.S.C. § 922(g)(1) the government has to prove beyond

---

[1] Defendant challenges the warrant extension in a separate motion.

a reasonable doubt that the defendant: 1) was a convicted felon; and 2) knowingly possessed a firearm; 2) knowingly possessed a firearm; 3) in circumstances that implicated interstate commerce. Williams, 717 F.3d at 38 (citing United States v. Staula, 80 F.3d 596, 604 (1st Cir.1996))." United States v. Guzman-Montanez, 756 F.3d 1, 8 (1st Cir. 2014)

8.    Here, the defendant intends to stipulate, pursuant to 18 U.S.C. § 922(g)(1), he was a convicted felon, and that the firearm was transported through the channels of interstate commerce. Hence, to sustain a conviction, the Government's burden is limited to proving the "knowing possession" element.

9.    "Knowing possession of a firearm" may be proven through either actual or constructive possession." *United States v. Liranzo*, 385 F.3d 66, 69 (1st Cir.2004). Actual possession is the state of immediate, hands-on physical possession. *United States v. Zavala Maldonado*, 23 F.3d 4, 6 (1st Cir.1994). Constructive possession can be established by proving that the person has the power and intention of exercising dominion and control over the firearm. *United States v. DeCologero*, 530 F.3d 36, 67 (1st Cir.2008). Either form of possession can be proven by way of direct or circumstantial evidence. *United States v. Rodríguez*, 457 F.3d 109, 119 (1st Cir.2006); see also *United States v. Guzman-Montanez*, 756 F.3d 1, 8 (1st Cir. 2014).

10. The discovery indicates there is no direct evidence Donovan was in actual possession of the firearm.  It would appear from the above referenced discovery that Kelley Finnigan would testify that the firearm was her property.

11. Accordingly, this key witness, Kelley Finnigan, has material and exculpatory information that would assist the defendant at trial. Her information is not cumulative or obtainable from another source. Kelley Finnigan indicated she is the owner of the firearm and will be able to state

whether or not Donovan had the requisite power and intention of exercising dominion and control over the firearm.

12. The prosecutor or this Court can grant immunity for Kelley Finnigan. "The power and discretion to immunize witnesses lies primarily with the prosecution." *United States v. Berroa*, 856 F.3d 141, 159 (1st Cir. 2017). "Trial courts have the ability to grant immunity to a witness upon a showing that the government's refusal to provide said immunity violated the defendant's due process rights. See United States v. Angiulo, 897 F.2d 1169, 1190 (1st Cir. 1990)." *Id.* "In order to prevail on such a claim, a defendant must establish that the government intentionally attempted to present a distorted version of the facts at trial. See Curtis v. Duval, 124 F.3d 1, 9 (1st Cir. 1997)." *Id.* "This type of deliberate distortion can occur in two ways: if the government attempts to intimidate or harass a potential witness, or if the prosecutor purposefully withholds use immunity to hide exculpatory evidence from the jury." *United States v. Castro*, 129 F.3d 226, 232 (1st Cir. 1997).

13. Here, the ATF has determined the shotgun was apparently stolen prior to being seized at Donovan's property. But there is no link between the purported theft of the gun and it being seized at Donovan's property (and bears no relevance to Donovan's charged conducted) . Nevertheless, the Government has threatened prosecution of Kelley Finnigan should she testify in this matter, based upon the gun being stolen. But yet, the government has not charged Donovan with any crime related to the theft or possession of a stolen firearm. Accordingly, the governments threat of prosecution of Finnigan should she testify is clearly an attempt to intimidate this key witness to the defense. Thus, governmental immunity appears unlikely.

14. The Court has the right, and it would be a protection of due process rights of the defendant for this Court to grant immunity to Kelley Finnigan to compel her to testify at trial for

the defendant, Corey Donovan. This witness has evidence that will be exculpatory to the

defendant. U.S. v. Castro,129 F.3d 226 (1st Cir. 1997); see also U.S. v. Mackey, 117 F.3d 24 (1stCir.

1997). The First Circuit has held that the Court can order immunity on due process grounds. *United*

*States v. Berroa*, 856 F.3d 141, 159 (1st Cir. 2017)

15. A Memorandum of Law is unnecessary, as the argument are contained herein.

16. The U.S. Attorney's Office does not assent to granting this Motion and will not confer

immunity on Kelley Finnigan.

**WHEREFORE**, the defendant Corey Donovan, prays for the following relief:

    a. To grant immunity to Kelley Finnigan to testify at trial for the defendant, Corey

        Donovan; or

    b. Grant a hearing; and

    c. For whatever other relief the Court deems equitable and just.

<div style="margin-left:50%">

Respectfully submitted,
**COREY DONOVAN**

</div>

Date: September 30, 2021        by:    /s/ Matthew G. Stachowske

                          Matthew G. Stachowske (#15609)
                          Stachowske Law, PLLC
                          634 Central Ave
                          Dover, NH 03820
                          O: 343-1842
                          C: 770-9045
                          matthew@stachowskelaw.com

<div style="text-align:center">

CERTIFICATE OF SERVICE

</div>

    I, Matthew G. Stachowske, hereby certify that I have mailed a copy of the within motion to Assistant United States Attorneys, Charles Rombeau, and Anna Krasinski, via the court's ECF facilities on today's date and emailed and 1st class mailed a copy to Attorney Donald Kennedy.

<div style="margin-left:50%">

/s/ Matthew G. Stachowske

</div>

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation:<br>DONOVAN, Corey (2021) | Investigation Number:<br>762095-21-0046 | Report Number:<br>12 |
|---|---|---|



## SUMMARY OF EVENT:

<u>CONTACT INTERVIEW</u>: On March 31, 2021, ATF Special Agent James Martin spoke with an individual, who identified herself as Kelley Finnigan, via telephone. Ms. Finnigan said she want to claim an item seized at her residence.

## NARRATIVE:

1. On March 31, 2021, ATF Special Agent James Martin spoke with an individual, who identified herself as Kelley Finnigan of 33 Route 4A, Wilmot, NH, via telephone. Ms. Finigan advised S/A Martin that her property was seized and she want to know how to have the item returned.

2. S/A Martin asked Ms. Finnigan if she could provide any details about the item or items or about the seizure. Ms. Finnigan asked S/A Martin to hold on. After several seconds, Ms. Finnigan said the item was .20 gauge shotgun. Ms. Finnigan also said she may be looking for an Officer John. S/A Martin asked if Ms. Finnigan could provide the manufacturer information or any other details. Again, Ms. Finnigan paused again for several seconds. Ms. Finnigan than said she would have to look at the paperwork.

3. S/A Martin advised Ms. Finnigan that he would pass the information on to the case agent and ended the telephone call.

4. S/A Martin reviewed the caller identification option on the phone and observed that the caller information showed the call came from Kelley Finnigan ███-4237. The duration of the call was (1:57) one minute and fifty seven seconds.

## ATTACHMENTS

Two (2) photos of caller identification

| Prepared by:<br>James A. Martin | Title:<br>Special Agent, Manchester I Field Office | Signature: | Date:<br>4/1/21 |
|---|---|---|---|
| Authorized by:<br>Amanda L. Cahill | Title:<br>Resident Agent in Charge, Manchester I Field Office | Signature: | Date:<br>04/01/21 |
| Second level reviewer (optional):<br>Kelly D. Brady | Title:<br>Special Agent in Charge, Boston Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

PRODUCTION 07.02.2021

USANH-00000173

**762095-21-0046 Two Pictures of MFO Call Log for Call from Kelley FINNIGAN on 3/31/2021**



1

762095-21-0046 Two Pictures of MFO Call Log for Call from Kelley FINNIGAN on 3/31/2021



2

Appellant's Appendix Vol. I Page 37 of 1007

# Exhibit 4

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA          )
                                  )
            v.                    )          1:21-cr-00088-PB
                                  )
COREY DONOVAN                     )

United States' Objection to Defendant's Request for Immunity for Kelley Finnigan

I.     Introduction

After ATF agents seized a gun from defendant Corey Donovan's Jeep, Donovan's

girlfriend Kelley Finnigan claimed ownership of the gun. After claiming the gun was hers, ATF

learned that the gun was stolen. Donovan is now facing trial for being a felon-in-possession of

that gun as well as ammunition found during a search of Donovan's residence, workshop, and

cars.  Donovan now asks the Court to immunize Finnigan, because "[i]t would appear" that

Finnigan "would testify that the firearm was her property." *Motion*, ECF No. 27, at 3.

The Court should deny the motion because Donovan cannot meet his burden to show that

this is an extreme case of prosecutorial misconduct warranting a grant of immunity to a defense

witness.  Rather, when the government learned that Finnigan may have a 5th Amendment issue,

the government asked the Court to appoint counsel for her and continues to communicate with

her counsel.  The government's conduct was prudent and reasonable.  Because Donovan cannot

show that the government's refusal to provide Finnigan with immunity would amount to a

violation of his constitutional rights, Donovan's motion fails.

II.    Background

In 2009, Donovan was convicted of conspiracy to commit bank robbery, bank robbery,

and possession of a firearm in furtherance of a crime of violence in the District of New

Hampshire. *United States v. Donovan*, 07-CR-130-01-SM.  Donovan was sentenced to 154

months' imprisonment followed by 3 years of supervised release. Donovan violated his terms of supervised release and, in February of 2020, was sentenced to 12 months' imprisonment, followed by 48 months of supervised release. Donovan was released from custody in June of 2020 and was serving his term of supervised release in March of 2021.

In March of 2021, agents obtained warrants to search Donovan's home, workshop, and cars. Agents executed the warrants on March 26, 2021 and seized a Mossberg shotgun and over 130 rounds of ammunition. Donovan's probation officer was also present and seized various knives and other weapons. In June of 2021, Donovan's probation officer filed a supervised release violation petition alleging that Donovan had violated his terms of supervised release by using methamphetamine, failing to participate in a required mental health treatment program, possessing a crossbow on March 9, 2021, and possessing 15 edged-weapons and the Mossberg shotgun on March 26, 2021. The shotgun was found tied to the roll bar of Donovan's Jeep:



On March 31, 2021, Finnigan called the ATF and said that the shotgun was hers. Report of Investigation, ECF No. 27-1. The agent she spoke to asked if she could provide information about the gun. Finnigan asked the agent to hold on and, after several seconds, said it was a .20-gauge shotgun. When the agent asked if she could provide the manufacturer information Finnigan paused for several seconds and then said she would have to look at the paperwork.

2

At some point after the search but before Donovan's arrest, Donovan sent a video to his probation officer of him taking a drug test. During the video, Donovan complains that his compound bows were seized. He also said that he had hands, swords, and machetes to protect himself. During the video, he asks "Kelley" how she feels since "they took your shotgun." A woman, presumably Finnigan, answers "Sad." Finnigan appears to be filming Donovan by holding a cellphone and is not visible in the video. Donovan says that he can fight off a fisher cat with his bare hands, and Kelley says that she cannot. But, with a shotgun, Donovan says, "she might have a fighting chance." Donovan later says that the video "will be good for Court."

Donovan was arrested on April 15, 2021 on the supervised release violation petition. The defendant appeared for a preliminary hearing and detention hearing on April 21 and 26, 2021. *See, Order of Detention*, 1:07-cr-00130-SM, ECF No. 175. Donovan's counsel informed the Court that he intended to have Kelley Finnigan testify at the preliminary hearing about her ownership of the shotgun. On April 22, 2021, agents learned that the shotgun was stolen. In light of this, the government asked the Court to appoint counsel for Finnigan. Exhibit 1, April 2021 emails. Finnigan was appointed counsel and did not testify at the hearing. The government has not spoken to Finnigan directly but is communicating with her attorney.

Donovan was indicted for being a felon-in-possession of the firearm and ammunition on May 17, 2021. At this time, the government has no evidence that either Donovan or Finnigan knew the shotgun was stolen, and neither has been charged with the crime of possessing a stolen firearm.

III.   This is not a rare or extreme case requiring the Court to immunize a defense witness.

Although a court may not grant immunity to a defense witness under the immunity statute, in very limited circumstances, a court may "require a grant of immunity" if the defendant's "constitutional rights were being violated by the government's refusal to provide immunity."  *United States v. Angiulo*, 897 F.2d 1169, 1190 (1st Cir. 1990); *see also United States v. Mackey*, 117 F.3d 24, 27 (1st Cir. 1997) ("The power to confer witness immunity under the statute has been given to the prosecutor, not the judge.").  A court's grant of immunity is limited to "rare" or "extreme" cases. *See, United States v. Castro*, 129 F.3d 226, 232 (1st Cir. 1997) (noting that such cases are "rare"); *Mackey*, 117 F.3d at 27 ("[I]n certain extreme cases of prosecutorial misconduct, the government's refusal to grant immunity could justify a court's refusal to allow the prosecution to proceed.").

The defendant bears the burden of establishing that the government "intentionally attempted to present a distorted version of the facts at trial."  *United States v. Berroa*, 856 F.3d 141, 159 (1st Cir. 2017).  There are two ways by which a defendant can demonstrate intentional distortion: (1) "by showing an attempt to harass or intimidate potential witnesses," or (2) "by showing that the prosecutor deliberately withheld immunity for the purpose of hiding exculpatory evidence from the jury."  *Berroa*, 856 F.3d at 159 (quoting *United States v. Castro*, 129 F.3d 226, 232 (1st Cir. 1997)).  Essentially, the defendant must show "prosecutorial misconduct."  *Angiulo*, 897 F.2d 1169, at 1192.

In evaluating whether the government has attempted to harass or intimidate a potential witness, courts look at whether a communication was made directly to the witness or to another individual or the Court.  *Id.* at 1193 ("[T]he defendants have not pointed to any direct communications between the prosecution and [the witness] at all.").  Courts also look at whether

4

the government repeatedly warned a witness that the witness was "liable for prosecution" on charges, that the witness's testimony could be used as evidence against the witness, and that the government could bring perjury charges if the witness lied on the stand. *Id.* at 1192. Advising the court or a witness' potential exposure or sending information about a witness' criminal activity to an investigating agency do not constitute witness intimidation. *Id.*

The defendant claims that the government "has threatened prosecution of Kelley Finnigan should she testify in this matter" and that, as such, the government is seeking to intimidate a witness. The defendant is mistaken. The government recognized the tension between Finnigan's claim of ownership of the gun with the knowledge that the gun is stolen and recommended that Finnigan be appointed independent counsel. Regardless of whether she testifies, if the government develops competent evidence that she knowingly possessed a stolen firearm or knowingly provided a firearm to a felon, the government may have an interest in prosecuting her. *See Mackey*, 117 F.3d at 27 (noting the concern that immunity might interfere with future prosecutions "has been a constant theme in circuit court opinions."). Pointing out the risk inherent in her testifying is hardly a threat.

The government has had no direct communication with Finnigan. And though Donovan claims that the government has threatened Finnigan with prosecution, Finnigan's counsel has made no such claim. In fact, it was Donovan's counsel who told Finnigan's counsel that the government threatened her with prosecution. Exhibit 2, September 2021 emails. The government has confirmed with Finnigan's counsel, both by email and by telephone, that while the government may have in interest in prosecuting her should the government develop competent evidence that she knowingly possessed a stolen firearm, the government has not threatened malicious prosecution in retaliation for her testifying. *See*, Exh. 2.

5

Donovan has also failed to establish that Finnigan's testimony is clearly exculpatory or essential to the defense. Though he proffers that Finnigan will claim ownership of the gun, he does not proffer what she would say about Donovan's access to the shotgun. Ownership is not synonymous with possession and constructive possession of a firearm "does not require ownership of the gun." *United States v. Liranzo*, 385 F.3d 66, 69 (1st Cir. 2004).

Here, because the shotgun was found tied to the rollbar of the Jeep, possession of the shotgun is directly tied to possession of the Jeep. Images taken from Finnigan's phone show Donovan driving the Jeep in September and October of 2020:



Footage from Donovan's surveillance cameras also shows Donovan using and accessing the Jeep in March of 2021. Her testimony, as proffered by Donovan, would have limited bearing on whether he possessed the gun, so her refusal to testify would not amount to a constitutional violation.

Immunizing Finnigan could undermine future prosecution of her if the government develops that she knowingly possessed a stolen gun or gave the gun to Donovan, knowing Donovan was a convicted felon. Where, as here, her testimony is not clearly exculpatory, and the government has not engaged in prosecutorial misconduct, immunity for a defense witness is not appropriate.

6

IV.    <u>Conclusion</u>

For the reasons stated, the Court should deny Donovan's motion to grant Kelley Finnigan immunity.

Respectfully submitted,

JOHN J. FARLEY
Acting United States Attorney

Date:  October 5, 2021          By:    <u>/s/ Anna Krasinski</u>

<u>/s/ Charles Rombeau</u>
Anna Krasinski
Charles Rombeau
Assistant U.S. Attorneys
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552

7

# EXHIBIT 1

| | |
|---|---|
| **From:** | Krasinski, Anna (USANH) |
| **To:** | Matthew Stachowske |
| **Subject:** | Re: US v. Donovan |
| **Date:** | Sunday, April 25, 2021 6:49:01 PM |

Matt,

I learned that the firearm is stolen. In light of that, I think it's prudent to give her the opportunity to consult with counsel before testifying about the gun.

Anna

Sent from my iPhone

> On Apr 24, 2021, at 4:48 PM, Matthew Stachowske
> < > wrote:
>
>
> What exposure do you foresee here?
>
> Matthew Stachowske, Esq.
> Stachowske Law, PLLC
> 634 Central Ave
> Dover, NH 03820
> O: (603) 343-1842
>
>
> IMPORTANT NOTICE: This communication may contain material protected by attorney-client privilege. It is privileged and confidential, and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmission to the intended recipient(s), any unauthorized distribution or copying of this transmission is prohibited. If you have received this transmission in error, please notify us immediately and permanently delete this communication. If tax or other legal advice is contained in this email, please recognize that it may not reflect the level of analysis that would go into more formal advice or a formal legal opinion and is not intended to meet IRS requirements for formal tax advice.
>
> **From:** Krasinski, Anna (USANH) < >
> **Sent:** Friday, April 23, 2021 3:10:37 PM
> **To:** brier_temple                                        Matthew
> Stachowske                          Matthew Stachowske
>
> **Subject:** US v. Donovan
>
> Matt and Brier,

If Ms. Finnegan testifies, I think she is potentially exposing herself to criminal liability and there may be some Fifth Amendment issues.  She may want to consult with counsel before testifying and I ask that the Court to appoint her counsel.

I'm available to discuss this if the Court wants to.


Thanks,
Anna

# EXHIBIT 2

| | |
|---|---|
| **From:** | Krasinski, Anna (USANH) |
| **To:** | Donald A. Kennedy |
| **Subject:** | RE: US v Donavan witness Kelley Finnigan |
| **Date:** | Thursday, September 23, 2021 8:30:00 AM |

Don,

If that is what Matt said, he must have either misheard or misunderstood me.  As you know, the firearm is stolen and there is risk in her testifying that it was hers.  I'm preparing for trial in a different matter and will circle back to your request for discovery on the stolen firearm when that trial concludes, mid to late next week.

Thanks,
Anna

**From:** Donald A. Kennedy
**Sent:** Tuesday, September 21, 2021 3:09 PM
**To:** Krasinski, Anna (USANH)
**Subject:** [EXTERNAL] US v Donavan witness Kelley Finnigan

Anna,

      What information can you give me about the gun being stolen in the Corey Donovan's case.  I spoke to Matt S and he said that you were going to prosecute Kelley Finnigan if she said the gun was hers.  Obviously there is a mens rea component that the person has to know it is stolen, but I am telling her not to say anything to anyone.

      But if you can give me some information that I can talk to her about.  I won't show it to her but just discuss it with her.  Names would be helpful as to where they were stolen and who did it if you know.  I will agree to a protective order or agreement for representation of this witness.

      I just want to impress upon this person what risk is out there and the more information that I have the easier it will be.

      Thank you, Don

Donald A. Kennedy, Esquire
908 Hanover Street
Manchester, NH 03104
Office (603)668-8787

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **UNITED STATES OF AMERICA** } | |
| } | |
| **v.** } | **1:21-cr-00088-PB** |
| } | |
| **COREY DONOVAN** } | |

**DEFENDANT'S MOTION IN LIMINE NO. 1:**
**OBJECTION TO GOVERNMENTS 404(B) EVIDENCE**

Defendant, Corey Donovan, by and through counsel, respectfully submits the within

Motion in Limine No: 1: Objection to the Government's 404(b) Evidence.

1.     Trial is scheduled to begin October 13, 2021.

2.     Pursuant to an indictment dated May 17, 2021 the defendant stands charged with

one count of possession of a firearm/ammunition by a prohibited person contrary to 18

U.S.C. §§922(g)(1). Specifically, the indictment alleges:

> On or about March 26, 2021, Corey Donovan, knowing that he had been
> convicted of a crime punishable by imprisonment for a term exceeding one
> year, did knowingly possess in and affecting interstate commerce, the
> following firearm and ammunition:
>
> a Mossberg Model 500, 20 guage shotgun, […]four rounds of Brenneke 20
> guage shotgun ammunition, seventy-one rounds of Federal 20 gauge shotgun
> ammunition; forty-eight rounds of Federal 28 gauge shotgun ammunition;
> eight rounds of Huntego 20 gauge shotgun ammunition; four rounds of
> Remington 12 gauge shotgun ammunition; ~~and one casing of Federal .357~~
> ~~Magnum caliber ammunition~~[1].

3.     The firearm and ammunition were all seized in a warranted search of defendant's

property on March 26, 2021.

---

[1] The .357 casing was stricken by agreement.

4.   The government has made disclosures of certain 404(b) evidence. Defendant objects to those disclosures as the proposed evidence should be ruled inadmissible.

5.   Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident."

6.   Rule 403 allows the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of…unfair prejudice." The First Circuit of Appeals has "adopted a two-part test to determine admissibility" of evidence of the defendant's other acts. *United State v. Aguilar-Aranceta,* 58 F.3rd 796, 798 (1st Cir. 1995).

> First, the trial judge must determine whether the evidence in question is offered for any purpose other than solely to prove the defendant had a propensity to commit the crime in question [,] [t]hat is,…has some 'special' probative value. Prior bad acts may be 'specially relevant' if they are probative of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> If the judge is satisfied that the proffered evidence has 'special relevance,' the focus shifts to the second part of the test, which applies Rule 403 to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

*Id.* (citation omitted).

7.   The government's proposed 404(b) evidence and Defendant's corresponding responses follow:

a.   **Testimony and video of the June 19, 2019 incident in Danbury, NH where Mr. Donovan was arrested after being found passed out inside the green 1987 Jeep Wrangler, as documented in the government's recent discovery supplement.**

Testimony and evidence concerning the June 19, 2019 events should be precluded in their

entirety. Mr. Donovan has stipulated he is a felon and that the firearm in question traveled in interstate commerce. **Mr. Donovan has offered to the government his willingness to stipulate he is the title holder of the green 1987 Jeep Wrangler**. Moreover, in an interview with Mr. Donovan's mother on the morning of March 26, 2021, she indicated that the Jeep belonged to Mr. Donovan and that he had driven it as recently as the day before, March 25, 2021. The government further provided the title to the Jeep in Mr. Donovan's name as part of discovery. Finally, video camera footage seized in the March 26, 2021 search of Mr. Donovan's property demonstrates Mr. Donovan's rummaging through the jeep demonstrating he had access to the Jeep.

The June 19, 2019, incident is unrelated and involved Mr. Donovan being found slumped over asleep behind the wheel of the Jeep Wrangler in a convenient store parking lot. He was charged in both State and Federal Court with felon in possession of a firearm(s) and possession of controlled drugs. Mr. Donovan was acquitted of the felon in possession charge in State Court and the US Attorney's Office subsequently dismissed its indictment presumably on double jeopardy grounds. There is *no* evidence of the Mossberg shotgun alleged in the pending matter was part of the June 19, 2019 incident. Any evidence concerning Mr. Donovan's June 19, 2019 incident, including the video and testimony, should be excluded as a prior bad act, irrelevant, duplicative, uncharged conduct that is highly prejudicial.

**b. Testimony and other evidence of the non-firearm weapons seized by U.S. Probation on March 26, 2021, as documented in the original discovery production.**

Mr. Donovan's possession of the non-firearm "weapons" is the subject of a pending petition for violation of his supervised release. These items have no special probative value

and are only being tendered to prove Mr. Donovan had the propensity to commit the crime in question.  Below is a picture taken by the government of the non-firearm "weapons."



There is no other rationale purpose for presenting such evidence than to establish propensity to commit the underlying offense. Any testimony regarding these items further lacks the requisite foundation.

> **c.  Testimony and other evidence of the homemade silencers seized by ATF on March 26, 2021, as documented in the government's recent discovery supplement, "*in the event we do not supersede to include those items in the charged conduct prior to trial.*"**

The government concedes this is uncharged conduct. Moreover, Mr. Donovan has been given no opportunity to refute and defend the government's conclusions the items seized in the search were two homemade silencers. The lab results were only provided to Mr. Donovan, via counsel, last Wednesday, September 29, 2021, nine (9) days ago. The government's production of this discovery in the form of an expert opinion is untimely, lacking a proper expert disclosure and highly prejudicial. The government has had this evidence since March 2021 or six months and only now presents evidence on the eve of trial.

> **d.  Testimony and other evidence of Mr. Donovan's drug use and/or possession of narcotics to the extent it may be relevant to issues of ownership, dominion or control of locations where the charged items were recovered.**

This is also uncharged conduct. Undoubtedly, the government would have charged Mr. Donovan had the government been able to establish he was in possession of narcotics. Evidence of Mr. Donovan's dominion or control of a space by way of drug use, without charging him, confuses the issues for the jury. It further serves to unfairly put Mr. Donovan in a bad light without basis. To the best of Mr. Donovan's knowledge, the government does not seek to present evidence connecting the drugs seized to Mr. Donovan. There were other people living at this house. There is no evidence being presented regarding Mr. Donovan's drug use, just evidence of drugs. Thus, such evidence is irrelevant and without foundation.

    **e. Testimony from one officer that in June 2019, law enforcement interacted with Corey Donovan and Courtney Donoghue while the two were in Donovan's Jeep. During that interaction, officers seized a rifle scope from Donovan's Jeep. That scope was later returned to Donovan. The government intends to limit testimony about this interaction to the vehicle itself, the occupants of the vehicle, and information about the scope. The government will also introduce the scope itself, which was recovered from the barn workshop on March 26, 2021.**

As stated above, any testimony or other evidence stemming from the June 2019 incident is irrelevant considering he will stipulate to being the title owner of the Jeep. Further evidence available to the government pertaining to Mr. Donovan's Jeep, includes the statement from his mother, his named title ownership of the vehicle and video obtained in the seizure demonstrating he was rummaging in the Jeep recently. The June 2019 incident is two years old, stale information that serves no purpose other than to establish a propensity for bad acts.

    The testimony regarding the scope must also be excluded. Mr. Donovan was acquitted of the June 2019 felon in possession charge after trial. Use of such testimony and evidence now of the June 2019 incident is the textbook definition of inadmissible 404(b) bad act evidence.

    **f. Testimony and evidence regarding items seized with the firearm and ammunition including a magazine, suspected silencers and a scope. The physical items the government intends to introduce are identified on the government's**

**exhibit list. The government does not intend to introduce expert testimony that the suspected silencers are in fact silencers and intends to limit evidence to the fact that they were seized with other items and the ATF suspected them to be silencers and sent them off for further analysis. The government may introduce testimony regarding seizure of Mr. Donovan's crossbows and knives, including where those were seized.**

Speculative testimony regarding "suspected" silencers is unreliable and serves no purpose to the jury. Without the disclosure of a proper expert witness pursuant to Rule 16 (g), there is no foundation to support such sheer speculative testimony. Accordingly, any testimony or image pertaining to a silencer should not be admitted. Testimony regarding Mr. Donovan's crossbows and knives falls under the "weapons" category, discussed supra, section b.

   g.  **The government intends to introduce limited evidence that the firearm was stolen. This includes a video jail clip of Donovan and Finnigan discussing the fact the firearm was stolen. The government obtained a copy of the call on October 5, 2021. The government will elicit testimony that they have no evidence that Mr. Donovan was involved in the theft or knew that it was stolen.**

This is an extremely late notice on the eve of trial that the government has an audio clip of a phone recording that likely occurred some months ago. Trial is scheduled to begin on October 13, 2021.  Counsel was alerted to the existence of this evidence and the government's intention to use this material as 404(b) evidence as recent as October 6, 2021 at 1:17 pm, a little over 48 hours ago.  The government admits it has no evidence linking Mr. Donovan to the theft. Mr. Donovan objects to the admissibility of such inflammatory evidence that will undeniably present the jury with an unreasonable inference Mr. Donovan has the propensity to commit an uncharged bad act. The fact that the gun was stolen serves no other purpose under 404(b) other than evidence of a bad act.

   8.  Mr. Donovan reserves the right to make further objections to the government's proffered evidence, especially considering the government is emailing counsel additional discovery via

USAfx (dropbox) as of the filing of this pleading and has been for a few days now.

**WHEREFORE**, the defendant Corey Donovan, prays for the following relief:

  a.  Rule consistently with the defendant's objections outlined above;

  b.  Schedule a hearing if the Court deems one necessary; and

  c.  For whatever other relief the Court deems equitable and just.

<div style="text-align: right">

Respectfully submitted,
**COREY DONOVAN**

</div>

Date: October 8, 2021                    by:     /s/ Matthew G. Stachowske
                                                 Matthew G. Stachowske (#15609)
                                                 Stachowske Law, PLLC
                                                 634 Central Ave
                                                 Dover, NH 03820
                                                 O: 343-1842
                                                 C: 770-9045
                                                 matthew@stachowskelaw.com

<div style="text-align: center">

CERTIFICATE OF SERVICE

</div>

I, Matthew G. Stachowske, hereby certify that I have mailed a copy of the within motion to Assistant United States Attorneys, Charles Rombeau, and Anna Krasinski, via the court's ECF facilities on today's date and emailed and 1st class mailed a copy to Attorney Donald Kennedy.

<div style="text-align: right">

/s/ Matthew G. Stachowske

</div>

# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA          )
                                  )
            v.                    )          1:21-cr-00088-PB
                                  )
COREY DONOVAN                     )

United States' Response to Defendant's Motion in Limine Regarding 404(b) Evidence

I.     Introduction

    Defendant Corey Donovan has filed a motion seeking to exclude evidence that the

government identified on its 404(b) notice.  The government provided an initial 404(b) notice on

September 28, 2021 and then narrowed and clarified that notice on October 6, 2021.  As such, a

number of issues are not truly in dispute.  For example, though the defendant moves to exclude

it, the government does not intend to introduce any video from the defendant's June 19, 2019

interaction with law enforcement.  The limited evidence the government seeks to introduce that

is potentially subject to Rule of Evidence 404(b), along with the government's rational for

seeking to introduce that evidence, is discussed below.

II.    The Search of the Defendant's Property and the Anticipated Defense

    In March of 2021, agents obtained warrants to search the defendant's home, a barn

workshop on his property, a junk Hyundai near the barn workshop, and the defendant's Jeep.  In

the defendant's Jeep, agents found a Mossberg 500 shotgun, loaded with six rounds of

ammunition, strapped to the roll bar.  Agents also found a bandolier containing 20 rounds of 20-

gauge ammunition.

    In the barn workshop, agents found an open long-gun case.  On top of the open case,

agents found a 20-gauge shotgun barrel, three plastic cylinders, one round of 28-gauge

ammunition, a bandolier containing 23 rounds of 28-gauge ammunition, a rifle scope, a shotgun fore-end, three rounds of 12-gauge Remington ammunition, and three 20-gauge shotgun shells. Near the open gun case, agents two suspected homemade silencers, one of which has been shot through.  Agents submitted the silencers for analysis and an expert has determined that both are, in fact, silencers.  Because the government did not get this determination until the week before jury selection, the government has not charged the defendant with possession of silencers in violation of the National Firearms Act.

In a Hyundai parked outside of the barn workshop, agents found an ammunition can that contained a firearm magazine, a bag containing Mossberg accessories, a Mossberg Owner's Manual, a firearm cleaning kit, a cleaning rod, a bandolier containing 24 rounds of 28-gauge ammunition, two boxes each containing 25 rounds of 20-gauge ammunition, and one round of 12-gauge ammunition.

The government anticipates that the defense will be that the shotgun belonged to the defendant's girlfriend Kelley Finnigan.  On March 31, 2021, Finnigan called the ATF.  During that call, Finnigan said that she wanted her property returned.  When the agent asked her to provide details about the property, Finnigan asked the agent to hold on.  After a pause, Finnigan said the item was a 20-gauge shotgun.  The agent asked if she could provide the manufacturer information or any other details about the gun.  After a pause, Finnigan said that she would have to look at the paperwork.  In addition, the defendant and Finnigan created a video that they sent to the defendant's probation officer.  In the video, discussed in more detail below, the defendant claims the gun belongs to Finnigan.

III.    Evidence that the Government Intends to Admit as Intrinsic or under Rule 404(b)

    A.  *The Defendant's Homemade Video Discussing the Shotgun while Taking a Drug Test and Testimony Regarding Seizure of the Defendant's Compound Bows*

Following the March 26, 2021 search and seizure of the shotgun, the defendant made a video of himself taking a drug test.  Exhibit 1, Clip from Video Sent to Probation.  During the video, the defendant says that they "lost another chicken" because of a predator because "you all decided to take my compound bows."  He asks Finnigan if she feels safe after "they took your shotgun" and explains that while he can defend himself from a fisher cat with his bare hands, Finnigan cannot.  The defendant sent this video to his probation officer, USPO Merna.  The government anticipates that USPO Merna will testify that the compound bows were seized from the barn garage.  To explain the seizure, USPO Merna will testify that the defendant's conditions of supervised release prohibit him from possessing weapons.

The government does not seek to introduce testimony or evidence about the defendant's drug use history or drugs found during the search.  Similarly, the government does not intend to elicit testimony that what the defendant is doing in the video is administering a home drug test.  The defendant can be seen taking the test, however, during the clip of the video that the government seeks to introduce.

    B.  *Evidence that a Scope and Gun Cleaning Kit was Seized from and Returned to the Defendant*

In June of 2019, law enforcement officers encountered the defendant and his then girlfriend, Courtney Donoghue, while they were passed out in the defendant's Jeep in a gas station parking lot.  During the encounter, officers ordered both the defendant and Donoghue out of the car and ultimately engaged in a physical altercation with the defendant, resulting in officers using their tazers on the defendant.  The incident was captured on body camera footage.

Officers obtained a warrant to search the Jeep and found, among other things, drugs, a scope mounted on a firearm, and a gun cleaning kit. The scope and gun cleaning kit were marked and photographed:



The scope was also marked with the evidence tag number "JPM27J" with silver sharpie.

The defendant was charged by the state with possession of methamphetamine, resisting arrest, and the unlawful possession of a firearm. The jury acquitted the defendant of all but the drug charge. On June 20, 2020, officers returned some of the defendant's property to him, including the scope and gun cleaning kit. The return of property is documented by an Andover Police Department property report. Exhibit 2, Return of Property Form.

During the search that gives rise to the instant charges, agents recovered this scope – it is still marked "JPM27J" – in the barn workshop on top of an open long gun case along with a bandolier containing 23 rounds of 28-gauge Federal ammunition, three rounds of 12-gauge ammunition, and a 20-gauge shotgun barrel. The defendant is charged with unlawfully possessing the ammunition found on the open gun case in the barn workshop.

In one of the cars near the barn workshop, a Hyundai with its windows blown out, officers found an ammunition can containing two boxes of 25 rounds of 20-gauge ammunition, a bandolier containing 24 rounds of 28-gauge ammunition, one round of 12-gauge ammunition, the

owner's manual to a Mossberg shotgun, and a firearms cleaning tools that appear to be identical to those returned to the defendant in June of 2020. The defendant is charged with possessing the ammunition found in this ammunition can.

The government seeks to introduce limited testimony from the officer who returned the items, Officer Hubbard, that a scope and gun cleaning kit were seized from the Jeep pursuant to a warrant in June of 2019, that the occupants of the Jeep were the defendant and Courtney Donoghue, and that he returned the items by handing them directly to the defendant in June of 2020. The government also anticipates that Officer Hubbard will identify the scope seized from the barn workshop is the same scope that he returned to the defendant in June of 2020 and testify that the gun cleaning kit seized from the Hyundai appears to be the same as the one he returned to the defendant in June of 2020. To be clear, the government does not intend to introduce body camera footage from the interaction, discuss any of the other evidence seized from the Jeep, or detail the altercation between the defendant and officers.

C.  *Evidence from the Shotgun's Owner and the Defendant's Discussion with Finnigan Regarding the Owner's Claim that the Shotgun is Stolen*

After agents seized the Mossberg shotgun from the defendant's Jeep, officers identified the initial purchaser of the firearm, Kevin Kwiatkowski. The government anticipates that Mr. Kwiatkowski will testify that he purchased the firearm in 2019. When he purchased it, it came with two barrels. The government anticipates that Mr. Kwiatkowski will testify that the 20-gauge barrel found on the open gun case in the barn workshop is the companion barrel to the shotgun seized from the Jeep. The government also expects him to testify that the fore-end found on the open gun case is the original fore-end that came with the Mossberg 500 shotgun. In addition, the government also anticipates that Mr. Kwiatkowski will testify that he put the shotgun, new in its box, in one of his storage units at Boscawen Mini Storage. At some point, he

was notified that there was not a lock on his storage unit.  He went and put a new lock on the unit but did not realize the shotgun had been taken from the unit until ATF agents told him that it had been recovered during the search.

On September 28, 2019, the defendant and Finnigan had a recorded video visit.  During that visit, the two discuss the report that the shotgun was stolen from a storage unit. During the brief conversation, Donovan expresses disbelief that only one thing would have been taken from Mr. Kwiatkowski's multiple storage units. about the shotgun, Finnigan says "like you wouldn't notice your brand new 12-gauge in the box missing."  The defendant responds "Yeah. 20-gauge, or whatever it was."  Exhibit 3, Clip from Video Jail Visit.

The government intends to elicit testimony that there is no evidence that either the defendant or Finnigan knew the shotgun was stolen on or before March 26, 2021.  Similarly, the government intends to elicit testimony that there is no evidence that either the defendant or Finnigan were involved in taking the shotgun from the storage unit.

D. *Evidence about items seized alongside charged ammunition, including suspected silencers*

The government seeks to introduce evidence and testimony regarding all of the firearm accessories seized during the execution of the warrant, including the items seized from the barn workshop, and all of the items found in the ammunition can.  The government does not intend to elicit expert testimony that an expert concluded that the silencers seized from the barn workshop are, in fact, silencers.

IV.  <u>Discussion</u>

A.  *Intrinsic Evidence and Federal Rule of Evidence 404(b)*

The proper test to determine the admissibility of uncharged acts depends upon whether the evidence is "intrinsic" to the charged offenses.  Intrinsic evidence includes acts that are "part of the necessary description of events leading up to the crime or that go to an element of the charged offense." *United States v. Souza*, 749 F.3d 74, 84 (1st Cir. 2014).  Evidence that is intrinsic to, or "comprises part and parcel of" the charged offenses is not governed by Federal Rule of Evidence 404(b).  *United States v. Gobbi*, 471 F.3d 302, 311 (1st Cir. 2006).   Evidence of prior contacts and transactions is intrinsic where it is necessary to complete the story of the charged crime.  *United States v. Taylor*, 284 F.3d 95, 101 (1st Cir. 2002) (citing *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994)).  Similarly, evidence that explains how a cooperating witness and a defendant "came together" to form an agreement is intrinsic.  *United States v. Robles-Alvarez*, 874 F.3d 46, 51 (1st Cir. 2017).

Rule 404(b) of the Federal Rules of Evidence "forbids the prosecution from asking the jury to infer from the fact that the defendant has committed a bad act in the past, that he has a bad character and therefore is more likely to have committed the bad act now charged." *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982).  Under Rule 404(b), however, evidence of an uncharged bad act may be admissible for any other purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2).

Courts engage in a two-part analysis to determine whether evidence of other acts should be admitted under Rule 404(b).  *United States v. García-Sierra*, 994 F.3d 17, 29 (1st Cir. 2021).  First, the court must determine whether the evidence is relevant "for any purpose apart from

showing propensity to commit a crime," including proof of plan, knowledge, or intent. *Id.* (quoting *United States v. Habibi*, 783 F.3d 1, 2 (1st Cir. 2015). This relevance "standard is not particularly demanding." *United States v. Galíndez*, 999 F.3d 60, 65 (1st Cir. 2021). If the evidence meets this relevance standard, the Court then determines whether the probative value of the evidence is substantially outweighed by any unfair prejudice. *García-Sierra*, 994 F.3d, at 29; Fed. R. Evid. 403.

Under Federal Rule of Evidence 403, a court may exclude relevant evidence where its probative value is substantially outweighed by the danger of unfair prejudice. "Unfair prejudice, however, is reserved for evidence that invites the jury to render a verdict on an improper emotional basis or for evidence that is shocking or heinous and likely to inflame the jury." *United States v. Soto*, 799 F.3d 68, 90 (1st Cir. 2015) (internal quotation marks and citations omitted).

### B. *Testimony Regarding Seizure of the Defendant's Compound Bows are Admissible under Rule 404(b)*

Testimony that the defendant's compound bows were seized from the barn workshop is admissible under Rule 404(b). The government must show the defendant's constructive possession of the ammunition seized from the barn workshop, so evidence that the defendant claimed ownership of other items seized in the barn workshop is relevant to whether he had access to and control of other items in the same area and thus knowledge and possession of the ammunition found there.

In a similar case, *United States v. McCutchen*, 150 F. App'x 517, 518 (6th Cir. 2005), officers executing a search warrant asked the defendant "where the 'weed' was." In response, the defendant took officers to a kitchen cabinet where a bag of marijuana was found. *Id.* Officers found two loaded firearms in another kitchen cabinet. *Id.* The defendant was charged

with the unlawful possession of the firearms. The court upheld the district court's admission of evidence regarding the defendant's retrieval of the marijuana from the kitchen. *Id.* at 522-23. The court found that evidence that the defendant "knew that one of the kitchen cabinets contained marijuana is, at the very least, probative of knowledge, and absence of mistake or accident with respect to constructive possession of the guns found in a cabinet nearby." *Id.* at 522. The court reasoned that this evidence was probative on the "issue of his access to, and dominion and control over, other cabinets; specifically, the one where the firearms were stored." *Id.*

Similarly, the central issue in the case is whether the defendant had constructive possession of the firearm and ammunition found on the property, including ammunition found in the barn workshop. *See, United States v. Fernandez-Jorge*, 894 F.3d 36, 44 (1st Cir. 2018) ("[V]alid circumstantial evidence of constructive possession includes evidence of an individual's control over the area where the contraband is found." (internal quotation marks omitted)); *United States v. Wight*, 968 F.2d 1292, 1393 (1st Cir. 1992) (finding that the government may prove constructive possession by presenting evidence that "a convicted felon knowingly has the power and the intention at a given time of exercising dominion and control over a firearm or over the area in which the weapon is located."). Here, the defendant sent a video of himself claiming ownership of the compound bows that USPO Merna seized from the barn workshop where the ammunition and firearm accessories were stored. This evidence has significant probative value.

And while this evidence is prejudicial, it is not unfairly so. It is highly probative of the defendant's access to, and dominion and control over the barn workshop and its significant probative value is not substantially outweighed by any unfair prejudice. Moreover, any prejudicial effect can be mitigated by an appropriate limiting instruction.

C. *Evidence that the Scope and Gun Cleaning Kit were Seized From the Jeep and Returned Directly to Donovan is Admissible under 404(b)*

Evidence that the defendant owned and took custody of the scope and the gun cleaning kit is relevant to whether he had knowledge and constructive possession of the ammunition and other firearm accessories seized along with those items.  The scope, for example, was on top of an open long-gun case along with a bandolier of ammunition and the second barrel to the Mossberg shotgun.  The gun cleaning kit appears to be identical to one found in the ammunition can along with two boxes of ammunition, a bandolier of ammunition, and one additional round of ammunition.

The fact that the scope was on the gun case is probative is probative of the defendant's knowledge of the other items found on the gun case.  Similarly, the fact that the gun cleaning kit was in the ammunition box with ammunition is probative of knowledge of other items in the ammunition box.  Thus, this evidence is probative to the issue of the defendant's access to, and dominion and control over, both the gun case and the ammunition box.

Though prejudicial, it is not unfairly prejudicial, particularly considering the very limited evidence the government seeks to introduce related to the scope and gun cleaning kit.  Moreover, the probative value of this evidence substantially outweighs   Any prejudicial effect can be mitigated by an appropriate limiting instruction.

D. *The Defendant Does Not Contest Admission of the Video where he is Self-Administering a Drug Test and the Government Does Not Intend to Elicit Any Other Evidence Regarding Drugs*

In the video where the defendant is self-administering a drug test the defendant claims ownership of the seized compound bows and claims that the seized shotgun belongs to Finnigan. The government understands that the defendant does not object to admission of this video at trial. But even if he did, this evidence is relevant to his possession and ownership of the crossbows

found in the barn workshop and, thus, to the defendant's possession of the ammunition and firearm accessories found there.  The government does not intend to introduce any testimony or evidence regarding the defendant's drug use history or drugs found during the search.

E. *Evidence of the Defendant's Statements about the Shotgun, which Occurred while He and Finnigan Were Discussing the Theft of the Shotgun is Admissible*

Though the defendant claims late-notice of the video of the defendant and Finnigan discussing the theft of the shotgun, the video visit occurred on September 28, 2021.  The government obtained copies of the defendant's recent jail calls and videos, including this video, on October 5, 2021, and provided copies of the calls and videos to defense counsel that same day.  The following day, the government informed defense counsel that it intended to use a portion of this visit at trial.  *Motion*, ECF No. 36, at 6.  Accordingly, there was no late disclosure.

More to the point, the defendant's discussion of the firearm is relevant to his knowledge of the firearm.  During the conversation, Finnigan identifies the shotgun as a "12-gauge shotgun."  The defendant corrects her and identifies it as a "20-gauge."  His familiarity with the shotgun, particularly in contrast to her lack of familiarity with the shotgun, is relevant to his knowledge of the shotgun.

Before obtaining this video call, the government did not intend to introduce any evidence that the firearm had been stolen from Mr. Kwiatkowski's storage unit.  But is the defendant that begins discussing the theft in his conversation with Finnigan.  Without the context of the conversation, his statement correcting Finnigan's improper identification of the firearm lacks meaning.  Because the defense in this case is that the gun belonged to Finnigan, this evidence has significant probative value.

The government intends to elicit testimony that there is no evidence that the defendant was involved in taking the gun from the storage unit and that there is no evidence that the

defendant knew the gun was stolen before he was charged in this case. Because there is no evidence that either the defendant or Finnigan was involved in or knew of the theft before the defendant was arrested here, this is not a bad act of the defendant, and thus admissible without recourse to 404(b). But even if it were, this evidence is not unfairly prejudicial. It is highly probative of the defendant's knowledge of the shotgun and its significant probative value is not substantially outweighed by unfair prejudice because the government intends to make clear that there is no evidence of his involvement in or knowledge of the theft. Moreover, the government has no objection to an appropriate limiting instruction on this issue.

F.  *Evidence of the Suspected Silencers is Intrinsic.*

Evidence of the items found in and around the open gun case is intrinsic to the charged offense. Because these items were seized together, they comprise part and parcel of the defendant's alleged possession of ammunition and the firearm.

In the alternative, this evidence is relevant under 404(b). The fact that ammunition and firearm accessories were stored in various places on the property in an open and obvious way is relevant to whether the defendant had knowledge of the charged ammunition and firearm.

An analysis under 403 similarly resolves in favor of admissibility, as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. The probative evidence is considerable, as it demonstrates the open and obvious nature in which ammunition and firearm accessories were stored and so is probative of the defendant's knowledge of ammunition and the firearm.

Although prejudicial, this evidence is not unfairly prejudicial, and the Court can provide a limiting instruction as to how the jury can consider evidence of items found alongside the charged ammunition and firearm.

V.      Conclusion

For the reasons stated above, the government requests that the Court deny the defendant's

motion and order that the evidence identified above is admissible at trial.

Respectfully submitted,

JOHN J. FARLEY
Acting United States Attorney

Date:  October 11, 2021                    By:     /s/ Anna Krasinski_____

/s/ Charles Rombeau_____
Anna Krasinski
Charles Rombeau
Assistant U.S. Attorneys
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** } | | |
| } | | |
| **v.** } | | **1:21-cr-00088-PB** |
| } | | |
| **COREY DONOVAN** } | | |

## DEFENDANT'S PROPOSED LIMITING INSTRUCTIONS

Defendant, Corey Donovan, by and through counsel, respectfully submits the within proposed limiting instructions:

1.     The government's evidence and the defendant's corresponding proposed limiting instruction follow:

**a. Evidence of a gun scope and gun cleaning kit that were involved in an unrelated event [an arrest] involving Mr. Donovan on June 19, 2019.**

"Certain evidence has been admitted in this case for only a limited purpose. The evidence, consisting of a scope and a gun cleaning kit, may be considered by you only for the purpose of the location in which the items were seized. Mr. Donovan is not charged with possession of these items."

**b. Evidence of two compound bows found in the warehouse on property occupied by Mr. Donovan.**

"The evidence, consisting of two compound bows, may be considered by you only for the purpose of the location in which the items were seized. Mr. Donovan is not charged with possession of the compound bows."

**c. Evidence of a video of Mr. Donovan spitting into a bottle.**

"The evidence, consisting of a video of Mr. Donovan spitting into a bottle is a standard and routine drug test required by probation and may be considered by you only for the purpose of the statements made on the video. Mr. Donovan is not charged with criminal drug use."

"You may not consider this evidence for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation."

**WHEREFORE**, the defendant Corey Donovan, prays for the following relief:

      a.   Grant the proposed limiting instructions; and

      b.   For whatever other relief the Court deems equitable and just.

<div align="right">

Respectfully submitted,
**COREY DONOVAN**

</div>

Date: October 12, 2021          by:    /s/ Matthew G. Stachowske
                                          Matthew G. Stachowske (#15609)
                                        Stachowske Law, PLLC
                                        634 Central Ave
                                        Dover, NH 03820
                                        O: 343-1842
                                        C: 770-9045
                                        matthew@stachowskelaw.com

<div align="center">

<u>CERTIFICATE OF SERVICE</u>

</div>

      I, Matthew G. Stachowske, hereby certify that I have mailed a copy of the within motion to Assistant United States Attorneys, Charles Rombeau, and Anna Krasinski, via the court's ECF facilities on today's date and emailed and 1st class mailed a copy to Attorney Donald Kennedy.

<div align="right">

<u>/s/ Matthew G. Stachowske</u>

</div>

# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21-cr-00088-PB |
| | ) | |
| COREY DONOVAN | ) | |

UNITED STATES' RESPONSE TO DEFENDANT'S
PROPOSED LIMITING INSTRUCTION

The United States of America, by John J. Farley, Acting United States Attorney for the

District of New Hampshire, hereby responds to defendant's proposed limiting instructions. Dkt.

No. 38. In the government's view, the proposed instructions too narrowly limit the range of

permissible uses under Fed. R. Evid. 404(b), which include "proving motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The

government instead proposes the following:

### a).     Evidence of the Scope and the Gun Cleaning Kit

"Certain evidence, consisting of a scope and a gun cleaning kit, has been admitted in this

case for only a limited purpose. The fact that those items were seized previously by investigators

is of no significance and it was not illegal for the defendant to possess them. You may consider

this evidence as proof for another purpose, namely that the defendant's receipt of those items in

2020 and their proximity to the charged items make it more likely that he had knowledge of and

possession of those charged items."

### b.)     Evidence of the Compound Bows

"Certain evidence, consisting of testimony related to Compound Bows, has been admitted

in this case for only a limited purpose. The fact that those items were seized is of no significance

and it was not illegal for the defendant to possess them.  You may consider this evidence as proof for another purpose, namely that the defendant's alleged claim of ownership of the bows and their proximity to the charged items make it more likely that he had knowledge of and possession of those charged items."

### c.) Video of Donovan

The government does not currently intend to introduce this video evidence.

Respectfully submitted,

JOHN J. FARLEY
Acting United States Attorney

Date:  October 12, 2021     By:     /s/ Anna Krasinski

/s/ Charles Rombeau
Anna Krasinski
Charles Rombeau
Assistant U.S. Attorneys
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552

# Exhibit 9

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 8, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                          *
UNITED STATES OF AMERICA                  *
                                          *   1:21-cr-88-1-PB
              v.                          *   October 12, 2021
                                          *   4:03 p.m.
COREY DONOVAN                             *
                                          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF MOTION HEARING
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:          Anna Z. Krasinski, AUSA
                             Charles L. Rombeau, AUSA
                             United States Attorney's Office


For the Defendant:           Matthew G. Stachowske, Esq.
                             Stachowske Law PLLC


Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

2

```
1                    P R O C E E D I N G S

2           THE CLERK:  Court is in session and has for

3    consideration a motion hearing in United States of America vs.

4    Corey Donovan, criminal case number 21-cr-88-1-PB.

5           THE COURT:  All right.  The -- I guess we couldn't

6    get the defendant on because of scheduling with the jail, but

7    we're not going to do any evidentiary issues today.

8           I want to help speed the case along so to the extent

9    I can, I'll rule on motions in limine and other lingering

10   motions so that we can start the trial on schedule at nine

11   o'clock tomorrow.

12          I have a court reporter here who'll be taking down

13   what's being said.

14          When we last spoke, I thought that the --

15   Mr. Stachowske started raising a novel claim, a new claim, in

16   support of his motion to suppress.  That claim appeared to

17   be that the fruits of the search of the Jeep should be

18   suppressed -- well, yes, that both -- the fruits of both

19   searches should be suppressed because the search was not

20   conducted in accordance with the warrant in that it was

21   conducted at night when the warrant did not authorize nighttime

22   searches.

23          I thought that I asked the parties to brief that

24   issue, but I didn't get any briefing on it.

25          Are you making that claim, Mr. Stachowske?
```

1      MR. STACHOWSKE:  Your Honor, I have -- no, I am not

2  personally making that claim.  My client would like me to make

3  that claim, but I'm making the decision not to for the

4  following reason.

5          I've reviewed additional discovery that I've

6  received since that hearing.  The search -- the SRT team report

7  that I've got in front of me indicates that they did, in fact,

8  clear the property beginning at 4:30 a.m., but the actual

9  search of the property did not begin until 6:00 a.m.

10         THE COURT:  All right.

11         MR. STACHOWSKE:  So for those reasons, I have not

12 filed that motion.

13         THE COURT:  Okay.  Ms. Krasinski, the actual search

14 was conducted at 6:00.  That would be fully in compliance with

15 the warrant even though it says daylight.  And I haven't looked

16 at the actual warrant.  Does it -- sometimes a warrant

17 application, I can't remember whether this one does, specify a

18 time and other times they just say daylight.  What did the

19 warrant actually say?

20         MS. KRASINSKI:  Your Honor, my colleague, Attorney

21 Rombeau, is going to handle this issue, if you don't mind.

22         MR. ROMBEAU:  Sure.  We divvied these up, your

23 Honor.

24         So the standard warrant form here is 6:00 a.m. to

25 10:00 p.m., which is what was checked.  So I think it -- it --

4

 1   it doesn't specifically say daylight hours.  It's 6:00 a.m. to

 2   10:00 p.m.  And the evidence we have is that they did not

 3   execute until 6:00 a.m. to clear the property.  And the fact

 4   that the defendant hasn't pressed this argument is why we did

 5   not do any additional briefing on this.

 6           THE COURT:  Well, all right.  You said something

 7   different from Mr. Stachowske.

 8           Mr. Stachowske said they did the protected sweep at

 9   4:30, they did the formal search at 6:00.  You've said they did

10   the sweep at -- protective sweep at 6:00 and followed it with

11   the search.

12           MR. ROMBEAU:  I believe Attorney Stachowske is

13   incorrect on that, your Honor.  We have -- we met with a member

14   of the SRT team.  I think they met for -- off-site for planning

15   purposes way in advance of 6:00 a.m., where they strategized

16   what they're going to do and they maybe began some off-site

17   surveillance of the property.

18           But the SRT team did not enter the property until --

19   to do its sort of initial clearance until right around six

20   o'clock.  It may have been a fraction of a minute or two early.

21   But as we've seen from the defendant's own surveillance videos,

22   I think the flash bang that they do is -- occurs at about 6:02

23   or 6:03 a.m.  So the agents actually executed the search

24   warrant, I don't believe it is, until after 6:30 or 6:45 a.m.

25           THE COURT:  All right.  So, Mr. Stachowske, do you

5

1    have evidence that calls that into question?  What I hear

2    Mr. Rombeau saying is that the team convened at around 4:30,

3    but they didn't actually enter the plaintiff's property -- the

4    defendant's property even to begin the search until six o'clock

5    or immediately prior to six o'clock, even the protective sweep.

6              MR. STACHOWSKE:  Well, I do, your Honor.  And I

7    apologize for this but I go back to the metadata, where we

8    started with this.

9              The photographs of the scene, some of the

10   photographs are taken as early as approximately 4:30 in the

11   morning, in the dark.  And I was under the impression after

12   reviewing the SRT letter that -- I've got it in front of me.

13             On March 26th, 2021, at 430 hours, I assisted ATF

14   with a search warrant in the town of Wilmot, New Hampshire.

15   After the 4:30 equipment issue, I responded to the town of

16   Wilmot to prepare for the 6:00 a.m. hours warrant service.

17             So the warrant service, in my opinion, would be the

18   actual execution of the warrant, but that the clearing of the

19   property would have taken place between 4:30 and 6:00.

20             So it -- it --

21             THE COURT:  So you have to decide after consulting

22   with your client what arguments to press on his behalf.  Your

23   view is even if the protective sweep occurred prior to 6:00,

24   well prior to 6:00, that doesn't violate the warrant because

25   the actual search wasn't conducted until 6:00 or thereafter

1    and, therefore, you're not pressing this argument.

2              MR. STACHOWSKE:  That's my understanding, your

3    Honor, yes.

4              THE COURT:  Mr. Rombeau, you're telling me that

5    you've investigated it and if and when this comes to it -- we

6    know the reality.  If -- the only way that we will not revisit

7    this is if the defendant's acquitted.  If the defendant's

8    acquitted, that will be the end of it.  If the defendant is

9    convicted, he will assert that Mr. Stachowske was ineffective

10   in failing to bring this argument and we will have to address

11   it at some point.

12             I want on the record what your position is, and your

13   position is you have already investigated it and the evidence

14   will show that they did not physically enter the property.

15   It's one thing to stand outside the property boundaries and

16   conduct surveillance, which one can do at any time of the day,

17   but that they did not enter the property and -- even to do the

18   protective sweep until after six o'clock.  And you say the

19   flash bang which commenced the -- the protective sweep was at

20   about 6:00, shortly after six o'clock, and so it would have

21   been immediately prior to 6:00 that they entered the property.

22             Do you have any response to his argument about the

23   metadata for the photos showing 4:30 a.m. photos?

24             MR. ROMBEAU:  That -- our response, your Honor, is

25   that the metadata is incorrect.  The SRT team -- and so that's

7

```
 1   what -- I will say that there's one caveat that I want to add
 2   that I understand some agents took up a -- a position on sort
 3   of the far end of the property just prior to SRT moving in, in
 4   case someone were to flee.  I think that that's not -- in our
 5   view, that's sort of open fields, you know, so they were on the
 6   property, but not -- you know, in any sort of improper way when
 7   SRT entered as sort of the initiation of the operation at 6:00
 8   a.m.
 9                So I just wanted to make that distinction.  But --
10   so our view is there would be no factual basis for the
11   argument, were Mr. Stachowske to press it, that they entered
12   and executed the warrant too early.  So we're not concerned --
13                THE COURT:  Well, my instruction is to make sure you
14   gather and preserve any evidence you have that bears on that
15   particular issue because I suspect if the defendant is
16   convicted, we'll be revisiting it.  Okay?
17                But I respect Mr. Stachowske's right to try to press
18   arguments on his client's behalf that he has a good faith basis
19   to pursue.  He doesn't believe he has a good faith basis,
20   although he disagrees with you about certain facts, and that --
21   they'll come out, if necessary, if it's raised in some kind of
22   postconviction notice.
23                All right.  So I'm not going to spend further time
24   on it.  Unfortunately, I spent time researching it and thinking
25   about it because that argument was presented, but I'm not going
```

```
 1    to express any final conclusions about it.

 2              Okay.  So the next thing that I want to take up is

 3    the immunity argument.  I have the parties' briefs on those

 4    issues.

 5              Mr. Stachowske, one allegation you make is that the

 6    government threatened the witness and I'm wondering if when you

 7    say threatened what you mean is what Ms. Krasinski said she

 8    did, which was to request that counsel be appointed for the

 9    witness and that she noted in it communications with her -- the

10    witness's counsel what she noted as shown in her emails.  Is

11    there anything more than that that you have to support a claim

12    of a threat?

13              MR. STACHOWSKE:  Your Honor, I -- the -- the

14    additional evidence would be that I have had a conversation

15    with Attorney Krasinski regarding this witness's testimony and

16    I was reminded of the potential charges that could be brought

17    against her.

18              I have reviewed the case law under *Angiulo*, *Castro*,

19    and *Rogers* -- well, under *Angiulo* and *Castro*.  I don't see her

20    raising the potential prosecution of this witness as being

21    necessarily a threat, but I -- my argument is that as it

22    relates to my client's due process rights, in the balance that

23    this office, the prosecutors, plurally, have purposefully

24    withheld the use immunity to hide exculpatory evidence from the

25    jury.
```

9

```
1              THE COURT:  Okay.
2              MR. STACHOWSKE:  And so --
3              THE COURT:  I just -- just to close the loop on
4    this, though.  I understand that you have that argument, but
5    you also made a statement of a threat.  And, as you know, one
6    of the ways in which a defendant can make a -- out an argument
7    of a due process violation is allegations of intimidation.
8              And to the extent there's intimidation or threats,
9    it's the government discovering that the weapon had been
10   stolen, notifying -- when the -- when the witness was preparing
11   to testify at a preliminary hearing, informing the Court that
12   the weapon had been stolen and the witness might need to have
13   an attorney appointed, communicating with that counsel
14   regarding the issue.
15             And that's -- that is what it is.  Whether -- but
16   there's no other evidence that could qualify as threat or
17   intimidation other than that that I'm aware of and I just want
18   to -- if you've got something else on just that point, I'd like
19   to hear it.  Is there anything else you have on just that
20   point?
21             MR. STACHOWSKE:  I don't have the date of the
22   conversation.
23             Just backing up, as being a party to that initial
24   email, I, too, agreed that -- that this witness needed counsel
25   and raised the issue with the Court.
```

10

1              THE COURT:  Okay.

2              MR. STACHOWSKE:  That led to Attorney Kennedy's

3     appointment.

4              THE COURT:  Yeah, I think that's what ethics would

5     require when you're going to have a -- and I do routinely -- if

6     I had been presiding at that hearing and someone had informed

7     me that a witness was about to testify who had a potential

8     criminal exposure, it's standard practice to advise the witness

9     that there's a risk and that -- to offer to have counsel

10    appointed.

11             And that's just -- ordinarily that's what a judge

12    does, that's what a prosecutor does, that's what a lawyer does

13    in those circumstances.  So I'm not inclined to infer anything

14    improper about that, and I just didn't see anything else

15    improper.

16             I understand you have this second argument which is

17    they're intentionally asserting this with the purpose of

18    depriving you of evidence you need to put on an effective

19    defense.  I think that's your principal argument.  I just want

20    to make sure there's nothing else on the -- the threat prong of

21    this that you're relying on.

22             MR. STACHOWSKE:  I would emphasize that the

23    government's made Ms. Finnigan well aware of the potential for

24    prosecution and yet at the same time in the government's own

25    pleading to this Court, in response to our request for

1   immunity, the government's acknowledged that at this time the

2   government has no evidence that either Donovan or Finnigan knew

3   that the shotgun was stolen and neither has been charged with

4   the crime of possessing a stolen firearm.

5          Now, your Honor, the -- the firearm was taking --

6   the -- the incident regarding the firearm took place well prior

7   to the March 2021 incident.  And in addition to that, upon

8   determining that the shotgun was stolen, the government's had

9   over, what, six months now, since March, to investigate this

10  firearm.

11         They've got -- they've got everything they need to

12  prosecute this witness, should they desire to do so.  And their

13  unwillingness to proceed against Ms. Finnigan but yet hang it

14  over her head when Mr. Donovan is the -- the primary target in

15  this case does amount to a threat.

16         They've got the -- the owner itself, we know from

17  another pleading, that Mr. Kevin Kwiatkowski is apparently

18  scheduled to testify.  He's the proper owner of this firearm.

19  They have -- they have knowledge that it's stolen.  They've got

20  all the information necessary to bring a few charges against

21  Ms. Finnigan and yet they've refused to do so.

22         If this was put in a different context, this -- for

23  example, the confidential informant that led to my client's

24  arrest and the search of his property, she was prosecuted and

25  she's protected now that she's been prosecuted.

1          So when the tides are turned, the government has the

2    right to prosecute somebody.  When they want to use that

3    witness subsequently, they do so.  But their failure to do so

4    now is knowingly, intentionally, and amounts to a threat.

5          THE COURT:  Okay.  I don't see that as a threat.  I

6    really see it dealing with the second prong.  Maybe I should

7    just explain my understanding of the law.

8          So the standard that I believe I should use when

9    evaluating a request by the defense to compel a grant of use

10   immunity to a defense witness is described in the

11   First Circuit's decision in *United States against Berroa*,

12   reported at 856 F.3d 141 at page 159, a 2017 First Circuit

13   decision, and *Curtis vs. Duval*, another First Circuit decision

14   reported at 124 F.3d 1, a 1997 decision.

15         Under those cases, the standard that I must use in

16   determining whether a grant of immunity should be awarded over

17   the government's objection requires a showing, now quoting from

18   *Berroa*, "showing that the government's refusal to provide said

19   immunity violated the defendant's due process rights."

20         Again, picking up in *Berroa*, quoting again, "in

21   order to prevail on such a claim, a defendant must establish

22   that the government intentionally attempted to present a

23   distorted version of the facts at trial."

24         And then, finally, quoting again, "this type of

25   deliberate distortion can occur in two ways; if the government

13

```
1    attempts to intimidate or harass a potential witness or if the
2    prosecutor purposely withholds use immunity to hide exculpatory
3    evidence from the jury."
4         I don't see any evidence that the government
5    attempted to intimidate or harass a potential witness here.
6    The only evidence of that sort that could be even argued
7    from -- from the evidence the parties have presented me with is
8    evidence that the government asked the Court to appoint counsel
9    for a witness who had a potential Fifth Amendment exposure.
10         I don't find anything improper about that, nor do I
11   find the government's communications with either the
12   defendant's counsel or the witness's counsel to be any kind of
13   an improper attempt to intimidate or harass.
14         So in my mind, the defendant's motion turns on
15   whether the defendant can establish that the prosecutor
16   purposefully withholds use immunity to hide exculpatory
17   evidence from the jury, and I find Mr. Stachowske's argument to
18   be directed to that prong of the standard and I understand him
19   to be arguing that, hey, the government has identified this as
20   a stolen weapon; the government has recovered the weapon;
21   months and months have passed, no charges have been brought;
22   from that we should infer that this is not an effort merely to
23   preserve the government's power to successfully prosecute a
24   potential criminal, but that, in fact, the government has no
25   intention to prosecute this witness for this crime and is
```

14

1    merely maintaining the fiction of a threat of prosecution to

2    prevent the defense from calling her as a witness.

3            So I understand that to be Mr. Stachowske's

4    argument.

5            Whoever's going to address that from the

6    government's side, what's your response?

7            MS. KRASINSKI:  Sure, your Honor.  I mean, at this

8    point, we don't have any evidence, as Attorney Stachowske said,

9    that she knew the gun was stolen before discovery was provided

10   in this case and so she hasn't been prosecuted for possession

11   of a stolen firearm because at this point we don't have

12   competent evidence to prove that.

13           I mean, there are other -- there is other potential

14   exposure here, for example, provide -- knowingly providing a

15   firearm to a felon, but, again, at this point she hasn't been

16   prosecuted because we don't have sufficient competent evidence

17   to prove that.  Obviously --

18           THE COURT:  Well, let me stop you.  So there are two

19   potential crimes that you've identified:  One is some

20   culpability with connection -- in connection with the -- the

21   theft of the firearm; related to that would be, and I don't

22   know if there's a federal equivalent to this, but there

23   certainly is under state law, knowing possession of stolen

24   goods potentially is a criminal exposure; and a third exposure

25   that you've identified is -- is this last offense that I'm not

15

1  familiar with, which is providing a weapon to a convicted

2  felon.  Is that what you're --

3           MS. KRASINSKI:  Yes, your Honor, knowing the

4  person -- to be transferring a firearm to a person known to be

5  prohibited.

6           THE COURT:  All right.  Do we have evidence that she

7  has claimed the firearm as her own --

8           MS. KRASINSKI:  Yes.

9           THE COURT:  -- in communication with the government,

10 although you say the circumstances of that are suspicious and

11 suggest that it's a manufactured claim and you provide various

12 evidence -- pieces of evidence to try to support that position

13 but if that were true, that she, in fact, was the owner of the

14 firearm, you have all the evidence that you have here of her --

15 that would also support a prosecution of her for providing that

16 to Mr. Donohue (sic), who is a prohibited person; she would be

17 in a position to know that; you could probably prove and

18 therefore you could probably prove her guilt of those charges.

19           To me the question is not whether you have

20 sufficient evidence to prosecute and have withheld prosecution;

21 the more realistic question is have you been able to rule her

22 out from liability under any of these charges.

23           Because if you knew that she was not, in fact,

24 guilty of these charges or had evidence sufficient to cause you

25 to make a decision not to prosecute and you continued to assert

16

```
 1    that right to prosecute, that would be much more significant

 2    evidence calling into question whether your intention here is

 3    to deprive the defendant of evidence rather than to simply

 4    preserve your right to hold a criminal to account if evidence

 5    develops later on.

 6              Do you have any evidence which would cause you to

 7    rule her out as having criminal exposure under any of the

 8    theories that you've identified?

 9              MS. KRASINSKI:  No, your Honor.

10              THE COURT:  All right.  So I've got Mr. Stachowske's

11    argument that you haven't prosecuted to date, which suggests

12    you don't intend to, which suggests this is being done for an

13    improper purpose, and I have your response to that.

14              Is there anything else you want to say,

15    Mr. Stachowske?

16              MR. STACHOWSKE:  Just that this is highly

17    exculpatory evidence that would be potentially otherwise

18    withheld when one of the elements in this case -- I think the

19    crux of this case is constructive possession and that

20    Ms. Finnigan is a key exculpatory witness and without her, my

21    client's due process rights are drastically hindered.

22              THE COURT:  All right.  So what you're really

23    asserting there is what the court in *Duval* calls an effective

24    defense theory.  And that's a -- that's an argument that I

25    understand that the circuit rejected in *Duval*, where the court
```

17

1    said notwithstanding the Third Circuit's pronouncement about

2    the theory, the effective defense theory has been roundly

3    rejected by other courts, most of which have agreed that the

4    power to grant immunity properly belongs to the executive

5    branch.

6           And I think -- and then he goes on to note, quoting:

7    We ourselves in a case decided only recently explicitly

8    rejected the effective defense theory.

9           So I don't think merely showing that it's necessary

10    to an effective defense is sufficient to cause the government's

11    withholding of immunity to be a due process violation, at least

12    in the First Circuit.

13           Did you have any response to that?

14           MR. STACHOWSKE:  No, your Honor, I agree with that

15    research.

16           THE COURT:  And I understand it's important, but

17    it's not the only way you could try to prove this defense.  So

18    you could -- this doesn't preclude you in any way from calling

19    other witnesses who may have seen her possessing the weapons,

20    may have heard her making admissions about the weapons if there

21    are exceptions to the rules of evidence that would justify the

22    admission of such evidence.  So there may be other ways to

23    establish this other than through her testimony.

24           I don't find here any evidence that the government

25    is intentionally withholding this for a -- the improper purpose

18

```
 1    of trying to deny the defendant a witness that would benefit

 2    him.  And I don't -- instead, it is my finding here that the

 3    government is simply preserving its right to potentially

 4    prosecute this defendant in the future.  Granting use immunity

 5    to a witness, although doesn't absolutely bar that witness's

 6    prosecution, can make a -- a successful prosecution later on

 7    very difficult because of derivative use.

 8              You folks probably won't born then, but if you go

 9    back to the Iran Contra investigation that I was involved with,

10    my committee granted use immunity to Oliver North and Admiral

11    Poindexter and the D.C. Circuit later ruled that their

12    subsequent prosecution was impossible in light of the court's

13    grant of use immunity.

14              I was an advocate at that time for not granting them

15    use immunity for exactly that reason.  I ultimately concluded

16    that I was wrong about that because the benefit of getting

17    their testimony was greater to the public than the -- of

18    preserving the independent counsel's ability to successfully

19    prosecute them.

20              So I've ultimately come around to the belief that

21    that decision was a correct one, although I -- I believed as a

22    former prosecutor that it made their prosecutions very

23    difficult.  But that's just an example of why a grant of use

24    immunity is potentially in most cases makes it almost

25    impossible to prosecute a defendant, particularly when the
```

19

```
 1   government has not yet acquired and locked in all of the
 2   evidence it needs to successfully prosecute the defendant,
 3   something that the government says that it does not have here.
 4           So I think the defendant has -- excuse me -- I think
 5   the government has a legitimate interest in preserving its
 6   ability to prosecute a potential offender and does not violate
 7   due process by refusing to grant use immunity here.
 8   Accordingly, I deny the defendant's motion.
 9           Is there anything that the government needs me to
10   find or say, address -- any issues they need me to address
11   other than what I've said about this motion?
12           MS. KRASINSKI:  No, your Honor.
13           THE COURT:  Anything else from you, Mr. Stachowske,
14   on this particular motion?
15           MR. STACHOWSKE:  Oh, I'm sure my client would have
16   me note the objection.
17           THE COURT:  Yeah.  And that's -- that will be
18   preserved.
19           All right.  So the -- there are a couple more
20   motions in limine that we can at least tentatively address or
21   try to address here.
22           There's a United States motion in limine regarding a
23   prior unrelated verdict.  I didn't have a -- a response on that
24   yet.  Has there been a response filed today?  I've been busy
25   all day.  Did you file a response yet on that, Mr. Stachowske?
```

20

```
 1                MR. STACHOWSKE:  I'm sorry.  I'm -- I've missed that

 2     motion.

 3                THE COURT:  Yeah, it's -- it's -- and we don't need

 4     to address it today, but it's essentially you've apparently

 5     listed as a government -- as a defense witness a cooperator who

 6     provided information used to obtain the search warrant in the

 7     present case who also provided information that was used in an

 8     unsuccessful attempt to prosecute another defendant.  They want

 9     to bar you from referencing the fact that there was an

10     acquittal in that case.  That was the case that was tried

11     recently to Judge McAuliffe to a defendant's verdict.

12                You don't have -- you haven't responded yet, so you

13     don't have to respond.  We won't -- we won't take it up now.

14     Just -- I'll just instruct, Mr. Stachowske, don't make

15     reference to that witness in front of the jury in your opening

16     statement and don't reference it or call the witness until

17     you've -- are ready to respond to that motion that the

18     government has filed.

19                MR. STACHOWSKE:  Yes, sir.

20                THE COURT:  All right.  Are there other pending

21     motions in limine that we should address prior to opening

22     statements?

23                MR. STACHOWSKE:  I think so, your Honor.

24                THE COURT:  What have you got?

25                MR. STACHOWSKE:  So I guess I'll proceed by
```

1    category.

2          There is an unrelated June 2019 arrest.  Both

3    parties have briefed this issue.

4          THE COURT:  Oh, that's the -- that's the DWI and the

5    Jeep issue?

6          MR. STACHOWSKE:  Yes.  Yeah.  He was found slumped

7    in his vehicle with three firearms, acquitted on the state

8    trial.  The government decided not to go forward on that.

9          Anna has --

10         THE COURT:  Directed felon in possession of the

11   state -- in state court or acquitted?  What was his defense?

12         MR. STACHOWSKE:  I wasn't -- he was taken --

13         MS. KRASINSKI:  It was -- his then girlfriend at the

14   time claimed ownership of the gun in the Jeep.

15         THE COURT:  Same girlfriend that this --

16         MS. KRASINSKI:  Different girlfriend.

17         THE COURT:  Wow.  That's pretty impressive.  Who was

18   the defense lawyer?

19         MR. STACHOWSKE:  Zuhn, Matt Zuhn, Z-u-h-n.

20         THE COURT:  Yeah, I don't know him.

21         Okay.  So what does the government want to -- can

22   the government -- would the government have -- I'm not saying

23   you have to do this, but would you be willing to sanitize this

24   so that it makes no reference to firearms and no reference to

25   the DWI conviction?

1          MS. KRASINSKI:  Yes.  So there's -- the only reason

2     that we want to introduce this at all is because when officers

3     interacted with Mr. Donovan, they ultimately got a warrant to

4     search his Jeep and they seized a firearm, which we don't want

5     to bring up, but in addition to the firearm that was seized,

6     they seized a scope and they seized a gun cleaning kit.

7          The scope was photographed and it received an

8     evidence tag number that was handwritten on it in Sharpie.  So

9     the scope was marked with the seizing officer's initials,

10    JPM --

11         THE COURT:  Can I stop you?  I thought you wanted to

12    show that he controlled the Jeep.  No?

13         MS. KRASINSKI:  No.  I think we have sufficient

14    evidence more close in time that he controlled the Jeep that

15    what we're really focusing on is the fact that this specific

16    item was then returned to Corey Donovan and we have the form

17    that he signed acknowledging receiving the scope and the gun

18    cleaning kit and then the scope was found, again, during this

19    search right next to ammunition that's charged.

20         So the issue isn't about --

21         THE COURT:  What can you tell me about where the

22    ammunition was, where the scope was?  Tell me the details.

23         MS. KRASINSKI:  So there was a big sort of barn

24    workshop on the property and in the shop there was an open long

25    gun case.

1    Out on top of the open long gun case was a bandolier

2    that contained ammunition, a few loose rounds of ammunition, a

3    shotgun barrel which happens to be the companion barrel that

4    was sold with the shotgun that was recovered from the Jeep --

5    the shotgun was sold with two barrels.

6        THE COURT:  What do you mean companion barrel?

7        MS. KRASINSKI:  So this shotgun is sold with a

8    barrel to shoot slugs and a barrel to shoot like birdshot.  So

9    one is rifled and one is not.  And you can take this gun and

10   you can swap out the barrel, depending on what you're going to

11   hunt.

12       THE COURT:  When you buy it legitimately, it comes

13   with two barrels.

14       MS. KRASINSKI:  That's correct.

15       THE COURT:  And you have somebody that's going to

16   testify this barrel goes with this shotgun that's found in the

17   Jeep.

18       MS. KRASINSKI:  Yes.

19       THE COURT:  Okay.

20       MS. KRASINSKI:  And the ammunition that's -- that

21   was on this open gun case along with the barrel is also

22   charged.  And the scope that is still marked -- I mean, you'll

23   be able to see it tomorrow when it's -- when we move to

24   introduce it -- is still marked in Sharpie JPM27J.

25       THE COURT:  All right.  Good.  All right.

```
 1              So is that scope also a scope that's compatible with
 2   the shotgun or is that a completely different kind of weapon?
 3              MS. KRASINSKI:  It is compatible with the shotgun,
 4   although the shotgun, as it was seized --
 5              THE COURT:  You don't usually use scopes with
 6   shotguns.  That's why I'm --
 7              MS. KRASINSKI:  That's true, but the shotgun
 8   actually has a different scope mounted to it.
 9              THE COURT:  All right.  Wow.  Okay.
10              And exactly how far away was the scope from the
11   ammunition?
12              MS. KRASINSKI:  Eight inches maybe.
13              THE COURT:  So it's in the open case?
14              MS. KRASINSKI:  It's in the open case.
15              THE COURT:  All right.  Yeah, that's a completely
16   different thing, Mr. Stachowske.  I -- that seems obvious to me
17   that that should be admitted.  What's your argument that it
18   shouldn't?
19              We'll sanitize it, there'll be no reference to any
20   firearms, there'll be no references to DWI.  It's simply to
21   establish that he -- he was in the Jeep -- was anybody else
22   with him in the Jeep?
23              MS. KRASINSKI:  His then girlfriend, Courtney
24   Donohue --
25              THE COURT:  The old girlfriend.  So you can elicit
```

1  information about who was with him in the Jeep, you can elicit

2  information that, among other things, a scope was seized; that

3  he asked for it back; that this was the scope, this was how it

4  was labeled; you can have a witness testify that that was the

5  scope; you can have people testify where the scope was found in

6  relation to the charged ammunition.

7       It clearly is relevant for a -- a legitimate purpose

8  of trying to show the defendant's -- the connection between the

9  defendant and the ammunition.  It's not admissible to show that

10  he possessed some kind of other firearm or that there's

11  anything inherently wrong with the scope.

12       If Mr. Stachowske wants some kind of limiting

13  instruction from me such as there's nothing wrong with the

14  possession of a scope, the defendant did nothing wrong by

15  possessing any scope, you may have found him possessing it and

16  you can't infer anything from the fact that he possessed a

17  scope about anything that's improper in and of itself.

18       Instead, the scope is being admitted to the extent

19  you deem it relevant in determining whether the ammunition that

20  was seized at the time the scope was seized in the search of

21  the barn or whatever it was was possessed by him.  Something

22  along those lines, I would grant a limiting instruction.

23       So it's a rule -- it's a Rule 403 thing.  It plainly

24  is relevant under Rule 401 to show possession of the charged

25  ammunition.

```
 1            The probative value is not substantially outweighed

 2   by the danger of unfair prejudice under Rule 403.  I am

 3   prepared to grant -- I am instructing the government to

 4   sanitize that evidence, instructing the witness not to make any

 5   reference to other weapons found in the -- in the Jeep or

 6   anything about the DWI charge, and I am prepared to grant a

 7   limiting instruction, if one is requested by Mr. Stachowske,

 8   who should draft it in advance and prepare it to me -- prepare

 9   it for me.

10            If he doesn't do that, I'll do the best I can on the

11   fly, but I will give one if the defendant wants one.  If the

12   defendant doesn't ask for one, I won't give one because that's

13   a tactical choice that counsel needs to make when determining

14   what's in the client's best interest.

15            All right.  Do you need me to rule -- anything else

16   you need me to say about the scope, Mr. Stachowske?

17            MR. STACHOWSKE:  No, your Honor.  As part of the

18   sanitizing effort, I'd ask that we take it -- I'd propose that

19   we take it a step further and disallow any reference to prior

20   police contact and simply -- potentially my client would even

21   stipulate that he was the owner of that scope.  I'd need to

22   talk to him about that.

23            THE COURT:  Yeah, you need to think about that and

24   both of you can look at a case called *Old Chief*, you may -- I'm

25   sure prosecutors have been trained on *Old Chief* which is
```

27

1   essentially the government can't be forced to stipulate to most

2   kinds of things and they are entitled to prove most kinds of

3   things.  And I think the government is -- seemed to go quite

4   far in agreeing to stipulations here.

5           To the extent the government believes there's

6   evidentiary value in showing that there's a tag on this

7   particular scope, that it's a police tag because the scope was

8   seized, I don't find that that -- I -- I'm not inclined, under

9   the *Old Chief* line of cases, to compel the government to

10  stipulate.

11          Now, I haven't gone back and looked at *Old Chief*.

12  I'm just trying to remember it.  But if you have a different

13  understanding of the case law, present it to me and -- but,

14  otherwise, if the government isn't willing to stipulate, I do

15  think there is evidentiary value that's entirely legitimate and

16  appropriate for the government to be able to conclusively

17  identify this particular scope to the scope that was found in

18  Mr. Donovan's Jeep at a time that he and a former girlfriend

19  were there and that's the best way of identifying it as the

20  particular scope that was in his vehicle.

21          And if he's not willing to stipulate, yes, that was

22  his scope, which is something I doubt he's likely to stipulate

23  to, given the success of the girlfriend-did-it defense, which

24  is what he seems to be trying to replicate here, I -- I'm not

25  inclined to force the government to further stipulations unless

28

1    the defendant presents me with case law suggesting that that is

2    an appropriate remedy here.  Again, I don't see that there's

3    danger about unfair prejudice that substantially outweighs

4    probative value.

5              But I note your argument and tell you that if you

6    give me case law, I might assess it.  If you don't give me case

7    law, I'm inclined to deny it for the reasons I've said.

8              MR. STACHOWSKE:  There is --

9              THE COURT:  Yes, Ms. Krasinski?

10             MS. KRASINSKI:  I just wanted to make sure the Court

11   was aware there was one other additional item seized from the

12   Jeep in 2019 and returned to Mr. Donovan in 2020 that we

13   believe was found again, and that is a gun cleaning kit that

14   was -- in 2019, it was new in its plastic case.

15             In 2021, what appears to be an identical gun

16   cleaning kit, although no longer new in its case, was seized in

17   the ammunition box that also contained charged ammunition.

18   It's not marked the same way that the scope was.  What we had

19   anticipated that the officer who returned both the scope and

20   the gun cleaning kit would testify is that he'd be able to say

21   without equivocation the scope is the scope that I returned and

22   the gun cleaning kit appears to be the same, but since it's

23   been removed from the marked new container --

24             THE COURT:  Doesn't that become cumulative at that

25   point?  I mean, is it any closer to the ammunition than the

29

1    scope?

2              MS. KRASINSKI:  They're in different locations.  So

3    there's ammunition seized in three separate locations in the

4    property.

5              The gun and some ammunition were seized in the Jeep;

6    some ammunition and the scope were seized in this workshop; and

7    some ammunition was seized in an ammunition case in what I sort

8    of call a -- kind of a junk Hyundai that was parked outside of

9    the garage.  It didn't have any tires on it, it didn't have any

10   windows.  Sitting inside of it was an ammunition can.  In that

11   ammunition can was this gun cleaning kit, more ammunition, the

12   manual to the shotgun that was seized from the Jeep.

13             THE COURT:  Is it a gun cleaning kit that is

14   compatible for a shotgun?  I don't --

15             MS. KRASINSKI:  It is.

16             THE COURT:  I'm not a gun owner, so I don't know

17   what these things are.

18             Are there -- like I would imagine the barrel cleaner

19   has to be kind of compatible with a larger barrel.  Is there a

20   gun cleaning kit for a shotgun --

21             MS. KRASINSKI:  Correct.

22             THE COURT: -- as opposed to a handgun?

23             MS. KRASINSKI:  It could, your Honor.  It has sort

24   of three metal rods that can screw together to clean the entire

25   barrel of a shotgun.

30

1          THE COURT:  I see.  And how close -- I mean, there

2    are probably a number of different manufacturers, a number of

3    different styles, a number of different things one could say

4    about a gun kit.

5          The First Circuit case law on chain of -- on saying

6    that a thing is what it purports to be is pretty loose, I will

7    acknowledge, and I tend to be quite -- quite a bit more strict

8    in how I view that, interpret that evidence.

9          So if the officer comes in and says, yeah, we had a

10   gun cleaning kit; yeah, it looks sort of like that.

11         Is it going to be that kind of testimony or is it

12   going to be we had a such and such manufacturer model number

13   XYZ gun cleaning kit; this is a such and such manufacturer XYZ

14   gun cleaning kit.  I looked at the gun cleaning kit that I

15   seized and I looked at this one and I see nothing different

16   about them except that it was new at this date and it appears

17   to be used at this date.  Otherwise they appear to be the same.

18         Is it going to be more like that testimony or is it

19   going to be more like, yeah, two gun cleaning kits.

20         MS. KRASINSKI:  No, it's going to be more -- more

21   like the other test.

22         So we have -- and, I'm sorry, the version I have

23   right now is quite small, a picture of the gun cleaning kit on

24   page 4 of the response and it is the exact same color bottle,

25   type of bottle, company that manufactured both.  I think one is

31

```
 1   an oil and one is a cleaner.  So both of those bottles appear

 2   to be identical and I think that's what -- that's what he would

 3   say.  I mean, it's no longer new in this plastic case, but

 4   it --

 5           THE COURT:  He sought the return to the gun cleaning

 6   kit as his; he went to the police station and asked for it

 7   back.  This is what the police gave him?

 8           MS. KRASINSKI:  Correct, your Honor.

 9           THE COURT:  All right.

10           Yeah, again, I'm certainly prepared to give a

11   limiting instruction here, but that does seem to be evidence,

12   if it comes in as you've identified, is sufficient to -- to

13   qualify as relevant for the purpose of trying to establish the

14   possession element with respect to the ammunition that the gun

15   cleaning kit is in the immediate vicinity of.  Under Rule 403,

16   the prejudicial effect is not -- does not substantially

17   outweigh that probative value.

18           Again, we would do the same sanitization rules.  I

19   would again agree to a limiting instruction and I leave it to

20   the defense at the time the evidence is offered to determine

21   whether to request a limiting instruction, but I'm inclined to

22   admit the evidence.

23           Okay.  Does that conclude that government memo or

24   motion?

25           MS. KRASINSKI:  (Nods head.)
```

1          THE COURT:  All right.  Is there another -- so,

2  Mr. Stachowske, do you have another motion in limine?

3          MR. STACHOWSKE:  I'm learning through the pleadings

4  that the government intends to call Mr. Kwiatkowski --

5  Kwiatkowski, ironic, given my name -- regarding the stolen

6  firearm.  He is the lawful owner.  I object to the relevance in

7  any shape or form of that testimony.

8          THE COURT:  All right.  Let's stop and ask, why is

9  that relevant?

10          MS. KRASINSKI:  For two reasons, your Honor.

11          First, the owner of the gun is going to be the one

12  to testify that when I bought it, it came with two barrels and

13  that -- that barrel, the one that was found in the shop, is the

14  barrel that goes with the shotgun that was found in the Jeep.

15          THE COURT:  So it's the type of barrel that goes

16  with the shotgun --

17          MS. KRASINSKI:  That's right.

18          THE COURT:  -- the barrel, which would imply

19  identity unless there's a marking on that makes it -- like is

20  the serial number on that barrel?

21          MS. KRASINSKI:  Well, there's no serial number on

22  the barrel.  So he'll -- Kwiatkowski will say there are two

23  barrels, that looks like the barrel that came with it.

24          And then there are markings on the barrel that

25  identify that it was made at a facility in El Paso, Texas, and

33

1  we expect Agent Forte to say that I know that the facility in

2  El Paso, Texas, is a subsidiary of Mossberg.

3          THE COURT:  All right.  But back to the witness.

4          MS. KRASINSKI:  Yeah.

5          THE COURT:  When -- so I have a pair of glasses

6  here.  They look a certain way.  There are probably thousands

7  and thousands of pair of glasses that are made -- exact same

8  style, exact same magnification, have the exact same amount of

9  wear on them.  If you showed me one of those, I couldn't tell

10  you, oh, those are my glasses.

11          How can he say that's my barrel?  I don't want him

12  to speculate because unless he can point to something that

13  would be identifying, I think that's just rank speculation to

14  say that's my barrel.  That's the same type of barrel that I

15  have that came with the gun and I -- when I last owned the gun,

16  it had that barrel, something along -- those two barrels.

17          That's fine, just not -- no discussion, obviously,

18  about what happened to the gun, how he transferred -- you know,

19  whether he transferred it or anything like that.

20          MS. KRASINSKI:  So I have to say, your Honor, up

21  until October 5th, the government had absolutely no intention

22  of introducing any evidence that the -- that the firearm was

23  taken from his storage unit.

24          But then we received the batch of sort of the

25  defendant's most recent jail calls and video calls.  And in a

34

```
 1    video visit with his girlfriend on September 28th of this year,
 2    the two discussed the testimony -- or discussed the discovery
 3    about the -- the shotgun being taken from --
 4                THE COURT:  Is that the clip where she talks about
 5    his shotgun?
 6                MS. KRASINSKI:  Where she's -- yes.  And she -- and
 7    the point of the clip for the government is they talk about --
 8    so what she says is:  Like you wouldn't notice your
 9    new-in-the-box 12-gauge shotgun taken.  And the problem is this
10    is not a 12-gauge shotgun.  And he quickly corrects her and --
11                THE COURT:  He says 20.
12                MS. KRASINSKI:  He says 20.
13                THE COURT:  But he would have known that by
14    reviewing the discovery, even if he didn't possess it.
15                MS. KRASINSKI:  And I think --
16                THE COURT:  The defense argument is, hey, even if he
17    had nothing to do with the shotgun, this -- this call occurred
18    on X date after which discovery had been provided which
19    identified the weapons.
20                And -- so I -- I understand you -- that's relevant,
21    certainly it's relevant, and should -- should come in, but I
22    don't think it -- it's -- it's as devastating as you think it
23    is because the defense will argue, yeah, of course he knew it
24    was a -- that it was a 20-gauge because, you know -- and I
25    think he said something like or whatever or something.  I
```

 1  looked at it earlier quickly.  I've been ...

 2          So two strikes me as relevant.  It doesn't strike me

 3  as improper or excludable under any reason.  But whether it

 4  conclusively establishes the point, I don't know.  But how does

 5  that tie into your need to call the other guy, the owner?

 6          MS. KRASINSKI:  So it just -- they're discussing

 7  that it's taken from a storage unit and so --

 8          THE COURT:  Oh, I'm sorry.  I didn't hear that.

 9  They talk about -- was that something that was disclosed in the

10  discovery?

11          MR. STACHOWSKE:  Yes, your Honor.

12          THE COURT:  Well, let me -- well, I won't bother --

13  I'll read -- I'll listen to it again.  I just watched it

14  without knowing exactly what -- so then, tell me, what is the

15  exact language about the storage unit?

16          MS. KRASINSKI:  I'm sorry.  I -- okay.

17          So she says -- so the beginning, and I don't have

18  the quote on this, is Mr. Donovan is explaining that

19  Kwiatkowski has multiple storage units and that he didn't

20  notice anything had been taken and --

21          THE COURT:  I'm talking about what does she say

22  about -- Donovan and her say about taking it from a storage

23  unit.

24          MS. KRASINSKI:  So after he says, you know, he

25  didn't report anything missing from his storage unit, Finnigan

```
 1   says, and I quote, like I wouldn't notice your brand-new
 2   12-gauge in the box missing.
 3             And then Corey Donovan says:  Yeah, 20-gauge or
 4   whatever it is.
 5             But so that's in the context of a discussion about,
 6   you know, the fact that it was taken from one of Kevin
 7   Kwiatkowski's storage units.
 8             MR. STACHOWSKE:  Your Honor --
 9             THE COURT:  What is the actual discussion -- or
10   maybe I just need to -- I mean, I started off my day drafting
11   jury instructions.  Then I edited a 25-page order on insurance
12   coverage matters.  Then I prepared for a preliminary injunction
13   hearing.  I held a preliminary injunction hearing and ruled
14   from the bench on it.  I've tried to prepare on motions in
15   limine.  I've worked on 10 or 15 other motions.  So I've been
16   busy today doing many things and I -- I can't remember the
17   exact language of that particular clip.  So I'll watch it.
18             But I -- you're -- how do you respond to what I
19   assume the defendant will say, which is this tells a jury
20   nothing other than that the defendant had access to discovery
21   materials that disclosed that the shotgun in question was taken
22   from a storage unit.  It doesn't tell us anything other than
23   that.  That's what the defendant would say.
24             MS. KRASINSKI:  Your Honor --
25             THE COURT:  And, therefore, it invites speculation
```

37

```
1   that they are culpable in the stealing of the firearm when

2   it -- it does nothing more than show that they were aware that

3   the -- from discovery that the firearm had been taken from a

4   storage unit.

5            MS. KRASINSKI:  So, first of all, I think it's

6   appropriate to address head-on and tell the jury that we don't

7   think that they were involved in the theft and that there's no

8   evidence of that and the jury shouldn't infer that.  I -- I

9   don't think we should leave it up to speculation.  I think a

10  jury -- a limiting instruction would be absolutely appropriate.

11           THE COURT:  Then why do we want to -- why do you

12  want to call the guy to say I left it in the storage unit and

13  then it was stolen?

14           MS. KRASINSKI:  I just think it provides context for

15  their conversation.  That's -- that -- I mean, without this

16  recorded video, we weren't even planning to go into it at all.

17           THE COURT:  Yeah.  I mean, I think the video is

18  relevant for reasons other than tying him to the storage unit

19  or showing that he had knowledge that it came from a storage

20  unit and I don't know why they need to hear about -- I mean,

21  they can hear the conversation about the storage unit and that

22  doesn't say -- I mean, I didn't glean anything from that, that

23  without knowing that this -- without calling the owner to say,

24  my gun was stolen from a storage unit, I wouldn't infer

25  anything bad about their discussion of the fact that it came
```

Document: 00118054127    Page: 117    Date Filed: 09/20/2023 of 6

38

1    from a storage unit.

2          What I infer bad is that she's talking about his

3    shotgun that she talks about as a 12-gauge and he corrects her,

4    a 20-gauge, not saying, what do you mean, by shotgun, that

5    was -- that's your shotgun.  That's what I took from it.  Maybe

6    I miss -- I mean, I just listened to it very quickly, but

7    doesn't it bear that interpretation, that she -- she makes a

8    comment about it being his shotgun and he doesn't correct her.

9          MS. KRASINSKI:  I -- I -- I don't glean that from

10   the clip, your Honor --

11         THE COURT:  Then let's not play it at all.  So I

12   think we're probably much better -- because I may have read

13   something into it that I shouldn't have.  That's what I read

14   into it, I said, wow, she said his shotgun and he didn't say

15   anything about it's not my shotgun.  You know, that seemed to

16   be shocking that he would have not disclaimed ownership of the

17   shotgun or -- that he's charged with possessing.  Like what do

18   you mean, girlfriend, that's your shotgun.

19         That's -- his defense is the girlfriend did it,

20   right?  That seems -- you don't have to say anything,

21   Mr. Stachowske.  That appears he won one on that, amazingly, in

22   another trial, so why not roll the dice and my new girlfriend

23   did it.  And -- but here you have a clip in which the

24   girlfriend is saying your shotgun and he's not correcting her.

25   But if you don't think it's useful for that purpose, then we

1    shouldn't play it at all because it doesn't really tell us

2    anything.

3          MS. KRASINSKI:  So, I mean, from the government's

4    perspective, right, the -- the idea that it -- the -- the

5    defense is it's her gun, but she doesn't know anything about

6    the gun.  And so that -- and he does.  He's the one who knows

7    about the gun.

8          THE COURT:  And she also says your shotgun.

9          MS. KRASINSKI:  She -- so I -- I think that's the

10   point, right.  In that context, she's talking about the owner,

11   Kevin Kwiatkowski, like you, Kevin Kwiatkowski, wouldn't know

12   your gun was missing.

13         THE COURT:  All right.  Stop.  I'm going to put you

14   on hold.  I'm going to blank out your cameras.  I'm going to go

15   listen to the tape again so I can comment on this.  All right?

16                    (Pause.)

17         THE COURT:  All right.  So I've reviewed the clip.

18         You've got to understand I just looked at it without

19   knowing anything about storage units and the guy that they were

20   talking about -- I mean, it's a clip of a conversation.  You

21   didn't give me the whole conversation.  I didn't have the

22   context in which the conversation occurred, I didn't understand

23   what they were talking about.  I tried to speculate as to why

24   it was relevant.

25         Now I understand your -- you -- that her comment

1    about your shotgun is a reference to your, the owner who has

2    the gun in a storage unit.  I mean, she's so hard to understand

3    because she's playing with her hair and kind of, you know,

4    making half-completed sentences.  They're just ruminating about

5    the discovery.  That's what it appears to me.  So it doesn't

6    appear to me to be highly useful at all.

7            Yes, he does correct her when she talks about a

8    12-gauge.

9            If she were to testify here, I -- you might be able

10   to use this in cross-examination.  If the -- there's evidence

11   admitted which tends to show that she bought the shotgun, she

12   owned the shotgun, something like that, I may reassess my

13   decision.  But my current thought is that it should not come in

14   in your case in chief.  It's too confusing.

15           Given that it occurred at a time when they would

16   have had discovery, there's a real danger that despite any

17   limiting instruction, the jury infers that their -- they were

18   culpable in storing -- in -- if they have knowledge other than

19   through the discovery, it would be because they were complicit

20   or knowledgeable about the theft, which is quite problematic

21   for him and would be prejudicial because he's not charged in

22   connection with that.

23           If they know it because of the discovery, the only

24   value is that she refers to it as a 12-gauge, he refers to it

25   as a 20-gauge, and, you know, provides some limited support for

41

1    your contention that it's not hers, it's his.  But on balance,

2    I -- based on what I know now, I don't deem the -- they have

3    sufficient probative value as that it would not be

4    substantially outweighed by the danger of unfair prejudice.

5             So I'm granting the motion in limine to bar

6    reference to the storage unit and his -- and I don't need the

7    owner's testimony about the storage unit either.  You can call

8    him to say, yeah, it came with two barrels -- yeah, this is my

9    gun and when I last possessed it, it came with two barrels;

10   this barrel is exactly the type of barrel that goes with this

11   gun.  But don't provide identity of testimony unless you have

12   more and don't provide evidence about it being stolen or taken

13   from his storage unit without getting my permission first.

14            MS. KRASINSKI:  Understood, your Honor.

15            Can we ask Mr. Kwiatkowski if he transferred the

16   firearm to Kelley Finnigan or to Corey Donovan?

17            THE COURT:  Why?

18            MS. KRASINSKI:  If her -- if the defense is she

19   owned the gun, then I think it -- his testimony that he didn't

20   give the gun to her or sell the gun to her has bearing on that.

21            THE COURT:  It doesn't -- I wouldn't allow him to

22   testify that he didn't give the gun to Mr. Donovan, but I would

23   allow him to testify that he didn't transfer the gun to the

24   defendant -- to the girlfriend.  He didn't transfer the gun to

25   anybody.

1          I'm inclined to say, no, that's -- we're just

2    getting in too far into the realm of asking the jury to

3    justify.  And you might be overthinking this.  I mean, you're

4    basing everything on trying to rebut the girlfriend-did-it

5    defense, I get that, but at the present -- I -- all these

6    rulings are tentative.  They're subject to reassessment.  Based

7    on the state of the evidence at the present time, I don't see

8    here that the answer to that question would have probative

9    value that's not substantially outweighed by the danger of

10   unfair prejudice.

11          MS. KRASINSKI:  Yes, your Honor.

12          THE COURT:  All right.  What else for motions in

13   limine?  Mr. Stachowske, have you got anything else?

14          MR. STACHOWSKE:  I do, your Honor.

15          There were items that the government's

16   characterizing as silencers.

17          THE COURT:  All right.  What do you want to say

18   about the silencers, Ms. Krasinski?

19          MS. KRASINSKI:  So the silencers were found on the

20   workbench next to -- that is next to the open gun case where

21   the ammunition and the barrel were found.

22          And sort of the other thing that's important to

23   understand about this shotgun is it doesn't look like a shotgun

24   anymore.  It is -- it has a scope on it.  It has a light on it.

25   It's been drilled out, the barrel has been drilled out, so that

43

1    there are six or seven sort of drill holes at the end of the

2    barrel.  Frankly, someone who doesn't know firearms looking at

3    it would think it's a rifle.

4            So we anticipate Mr. Kwiatkowski to say that when it

5    was in his possession, it -- it didn't look like that.  It

6    didn't have the scope, it didn't have the drilled holes, it

7    didn't have the light.

8            And so there's sort of two pieces of it.  First, you

9    know, I think possession of the gun, it's going to sort of come

10   down to the person who's tinkering with the gun, the person

11   who's going to be drilling holes, the person who's -- who's

12   kind of showing that they're tinkering with these things.  And

13   so the fact that there are silencers, sort of another tinkerer

14   someone -- someone's tinkering with, one is --

15           THE COURT:  Are those --

16           MS. KRASINSKI:  -- one is shot through --

17           THE COURT:  Are these -- are these manufactured as

18   silencers?  Are these improvised silencers?  What's the means

19   of attachment of them to the shotgun?  What do they have to do

20   with this particular firearm?

21           MS. KRASINSKI:  So they're homemade silencers made

22   out of oil cans.  One is shot through and they're found sort of

23   part of the mere -- near the gun case.

24           And I -- and I think sort of the other aspect for us

25   is there was gun accessories, gun paraphernalia, littered --

1             THE COURT:  It sounds as though -- that's --

2    possession of silencers is like a crime, so we're going to be

3    very careful about putting in evidence of uncharged crimes.

4    And just telling me, well, they're in the vicinity of X, I'm

5    not -- that's not going to cut it with me.

6             MS. KRASINSKI:  Yes.

7             THE COURT:  I mean, you can use a bag full of water

8    as a silencer.  You know, there are all kinds of things that

9    can qualify.  I've actually written an opinion about silencers,

10   if you go back and look into it, but --

11            MS. KRASINSKI:  And --

12            THE COURT:  Are these tin cans that could be put

13   over a barrel of a gun and have some kind of a silencing

14   capacity?  What are we talking about?

15            MS. KRASINSKI:  So those are oil cans that have been

16   changed to silencers.  And just so the Court kind of

17   understands the timing of this, these were sent off to the lab

18   for a determination as to whether or not they were silencers.

19   We got that determination a week before jury selection.  So had

20   the timing been different, we probably would have superseded

21   and added a possession of NFA weapons.  We obviously did not.

22            And we don't sort of intend to call any expert to

23   come and say, you know, these are, in fact, silencers, but when

24   you -- when you're looking at kind of the scene overall, and

25   we're talking about what agents seized, why they seized it --

45

```
 1                  THE COURT:  Complete this sentence for me.
 2                  These silencers tend to show that the defendant is
 3       guilty of the charged crime because ...
 4                  MS. KRASINSKI:  They relate to knowledge of firearms
 5       and ammunition and firearm accessories throughout the property.
 6                  THE COURT:  Not enough.
 7                  MS. KRASINSKI:  Okay.
 8                  THE COURT:  The cans stay out.
 9                  MS. KRASINSKI:  Got it.  Thank you, Judge.
10                  THE COURT:  All right.  What else, Mr. Stachowske?
11                  MR. STACHOWSKE:  There is a whole table of --
12       there's a whole table of weapons -- the government's calling
13       them weapons -- knives, machetes, bow and arrows, that were all
14       seized and are the subject of a violation of probation.
15                  I don't see their relevance.  I'll just say that.
16       The government seeks to admit those.
17                  THE COURT:  All right.  What do you say to that,
18       Ms. Krasinski?
19                  MS. KRASINSKI:  So there were two compound bows that
20       were seized from the garage barn shop.  And after the search
21       warrant but before the defendant was arrested, he and Kelley
22       Finnigan made a video with a cell phone.  And during that
23       video, Corey Donovan says, essentially, those -- you took my
24       compound bows, you took my knives.  He's complaining about
25       another chicken being lost on the property.
```

46

```
 1                    THE COURT:  Is that the fisher cat tape?
 2                    MS. KRASINSKI:  Yes.
 3                    THE COURT:  Okay.
 4                    MS. KRASINSKI:  And so because he claims ownership
 5     of these compound bows and the compound bows were stored in the
 6     shop where the gun case was, where ammunition was, his
 7     ownership of other items in the shop is relevant to whether or
 8     not he owned the item -- the gun case and the items on it,
 9     including ammunition.
10                    THE COURT:  How big is this shop?
11                    MS. KRASINSKI:  It's a large shop.
12                    THE COURT:  Where were these weapons in relation to
13     the ammunition that was -- so there was -- it wasn't another
14     weapon, it was ammunition seized from the shop?
15                    MS. KRASINSKI:  Correct.  There's only one gun and
16     that was in the Jeep.  Everywhere else it's ammunition.
17                    THE COURT:  All right.  And where was the ammunition
18     in relation to these other items?
19                    MS. KRASINSKI:  So I'm basing this -- so, one, I can
20     talk about, one I'm not sure, but maybe Attorney Rombeau knows
21     where the other one was seized from.  Tim Merna has said both
22     were seized from the shop.
23                    One is sort of across the barn, kind of on top of a
24     box at the shop, not sort of all the way on the other side, but
25     sort of like -- I'm piecing this together from body camera
```

1    footage, your Honor, that you have to walk around -- the barn

2    is kind of a hoarder's paradise.  You sort of have to walk

3    around some of -- some boxes and stuff that's set up and walk

4    around that and get to where the compound bow was.  I think it

5    would take you 30 -- 20 to -- maybe less than that, 20 seconds

6    to walk from where the guns were to where the one compound bow

7    is that you can see in the video.

8              I know that Officer Merna says two of the three bows

9    were seized from the garage.  I can't -- I don't see the

10   other -- where the other bow was in the garage.  I know --

11             THE COURT:  I need to know more factually about this

12   before I can rule on it.  I can't give you a ruling now.  Don't

13   mention it in your opening statement or produce any evidence

14   concerning it until you seek permission from me and I'll make

15   an -- an evaluation of -- it's -- it's a Rule 403 problem and I

16   just have to balance probative value and prejudicial effect,

17   but I need to know how probative it is, I need to know how

18   prejudicial it is, and I need to do the Rule 403 analysis that

19   I can't do now because I don't know enough about facts.

20             MS. KRASINSKI:  Sure.  And just -- sorry.

21             THE COURT:  Go ahead.

22             MS. KRASINSKI:  Just to be clear, we don't need to

23   introduce the photograph of all of the knives and everything

24   that was seized that was a potential violation of his

25   probation.  What -- what we're -- what we're focusing on, the

48

```
1    evidence that we want to elicit, is that probation took these

2    two compound bows from the -- the shop.  That's it.  We don't

3    want to get into all the knives; we don't want to -- we don't

4    need to introduce the picture of all of the stuff.  All we want

5    is the limited testimony from Officer Merna and, you know,

6    showing on the video that the --

7              THE COURT:  We don't have to elicit evidence that he

8    was on probation, do we?

9              MS. KRASINSKI:  I think it would require -- I mean,

10   I guess we could find a way to -- well, I think we have to.  I

11   mean, he sent a video -- his video to probation.  He -- it was

12   the probation officer that seized them.

13             MR. STACHOWSKE:  I was just going to ask for a

14   limiting instruction on that.

15             MS. KRASINSKI:  Yeah.  I have no objection to a

16   limiting instruction.  And his probation officer's testimony

17   is -- we would intend to call him regardless because --

18             THE COURT:  All right.

19             MS. KRASINSKI:  -- he --

20             THE COURT:  There's a -- there's going to be a

21   stipulation that he was convicted of a felony, so that

22   explains -- gives an innocent -- you know, no more culpable --

23   a no more bad act type evidence so it -- that it already has to

24   be stipulated to for this particular charge, so -- but no

25   details about what he was charged with, what led to the
```

1　probation, what kind of sentence he did.  Just the probation

2　officer, you know, here's the tape, the probation officer got

3　this tape, here's a compound bow.

4　　　　　But I'm not going to make a ruling about the bows

5　now, but you've made clear that you're not going to try to

6　introduce a full array of all these weapons, just two compound

7　bows.

8　　　　　MS. KRASINSKI:  That's right, your Honor.

9　　　　　THE COURT:  Of course, I'd give a limiting

10　instruction -- he's not charged with anything improper about

11　the compound bows in this case, so basically I'm going to be

12　inclined to instruct the jury, if I allow it at all, if the

13　defense requested a limiting instruction that he didn't -- he's

14　not charged with anything and no -- draw no inference that he

15　acted improperly in possessing the compound bows.  Those may be

16　violations of conditions of probation, but he hasn't been found

17　liable for that.  He's entitled to a presumption of innocence

18　on it, hasn't been charged, really doesn't tell us anything

19　about his guilt or innocence that it violates his probation to

20　possess it.  It's the possession and its proximity that make it

21　potentially relevant.

22　　　　　So if it does come in, it'll be limited to the two

23　compound bows with a limiting instruction if the defendant

24　requests it, but beyond that I can't say.  Okay?

25　　　　　All right.  What else, Mr. Stachowske?

50

1          MR. STACHOWSKE:  Your Honor, there is what I'll --

2   I'll put in one category.

3          There are numerous exhibits regarding my client's

4   use of the Jeep.  The Court's reminded me of the *Old Chief*

5   case.  We've attempted to stipulate that my client's the title

6   owner of the Jeep, but there must be one -- there's at least a

7   dozen deer cam videos and Cellebrite images of my client in the

8   Jeep that are undated and they far predate this incident.

9          And I'll say this.  The -- the Court's already seen

10  and my client -- there is at least one video from the day

11  before where my client's rummaging through the Jeep.  That's

12  one piece of evidence that I think is admissible.

13         The mother admits that she saw her son, my client,

14  driving the Jeep the day before the March 26th seizure.

15         And, three, the government's got in its possession

16  the title to the Jeep.  He's the title owner of the Jeep.

17         So I think it's cumulative for all of these -- I

18  mean, there's dozens of videos, Cellebrite -- a deer cam video

19  and Cellebrite video of my client in and around the Jeep that I

20  think are --

21         THE COURT:  Well, I probably at some point will deem

22  such evidence to be cumulative, particularly if they can't be

23  dated in time as being relatively close in proximity to this

24  particular incident and I would be inclined to allow some

25  evidence showing him in possession of the Jeep, driving the

51

1   Jeep, using the Jeep.  At some point it becomes cumulative.

2   The less the ability of the government to tie it temporally to

3   the search, the less relevant it is and, therefore, the more

4   likely it's going to be deemed to be just merely cumulative.

5           So the government should be selective about what it

6   wants and at some point if the defense claims it becomes

7   cumulative, you can move, object, and ask for a sidebar, claim

8   it's cumulative, and at some point I might tell the government

9   to just stop.

10          So if I were you, Government, I would put the best

11  stuff in first because at some point you may be denied the

12  opportunity to do more.  Okay?

13          MS. KRASINSKI:  Got it, your Honor.

14          THE COURT:  All right.  Okay.  What else,

15  Mr. Stachowske?

16          MR. STACHOWSKE:  With the video that my client sent

17  to probation, I guess I'm going to be asking for a limiting

18  instruction I'll file with the Court as to why he's spitting in

19  a container.

20          THE COURT:  Well, he can just say that's routine

21  drug testing for somebody on probation, right?  It's not -- it

22  doesn't imply that he's done anything wrong.  It's just a

23  routine testing requirement.

24          So I can -- if you can work out a stipulation and it

25  goes in advance of playing it, you're going to see a videotape,

1    the defendant has -- appears to be spitting into a bottle and

2    shaking it, and I instruct you that the parties agree that this

3    is a -- a video that he made as a part of routine drug testing

4    for someone on probation and that you can't infer anything from

5    the fact that he's taking drug -- that he's -- that he's

6    undergoing a drug test.  Is that -- something along those lines

7    will be fine with me.

8                What else?

9                MR. STACHOWSKE:  I have --

10               MS. KRASINSKI:  Your Honor --

11               MR. STACHOWSKE:  Go ahead.

12               MS. KRASINSKI:  Oh, sorry.

13               MR. STACHOWSKE:  Go ahead, Anna.

14               MS. KRASINSKI:  No, I just -- as I understand it,

15   Officer Merna is pretty early in our lineup, so I think what we

16   might do is kind of have something ready to answer the Court's

17   questions on precisely where the bows were tomorrow morning.

18               THE COURT:  All right.  Well, come in at -- be in

19   the building by 8:30, I'll try and come in at 8:30, so we can

20   try to go as close to 9:00 as possible.

21               MS. KRASINSKI:  Okay.

22               THE COURT:  I really don't like to keep the jury

23   waiting.

24               Okay.  Can you think of anything else,

25   Mr. Stachowske, that you want to take up with me today?

53

1          MR. STACHOWSKE:  I have -- with respect to our

2   defense, the statement that Kelley Finnigan made, it --

3   realizing that she's now precluded from testifying, will the

4   Fifth Amendment -- will the Court be instructed on a Fifth

5   Amendment issue regarding Ms. Finnigan?

6          THE COURT:  So you're going to try to introduce her

7   statement to the police.

8          MR. STACHOWSKE:  Yes, your Honor.

9          THE COURT:  As a statement against interest, you're

10  saying?

11         MR. STACHOWSKE:  Yes, your Honor.

12         THE COURT:  Is the government opposing that?

13         MS. KRASINSKI:  We had anticipated having Agent

14  Martin discuss the phone call.

15         THE COURT:  So then it'll come in in your case in

16  chief, so it won't matter.

17         MS. KRASINSKI:  (Nods head.)

18         THE COURT:  Okay.  All right.  So -- and you want --

19  you want a -- you're going to request an instruction that

20  she -- the defense wanted to call her as a witness, but she

21  invoked her Fifth Amendment privilege.

22         MR. STACHOWSKE:  Yes, your Honor.

23         THE COURT:  Okay.  I don't know anything about the

24  case law on that.  Generally you don't instruct juries on

25  privilege invocations because they don't necessarily tell us

54

1    anything about a person's guilt.

2              So there's got to be case law on that.  I've been

3    working all day here, so I'm going to tell you, do some

4    research on it.  If you want such an instruction when the time

5    comes, be -- be ready with case law on it.

6              And I would -- my law clerk's on the call.  I'd just

7    ask my law clerk to do some research tomorrow about a -- an

8    anticipated request from defendant that a witness who has made

9    a statement against interest has been subpoenaed by the defense

10   and claimed their Fifth Amendment privilege and what, if

11   anything, I should tell the jury about that.

12             You know, I -- ordinarily we don't ask jurors to

13   speculate about what invocation of a privilege means because

14   people have a right to invoke a privilege if there's any

15   possibility of prosecution.  They could be entirely innocent.

16   And we don't -- we wouldn't want your client's invocation of a

17   Fifth Amendment privilege to justify an inference of

18   culpability and absent some case law suggesting that I should

19   give an instruction like that, I'm not inclined to do it.

20             But I don't know anything about the relevant law and

21   so no ruling I've made here is final.  Everything is tentative.

22   Just follow my basic instructions.  Don't go into an area or

23   subject to a request without seeking my permission first.

24             All right.  What else?

25             MR. STACHOWSKE:  Anna, if we could stay on for a few

1    minutes, maybe you could give me the insight as to the lineup

2    tomorrow?

3             THE COURT:  Yeah.  Why don't you just email him a

4    list of your -- everybody should tell the other side the day

5    before what the witnesses they're going to call are.  So, you

6    know, just email them tonight with a list of the witnesses that

7    you're going to call, you anticipate calling tomorrow.

8             MS. KRASINSKI:  That's fine, your Honor.

9             THE COURT:  All right.

10            And, Ms. Krasinski, anything else from you guys on

11   your motions -- any motions in limine you have?

12            MS. KRASINSKI:  No, your Honor.

13            THE COURT:  Okay.  So we should be good to go.

14            I -- there was -- there was this brouhaha about DNA.

15   I guess you decided, Ms. Krasinski, not to do anything on DNA?

16            MS. KRASINSKI:  The Court granted the order

17   authorizing ATF to use limited use of force to obtain that

18   sample.  My understanding is that they are going to obtain the

19   sample.  I don't know that it ever comes in at this trial, but

20   it's possible that it comes in at a supervised release

21   violation hearing.

22            So that just happened, maybe it was yesterday.

23            THE COURT:  Is this because you obtained DNA from

24   the -- the weapon or some of the ammunition?

25            MS. KRASINSKI:  There's DNA on the shotgun, yes, as

56

```
 1    I understand.

 2              THE COURT:  And did you do the DNA and rule out that

 3    it wasn't the girlfriend's DNA?

 4              MS. KRASINSKI:  She has also refused to provide a

 5    sample.

 6              THE COURT:  Okay.  All right.  So that's going to be

 7    a principal argument in the case; there's DNA, you didn't

 8    analyze it.

 9              There is this kind of -- and I don't mean to be

10    critical of the parties here, but this kind of ad hocery

11    about -- I mean, I used to prosecute murder cases, so they were

12    serious things.  But we would prepare months in advance for

13    trials, you know, not like the week before trial.  And not just

14    the government; the defendant's doing the same thing here.

15    It's like --

16              MR. STACHOWSKE:  It's just kind of --

17              THE COURT:  -- just sort of spinning it out on --

18    discovering new stuff every day.  And it's just not the way

19    I'm used to having business done.  I just have to note that,

20    that --

21              MR. STACHOWSKE:  And I appreciate that, your Honor.

22    I hope to never do it this way again.  I think the government

23    can agree with me in that regard.

24              THE COURT:  Yeah.  I mean, I know the defendant --

25    this -- the defendant has a right to do this, to demand a
```

57

1    trial.  And I think the government is so used to -- and even

2    defendants are so used to it taking about a year to get a case

3    to trial that they have all this time to develop their case and

4    their response and -- but, you know, the -- this defendant, he

5    beat a charge in the face of overwhelming evidence.

6          So you can anticipate that he's going to try to beat

7    another charge and, you know, you just have to line it up.  But

8    you're going to get a significant argument and I'm going to

9    allow it that there was DNA on this firearm, that the

10   government has not tested that DNA and tried to compare it.

11   And you can make your arguments about they refused to provide

12   samples and -- you know, we'll -- we'll go from there.  But,

13   you know, that -- acquittals are made of less than that.  So,

14   you know --

15         MS. KRASINSKI:  Your Honor, I --

16         THE COURT:  The standard argument that they didn't

17   test for DNA is a routine argument that defense lawyers make

18   and that never works.  But an argument that there is DNA and

19   they never bothered to test it, that's a more potent argument.

20         MS. KRASINSKI:  We had discussed that earlier.  My

21   understanding was that the Court was going to prohibit the

22   government from mentioning that we tried to take samples unless

23   the defense brought up that there was DNA on the gun.  So we

24   were sort of operating under that assumption still.

25         THE COURT:  Yeah.  I'm not -- I mean --

58

```
 1              MS. KRASINSKI:  Great.

 2              THE COURT:  -- if the -- you're not going to bring

 3    up that there was DNA on the gun that was never tested, but the

 4    defense is going to bring it up, I assume, on

 5    cross-examination.  Because I mean, they don't have a lot to do

 6    here and that's going to be one of their principal arguments.

 7    And then, if they do, you can -- you can ask, well, did you try

 8    to get DNA, when did you start trying to get DNA?  What

 9    happened?  The defendant refused to provide, the other witness

10    refused to provide.

11              And you, Mr. Stachowske, may open the door to that

12    line of questioning by asking about DNA evidence because you

13    want to argue they never even tried to do it.  Well, if they --

14    if you -- you know, the inference that you want the jury to

15    draw is they never even tried, that would be a false inference.

16              So we need to -- once we get into that subject, I

17    need to allow some additional evidence by the government to put

18    it in.  You still have an argument that they waited until three

19    weeks before trial to even try and, you know, it -- and that

20    alone is reasonable doubt.  I'm sure you'll make that argument,

21    you know, and I'm sure the government will be ready with that

22    argument.

23              And, you know, then -- this is a theory that is in

24    one form or another tried probably 50 times in front of me.

25    And 50 out of 50 it hasn't succeeded, but it does succeed in
```

1   some cases.  So you just have to see how it works.  And I'm

2   going to let the defendant -- it's a tactical decision because

3   it may open the door to some evidence that the defendant

4   believes is damaging to the defendant.

5           Why would he refuse, you know?  And the defendant

6   doesn't have a right -- there's -- this isn't a case where he

7   has a Fifth Amendment right to refuse the DNA.  So it's not

8   like this is impinging upon his Fifth Amendment right or his

9   Fourth Amendment right, because the magistrate judge has

10  determined he doesn't have one, right?  The magistrate judge

11  has ordered him to submit to DNA.  Is that right?  I mean,

12  that's my understanding of the status of things.

13          MR. ROMBEAU:  That's correct, your Honor.

14          THE COURT:  Yeah.  So that's just -- I don't think

15  there's an argument that he -- he's being forced to compromise

16  some constitutional right he has.  It's not like the right to

17  remain silent.  So if he refuses, I'm not going to suggest --

18  I'm not going to give an adverse inference instruction or allow

19  the government to argue an adverse inference, but it seems to

20  me that the government has an explanation that he tried to get

21  DNA and the reason that it didn't do DNA was that the defendant

22  would not provide.

23          And, you know, you can take it out as far as you

24  want, but I think if you elicit from the government that

25  there's DNA on that and then, go on to argue that the

60

1   government didn't analyze the DNA, I'm inclined to say I cannot

2   stop the government from at least introducing evidence to the

3   jury that they sought to take a DNA sample, that the defendant

4   refused; that they sought an order from the court authorizing

5   limited force; and that they haven't been able to execute that

6   yet.

7           I wouldn't allow an inference that you can infer

8   that the defendant's guilty because he refused it and I

9   wouldn't allow any argument to that -- anything within a mile

10  of that, but I think it's an argument to say that, you know, an

11  argument to rebut the claim that the government is completely

12  lackadaisical.

13          Of course, that is also a tactical choice that the

14  government might want to make because the government might want

15  to just say the heck with this, we've got overwhelming

16  evidence, we don't even need the jury to hear about why we

17  didn't analyze the DNA because you don't analyze -- you don't

18  analyze DNA when you've got compelling evidence of somebody's

19  guilt.  That -- in some circumstances, I've heard prosecutors

20  argue that.  That's why we didn't do DNA, because we have video

21  footage of the defendant committing the crime, you know.

22  That -- that's an explanation why you don't look for DNA.

23          But DNA is a reality of the modern world and juries

24  generally expect DNA to be analyzed.  That's -- you know,

25  it's -- so -- but so, to be clear, if the -- Mr. Stachowske,

61

1    I'm open to hearing from you that I should restrict the

2    government from going into your client's refusal to provide a

3    sample, but as I understand the current state of the law here,

4    the defendant does not -- and I haven't researched it yet, so

5    it's incumbent upon you to research it and make a request

6    supported by argument and evidence and case law for a

7    restriction.

8           But unless I get a request by you, what I'm -- if

9    you elicit from a government witness that DNA was taken from

10   the gun and not analyzed, I'm also inclined, if the government

11   chooses to do so, to allow the government to go a step further

12   and say the government sought to have a DNA sample from the

13   defendant, the defendant refused, and I'll think about whether

14   if the government wants to go further than that, which it might

15   not want to or need to.

16          But I would not be inclined to allow any argument

17   that a -- an instruction of an adverse inference, nor an

18   argument of an adverse inference.  I would allow the evidence

19   for a more limited purpose, that is, to simply show that the

20   government was diligently -- responding to an argument that the

21   government was not diligently attempting to gather relevant

22   evidence and, therefore, the jury should have a reasonable

23   doubt about guilt.

24          That would be the concern I would have if I were on

25   the government's side.  The concern I would have on the defense

```
 1    side is that the jury might draw an adverse inference from the

 2    silence, but this is not a case where he has a constitutional

 3    right to remain silent, and so I am inclined to simply not

 4    allow -- not give an instruction and not allow government

 5    argument on it and just to let it sit there and let the

 6    government only argue what it wants to argue.

 7              If either side wants to come to me with case law

 8    suggesting I should deal with this differently, you need to

 9    come to me with case law.  I -- I'm on the day before trial.

10    As I said, it's -- we're now at 5:30.  I've been working since

11    nine o'clock on seven or eight matters.  I do not have the time

12    to do all of this work for you.  So if you want me to take some

13    action, you need demonstrate it for me.

14              But I would say to the government, don't go into the

15    DNA.  If the -- let the defendant decide to bring it up and

16    we'll take it step by step after that.

17              MS. KRASINSKI:  That was our plan, just confirming.

18              There's one other issue that I wanted to raise and

19    that relates to a jail call from this weekend.

20              In the jail call, Mr. Donovan is talking, I believe

21    to his daughter, and he says, one of the jurors or one -- one

22    of the -- he doesn't use the word prospective jurors -- kind of

23    winked at me and nodded and made it like they wouldn't find me

24    guilty, regardless of the evidence.

25              It sounds to me from it that it is ultimately
```

1    someone who was not chosen for the jury, but I would just ask

2    the Court, when the jury comes in, to remind them, you know,

3    not to prejudge and, you know, sort of the standard

4    instructions.

5            THE COURT:  If all you want is be open-minded, don't

6    form any views about the case, that's great.  If you want --

7            MS. KRASINSKI:  Yup.

8            THE COURT:  -- some kind of more like juror-specific

9    inquiry, then you need to give me more than that because that

10   sounds like the -- the usual braggadocio of a defendant who

11   wants to reassure his daughter that this is in the bag, we're

12   taking care of it.  It doesn't sound to like me like you've got

13   a biased juror.

14           MS. KRASINSKI:  I do not want any specific inquiry,

15   just sort of the standard general instruction about being

16   open-minded.

17           THE COURT:  Okay.  Anything else?

18           MR. STACHOWSKE:  I will be --

19           THE COURT:  I've never had to work so hard in a

20   single-count felon in possession of a firearm case in my life.

21   And I've done many, many of these.  This has been hard work for

22   me.

23           So whatever the outcome, Mr. Stachowske, you can

24   at least brag to your client that the judge was saying that

25   you've -- he's -- you have made him work harder on a felon in

64

```
 1    possession case than he's ever had to work on a felon in

 2    possession case.

 3               MR. STACHOWSKE:  I appreciate that.  After he fires

 4    me.

 5               THE COURT:  All right.  Anything else that either of

 6    you need to talk to me about?

 7               MS. KRASINSKI:  No, your Honor.  Thank you.

 8               MR. STACHOWSKE:  No, thank you.

 9               THE COURT:  Go ahead.

10               MR. STACHOWSKE:  The constructive possession aspect

11    of it, I would like to be able to get some insight as to the

12    jury instruction before closing arguments.

13               THE COURT:  Yeah, well, I -- I've been working on

14    them.  Unless you give me something different, I'm going to use

15    the standard instructions which do describe constructive

16    possession and -- but I'm going to use the same instructions I

17    give in all of these cases.  I will provide it to you well in

18    advance of the jury instruction.  I was working on it today.

19               MR. STACHOWSKE:  Thank you, your Honor.

20               THE COURT:  Yeah.  I did -- I mean, we're -- the

21    government has correctly taken into account the Rehaif case, so

22    you do have that element in there.  I was worried about that.

23               The instructions are pretty basic, similar to what

24    the government is proposing in most respects and standard

25    instructions that I routinely give in felon in possession
```

```
 1   cases.
 2            Okay.  So be in the building by 8:30.  If you need
 3   to talk to me about anything, tell the court reporter -- or the
 4   case manager then and I'll come down and we'll try to get rid
 5   of it before 9:00.  Opening statements at 9:00, followed by
 6   evidence.  Let's try to get a full day in.  Okay?
 7            MR. STACHOWSKE:  Thank you.
 8            THE COURT:  All right.  Thank you.
 9            MS. KRASINSKI:  Yes, your Honor.  Thank you.
10            THE COURT:  See you tomorrow.  Yup, bye-bye.
11            (Proceedings concluded at 5:41 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                    C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.



Submitted: 5/9/2022          /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR
```

# Exhibit 10

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 8, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
UNITED STATES OF AMERICA                  \*
                                          \*   1:21-cr-88-1-PB
              v.                          \*   October 13, 2021
                                          \*   8:50 a.m.
COREY DONOVAN                             \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*




TRANSCRIPT OF JURY TRIAL DAY 2 - MORNING SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO


Appearances:


For the Government:        Anna Z. Krasinski, AUSA
                           Charles L. Rombeau, AUSA
                           United States Attorney's Office



For the Defendant:         Matthew G. Stachowske, Esq.
                           Stachowske Law PLLC



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

2

```
1                    I N D E X

2
                                                     PAGE
3    Motion Hearing                                    4

4
     Preliminary Instructions                          24
5

6    Opening Statements
7       By Ms. Krasinski                               34
        By Mr. Stachowske                              44
8

9    Witness              Direct   Cross   Redirect   Recross

10   John Cook

11      By Ms. Krasinski        47
        By Mr. Stachowske             109
12

13
     Exhibits                      For ID          In Evd
14
     Government's Exhibit 109                         95
15
     Government's Exhibit 109a                        97
16
     Government's Exhibit 109b                        98
17
     Government's Exhibit 109c                        99
18
     Government's Exhibit 109d                        100
19
     Government's Exhibit 109e                        101
20
     Government's Exhibit 110                          103
21
     Government's Exhibit 110a                         103
22
     Government's Exhibit 110b                         105
23
     Government's Exhibit 110c                         105
24
     Government's Exhibit 300                          56
25
     Government's Exhibit 301                          58
```

3

Exhibits Continued

Government's Exhibit 302                                63

Government's Exhibit 303                                61

Government's Exhibit 304                                68

Government's Exhibit 305                                69

Government's Exhibit 306                                69

Government's Exhibit 307                                69

Government's Exhibit 308                                77

Government's Exhibit 309                                83

Government's Exhibit 310                                87

Government's Exhibit 311                                88

Government's Exhibit 314                                96

Government's Exhibit 315                               109

Government's Exhibit 322                                51

Government's Exhibit 324                                72

```
1                    P R O C E E D I N G S

2              THE CLERK:  Court is in session and has for

3    consideration a motion hearing, United States of America vs.

4    Corey Donovan, criminal case number 21-cr-88-1-PB.

5              THE COURT:  All right.  You wanted to speak to me,

6    someone?

7              MR. ROMBEAU:  Yes, your Honor.  I'll start on the

8    government's behalf.

9              We just wanted to, before we present any witnesses,

10   check in with the Court on the issue of the compound bows that

11   we discussed in the hearing yesterday.

12             THE COURT:  Right.

13             MR. ROMBEAU:  We had a chance to discuss it amongst

14   ourselves last night and our proposal to Attorney Stachowske

15   this morning, which I don't know if he's had a chance to weigh

16   in with his client on, is that we propose to ask the witness,

17   whether it's Probation Officer Merna or Detective Campbell,

18   whether they observed any bows, compound bows, in the barn.

19   And then later on, certainly through Officer Merna, we would

20   want to ask him did Mr. Donovan make any statements to him

21   about the bows belonging to him.

22             We don't intend to introduce that they were seized,

23   no photos of the bows being seized.  And in our view, this is

24   relevant evidence in that it goes to the defendant's access to

25   ownership of possession of items in the barn in the same way
```

5

1    that if we had found his lucky Red Sox hat in the barn --

2         THE COURT:  And in no way will you make any comment

3    or elicit evidence suggesting that his possession of the

4    compound bows was improper in any way?

5         MR. ROMBEAU:  That's correct, your Honor.  It's no

6    different than an item of clothing or something that he had

7    claimed ownership of that's in a location where the other stuff

8    is.

9         THE COURT:  And a jury would not have any reason to

10   attribute any improper action to possession of a compound bow.

11   It may or may not be a violation of his supervised release, but

12   jurors wouldn't know that.  That's not an issue.

13        MR. ROMBEAU:  That's right.  And if your Honor still

14   would like to do a limiting instruction or defendant would

15   request one, that's fine, but our -- our view it's really this

16   limited issue of it's something that he's acknowledging that's

17   his in the same area.

18        THE COURT:  Yeah.  That's a standard thing that

19   depends on the geographical connection between the item you're

20   trying to show he possessed and the item that you know he

21   possessed.  And so sometimes yes, sometimes no.  If it's in the

22   same safe as the item you want to tie it to, that ordinarily

23   comes in.  If it's somewhere on the property, hundreds of yards

24   away from the other, it doesn't come in.  At some point the

25   connection is so remote that it ceases to have any potential

1    relevance.

2              So I have to see what the -- your actual evidence is

3    about exactly where the bows are, what the room is like.  I

4    don't know what the workshop is like right now.  You've just

5    generally described it to me.

6              So don't reference it in your opening statement.

7    When you get someone on the stand who's going to talk about the

8    shop, start describing the shop, where the item was that you --

9    the ammunition that you're trying to attribute to him, other

10   relevant information, and when you're about to get into the

11   compound bow, approach sidebar.

12             Once you've explained to me and the jury everything

13   about the workshop that I need to know, then you can -- I guess

14   we're not doing actual sidebar, but virtual sidebar, explain to

15   me where exactly in this room that you've now described are the

16   compound bows and I'll make a judgment as to whether the

17   connection is sufficient to at least -- to meet the minimal

18   test of relevancy under Rule 401.  That's how I would be

19   thinking about doing that.

20             MR. ROMBEAU:  Thank you, your Honor.

21             THE COURT:  Okay.  Anything else from you?

22             MR. ROMBEAU:  The other issue is our pending very

23   limited motion in limine on the reference to the prior verdict

24   in the case where the -- that sort of initial tipster source of

25   information had testified a few weeks ago.

```
1          We are seeking to limit any questioning or

2    impeachment of -- just by reference to the verdict.  It can --

3    we don't see any problem if there are going to be questions

4    about testimony in that matter.  Impeachment can be on those

5    grounds.  We just don't want the verdict itself --

6               THE COURT:  So let me see if I understand what

7    you're saying.

8               What you're speaking about is a potential defense

9    witness who was an informant that provided information that

10   supported the affidavit for the search warrant in this

11   particular case.  That informant also provided information in

12   another unrelated case.  That case was tried in front of a

13   different judge a couple of weeks ago to a defendant's verdict.

14   And you're talking about if the defense calls that witness, you

15   want to limit the defense's ability to question them.

16               Explain to me now what it is you want them to -- not

17   to be able to inquire into.

18               MR. ROMBEAU:  So I would say our motion's a little

19   bit broader, your Honor, that -- for example, Special Agent

20   Forte was the case agent on that prior case and interacted with

21   the source of information.  And so if the informant doesn't

22   testify, but Special Agent Forte does, it -- trying to impeach

23   him by virtue of the verdict is --

24               THE COURT:  How could -- how could that possibly be

25   done?  I don't even understand how that -- what, you are an
```

1   agent in another case where there was a not guilty verdict?

2   No --

3                MR. ROMBEAU:  Well, I think that --

4                THE COURT:  -- that's craziness.  That isn't even

5   close to the margin.

6                Someone has to postulate a theory for me by which it

7   might be admissible before I can determine whether it is not

8   inadmissible.  I mean, my gut reaction is that kind of stuff is

9   crazy and you wouldn't even be able to do it.  If the defense

10  calls her and wants to treat her as a hostile witness, then

11  ordinarily the defense can impeach her and showing she made

12  false statements in another case you can inquire into at least.

13  Then whether you can -- this is a complicated -- you can't just

14  like throw stuff out.  Okay?

15               MR. ROMBEAU:  No.

16               THE COURT:  This involves can you -- can you ask the

17  question; then are you -- can you introduce intrinsic --

18  extrinsic evidence.

19               I need to know the context.  I have no idea what the

20  context is now.  But I certainly don't want Mr. Stachowske

21  trying to question a case agent in your case about an acquittal

22  in an unrelated case without first getting my permission to do

23  so because I can't even see how it could possibly be done.  It

24  doesn't tell us anything useful about this particular case.

25  Whether that case was properly brought, improperly brought,

9

1    even a not guilty verdict doesn't say anything about the

2    quality of the investigation or anything else.  It just says

3    that the jury had a reasonable doubt, which sometimes that

4    happens and, you know, I don't -- it doesn't tell us anything

5    useful.

6              So before you do anything like that,

7    Mr. Stachowske -- I don't think you're intending to, but before

8    you do anything like that, just come and explain to me your

9    theory so I can evaluate it.  You don't have to, you know,

10   limit yourself now, but I think the principal area where it

11   could come up, he has listed this informant as a witness on his

12   witness list.  If he were to call her and she had something

13   relevant to testify to in this case, it's not clear to me that

14   she does, and he thinks she's a hostile witness and wants to

15   impeach her, then he may be able to legitimately impeach her.

16   But whether this is legitimate impeachment, it's not apparent

17   to me right now that it is, so I'll have to wait.

18             But that's -- there are so many contingencies before

19   I even get into that.  All I'll say now is, Mr. Stachowske,

20   don't in the government's case start asking questions about a

21   not guilty verdict in an unrelated case without first getting

22   my permission.  Okay?

23             Is that satisfactory you?

24             MR. ROMBEAU:  We're satisfied.  Thank you, your

25   Honor.

```
 1              THE COURT:  Anything else from you, Mr. Stachowske?
 2              MR. STACHOWSKE:  Your Honor, I -- the Court may
 3    recall last night the government indicated to the Court that it
 4    would be calling a James -- Special Agent James Martin.
 5              The -- the search of the property was on March 26th.
 6    The Court may recall that subsequent to that on March 31st,
 7    Kelley Finnigan called and spoke with Agent Martin and asked
 8    for her property back, specifically the Mossberg shotgun.  The
 9    government this morning indicates that they've elected not to
10    call him or elicit that testimony from him.
11              As a result, it's a key piece of defense in our
12    case.  I would like to discuss it in opening statement and I'm
13    making an oral motion in limine now that this statement is,
14    while hearsay --
15              THE COURT:  You guys love to, like, try to force me
16    to make decisions with no time.  Like you wait until the last
17    minute to raise things and then you tell me you're going to do
18    one thing last night and now you completely change it.
19              I'm getting tired of you folks doing this to me.
20    Not you, Mr. Stachowske, but the government as well.  I -- this
21    is unfair to me for you to be constantly flopping around and
22    throwing in new arguments that -- I mean, I'm up last night
23    until eleven o'clock doing research about another issue that
24    you raised last night.
25              So your argument is it is admissible because it is
```

Case: 23-1328　Document: 00118054127　Page: 157　Date Filed: 09/20/2023　Entry ID: 6592810

```
 1   what?  Why is it admissible if you want to call that person in

 2   your case?

 3              MR. STACHOWSKE:  She's unavailable, your Honor,

 4   pursuant to the Court's order and it's a statement against

 5   interest.

 6              THE COURT:  All right.  What's the government's

 7   response to that?

 8              MS. KRASINSKI:  Your Honor, she's not unavailable as

 9   a witness.  Just because the Court has declined to grant her

10   immunity doesn't make her unavailable.

11              THE COURT:  You give me case law on that because

12   that seems to me absolutely wrong.  Do you have case law that

13   says a witness invoking the Fifth Amendment is not unavailable?

14              MS. KRASINSKI:  I'm going to have to -- I'm going to

15   have to look, your Honor.

16              But additionally, it's hearsay, your Honor.  It's

17   an out-of-court statement offered for the truth of the

18   matter --

19              THE COURT:  Right.  And that's what the -- statement

20   against interest is an exception to the hearsay rule for

21   witnesses that are unavailable.  There's a two-part test for

22   that and, arguably, the second part of it is not met, but the

23   first part, that they're unavailable and that the statement is

24   against interest, the question is is there sufficient

25   corroborating evidence to justify its admission as a statement
```

```
 1   against interest.

 2          But I -- I'm -- I mean, I -- I'm going based on my

 3   memory of the rule because you didn't raise this with me last

 4   night.

 5          MS. KRASINSKI:  So I -- I would say as it relates to

 6   the statement against interest, she didn't know -- there's no

 7   evidence she knew the gun was stolen until we told her, the

 8   government told defense, that the gun was stolen.  And so

 9   calling someone who's not a felon and calling and saying the

10   gun is mine, that's not a statement against interest at all

11   because she didn't have any knowledge --

12          THE COURT:  No, that's not the way I understand the

13   rule operates.

14          All right.  I'm going to -- it's almost nine o'clock

15   now.  I'm not going to be able -- oh, God, now you want to

16   reference it in the opening statement.

17          MR. STACHOWSKE:  I --

18          THE COURT:  I can't really analyze it now without

19   briefing from the two of you, so you aren't going to be able to

20   say it in your opening statement.  You can defer your opening

21   statement until your case if you want, but if you choose to

22   make an opening statement now, you're not going to be able to

23   reference that.  And you can brief the issue of why it

24   qualifies under -- you know, the government makes a claim that

25   I think is clearly wrong that she's available even though
```

1    she's -- the government knows she's going to invoke the Fifth

2    Amendment.  I think that's completely wrong, but if the

3    government has case law to support it, they should let me know.

4           The government argues that the statement is not

5    against interest because she did not know that it was --

6    there's no evidence to suggest that she knew, that is -- so

7    what the government is saying, she's probably innocent of this

8    charge, but because we -- unless you can show that the witness

9    knew that her statement exposed her to criminal liability, the

10   exception doesn't apply.

11          That will require research.  That is not consistent

12   with my understanding of the rule.  When I look at Rule 804 --

13          MS. KRASINSKI:  (b)(3), your Honor.

14          THE COURT:  -- (b)(3), there is a second component

15   to (b) -- to (b)(3) that is (b)(3)(B), and there's a

16   requirement in a criminal case that the statement is supported

17   by corroborating circumstances that clearly indicate its

18   trustworthiness if it is offered in a criminal case as one that

19   tends to expose the declarant to criminal liability.

20          Whether that -- that requirement is met, I -- I do

21   not know because obviously the defendant's girlfriend has a

22   strong motive to falsify claims like this and I -- I think it's

23   going to be incumbent upon you to demonstrate that there is

24   evidence that is --

25          MR. STACHOWSKE:  Trustworthy.

```
 1              THE COURT:  -- that is -- clearly indicates
 2   trustworthiness.  All right?
 3              So you've got to do the research, come up with a
 4   memorandum, give me case law, identify the facts that support
 5   your position, and then if you can demonstrate it to me, I'll
 6   let you go into it.  But I can't do it now.  It's after nine
 7   o'clock.
 8              We had a -- I did that hearing to accommodate you
 9   guys yesterday because I was already very, very busy and nobody
10   raised this issue with me.  I actually raised the statement
11   against interest exception with you.  You didn't -- nobody
12   suggested -- the government was telling me they were going to
13   call the witness, so I -- we didn't pursue it then.  Okay?
14              So I -- I can't -- I don't have time to do it now
15   with you.  Don't mention it in your opening statement.
16   Demonstrate when you want to -- when you want to elicit the
17   statement that it's admissible and we'll go from there.
18              You can call -- definitely they'll have to make the
19   agent available to you in your case.  You can call them as a
20   witness -- call that person as a witness.  And if they have --
21   if I allow you to do it, you can ask the question.  All right?
22   Okay?
23              MR. STACHOWSKE:  Yes, your Honor.
24              THE COURT:  Isn't there also some -- I'm remembering
25   the drug testing tape has a reference.  You're going to play
```

1    the drug testing tape; are you not doing that now?

2          MS. KRASINSKI:  I think we are not going to play the

3    drug testing tape, your Honor.

4          THE COURT:  I wish you would make decisions about

5    what you're going to do more than two minutes before you do it

6    so that I can -- I can evaluate this.

7          I -- I spent a lot of time analyzing that issue with

8    you last night and that -- if -- that tape, I thought, tended

9    to support your position that, in fact, her statement of

10    claiming ownership is not trustworthy because the defendant

11    clearly states right there, this will be good in court, which

12    suggests it's a manufactured statement.  But now you're not

13    going to put that in.

14          MS. KRASINSKI:  Your Honor, I think, you know, as we

15    march toward trial, things change.  We try to let everyone know

16    as soon as we make a decision.  And I understand the Court's

17    frustration.  I apologize.  But we did want to let counsel know

18    that we had made a different decision once we had made it.  So

19    I do apologize for --

20          THE COURT:  All right.

21          MS. KRASINSKI:  -- putting the Court in the hot

22    seat.

23          THE COURT:  Well, you're not going to play that

24    tape.  Okay.  We'll proceed, and I'll try to do the best I can

25    to rule properly in this ever-evolving plan of how the case is

1    going to proceed.

2              I do want to comment on one issue that I raised with

3    you last night.  Of course, I explained to you that all of my

4    rulings on motions in limine are tentative and I explained to

5    you what you need to do to preserve your argument with respect

6    to any motion in limine that you want to get in evidence where

7    I've told you, don't mention it in your opening and consult

8    with me before you elicit that information.  The way to

9    preserve that issue is to ask to approach when you're going to

10   offer the evidence and seek a ruling from me because that's the

11   point at which I can finally and authoritatively determine how

12   to rule.  So all of my discussions with you last night were

13   tentative.

14             I do want to make you aware at least that my

15   discussion with you about the DNA testing is particularly

16   tentative and subject to reassessment.  So -- and this is

17   important because the defense has to make some kind of tactical

18   judgment and I just want you to be aware of this issue.

19             The government is not going to elicit in its

20   questioning of witnesses that there was DNA found on the rifle,

21   or the shotgun, excuse me.  The defense may seek to elicit

22   information that DNA was found on the shotgun.  In some cases,

23   defendants like to try to argue to a jury that there is

24   reasonable doubt because there was existing evidence that was

25   not examined and that's an argument that the defendant may want

17

1    to make or may not want to make.

2         One of the problems with the defendant making that

3    argument in this case is the defendant was ordered to submit to

4    a DNA sample and the defendant has refused to submit to a DNA

5    sample.  So a question becomes if it the defendant elicits

6    information that a DNA was found on the shotgun, should the

7    government be allowed to elicit evidence that the defendant

8    refused to provide a DNA sample.  And then further, should the

9    government be able to argue that the defendant's refusal to

10   submit to a DNA sample is consciousness of guilt.

11        Now, that issue was not one that I had researched

12   but, again, at ten o'clock last night I'm starting to look into

13   the research on the matter, and it does appear that there is

14   substantial case law that suggests, A, a defendant who is in

15   custody and subject to a lawful order to provide DNA samples

16   has neither a Fifth Amendment right against self-incrimination

17   nor a Fourth Amendment right against unlawful searches and

18   seizures to resist.  And several courts have said that a -- a

19   defendant's refusal to submit to DNA may be evidence of

20   consciousness of guilt that a jury could consider.

21        I will provide the cases that I uncovered at

22   ten o'clock last night and the parties should be prepared if

23   the defense makes a tactical choice to inquire into the DNA

24   that the government may seek to go and -- further and elicit

25   additional evidence and then make additional arguments.

1    I do not know how I will rule if the government

2    tries to do that, but it's an important tactical choice for the

3    defendant and since we discussed it last night in general

4    terms, I wanted to make the defense aware that I am open to

5    hearing your arguments about, you know, if you do that, should

6    the defense -- should the government be limited in going

7    further; should the government be able to argue that it's not

8    evidence of consciousness of guilt.

9    That's -- but you will not be -- we will not even

10    get into that unless you elect to question about DNA because I

11    won't allow the government, since it's made a decision not to

12    discuss the DNA.  If the government doesn't discuss it, there

13    won't be any consciousness of guilt argument or anything else.

14    If the defense opens the door to it by wanting to

15    elicit testimony about the DNA in the rifle, or the shotgun,

16    then we may have to go further.  And I don't know how far yet

17    because I want to hear the parties' arguments.

18    But it's not my job to evaluate these things in a

19    vacuum.  The lawyers are supposed to give me the arguments and

20    the law supporting their positions.

21    So I just -- but I wanted Mr. Stachowske, who's

22    sitting here having to make an important decision, say, in an

23    opening statement, do I reference that there's DNA on that

24    shotgun.  He would be entitled to make that reference if he

25    wants to, but if he makes it, it may lead to an opening of the

Document: 00118054127　Document: 2　Date Filed: 09/20/2023　of 13

```
 1    door to further information and I wanted to just be clear that
 2    I don't know whether I would agree that the door should be
 3    opened and how far I'm willing to go, but I -- to the extent I
 4    suggested some skepticism about consciousness of guilt
 5    inferences, I just wanted to make the parties aware that last
 6    night at ten o'clock, while trying to acquaint myself on the
 7    relevant law -- that there is law out there that suggests that
 8    a refusal to give a blood sample or a DNA test that's under
 9    circumstances like the one here can be evidence of
10    consciousness of guilt and I don't know whether I would agree
11    with that under analysis or not.  And I'll make the parties
12    aware of those cases.
13            I just wanted Mr. Stachowske to know about that.
14    I'm not prohibiting him from referencing the DNA in his opening
15    statement.  But if he does, it may end up ultimately opening
16    the door to further matters -- further examination about DNA.
17    All right?
18            Yes.
19            MS. KRASINSKI:  I just wanted to say for the record
20    that I did a little quick research and I was obviously wrong on
21    whether or not she's unavailable by invoking the Fifth.  That
22    does make her unavailable under the rule.  So --
23            THE COURT:  Okay.
24            MS. KRASINSKI:  -- that's -- I just wanted to make
25    that clear.
```

20

1          THE COURT:  Yeah.  I mean, I -- you know, I've been

2     doing this for a long time, so I kind of -- I think I know what

3     the rules are even if I don't have a specific memory, but

4     that's -- that one seemed relatively clear to me.

5          MS. KRASINSKI:  And then I had planned to mention

6     the scope in my opening based on our discussion last night, but

7     I can certainly omit that.

8          THE COURT:  I didn't tell you you couldn't reference

9     the scope.  I don't recollect I told you that.  In fact, your

10    proffer seemed to suggest that you would be able to lay a

11    sufficient foundation to -- to allow the scope into evidence.

12    Of course, if it doesn't live up to what you told me, I might

13    exclude the scope when it comes in.

14         So if you make a reference in your opening statement

15    and you aren't able to put it in, then that's fair comment for

16    the defense.  That's a decision you have to make.  I didn't

17    prohibit you from referencing the scope because your proffer

18    was detailed and suggested to me that these were in immediate

19    proximity to some of the charged ammunition and there's strong

20    evidence that you intend to introduce tying the scope to the

21    defendant, which tends to support your claim that he was in

22    possession at some point of the charged ammunition.

23         So I do believe that is admissible if you can prove

24    it the way you say you can prove it, so I'm not barring you

25    from referencing that in your opening statement.

1          I did say that there -- and you'll have to rely on

2    your own recollections, but I do recall that there were certain

3    things that I suggested that the parties not reference in their

4    opening statement and that's because before I can definitively

5    rule, I need to know more about the context and that will

6    become clear to me during the course of the trial.

7          What stipulations have the parties reached with

8    regard to the defendant's prior conviction, whether he knew

9    that the conviction was punishable by a -- more than a year in

10   prison, that there was interstate commerce?  What stipulations

11   have the parties worked out on those matters?

12          MS. KRASINSKI:  Your Honor, the parties have reached

13   stipulations as to the fact that Mr. Donovan was convicted of a

14   felony, the fact that he knew it, and interstate nexus related

15   to all the firearms and ammunition.  Those are identified as

16   Government's Exhibit 700 and 701.

17          And I think that we agreed --

18          THE COURT:  Well, I appreciate that, Mr. Stachowske,

19   that you want to focus -- because I think this is in your

20   client's interest -- you want to focus the jury's attention on

21   the key issue in the case and that is did the defendant possess

22   these ammunition and firearms, not these other issues.

23          So I -- I just want to say I appreciate you agreeing

24   to those stipulations.  You're not required to do that, but it

25   does make -- it'll shorten the trial, it'll focus the jury's

```
 1   attention on the key issues in the case, which is what they
 2   should be doing.  So I -- I applaud the defense for agreeing to
 3   those basic stipulations.
 4           Yes, Mr. Stachowske, did you want to say something?
 5           MR. STACHOWSKE:  Just one minor but potentially
 6   major issue, that the government just said firearms plural and
 7   they've also said firearms plural in their --
 8           THE COURT:  Yeah, they should say firearm and
 9   ammunition because there's only one.
10           MR. STACHOWSKE:  It's in the proposed jury
11   instructions, firearms plural, as well, so --
12           THE COURT:  Yeah, I've got to make sure that I --
13   the instruction references firearm and ammunition and not
14   firearms.
15           MR. STACHOWSKE:  Okay.
16           THE COURT:  Anything else from you?
17           MS. KRASINSKI:  So I don't know if this is the
18   appropriate time, but we've agreed to the admission of some
19   exhibits.
20           THE COURT:  Let's do it at the next break.  You can
21   read -- I don't need to be present.  You can both be here, read
22   into the record with the case manager here as to what documents
23   are admitted and what still remain objected to because he's
24   responsible for keeping that list.  So you work with him at the
25   break and just tell him what's admitted.
```

23

```
 1                MS. KRASINSKI:  Yes, your Honor.

 2                THE COURT:  All right.  What else?

 3                MR. ROMBEAU:  One very brief issue, your Honor.

 4                We've not had an opportunity yet to speak to the

 5      original owner, Mr. Kwiatkowski, after the Court's ruling on

 6      the motion in limine about the stolen gun.  I think he should

 7      be here before the 10:30 break, so I can meet with him and

 8      advise him not to make any reference at that point, but if

 9      things were to go very quickly, I might ask if we can take the

10      break at that time so we can advise him.

11                THE COURT:  If you need to do that to make sure he's

12      properly instructed.  I don't want him to make any reference to

13      the circumstances under which he no longer possessed the

14      weapon.  So you should be phrasing it in terms of when you last

15      possessed this weapon, this firearm, blah, blah, blah.  And

16      tell him I don't want to hear anything about it being stolen or

17      anything like that in front of the jury.

18                MR. ROMBEAU:  Absolutely, your Honor.  We intend to

19      do that.  We just want to make sure we have that moment to do

20      that with him.

21                Thank you.

22                THE COURT:  Okay.  All right.  Are we ready to bring

23      the jury in?

24                Okay.  Bring the jury in.

25                     (With the jury present.)
```

```
 1              THE CLERK:  Judge, would you like me to swear the
 2   jury?
 3              THE COURT:  Yes, please swear the jury.  Everybody
 4   else can be seated.
 5              THE CLERK:  Jurors, raise your right hand.
 6                  (Jury sworn by the deputy clerk.)
 7              THE CLERK:  Thank you.  You may be seated.
 8              Court is in session and has for consideration a jury
 9   trial in United States of America vs. Corey Donovan, criminal
10   case number 21-cr-88-1-PB.
11              THE COURT:  All right.  Good morning, members of the
12   jury.  Thanks again for serving on this case.  I know you're
13   busy and this is a sacrifice that you're making by being here,
14   but it's really vital for the ability of our constitutional
15   government to work because the -- the right to a trial by jury
16   is one of the constitutional rights that we all enjoy and we
17   could not accord Mr. Donovan that right if people like you
18   weren't willing to serve.  So thank you for service.
19              I'm going to give you some preliminary instructions,
20   tell you a little bit about the case.
21              I want to start with the COVID issue and the masks
22   that we're wearing.  I want to apologize for that.  I'm sure
23   many of you have either had COVID or you've been vaccinated and
24   you wonder, well, why are we wearing these masks.
25              Well, you know, I'm fully vaccinated.  I wear the
```

25

1    mask.  I -- we have a consulting virologist who works closely

2    with the court and we have put in place many measures that are

3    designed to minimize the risk to you because I'm bringing you

4    here into court against your will and I want to do everything I

5    can to ensure that I'm providing you with the maximum possible

6    protection.

7             We've developed these measures over time.  We've

8    been holding jury trials in this court for more than a year and

9    we've not had any in-court COVID transmission and we want to

10   keep that record intact.

11            So for the time being, we are imposing certain

12   restrictions on you and everyone else in the building to

13   protect you.  And that's what we're doing.  That's why

14   everything we're doing here that strikes you as unusual is

15   something we've carefully considered and determined is in your

16   best interest and so we're going to proceed as we've instructed

17   you.

18            I want to tell you about witnesses who may be

19   testifying here today.  So when a witness is called to testify,

20   they'll come into the courtroom wearing a mask.  When they're

21   sworn in and seated, they will take the mask off.  And that's

22   because you have to evaluate their credibility and it helps you

23   to be able to see their entire face while they're testifying.

24            The lawyers will also, when they're questioning and

25   speaking to you directly, will take their masks off.  Anyone

1   who takes their mask off, even for a brief period of time in

2   this building, has either been vaccinated or they have taken a

3   rapid COVID test today and produced a negative test result.  We

4   have validated, highly reliable rapid tests and our consulting

5   virologist tells us that there is a very, very, very limited

6   risk that a person who has that negative test is on the same

7   day they test negative, in fact, infectious with COVID.

8            Of course, the vaccines have been proven highly

9   effective in preventing severe illness and transmission and so

10  we also, fortunately, are in a very large room with very good

11  ventilation, a very good ventilation system.  We monitor things

12  like carbon dioxide buildup in the room to make sure that we're

13  complying with all of our protocols.

14           So bear with us when we do the COVID stuff, even if

15  you don't necessarily agree with what we're doing.  We're going

16  to err on the side of protection.  That's just how we operate

17  here.

18           Okay.  So enough about COVID.  Let me talk to you

19  about the case here.

20           So we're going to be in trial together for the next

21  two or three days.  I'm confident that we should be able to

22  resolve the case before Friday -- the end of the day on Friday

23  unless something unforeseen happens.  I'll keep you apprised of

24  what's going on.

25           Court will go from nine o'clock until 4:00 or 4:30

```
 1   at the latest without getting your permission to go beyond
 2   4:30.  We'll take a break in the middle of the day for at least
 3   an hour, could be a little bit longer, a break of about
 4   15 minutes in the morning, 15 minutes in the afternoon.
 5           If you should need a break when we're not scheduled
 6   to have one, raise your hand.  I'll ask if you need a break and
 7   we can -- we can accommodate that.  So don't worry about it if
 8   you end up having to use the restroom or something and need a
 9   brief break.  We can we can accommodate that.
10           The case will continue from day to day until we get
11   to -- complete the evidence, until you hear closing arguments
12   and I give you instructions on the law.
13           As I told you when you were selected, you need to
14   keep an open mind.  You have not heard any evidence in this
15   case.  You can't form a view about the case without the
16   evidence.  All right?  So you can't know anything about the
17   guilt or innocence of this defendant.  You can know one thing,
18   which under the law this defendant is presumed innocent and
19   remains innocent unless and until the government proves his
20   guilt beyond a reasonable doubt.
21           So you know about the presumption of innocence.  You
22   must give the defendant the benefit of that presumption and
23   then you must wait until you hear all the evidence in the case
24   to decide whether the government can meet its burden of proving
25   the defendant's guilt beyond a reasonable doubt.
```

1          I told you the defendant has a constitutional right

2   to remain silent.  You cannot hold that exercise of that right

3   against him.  A defendant has no obligation to produce

4   evidence, call any witnesses, ask any questions, or testify.

5   The burden is always on the government to prove the defendant's

6   guilt beyond a reasonable doubt.  Please keep that in mind

7   throughout the trial and I'll reinforce that once again when I

8   give you instructions on the law.

9          You need to keep an open mind because you have --

10  you haven't heard the evidence.  You also haven't heard the

11  law yet.  I will wait until the evidence is in and give you

12  detailed instructions on the law, everything you need to know

13  about the law to decide this case.

14         So we're both judges here.  You're the judges of the

15  facts.  You determine what happened.  I'm the judge of the law.

16  I determine what the law is and I give you the law and you take

17  the law I give you and apply it to the facts as you find them

18  to be and determine whether the government has proved the

19  defendant's guilt.  That's the way it works.  So until you hear

20  the law, you can't know whether the defendant is guilty or not

21  guilty.

22         You also should wait until you hear the lawyers'

23  summations, their closing arguments, and you hear what other

24  people on the jury have to think before you finally make up

25  your mind.  You want to be willing to listen to other people on

```
 1    the jury, of course.  So keep an open mind.

 2              Don't discuss the case with anyone.  I would prefer

 3    as jurors, even when you're on your break, don't like gather in

 4    small groups and start talking about the case because I want

 5    all of you to hear what each other are saying.  All right?  So

 6    don't -- you can talk about light things, you know, something

 7    funny happens in court or you just -- but don't try to like

 8    figure out what the evidence means and talking through with

 9    other people until we get to the deliberation stage and then

10    everybody should be present when you're talking about the case

11    so everybody can hear what you think.

12              Don't expose yourself to any discussions of the case

13    in the media.  Don't talk to anybody outside your family,

14    friends, about the substance of what happens.  Don't engage

15    with social media about the case while the case is pending.  No

16    tweeting, no Facebooking, no anything of that about the case.

17    When it's done, do whatever you want.  Post videos, do

18    whatever.  But until the case is over, don't do any of that.

19    All right?

20              Don't go out and do any Internet research on

21    anything.  I'll give you, and the lawyers will give you, all

22    the facts and you have to base your verdict on what comes out

23    in the courtroom.  So don't go out and do any research about

24    the case.

25              You have been given notebooks.  Let's talk about
```

```
 1    notebooks for a second.

 2             You can take notes if you want to.  You don't have

 3    to take a single note.  Okay?  And if you do decide to take

 4    notes, there are a couple things to keep in mind.

 5             Don't let note-taking be an obsession that prevents

 6    you from watching what's happening and listening to the

 7    evidence.  Okay?  If I see your head down trying to transcribe

 8    everything that's being said, I'm going to be worried that

 9    you're not watching and listening.  All right?

10             We have a professional here.  That's what she does.

11    She just takes down every word that's said.  You don't need to

12    do that.  All right?  So don't -- if you take notes, don't let

13    it interfere with what your principal mission is.  Okay?

14             If you do take notes, you can use them only to

15    refresh your own recollection.  I don't want you reading from

16    your notes to other jurors, showing them your notes, anything

17    like that.  If you want to persuade another juror about a fact,

18    you have to do so based on your discussion with that juror, not

19    by saying, well, I wrote it down, because people don't

20    transcribe things perfectly.  Okay?  So use notes if you want

21    to; don't use them if you don't want to.

22             No one -- you shouldn't show your notes to anybody.

23    Nobody will ever see your notes.  Each day it gets put in an

24    envelope and collected by the case manager.  At the end of the

25    case, they're destroyed by the case manager.  No one will ever
```

1    see your notes.  All right?

2            So take them if you want, don't take them if you

3    don't want to.  Use them to refresh your own memory, not for

4    any other purpose.

5            How's the trial going to unfold?  So trials begin

6    with opening statements.  The prosecutors make their statement,

7    then the defense attorney has an option to make a statement

8    then if he wants to.

9            After the opening statements, there'll be evidence

10   and the government will call witnesses one at a time.  Each

11   witness will testify on what's called direct examination, then

12   the defense will have an opportunity for cross-examination and

13   the government will have an opportunity for a brief redirect.

14   I rarely allow recross-examination unless there's something new

15   or different that comes up on the redirect.  And we'll go

16   through witnesses one at a time until the government has called

17   all of its witnesses.

18           When the government rests its case, the defendant

19   will have an opportunity to call witnesses if he chooses.  He

20   doesn't have to.  Can't hold it against him if he doesn't.  But

21   he can call witnesses and then it will proceed in the same way;

22   defense will ask direct, government will ask cross, defense can

23   ask redirect, and then that witness will usually be done.

24           We will have testimony from witnesses.  We will have

25   exhibits offered into evidence.  To the extent they're admitted

1     into evidence, you can consider those exhibits along with the

2     testimony.

3             We will have some stipulations.  Stipulations are

4     agreements by the parties that a certain fact is established

5     that doesn't require evidence to prove it.  And so if a

6     stipulation is read to you, it'll be identified as a

7     stipulation.  And if there is a stipulation, that's an

8     agreement by the parties and the parties have agreed that fact

9     is true, need not be subject to proof, and you can accept the

10    truth of that fact just based on the stipulation.  You don't

11    need to do any more worrying about it because it's been

12    established by agreement.

13            So you will take the testimony, the exhibits, the --

14    any stipulations, and then you can also consider what's called

15    circumstantial evidence.

16            There are two types of evidence.  There's direct

17    evidence and there's circumstantial evidence.  Direct evidence

18    is what the witnesses say they saw, that they did, that they

19    said to other people, and what the exhibits show exactly what

20    happened.

21            Circumstantial evidence is a kind of inference that

22    you can draw using your daily experience and common sense.

23    Neither kind of evidence is better than the other.  All right?

24    You can consider circumstantial evidence just like you consider

25    direct evidence.

```
1              I'll give you an example of what I mean.  Suppose in
2     late November you go to bed and the sidewalk in front of your
3     house is bare.  You wake up in the morning and you see there's
4     new fallen snow and you see a set of footprints in those -- in
5     the new fallen snow.  You know somebody walked across that
6     walkway, right?  You didn't see them, but you know they did,
7     and that's using circumstantial evidence.  Okay?  That's an
8     inference that you draw about -- using daily experience and
9     common sense about what actually happened.  And you can use
10    circumstantial evidence, like direct evidence, in deciding
11    whether something has been proved or not proved.
12             So after you get all the evidence, there'll be
13    closing arguments by the lawyers and then I'll give you jury
14    instructions on the law.  All right?  And that's the way the
15    case will unfold.
16             What the lawyers say to you in this trial, nothing
17    they say to you is evidence.  Okay?  It's what the witnesses
18    say in response to their questions that's evidence.  It's what
19    the documents show.  It's not what they say.
20             So when they give an opening statement or a closing
21    argument, they're making statements about -- in an opening
22    statement what they expect the evidence shows; in a closing
23    argument, what they want you to conclude from the evidence that
24    has come in.  But that's not evidence.  You have to -- and to
25    the extent they say something that's inconsistent with the
```

```
 1    evidence, just disregard what they say.  All right?
 2            So those are some general instructions to keep in
 3    mind.  And with that, we are ready to begin with opening
 4    statements.
 5            So let's start with the prosecutors.
 6            MS. KRASINSKI:  Thank you, your Honor.
 7            Good morning, everyone.  I'm Anna Krasinski.
 8            Corey Donovan can't have a gun and he can't have
 9    ammunition because he's a convicted felon.  And yet there was
10    ammunition littered across the property where he lives and
11    there was a shotgun in his Jeep.
12            Essentially this case boils down to one thing, and
13    that's possession; was Corey Donovan in possession of the
14    shotgun that was inside his Jeep, was he in possession of
15    ammunition that was in the center console of his Jeep, was he
16    in possession of ammunition that was found in a workshop on the
17    property where he lives, and was he in possession of ammunition
18    found in an ammunition can in another vehicle, kind of a junk
19    Hyundai -- a car with no tires, with no windows -- a car that
20    was parked right outside this workshop.
21            So first I want to talk about what the evidence is
22    and how we got it.
23            Agents got a warrant to search the property where
24    Corey Donovan lives.  And it's a property in Wilmot,
25    New Hampshire, and the search was for guns and ammunition.
```

1                And you'll learn that this is a big, rural property.

2      There are multiple buildings on the property.  There's a main

3      house where Mr. Donovan's mom lives, and then there's a

4      separate residence, a garage, that's converted into an

5      apartment, so this garage apartment, and that's where the

6      defendant lived with his girlfriend, Kelley Finnigan.  And then

7      up from that garage apartment is a big barn workshop.

8                And there were multiple cars on the property.

9      Parked right by this sort of garage apartment where Corey

10     Donovan lived was the defendant's green soft-top Jeep.  And

11     it's a Jeep that's registered to Corey Donovan.

12               And up by the barn there were a series of three

13     other -- this barn workshop, there were a series of three other

14     cars that were parked out there, including this kind of junk

15     Hyundai that I mentioned to you -- no tires, no windows,

16     nothing -- and agents searched that property on March 26th of

17     this year.

18               So let's talk about what they found and where they

19     found it.

20               Agents searched the garage apartment, didn't find

21     much there, but they also searched the green Jeep that's parked

22     outside of it.  And in the green Jeep, agents found a bandolier

23     loaded -- or not loaded, but that had 20 rounds of 20-gauge

24     ammunition in it.

25               Now, what's a bandolier?  A bandolier is essentially

1   a belt, often it's worn sash style sort of across the shoulder

2   to the hip, where you can hold individual rounds of ammunition.

3   Sometimes people sling it over their shoulder.  And that was in

4   the open center console of the Jeep.

5          And then strapped to the roll bar of the Jeep was a

6   Mossberg 500 shotgun fully loaded with six rounds of 20-gauge

7   ammunition, including one round in the chamber, and then on the

8   shoulder stock of the shotgun was sort of another ammunition

9   holder and there were four rounds of ammunition on that.

10         For anyone who's not really familiar with Jeeps, a

11  roll bar is kind of a bar that goes across and overhead and

12  it's basically a safety measure.  In case the Jeep rolls over,

13  it's to protect, you know, the heads of anyone inside of it so

14  that if the Jeep rolls over, someone inside doesn't get hurt.

15  So strapped to the roll bar of the Jeep.

16         Now, I want to talk about the evidence that you're

17  going to hear that it was the defendant, Corey Donovan, who was

18  in possession and control of this green Jeep where the gun and

19  this ammunition were found.

20         First, the Jeep is registered to Corey Donovan.

21  You'll learn that he renewed that registered in February of

22  this year, not long before this search occurred in March of

23  this year.  And this is one of the cars he drives.  You'll see

24  pictures of him driving the Jeep, you'll see video of him

25  driving the Jeep and also messing around in the Jeep.

37

1          And where'd this video come from?  You'll hear that

2    when agents searched the property, they found that there was

3    security, home security footage, set up outside of the garage

4    apartment.  And one of those cameras was set up close to where

5    the Jeep is parked.  And so you can see sometimes the Jeep

6    parked there and you can see people walking around the Jeep,

7    getting in the Jeep, getting out of the Jeep.  And so you'll

8    see some of that footage.

9          And in particular we'll focus on kind of the few

10   hours, the afternoon of March 25th, the day before the search,

11   and you'll see that the defendant is the one who's driving that

12   Jeep.  You'll hear that he's the last person to drive that Jeep

13   and that he's the last person to have been in that Jeep before

14   the search.

15         And there's going to be evidence that he would have

16   had to have known that the gun and ammunition were in the Jeep.

17   You'll hear that the ammunition that was in the center console,

18   it wasn't hidden.  It was open, it was obvious.  The center

19   console was open, right?  So as in any car, sometimes you can

20   close the center console, but in this one it was already open

21   when agents searched the vehicle.

22         In fact, you'll hear from multiple witnesses that

23   they could see ammunition in the center console from outside of

24   the vehicle.  So it wasn't hidden.  It was right there, obvious

25   in that center console.

1          And you'll see a picture and you'll hear a

2    description of how the shotgun was strapped to the roll bar of

3    the Jeep, partially concealed in kind of a ghillie camouflage

4    material, but you'll also see and you'll hear about how close

5    that roll bar is to where the driver sits in the car; that when

6    you're sitting in the driver's seat, you could -- it's close

7    enough to reach up and grab.  It's close.  It's right there.

8          And the video that I mentioned in the afternoon

9    before the search, not only will you see the defendant driving

10   the vehicle, but you'll see footage of him what I'm going to

11   call messing around in the Jeep.  You'll see footage when it's

12   dark out the night before the Jeep.  He's in there with a

13   flashlight.  We can't see exactly what he's doing, but you'll

14   see that he spends time alone in that Jeep the night before the

15   search.

16         Overall, I think you'll hear the agent testify that

17   in the video footage that he watched of the afternoon and

18   evening the day before the search that the defendant was sort

19   of in -- messing around and tinkering in the Jeep for about a

20   half an hour over the course of that afternoon by himself, you

21   know, in the Jeep.

22         So that's what was found in the Jeep.  So now let's

23   talk about the evidence that agents found in the barn and the

24   workshop -- the sort of barn workshop.  I kind of call it a

25   workshop.  Sometimes I call it shop.

39

1          This shop is just up a driveway from the garage

2   apartment and where the Jeep was parked.  And agents walk in

3   and as they walk in, you'll see video of this, sort of to the

4   left side, there's an open long gun case.  And on the open long

5   gun case is another bandolier.  And this bandolier has 23

6   rounds of 28-gauge ammunition laying out on top of it.

7          And just to be clear, there's only one firearm

8   that's found and it's the Mossberg shotgun in the Jeep, and

9   that was a 20-gauge.  So there's the 28-gauge ammunition laying

10  out on the gun case, but no 28-gauge shotgun was found during

11  this search.

12         There were a couple other things on top of this

13  open long gun case in the -- in the shop and one of those is a

14  shotgun barrel.  And you'll hear that it's not just any shotgun

15  barrel.  It's essentially a companion barrel to the shotgun

16  that was found in the Jeep.

17         You'll learn from the gentleman who first purchased

18  this shotgun new from a gun shop that when he bought it new, it

19  came with two barrels; essentially, interchangeable barrels

20  that you could swap out depending on what you want to use it

21  for hunting for.  So one barrel is for ammunition that you

22  might use to hunt larger game like deer and one is for shooting

23  smaller animals, maybe like birds.

24         And the first owner will tell you that the barrel

25  that was found on the open long gun case in the shop looks like

1    the one that came new when he purchased that shotgun.

2            And you'll hear from another witness that that

3    shotgun barrel could be swapped with the one that was actually

4    on the Mossberg 500 that was strapped to the roll bar of the

5    Jeep.  So companion barrel.

6            There's another item that I want to talk about that

7    was on that open long gun case.  And this is a scope.  And it's

8    Corey Donovan's scope.  And how do we know that?  Well, you'll

9    see that the scope has writing on it, writing from gray silver

10   Sharpie, and it says JPM27J.

11           So what is that?  You'll learn that this scope was

12   seized by law enforcement in 2019 and that as part of that

13   seizure, it was marked JPM27J.  And you'll hear from the

14   officer that returned that scope that he returned that scope to

15   the defendant, Corey Donovan.

16           Now, I want to be clear.  I'm not saying he can't

17   have a scope.  A scope is essentially a glorified magnifying

18   glass, right?  Nothing wrong with having a scope.  But this

19   scope was on the open long gun case with the barrel and with

20   the ammunition and so it's related to who's possessing, who's

21   controlling, who's -- those items that were on the long gun

22   case.

23           Now, I want to talk about evidence that you're going

24   to see that Corey Donovan accessed and controlled this shop in

25   addition to the fact that his scope was on the long gun case

41

1    with that ammo.

2              You'll hear from a witness, Tim Merna, that Corey

3    Donovan showed him around the barn; that Corey Donovan would

4    invite him up to the barn, the barn workshop.  You'll also see

5    photos of Corey Donovan using this barn workshop as a shop

6    there, using a tool, working with wood, doing something.  And

7    the question that you're going to be asking as you look at

8    those photos is how do we know that that's the shop.

9              There's a landmark, and there's a landmark that

10   you're going to see in the photos of the defendant working in

11   the shop and the photos and video that you're going to see of

12   how the long gun case was when it was in the shop.  And that's

13   a -- there was a -- there was a refrigerator in the shop.  You

14   know, kind of a normal refrigerator, overhead freezer, and

15   you'll see in the images of the long gun case that it's right

16   there by that refrigerator.  And when you look at those

17   pictures of Corey Donovan working in the shop, you'll see he's

18   right there by that refrigerator.  That's the area where he

19   worked, the area where this long gun case was found.

20             I also mentioned that there was some evidence found

21   in this Hyundai.  This car, this kind of junk car, was parked

22   outside the workshop and in it, right there where the passenger

23   seat should be, there's an ammo can.  And I say where the

24   passenger seat should be because there's only one seat

25   remaining in the vehicle.  And you'll see that.  It's the

1    driver's seat.  It's the only seat that's in there.  And so

2    right there on the floor is an ammo can.  No windows in the

3    car; anyone could reach in and grab that ammo can.

4          And so when agents open the ammo can, in it there's

5    a bandolier, again, with 24 rounds of 28-gauge ammunition;

6    there's a round of 12-gauge ammunition; there's two boxes that

7    are full of 20-gauge ammunition -- and you'll hear it totals 50

8    rounds of ammunition, 20-gauge ammunition; and there were also

9    a few other things in that ammo can.

10          There was the user manual to the Mossberg 500 that

11    was found strapped to the roll bar of the Jeep, there was a gun

12    cleaning kit that looks a lot like one that was returned to

13    Corey Donovan along with that scope, and you're going to see

14    and you're going to hear evidence that, you know -- you know

15    where the gun was and ammunition and firearm accessories like

16    the bandoliers, like the gun cleaning kit.  I mean, it was all

17    around the property.  It was broadly disbursed.  Some was in

18    the car.  There's no attempt to segregate any of it out.  You

19    know, there's no -- there's nothing on the property that says,

20    oh, well, it was all, you know, contained in a safe that the

21    defendant had -- didn't have access to.  Nothing like that.

22    You're going to hear that it's all over and it's all over in

23    areas that the defendant had access to and control of.

24          Now, there are three additional things the

25    government needs to prove in addition to the fact that the

1   defendant possessed the gun and the ammunition that we've

2   talked about and the government has to prove those beyond a

3   reasonable doubt; that the defendant was previously convicted

4   of a felony and that in March he knew that he had previously

5   been convicted of a felony, and the government also has to

6   prove that the Mossberg shotgun and all the ammunition traveled

7   in interstate commerce, what we often refer to as nexus.

8   You're going to hear that we've all agreed to that.

9            At some point, my colleague, Attorney Rombeau, and

10  I, one of us, will stand up and read stipulations into the

11  record where essentially we both agree and the defendant agrees

12  that he is a convicted felon, that he knew he was a convicted

13  felon, and that the gun and all of the ammunition had traveled

14  in interstate commerce, which is why I said at the beginning

15  what this case really boils down to is possession.

16           So Corey Donovan is charged with one crime.  And

17  that's on or about March 26th, 2021, he unlawfully possessed

18  all of the ammunition that was found during the search, the

19  ammunition in the center console of his car, the ammunition in

20  this Hyundai parked out by the shop, the ammunition on the open

21  long gun case in the shop, and that he was in unlawful

22  possession of the shotgun that was in his Jeep.

23           And the evidence will prove beyond a reasonable

24  doubt that the defendant is guilty after you see the photos,

25  review the security camera footage, hear the testimony about

```
 1   his ownership of the Jeep, his access to the barn, his control

 2   over other items found with the gun and ammunition.

 3              My colleague, Attorney Rombeau, will return to you

 4   and ask you to render the only reasonable verdict, that the

 5   defendant is guilty.

 6              Thank you.

 7              THE COURT:  Thank you, Counsel.

 8              We'll hear the defense opening statement, if you

 9   choose to make one.

10              MR. STACHOWSKE:  Yes, your Honor.

11              Good morning, ladies and gentlemen.  My name's

12   Attorney Matthew Stachowske.  With me at the conference table

13   today is my client, Corey Donovan.

14              Mr. Donovan is a 39-year old man from Wilmot,

15   New Hampshire, where he resides with his girlfriend, Kelley

16   Finnigan.  And my client is a convicted felon.

17              You will hear testimony from U.S. Probation Officer

18   Tim Merna who has worked with my client for close to three

19   years during his probation who will tell you that my client

20   acknowledged and agreed and understood that he was a convicted

21   felon and that he was not authorized to possess a firearm.  He

22   recognized that.

23              You will further hear that my client signed an

24   acknowledgment, understood and recognized that he was not to

25   possess a firearm.  That document will likely come into
```

45

```
1   evidence.  We are not hiding that fact.  We have nothing to
2   hide here.
3              You will next hear that on March 22nd -- March 26th,
4   2021, excuse me -- again, March 26th, 2021 -- that law
5   enforcement agents descended upon my client's mother's property
6   in Wilmot, New Hampshire, where my client resides, or resided,
7   with his girlfriend, Kelley Finnigan, and during the search of
8   that residence, they found various calibers of ammunition --
9   20-gauge, 28-gauge -- for a shotgun, various ammunition.
10             They also found one single firearm, a shotgun.  The
11  shotgun was found during a subsequent search of a vehicle, a
12  Jeep Wrangler registered to my client.
13             But what you will not hear and what the evidence
14  cannot and will not demonstrate is that Mr. Donovan was
15  handling a firearm or ammunition.  At no time did he physically
16  possess the firearm found or the ammunition found.
17             There will be no evidence that Mr. Donovan had
18  special access or proximity to the firearm or the ammunition.
19  There'll be no evidence that Mr. Donovan made prior statements
20  about the gun or the ammunition.  The evidence will fail to
21  demonstrate that Mr. Donovan had the power or the intent to
22  possess the gun or the ammunition at issue.  You see, that is
23  going to be the key to this case.  The government is brushing
24  over the distinction between actual possession and constructive
25  possession.
```

1           At the end of this case I'll come back to you and
2    have the opportunity to discuss that further and you're going
3    to hear clear instructions from this Court regarding the
4    distinction between actual and constructive possession.  And
5    I'm here to tell you now that there is no actual possession and
6    it's the government's burden of proof to prove beyond a
7    reasonable doubt that my client constructively possessed the
8    firearm and the ammunition in this case.  And that includes the
9    intent, that my client intended to possess these items.  And
10   the evidence will not demonstrate that in the slightest.
11          So, again, at the close of the case, I will return
12   and ask for you to consider after deliberation that the
13   government has failed to prove their case beyond a reasonable
14   doubt and to return a not guilty verdict.
15          Thank you.
16
17
18
19
20
21
22
23
24
25

```
 1                    THE COURT:  Thank you, Counsel.

 2                    Is the government ready to call its first witness?

 3                    MS. KRASINSKI:  Yes, your Honor.  The government

 4   called Special Agent John Cook.

 5                    THE COURT:  Please stand by the witness stand and

 6   raise your right hand, sir.

 7                    THE WITNESS:  Yes, your Honor.

 8              JOHN COOK, having been first duly sworn, testified

 9   as follows:

10                    THE CLERK:  Thank you.

11                    Would you please state your last name and spell

12   your -- state your full name and spell your last name for the

13   record, please.

14                    THE WITNESS:  It's John Cook, C-o-o-k.

15                    THE COURT:  Sir, you can take your mask off while

16   testifying.

17                    THE WITNESS:  Thank you, your Honor.

18                         DIRECT EXAMINATION

19   BY MS. KRASINSKI:

20         Q.    Good morning, Agent Cook.

21         A.    Good morning.

22         Q.    Where do you work?

23         A.    I'm a special agent with the Bureau of Alcohol,

24   Tobacco, Firearms, and Explosives, better known as ATF.

25         Q.    And how long have you been a special agent with ATF?
```

48

1      A.    A little over 16 years.

2      Q.    Did you undergo any training to become a special

3  agent?

4      A.    Yeah.  To be a special agent, you start off with a

5  CITP.  It's like Criminal Investigative Training Program.  It's

6  a three-month program in Georgia.  Then it's followed up by

7  special agent basic training, which is an additional three

8  months, also in Georgia.  And then there's an OJT program of

9  about one year and a probationary period of three years.

10     Q.    And are you assigned to a particular location or

11 division?

12     A.    I'm assigned to the Manchester field office here in

13 New Hampshire.

14     Q.    Have you been assigned here in New Hampshire your

15 entire career with ATF?

16     A.    I have.

17     Q.    What did you do before joining ATF?

18     A.    I was a sworn police officer in Lexington, Kentucky.

19     Q.    And what'd you do before that?

20     A.    I was in the United States military.  I was in the

21 United States Marine Corps for six years.

22     Q.    Now, how did you become involved in the

23 investigation that leads us here today?

24     A.    I was asked to assist on a search warrant at the

25 defendant, Corey Donovan's, residence, on March 26th of this

1    year.

2         Q.    And where's that residence?

3         A.    It's at 33 NH Route 4A in Wilmot, New Hampshire,

4    kind of by the Sunapee area.

5         Q.    Can you give us an overview of the property?

6         A.    It's -- it was a large property.  It's approximately

7    like eight acres, had multiple buildings on it.  There was like

8    a primary residence -- if you're facing the property from the

9    roadway, there was like a primary residence on the right which

10   was the mother's residence; in the center there was like a

11   garage/apartment; and then in the back left of the property

12   there was a large barn/woodshed or workshop, I should say.

13        Q.    And who lived in the garage apartment, if you know?

14        A.    The defendant, Corey Donovan, did.

15        Q.    Did his girlfriend, Kelley Finnigan, also live

16   there?

17        A.    Yes.

18        Q.    Were there multiple cars parked along -- on that

19   property?

20        A.    There were.  There was several on the -- on the --

21   the driveway went kind of like to the left of the garage and

22   ran all the way back to the barn and there were several cars on

23   the left of that driveway.

24        Q.    Agent Cook, I want to show you, and just you at this

25   point, Government's Exhibit 322.

50

```
 1                  Is it easiest if I take a hard copy up and then --
 2                  THE COURT:  He should be able to see it.
 3                  So let me just explain, members of the jury.
 4                  Some exhibits have already been admitted by
 5     agreement.  Other exhibits have not yet been admitted into
 6     evidence.  You can only see exhibits that are admitted into
 7     evidence.  So right now this has not been admitted.  So I can
 8     see it, the lawyers can see it, the witness can see it, but not
 9     you.  If it's admitted, then it will be displayed to you so you
10     can see it.
11                  So bear with us when we -- the person offering the
12     evidence seeks to lay a foundation so that it can be admitted.
13                  All right.  Go ahead.
14                  MS. KRASINSKI:  Thank you, your Honor.
15          Q.    Do you recognize Government's Exhibit 322?  Oh, is
16     your screen --
17          A.    I'm sorry.
18                  THE COURT:  Hang on a second.  That came on for a
19     second, but it's not on my screen.  There it is.
20                  You can go ahead.
21                  THE WITNESS:  I'm sorry, your Honor.  I don't have
22     it on my screen.
23                  THE COURT:  You don't have it on your screen?
24                  MS. KRASINSKI:  I can bring up a hard copy, your
25     Honor.
```

51

```
 1              THE COURT:  Well, let's get the system working
 2    right.
 3              Do you know why he would not see it?
 4              THE CLERK:  It should come up.
 5              THE WITNESS:  Yes, I have it now.
 6        Q.    What is that?
 7        A.    That is an overview of the location of the
 8    defendant -- the defendant's residence.
 9        Q.    And so it's an aerial view of the property you
10    searched on March 26th of this year?
11        A.    It is.  It appears to be a satellite view of that
12    property, yes.
13        Q.    And how do you know that?
14        A.    I do recognize the layout of the house.  To the
15    right of the property, the garage in the center, the barn in
16    the back, and it's actually marked as 33 NH Route 4A on -- on
17    the map itself.
18              MS. KRASINSKI:  Your Honor, I'd move to strike the
19    ID on Government's Exhibit 322.
20              THE COURT:  Any objection?
21              MR. STACHOWSKE:  No objection.
22              THE COURT:  Without objection, it will be admitted.
23    You can show it to the jury.
24              MS. KRASINSKI:  Thank you, your Honor.
25                   (Government's Exhibit 322 admitted.)
```

1           MS. KRASINSKI:  And can we enlarge the center

2     portion that displays the property?

3           THE COURT:  Do you have somebody doing that?

4      Q.    Agent Cook, your screen should be a touchscreen.  So

5     can you point out on the screen where the main house that you

6     described is, the house where Mr. Donovan's mother lived?

7           THE CLERK:  Actually, his screen is not a

8     touchscreen.

9           MS. KRASINSKI:  It's not a touchscreen?  Okay.

10          THE CLERK:  It has a protector over it.

11          MS. KRASINSKI:  Got it.

12          THE COURT:  It has been in the past.  Maybe it's a

13    COVID issue.

14          THE CLERK:  Yeah, because of the way the juror's

15    sitting now with the protector over it so they can't see.

16          THE COURT:  Oh, I see.  Yeah.  So because we had to

17    seat the jurors where they could see the screen and some

18    exhibits would not -- the bottom line it's not -- it doesn't

19    have the touchscreen feature working.

20          THE WITNESS:  Okay.

21     Q.    Can you describe for us which building that you see

22    on Government's Exhibit 322 is Mr. Donovan's mother's

23    residence?

24     A.    Yes, it's marked by the 33 NH Route 4A, where that

25    star is on the top line.  That's the mother's residence.

53

1     Q.    And which of the property or the buildings that you

2   see on here is kind of the garage apartment where Corey Donovan

3   lived?

4     A.    It's the one marked 31 NH Route 4A.

5     Q.    And, finally, which building on here is the sort of

6   barn workshop?

7     A.    That's 29 NH Route 4A, in the center of the -- of

8   the picture.

9     Q.    And how do you get between the buildings?

10    A.    There's a long driveway that went from the roadway

11  down to the left of the garage all the way down to that barn.

12    Q.    Now, did the search warrant that you had, did it

13  authorize the search of all three of these buildings?

14    A.    It did not, no.

15    Q.    What did it authorize the search of?

16    A.    The search of 31 NH Route 4A, the garage/apartment,

17  and 29 NH Route 4A, the barn.

18    Q.    So can you kind of walk us through how the search

19  went down that day?

20    A.    I was asked to be the team leader just to provide

21  security for -- we had a -- ATF has what's called SRT.  It's a

22  Special Response Team.  They sometimes conduct the security

23  sweep prior to a search warrant being executed.

24          So they were going to secure the garage/apartment

25  and the barn.  To do so, they were going to have to move past

54

1    that residence.  So for security reasons, I took a team and

2    established a perimeter around that house just so the ATF

3    SRT team wouldn't have their back to a possible threat.

4         Q.    And then what does the SRT team do and what happens

5    next?

6         A.    They secure the area.  They just make sure it's safe

7    for the search to begin.  If there's people there, they locate

8    them and they just secure it.  And once it's secure and safe,

9    then they turn it over to us, the search team.

10        Q.    Were there any people there?

11        A.    There were not in the 31 or 29, the garage apartment

12   or the barn.  The defendant's mother and brother were in the

13   residence and they did come outside the house, but they were

14   not in the areas that were searched.

15        Q.    So if I understand correctly, the two areas that you

16   were authorized to search, the garage apartment and the sort of

17   barn workshop, those were empty?

18        A.    Correct, yes.

19        Q.    Okay.  So once you know it's safe to search, what

20   happens?

21        A.    The first thing we do is we'll take a video.

22   Somebody will walk through and videotape the interior of the

23   building that we're going to search.  And that's just so we can

24   record the condition of the property before we even begin

25   searching.

55

1    Q.    And then what?

2    A.    Then we search for evidence.  If you locate a piece

3    of evidence, you notify the photographer, they come, photograph

4    the evidence in place, and then we seize the evidence.

5    Q.    And so were the barn and the residence searched the

6    way you just described?

7    A.    The barn and the garage/apartment were, yes.

8    Q.    And what happened after those searches concluded?

9    A.    Once those were done, I found out that Special Agent

10   John Forte, who's the case agent, had noticed some ammunition

11   in plain view in some of the vehicles that line the driveway

12   going back to the barn and that he was applying for additional

13   search warrants so that we could search those vehicles.

14   Q.    And so what did you do while he was applying for

15   those warrants?

16   A.    Well, we were -- we had just finished up the barn.

17   It was a lot of waiting, honestly, just waiting for the search

18   warrants to get signed.

19   Q.    And ultimately did you get the additional warrant

20   for the vehicles on the property?

21   A.    Yes.  Special Agent John Forte did, yes.

22   Q.    Okay.  And were those vehicles then searched?

23   A.    They were.

24   Q.    Okay.  Let's start talking about some of the items

25   that were found during the search and let's start with the

56

```
1    Jeep.
2                 And so before we go into the stuff found in the
3    Jeep, let's look at the Jeep and get oriented to the property a
4    bit more.
5                 Can we please display for the witness only
6    Government's Exhibit 300.
7                 Agent Cook, do you see that exhibit?
8         A.    I do.
9         Q.    Do you recognize it?
10        A.    I do.
11        Q.    What is it?
12        A.    That is the Jeep that we searched that was on the
13   defendant's property.
14        Q.    And how do you know?
15        A.    I recognize the Jeep and I also recognize in the
16   background the garage/apartment building.
17                MS. KRASINSKI:  Your Honor, I'd move to strike the
18   ID on Government's Exhibit 300.
19                THE COURT:  Any objection?
20                MR. STACHOWSKE:  No objection.
21                THE COURT:  It'll be admitted.
22                  (Government's Exhibit 300 admitted.)
23                MS. KRASINSKI:  Permission to publish, your Honor?
24                THE COURT:  Go ahead.
25        Q.    So I guess first and foremost, what's this vehicle?
```

57

1      A.   It's a Jeep Wrangler.

2      Q.   And do you see sort of behind the Jeep Wrangler

3  there's a green building with kind of reddish-orangeish trim?

4      A.   I do.

5      Q.   And what's that building?

6      A.   That's the garage/apartment that was on the

7  property.

8      Q.   All right.  And was that Corey Donovan's residence?

9      A.   Yes.

10      Q.   Can you estimate the distance between this Jeep

11  Wrangler and Mr. Donovan's residence?

12      A.   30 -- 30 feet.

13      Q.   Now, if we're looking at sort of the driveway,

14  that's -- you can see behind the Jeep, if you were to go right

15  towards the right of the image, where would going down that

16  driveway take you?

17      A.   You would walk out to the street.

18      Q.   And if looking at the image as we're looking at it

19  you were to go left and along that way up the driveway, where

20  would that take you?

21      A.   You'd go to the barn.

22      Q.   Did you learn who this Jeep was registered to?

23      A.   Yes.  It's registered to the defendant, Corey

24  Donovan.

25          MS. KRASINSKI:  Can we please display for the

58

```
 1    witness only Government's Exhibit 301.
 2         Q.    Agent Cook, do you recognize Government's
 3    Exhibit 301?
 4         A.    I do.
 5         Q.    What is it?
 6         A.    That's the registration for the vehicle, the Jeep
 7    Wrangler, registered to Corey Donovan.
 8         Q.    How do you recognize it?
 9         A.    It has -- the Jeep listed has Corey Donovan's name
10    listed on it as well as the address where the item was taken.
11         Q.    And was it found during the search on March 26th,
12    2021?
13         A.    It was.
14              MS. KRASINSKI:  Your Honor, I'd move to strike the
15    ID on Government's Exhibit 301.
16              THE COURT:  Any objection?
17              MR. STACHOWSKE:  No objection.
18              THE COURT:  It'll be admitted.
19                 (Government's Exhibit 301 admitted.)
20              MS. KRASINSKI:  Permission to publish, your Honor?
21              THE COURT:  Go ahead.
22         Q.    So you mentioned that this is the registration for
23    the Jeep.  And do you see Corey Donovan's name on it?
24         A.    I do.
25         Q.    Anyone else's name on it?
```

59

```
1          A.    No.

2          Q.    Looking at this registration, can you tell us make,

3    model?

4          A.    Yes.  It's a Jeep Wrangler.

5          Q.    And when was this vehicle's registration renewed,

6    last renewed?

7          A.    On February 2nd of 2021.

8          Q.    And where do you see that?  Can you point that out

9    to us?

10         A.    It is right in the center of it, to the left of the

11   New Hampshire SDMV stamp, that validation stamp, to the left of

12   that it says renewal registration, 02 February, 2021, and they

13   paid $43.20.

14         Q.    And when does this registration expire?

15         A.    It expires on October 31st of 2021.

16         Q.    Now, was there anything seized from the Jeep?

17         A.    Yes.

18         Q.    Can you generally tell us what?

19         A.    There was ammunition seized and a Mossberg 500

20   shotgun.

21              MS. KRASINSKI:  Your Honor, I've not had a trial

22   here yet where I'm actually allowed to take my mask off for

23   part of this.  I'm going to start working with physical

24   evidence.  Should be I be putting my mask on as I --

25              THE COURT:  Are you going up to hand him things?
```

```
1              MS. KRASINSKI:  Yes, your Honor.

2              THE COURT:  Yeah.  So if you need to do that, you

3    can, or you can ask the clerk to hand it to him.  Maybe that's

4    even easier.  So --

5              THE CLERK:  Okay.

6              THE COURT:  So just ask the clerk to bring it up.

7    You don't have to put it on.  Just ask the clerk to bring it

8    up.

9              MS. KRASINSKI:  Okay.  So the first thing let's look

10   at is Government's Exhibit 112 and 112a.  It should be in the

11   plastic bucket over there in a --

12             THE CLERK:  Okay.

13             MS. KRASINSKI:  -- folder marked --

14             THE CLERK:  112 and 112a.

15             MS. KRASINSKI:  Yes.  Thank you.

16             And those have been admitted by agreement.

17             THE COURT:  Okay.

18        Q.   So what is Government's Exhibit 112?

19        A.   This is 20 rounds of ammunition in a bandolier.

20        Q.   Agent Cook, can you take that out of the bag and

21   show it to the jury?

22        A.   Yes.

23        Q.   What is a bandolier?

24        A.   It's just a way to hold more ammunition.  It just --

25   this is almost like a belt, where they just strap it around to
```

61

```
 1   hold more ammunition if they go out shooting.
 2        Q.   And you said 20 rounds of ammunition?
 3        A.   Yes.  Let's -- yes, that's correct.
 4        Q.   What gauge ammunition is it?
 5        A.   It's all 20-gauge ammunition.
 6        Q.   Do you know what type of ammunition it is?
 7        A.   It's a mix.  It looks like it's Federal ammunition
 8   and then there's another brand here on the -- on the far right
 9   that I don't -- I don't know the manufacturer of it.
10        Q.   Let's take a look at where that was found in the
11   Jeep.
12             Can we please show for the witness only Government's
13   Exhibit 303.
14             Agent Cook, do you recognize that?
15        A.   I do.
16        Q.   What is it?
17        A.   That's the interior of the Jeep.
18        Q.   How do you know?
19        A.   I recognize where the ammo is in the center console;
20   I recognize the -- honestly, the mess inside the Jeep.
21             MS. KRASINSKI:  Your Honor, I'd move to strike the
22   ID on Government's Exhibit 303.
23             MR. STACHOWSKE:  No objection.
24             THE COURT:  It'll be admitted.
25                  (Government's Exhibit 303 admitted.)
```

```
 1              MS. KRASINSKI:  Permission to publish, your Honor?
 2              THE COURT:  Yes.
 3         Q.   Now, do you see that the lid to the center console
 4    is open?
 5         A.   I do.
 6         Q.   Who opened the lid?
 7         A.   I believe it was open.
 8         Q.   So law enforcement didn't open the lid?
 9         A.   No.
10         Q.   Do you see --
11              MR. STACHOWSKE:  Your Honor, I'm sorry.  I didn't
12    hear that answer.
13              THE COURT:  He said no, law enforcement didn't open
14    the lid.
15              MR. STACHOWSKE:  Thank you.
16         Q.   Do you see the sort of camouflage glove that appears
17    to be on the -- at least at this point -- passenger seat of the
18    Jeep?
19         A.   I do.
20         Q.   Did you see that glove when you were there that day?
21         A.   I did.
22         Q.   Did you notice the size of the glove?
23         A.   They were large gloves, like I would say adult large
24    gloves.
25         Q.   Could those have fit your hands?
```

1       A.   Yes.

2       Q.   Now, we talked about the ammunition that was found

3   in the Jeep.  Let's talk about the shotgun.  Can you tell us

4   about that?

5       A.   It was a Mossberg model 500 20-gauge shotgun that

6   was found.

7       Q.   And where was it found?

8       A.   It was found in the ceiling of the Jeep.  It was

9   kind of strapped in to the back rail of the Jeep.

10           MS. KRASINSKI:  Let's take a look at this point for

11  the witness only at Government's Exhibit 302.

12      Q.   Do you recognize that?

13      A.   I do.

14      Q.   What is it?

15      A.   That's the interior of the Jeep, and you can see the

16  shotgun barrel.

17      Q.   And is this photo taken from the March 26th, 2021,

18  search?

19      A.   It is, yeah.

20           MS. KRASINSKI:  All right.  Your Honor, I'd move to

21  strike the ID on Government's Exhibit 302.

22           MR. STACHOWSKE:  No objection.

23           THE COURT:  It'll be admitted.

24               (Government's Exhibit 302 admitted.)

25      Q.   So walk us through here.  Which side is the driver's

64

1    side?

2         A.    The side farthest from the camera.

3         Q.    So if you're looking at this image, the driver's

4    side is the headrest that's on the kind of right corner?

5         A.    Lower right corner, correct.

6         Q.    And the headrest that's closer to the left corner,

7    what's that seat from?

8         A.    That's the passenger seat.

9         Q.    And can you estimate the distance of that bar that

10   the gun is strapped to to the headrest?

11        A.    A little over a foot.

12        Q.    Now, I want to show you Government's Exhibit 111,

13   which has been agreed -- admitted by agreement.  It's the

14   actual shotgun.  So in that top box.

15             Now, before we kind of talk details of the shotgun,

16   I just want to ask, before any firearm is brought into a

17   courtroom, what happens?

18        A.    It's cleared to make safe -- make sure it's safe,

19   and I did the same.

20        Q.    And is the firearm kind of strapped so that even if

21   it were -- someone tried to fire it, it could not fire?

22        A.    It is.  There's a pistol lock going through the

23   breach.

24        Q.    So you know holding that in here that it's safe?

25        A.    It's safe.

65

```
 1          Q.    All right.  And so what are you holding?

 2          A.    It's a Mossberg model 500 20-gauge shotgun.

 3          Q.    Can you tell us the serial number?

 4          A.    I must need my reading glasses, I'm afraid.

 5                It looks like V1051663.

 6          Q.    And what do you see at the end of the barrel?

 7          A.    Someone has taken a drill and they've drilled holes

 8    in the barrel.  That's not -- it doesn't come that way.

 9          Q.    And is there a strap on that shotgun?

10          A.    This?  Yes.

11          Q.    What is the orange piece that's on that?

12          A.    It's a -- it says a cable cuff, some type of like

13    way to lock it in, attach it to something.

14          Q.    And one last question about that.  The barrel on the

15    Mossberg shotgun, is it smooth or does it have rifling inside?

16          A.    It's smooth bore.  Yeah, it's a shotgun, so it's

17    smooth bore.

18          Q.    Now, when that shotgun was seized from the Jeep, was

19    it loaded?

20          A.    It was.

21          Q.    I'd like to show you Government's Exhibit 113 and

22    113a, which have been admitted by agreement.

23                Is it easier if I --

24                THE CLERK:  Oh, I'm sorry.

25                MS. KRASINSKI:  No.
```

66

```
1                    THE CLERK:  I thought it was an electronic exhibit.

2       No problem.

3                    I just want to make sure I have the right --

4                    MS. KRASINSKI:  Yes.  Thank you.

5                    THE CLERK:  You're welcome.

6          Q.    So I think you have a folder containing two exhibits

7       in front of you, 113 and 113a, as well as a bag, 114a with 114

8       in it.  Is that fair?

9          A.    It is, yes.

10         Q.    Okay.  So let's just work one at a time and let's

11      look at 113 and 113a.  What is that?

12         A.    This is six rounds of 20-gauge ammunition.  This was

13      what was found loaded in the shotgun.  There was five in the

14      pipe and one in the chamber.

15         Q.    What do you mean in the chamber, what do you mean in

16      the pipe?

17         A.    It was loaded, ready to go.  And then this would be

18      what I would call the pipe, where you'd load ammunition and

19      then one in the chamber.  So if you pulled the trigger, it

20      would fire.

21         Q.    And can you tell the manufacturer of those rounds of

22      ammunition?  And you can take them out of the bag.

23         A.    It -- it says Federal.

24         Q.    Was there additional ammunition on the shotgun found

25      in the Jeep?
```

1        A.    Yes.  It's -- there is additional ammunition that
2    was found loaded in this part of the shotgun.
3        Q.    What would you call that?  And, also, can you show
4    the judge, too, please?
5              THE COURT:  Okay.
6        A.    I don't know what I'd call it.  Just a butt stock
7    ammunition storage strap, I guess.
8        Q.    And you have Government's Exhibit 114 and 114a in
9    front of you which have previously been admitted by agreement.
10   What are those?
11       A.    These are four rounds of 20-gauge ammunition that
12   was removed from that location in the shotgun.
13       Q.    And can you tell the manufacturer of that?
14       A.    It's Federal.
15       Q.    And we won't go -- I want to go through the process
16   of you reviewing and seeking to admit a series of photographs
17   that we may then view with another witness, so let's go through
18   those.
19              Can we please show to the witness only Government's
20   Exhibit 304.
21       A.    Uh-huh.
22       Q.    And what's that?
23       A.    That is the -- that is the shotgun here and you can
24   see that it's loaded, the ammunition is still in the butt stock
25   area, and it's being held by one of our special deputies.

68

1      Q.    And is this photograph taken after it was seized

2   from the Jeep?

3      A.    It was.

4           MS. KRASINSKI:  Your Honor, I'd move to admit

5   Government's Exhibit 304.

6           MR. STACHOWSKE:  No objection.

7           THE COURT:  It'll be admitted.

8              (Government's Exhibit 304 admitted.)

9      Q.    And let's briefly show that.  And so can you show us

10  how you know that the firearm was loaded?

11     A.    Just in -- where it's -- it's closed, there's

12  that -- you can tell that indicator in the center of the

13  shotgun that there's a round in the chamber.

14     Q.    And can you see the ammunition that was loaded in

15  sort of that shoulder stock ammo carrier?

16     A.    Yes, down at the bottom of the photograph.

17     Q.    And, now, let's briefly look through -- I'm going to

18  ask you to look at Government's Exhibit 308 again -- excuse me,

19  305, again only for the witness.

20           Do you recognize that?

21     A.    Yes, it's the same shotgun.  It's just turned upside

22  down so that you can see the ammunition in the firearm.

23     Q.    And is that this firearm and this ammunition seized

24  from the March 26th, 2021, search?

25     A.    It is.

69

```
1              MS. KRASINSKI:  Your Honor, I'd move to strike the
2    ID on Government's Exhibit 305.
3              MR. STACHOWSKE:  No objection.
4              THE COURT:  It'll be admitted.
5                  (Government's Exhibit 305 admitted.)
6         Q.   Let's turn to Government's Exhibit 306.  Do you
7    recognize that?
8         A.   Yes.  That's the same shotgun.  It's just a close-up
9    of the make and model.
10             MS. KRASINSKI:  Your Honor, I'd move to strike the
11   ID on Government's Exhibit 306.
12             MR. STACHOWSKE:  No objection, your Honor.
13             THE COURT:  It'll be admitted.
14                 (Government's Exhibit 306 admitted.)
15        Q.   If we turn to 307, do you recognize that?
16        A.   Yes.  It's the serial number on the shotgun that I
17   just read aloud.
18        Q.   And that's the shotgun that was seized from the
19   Jeep?
20        A.   It was.
21             MS. KRASINSKI:  Your Honor, I'd move to admit 307.
22             MR. STACHOWSKE:  No objection.
23             THE COURT:  It'll be admitted.
24                 (Government's Exhibit 307 admitted.)
25        Q.   So we have talked now about the firearm that was
```

70

1    seized from the Jeep and the ammunition that was found in the

2    firearm and in the center console of the Jeep.  Let's turn now,

3    excuse me, to the search of sort of the workshop barn.

4              Can you describe for us what the barn workshop

5    looked like?

6         A.   It was a really big structure.  It was -- on the

7    front of it, it had a -- like a man door and then a roll-up

8    door.  It was probably 30 by 60 feet.

9              The interior was -- it definitely had a lot of junk

10   in it, but it had kind of like hoarders almost, where you did

11   have a path where you could walk and the other area so

12   cluttered you couldn't get even into it.

13        Q.   So did it appear that parts of the barn were not

14   used?

15        A.   Yes.

16        Q.   And I take that those were the parts that you

17   described as cluttered, kind of couldn't get into?

18        A.   Yes.

19        Q.   Did it appear that there were parts of the barn that

20   were actively -- or the shop that were actively used?

21        A.   Yeah.  There was a clear area where you could walk.

22   You could walk to a workbench on the left as you walked in, a

23   long workbench, and then in the center there was actually a

24   little table, a little sitting area, where somebody would like

25   hang out in the barn.

1    Q.    And was there a way to get from sort of that
2    workbench area to out the other door of the barn?
3    A.    Yes.
4    Q.    And were there any animals outside on the other side
5    of that?
6    A.    Yes.
7    Q.    What were they that you saw?
8    A.    There were horses on the back -- back of the barn.
9    Q.    So could you walk from where this sort of workbench
10   was to where the horses were?
11   A.    Yes.
12   Q.    Now, you mentioned earlier that when you searched
13   sort of this barn workshop and when you searched the garage
14   apartment there was camera footage taken first.  So walk us
15   through that and why you did that.
16   A.    That's just our standard procedure before searching
17   a structure.  It was done by Special Agent James Martin on that
18   day.  He just goes in, he films it all the way from entry to
19   the back of the property -- back of the building, I should say.
20   Q.    And, ultimately, was anything found in this barn
21   workshop?
22   A.    There was a long gun case, there was additional
23   ammunition, and some accessories.
24   Q.    So we sort of generally talked about this barn
25   workshop.  Let's start by talking about what it looked like

72

```
1    when you guys first went in.
2            Have you reviewed before your testimony today the
3    presearch footage at Government's Exhibit 324?
4        A.    I have.
5        Q.    And did you recognize it?
6        A.    I did.
7        Q.    How did you know what it was?
8        A.    It's pretty distinct.  There was like deerskin to
9    the left as you walked in, the long workbench on the left, just
10   the general clutter.
11       Q.    And was it sort of that -- was that video kind of
12   altered, changed in any way?
13       A.    No.
14           MS. KRASINSKI:  I'd move to strike the ID on
15   Government's Exhibit 324.
16           MR. STACHOWSKE:  I don't see any -- we've reviewed
17   that.  No objection.
18           THE COURT:  It'll be admitted.
19              (Government's Exhibit 324 admitted.)
20           MS. KRASINSKI:  Ms. Shedd, can we please begin
21   playing Government's Exhibit 324.
22                  (Video recording played.)
23           MS. KRASINSKI:  Can we stop at about 39 seconds.
24                  (Video recording played.)
25           MS. KRASINSKI:  Pause that right here.
```

73

```
 1        Q.    Tell us what you see.

 2        A.    There, almost as soon as you walk in, you can see in

 3   the center of the screen underneath that refrigerator that

 4   black long box is the long gun case.

 5        Q.    And was it open that way --

 6        A.    It was.

 7        Q.    -- when you walked in?

 8        A.    It was.

 9              MS. KRASINSKI:  All right.  Let's play for about ten

10   more seconds.

11                     (Video recording played.)

12              MS. KRASINKSI:  Can we go just a little bit further?

13                     (Video recording played.)

14        Q.    Okay.  Great.  Thank you.

15              So tell us kind of what you see here.

16        A.    I can see the bandolier of ammunition in the right

17   corner.  You can see the brass kind of crescent shape there.  I

18   can see a shotgun barrel at -- just underneath that cardboard.

19   I can see some individual shotgun shells.  And to the right of

20   those yellow shotgun shells and in between that bandolier of

21   shotgun shells is a black foregrip for a shotgun.

22        Q.    And was there a scope on this?

23        A.    Yes.  In the bottom left there's a scope.

24        Q.    Now, you mentioned that some areas of the barn you

25   couldn't get to, some appeared kind of -- there was a clear
```

74

1  path and seemed used.  Where was this in all of that?

2      A.    That's right in the clear path.  As soon as you

3  walked in to the left is the workbench and you could -- just as

4  Special Agent James Martin did, you can walk in and go straight

5  to that workbench and this was just to the right of that

6  workbench where this was located.

7          MS. KRASINSKI:  And let's play for about, I don't

8  know, seven to eight more seconds.

9                    (Video recording played.)

10      Q.    And so we've sort of paused here.  There's kind of

11  boxes piled.  Back there, what was that?

12      A.    That's the area that you just -- it was hard to

13  search, I remember because I searched that area, just hard to

14  get to.  There was just no path back there.

15          MS. KRASINSKI:  And let's play for a few more

16  seconds.

17                    (Video recording played.)

18          MS. KRASINSKI:  Sorry.  Keep going, please.

19                    (Video recording played.)

20      Q.    Now, where Agent Martin's walking now, is that part

21  of a clear path?

22      A.    It is now, yes.

23          MS. KRASINSKI:  And let's just watch this to

24  conclusion.

25                    (Video recording played.)

75

```
 1              MS. KRASINSKI:  I think that's great.
 2         Q.    And so the area that he just walked, from where the
 3    long gun case was to sort of that door where we could briefly
 4    see the horses, that was a clear pathway?
 5         A.    It was, yes.
 6         Q.    So --
 7              THE COURT:  Are you finished with this video?
 8              MS. KRASINSKI:  I am, your Honor.
 9              THE COURT:  All right.  Let's take our morning
10    break, members of the jury.  We'll break for about 15 minutes.
11              THE CLERK:  All rise.
12              THE COURT:  You can head into the jury deliberation
13    room.
14                        (Jury excused.)
15              THE COURT:  Sir, you can step down and take your
16    break.
17              THE WITNESS:  Thank you, your Honor.
18              THE COURT:  Are you going to get into crossbows now
19    or is that later?
20              MS. KRASINSKI:  We weren't going to get into it with
21    this witness, although the video did show one of the crossbows.
22              THE COURT:  I didn't catch -- I didn't catch it,
23    but --
24              MS. KRASINSKI:  Because we -- yeah, we didn't pause
25    on it and sort of point it out, but we can do that right now if
```

76

1   you want.

2            THE COURT:  No, I just want to be clear the

3   defendant's prior objection to the crossbow is preserved, all

4   right, so you don't need to object again when it comes in.  But

5   if the government acts consistently with its proffer, which is

6   it's going to only elicit testimony about the two crossbows,

7   none of the other weapons, that the -- there won't be any

8   implication that the possession of the crossbows was improper

9   by him.

10           I do find it meets the test of relevance under 401

11  and that any prejudicial effect doesn't substantially outweigh

12  probative value.  So I will allow the anticipated testimony

13  about the crossbows.  Okay?

14           MS. KRASINSKI:  Thank you, your Honor.

15           THE COURT:  All right.  So we'll just take a break.

16          (Recess taken from 10:37 a.m. until 11:10 a.m.)

17           THE COURT:  So you can bring the jury back in.

18           THE CLERK:  Okay.

19                  (With the jury present.)

20           THE CLERK:  Please be seated.  Court's in session.

21           THE COURT:  All right.  Go ahead, Counsel.

22           MS. KRASINSKI:  Thank you, your Honor.

23      Q.   When we left, we had just finished looking at the

24  video of the presearch of the barn workshop.  And before we

25  start going through the physical exhibits themselves, can you

1    please look right now for the witness only at Government's

2    Exhibit 308.

3              What is that?

4        A.   That's a photograph of the gun case and everything

5    that was on top of it when we walked into the barn.

6        Q.   And how do you recognize it?

7        A.   I recognize it from the background and the items in

8    the case itself.

9              MS. KRASINSKI:  Your Honor, I'd move to strike the

10   ID on Government's Exhibit 308.

11             THE COURT:  Any objection?

12             MR. STACHOWSKE:  No objection.

13             THE COURT:  That'll be admitted.

14               (Government's Exhibit 308 admitted.)

15             MS. KRASINSKI:  So let's leave this image,

16   Government's Exhibit 308, up so we can sort of go back and

17   forth between looking at some of the physical exhibits and then

18   kind of where they were found on this open gun case.

19             So I'm going to ask you to look at Government's

20   Exhibit 100.

21             Thank you so much.

22             THE CLERK:  You're welcome.

23             MS. KRASINSKI:  It's the black gun case.

24             THE CLERK:  Oh, 100.  I'm sorry.

25             MS. KRASINSKI:  Thank you.

78

```
 1              THE CLERK:  You're welcome.
 2         Q.   And, Agent Cook, Exhibit 100 has been admitted by
 3    agreement along with its contents.  Can you first tell us what
 4    that is?
 5         A.   This is the gun case that I seized out of the barn
 6    of the defendant's property.  It was open at the time when we
 7    walked in.
 8         Q.   Now, it was open at the time.  Was there a lock on
 9    it anywhere?
10         A.   No.
11         Q.   Was there a lock near it anywhere?
12         A.   No.
13         Q.   Can you please open Government's Exhibit 100.
14              And, Agent Cook, I know we're focused on showing
15    this to the jury, but can we also just make sure that the judge
16    can also see it?
17              THE COURT:  Thank you.
18              Mr. Stachowske, do you want to -- you can come a
19    little closer to take a look.
20              MR. STACHOWSKE:  Thank you, your Honor.
21              MS. KRASINSKI:  And all of its contents have been
22    previously admitted by agreement.
23              THE COURT:  Okay.  Good.  Thank you.
24         Q.   Okay.  So let's first look at Government's Exhibit
25    100a.  What is that?
```

1       A.    This is a shotgun barrel.  It's a 20-gauge shotgun

2   barrel.

3       Q.    And looking to your screen at Government's

4   Exhibit 308, where on the open gun case was the shotgun barrel?

5       A.    It's just below that yellow cardboard.  You can tell

6   that it's more so going that way.  This is at the top of it in

7   the picture.

8       Q.    Now, I've learned that while you may not be allowed

9   to touch your screen and make marks, I think I may still have

10   the capability to do that.

11          So if I understood you correctly, is this -- is what

12   I just circled on there what you were talking about?

13       A.    That's correct, yes.

14       Q.    Okay.  So the item within that sort of purple

15   circle, that's the barrel you're holding right now?

16       A.    Correct.

17       Q.    Okay.  Let's take a look at Government's Exhibit

18   100b.  And what does that look like to you?

19       A.    This is a cut vacuum tube, vacuum tube, and it's

20   been hacksawed.

21       Q.    Does it appear to you to relate to the shotgun or

22   the barrel in any way?

23       A.    It does.  It appears to have been cut to fit the

24   length of the barrel.

25       Q.    And, now, where on Government's Exhibit 308 on your

1    screen do you see that cut vacuum tube?

2         A.    It's also in the center of the -- of the case.

3         Q.    Okay.  And I'm going to go ahead and circle.  And is

4    that the cut vacuum tube?

5         A.    That's correct, yes.

6         Q.    Let's go ahead -- we can, I guess, briefly look at

7    Government's Exhibit 100c.  And what is it?

8         A.    It's a metal tube.

9         Q.    And was that on this open gun case?

10        A.    It is.

11        Q.    And what about Exhibit 100d?

12        A.    The same.  It's a plastic tubing that's been cut.

13        Q.    Again, found on that open gun case?

14        A.    Correct, yes.

15             MS. KRASINSKI:  Let's go ahead and -- I think you

16   can kind of -- you can close that, Agent Cook.

17             The next physical exhibit we're going to look at is

18   Government's Exhibit 103.

19             And, Deputy Clerk Negron, will you please pass the

20   witness Government's Exhibit 103.  And for ease, the next

21   physical exhibit I'm going to ask him to look at after that is

22   Government's Exhibit 101.  Both of these have been admitted

23   into evidence by agreement.

24             THE CLERK:  103 and 101?

25             MS. KRASINSKI:  Thank you.

1           THE COURT:  And can he take the case back?  Are you

2  done with that?

3           MS. KRASINSKI:  Yes.  Thank you, your Honor.

4      Q.   So let's start with Government's Exhibit 103.  What

5  is that?

6      A.   It's a scope.  It's the scope that I seized out of

7  the gun box.

8      Q.   Where on Exhibit 308 is that scope?

9      A.   It's harder to see, but it's underneath the barrel

10 and between the barrel and the vacuum tube.

11     Q.   I'm going to circle what I believe to be the -- what

12 you're referring to and will you tell me, in the center of

13 that, is that the scope?

14     A.   That's correct.  Yes.

15     Q.   Now, are there any markings on the scope?

16     A.   There are.  They are both manufacturer markings and

17 then there's something written in permanent marker on the end

18 of it.

19     Q.   Can you first tell us what's written in permanent

20 marker and then show both the judge and the jury?

21     A.   It's -- JPM27J has been written on the scope.

22          THE COURT:  Thank you.

23     Q.   And those markings, the JPM27J, was that on the

24 scope the way you found it on this open gun case?

25     A.   It was, yes.

1        Q.    So now let's turn to Government's Exhibit 101.    And
2    what is that?

3        A.    This is a -- sorry.    It's hard to see through the
4    plastic, but a single shell casing.    It's a 28-caliber shotgun
5    shell.

6        Q.    Will that 28-caliber shotgun shell fit the Mossberg
7    shotgun that was found in the Jeep?

8        A.    No, it's a -- it's a 28.    The shotgun is a
9    20-caliber, 20-gauge.

10       Q.    Now, do you know where on the open gun case that
11   single 28-gauge shotgun shell was found?

12       A.    I think it was more closer to the bandolier area.    I
13   don't think you can see it in the photograph.

14       Q.    Okay.    Before we -- actually, before I move on, can
15   you tell the manufacturer of that ammunition, that single round
16   of 28-gauge ammo?

17       A.    I think I'd have to take it out of the bag.    Is that
18   okay?

19       Q.    Yes, thank you.

20       A.    It's Federal.

21       Q.    All right.    Now, before we turn to a few of the
22   other physical items seized from this, let's look right now for
23   the witness only at Government's Exhibit 309.

24            Agent Cook, do you recognize that?

25       A.    Yes.    That's just a close-up of the same box.

1      Q.    And this is the box from the March 26th, 2021,

2    search of the barn workshop?

3      A.    It is.

4            MS. KRASINSKI:  Your Honor, I'd move to strike the

5    ID on Government's Exhibit 309.

6            MR. STACHOWSKE:  No objection.

7            THE COURT:  It'll be admitted.

8               (Government's Exhibit 309 admitted.)

9      Q.    Now, you mention it's a close-up, so why don't we

10   leave this up while we kind of go ahead and look at a few more

11   pieces of the physical items.

12           So let's look at Government's Exhibit 102 and 102a.

13           May I approach, your Honor?

14           THE COURT:  Yes.  If you think it's easier and

15   quicker for you to put your mask on when you go up to him

16   rather than having the clerk do it, that's fine, too.

17           MS. KRASINSKI:  The clerk had stepped out.

18           THE COURT:  Yeah, either way is fine.

19           MS. KRASINSKI:  Thank you, your Honor.

20           And, again, this has previously been admitted by

21   agreement.

22     Q.    What is that?

23     A.    This is a bandolier of 28-gauge shotgun shells,

24   Federal.

25     Q.    And how many rounds did you say?  I'm sorry.

84

```
 1         A.    I counted 23.

 2         Q.    And I think you were counting again.  Was that

 3    confirming that it's --

 4         A.    I was, yes.  23, yes.

 5         Q.    Okay.  Thank you, Agent Cook.

 6         A.    Thank you.

 7         Q.    And is that the bandolier that we see pictured in

 8    Government's Exhibit 309?

 9         A.    It is.

10         Q.    I'm going to hand you Government's Exhibits 106 and

11    107 and 108, all of which have previously been admitted by

12    agreement, and I'm going to clear some of these items from the

13    witness stand.

14               Okay.  Let's start with Government's Exhibit 106.

15    Can you show that to the Court and the jury and tell us what it

16    is, please.

17         A.    This is the foregrip for a shotgun that's pictured

18    in the picture on the screen.

19         Q.    What's a foregrip?

20         A.    This is where your forward hand would go.

21         Q.    Is it labeled in any way?

22         A.    I don't see any markings, no.

23         Q.    Now, turning to Government's Exhibit 107, what is

24    that?

25         A.    One is three rounds of 20-caliber ammunition that
```

85

```
 1    have been spent, so they're -- they're empty.
 2         Q.    And that's Government's Exhibit 108?
 3         A.    That's correct, 108a.
 4         Q.    What does it mean that they're spent or empty?
 5         A.    They've been used.
 6         Q.    So essentially three shotgun holes; is that --
 7         A.    That's right.  You can tell they've -- actually,
 8    they even have the puncture mark on the primer to show that
 9    they've been shot.
10         Q.    And what about Government's Exhibit 107?
11         A.    It is three rounds of 12-gauge Remington shotgun
12    shells.
13         Q.    And where were those three rounds of 12-gauge
14    shotgun shells found?
15         A.    Right underneath the bandolier of the other
16    ammunition.
17         Q.    The green item?
18         A.    Correct, yes.
19         Q.    And the three shotgun hulls, Government's
20    Exhibit 108, where were those found?
21         A.    In that same area with the other ammunition.
22         Q.    Before we turn to the search of the Hyundai, can you
23    sort of give us your overall impressions of the workshop?
24         A.    I mean, it's -- it seemed like kind of a guy's
25    hangout.  It was somebody who definitely was mechanical.  There
```

1  was a lot of tools on that workbench, the left-hand side.

2          It was somebody that liked to hunt.  There was some

3  skinned deer as soon as you walked in.  It seemed like there

4  was a spot to hang out in the center.  There was like an

5  ashtray, a table.  It seemed like a place where somebody

6  mechanical would hang out.

7          Q.    Now, I want to turn to the search of the Hyundai.

8  Where was the Hyundai on the property?

9          A.    It was the closest car to the barn.  It's

10  probably -- it was probably maybe 20 -- 20, 30 feet to the

11  entrance of the barn, to the left.

12          Q.    And can you describe it for us?

13          A.    It was gray.  It had like an orange racing number, I

14  think, spray-painted on it.  It had no tires, maybe missing a

15  tire.  It had no windshield.  I remember that looking in it,

16  the passenger seat, front passenger seat, was gone and you

17  could see an ammo box just sitting right in plain view right

18  where the passenger seat should be.

19          MS. KRASINSKI:  Now -- I'm sorry.  Can we display

20  for the witness only Government's Exhibit 310?

21          And while that loads, I'm just going to come and get

22  the shotgun and put it back by the evidence.

23          Thank you.

24          Q.    Is that up for you, Agent Cook?

25          A.    I'm sorry?

87

1      Q.   Is the image up for you?

2      A.   It is.

3      Q.   Do you recognize it?

4      A.   That's the Hyundai on the far right there with the

5   orange lettering.

6      Q.   And how do you recognize it?

7      A.   It was distinct.  I recognized the property.

8          MS. KRASINSKI:  Your Honor, I'd move to strike the

9   ID on Government's Exhibit 310.

10         MR. STACHOWSKE:  No objection.

11         THE COURT:  It'll be admitted.

12             (Government's Exhibit 310 admitted.)

13     Q.   So the image we're looking at has three cars in it.

14   Which car are we focused on?

15     A.   The far right, the blue passenger car with the 42R

16   in orange.

17     Q.   And where -- from where we're standing looking at

18   this car is the barn --

19     A.   To the right of that car, 20, 25 feet.

20     Q.   And any tires on the car?

21     A.   No.

22     Q.   Front fender?

23     A.   No.

24     Q.   Do you see any sort of the side windows?

25     A.   No.

1    Q.    It does appear to have a front windshield; is that

2    right?

3    A.    Yes.

4          MS. KRASINSKI:  And let's go ahead and for the

5    witness only look at Government's Exhibit 311.

6    Q.    Do you recognize that?

7    A.    I do.

8    Q.    What is it?

9    A.    That's the interior of that Hyundai car, the blue

10   car with the orange lettering, and the ammunition box that was

11   just sitting there on the passenger side.

12         MS. KRASINSKI:  Your Honor, I'd move to strike the

13   ID on Government's Exhibit 311.

14         MR. STACHOWSKE:  No objection.

15         THE COURT:  It'll be admitted.

16             (Government's Exhibit 311 admitted.)

17   Q.    I'm going to -- you just mentioned an ammunition

18   box.  I'm going to circle what I believe you were talking

19   about.  Can you confirm for me?

20   A.    That's correct.

21   Q.    And is that where the passenger seat sort of should

22   have been?

23   A.    Yes.

24   Q.    Could you have simply reached in the window and

25   grabbed this?

89

1    A.    Yes.

2    Q.    Now, let's go ahead and look at the ammo can itself.

3    I'm going to hand you what's been marked as Government's 109

4    for identification purposes.  You can go ahead and take a look

5    at that.  You can peek inside if you want.  Don't take anything

6    out yet.  After you have a chance to look, tell me if you

7    recognize what that is, please.

8    A.    It's the contents that were in the ammunition can

9    when I seized it.

10    Q.    And that ammo can itself, where did that ammo can

11    come from?

12    A.    Right from the pass -- where the passenger seat

13    should have been in that blue car.

14    Q.    All right.  So Government's Exhibit 109, the ammo

15    can that you're holding is the ammo can that's pictured in

16    Government's 311?

17    A.    That's correct, yes.

18    MS. KRASINSKI:  Your Honor, I'd move to strike the

19    ID on Government's Exhibit 109.

20    MR. STACHOWSKE:  Can we approach, your Honor?

21    THE COURT:  Yeah.  We don't approach, though, in

22    COVID times, so use the headset and everybody just try and

23    whisper.  I'll try to whisper.  I have such a loud voice.  I'll

24    do my best.

25    Try not to listen to me.  Okay?

```
 1                          AT SIDEBAR
 2              THE COURT:  So you put the headset on and you speak
 3    into the microphone front.  Okay?
 4              Wait a minute.  Vinny, I'm not hearing --
 5              MS. KRASINSKI:  Testing.
 6              THE COURT:  I'm not hearing anything.  Now it may
 7    be -- yeah, okay.
 8              MS. KRASINSKI:  Test.
 9              THE COURT:  I need another -- all right.  Yes, okay.
10              Can you hear me, Mr. Stachowske?
11              MR. STACHOWSKE:  I can, your Honor.
12              THE COURT:  Okay.
13              MR. STACHOWSKE:  The contents of this ammo can
14    include the cleaning kit that were found in the prior
15    involvement back in June of 2019 and I renew my objection to
16    the admissibility of that.
17              THE COURT:  This is the cleaning kit that was
18    testified to earlier that was found in the vicinity of the open
19    gun case; is that what we're talking about?
20              I can't hear you.
21              MS. KRASINSKI:  This gun kit -- the gun cleaning kit
22    was found in the ammunition can along with other charged
23    ammunition.
24              THE COURT:  Okay.  And -- and the basis for your
25    objection is, Counsel?
```

1    MR. STACHOWSKE:  Is -- this is the cleaning kit that

2  was provided or that was returned to my client in June of 2019.

3    THE COURT:  Okay.  And the government's proffer is

4  that you're going to call a witness who saw the gun cleaning

5  kit that was seized by -- from the defendant previously.  What

6  will that witness say about the gun cleaning kit that can allow

7  the jury to draw an inference that it's the same gun cleaning

8  kit?

9    MS. KRASINSKI:  Your Honor, there are a number of

10  pieces of -- there's a bottle of cleaning fluid and a bottle of

11  oil.  Both bottles are identical to the bottles that were

12  seized and then returned to the defendant in 2020.  Officer

13  Hubbard will testify that it appears to be identical to the one

14  that was returned except that it's no longer in its sort of new

15  case.

16    THE COURT:  So the gun case, the cleaning kit, has a

17  color on it.  Is it a particular color?

18    MS. KRASINSKI:  Yes, your Honor.  And, actually, it

19  is -- we can pull up for the Court only Government's

20  Exhibit 116.

21    I -- you can see the cleaning kit as it was seized

22  and you can see the distinct bottles and items with it.  So the

23  identical orange bottle and an identical sort of brown bottle

24  with the same label are in a different plastic case in the

25  ammunition container along with this identical -- an identical

```
1    cleaning rod and identical kind of cleaning components.
2              What's not there anymore is I can kind of see how
3    it's new in its plastic case.  It's no longer new in the
4    plastic case, but the components within it appear to be
5    identical.
6              THE COURT:  All right.  I'm sorry.  I'm confused.
7              Was -- when it was seized from inside the ammunition
8    case, was it in a plastic case like is in this picture?
9              MS. KRASINSKI:  When it was seized in 2019?
10             THE COURT:  No, no.  I'm asking -- I'm starting with
11   what this witness has testified to.
12             It was seized from an ammunition container, right?
13             MS. KRASINSKI:  No, he hasn't testified about this
14   yet.  What he will -- what we anticipate he will -- this
15   witness would testify is that these contents were in the
16   ammunition can along with these other items.  This witness has
17   no knowledge of the 2019 seizure.
18             THE COURT:  I'm not asking about the 2019 seizure
19   now.  I'm asking about the one that he was involved with.  And
20   this was taken from an ammunition can during that search, right
21   or wrong?
22             MS. KRASINSKI:  Correct, your Honor, yes.
23             THE COURT:  Okay.  When it was, was it in a plastic
24   case like the photograph indicates?
25             MS. KRASINSKI:  No, it's in a -- a different plastic
```

```
 1   case.

 2            THE COURT:  What -- where did this photo come from?

 3            MS. KRASINSKI:  This photograph is how it was seized

 4   in 2019.

 5            THE COURT:  Okay.  So --

 6            MS. KRASINSKI:  It's hard for me to -- I'm just

 7   trying to show you the objects in it.

 8            THE COURT:  Stop.  Just answer my questions and then

 9   you can say whatever you want to say.  Okay?

10            MS. KRASINSKI:  Yes, your Honor.

11            THE COURT:  All right.  So let me ask the questions.

12       When it was seized from the ammunition container

13   that this defendant -- this witness, excuse me -- found, what

14   exactly did he see when he looked in there?

15            MS. KRASINSKI:  So there is a different plastic case

16   that contains the -- an identical orange bottle like the one

17   you see here, an identical brown bottle like the one you see

18   here, and sort of identical brushes to the ones that you see

19   here.

20       And then outside of the plastic case but in the ammo

21   can were identical cleaning rods like the cleaning rods you see

22   here.

23            THE COURT:  Okay.  So you agree the case is not

24   identical.  No one will testify that they saw anything that

25   looks like the case that it was in in -- in 2019.
```

94

```
 1              MS. KRASINSKI:  Correct.

 2              THE COURT:  Okay.  In fact, it was in a different

 3    case when it was most recently seized.

 4              MS. KRASINSKI:  That's correct.

 5              THE COURT:  Okay.  So what your argument is is that

 6    the components appear to be identical to the components of the

 7    gun cleaning kit that was seized in 2019.

 8              MS. KRASINSKI:  Correct.

 9              THE COURT:  All right.  So the -- you're proffering

10    to me that the officer who did the 2019 search would say the

11    two bottles are exactly the same types of bottles that were

12    there in the orange gun cleaning kit, the gun cleaning rod

13    appears to be the same type of rod that was in the gun cleaning

14    kit, and the only difference you see is that there's a

15    different case.

16              MS. KRASINSKI:  Yes, your Honor.

17              THE COURT:  All right.  Will anybody testify about

18    how gun cleaning kits are sold?  Are there multiple colored

19    bottles in gun cleaning kits?  Are there various sizes of gun

20    cleaning kits?  Do you have any information about that or is

21    this something that's standard, like there's only one gun

22    cleaning solution that comes in only one color bottle.

23              MS. KRASINSKI:  Can you give me one second, your

24    Honor?

25              THE COURT:  Yeah.
```

1          MR. ROMBEAU:  Your Honor, I've just had a chance to

2     confer with Special Agent Forte and I think on that particular

3     issue he would testify there are multiple products on the

4     market --

5          THE COURT:  Okay.

6          MR. ROMBEAU:  -- and multiple varieties of gun

7     cleaning kits.

8          THE COURT:  Okay.  I think there -- the -- if the

9     government is able to produce evidence consistent with its

10    proffer here that they have met a minimally sufficient

11    threshold to permit the evidence to be introduced and the

12    parties can argue the question to the jury.

13          So I am going to overrule the defendant's objection

14    to the admissibility of the cleaning kit based on the

15    government's proffer as to what subject -- what additional

16    evidence will be produced with respect to the gun cleaning kit.

17    Okay?

18          MR. STACHOWSKE:  (Nods head.)

19                    CONCLUSION OF SIDEBAR

20          THE COURT:  You can proceed.

21          MS. KRASINSKI:  So where we were is I had moved to

22    admit Government's Exhibit 109.

23          THE COURT:  That will be admitted.

24          (Government's Exhibit 109 admitted.)

25      Q.   So before I have you go through the ammo can that's

```
1    in front of you, let's take a look at Government's Exhibit 314
2    right now for the witness only.
3              Do you recognize that?
4         A.   Yes.
5         Q.   What is it?
6         A.   That's this ammunition box in front of me and it's
7    actually on the car that it was taken out of.
8         Q.   And you recognize it because?
9         A.   Both the car itself and the ammunition box.
10             MS. KRASINSKI:  Your Honor, I'd move to strike the
11   ID on Government's Exhibit 314.
12             MR. STACHOWSKE:  No objection.
13             THE COURT:  It'll be admitted.
14                (Government's Exhibit 314 admitted.)
15        Q.   So we're looking at this ammo can.  You just
16   mentioned it's on the car.  Is this how it looked when you --
17   the ammo can was first opened?
18        A.   Yes.
19        Q.   And what do you see right on top?
20        A.   Ammunition, the bandolier with ammunition in it.
21        Q.   So if you go ahead and open the ammo can, we're
22   going to kind go through things one by one.
23             Do you see in there Government's Exhibit 109?  And
24   I'd ask that -- you know, you're going to have to obviously go
25   through and look, but before displaying anything to the jury,
```

```
 1    let's make sure that it's formally admitted first.

 2          A.    I see.  Yes.  Would it be 109a?

 3          Q.    Yes.  Thank you.  So don't hold stuff up yet.

 4          A.    Oh, I'm so sorry.

 5          Q.    So before that, do you recognize 109a?

 6          A.    I do.

 7          Q.    What is it?

 8          A.    It is an AK variant magazine.

 9          Q.    And where'd you find that?

10          A.    Inside this ammo box.

11          Q.    And has it been altered, changed, in any way?

12          A.    It has not.

13                MS. KRASINSKI:  Your Honor, I'd move to admit

14    Government's Exhibit 109a.

15                MR. STACHOWSKE:  No objection, your Honor.

16                THE COURT:  It'll be admitted.

17                 (Government's Exhibit 109a admitted.)

18          Q.    Okay.  Now you can go ahead and display it.

19          A.    So sorry.

20          Q.    Now, could that fit the shotgun that was found in

21    the defendant's Jeep?

22          A.    No.

23          Q.    Let's go ahead and see if you can pull out

24    Government's Exhibit 109b.  At this point, please don't display

25    it.
```

98

```
 1              Do you recognize that?

 2      A.   I do.

 3      Q.   What is it?

 4      A.   These were accessory items found in this ammo box.

 5      Q.   And have they been altered or changed in any way?

 6      A.   They have not.

 7           MS. KRASINSKI:  Your Honor, I'd move to admit

 8  Government's Exhibit 109b.

 9           MR. STACHOWSKE:  Your Honor, if I could just take a

10  look at that?

11           THE COURT:  Yes, you can.  You can approach the

12  witness.

13           MR. STACHOWSKE:  No objection.

14           THE COURT:  It'll be admitted.

15             (Government's Exhibit 109b admitted.)

16      Q.   Now, you mentioned those were accessories.

17  Accessories to what?

18      A.   A shotgun, a Mossberg shotgun.

19      Q.   And how do you know they're accessories to a

20  Mossberg shotgun?

21      A.   The brand is actually on this yellow plastic.

22      Q.   Now, can you go ahead and pull out but don't display

23  Government's Exhibit 109c.

24      A.   Okay.

25      Q.   Do you recognize it?
```

99

1          A.    I do.

2          Q.    What is it?

3          A.    It's a cleaning rod that was found in this ammo

4    kit -- ammo kit.

5          Q.    Is it in substantially the same condition now as

6    when you found it?

7          A.    It is.

8                MS. KRASINSKI:  Your Honor, I would move to admit

9    Government's Exhibit 109c.

10               MR. STACHOWSKE:  Same request.

11               THE COURT:  Yeah, prior objection -- prior objection

12   I've ruled on is preserved.

13               MR. STACHOWSKE:  Thank you.

14               MS. KRASINSKI:  Your Honor, does the Court admit

15   109c?

16               THE COURT:  Yes, without objection -- subject to the

17   prior objection.

18                   (Government's Exhibit 109c admitted.)

19         Q.    Can you please display that to the Court and jury.

20         A.    (Witness complied.)

21         Q.    Now, it's in a plastic bag now, right?

22         A.    Correct.

23         Q.    But was it in a plastic bag when it was in the ammo

24   box?

25         A.    It was not.

100

```
1        Q.    It was just loose in there?

2        A.    It was.

3        Q.    Can you please pull out and take a look at but don't

4   yet display Government's Exhibit 109c -- excuse me, d.

5        A.    Yes.

6        Q.    Do you recognize that?

7        A.    I do.

8        Q.    What is it?

9        A.    It's a cleaning kit for a firearm.

10       Q.    And where was that cleaning kit located?

11       A.    Inside this ammo box.

12       Q.    And is it in substantially the same condition now as

13   when you found it?

14       A.    It is.

15             MS. KRASINSKI:  Your Honor, I'd move to admit

16   Government's Exhibit 109d.

17             THE COURT:  Any objection?

18             MR. STACHOWSKE:  Same objection.

19             THE COURT:  Same objection, overruled, admitted.

20             (Government's Exhibit 109d admitted.)

21       Q.    Agent Cook, can you please display for the judge and

22   jury Government's Exhibit 109d?

23       A.    (Witness complied.)

24       Q.    Now, again, that kit is in a plastic bag right now,

25   fair?
```

101

```
 1          A.    Correct.
 2          Q.    Was it in that plastic bag when it was found in the
 3    ammo case?
 4          A.    It was not, no.  Just this plastic case inside the
 5    bag.
 6          Q.    Now, if you could take a look but don't yet display
 7    Government's Exhibit 109e, do you recognize that?
 8          A.    I do.
 9          Q.    What is it?
10          A.    It's an owner's manual for a Mossberg shotgun.
11          Q.    And where was that found?
12          A.    Inside this ammo box.
13          Q.    And is it in substantially the same condition now as
14    it was when it was found?
15          A.    It is.
16                MS. KRASINSKI:  Your Honor, I'd move to admit
17    Government's Exhibit 109e.
18                MR. STACHOWSKE:  No objection.
19                THE COURT:  Without objection.
20                  (Government's Exhibit 109e admitted.)
21          Q.    Can you please display that to the jury and to the
22    Court?
23          A.    (Witness complied.)
24          Q.    And does that owner's manual relate to a specific
25    firearm?
```

102

```
 1          A.    It does.

 2          Q.    Which firearm?

 3          A.    The Mossberg model 500 shotgun.

 4          Q.    The one that was found in Corey Donovan's Jeep?

 5          A.    Correct.

 6          Q.    A few more pieces of physical evidence.

 7                If you could please go ahead and look at

 8    Government's Exhibit 110.

 9                Once you've had a chance to look at that, please let

10    me know if you recognize it.

11          A.    There's several items in here.  110 -- oh, just 110

12    itself?

13          Q.    Yes.

14          A.    Yes, I do recognize it.

15          Q.    What is 110?

16          A.    It's a bandolier of shotgun shells.

17          Q.    And where was that bandolier of shotgun shells

18    found?

19          A.    In the top of that ammo can here.

20          Q.    And is it in substantially the same condition now as

21    it was when you found it?

22          A.    It is.

23                MS. KRASINSKI:  Your Honor, I'd move to admit

24    Government's Exhibit 110.

25                MR. STACHOWSKE:  No objection.
```

1          THE COURT:  It'll be admitted.

2              (Government's Exhibit 110 admitted.)

3     Q.    Can you tell us how many rounds of ammunition are in

4 there?  And if you need to open the bag, go ahead.

5     A.    24.

6     Q.    And what type of ammunition is that?

7     A.    It's Federal 28-gauge shotgun shells.

8     Q.    And our last three physical exhibits you should also

9 have in front of you.  Can you take a look at Government's

10 Exhibit 110a.

11     A.    Yes.

12     Q.    Do you recognize that?

13     A.    I do.

14     Q.    What is it?

15     A.    It's a shotgun -- a green shotgun shell.

16     Q.    And where is that green shotgun shell from?

17     A.    It's from the same ammo box.

18     Q.    And is it in substantially the same condition now as

19 it was when it was seized?

20     A.    It is.

21          MS. KRASINSKI:  Your Honor, I'd move to admit

22 Government's Exhibit 110a.

23          MR. STACHOWSKE:  No objection.

24          THE COURT:  It'll be admitted.

25              (Government's Exhibit 110a admitted.)

104

1       Q.    Agent Cook, could you please display that to the

2   Court and to the jury?

3       A.    (Witness complied.)

4       Q.    And can you tell us what type of shell it is?

5       A.    I'm sorry.  I'm going to have to take that out to

6   see it.

7             It's a Remington 12-gauge shotgun shell.

8       Q.    Now, that 12-gauge shotgun shell, will that fit in

9   the shotgun found in the defendant's Jeep?

10      A.    No.

11      Q.    What about the 24 rounds of 28-gauge ammunition in

12  the bandolier that you just showed us, Government's

13  Exhibit 110?  Would that fit in the defendant's -- or, excuse

14  me, in the shotgun that was found in the defendant's Jeep?

15      A.    No.

16      Q.    Last two physical items, Government's Exhibit 110b

17  and 110c, can you take a look at those, please?

18      A.    Yes.

19      Q.    And let's -- what are -- what's 110b?

20      A.    It's a box of shotgun ammunition.

21      Q.    And where is that from?

22      A.    This ammo box.

23      Q.    What about 110d?

24      A.    It's the same, a box of shotgun shells.

25      Q.    Okay.  And are both of those boxes of shotgun shells

105

```
 1    in substantially the same condition now as when they were

 2    seized?

 3         A.    Yes.

 4              MS. KRASINSKI:  Your Honor, I'd move to admit

 5    Government's Exhibit 110b and 110c.

 6              MR. STACHOWSKE:  No objection.

 7              THE COURT:  Without objection, they'll be admitted.

 8         (Government's Exhibits 110b and 110c admitted.)

 9         Q.    And 110d, is that just the bag that was containing

10    those items?

11         A.    I'm sorry.  110d is --

12         Q.    D.

13         A.    That's correct.  Yes.

14         Q.    So we'll go through that one in just one minute, but

15    can you tell us about 110b?

16         A.    It's a box of 20-gauge Federal ammunition.

17         Q.    And what about Government's Exhibit 110c?

18         A.    It's the same, Federal 20-gauge shotgun ammunition.

19         Q.    And how many rounds?

20         A.    25.

21         Q.    So I just want to turn -- the last thing I want to

22    talk about, the -- all of this stuff seized from the ammo box

23    is a photograph of it.

24              Can we display for the witness only Government's

25    Exhibit 315.
```

```
 1              Do you recognize that?

 2       A.   I do.

 3       Q.   What is it?

 4       A.   That's the contents of the ammo box that was taken

 5  out and photographed.

 6       Q.   Now, it looks to me like one of these ammo boxes is

 7  empty in this picture.

 8       A.   Correct, yes.

 9       Q.   Can you tell me about that?

10       A.   There is loose rounds of ammunition of the -- of the

11  Federal ammunition that spilled out of one of the boxes.  So

12  after when we collected it, I put the ammunition in the box.

13       Q.   So it -- it had spilled out in the ammo can?

14       A.   Correct.

15       Q.   And if I understand it correctly, you kind of

16  cleaned it up, put it in the ammo box for --

17       A.   Correct, yeah.

18       Q.   Now, last piece I want to talk about, the -- the

19  search for now, were you aware that there were cell phones

20  seized from the garage apartment?

21       A.   Yes.

22       Q.   And was one of those an iPhone X?

23       A.   Yes.

24       Q.   Do you know what happened to that cell phone?

25       A.   We took it into ATF custody and then it was taken to
```

1    another special agent down in Massachusetts so it could be

2    searched and then brought back to the ATF field office.

3        Q.    Do you know where that iPhone X is now?

4        A.    I -- I would believe it's still in the ATF

5    Manchester field office.

6        Q.    Now, the last topic I want to cover with you,

7    Agent Cook, when a gun is seized in an investigation, does ATF

8    typically trace the gun?

9        A.    Yes.

10        Q.    And what does that mean?

11        A.    To trace a gun means we look at the manufacturer and

12    serial number on the gun.  We actually reach out to the

13    manufacturer.  In this case, it was a Mossberg shotgun.  So we

14    actually would call the manufacturer, Mossberg, find out who

15    they sold that gun to, there's usually a wholesaler middleman,

16    and then to the wholesaler, to the local retail shop, and then

17    we would contact the local retail shop and find out who

18    actually purchased the firearm.

19        Q.    And so all of that means you're trying to identify

20    the first individual who purchased the gun?

21        A.    That's correct, yes.

22        Q.    And so is there sort of an overall gun registry?

23        A.    No.

24        Q.    So it's just identifying the first purchaser?

25        A.    Correct, yes.

```
 1        Q.    Okay.  And not necessarily what happened to a gun

 2   after that?

 3        A.    No.  We just know the first purchaser.

 4        Q.    Now, was this Mossberg shotgun traced?

 5        A.    It was, yes.

 6        Q.    And was ATF able to identify the initial purchaser?

 7        A.    Yes.

 8        Q.    And who was that?

 9        A.    A gentleman named Kevin Kwiatkowski.  I probably

10   slaughtered that.

11        Q.    Well, I'm a Krasinski, so it's -- and are you --

12   does that documentation let us know when Mr. Kwiatkowski

13   purchased the firearm?

14        A.    Yes.  He purchased it November 8th, 2019, from

15   Shooter's Outpost here in New Hampshire.

16              MS. KRASINSKI:  Thank you.  I have nothing further,

17   your Honor.

18              THE COURT:  All right.  Thank you.

19   Cross-examination?

20              MR. STACHOWSKE:  Yes, your Honor.

21              MS. KRASINSKI:  Your Honor, may I clear the witness

22   stand?

23              THE COURT:  Yes.

24              MS. KRASINSKI:  Your Honor, my cocounsel reminded me

25   gently that I did not move to formally admit Government's
```

1    Exhibit 315, which Agent Cook was talking about, so I'd move to

2    admit Government's Exhibit 315.

3            THE COURT:  All right.  Without objection, it'll be

4    admitted.

5            MR. STACHOWSKE:  No objection.

6            (Government's Exhibit 315 admitted.)

7            MS. KRASINSKI:  Thank you.

8                      CROSS-EXAMINATION

9    BY MR. STACHOWSKE:

10        Q.    Good afternoon, Agent Cook.

11        A.    Good afternoon, sir.

12        Q.    Semper Fi, my hello jarhead.

13        A.    Semper Fi.

14        Q.    You were part of the SRT team?

15        A.    I was, yes.

16        Q.    I want to talk specifically about your commentary on

17    what you do when you find a piece of evidence.

18        A.    Yes.

19        Q.    You mentioned something about finding a -- either a

20    videographer or photographing it.  Can you tell the jury the

21    process that -- that -- I'm assuming this SRT team implemented?

22        A.    Yes.  So the initial thing would be for an agent to

23    do a -- just an overall video search, just documentation of

24    the -- basically the condition of the property when we first

25    walk in; this is what it looks like when we start our search.

1    Q.    Okay.  But, more specifically, you said -- and

2    correct me if I'm wrong -- but I think you said if I find a

3    piece of evidence, we photograph it in place and get a

4    videographer.  Is that what you said?

5    A.    I don't know if that's what I said.  That would not

6    be correct if I said that.  The video -- the videographer would

7    just do the initial video of the scene.  Then you'd begin your

8    search.  If you found an item, then you'd contact the

9    photographer to take a still shot photo.

10    Q.    Okay.

11    A.    That would be the proper thing to do, get a still

12    shot photo of the evidence in place and then seize the item.

13    Q.    And how many people were part of the SRT team on

14    this job?

15    A.    So myself, Patrick Dawley, James Martin, two Vermont

16    agents, two special deputies, and then I think Special Agent

17    John Forte came in as well.  So approximately eight just for

18    the barn.

19    Q.    So I want to be clear.  You and the other agents you

20    just mentioned were part of the SRT team?

21    A.    The search team?  Oh, are you talking about SRT,

22    sir?

23    Q.    SRT.

24    A.    Oh, I'm sorry, sir.  No, I misunderstood you.

25    That's just the search team.

111

```
 1        Q.    Okay.
 2        A.    SRT, our Special Response Team, oh, so that's
 3   the -- that's the unit that initially clears and secures the
 4   property.  I would guess they might have had 15 -- 15 guys
 5   maybe.
 6        Q.    Okay.  And you're not a part of that?
 7        A.    No, sir.
 8        Q.    Neither is Agent Forte, none of the people you
 9   mentioned?
10        A.    No, I'm sorry.  We were the search team.
11        Q.    Okay.
12        A.    Yeah.
13        Q.    Does the SRT team report to the search team after
14   the clearing of the property it completed?
15        A.    They -- they report when it's all clear, when the
16   scene is secure.
17        Q.    And how do they go about doing that?
18        A.    Just -- the SRT supervisor to supervisor to the
19   local field office supervisor all clear.
20        Q.    Do the proverbial boots on the ground for the SRT
21   team speak with the search team on site?
22        A.    Oh, they very well might, yeah.  Sure.  I mean, we
23   would know each other, yeah.
24        Q.    Did they in this instance?
25        A.    They might have.  I don't remember myself speaking
```

1    to anybody in the SRT team.

2        Q.    And who was leading, if you will, the search team?

3        A.    For the barn, it was myself.

4        Q.    Okay.  And how about for the garage where my client

5    resided?

6        A.    I believe that was Special Agent -- it was either

7    Kristi McPartlin or Andy Cox.  I'm not sure which one was the

8    team leader for that building.  I don't know.

9        Q.    Was there a separate team with a team leader for a

10    search of the vehicles?

11        A.    No, because that was developed after the search of

12    the barn.  So I -- I guess I assumed that responsibility.

13        Q.    Okay.  So just to be clear, it's your testimony that

14    you were the team leader for the search of the vehicles?

15        A.    I would say I -- yes, I would say I assumed that

16    responsibility.

17        Q.    And what does that entail, being a team leader?

18        A.    That I would make sure that the -- the evidence was

19    being documented when it was found and photographed.

20        Q.    And what would you do to ensure that it was

21    photographed to your satisfaction?

22        A.    I would just make sure that Special Agent James

23    Martin had been notified.  He was the photographer that day.

24    I'd just make sure that, hey, they have something here, go

25    photograph it.

113

```
1        Q.    And how would you convey that information to Mr. --
2   Agent Martin?
3        A.    Just in person.
4        Q.    Is that, in fact, what you did here is convey to
5   Agent Martin in person, go photograph X, Y, or Z?
6        A.    Definitely.  Not to say that it can't be somebody
7   outside of the -- of who's doing the search notify Agent Martin
8   as well.
9        Q.    Okay.
10       A.    Like somebody else searching can be like, hey -- you
11  know, hey, Jim, come take a picture of this.
12       Q.    And how many -- I'm sorry.  I don't want to
13  interrupt you.  You were about to say something?
14       A.    No, that's fine.
15       Q.    How many people were part of your team with respect
16  to search of the vehicles?
17       A.    I think it was the same -- same group that was doing
18  the barn, so approximately eight or nine.
19       Q.    And this is a combination of federal and state
20  officers that are working in concert?
21       A.    Well, the state have all -- were special deputies,
22  so they had been -- ATF can deputize local law enforcement to
23  enforce federal law.  There was two special deputies as part of
24  the search team.  They weren't deputized just for this case.
25  All right?  They've been special deputized to help -- help ATF
```

114

```
 1    just with manpower.  So there are two special deputies, ATF
 2    special deputies, who were part of the search team.
 3         Q.    Between you and Agent Forte who's sitting at the
 4    government's table, who's got seniority?
 5         A.    Forte does.
 6         Q.    All right.  By how much?
 7         A.    A couple -- two or three years, I think.
 8         Q.    All right.  So who was leader of this overall search
 9    that day?
10         A.    So Special Agent John Forte is definitely the case
11    agent.  So he is over viewing the whole -- the whole case, not
12    to say that -- I mean, the commander would be our resident
13    agent in charge, Amanda Cahill.  She would be the -- she's
14    Special Agent Forte's supervisor who would be on scene at the
15    time.  So as far as like scene control, Resident Agent Amanda
16    Cahill would be the ultimate in charge.
17         Q.    All right.  Am I correct that Agent Forte was
18    responsible for the garage?  I think you said that.
19         A.    He came in briefly to the garage, but he was
20    checking on other parts of the case as well.
21         Q.    Okay.  So in his absence, who was instructing
22    Agent Martin to take photographs in the garage?
23         A.    It would have been me.
24               THE COURT:  We may have confusion about terminology.
25               You say garage.  Do you mean the apartment?
```

Case: 23-1328 Case: 23-1328 Document: 00118054127 Document: 7 Page: 261 Page: 261 Date Filed: 09/20/2023 Date Filed: 09/29/2023 Entry ID: 6592810 of 15

115

1        MR. STACHOWSKE:  Yes.

2        THE COURT:  He's hearing something completely

3   different from what you're saying.

4        THE WITNESS:  My apologies.

5        MR. STACHOWSKE:  Thank you.

6        THE COURT:  So maybe we can refer to it as the

7   apartment or the barn workshop as the other buildings.  That

8   way we won't have confusion.

9        MR. STACHOWSKE:  Thank you, your Honor.

10      Q.   So for clarification, the garage I'm referring to is

11   an actual garage that's been converted into the apartment.

12      A.   Okay.

13      Q.   Who was responsible for instructing Agent Martin to

14   photograph the apartment in --

15      A.   I see.

16      Q.   -- Agent Forte's absence?

17      A.   So that was not Special Agent Jim Martin taking

18   those photographs.

19      Q.   Who was it?

20      A.   That was -- I would -- I believe it was Special

21   Agent Andrew Cox.  He would -- each location had a different

22   photographer because we're not going to grab the photographer

23   from one house to the next house and back and forth.  So the

24   apartment/garage had its own photographer and I believe it was

25   Special Agent Andy Cox.

116

```
 1          Q.    Okay.  What time did the SRT team begin its clearing
 2    of the property?
 3          A.    Just right after 6:00 a.m. that morning.
 4          Q.    The SRT team?  The SRT team.
 5          A.    That's right.  The SRT team, correct, yes, actually
 6    clearing and securing the property started right after 6:00.
 7          Q.    What time did they begin to mobilize that morning?
 8          A.    I think we met maybe an hour before maybe.  I
 9    just -- there was a parking lot down the street or like a
10    park-and-ride.  I think that's where we initially -- so maybe
11    about an hour before is when people started arriving there.
12          Q.    All right.  The metadata -- you know what metadata
13    is, right?
14          A.    For the -- like the cell phone -- for cell phone
15    metadata?
16          Q.    For digital evidence.
17                MS. KRASINSKI:  Your Honor, objection.  Relevance.
18                THE COURT:  All right.  I -- you'll have to put the
19    headsets on because I don't know the details.
20                Let me -- let me just say we're at 12:15.  Unless
21    you're going to wrap up in the next few minutes, let's take our
22    lunch break now.
23                Members of the jury, so we'll -- we'll break until
24    1:30.  I've got to do a little work with the lawyers here and
25    then I've got to give them a chance to get some lunch.  So
```

1    you're free until 1:30 and we'll come back at that time.

2              THE CLERK:  All rise.

3                  (Jury excused for the lunch recess.)

4              THE COURT:  Okay.  You can be seated.

5          So where are you going with this, Counsel?

6              MR. STACHOWSKE:  Your Honor, I -- I've consulted

7    with the government on this as well.  I intend to revisit the

8    issue of the metadata and the photographs that were the subject

9    of a prior motion before this Court, the -- the two photographs

10   taken inside the Jeep, one at 10:30 a.m., and all I'm looking

11   to do is establish that he's aware of what the metadata is.  If

12   he's not --

13             THE COURT:  What's the importance of this for the

14   jury to know?  I mean, I understood your argument about the

15   motion to suppress, but what is -- why would it matter?

16             MR. STACHOWSKE:  It goes to credibility, your Honor.

17             THE COURT:  All right.  So you want to try to show

18   that photographs were taken -- is this like the Jeep and the --

19   the ammunition covered by the glove and you want to show that?

20             MR. STACHOWSKE:  Yes.

21             THE COURT:  There's time data on one or more of

22   those photos that suggest that it -- somebody had to have

23   entered the Jeep before the actual warrant issued.

24             MR. STACHOWSKE:  Yes.

25             THE COURT:  All right.  It seems to be of almost no

```
 1   relevance to the jury.  It's -- you're trying to suggest like
 2   they did something bad with respect to the search and that that
 3   undermines their credibility?  Is that what you're trying to
 4   do?
 5               MR. STACHOWSKE:  Yes.
 6               THE COURT:  All right.  What's your response to
 7   that?
 8               MS. KRASINSKI:  The defendant has elected not to
 9   move to suppress on this ground and so we shouldn't be trying
10   to elicit suppression -- I mean, what it seems to me is trying
11   to elicit testimony related to a suppression issue that the
12   defendant ultimately decided to not move forward on.
13               THE COURT:  Well, no, I think he -- to his -- I
14   understand him to have argued that the second warrant was based
15   on a material misrepresentation about how the officer made the
16   observations he testified to and in support of that, he has
17   argued, I think consistently, that there was -- that I should
18   infer from the photographic evidence that the agent was -- the
19   affiant was not telling the truth.
20               So this issue was tied up in what he was litigating
21   in the motion to suppress, but I just don't see why -- I mean,
22   that was an issue for me to resolve.  I resolved it.  And the
23   only question is so -- you have a photograph that bears the
24   time stamp in your mind --
25               MR. STACHOWSKE:  Yes.
```

1          THE COURT:  -- right?

2          And that time stamp is prior to the time that the

3    second warrant was issued, right?

4          MR. STACHOWSKE:  Correct.

5          THE COURT:  And you're saying basically this witness

6    should not be trusted by the jury because a person working

7    under his direction took a photograph that shows that he

8    entered the vehicle before the actual warrant was obtained and

9    took a photograph he couldn't have taken through the open

10   doorway.  That's your theory.

11         MR. STACHOWSKE:  As -- in furtherance of that

12   theory, I would make an offer of proof that I would

13   cross-examine this witness on a consistency with which the

14   government or the -- excuse me -- the consistency with which

15   the agent's photograph, the evidence seized contemporaneously

16   with actually locating the items and from the vantage -- from

17   the photographs taken from the same vantage in which the item

18   is seized or viewed.

19         This is an anomaly in that the agent has

20   testified --

21         THE COURT:  Maybe you can show me -- let's do this.

22   Let's excuse the witness so he doesn't have to hear all the

23   details.

24         So you can step outside of the courtroom, sir --

25         THE WITNESS:  Thank you, your Honor.

120

```
 1              THE COURT:  -- and go have your lunch.  You're free
 2    till 1:30.
 3                   (Witness excused for the lunch recess.)
 4              THE COURT:  Can you show me the specific photographs
 5    you're talking about and what they -- what you think they mean?
 6    I think this is very attenuated from the issues that the jury's
 7    going to be considering.  So what photographs are you talking
 8    about?
 9              MR. STACHOWSKE:  Am I on?
10              THE COURT:  Are you trying to display a photograph?
11              MR. STACHOWSKE:  Oh, I've got Apple TV.  Thank you,
12    Charlie.
13              Very similar to the presentation I made for your
14    Honor in the hearing, the photograph on the left was taken at
15    approximately, oops, 11:38 a.m.
16              THE COURT:  And what time was the second warrant
17    granted?
18              MR. STACHOWSKE:  The second warrant's granted at
19    1:20 p.m. and the image on the left is -- if I can do this --
20    this image was taken at 1:38, I believe it was.  1:39.
21              THE COURT:  Okay.  So --
22              MR. STACHOWSKE:  And so the -- the government's
23    already conceded that the evidence was seen.  The evidence that
24    led to the search warrant was observed from the passenger side
25    window, but yet this photograph was taken from the driver's
```

121

```
 1   side.  And it's our position that the photo on the left,

 2   there's no way that -- well, I'd leave that for the jury to

 3   decide as to whether or not they can see any shells, any shell

 4   casings.  It just goes to credibility, your Honor.

 5              THE COURT:  All right.  Do you want to say something

 6   else?

 7              MS. KRASINSKI:  So I -- I don't think that -- I

 8   don't have any issue with him impeaching any witness who says

 9   they stood outside the Jeep and saw the ammunition with that

10   photo with the glove on the top.  I think that's perfectly

11   appropriate.

12              What we're talking about now is the metadata and

13   trying to imply that there was sort of a -- something done

14   before the search warrant was issued.  And we talked about this

15   photograph on the left in relation to the suppression hearing

16   and there's no dispute that it was taken from outside the car

17   before the warrant issued, and with the metadata on the

18   photograph on the right, that appears to be after the warrant

19   issued.  So to use these to try to suggest that agents acted

20   improperly I think is an inappropriate way to impeach with

21   this.

22              Now, I don't have any objection --

23              THE COURT:  Let me stop.  Do you agree that the

24   photo on the right was taken after the second search warrant

25   was issued?
```

```
 1              MR. STACHOWSKE:  Yes.

 2              THE COURT:  All right.  And you're saying that the

 3   photo on the left could not have been taken through the window

 4   of the Jeep.

 5              MR. STACHOWSKE:  That's not what I'm saying.  I'm

 6   saying that the shotgun shells were not visible from either the

 7   left and a photograph was not taken from the right.

 8              THE COURT:  All right.  But --

 9              MR. STACHOWSKE:  And --

10              THE COURT:  -- if you want to ask this witness, I

11   want to -- you've testified about the photo on the right,

12   right?  And that was after the search had started of the

13   vehicle, right?  And he'll say yes, right?

14              Okay.  Now I'll show you the photo on the left.

15   The -- that photo was taken before you say you started the

16   search, right?  And you want to say to him, isn't it true --

17   effectively, after you would do this in a different way, but

18   the ultimate would be do you now admit, sir, that you couldn't

19   see shotgun shells through the open doorway peering into that

20   car.  That's what you want him to say, right?

21              MR. STACHOWSKE:  Yes.

22              THE COURT:  Ultimately he'd say whoever did this

23   must have violated the rule and searched improperly because I

24   couldn't see that -- you couldn't see the shotgun shells.

25   That's the point you want to make, right?
```

123

```
1              MR. STACHOWSKE:  Yes.

2              THE COURT:  So you're not contending that the photo

3    on the left could not have been taken before the search

4    warrant.

5              MR. STACHOWSKE:  No.

6              THE COURT:  It could have been taken before the

7    search warrant was issued.  So the metadata doesn't really say

8    anything controversial.  It just confirms what is apparently

9    the case, which was that photo was shot through the window of

10   the vehicle prior to the second search.  The affiant who

11   obtained -- who obtained the second search warrant has now

12   admitted that there was an error in the -- his affidavit and

13   that he made the observations of the shotgun shell by looking

14   through the driver's side door.  This witness did not do that.

15   This is someone else who did that before the second search was

16   conducted.

17             If you want to ask him, you know, did you look

18   through the open doorway before you looked in and could you

19   have seen the shotgun shells, you know, he'll say yes or no to

20   that, but you're -- I mean, there's a limited amount you can do

21   with this and -- but now that I understand what you're saying,

22   I will allow you to do it.  You can question this witness to

23   the extent he has personal knowledge about what observations he

24   could have made through the open doorway before he removed the

25   glove that was covering the shotgun shells.  All right?
```

1   That's -- that's all this is amounting to.

2           You don't have a problem with that?

3           MS. KRASINSKI:  (Shakes head.)

4           THE COURT:  That seems okay to me, but to the extent

5   he doesn't know -- like if he said, nope, I didn't look through

6   that, I wasn't the one that got the affidavit, then just move

7   on to a different subject.

8           MR. STACHOWSKE:  Yes, sir.

9           THE COURT:  But you can say did you walk around the

10  vehicle before you started looking in, right?  Did you look in

11  the open door before you actually went in and removed the glove

12  and you couldn't see shotgun shells there, could you?

13          And then you want to somehow with a later witness --

14  who's the affiant?  Is it Forte?

15          MR. STACHOWSKE:  It's Forte.  Martin took the

16  pictures.

17          THE COURT:  So Forte's going to be testifying and

18  you can try to impeach him and say, you -- is Forte testifying?

19  I don't know.  Yeah, Forte's going to testify.

20          And you can try to go after him and say, you know,

21  you lied in your affidavit and now you're lying when you say

22  you could have seen the shells through the open doorway.

23          You can try -- I'm saying not that you can use those

24  exact words, but you can effectively pursue lines of inquiry

25  like that.

```
 1              So I will allow you to proceed in a limited way, but
 2    if you're not getting the witness having personal knowledge
 3    about something, you need to move on to a different subject.
 4              MR. STACHOWSKE:  Yes, sir.
 5              THE COURT:  Okay?  All right.  Anything else we need
 6    to talk about?
 7              MS. KRASINSKI:  Your Honor, Agent Cook sent Agent
 8    Forte a message that he may know one of the jurors and would --
 9    but it's hard to tell with masks on.  Would the Court permit me
10    to go over names of jurors with Agent Cook to confirm whether
11    or not he knows the witness he thinks he knows or should we
12    just leave --
13              THE COURT:  The two of you together can meet with
14    Agent Cook and go -- that's you and Mr. Stachowske -- and just
15    show -- ask him, I'm going to give you a list of names, do you
16    recognize any of these names, why do you think you might know
17    one of the jurors, who do you think it is.  You can ask those
18    kind of questions together and report back to me if there's
19    some kind of issue that requires examination.
20              MS. KRASINSKI:  The only other thing I'd ask of the
21    Court is could we convene maybe 15 minutes early so that we can
22    address the issue related to Jim Martin's testimony?  And the
23    reason I'd like to address --
24              THE COURT:  Who's Jim Martin?  I have a lot of
25    things that I'm thinking about.  I'm not focused on everything
```

126

```
 1    you are.  Who is --

 2              MS. KRASINSKI:  I apologize.

 3              THE COURT:  Who's Jim Martin?  What do you want to

 4    talk --

 5              MS. KRASINSKI:  He's the agent, if the Court would

 6    allow it, that would testify to the call that Kelley Finnigan

 7    made where she asked for the gun back.  And the reason that I'd

 8    like to address it today is because if the Court allows it,

 9    we'd like to allow Attorney Stachowske to call him today

10    because he is -- frankly, he's the pallbearer at one of his

11    best friend's funerals tomorrow.  And so if the Court allows

12    that testimony, we'd like to allow --

13              THE COURT:  I'm not -- I'm sorry.  I -- I've got to

14    make correct rulings and when the parties spring stuff on me

15    minutes before I'm supposed to make important rulings that

16    ordinarily -- like if you read Weinstein on Evidence, which I'm

17    trying to do while I'm presiding over the evidence because you

18    present this stuff to me with so little notice.

19              Weinstein said of course issues like this ordinarily

20    need to be addressed in a pretrial hearing.  Okay?  So you

21    didn't give me that chance.  And I'm going to do the best I can

22    and if I can get to him and we can get him on, fine.  If I

23    can't, I won't, because I'm not going to rush to make a ruling

24    when the parties have not given me what I need to be able to

25    reliably rule on a matter.  I'm looking -- I'm doing research
```

127

```
1    while we're talking, I'm reading and thinking about it.
2              My current thought about it seems to me a very
3    difficult proposition that the defendant is advancing that they
4    should be allowed to get that statement in as a statement
5    against interest.
6              First, as you have mentioned, I'm not aware of any
7    evidence that's -- that has come in or that can be proffered to
8    me that she, in fact, knew that the shotgun had been stolen.
9    So without that kind of evidence -- this isn't a case like
10   where she calls up the police and said, can I have my fentanyl
11   back, you know.  That is a -- that is obvious at that point
12   that she has a potential penal interest at stake.
13             I want my shotgun back by itself doesn't suggest
14   that the statement is against interest.  It requires some
15   knowledge or participation in the criminal act of stealing the
16   gun.  At this point no one has proffered evidence to me that
17   she was aware that the gun had been stolen and so the -- the --
18   whether it is, in fact, a statement against interest is a
19   substantial question for me.
20             As I've alluded to previously, and I'll -- you know,
21   again, I've got to get some lunch.  I'm going to try to do some
22   work on this, but the rule requires -- the rule requires
23   corroborating circumstances that clearly indicate its
24   trustworthiness.  It's not apparent to me what the
25   corroborating circumstances are here.  We have the statement
```

128

1   itself.  It was made to the police.  But one of the factors

2   that you consider when examining whether there is -- that

3   standard is satisfied is whether the witness has any

4   relationship to the defendant that would suggest a strong

5   motivation to falsify, which is obviously the case here; a

6   search had just been conducted and a weapon seized from a -- a

7   vehicle titled to a convicted felon who can't lawfully possess

8   that weapon who happens to be the boyfriend of the girl who

9   makes the statement and that is a circumstance that tends not

10  to support the theory that there is evidence clear -- clearly

11  indicating that the statement is reliable.

12          Now, that standard, I'm reading cases and trying to

13  make sure that I understand the standard, but the use of that

14  terminology is difficult for a judge to apply, you know.  It's

15  like the old story of the porridge is too hot, the porridge is

16  too cold, oh, the porridge is just right.  Well, where does

17  it -- that line, where does one draw that line?  And I don't

18  see at the present time what the evidence is that would suggest

19  that the -- that clearly indicates the trustworthiness of the

20  statement given the relationship between the speaker of the

21  statement, the declarant, and the defendant.

22          This -- so that raises real concerns for me.  I'm

23  going to be looking for the defense to tell me what is it

24  about that statement or what other evidence is there of clear

25  trustworthiness.  I mean, are we going to have other witnesses

129

```
1    that are going to show her in sole possession of the weapon

2    that would suggest that she, in fact, is the possessor of it,

3    that there's some reason to credit the statement as true, are

4    there other kinds of evidence about it?

5              So I think there are a couple of real problems with

6    it qualifying as a statement against interest, but I don't have

7    any legal briefs from the parties; nobody's presented me with

8    any case law; nobody's really argued the issue to me yet.

9              I'm trying to run a trial here.  So I -- I'm sorry

10   for your agent, but I'm going to make sure I need -- I do

11   what's necessary to be able to reliably rule, and it may -- it

12   may not happen today.

13             MS. KRASINSKI:  I understand.  That's why I was

14   asking to -- you know, if Attorney Stachowske and I could take

15   the lunch break to sort of formulate our arguments and case law

16   and present it to the Court at the end of the lunch break.  But

17   I certainly understand --

18             THE COURT:  Yeah, we'll see.

19             MS. KRASINSKI:  Okay.  Understood.

20             THE COURT:  Yeah.

21             THE CLERK:  All rise.

22             THE COURT:  Oh, I should -- I'm sorry.  Can you take

23   a little bit more?

24             THE COURT REPORTER:  Sure.

25             THE COURT:  So, Attorney Stachowske, you did present
```

130

1    a different argument to me about the invocation of the

2    witness's Fifth Amendment right yesterday.  You were -- I think

3    you made an argument to me that you should be allowed to have

4    the jury be informed that she --

5            MR. STACHOWSKE:  Yes.

6            THE COURT:  -- took her Fifth Amendment right to

7    remain silent so that the jury might draw an inference that, in

8    fact, she does have a possessory interest in the weapon,

9    something along those lines.

10           I just want you to know that I've researched that

11   issue and in the *United States against Santiago*, a First

12   Circuit case reported at 566 F.3d 65, a 2009 decision of the

13   First Circuit, I believe the First Circuit has rejected that

14   argument that a jury should draw some adverse inference from a

15   potential witness's invocation of the -- their Fifth Amendment

16   right.

17           I'll just give you a little background quote from

18   some portions of the case:  Santiago's main claim on appeal is

19   that he was denied the right to present a defense in violation

20   of due process, compulsory process, and confrontation rights

21   guaranteed by the Constitution.  The government's case rested

22   primarily on the live testimony by two DEA agents and one

23   police officer involved in the investigation on videos of the

24   May 14th and 17th meetings and on audiotaped recordings of

25   telephone conversations between Santiago and Dixon and Ortega,

1    including a tape of the initial April 14th call.  When Santiago

2    proposed to summon Dixon and Ortega as witnesses as part of his

3    defense, both men invoked their privilege against

4    self-incrimination.

5              The district judge conducted voir dire of both men

6    and concluded that their assertions of privilege were

7    legitimate and he declined to let them be questioned before

8    this -- the jury on the ground that any unprivileged bits and

9    pieces would merely confuse the jury.  The judge also refused

10   Santiago's request that the videotapes and audiotapes be

11   stricken.

12             The Court then analyzed the issue which seems to me

13   to be the same issue you're raising, quoting again from a

14   different portion of the opinion:

15             Santiago was not, as he claimed in the district

16   court and, hence, on appeal, entitled to call the witness

17   merely to have them assert their privilege before the jury.

18   Doing so would not infringe their privilege, but in ordinary

19   circumstances, no relevant rational inference can be drawn

20   about the underlying facts because the privilege can be claimed

21   by an innocent person.

22             Citing another decision of the Tenth Circuit summing

23   up the matter, now quoting that case:

24             Because a jury may not draw any legitimate

25   inferences from a witness's decision to exercise his Fifth

132

```
1   Amendment privilege, we have repeatedly held that neither the
2   prosecution nor the defense may call a witness to the stand
3   simply to compel him to invoke the privilege against
4   self-incrimination.
5           I do not believe that a jury could draw any
6   inference one way or the other from being informed that the
7   witness has invoked her Fifth Amendment privilege, so I'm not
8   going to allow you to argue that some kind of adverse inference
9   should be drawn from her invocation of the privilege.  It just
10  doesn't give the jury useful information.
11          Now, if you wanted to call the witness outside the
12  presence of the jury for me to voir dire the witness and make
13  sure that she is, in fact, invoking her Fifth Amendment
14  privilege because you doubt what her lawyer is saying, I'd let
15  you do that, but the attorney has proffered that her -- his
16  client is going to invoke the privilege.  I don't see any
17  reason in calling her to court just to formally invoke it
18  unless you want me to press that matter.
19          MR. STACHOWSKE:  If I could have a second?
20          THE COURT:  You can consult with your client about
21  it and deal with it later in your case because it would be in
22  your case you would be calling her to invoke the privilege and
23  then argue for some kind of inference.  I'm suggesting that the
24  only thing I would do is do a hearing outside the presence of
25  the jury to verify that, in fact, what her lawyer has
```

 1   represented to you, that she's going to invoke the privilege,

 2   is, in fact, the case.

 3            MR. STACHOWSKE:  Yes, your Honor.

 4            THE COURT:  Okay.  All right.  So let's take a -- a

 5   lunch break.

 6            THE CLERK:  All rise.

 7            (Lunch recess taken at 12:37 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

134

C E R T I F I C A T E


          I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 5/9/2022          /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR

# Exhibit 11

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                        *
4    UNITED STATES OF AMERICA           *
                                        *
5                                       *  No. 1:21-cr-00088-PB-1
              v.                        *  October 13, 2021
6                                       *  1:30 p.m.
                                        *
7    COREY DONOVAN,                     *
                                        *
8                   Defendant.          *

9    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10

11             DAY TWO OF JURY TRIAL - AFTERNOON SESSION

               BEFORE THE HONORABLE PAUL J. BARBADORO
12

13

     APPEARANCES:
14

15   For the Government:       Anna Z. Krasinski, AUSA
                               Charles L. Rombeau, AUSA
16                             United States Attorney's Office

17

     For the Defendant:        Matthew G. Stachowske, eSQ.
18                             Stachowske Law PLLC

19

20

     Court Reporter:           Brenda K. Hancock, RMR, CRR
21                             Official Court Reporter
                               United States District Court
22                             55 Pleasant Street
                               Concord, NH 03301
23                             (603) 225-1454

24

25

1                        I   N   D   E   X

2    WITNESSES:           DIRECT     CROSS    REDIRECT    RECROSS

3    JOHN COOK
     (Resumed)
4
     By Ms. Krasinski                             25
5    By Mr. Stachowske              13

6    KEVIN KWIATKOWSKI
     By Mr. Rombeau       26                      59
7    By Mr. Stachowske              32

8    RICHARD CAMPBELL
     By Mr. Rombeau       33
9    By Mr. Stachowske              56

10   TIMOTHY MERNA
     By Mr. Rombeau       60                      70
11   By Mr. Stachowske              73

12   JACOB HUBBARD
     By Mr. Rombeau       79
13   By Mr. Stachowske              89

14

15                      E   X   H   I   B   I   T   S

16   **For Identification**                          Page
     Defendant's
17        B.........................................22

18
     **In Evidence**
19
     Government's
20
            2.........................................22
21        117.........................................81
          116.........................................82
22        115.........................................84

23   Defendant's
          A.........................................17
24

25

```
 1                    P R O C E E D I N G S

 2          THE CLERK:  All rise.

 3          THE COURT:  All right.  So, I don't want to delay the

 4   jury.  If we can resolve this statement-against-interest issue

 5   now, I'm willing to take a couple of minutes, but if it takes

 6   longer than that, I'm just going to stop.

 7          First, let me ask, this would be a defense -- this

 8   would be a defense witness or -- you're not planning to call

 9   this agent, right?

10          MS. KRASINKSI:  Correct, your Honor, we don't intend

11   to call him.

12          THE COURT:  So, he wouldn't be testifying until the

13   defense case.  If I allow it, you want to take him out of

14   order?

15          MS. KRASINKSI:  Yes, your Honor.

16          THE COURT:  Does the witness have anything to say

17   other than what's in his report about the statement?

18          Let me ask Mr. Stachowske.  Can you elicit anything

19   from him other than what's in that?

20          MR. STACHOWSKE:  No, your Honor, I don't intend to,

21   and I've proposed that we work off the paper.

22          THE COURT:  All right.  So, we just stipulate to the

23   statement.  If it does come in, I think the agent, you can let

24   the agent go to his funeral, and you can -- if I allow it,

25   we'll just have the statement.  You'll craft a stipulation that
```

```
1   the parties stipulate that on such-and-such a date so and so
2   spoke with agent so and so, and he would testify that she said
3   to him blah, blah, blah.  Right?
4            MR. STACHOWSKE:  Yes.
5            THE COURT:  And that would be it?  So, we don't need
6   it, even if I allow it?
7            MR. STACHOWSKE:  I don't think we do, your Honor.
8            THE COURT:  Can we agree that we don't need him?  Do
9   you think you can get something -- I mean, that would include
10  the "and they waited for a few seconds," all that stuff.  The
11  whole thing would be part of the stipulation that you would
12  agree to.
13           MS. KRASINKSI:  I mean, I think it sort of comes
14  through this.  I think what he would testify is that it was
15  uncomfortably long.
16           THE COURT:  Right.  You would have to agree to a
17  stipulation about what he would say.  There are some things in
18  the report, it's not just the statement, but the circumstance
19  that she was paused, there was a wait, and then they came back
20  and said something about the gun and then couldn't identify
21  additional things about the gun.
22           MS. KRASINKSI:  Yes.
23           THE COURT:  So, just work it out by way of a
24  stipulation so that we don't have to immediately rush.
25           MS. KRASINKSI:  We can do that, your Honor.
```

1          THE COURT:  I want to make clear, however, that I have

2     substantial doubt about whether the statement is admissible as

3     a statement against interest for two reasons.  I'll lay these

4     out, but it will give you a chance to spend the evening

5     briefing it up, and I'll make a final decision when the defense

6     starts its case, since we don't have to have the agent.

7          So, let me just lay out my thinking based on ten

8     minutes of research and five minutes of reflection.

9          The exception to the hearsay rule that Mr. Stachowske

10    is invoking is Rule 804(b)(3) and, to qualify, the declarant

11    has to be unavailable.  As I said, I think the declarant is

12    unavailable, based on the proffer that she will invoke her

13    Fifth Amendment right when asked anything about this subject

14    matter.  So, assuming that the declarant is unavailable, the

15    person offering the statement must demonstrate that a

16    reasonable person in the declarant's position would have made

17    the statement only if the person believed it to be true,

18    because, when made, it was so contrary to the declarant's

19    proprietary or pecuniary interest or had so great a tendency to

20    invalidate the declarant's claim against someone else or expose

21    the declarant to civil or criminal liability.

22          Here, the argument that the defense is presenting is

23    that the statement exposes her to criminal liability, and,

24    therefore, qualifies because a reasonable person in her

25    position believed the statement to be true and believed it was

6

1    contrary to her proprietary or pecuniary interest.  The second

2    part of the rule is that in cases like this one, criminal

3    cases, there must be corroborating circumstances that clearly

4    indicate the trustworthiness of the statement.  So, there are

5    two requirements here that are in dispute.

6         I would direct the parties' attention to a Tenth

7    Circuit case which provided the most detailed analysis of both

8    of these issues that I could find in the limited research I was

9    able to conduct.  It's United States v. Lozado, reported at

10   776, 1119, a 2015 decision of the Tenth Circuit Court of

11   Appeals, and in that case the defense was seeking to elicit a

12   statement, evidence of a statement by an unavailable declarant,

13   and the statement was not on its face inculpatory, obviously

14   inculpatory.  So, it's not a statement like, I just robbed the

15   bank, or, I would like my fentanyl back, something that is

16   inherently contraband.  It wasn't one of those kinds of

17   statements.  It was a statement about, of all things,

18   ammunition and ownership of ammunition that the defendant was,

19   I believe, charged with possessing; and the declarant was

20   making a statement that it was his ammunition, and the argument

21   that it was a statement against interest was because he was a

22   drug user, and there's apparently a crime for a drug user in

23   possession of ammunition.

24         And the Court analyzed a claim that the defendant was

25   making, which was to establish the prong of -- the first prong

1    that we're discussing here of the statement against interest

2    rule could be established merely by showing that, by making the

3    statement, the defendant had some potential criminal exposure

4    if it could be proved that he was a drug user, and the

5    government argued in that case that, no, a reasonable person in

6    his position wouldn't necessarily know that it would be a crime

7    for a drug user to possess ammunition, and, therefore, that

8    first prong of the declarant against interest -- declaration

9    against interest statement is not satisfied.

10           And the Tenth Circuit did a pretty good, in my view,

11   pretty persuasive analysis of how you deal with that kind of a

12   problem, and what the Court said was that the rule should be

13   construed if the, and I'll quote now, "If proof establishes the

14   declarant's actual state of mind as to whether the statement is

15   against penal interest, courts should consider that evidence as

16   part of 'in the declarant's position' to determine whether the

17   hearsay is admissible.  If, however, the declarant's state of

18   mind on the against-interest question has not been proved,

19   courts should consider whether 'a reasonable person in the

20   declarant's position' would have believed the statement is

21   against his or her interest."

22           And then they applied that ruling to the facts of the

23   case and concluded that the qualification was -- the

24   requirement was not satisfied in that case, because a

25   reasonable person in the declarant's position would not have

1    understood his statement to be against penal interest.

2          Our case is like that in this way:  We have a

3    statement of ownership of a gun, but there's nothing on the

4    face of it that suggests that ownership of a gun is unlawful.

5    This is not a case where the evidence demonstrates that the

6    declarant had a felony conviction so ownership of the gun would

7    arguably be against her penal interest.  In order for it to be

8    against the penal interest of the declarant, it would require

9    some evidence that the declarant had culpable knowledge of the

10   theft of the firearm, and no one has proffered any evidence to

11   me suggesting that the declarant had any knowledge, culpable

12   knowledge, of the robbery, and, in fact -- or the theft -- and,

13   in fact, it's unlikely that she did, because you wouldn't be

14   calling the police to try to recover a stolen -- a weapon you

15   had been involved in stealing.

16         But the much more likely explanation is, whether she

17   is falsifying her statement to help her boyfriend or whether

18   she's making it truthfully, she's doing it without knowledge

19   that she has any criminal culpability, and so a reasonable

20   person in her position would not have understood her statement

21   to be inculpatory unless somebody presents me with some

22   evidence that, in addition to claiming ownership, she had a

23   basis to believe that she was involved in the theft in some way

24   that would make her culpable.  So, that requirement doesn't

25   appear to be satisfied.

1          The case also goes on to analyze, in the alternative,

2    the second issue here, which is whether there are corroborating

3    circumstances that, in the words of the rule itself, clearly

4    indicate the trustworthiness of the statement, and the Court

5    goes on to conclude that, even if the first part of the test

6    had been satisfied, that the second part was not satisfied,

7    and, in doing so, the Court specifically focused on the close

8    relationship between the declarant and the defendant.  And the

9    Court notes:  "Second, Mr. Farris's statement is suspect

10   because he is Mr. Lozado's brother-in-law, which provided him

11   with a motive to help Mr. Lozado.  A close relationship between

12   the declarant and the defendant can damage the trustworthiness

13   of a statement."

14         The circumstances under which the statement was made

15   was within a matter of a short period of time after the police

16   had conducted a search of the defendant's premises, someone who

17   was a convicted felon and couldn't possess firearms, and who

18   had, if I'm understanding it correctly, had previously been

19   tried and acquitted of a charge of possessing firearms while

20   being a convicted felon, where he was able to gain an acquittal

21   by presenting a defense that those firearms were possessed by

22   his then girlfriend.  This is a case where his current

23   girlfriend is calling the police to claim ownership of a weapon

24   after she has reason to believe that the defendant is likely to

25   be prosecuted if he's associated with the weapon rather than

1    her, so there's a very strong motive to falsify on her part.

2    And that was one of the circumstances that the Court in the

3    Tenth Circuit looked to to say that that close relationship

4    undercuts a claim that there is clearly reliable evidence

5    indicating the trustworthiness of the statement.  Here I don't

6    see any evidence, apart from the statement itself, that

7    buttresses the reliability of the statement.

8            So, did you want to say something?

9            THE DEFENDANT:  Yes, please, your Honor.

10           THE COURT:  Yes, Mr. Donovan.

11           THE DEFENDANT:  So, Matt hasn't got it yet, and

12    because he can't deal with -- there's a video from back in

13    February where my son got swords that we had got him.  They're

14    in the shotgun box, and he thinks he's got a shotgun.  No, you

15    did not get a shotgun.  Kelley got a shotgun.  Kelley is a good

16    girl.  He was not a good girl.  It predates all of this, your

17    Honor.  It's really not my gun.  Do I know it's there?  I'll

18    tell you, yes, I knew it was there.  It's really not mine, sir.

19           THE COURT:  I don't want you to say anything that

20    could hurt yourself.

21           THE DEFENDANT:  Yeah.

22           THE COURT:  You should talk to your lawyer.

23           THE DEFENDANT:  But, you know, it's --

24           THE COURT:  All right.  But that's a whole different

25    kettle of fish, that if you produce that in your case and it

```
 1   comes in maybe it can be considered, but that would be
 2   corroborating evidence that her statement is true, if you can
 3   establish it.  So, bring it on, but until I have it I can't do
 4   anything about it.  I'm just telling you what this case shows
 5   and how I think it applies based on what I know at the moment.
 6   So, that's what we've got.  I appreciate it.  I've got to get
 7   going with the jury.
 8           THE DEFENDANT:  One thing real quick?  She wanted to
 9   testify before, and then it was put forth so she was given an
10   attorney who said, Oh, you might be a prohibited person, and
11   they kept her on the line, on the phone so she couldn't
12   testify, and now it's come forward about this whole stolen
13   firearm, and she's been intimidated, your Honor.
14           THE COURT:  Yeah, your lawyer has tried to make that
15   point to me.
16           THE DEFENDANT:  It's true.
17           THE COURT:  Yeah, I got it.  Okay.  All right.  So, I
18   just wanted to give you guys the case cite so you can think
19   about it overnight.  My preliminary assessment is neither of
20   those two requirements can be satisfied here for reasons
21   substantially similar to those that were at issue in the Lozado
22   case I've cited to you.  But if it does come in, it's going to
23   come in by way of a stipulation so the agent can go to his
24   funeral.  Okay?
25           MS. KRASINKSI:  Thank you, your Honor.
```

```
 1              THE COURT:  All right.  Are we ready to bring the jury
 2       in?
 3                         (Pause)
 4              MR. STACHOWSKE:  Your Honor, my client would like to
 5       have Agent Forte sequestered.
 6              THE COURT:  The rule is that you get to have a case
 7       agent sit at counsel table.  So, I understand the sequestration
 8       request.  Those requests routinely are excepted for a case
 9       agent who is specifically in the rules allowed to sit at
10       counsel table.  So, I deny your request.
11              MR. STACHOWSKE:  Thank you.
12              THE CLERK:  All rise for the jury.
13                      (The Jury entered the courtroom)
14              THE CLERK:  Please be seated.  Court is in session.
15              THE COURT:  Sorry for the delay.  Everything -- we're
16       working, so if we're not coming in here right on time, it's
17       almost always because I'm doing something with them that will
18       speed up some part of the trial.  So, believe me, I'm doing
19       everything humanly possible to keep this thing moving for you
20       folks.  I don't want to keep you here one minute longer than
21       necessary.
22              THE JUROR:  We didn't just think you had a long lunch,
23       your Honor.
24              THE COURT:  Pardon me?
25              THE JUROR:  We didn't just think you had a long lunch,
```

```
 1   your Honor.
 2            THE COURT:  Okay.  All right.  So, let's go with
 3   cross-examination, okay, continue with cross-examination.
 4            MR. STACHOWSKE:  Yes, your Honor.  I'm just pulling up
 5   the -- if I could have a second to pull this.
 6                           (Pause)
 7            MR. STACHOWSKE:  I'm almost there.
 8                           (Pause)
 9   CONTINUING CROSS-EXAMINATION BY MR. STACHOWSKE:
10   Q.   Agent Cook, thank you for your patience.
11   A.   Of course.
12   Q.   When we last spoke you were discussing the procedure
13   involved with photographing evidence.  Do you remember that?
14   A.   I do.
15   Q.   Okay.  I'm going to present to you a photograph of -- just
16   waiting for the code.  Worse than using the remote at home.
17            All right.  I think you testified earlier that you
18   were team leader for the search of the vehicles.
19   A.   Correct.
20   Q.   Yes?
21   A.   Yes.
22   Q.   Okay.  This is a photograph.  Do you remember instructing
23   Agent Martin to take this photograph?
24   A.   I would have instructed him to take each specific
25   photograph.  I would have instructed him to take overall
```

1  photographs before the search, and then he would have known to

2  have taken photos as evidence was discovered.

3  Q.    Okay.  Do you see a shotgun shell in this photograph?

4  A.    In that photograph, no, I do not.

5  Q.    Do you recall any of your seven or eight agents telling

6  you that they saw a shotgun shell that would prompt Agent

7  Martin to take a photograph of this vehicle?

8  A.    We knew that Special Agent Forte was applying for a search

9  warrant because he had seen ammunition both in this vehicle and

10 the ammo can in the other vehicle, the blue car, and Special

11 Agent Martin started taking overall photographs of the

12 vehicles.

13 Q.    Okay.  So, you don't have personal knowledge of seeing

14 shotgun shells in this vehicle; is that right?

15 A.    No.  I peeked in each vehicle.  I saw the shotgun shells

16 in this vehicle, and I saw the ammo can in the blue vehicle.

17 Q.    Prior to the extension of the search warrant?

18 A.    That's right.

19 Q.    And from what vantage did you see the shotgun shells?

20 A.    This vantage point.

21 Q.    And where?  Point --

22       MR. STACHOWSKE:  Do we have the ability to circle?

23       THE CLERK:  You can, but he cannot.

24       MR. STACHOWSKE:  I can?

25       THE CLERK:  Yes.

1          MR. STACHOWSKE:  All right.  Can we pull up the -- I

2     just want to be clear before I engage in this line of

3     questioning so as not to waste everybody's time.

4     A.    Sure.

5     Q.    Am I correct that your testimony is that you personally

6     observed shotgun shells from this vantage in the Jeep prior to

7     the extension of the search warrant?

8     A.    That's correct.  When I heard that Special Agent Forte had

9     seen ammunition and he was applying for a search warrant, I

10    looked at both vehicles, looked in both vehicles, and I could

11    see shotgun shells in this vehicle in the center console, and I

12    could see the ammo can in plain view in the other vehicle.

13         THE COURT:  But just to save time, what's important to

14    him, he's asking vantage point, and so there's no confusion

15    this photo appears to be taken from outside the car on the

16    driver's side, and I think what counsel means is from that

17    vantage point are you testifying before anybody entered the

18    vehicle and removed the gloves that you could see from that

19    vantage point the shotgun shells?  Is that your testimony?

20         THE WITNESS:  Yes, your Honor.

21         THE COURT:  Okay.

22    Q.    Can you see the shotgun shells depicted in the photo

23    that's presented to you here now?

24    A.    I can.

25    Q.    How tall is Agent Martin?

1    A.    He's probably six foot.

2    Q.    And how tall are you, sir?

3    A.    I'm six foot, four.

4    Q.    So, you had a higher vantage than Agent Martin when he

5    took the photograph?

6    A.    Correct.

7    Q.    Approximately four inches.  And your testimony is that you

8    were able to see shotgun shells without moving the camouflage

9    gloves that are depicted in the console of this Jeep?

10   A.    That's right, sir.

11          MR. STACHOWSKE:  Karen, would you mind pulling up the

12   government's exhibit related to the shells that were found?

13                              (Pause)

14   Q.    So, this is a duplicate of one of the government's

15   exhibits.  I do not have the exhibit number.  It's my

16   understanding this photo was taken after the 1:20 p.m. search

17   warrant was granted.  Is that consistent with your

18   understanding?

19   A.    I would think so, because that looks like a photo that Jim

20   Martin is taking of the evidence in place.

21   Q.    Okay.  And you can see in this photo the camouflage gloves

22   are now moved to the passenger side, correct?

23   A.    Correct.  Yes.

24   Q.    And now we can plainly see the shotgun shells, correct?

25   A.    Correct.

1   Q.   All right.  So, is it your testimony that the prior

2   photo --

3               THE CLERK:  Is this photo in evidence?

4               THE COURT:  It is, but he doesn't have this version of

5   it marked, but I have seen this photo before.

6               Does the government remember the exhibit number?

7               MS. KRASINKSI:  It hasn't been introduced in the

8   government's exhibit list, but we have no objection to its

9   admission.

10              THE COURT:  All right.  It will be admitted and marked

11  as the next defendant's exhibit, if it isn't previously in.

12              (Defendant's Exhibit A admitted into evidence)

13              MR. STACHOWSKE:  I'll go back to the last photo and,

14  your Honor, I'll have one or two more questions, and I'll be

15  done with this, if I can find the photo.

16  Q.   All right.  Is it your testimony that the photo we saw

17  minutes ago, where the camouflage gloves were in the center

18  console here, displayed the shotgun shells and in what you had

19  characterized as plain view?

20  A.   The last photo?

21  Q.   Yes.

22  A.   Based on the photo, no, you could not see the shotgun

23  shells.

24  Q.   Okay.  And do you know why Agent Forte would include such

25  a statement in his affidavit?

```
 1    A.    Well, he's not talking about the photo himself.  I'm sure
 2    he's talking about what he actually witnessed.
 3    Q.    From that --
 4          MS. KRASINKSI:  Objection.  Basis of knowledge.
 5          MR. STACHOWSKE:  I'll strike that.  I'll move on.
 6    Q.    You spent a considerable amount of time talking about the
 7    shotgun itself, the fact that it was loaded, there was one in
 8    the chamber.  You made no mention of there being a safety.  Was
 9    there a safety?
10    A.    I don't recall.
11    Q.    Okay.  Is there typically a safety on a shotgun?
12    A.    Yes.
13    Q.    Okay.  And you would agree with me that there's probably a
14    shotgun (sic) on a standard-issue Mossberg shotgun?
15    A.    500?  Yes, it would have a safety.
16    Q.    And when it was seized do you know whether or not the
17    safety was on?
18    A.    I don't remember.  I don't know.  It would have been
19    rendered safe, so the safety would have been put on, but I
20    don't know if the safety was on or not on at the time of
21    seizure.
22    Q.    Who actually removed the shotgun from the vehicle?
23    A.    I believe it was Detective Campbell who reached in and
24    removed it from the inside of the Jeep.
25    Q.    How did he remove it, if you know?
```

1  A.   I don't.

2  Q.   You talked about the barn, the warehouse, okay, so the

3  warehouse, not the garage, but the warehouse.

4  A.   Mm-hmm.   Yup.

5  Q.   I think you characterized it as a hoarder's paradise?

6  A.   Definitely junked up, yes.

7  Q.   And say more about what you mean when you say hoarder's

8  paradise.

9  A.   Just where there were areas of it that just were not

10  passable.   There were things stacked on top of things.   It was

11  messy.

12  Q.   Okay.   So, items that had been stored there for an

13  extended period of time, in your opinion?

14  A.   I'm sure of it.

15  Q.   Based on your observations, were there items from

16  gardening, different --

17  A.   I'm sure there's all kinds of items in there.   Absolutely.

18  Q.   Okay.   But you characterized that space as a guy's

19  hangout.   I'm trying to rectify that with a hoarder's paradise.

20  Which one was it?

21  A.   I don't know if I -- I would say the back, the back stuff

22  was more like Christmas decorations, and then the front was

23  more and the -- the tool area was more mechanical, mechanically

24  based, and hunting.   That's where the deer was as well, deer

25  skins.

```
1   Q.   All right.  And you didn't inventory all the items that
2   were in that warehouse, correct?
3   A.   No.
4   Q.   Would it be possible?
5   A.   It would be impractical.
6   Q.   When you found items of interest, you photographed those,
7   correct, before retrieving those and seizing them?
8   A.   Correct.
9   Q.   And what did you do with them when you retrieved the items
10  that you photographed?
11  A.   I would package it, and I would note it on the evidence
12  log that I kept.
13  Q.   So, if an item was observed in one photo, say in the gun
14  box, and then was observed in another photo in a completely
15  separate space in the garage, I mean in the apartment, how
16  would you explain that?
17  A.   We wouldn't -- there's two different search teams.
18  There's my search team that's on the barn, and then there's a
19  completely separate search team that was doing the garage,
20  slash, apartment area.  We were both working at the same time.
21        MR. STACHOWSKE:  And there are a lot of photos, so I
22  apologize.  The photo of the shotgun case in the government's
23  exhibits, it's been presented multiple times today.  The
24  shotgun case is 100.  Would it be possible to pull that up?
25        MS. KRASINKSI:  100 is the physical.
```

1        MR. STACHOWSKE:  Not the physical evidence but the

2    actual photo at the warehouse.

3        MR. ROMBEAU:  308.

4        MS. KRASINSKI:  You want the open gun case?

5        THE COURT:  He wants the photograph of the gun case

6    that you were displaying during your examination.

7        MR. STACHOWSKE:  308.  308.  Charlie's correct.

8        Thank you, Karen.

9    Q.   All right.  So, we're now looking at the Government

10   Exhibit 308.  You recognize this photo, correct?

11   A.   Yes, sir.

12   Q.   Behind the bandolier is a silver item.  Do you see that?

13   A.   I do.

14   Q.   Do you know what that is?

15   A.   It was a pocketknife.

16   Q.   And was that item seized?

17   A.   It was not.

18       MR. STACHOWSKE:  Bear with me for a second.  All right

19   I'm going to take -- I've not emailed this to the Court yet.

20   This would be an additional exhibit.

21       THE COURT:  All right.  So, do you have the next

22   available number?

23       THE CLERK:  2.

24       THE COURT:  2?

25       THE CLERK:  Defendant's 2.

1       THE COURT:  This is Defendant's 2 For Identification.

2    Don't show it to the jury yet.

3           (Defendant's Exhibit B marked for identification)

4    Q.   Sir, do you recognize what's depicted in this image?

5    A.   I do.

6    Q.   And how do you recognize it?

7    A.   I recognize it as one of the photos taken from the other

8    search team of the inside of the garage apartment.

9    Q.   And do you know who took this photo?

10   A.   I believe it's Special Agent Andy Cox.

11          MR. STACHOWSKE:  All right.  I move to strike the ID.

12          THE COURT:  Any objection?

13          MS. KRASINKSI:  No objection.

14          THE COURT:  Without objection, it will be admitted as

15   an exhibit.

16          (Defendant' Exhibit No. 2 admitted into evidence)

17          THE COURT:  Display it to the jury, Defendant's 2.

18   Q.   It kind of loses its luster by the time involved, but the

19   knife that's seen in this image, in your opinion is that the

20   same knife that was displayed in the last photo?

21   A.   It's the same type of knife, yes.

22   Q.   And can you explain how this knife would end up in two

23   different locations?

24   A.   He bought two knives of the same type.

25   Q.   But you're speculating at this point, correct?

1    A.    I know that the firearm -- the knife in the barn stayed in
2    the barn.  There is no contact between the other search team in
3    the garage apartment and the barn.  We're both searching at the
4    same time.
5    Q.    When the shotgun was retrieved did you personally inspect
6    it?
7    A.    I took it into custody after it had been rendered safe.
8    Q.    The cleaning kit that has been submitted today, that
9    includes CLP?
10   A.    I believe it does, yes.  Are you talking about in the ammo
11   box from the other car?
12   Q.    What is CLP?
13   A.    It's a cleaning agent for firearms.
14   Q.    What does CLP do?  What's it used for?
15   A.    To clean.
16   Q.    And its intention is to remove rust and to keep it from
17   rusting, correct?
18   A.    Correct.
19   Q.    And would you agree with me that this shotgun has not been
20   cleaned in some time?
21   A.    I did not -- I would agree with that, yeah.  I didn't
22   really, like, look at it for cleanliness, but I would say what
23   I can remember, yes.
24   Q.    You're an ATF agent, right?
25   A.    Correct.

24

 1    Q.    You're tasked with -- your entire life revolves around

 2    firearms, I'd imagine, correct?

 3    A.    My professional life, yes.

 4    Q.    You clean your firearms?

 5    A.    Of course.

 6    Q.    Yeah.  And when you picked this firearm up did you clearly

 7    see rust visible on the barrel?

 8    A.    Rust is not something I would have been inspecting the --

 9    I wouldn't be inspecting the quality of the firearm.

10    Q.    Well, you just picked it up today.  Did you see rust on it

11    today?

12    A.    I could tell it was dirty today, but I didn't check it for

13    rust.  I would assume that there's rust on it, but I would have

14    to look at it again.  It's just not something I would note.

15    Q.    And, based upon your observations, you would have no way

16    of telling -- well, strike that.

17               It was apparent from your inspection of this firearm

18    that it had been some time since it had been fired, correct?

19    A.    I don't know that.

20               MR. STACHOWSKE:  If I could just have a second, your

21    Honor.

22                              (Pause)

23               MR. STACHOWSKE:  Nothing further, your Honor.

24               THE COURT:  Thank you.

25               Any redirect?

1    MS. KRASINKSI:  Briefly, your Honor.

2    REDIRECT EXAMINATION

3    BY MS. KRASINKSI:

4    Q.   You talked about there was some stuff in the back, I think

5    you referred to it as, like, Christmas stuff, stuff that's not

6    easily accessible, and you talked about places I think you said

7    mechanical and hunting that's sort of, if I understood

8    correctly, was easily accessible.  Have I got that correct?

9    A.   Yes.

10   Q.   Where was the open gun case with the ammunition in that?

11   A.   Right by the workbench.  As you entered the barn,

12   workbench is on the left.  Right at the end of the workbench

13   was where that case was where the ammunition was found.

14   Q.   And would you classify that as in the easily accessible

15   part?

16   A.   Yes.  You could walk right up to it.

17        MS. KRASINKSI:  Thank you.  Nothing further.

18        THE COURT:  All right.  Thank you, sir.  You can step

19   down.

20             (Witness stepped down)

21        THE COURT:  Call your next witness, please.

22        MR. ROMBEAU:  The government calls Kevin Kwiatkowski,

23   your Honor.

24        THE COURT:  Follow this gentleman here.  He'll tell

25   you where to go.

1           THE CLERK:  Good afternoon, sir.  Step around there

2     and raise your right hand.

3           **KEVIN KWIATKOWSKI,** having been duly sworn by the

4     clerk, was examined and testified as follows:

5           THE CLERK:  Thank you.  You may be seated.  Would you

6     please state your full name and spell your last name for the

7     record.

8           THE COURT:  Don't worry.  We can give you another one

9     on the way out.

10          THE WITNESS:  It's Kevin Kwiatkowski.  The last name

11    is K-w-i-a-t-k-o-w-s-k-i.

12          MR. ROMBEAU:  May I proceed, your Honor?

13          THE COURT:  Go ahead.

14                        DIRECT EXAMINATION

15    BY MR. ROMBEAU:

16    Q.   Good afternoon, Mr. Kwiatkowski.  Can you start by telling

17    the jury and the Court where you currently live, what town?

18    A.   Boscawen, New Hampshire.

19    Q.   About how long have you lived in Boscawen?

20    A.   Almost five years.

21    Q.   Back in November of 2019 did you purchase a firearm?

22    A.   Yes.

23    Q.   And was this a Mossberg 20 gauge shotgun?

24    A.   Yes.

25    Q.   Where did you buy it from?

1    A.    Shooters Supply down in Hooksett, New Hampshire.

2    Q.    Do you remember approximately how much you paid for it?

3    A.    Roughly $450.

4    Q.    Was it a new purchase or a used firearm?

5    A.    New.

6    Q.    Do you recall, in buying it, whether you had to fill out

7    any sort of paperwork in order to effectuate the purchase?

8    A.    Yes, I had to sign paperwork.  Yes.

9    Q.    And in part of that process are you asked a number of

10    questions in filling out and answering on the form?

11    A.    Yes.  There's many questions answered, yes.

12    Q.    And at some point in that process does Shooters write down

13    information on the firearm that you're purchasing?

14    A.    Yes.

15    Q.    And does that include the serial number of the firearm

16    you're attempting to purchase?

17    A.    Yes.

18    Q.    Did we review that form in our office last week with you

19    regarding your purchase of the shotgun from Shooters?

20    A.    Yes.

21    Q.    And after you purchased the firearm, after that was

22    completed, where -- before I get to that, why were you

23    purchasing that shotgun back in 2019, if you remember?

24    A.    For hunting purposes.

25    Q.    Did you, in fact, ever take it hunting?

```
 1    A.    No.
 2    Q.    And after you purchased it, where did you put it?
 3    A.    In my storage room.
 4    Q.    Is that also in Boscawen?
 5    A.    Yes.  Boscawen storage.
 6    Q.    Okay.  And so, jumping ahead, what kind of -- did you ever
 7    fire the shotgun?
 8    A.    No.
 9    Q.    What kind of shape was it in when you last saw it in your
10    storage unit?
11    A.    Pristine.  It was in unused condition.
12    Q.    When you purchased it how did it come to you?  What sort
13    of packaging or materials was it in?
14    A.    A box.
15    Q.    And is that like a plastic box, a cardboard box, some
16    other kind of box?
17    A.    Cardboard box.
18    Q.    And the firearm, did it come with more than one barrel?
19    A.    Yes.
20    Q.    Is there a particular reason that the gun had more than
21    one barrel, if you know?
22    A.    Well, two barrels were for two different purposes.
23    Q.    And what are -- generally speaking, what are the two
24    purposes?
25    A.    One's a field barrel to shoot for birds, and the other one
```

1   is a slug barrel used for deer.

2   Q.   And do you recall if the shotgun came with a manual?

3   A.   It did.

4   Q.   Okay.  Did it come with any other accessories of anything

5   that you recall?

6   A.   No.

7   Q.   When you came to our office last week, Mr. Kwiatkowski,

8   did you have a chance to examine a firearm in connection with

9   this case?

10   A.   Yes.

11   Q.   And was the serial number on that firearm, did that match

12   the serial number from your paperwork from when you purchased

13   the gun at Shooters?

14   A.   Yes.

15        MR. ROMBEAU:  Okay.  And may I approach the witness,

16   your Honor?

17        THE COURT:  Yes.

18   Q.   Mr. Kwiatkowski, I want to just put in front of you, you

19   don't need to handle it, what is already in evidence and has

20   been marked as Exhibit 111.  I want to ask you a couple of

21   questions about the firearm in front of you.  Is this the

22   condition or does the firearm appear to you here today in the

23   same condition as when you bought it?

24   A.   It's not in the same condition, no.

25   Q.   Okay.  In what way is it different?

1    A.    Well, there's a couple of modifications here.    The

2    drilling of the holes on the barrel, the scope I don't believe

3    that was part of it.    The scope wasn't part of it.    The

4    drilled-out holes are in the barrel, and it looks like there's

5    some kind of spotlight, plus the sling and also the, I don't

6    know, that band on the back where you hold bullets, whatever

7    you call it, bandolier.    I don't know.

8    Q.    So, the strap, the flashlight, the ammunition holder, the

9    scope and the holes in the barrel, those are all alterations

10   from when you saw the firearm; is that correct?

11   A.    Yes.

12   Q.    I want to show you what's -- let me take that back and

13   show you what's been marked and admitted as Exhibit 100A, Mr.

14   Kwiatkowski.    Do you recognize what I've put in front of you

15   there?

16   A.    Yes, I guess so.

17   Q.    Okay.    And I'll ask does that appear consistent with the

18   second barrel that had been with the firearm when you purchased

19   it?

20   A.    Yeah.

21   Q.    Obviously, one barrel is attached to the weapon, Exhibit

22   111 that we just observed, correct?

23   A.    Yeah.

24   Q.    And I'm going to show you just a couple of other things.

25   What's been admitted into evidence as Exhibit 109e, please take

1    a look at that exhibit, sir, and let me know when you're ready.

2         Do you recognize what's been admitted into evidence as

3    Exhibit 109e there?

4    A.   I don't remember everything.  I didn't study the box and

5    all that was included when I bought the gun.  I saw it one time

6    and put it away.  I don't recall, you know, studying these

7    things.

8    Q.   For sure.  Is what I've shown you, is that a manual for a

9    Mossberg shotgun?

10   A.   It appears to be so.

11   Q.   And do you recall if a manual came with the shotgun when

12   you purchased it?

13   A.   It did.

14   Q.   Okay.  And just one more thing to show you, sir.  I'm

15   showing you what has been marked and admitted into evidence

16   already as Exhibit 106, Mr. Kwiatkowski.  Do you recognize what

17   sort of piece of a firearm that is that I've just put in front

18   of you?

19   A.   I think this is called the fore-end.

20   Q.   And I know when you reviewed the firearm, Exhibit 111, a

21   few moments ago you noted that the flashlight forehand (sic)

22   that is on there was not there when you purchased the firearm.

23   Is what's in front of you there as Exhibit 106 consistent with

24   the type of fore-hand that was on the firearm when you

25   purchased it?

```
 1   A.   Right.

 2   Q.   Is that a yes, sir?

 3   A.   Yes.

 4        MR. ROMBEAU:  Let me take that back.  I have nothing

 5   further, your Honor.  Thank you.

 6        THE COURT:  All right.  Thank you.

 7                       CROSS-EXAMINATION

 8   BY MR. STACHOWSKE:

 9   Q.   Sir, I'll be brief.  Did the gun come with the scope?

10   A.   No.

11   Q.   We just didn't discuss it, so I didn't know if it came

12   with a scope.

13   A.   No.

14        THE COURT:  He said, "No."

15        MR. STACHOWSKE:  Okay.  Nothing further.

16        THE COURT:  All right.  Thank you, sir.  You're all

17   set.  You can step down.

18                  (Witness stepped down)

19        THE COURT:  Call your next witness.

20        MR. ROMBEAU:  The government calls Detective Richard

21   Campbell, your Honor.

22        THE COURT:  Come on up here, sir, over on this side,

23   and the case manager will give you directions.

24        THE CLERK:  Step into the witness box and raise your

25   right hand.
```

```
1          RICHARD CAMPBELL, having been duly sworn by the Clerk,

2    was examined and testified as follows:

3          THE CLERK:  Thank you.  Would you please state your

4    full name and spell your last name for the record.

5          THE COURT:  Richard Campbell, C-a-m-p-b-e-l-l.

6                      DIRECT EXAMINATION

7    BY MR. ROMBEAU:

8    Q.   Good afternoon, Detective Campbell.  Can you start by

9    telling the jury and the Court where you're currently employed.

10   A.   I'm employed with the City of Somersworth, Somersworth

11   Police Department.

12         THE COURT REPORTER:  I'm sorry.  Can you please repeat

13   that?

14   A.   Somersworth Police department.

15         THE COURT REPORTER:  I think your microphone is off.

16         THE COURT:  Case manager, go over there and see if you

17   can make sure it's on.

18         And, sir, you want to speak right into it and speak as

19   loudly as you can, please.

20   A.   With the City of Somersworth, Somersworth Police

21   Department.

22   Q.   And how long have you been employed by Somersworth Police?

23   A.   It will be 16 years in January.

24   Q.   And what do you currently do there?

25   A.   I'm a detective there.
```

1    Q.   And how long of those 16 years have you been a detective?

2    A.   I've been a detective just over five years.

3    Q.   Do you have any additional responsibilities, collateral

4    duties at Somersworth in regard to firearms?

5    A.   Yes.  I'm the department firearm instructor there as well

6    as the taser instructor.

7    Q.   And what do your responsibilities as the firearm

8    instructor entail?

9    A.   To qualify all our officers annually once a year, as well

10   as any new officers, make sure that they can handle and

11   discharge their firearms safely.

12   Q.   Additionally or in addition to your responsibilities at

13   Somersworth PD do you have any formal responsibilities with the

14   Bureau of Alcohol, Tobacco, Firearms & Explosives or ATF?

15   A.   Yes.  I am deputized as a Task Force Officer with the ATF.

16   Q.   About how long have you had that designation with ATF?

17   A.   It's been a little over a year now.

18   Q.   How did that come about?

19   A.   We've worked several cases with the ATF, as well as the

20   ATF did send me to become NIBIN certified with the ATF, so

21   that's how that all came about.  Being that we work many cases

22   with them, the decision was made to deputize a few of us with

23   them.

24   Q.   You mentioned a term in there.  I just want to follow up.

25   When you say "NIBIN," what is NIBIN?

1    A.    NIBIN is the National Integrated Ballistics Information

2    Network.  Basically, any shell casings that have been fired, I

3    can enter them into that system, and they can be compared with

4    other shell casings that have been entered into the system for

5    comparison to see if anything has been used throughout the 50

6    states.

7    Q.    And were you involved at some point, sir, in the execution

8    of a search warrant in Wilmot, New Hampshire on or about March

9    26th?

10    A.    I was.

11    Q.    Okay.  How did that come about?  How did you get involved?

12    A.    We were asked for assistance in executing the search

13    warrant on the property.

14    Q.    You said "we."  Who else was included in the "we"?

15    A.    There were a couple of other officers in our agency as

16    well as members of the ATF.

17    Q.    And on that particular day, why don't we just kind of run

18    through your roles during the course of your time there.  What

19    did you start out as assigned to or participating in?

20    A.    My initial responsibility was to be on the perimeter of

21    the main residence on the property for security.

22    Q.    And when you say "security," what do you mean by that?

23    A.    Just for officer-safety issues, to make sure nobody fled

24    the residence prior to any search being executed.

25    Q.    Were you part of the Special Response Team or SRT group

1    that goes in sort of in advance?

2    A.    I was not.

3    Q.    Okay.  And so, about how long were you on this initial

4    assignment of security at the main residence?

5    A.    At the main residence I was probably approximately 30

6    minutes, 35 minutes.

7    Q.    And, once that completed, did you move on to a new

8    assignment?

9    A.    I did.  I moved on from the main residence to a garage,

10   which I believe there was an apartment in that garage.  My

11   responsibility was to be on the backside of that to watch the

12   door and driveway to make sure that nobody entered the

13   property.

14   Q.    And do you have a ballpark estimate of how long you were

15   in that role on that day?

16   A.    Approximately 35, 40 minutes.

17   Q.    After that completed did you move on to another

18   assignment?

19   A.    I did.  There was a shop in the back of the property, and

20   that was being cleared at the time that I was at this

21   particular garage and apartment.  Once that was secured and the

22   property was secured, I went to the shop area to assist in the

23   execution of the search.

24   Q.    In the course of that did you actually enter the shop?

25   A.    I did.

1   Q.   Were you able to -- or were you assigned to any particular

2   location, or were you able to move freely throughout the shop?

3   A.   I was able to move freely.

4   Q.   While in the shop -- well, let me ask this first:  How

5   would you describe the general condition of the shop on the

6   inside?

7   A.   It was very full of clutter, boxes, and looked like

8   packed-up property, several tools, there was a vehicle, a frame

9   somebody was working on.  It was very cluttered.

10  Q.   And were there particular areas that had been cleared or

11  made accessible for movement?

12  A.   There was some aisle-ways.  There was an aisle-way from

13  the main door going to, like, a bench.  You could freely walk,

14  if you stepped over a few items, to where the vehicle or the

15  four by four was being worked on, the frames, as you will, and

16  there was a pathway going out back to a barn.  There was some

17  hay in a back right corner, because there was horses on the

18  property, in the back of the shop.

19  Q.   And in an area near the back of the shop did you make any

20  observations of any compound bows of any kind?

21  A.   I did.  Toward the back right corner there was a compound

22  bow.

23  Q.   Okay.  And during the search of the shop itself did you

24  make any observations of a firearm or ammunition or anything of

25  that nature in the shop?

```
 1   A.    I was made aware that there was actually ammunition found
 2   to the left side, near the bench area of the shop.
 3   Q.    Were you the particular individual who located that, or
 4   was it someone else?
 5   A.    Somebody else had located that.
 6   Q.    Did you make any observations in the shop about any animal
 7   skins or any animal carcasses of any kind?
 8   A.    Yeah.  There were two deer hides to the left-hand side as
 9   you entered the door near the furnace.
10   Q.    Are you a hunter yourself, Detective?
11   A.    I am.
12   Q.    Did you make any observations as to the sort of freshness
13   or the recency as to those animals?
14          THE COURT:  Hang on a second.  Objection?  Relevance?
15          MR. STACHOWSKE:  Yes.
16          THE COURT:  I'm going to let a few more questions go
17   by, and if it doesn't appear to me relevant, I'll strike it.
18          You can answer.
19   Q.    You can answer.
20   A.    They were fairly fresh, I mean, within maybe a few days or
21   a week.
22   Q.    Okay.  I'll move on.  And after your time in the barn or
23   workshop, as we're calling it, did you take on another
24   assignment?
25   A.    Yeah.  There was some downtime.  I was made aware that
```

1    they were going to be applying for an additional search warrant

2    to search the vehicles that were on the property.

3    Q.   All right.  And do you know if that additional warrant was

4    eventually granted?

5    A.   It was granted.

6    Q.   And did you take a role in particular -- or did you take a

7    role in connection with any particular vehicle in searching?

8    A.   Yes.  There was a green Jeep over near the garage

9    apartment area parked off to the side.  I was asked to assist

10   in searching that Jeep.

11          MR. ROMBEAU:  Ms. Shedd, could we pull up Exhibit 300,

12   please, that's already been admitted into evidence?

13   Q.   This may take a moment to come on the screen in front of

14   you, sir.

15   A.   Yes, that is the Jeep.

16   Q.   Okay.  And there is a building behind the Jeep.  Do you

17   recognize what building that that is?

18   A.   Yes.  That's the building.  Off to the left of that is

19   where I secured and stood by while they were securing the shop

20   area.

21   Q.   Okay.  And, as you can see in Exhibit 300, the passenger

22   door is open; is that right?

23   A.   Correct.

24   Q.   Do you recall if the Jeep was in that condition when you

25   came upon it?

1   A.   It was.

2   Q.   Okay.  And when the time came to search the Jeep, can you

3   tell the jury and the Court how you went about doing that?

4   A.   I approached the Jeep from the passenger side.  When I got

5   to that Jeep or arrived at that Jeep there was an agent near

6   the rear of the vehicle and another agent at the driver's side

7   already beginning to execute the search warrant.  I approached

8   the passenger side.  When I got to the passenger side I peered

9   inside the vehicle.  In the console I did notice some shotgun

10  shells, shotgun shells in the console.

11       When asking what had already been searched or what

12  hadn't been searched, I then leaned in the vehicle, and what

13  caught my attention was some camo around the roll bar of the

14  Jeep, a ghillie suit type of camo, if you will, which is a

15  3D-style of camo, which is made to look like leaves and blow

16  and what not to give it a 3D appearance.  As I was looking at

17  that camo, I happened to notice what I believed to be an optic

18  or a scope, if you will.

19       At that time I had, you know, informed the other

20  agents, I believe there's something up here, a scope or

21  something of that nature, so I reached up on that roll bar and

22  felt, and I felt a firearm.  While removing some of the camo so

23  I could observe further, I noticed a black shotgun strapped to

24  the roll bar of the Jeep.

25            THE COURT:  Just for the non-hunters in the room, when

1    you say "camo," that's like a camouflage that someone actually

2    puts on.  And you say a ghillie suit.  Sometimes it's like

3    loose things that kind of simulate leaves that help you conceal

4    yourself when you're hunting?

5        THE WITNESS:  That's correct, your Honor.  A ghillie

6    suit was typically used by folks in the military for

7    concealment, to mask them being in the area.  It's also

8    typically used by hunters to camouflage themselves while deer

9    hunting.

10   Q.   You covered a lot of ground there, Detective, and Judge

11   Barbadoro already preempted a couple of follow-ups I have for

12   you, but I want to back up just a little bit.

13       I believe you said before you entered the vehicle you

14   could see shells in the center or -- shells in the center

15   console; is that right?

16   A.   That's correct.

17   Q.   And just so we're clear, what was your vantage point in

18   looking at the vehicle at that point?

19   A.   Like I said, I was standing outside the passenger, where

20   the door is open, so I had a pretty clear view of the center

21   console of the Jeep and the interior at that time.

22       MR. ROMBEAU:  Could we pull up Exhibit 303 that's

23   already in evidence, please.

24   Q.   And Detective Campbell, obviously this is through the

25   driver's side view, but is that the location where you observed

42

```
 1    the ammunition in the center console?

 2    A.   Yes, it is.

 3    Q.   And did you or one of your compatriots remove that

 4    ammunition from the vehicle?

 5    A.   Yes, they were removed.

 6              THE COURT:  I'm just going to ask a question before

 7    you get further.  You see the gloves on the passenger side?

 8    See it there?

 9              THE WITNESS:  Yes.

10              THE COURT:  When you first observed the ammunition

11    were the gloves in that location, or were they in a different

12    location?

13              THE WITNESS:  I don't particularly recall the exact

14    location of those gloves, your Honor.  In the photo what I'm

15    looking at, that's what I recall seeing at the time that I

16    looked inside the Jeep.

17              THE COURT:  Okay.

18              MR. ROMBEAU:  May I approach, your Honor?

19              THE COURT:  Yes.

20    Q.   Detective, I'm showing you what's already been admitted

21    into evidence as Exhibit 112.  Take it out of the bag and take

22    a look.

23    A.   (Witness complied).

24    Q.   And do you recognize what's in front of you there?

25    A.   Yes.
```

```
 1    Q.   And can you just describe what it is?
 2    A.   These would be the carrier and shells that I had observed
 3    in the console of the Jeep at the time.
 4    Q.   Okay.  And you mentioned a few moments ago that you're a
 5    hunter yourself.  Is there a difference in the types of
 6    ammunition that can be put in a shotgun?
 7    A.   There are a couple of different types of ammunition that
 8    can be used for a shotgun.
 9    Q.   And what are those types?
10    A.   One would be a various number of birdshot or double-aught
11    buck, which is used typically for deer hunting, or a slug.
12    Q.   All right.  And what makes something a slug?
13    A.   It would be a solid piece of lead.
14    Q.   And is that more what I guess -- in my mind I'm thinking
15    it's more like a bullet, a single projectile.  Is that a fair
16    description?
17    A.   Correct.
18    Q.   Just much bigger?
19    A.   Yes.
20    Q.   Okay.  In that particular bandolier in Exhibit 112 that's
21    in front of you what type of ammunition is that, if you can
22    tell?
23    A.   This appears to be birdshot.
24         MR. ROMBEAU:  Can we -- I'll take that back, put it
25    back in the bag.  Thank you.
```

1           Could we pull up Exhibit 302, please?

2    Q.    This is already in evidence, sir, but I want to ask you do

3    you recognize this vantage point here we're looking at in the

4    photo marked as Exhibit 302?

5    A.    Yes.

6    Q.    And you already answered the Judge's questions from a few

7    moments ago, but can you describe for us the ghillie material

8    that's on the screen in front of you or what it is?

9    A.    Yes.  So, the material -- excuse me -- the material

10   wrapped around the roll bar of the Jeep above the seats is the

11   material that would be a ghillie type of camo, various

12   different types of shades of green.

13   Q.    You referenced a few moments ago or a few minutes ago the

14   roll bar of the Jeep.  What is a roll bar, generally?

15   A.    It's protection for the occupants inside the Jeep should

16   the Jeep roll over.  It provides protection for the head.

17   Q.    All right.  And do you see the roll bar in Exhibit 302 in

18   front of you?

19   A.    I do.

20   Q.    And can you describe it or point out -- I don't think the

21   touch screen is working for you there, sir, but can you tell

22   the jury where it is?

23   A.    If you look at the headrest on the driver's side, you'll

24   see a bar that heads toward the rear of the vehicle on

25   basically a 45-degree angle.  Then you'll see part of the round

1    tube that goes up to where the camo material is, and it goes

2    across to the passenger side, curls back down, and then there

3    would be an additional bar extended to the rear of the vehicle.

4    Q.   I think my touch screen works so let's see if I can --

5    have I circled the right place that you were just referring to,

6    Detective, as sort of the bar that comes up at an angle and

7    then the crossbar that comes across?

8    A.   Yes.

9    Q.   If I can ask what -- let's see if I can clear that.  If

10   you know, sir, what is this bar on sort of the top-most piece

11   there that I've just circled?

12   A.   I would believe that would be the bar to the top of the

13   Jeep.

14   Q.   Okay.  And is that above the roll bar, then?

15   A.   Yes.

16   Q.   Okay.  Clear that.  And so, after you make this discovery

17   -- oh, let me -- before I move on, so how many rows of seats is

18   the Jeep?

19   A.   There would be the passenger seat, the driver's seat, and

20   then there would be room for two adults in the rear.

21   Q.   Okay.  And the headrest that we see there, are those for

22   the passenger and the driver?

23   A.   Yes.

24   Q.   And so, the location of the roll bar and, therefore, the

25   firearm, where is that in relation, then, approximate distance

1   from the headrest?

2   A.   It's in very close reach of the headrest.

3   Q.   And then, so to focus, then, on the firearm, when you find

4   it, what was the first piece that you identified when you were

5   looking up in that area?

6   A.   If you look at the picture where the orange is, the scope

7   is right in that general area.  I happened to notice the front

8   of the scope and the glass part of it.

9   Q.   And I'll see if I can circle it.  Have I circled on the

10  screen in front of you, sir, is that the --

11  A.   Yeah.

12  Q.   -- the scope?

13  A.   You would have the scope in that circle, correct.

14  Q.   And which direction was the rifle barrel pointing?

15  A.   The barrel was pointed toward the passenger side of the

16  vehicle.

17  Q.   Okay.  And so, after you make this discovery what steps do

18  you take at that point?

19  A.   At that point I would reach up, grab the barrel, slide the

20  camo away from it to free it.  Another agent was on the

21  driver's side un-securing it from the bar on the driver's side,

22  and then I removed the firearm or the shotgun from the

23  passenger side of the vehicle.

24  Q.   And were there fasteners or something helping hold it in

25  place?

1   A.    There was a fastener on the driver's side.  That would be

2   that orange piece that you see there.  It was like a

3   bungee-style fastener.  I couldn't tell you exactly for sure

4   what kind of fastener it was.  Like I said, the agent removed

5   it from that side.

6   Q.    And was there any sort of fastener on the barrel end

7   behind the passenger's head?

8   A.    The barrel end, like I said, it seemed to be slid in

9   through the camo, ghillie material.  I was able to slide that

10   away, free from the barrel, to remove it.

11        MR. ROMBEAU:  Okay.  Can we pull up Exhibit 304 that's

12   in evidence, please, Ms. Shedd.

13   Q.    I've put on the screen what's already in evidence as

14   Exhibit 304, Detective.  Do you recognize this photo?

15   A.    Yes.  That would be me holding the shotgun.

16   Q.    Okay.  And obviously this photo, the gun is no longer in

17   the vehicle.  Is this just after it was removed?

18   A.    Correct.

19   Q.    In this particular photo had you made the gun safe yet?

20   A.    I hadn't made it safe.  I was in the process of doing so.

21   Prior to that photo I had turned the shotgun upside down.  And

22   then the magazine, if you look just in front of where the

23   trigger guard is, that's considered the magazine, too, I

24   noticed the end of a shotgun shell indicating that there was

25   shells in the shotgun.  So, at that time I grabbed the slide

1   release, where there's a little button behind the trigger

2   guard, which allows you to slide the forearm back, and in doing

3   so I noticed that there was an actual round chambered in the

4   shotgun.

5   Q.   Were you able to make any observations if the safety was

6   on?

7   A.   I didn't recall the safety.  I checked the safety.  I

8   don't recall if it was on or off, to be honest with you,

9   because my first, initial intent was, once I noticed there was

10  a round in the shotgun, I obviously pointed it in a safe

11  direction to open up the action and noticed the round

12  chambered.

13  Q.   And so, in rendering a firearm safe what steps do you have

14  to take?

15  A.   With this particular shotgun I had to keep working the

16  forearm back and forward, emptying all the rounds out of it.

17  There was a total of six rounds in the shotgun.

18  Q.   All right.  And then, once the rounds are removed from

19  actually being inside the shotgun do you have to take any

20  additional steps to make it safe?

21  A.   No.  Once I got all the rounds removed, I just left the

22  action open.

23  Q.   And, as depicted in the bottom of Exhibit 304 here, were

24  there additional rounds in a sleeve on the stock of the gun?

25  A.   Yes.  If you look in the photograph, there is a sleeve

1    that was put on the butt of the shotgun for extra rounds.

2    Q.    I'm just going to show you a couple of physical exhibits,

3    Detective.  Let me show you what's been marked as Exhibit 113

4    and 114 that have been admitted into evidence.  Why don't we

5    start with Exhibit 113.  Feel free to take a moment to look at

6    the exhibit, sir.  How many rounds are in that bag?

7    A.    There's six rounds in the bag.

8    Q.    And are those the rounds that you just described a moment

9    ago that were taken out from outside in the shotgun?

10   A.    That's correct.

11   Q.    And we talked a little while ago about the different kinds

12   of ammunition used in a shotgun, whether slugs or birdshot.

13   Did you make any observations as to the type of ammunition that

14   were inside the weapon?

15   A.    There were two slugs and four birdshot.

16   Q.    And turning your attention to Exhibit 114, the other bag

17   in front of you, Detective, do you recognize that ammunition?

18   A.    Yes.  This would be the extra ammo that was attached to

19   the butt of the shotgun.

20   Q.    And did you make any observations as to the type of

21   ammunition, whether slug or birdshot, that that ammunition is?

22   A.    Two slugs, two birdshot.

23   Q.    Can you use slugs and birdshot interchangeably in a

24   shotgun?

25   A.    Yes, you can.

1    Q.   Let me take those back from you, sir.  If I can leave this

2    in front of you here.  Detective, I've put Exhibit 111, the

3    shotgun, in front of you there, and I want to ask what makes

4    this a shotgun and not a rifle?  To my untrained eye, can you

5    explain to me the difference?

6    A.   The caliber is the difference.  You know, rifles are

7    typically a lot smaller caliber.  Shotguns are manufactured

8    to -- you can deer hunt with them and bird hunt with them or

9    sport shoot with them, for skeet shooting or bird hunting, but

10   the caliber is what makes it a shotgun.

11   Q.   And the firearm in front of you there, do you see the

12   holes drilled at the end of -- or the holes in the end of the

13   barrel there?

14   A.   Yes.

15   Q.   Is that -- do shotguns come that way, sir?

16   A.   You can buy shotguns that have manufactured holes in them

17   or a suppresser on the end of them, but, in looking at this

18   particular shotgun, those weren't manufacture-ally (ph)

19   drilled.  Somebody had actually drilled those out.

20   Q.   And, again, to the untrained eye, can you explain how

21   you're able to make that observation in looking at Exhibit 111

22   in front of you?

23   A.   Well, the spacing between all the holes are not equally

24   spaced or in a direct line.

25   Q.   And what is the purpose of a scope on a shotgun?

1    A.   There could be a couple of different reasons why one would

2    have a scope on a shotgun.  If they were deer hunting with it

3    they would put a scope on it for a more accurate shot --

4    placement or longer distance placement.

5             THE COURT:  Yes, Counsel?

6             MR. STACHOWSKE:  I have an objection.

7             THE COURT:  You object?  I don't know the basis, so

8    put the headphone on and tell me what it is.

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10            THE COURT:  Can you hear me, Counsel?

11            MR. STACHOWSKE:  Yes, your Honor.

12            MR. ROMBEAU:  Yes.

13            THE COURT:  Go ahead.

14            MR. STACHOWSKE:  Thank you.  This constitutes expert

15   testimony at this point, and there's no disclosure, expert

16   disclosure in this case, and the testimony is going on

17   *ad nauseam* regarding this individual's opinion regarding the

18   condition of the shotgun and what it's used for, all of which

19   constitutes expert testimony, which should be precluded or

20   stricken.

21            THE COURT:  Do you need to go into anything further?

22   I don't see why this really matters to your case.

23            MR. ROMBEAU:  We'll wrap it up, your Honor.

24            THE COURT:  All right.  Wrap it up.

25   (END OF SIDEBAR CONFERENCE)

52

1  Q.   Detective, while you have the firearm in front of you, can

2  I just ask what -- we talked about the different kinds of

3  ammunition that were recovered.  Are there different barrels

4  used, that can be used for different kinds of ammunition?

5  A.   Yes.  For a shotgun, yes.

6  Q.   And were you able to make any observations about the

7  barrel that's attached to Exhibit 111 currently?

8  A.   I have had the opportunity to look at this particular

9  barrel, and it's a slug barrel.

10 Q.   And just very generally, what makes a difference or how

11 can you tell in looking at something what makes it a slug

12 barrel versus a shotgun barrel?

13 A.   If you were to take a flashlight and look down --

14       MR. STACHOWSKE:  Objection, your Honor.

15       THE COURT:  All right.  Stop for a second.  So, the

16 basis is -- well, never mind.  I think I know the basis.

17       MR. STACHOWSKE:  Yes.  The same objection, your Honor.

18       THE COURT:  Can you cite me to the rule that you're

19 relying on, the Rule of Criminal Procedure that requires

20 disclosure?

21                         (Pause)

22       MR. STACHOWSKE:  I believe it was Rule 16, your Honor,

23 but I could be mistaken.  I could cite to the *Rules of*

24 *Evidence*, your Honor.  The *Rules of Evidence* are equally

25 applicable.

```
1            THE COURT:  Did you make a request of the government
2   to disclose this information?
3            MR. ROMBEAU:  Your Honor, should we do this at
4   sidebar?
5            THE COURT:  No.  There's no reason the jury can't hear
6   this.  The argument is that it's an expert opinion.  It is
7   plainly the kind of testimony this officer can give.  The
8   question is was there a demand for disclosure under Rule 16,
9   and did you fail to comply with the disclosure.
10           We'll take a break, members of the jury.  I'll deal
11   with this outside of your presence, okay?  So, we'll take our
12   mid-afternoon break now.
13                    (The jury exited the courtroom)
14           THE CLERK:  Please be seated.
15           THE COURT:  Okay.  So, what else do you want to elicit
16   from this witness that would be in the way of expertise?
17           MR. ROMBEAU:  Nothing, your Honor.  I'll say we
18   understand Special Agent Cook earlier misidentified which of
19   the two barrels was attached.  I think he said the shot barrel
20   was attached, when instead we believe it to be the rifled
21   barrel was attached, so I was just trying to use this witness,
22   because I know he had observed the firearm, to confirm which
23   barrel was attached, but we're not going any further than that.
24           THE COURT:  This isn't the kind of stuff that
25   ordinarily is the subject of disclosure, but if you want to
```

1    press the point, I need you to give me the legal argument.  I'm

2    happy to, again, go out and spend time researching this on

3    breaks, but your position is that under Rule 16 that this is

4    expert witness testimony, which we're talking about

5    16(b)(1)(G), expert witnesses.  "At the defendant's request the

6    government must give to the defendant a written summary of any

7    testimony the government intends to use under Rule 702, 703 or

8    705 during its case in chief.  If the government requests" --

9    we don't need that part.

10          So, you're saying that's the requirement, and it

11   appears to be at your request.

12          MR. STACHOWSKE:  I have not made the request, your

13   Honor.

14          THE COURT:  This is routine, non-objectionable stuff.

15   He's not asking for some kind of complicated assessment.  I

16   mean, it is what it is.  You know what kind of barrel it is.

17   Anybody who has even a moderate understanding of firearms could

18   look at it and express that.  I can't, because I don't know

19   anything about firearms, but almost anybody else.  So, it's not

20   the subject of lay testimony.  It's not really disputed.

21          So, I don't believe the rule, to the extent he's

22   basing his objection on Rule 16, he didn't make a request for

23   disclosure, and, therefore, isn't entitled to bar you from

24   eliciting this information.  Don't go any further than this.

25   Just ask the question about the barrels and move on, okay?  The

1    objection is overruled to that extent.  Don't go any further by

2    way of eliciting expert testimony from the witness.  Okay?

3          It's really a collateral matter.  You're not going to

4    be making some kind of argument based on which of the two

5    barrels it is.  The point is the other barrel is with the

6    scope, right?  That's what this is all -- isn't this --

7          MR. ROMBEAU:  That's right, your Honor.  They go

8    together.

9          THE COURT:  All right.  Let's take a break.

10          THE CLERK:  All rise.

11                (Discussion held off the record)

12              (Recess taken from 3:00 to 3:20 p.m.)

13          THE CLERK:  All rise for the Honorable Court.  Please

14    be seated.

15          Do you need to talk to the parties?

16          THE COURT:  No, not for me.  Thanks.  We'll bring the

17    jury in.

18          THE CLERK:  All rise for the jury.

19                (The jury entered the courtroom)

20          THE CLERK:  Please be seated.  Court is in session.

21          THE COURT:  All right.  Go ahead.

22          MR. ROMBEAU:  Thank you, your Honor.

23    Q.   Detective, just to wrap up a question where we took the

24    recess, how could you tell the difference between which barrel

25    was on the weapon when you examined it?

1    A.   I could tell that the slug barrel was on the shotgun at

2    the time that I took it just looking down.  If you look down at

3    the end of the barrel from the manufacturer there is rifling on

4    the inside of the barrel, and that would be for a slug.  What

5    that does is the rifling causes the slug or a bullet, if you

6    will, to rotate much like a spiral of a football, so when it

7    comes out of the muzzle of the gun it's for accuracy.

8    Q.   And that's in contrast how to the barrel for the shot or

9    birdshot?

10   A.   A bird barrel or a birdshot barrel, if you will, is smooth

11   bore; there is no rifling on the inside.

12            MR. ROMBEAU:  Nothing further, your Honor.  Thank you.

13            THE COURT:  Thank you.  Cross-examination?

14            MR. STACHOWSKE:  Just briefly, your Honor

15                        CROSS-EXAMINATION

16   BY MR. STACHOWSKE:

17   Q.   Good afternoon, sir.  My name's Attorney Matt Stachowske.

18   How are you?

19   A.   Good.  Yourself, sir?

20   Q.   Excellent.  So, you're the actual officer that recovered

21   the shotgun from the Jeep?

22   A.   Correct.

23   Q.   In the course of doing so you are also a member of the SRT

24   team?

25   A.   I'm not a member of the SRT team.

57

1   Q.   Okay.  You didn't do any clearing of the property?

2   A.   No, I did not.

3   Q.   At no time did you see my client on the property on March

4   26, 2021?

5   A.   I did not.

6   Q.   All right.  At no time did you see Kelley Finnegan on the

7   property on that day, did you?

8   A.   I did not.

9   Q.   Was Vivian Hodgdon present?

10  A.   I'm not aware if she was or not, sir.

11  Q.   Do you know whether or not my client's brother was on

12  site?

13  A.   Again, I've never met these folks.  I can tell you that

14  there were three people present in the main residence at the

15  time.

16          MR. STACHOWSKE:  With the Court's permission, I'm just

17  going to go back to that one photo regarding the contents of

18  the console of the Jeep.  All right.

19  Q.   At what time approximately did you -- at what did you --

20  at what time were you tasked with taking evidence from the

21  Jeep?

22  A.   Boy, I never really actually looked at a time.  It was

23  late -- probably mid-afternoon, you know, toward the later part

24  of afternoon.

25  Q.   Okay.  So, after 12:00?

1    A.    I believe it was, if I recall.

2    Q.    And I think you testified that you spent 30 to 35 minutes

3    in two other areas?

4    A.    Yes.  That's correct.

5    Q.    And who called you to seize property from the Jeep?

6    A.    I was asked to assist in the search by Agent Forte.

7    Q.    And at the time that you observed the Jeep, if I can pull

8    this up, you -- can you see this image?

9    A.    Yes, I can see that image.

10    Q.    At the time you came upon the Jeep to conduct this seizure

11    of property do you recall the interior of the Jeep looking like

12    the image depicted here?

13    A.    As stated, when I started to assist in the Jeep it had

14    already begun.  I did not see it like that.  I could see the

15    shells, not the gloves.

16    Q.    So, you saw it like this?

17    A.    Correct.

18    Q.    Do you know who moved -- do you have personal knowledge as

19    to who moved the gloves?

20    A.    I do not.

21    Q.    All right.  You talked about making sure that nobody fled

22    the property.  What were you referring to?

23    A.    If anybody was to run out of the residence to avoid having

24    any contact with law enforcement, again for safety, officer

25    safety reasons and purposes.

1    Q.    That's where I drew some confusion, because I didn't think

2    you were part of the SRT team.

3    A.    I was not.

4    Q.    How easy was it for you to remove this shotgun from the

5    roll bar?

6    A.    Again, on my end it was fairly, relatively easy.  There

7    was another agent un-securing it from the driver's side.  It

8    was not very difficult or did not appear very difficult for

9    him.

10          MR. STACHOWSKE:  Okay.  All right.  Nothing further.

11   Thank you.

12          THE COURT:  Thank you.

13          Redirect?

14          MR. ROMBEAU:  Very briefly, your Honor.

15                      REDIRECT EXAMINATION

16   BY MR. ROMBEAU:

17   Q.    Detective Campbell, did you and the other officers wait

18   until after the search warrant was obtained before searching

19   the Jeep?

20   A.    Yes.

21   Q.    Did you see anyone else search the Jeep prior to the

22   obtaining of the second search warrant?

23   A.    I did not.

24   Q.    And you were just asked a couple of questions about the

25   firearm and its connection in the Jeep.  Was it reachable for

1    the driver, from the driver's seat inside the Jeep?

2    A.   Yes.

3         MR. ROMBEAU:  Nothing further.  Thank you, your Honor.

4         THE COURT:  Thank you, sir.  You can step down.

5                   (Witness stepped down)

6         THE COURT:  Call your next witness.

7         MR. ROMBEAU:  The government calls Tim Merna, your

8    Honor.

9         THE COURT:  Come on up here, sir, walk over this way,

10   and the case manager will give you directions.

11        **TIMOTHY MERNA**, having been duly sworn by the Clerk,

12   was examined and testified as follows:

13        THE CLERK:  Thank you.  Would you please state your

14   full name and spell your last name for the record.  You can be

15   seated.

16        THE WITNESS:  Timothy Merna, T-i-m-o-t-h-y, last name

17   is M-e-r-n-a.

18                   DIRECT EXAMINATION

19   BY MR. ROMBEAU:

20   Q.   Good afternoon, Mr. Merna.  Can you start by telling the

21   jury and the Court how you're currently employed?

22   A.   I'm employed as a U.S. Probation Officer.  I've worked in

23   this field for the last 14 years.

24   Q.   Okay.  And, generally speaking, what does a U.S. Probation

25   Officer do, just generally speaking?

1    A.    Generally speaking, we enforce conditions of the court,

2    make sure that defendants, whether post convicted or pretrial

3    defendants are abiding and complying with the conditions of the

4    court that's been imposed.

5    Q.    And is your office part of the Department of Justice?

6    A.    No.

7    Q.    What is it a part of?

8    A.    We're part of the U.S. Courts.

9    Q.    In terms of, generally speaking, your day-to-day

10   activities as a probation officer, are you assigned particular

11   individuals to supervise?

12   A.    Yes.

13   Q.    At any given time about how many do you have?

14   A.    Between 50 and 60.

15   Q.    And when someone is assigned to you are they sort of

16   exclusively yours, or are they shared among other of your

17   colleagues at the office?

18   A.    Exclusively mine, but I do have a supervisor I staff those

19   issues with that --

20          THE COURT:  You've got to lean in a little bit and

21   speak louder, please.

22   A.    With that I do staff those defendants or offenders or

23   those cases with my supervisor.

24   Q.    Can I ask you to just slide a little closer to the

25   microphone, Officer Merna?

1    A.    Sure.

2    Q.    Thank you.  And over the last few years or so have you had

3    a particular geographic region or area of individuals that

4    you've been assigned to?

5    A.    Yes.

6    Q.    And where was that?

7    A.    It's a unique area, but I would generally describe it as

8    the 89 corridor as well as the Keene area and then down towards

9    the southwestern northern -- or the border there, you know,

10   that adjoins with Massachusetts.

11   Q.    And, generally speaking, are you out in the field seeking

12   to meet with people, or do people come to you here at your

13   office?

14   A.    Both.

15   Q.    Okay.  How do you decide which to do?

16   A.    Based on, you know, need and risk and what's going on in

17   that case at that specific time.  Also, it depends on people's

18   convenience, myself and then the people I'm working with.

19   Q.    Turning your attention to the matter that brings you here

20   today, at some point were you assigned in connection with Mr.

21   Donovan?

22   A.    Yes.

23   Q.    Approximately when was that?

24   A.    I've been assigned Mr. Donovan since 2018.

25   Q.    And have you been his, for lack of a better term, sort of

1    sole probation officer or officer during that time since 2018?

2    A.   Yes, yes.

3    Q.   Approximately how many times would you say you've

4    interacted with him in person over that time?

5    A.   Between 25 and 30 times.

6    Q.   Do you see him in the courtroom here today?

7    A.   Yes, I do.

8    Q.   Could I ask you to describe him by an item of clothing

9    he's wearing?

10   A.   Yes.  He's the gentleman raising his hand with the mask

11   there.

12   Q.   Thank you.

13          MR. ROMBEAU:  Your Honor, we ask the record reflect

14   that the witness --

15          THE COURT:  Yes, it shall reflect that Mr. Donovan was

16   happy to raise his hand.  He's not making any secret of who he

17   is.

18          MR. ROMBEAU:  Thank you, your Honor.  We always just

19   want to make sure we don't forget.

20          THE COURT:  All right.

21   Q.   And in the time that you've known Mr. Donovan where has he

22   lived?

23   A.   He's lived at his residence in Wilmot, New Hampshire.

24   Q.   And is that going back to 2018 --

25   A.   Yes.

64

1    Q.    -- the entirety of your time knowing him?

2    A.    Off and on, yup.

3    Q.    And we've already heard a little bit of testimony about

4    the property there, but could I ask you to describe what

5    location he resides at in Wilmot?

6    A.    It's a large property, consists of primarily three

7    structures.  The first is a single-family home.  It almost

8    looks like an old farm home.  Off to the home approximately 25

9    to 30 yards, kind of perpendicular to the street he lives on,

10   is a garage with a furnished apartment included in that garage.

11   It's, I believe, a two-car garage.  There's a driveway, paved

12   driveway, that leads to a dirt driveway, which runs diagonal

13   back from the garage, which leads to a large metal structure,

14   metal barn workshop, or I was always told it was a

15   tractor-trailer garage.

16   Q.    Over the years have you personally visited that property?

17   A.    I have.

18   Q.    About how many times, if you know?

19   A.    Approximately 12 to 15.

20         MR. ROMBEAU:  Okay.  And if we could just pull up

21   exhibit -- let me just double check to make sure it's in --

22   322, yes, that's a full exhibit.  Ms. Shedd, Exhibit 322.

23   Q.    It should appear in a moment on the screen in front of

24   you, sir.  I'll represent to you, sir, this has already been

25   admitted into evidence, but do you generally recognize what

1    we're looking at here in Exhibit 322?

2    A.    I do.

3          MR. ROMBEAU:  Okay.  And could we zoom in, possibly?

4    Okay.  Thank you.

5    Q.    And can you describe for the jury what you're looking at

6    here?

7    A.    It's pretty much the property I just described.  It's Mr.

8    Donovan's property.  That's where I'm known to visit him.

9    Q.    Okay.  The particular location on the property, what was

10   the particular location on the property that you understood Mr.

11   Donovan to be residing in?

12   A.    The 31 New Hampshire Route 4A.

13   Q.    And is that that garage apartment building that you

14   referenced a few moments ago?

15   A.    That's correct.

16   Q.    Did you have an understanding as to who was living in the

17   main house or sort of main property house, for lack of a better

18   term?

19   A.    Yes.  Yup.  I assume you're referring to the single-family

20   home.

21   Q.    Thank you for correcting me on it.  Single family home.

22   Who did you understand to be living there?

23   A.    I know it was his mother and his sister.  I know them to

24   reside there in that building.

25   Q.    And did anyone share the apartment with Mr. Donovan in the

1  time you've known him?

2  A.   Yes.  His girlfriend, Kelley.

3  Q.   And when did Kelley join him on the property, if you know?

4  A.   Roughly in the fall of 2020.

5  Q.   Was there a girlfriend who lived there prior to Kelley?

6  A.   There was.

7  Q.   And what was her name?

8  A.   Courtney Donahue.

9  Q.   And, obviously, there are personal details about the

10  individual, who they're dating, or who's living with them.  Was

11  it, in part, your business to know these things?

12  A.   Yes, it was.

13  Q.   Over the time you've known him did you ever enter -- I

14  guess we'll start with the single-family house.  Did you ever

15  enter that house where mom and sister resided?

16  A.   I did one time.

17  Q.   And what about the apartment or garage?

18  A.   Approximately 10 to 15 times.

19  Q.   Okay.  And then what about the barn or workshop property

20  kind of on the bottom of the screen?

21  A.   Around four to five times.

22  Q.   Okay.  So, why don't we focus on those four to five times,

23  the times visiting the barn and workshop.  Can you describe

24  generally what that space or building was?

25  A.   The space appeared to be used for a lot of different ways.

1  The first time I inspected it, it was large, open, it was very

2  spacious, there wasn't a lot of property in there.  It looked

3  like it had been used for various projects.  There was also

4  projects going on outside of it, it looked like.  There was

5  some livestock, ducks, horses, vehicles that were parked

6  outside, abandoned.  And then inside, as I said, it seemed to

7  be used a lot more for storage as well for a lot of property

8  like outdoor, rural.

9  Q.   And over the time of your visits did more stuff end up

10  inside?

11  A.   Yes.

12  Q.   Okay.  And when was the last time prior to -- we'll talk

13  about March 26 in a little bit, but prior to that point when

14  was the last time that you had been in the barn?

15  A.   The last time I poked my head in the barn was February

16  11th of that year.

17  Q.   Of that year.  Do you mean this year, 2021?

18  A.   Yeah, excuse me.  2021.  Correct.

19  Q.   Okay.  Can you tell the jury about the circumstances that

20  led to that visit?

21  A.   I can.  I was visiting or I had scheduled a visit to meet

22  with Mr. Donovan at that residence.  He agreed to be there.  He

23  wasn't there when I went to go visit him on that date.  Part of

24  my inspection was to see him or to walk back there and see if

25  he was present, because sometimes he had been known to work

1    back there, and I've had contact with him back there.  So, I

2    had walked back there.  There's a regular door that goes into

3    the garage right as you walk up to that structure, and I opened

4    it, and then, when I opened it, it creates light in there.  It

5    looked like no one had been in there.  Called out his name a

6    few times, and he wasn't there.  So, that was the last time I

7    was in there.

8    Q.   And did you make any observations about sort of the state

9    of the inside of the barn while you were there?

10   A.   It was much more cluttered and busy than I had noticed

11   before.

12   Q.   And when you were on the property that day in February why

13   did you go to the barn to look for Mr. Donovan?

14   A.   He indicated he would be there to -- we agreed to be -- or

15   he knew I was going to be at the property to see him on that

16   morning of February 11th, and he wasn't present or I couldn't

17   locate him, so one of my ways to try to locate him was to visit

18   the barn in the back.

19   Q.   In your prior visits when Mr. Donovan had been there, had

20   he ever invited you to come to the barn?

21   A.   He had, yeah.

22   Q.   Was that an occasional occurrence, a regular occurrence or

23   something else?

24   A.   A regular occurrence.  Sometimes I would not take him up

25   on it.  Sometimes I would, though.

1    Q.   And you mentioned a few moments ago about your contact

2    with him prior to your visit in February.  Would you typically

3    let him know in advance if you were coming to visit?

4    A.   Yes.

5    Q.   And why is that?

6    A.   He lived in a rural area.  I would want to make sure that

7    my contact with him was productive, make sure that he was there

8    at home.  That's the primary reason.

9    Q.   And is that the process you followed in February of this

10   year, when he was not present?

11   A.   Yeah.  I had made that arrangement the night before.

12   Q.   Was anyone else in the barn when you went in?

13   A.   No.

14   Q.   In your time on the property, in your visits over the

15   years, did you ever observe a green Jeep?

16   A.   Yes.

17   Q.   Can you tell the jury about that?  Is that something you

18   would regularly see?

19   A.   I can't recall seeing it there all the time, but there was

20   -- on occasion I would see the Jeep there.  There was one

21   specific time where I did see the Jeep parked outside his front

22   door.  I specifically remember having a conversation about the

23   Jeep, him tinkering with the Jeep or working on it.  It was

24   something we kind of, when we were having a conversation I was

25   leaning on or when I was engaging or writing stuff down and

1  possibly using the hood of the car, the hood of the Jeep,

2  excuse me.

3  Q.   And during these visits would you typically meet with him

4  inside a structure or outside or just varied?

5  A.   Pre-pandemic mostly inside.  I'd want to inspect things.

6  But, you know, post-pandemic or during the pandemic mostly

7  outside.

8  Q.   And so, you mentioned seeing the Jeep on a number of

9  occasions.  Did you have any understanding as to whose Jeep it

10  was?

11  A.   It was my understanding it was his, it was Mr. Donovan's.

12  Q.   I think you mentioned a few moments ago some animals on

13  the property.  Do you know Mr. Donovan to keep any livestock or

14  other animals?

15  A.   Yes.

16  Q.   What kind of animals?

17  A.   I know there were horses.  I know there was ducks.  That's

18  all I can recall.

19  Q.   All right.  Would the animals be an occasional topic of

20  conversation during your visits?

21  A.   Yeah.

22  Q.   Did he ever mention any problems to you about predators

23  going after the animals?

24  A.   Not that I recall.

25  Q.   Shifting your focus, Probation Officer Merna, to March 26

1    of this year, the jury's already heard about the execution of a

2    search warrant.  Were you notified in advance that a warrant

3    was going to be executed that day?

4    A.    I was.

5    Q.    And did you make your way over to the property at some

6    point during that day?

7    A.    Yes.

8    Q.    And, generally speaking, why would you be there as a

9    probation officer?

10   A.    I wanted to see if they discovered anything that would

11   constitute a violation of his supervised release conditions.

12   Q.    Okay.  And were you part of any sort of search by

13   investigators from ATF or folks working with ATF that actually

14   searched locations in executing the search warrant?

15   A.    No, I was not.

16   Q.    Okay.  And while on site that day did you go in the barn

17   workshop area?

18   A.    Yes.

19   Q.    While in the barn workshop area did you observe any

20   compound bows of any kind?

21   A.    Yes.

22   Q.    At a later date did Mr. Donovan send you a message stating

23   those compound bows were his or belonged to him?

24   A.    Can you ask that again?

25   Q.    At a later date, so we're talking about March 26 --

1    A.    Okay.

2    Q.    -- you made this observation.  At a later date did Mr.

3    Donovan send you a message or communicate to you that those

4    bows in the barn were his?

5    A.    Yes.  Yes, he did.

6    Q.    You mentioned earlier that Mr. Donovan was residing with

7    Ms. Finnegan at least going back to some point in 2020.  Did

8    you ever meet Ms. Finnegan?

9    A.    I did.

10   Q.    And, again, generally speaking, do you recall any of the

11   circumstances of that meeting?

12   A.    I do.  It was in January of this year, earlier this year,

13   2021.  I was meeting with Mr. Donovan inside of his home.  I

14   had collected a drug test.  I inquired with her, you know, just

15   how she was doing, how she was feeling.  She looked a little

16   sick.

17   Q.    And so, I won't ask any further questions of her.  You did

18   mention a drug test.  Is that just a routine part of all

19   individuals required for supervision?

20   A.    Yes.

21   Q.    At any point in your interactions with Mr. Donovan did he

22   ask you if Ms. Finnegan could keep a firearm on the premises?

23   A.    Never.

24   Q.    At any point did Mr. Donovan ask you if anyone else

25   residing in the main house, his mom or sister, could keep a

73

```
 1   firearm on the premises?

 2   A.    No.

 3   Q.    And at any point did Mr. Donovan ask if Ms. Finnegan could

 4   keep any ammunition anywhere on the premises?

 5   A.    No.

 6   Q.    Did he ask any of those questions about anyone else,

 7   including his mom or his sister, about keeping ammunition on

 8   the premises?

 9   A.    No.

10   Q.    If he had raised a question about Ms. Finnegan having a

11   firearm, what would your response have been?

12   A.    I'd want to have a conversation with her to find out how

13   she planned to, you know, secure it so it's, you know, he

14   wouldn't have possession over it or he couldn't be -- there

15   wouldn't be misperceptions of him having possession of it.

16   Q.    And no such conversation ever took place here; is that

17   right?

18   A.    No.

19          MR. ROMBEAU:  I have nothing further, your Honor.

20   Thank you.

21          THE COURT:  Thank you.

22          Cross-examination.

23                        CROSS-EXAMINATION

24   BY MR. STACHOWSKE:

25   Q.    Hi, Tim.
```

74

1   A.   Good afternoon.

2   Q.   How are you?

3   A.   Great.

4   Q.   I'll pick up where the government left off.  You would

5   want to have a conversation with hypothetically Kelley if she

6   wanted to possess a firearm.  What would you want to talk with

7   her about?

8   A.   How she planned to keep it, what was it used for, why was

9   it necessary.  You know, I know she was dating Corey, so I'd

10  wanted to make sure he was protected from not having, you know,

11  possession of it, making sure that he couldn't be misconstrued

12  to having possession of it.

13  Q.   Okay.  So, you would not be opposed to her possessing a

14  firearm, would you?

15  A.   No.

16  Q.   Why not?

17  A.   Well, it depends on how she possessed it, you know?  If

18  she possessed it in the correct manner, then, you know, that

19  would potentially -- appeared law abiding, I would have to go

20  along with that.

21  Q.   There's no lawful reason why she could not possess a

22  firearm?

23  A.   Correct.

24  Q.   All right.  In the three years that you've worked with Mr.

25  Donovan you've never seen any firearms, correct?

1   A.   No.

2   Q.   And you've never seen any -- you've never seen my client

3   holding, possessing any firearms, actually possessing them?

4   A.   Correct.

5   Q.   You've never seen any firearms on the property, have you?

6   A.   When I've been on the property?

7   Q.   Correct.

8   A.   Right.  I've never seen them when I've been there.

9   Q.   You said you visited the property 12 to 15 times.  Is that

10  over the course of three years?

11  A.   Yes.

12  Q.   That comes out to about quarterly?

13  A.   Sometimes he was incarcerated.  Between those and the last

14  three years.

15  Q.   And how many interactions have you had with Kelley

16  Finnegan?

17  A.   Face-to-face, one time.

18  Q.   Just the one time?

19  A.   Just one time.

20  Q.   And in your dealings with Mr. Donovan he's always been

21  honest with you and up front with you?

22  A.   I believe so.

23  Q.   And you've tried to respect that and be up front with him?

24  A.   Correct.

25  Q.   And on occasion you've seen pocketknives or similar items

```
 1    at his residence, and you've discussed that with him, correct?

 2    A.    Yes.  Yes.

 3    Q.    And he's never hidden those items from you, correct?

 4    A.    No.

 5    Q.    He's always been up front with you regarding --

 6    A.    Yes.

 7    Q.    -- regarding his possession of whatever he may have?

 8    A.    Yes.

 9    Q.    This is a rural area?

10    A.    Yes.

11    Q.    Do you recall my client ever directly or indirectly

12    discussing coyotes, or wildlife, or predators?

13    A.    I don't believe so.

14    Q.    And that in this rural area you've got his farm, his

15    mother's farm, correct?

16    A.    Correct.

17    Q.    All right.  And in this February incident that you're

18    referring to where you went to the house and you poked your

19    head into the barn --

20    A.    Yes.

21    Q.    -- on that occasion you subsequently learned that my

22    client was up at another farmhouse, correct?

23    A.    That's what I was told.  Yes.

24    Q.    So, it's a farming area.  Yes?

25    A.    There's a field across the street.
```

1    Q.   Well, you were shaking your head.

2    A.   I would call it an old farming area, yeah.  Yeah, I guess

3    you could call it a farm.  I'm not an expert farmer, but I'll

4    go along with that and say it's a farm.

5    Q.   How many times have you been in the barn?

6    A.   Four or five.

7    Q.   All right.  In three years?

8    A.   Yes.

9    Q.   And, as his probation officer, had you observed anything

10   that concerned you, you would have brought it to his attention

11   or taken a step further than that and filed something against

12   him, correct?

13   A.   I've had discussions with him about certain things, but I

14   didn't feel it was necessary to file anything.

15          MR. STACHOWSKE:  That's all I have, your Honor.

16          THE COURT:  Thank you.

17          Redirect?

18          MR. ROMBEAU:  Very briefly, your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. ROMBEAU:

21   Q.   Officer Merna, you were asked a few questions on

22   cross-examination about knives and such on the property.  Was

23   Mr. Donovan prohibited under federal law from possessing

24   knives, to the best of your knowledge?

25   A.   I believe the phrase is "possession of dangerous weapons

1   that can inflict serious bodily injury."

2   Q.   And there were some questions about whether he was honest

3   and up front with you.  Just so the record's clear, did Mr.

4   Donovan ever disclose that there was a firearm and ammunition

5   on the property at any point?

6   A.   Never.

7          MR. ROMBEAU:  Nothing further.  Thank you, your Honor.

8          THE COURT:  All right.  Thank you, sir.  You can step

9   down.

10              (Witness stepped down)

11          THE COURT:  Do you have someone else we can call and

12   complete?

13          MR. ROMBEAU:  I believe so, your Honor.  We would call

14   Officer Jacob Hubbard.

15          THE COURT:  All right.  Come on up here, sir, on this

16   side, and the case manager will give you directions.  So, just

17   stand right over there for a minute.

18          THE CLERK:  Please raise your right hand.

19          **JACOB HUBBARD**, having been duly sworn by the Clerk,

20   was examined and testified as follows:

21          THE CLERK:  Thank you.  Please state your full name

22   and spell your last name.

23          THE WITNESS:  It's Jacob Hubbard, H-u-b-b-a-r-d.

24          THE CLERK:  Thank you.

25

```
 1                     DIRECT EXAMINATION

 2    BY MR. ROMBEAU:

 3    Q.   Good afternoon, Officer.

 4         THE COURT:  You can take your mask off while

 5    testifying.

 6    Q.   Could you start by telling the jury and the Court how

 7    you're currently employed?

 8    A.   I'm employed by the Andover, New Hampshire Police

 9    Department.

10    Q.   And approximately how large is the Andover Police

11    Department?

12    A.   We employ two full-time officers, myself included, and one

13    part-time officer.

14    Q.   And for those of us who failed New Hampshire geography,

15    where is Andover in relation to Wilmot?

16    A.   It's directly east.  It abuts it.

17    Q.   Okay.  I want to ask if you are generally familiar with a

18    June 2019 interaction involving Mr. Donovan and his green Jeep

19    Wrangler.

20    A.   I am.

21    Q.   And did this take place in Andover, New Hampshire?

22    A.   It did.

23    Q.   And do you know if anyone was with Mr. Donovan on that day

24    in June of 2019?

25    A.   Yes.
```

1    Q.   And who was that?

2    A.   Courtney Donahue.

3    Q.   Were you on the scene that day yourself?

4    A.   I was not.

5    Q.   And were you later involved in the processing of the green

6    Jeep Wrangler after it had been taken to Franklin Police

7    Department for execution of a search warrant?

8    A.   I was.

9    Q.   Okay.  Who were you working with that day?

10    A.   Chief Mahoney.  He's the Chief of Police in Andover.

11    Q.   And does that make him the other half of the Andover

12    Police Department?

13    A.   Correct.  Yes.

14    Q.   And did you assist Chief Mahoney in tagging items seized

15    from the Jeep that day?

16    A.   I did, yes.

17         MR. ROMBEAU:  Could I show just for the witness,

18    please, Exhibit 117, just for the witness.  Thank you.

19    Q.   Officer Hubbard, do you recognize what's on the screen in

20    front of you that's been marked for identification purposes as

21    Exhibit 117?

22    A.   I do, yes.

23    Q.   And what is it?

24    A.   It's a scope for a gun.

25    Q.   Okay.  And there is some writing on the board there.  What

```
 1    is that writing?
 2    A.    That's an Andover case filing number for the incident.
 3    Q.    All right.  And do you recognize this in connection with
 4    being taken from the green Jeep Wrangler that we were talking
 5    about a few minutes ago?
 6    A.    I do, yes.
 7    Q.    Can you tell us --
 8          MR. ROMBEAU:  Well, before I do that, the government
 9    would move to strike the ID and publish this as a full exhibit
10    to the jury, your Honor.
11          MR. STACHOWSKE:  I believe it's already an exhibit.
12          THE COURT:  All right.  In any event, it's admitted
13    without objection.
14          MR. STACHOWSKE:  No objection.
15      (Government's Exhibit No. 117 admitted into evidence)
16    Q.    It's now, it's up in the screen in front of the jury,
17    Officer Hubbard.  Could I have you explain sort of what the
18    lettering or numbering means?  That JPM 27J.  What does that
19    mean?
20    A.    So, JPM, JPM being the initials of Joseph Patrick Mahoney,
21    he was the person who seized it; and 27J is its corresponding
22    Andover Police Department evidence number.
23    Q.    And why is a particular number assigned to something,
24    generally speaking?
25    A.    Generally speaking, it's so it can be tracked and, you
```

```
1    know, appropriately cared for while it's in our custody.

2           MR. ROMBEAU:  Okay.  Just for the witness could we

3    pull up Exhibit 116, please.

4    Q.   Do you recognize what's on the screen in front of you

5    here, Officer Hubbard?

6    A.   I do.

7    Q.   And what is it?

8    A.   It's another piece of evidence related to that case, and

9    it is a gun cleaning kit.

10   Q.   And was this seized from the green Jeep Wrangler in 2019?

11   A.   Yes, it was.

12          MR. ROMBEAU:  Okay.  Move to strike the ID and publish

13   116 to the jury, your Honor.

14          MR. STACHOWSKE:  Your Honor, we've already addressed

15   the issue, and the Court's already given a ruling.  Just note

16   my objection.

17          THE COURT:  Yes.  Subject to the prior objection,

18   which I overruled, it can be admitted.

19      (Government's Exhibit No. 116 admitted into evidence)

20          MR. STACHOWSKE:  And that's with respect to 115 and

21   116?

22          THE COURT:  Yes.

23          MR. STACHOWSKE:  Thank you.

24   Q.   And just, now it's up on the screen for the jury to see,

25   Officer Hubbard, can you generally describe the contents of
```

1    what's depicted here?

2    A.   Yup.  So, there's a rod that you would use to clean the

3    barrel of a rifle or pistol, some I guess you would call them

4    sponges, like a felt material that would clean the debris out

5    of a barrel as well as two canisters of oil.

6    Q.   And, again, there's a notation here.  What does that mean?

7    A.   So, just like 117, this is an Andover evidence filing

8    number that would correspond with that case.

9    Q.   All right.  Turning your attention to 2020, did you have a

10    direct interaction with Mr. Donovan about these two items we've

11    just looked at pictures of?

12    A.   I did, yes.

13    Q.   Can you tell the jury about that?  What was your

14    interaction with him in regards to?

15    A.   Yeah.  It was June 19th, 2020.  It was around 7:00 p.m. in

16    the afternoon, and per my chief I was going to release those

17    two items as well as a series of other items back to Corey

18    Donovan, as the Andover Police Department no longer needed to

19    hold them.

20    Q.   And in connection with that return of items does the

21    Andover Police Department have any forms that you have to fill

22    out?

23    A.   It does, yes.

24    Q.   Tell us about that.  What do you have to fill out?

25    A.   So, we, as a department, any time we take anything from a

1    search warrant we would fill out a standard form, and that's

2    just, you know, we give it to the people that we seize the

3    evidence from or are releasing it back to, and it's just

4    standard for recordkeeping.

5    Q.    I believe we have -- I'm going to show you what's been

6    marked for identification purposes only as Exhibit 115.  Could

7    you take a look at that.  Don't show it to the jury yet, but

8    just take a look and let me know when you're ready.

9    A.    Yup.

10   Q.    And what are you looking at there that's been marked as

11   Exhibit 115?

12   A.    I'm looking at that form I previously described.

13   Q.    And do you recognize your name or signature on that form?

14   A.    I do, yes.

15   Q.    Okay.  And do you recognize the name or signature of Mr.

16   Donovan?

17   A.    Yes.

18   Q.    And did Mr. Donovan, in fact, sign that form?

19   A.    He did, yes.

20          MR. ROMBEAU:  Your Honor, we would move to strike the

21   ID and publish Exhibit 115 to the jury.

22          MR. STACHOWSKE:  Subject to the same objection.

23          THE COURT:  Subject to the prior objection, it's

24   overruled, and it's admitted.

25          (Government's Exhibit No. 115 admitted into evidence)

```
1              MR. ROMBEAU:  Can we pull up 115 for everyone?  Okay.

2    Q.    And is this, like all good government forms, Officer, is

3    this one of the sort of triplicate, multicolored-type forms?

4    A.    Yes, it is.

5    Q.    So, the hard copy you have in front of you, what color is

6    that?

7    A.    This is a yellow copy.

8    Q.    Okay.  And is that the copy that's kept for Andover Police

9    records?

10   A.    This is the copy that would be kept for Andover Police

11   records, yes.

12   Q.    And there are a number of items listed here.  Did you

13   review the actual items themselves prior to them being

14   delivered to Mr. Donovan?

15   A.    I did.

16   Q.    Okay.  And did you make sure that the items that were

17   provided to Mr. Donovan were also listed on this form here?

18   A.    Yes.

19   Q.    And the two items that we looked at a few moments ago, the

20   scope and the gun cleaning kit, are those identified on the

21   form here at 115?

22   A.    They are, yes.

23   Q.    And do you recall providing those items to Mr. Donovan

24   back in 2020?

25   A.    I do.
```

1　　Q.　Okay.  Now, Officer Hubbard, last week did you have a

2　　chance to come view certain items seized in connection with

3　　this case in March 2021 following the execution of a search

4　　warrant in Wilmot, New Hampshire?

5　　A.　I did, yes.

6　　Q.　Was that at the U.S. Attorney's Office next door?

7　　A.　It was.

8　　Q.　Okay.  I'm going to show you what has been marked and

9　　admitted into evidence as Exhibit 109c and 109d.  Take a moment

10　　to look those over, sir.

11　　　　　MR. STACHOWSKE:  You said 109c and d?

12　　　　　MR. ROMBEAU:  Yes.

13　　Q.　Could I ask you, Officer Hubbard --

14　　　　　MR. ROMBEAU:  And can we pull up Exhibit 116, please,

15　　for the screen?

16　　Q.　And, Officer Hubbard, can I ask you are the materials that

17　　you see in 109c and 109d consistent with the materials marked

18　　as Exhibit 116 that you returned to Mr. Donovan in 2020?

19　　A.　It's a different casing, but, yes, the contents are

20　　otherwise the same.

21　　Q.　Okay.  Can I have you describe how you've reached that

22　　conclusion that they appear to be the same materials?

23　　A.　They're the exact same branded gun oils.  It contains the

24　　same tube, cloth, tips.  This separate one in this separate bag

25　　is the same rod that's contained in that (indicating).

87

1    Q.   All right.  Let me take those away from you.

2         Officer Hubbard, I want to show you what's been marked

3    and admitted as Exhibit 103.  Can you open that bag, sir, and

4    take a look at the contents inside?

5    A.   (Witness complied).

6    Q.   Do you recognize that item that's been admitted into

7    evidence as Exhibit 103?

8    A.   I do.

9    Q.   And what is it?

10   A.   It's the same item that was released by me in June of last

11   year.

12        MR. ROMBEAU:  Okay.  And could we pull up Exhibit 117,

13   please, on the big screen.

14   Q.   And, as you look at that scope, are there any identifying

15   markings on it, on the actual piece of evidence in front of

16   you, on 103?

17   A.   Yes, there are.  In silver Sharpie there's the same

18   Andover Police filing number on the side of the scope as is in

19   that picture on that yellow paper.

20   Q.   And, obviously, there's no visible markings on the scope

21   depicted in 117.  If you were to orient it in the way that it's

22   depicted in the picture would you be able to see the markings

23   in that way?

24   A.   No, you would not.

25   Q.   And was it the practice of the Andover police to

1    physically mark exhibits in the fashion that this has with the

2    actual exhibit number written on it?

3    A.   Yes.

4    Q.   And so, as you sit here, is that the same scope that you

5    seized from the green Jeep in 2019 and returned to Mr. Donovan

6    in 2020?

7    A.   It is.

8    Q.   Okay.  Finally, Officer, speaking of the green Jeep, have

9    you ever just made any general observations or seen the green

10   Jeep being driven throughout the community?

11   A.   I had, yes.

12   Q.   Can you just ballpark for us the number of times you may

13   have seen the Jeep?

14   A.   It was around 20 times.

15   Q.   Okay.  And have you made any observations as to who was

16   driving it?

17   A.   Yes.

18   Q.   And who was that?

19   A.   Corey Donovan.

20            MR. STACHOWSKE:  Objection, your Honor.

21            THE COURT:  Basis?

22            MR. STACHOWSKE:  Foundation, timing.

23            THE COURT:  Overruled.  You can cross-examine on

24   timing.

25   Q.   You can answer, sir, about any observations you've made

1    about who's driving it.

2    A.    Corey Donovan.

3    Q.    And just so we're clear, what's the approximate time frame

4    you've made these number of observations about the driving of

5    the vehicle?

6    A.    It was in the following months after I released the

7    evidence as well as before.  So, it was around that same, a

8    month-long window, roughly.

9    Q.    So, we're talking 2020?

10   A.    Right.

11   Q.    Okay.

12   A.    Around the June-July period of 2020.

13   Q.    And what about more recently as we get into 2021?  Had you

14   observed it?

15   A.    No.

16            MR. ROMBEAU:  I have nothing further, your Honor.

17   Thank you.

18            THE COURT:  Thank you.

19            Cross-examination?

20            MR. STACHOWSKE:  I just have a couple of questions.

21                      CROSS-EXAMINATION

22   BY MR. STACHOWSKE:

23   Q.    Good afternoon, sir.  With respect to the cleaning kit,

24   can you just pick that up?  Do you have the cleaning kit in

25   front of you?

```
1    A.   I don't anymore.

2    Q.   Okay.

3               (Counsel conferred off the record)

4          MR. STACHOWSKE:   Could I approach the witness, your

5    Honor?

6          THE COURT:   Yes.

7          MR. STACHOWSKE:   Thank you.

8    Q.   Sir, I'm going to show you -- can you read that?

9    A.   Can I read what?

10   Q.   The ID number.

11   A.   Yup.  It says 109d.

12   Q.   All right.  109d.  And there's 109c.  Who's the

13   manufacturer of the cleaning kit?  Hoppe's?

14   A.   Hoppe's, yes.

15   Q.   And it's your testimony that the property you returned to

16   my client is the same property that the government's suggesting

17   was found in my client's property.  That property was seized in

18   2019, correct?

19   A.   Yes.

20   Q.   All right.  As you sit here today, how sure can you be

21   that those are one in the same items?

22   A.   The wear on them is consistent.  They're obviously not in

23   the same container that they were seized by the Andover Police

24   and then released in.  The components themselves are nearly

25   identical.  Ultimately, you know, it's a thing that was
```

 1    probably manufactured thousands of times, but the wear on this

 2    is consistent, and the pieces are consistent with what we

 3    seized.

 4    Q.   All right.  So, quick search, Hoppe's cleaning kits

 5    available on Amazon?  You're shaking your head yes?  You're not

 6    surprised?

 7    A.   Yeah.  No, I'm not surprised.  I understand.  Yes.

 8    Q.   Dick's Sporting Goods?  Yes?

 9    A.   Yes.

10    Q.   All right.  And Walmart?

11    A.   Yep.

12    Q.   The list goes on.  So, essentially you're speculating as

13    to this being the same cleaning kit, correct?

14    A.   It's the same materials that are contained in the cleaning

15    kit that I released.

16    Q.   But that's all you can say?

17    A.   Yes.

18            MR. STACHOWSKE:  All right.  Nothing further.

19            THE COURT:  Thank you, sir.

20            Any redirect?

21            MR. ROMBEAU:  No, your Honor.

22            THE COURT:  Thank you, sir.  You can step down.

23            THE WITNESS:  Thank you, your Honor.

24            THE COURT:  I think we're at a good stopping point,

25    members of the jury.  We made some good progress today.  I

1    think, as far as I can determine, we're on schedule.

2              You can step right down, sir.  Thank you.

3                        (Witness stepped down)

4         THE COURT:  Please keep my general instructions in

5    mind.  Keep an open mind.  You haven't heard everything yet, so

6    you can't really make up your mind.  Don't discuss the case

7    with anybody.  Don't expose yourself to any discussions of the

8    case in the media.  Don't go on the Internet and try to do any

9    investigation or research.  No social media about the case now

10   until the case is over.  And have a good evening and come back

11   a little before 9:00.  We'll try to get going as close to 9:00

12   as we can.

13             Question.

14        THE JUROR:  Do we have to call again tomorrow morning?

15        THE COURT:  I think we're on schedule to complete, so

16   just come in.  If something should happen, we'll contact you.

17        THE CLERK:  I'll contact you guys if something should

18   happen.

19        THE COURT:  All right.

20        THE CLERK:  All rise.

21                  (The jury exited the courtroom)

22        THE COURT:  Please be seated.  All right.  So, from my

23   perspective, we've made good progress.  What does the

24   government have left?

25        MS. KRASINKSI:  I think we have two witnesses left,

```
1    your Honor, Agent Forte and Agent Kelsch, and then we have to

2    read the stipulations into the record.

3              THE COURT:  All right.  So, probably before lunch you

4    should be resting, right?

5              MS. KRASINKSI:  I can't anticipate the length of

6    cross.

7              THE COURT:  Yeah, okay.  I mean, he is the case agent,

8    so there might be longer cross, but we're certainly on track to

9    complete the government's case at some point tomorrow.

10             MS. KRASINKSI:  Yes, your Honor.

11             THE COURT:  Mr. Stachowske, you don't have to commit

12   to calling witnesses, but, other than your client, are you

13   currently anticipating calling witnesses?

14             MR. STACHOWSKE:  Your Honor, I'm happy to answer that

15   question.  I am still actively trying to resolve this issue

16   with Ms. Finnegan.  We have -- I'm in the process of

17   subpoenaing her.  Both myself and the government have made

18   strides towards reaching out to Attorney Kennedy.  It remains

19   unclear if Ms. Finnegan is going to comply with her attorney's

20   recommendation that she not testify, or she might testify on

21   her own.  Additionally, tonight I will brief the statement

22   against interest that we discussed earlier.

23             THE COURT:  All right.  So, if you have a witness

24   other than your client, it's going to be Ms. Finnegan?  Is that

25   what you're telling me?
```

1         MR. STACHOWSKE:  Yes, your Honor.  Those are my

2    witnesses.

3         THE COURT:  And what we currently know is that through

4    her counsel she's going to invoke her Fifth Amendment

5    privilege?

6         MR. STACHOWSKE:  That's his high, strong

7    recommendation.

8         THE COURT:  All right.  I thought it was more than

9    just his recommendation.  I thought it was her assertion that

10   she was going to, through him, that she was going to take the

11   Fifth.

12        MR. STACHOWSKE:  That was my understanding, but, as

13   with everything else in this case, subject to change.

14        THE COURT:  All right.  If you get her here and you

15   have any doubt about it, I'll question her out of the presence

16   of the jury to make sure that she is willing to testify.  If

17   she's willing to waive the privilege, then she can testify.

18   So, that's fine.  But if she invokes in front of me I'm not

19   going to put her in front of the jury merely for the purpose of

20   invoking in front of the jury for the reasons that I've said to

21   you.

22        MR. STACHOWSKE:  Yes, your Honor.

23        THE COURT:  We can also -- I can hear any argument

24   that you have about the statement against interest.  In the

25   event that she doesn't testify, you would want to try to get

1    that statement in.  You might want to get it in anyways, try to

2    get it in anyways, and I can make a ruling on that, and then,

3    other than that, it's just will your client testify or not.

4         MR. STACHOWSKE:  The subpoena includes a request that

5    she bring with her this video that my client's referred to

6    regarding a Christmas gift and the box the shotgun came in, and

7    we believe that we would present that to bolster her

8    credibility and trustworthiness as part of what are the

9    elements --

10        THE COURT:  Okay.  And if she does testify do you have

11   reason to expect she'd be able to identify how she came into

12   possession of the shotgun?

13        MR. STACHOWSKE:  I have been very cautious in my very

14   limited conversations with --

15        THE COURT:  You can't really have direct communication

16   with her.  You have to be acting through counsel.

17        MR. STACHOWSKE:  I struggle with that, because --

18        THE COURT:  Your client can have contact with her, if

19   she's willing to have contact with him, but where she's been

20   represented by counsel, unless she gives you permission to

21   speak with her without counsel, you would have to deal with her

22   through counsel.

23        MR. STACHOWSKE:  Yes, your Honor.

24        THE COURT:  All right.  So, what I guess I'm telling

25   you folks is there is at least a possibility that we will close

1    and instruct tomorrow, so you need to be ready for that.  I

2    will have a set of instructions for you tomorrow morning.  I'm

3    going to edit them tonight.  They are pretty much my

4    boilerplate instructions with the addition of the elements.

5    The elements I'm going to instruct on are the four elements

6    that are in the government's requested instruction.  As I'm

7    understanding it, we're getting stipulations as to three of

8    those four elements, and so we're really only dealing with the

9    instruction on knowing possession.  I've read you the

10   instruction, pretty much the instruction I intend to give on

11   possession, so you're not going to be surprised about that.

12   The instruction on knowing is the standard instruction on

13   knowing.  It won't be a surprise to any lawyer who's ever tried

14   a criminal case.

15         And other than that, I don't have any unusual

16   instructions, so I don't think I've gotten any from the parties

17   that are anything other than the usual set of instructions.

18         MS. KRASINKSI:  The only thing that the government

19   added to its proposed jury instructions in this case is,

20   because there are so many items charged, the jury is not

21   required to find that he possessed each and every one of them.

22         THE COURT:  Right.  I'm instructing that, although

23   when an indictment charges in the conjunctive the prosecution

24   can establish its case by proof in the disjunctive, so the

25   instruction effectively will be possession of the firearm or

1    any of the rounds of ammunition identified in the indictment

2    satisfies that element with respect to that particular piece of

3    ammunition and can -- or the firearm -- and can independently

4    support a conviction, but that they have to unanimously agree

5    on which one of those it is.

6         So, if the government has a different take on that

7    last point, you need to provide me with authority, because

8    otherwise I'm going to say they have to either unanimously

9    agree on the gun, unanimously agree on which round of

10   ammunition or ammunitions.  I don't think this is one of those

11   cases where six can think the gun and six can think the

12   ammunition but disagree with each other about that and still

13   have a guilty verdict.  There are some elements that you don't

14   require unanimity as to the item, but in my mind, and I haven't

15   done the research on this, so I'm open to being persuaded I'm

16   wrong, but in my mind, where you've charged a specified gun and

17   specified ammunition, that there has to be unanimity as to the

18   gun or a round of ammunition that is charged to support a

19   conviction.

20        MS. KRASINKSI:  I actually believe that unanimity is

21   not required, but if I'm not correct on that --

22        THE COURT:  It wasn't in your request for instruction,

23   so I didn't research it.  Again, it's your obligation to give

24   me what I need to do my work.  Okay?

25        MS. KRASINKSI:  Understood, your Honor.

1        THE COURT:  It's not my job to try to guess what the

2    lawyers might want and spend my time doing research to try to

3    answer it.  So, next time put it in your request.  But present

4    me with the authority tomorrow, and I'll do what the law

5    requires.  Okay?  I'm just not your research assistant.  Your

6    job is to help me, not my job to help you.  Do you understand?

7        MS. KRASINKSI:  I do understand.  Your Honor, there's

8    one additional thing I want to raise about Ms. Finnegan, should

9    she decide to testify, and that is in jail calls the advice

10   that she is receiving from Mr. Donovan is that she can testify

11   on direct but invoke on cross.

12       THE COURT:  No.  Her testimony would in all likelihood

13   be completely stricken if she were to do that.  Unless the

14   cross is on collateral matters, if she's crossed about the

15   subjects of her direct and tries to invoke, I'll strike her

16   whole testimony.

17       MS. KRASINKSI:  My request is that the Court advise

18   her of that beforehand so that she can make --

19       THE COURT:  Yeah.  I mean, it would be very damaging

20   for her, because her testimony would, in fact, be stricken, but

21   all of the testimony that she's giving that's inculpatory to

22   her can be used against her in a subsequent prosecution.  So,

23   that would be the worst of all possible worlds for her and her

24   boyfriend, because none of it would be usable for him, and all

25   of it would be usable in a subsequent prosecution of her.  I

99

1    can't imagine she would want to do that.  But if you're

2    concerned she's getting improper advice, hopefully Attorney

3    Kennedy will be here and can give her advice.  It's not my job

4    to be her attorney either.

5            MS. KRASINKSI:  I understand that, your Honor.

6            THE COURT:  I will advise her of her rights and the

7    consequences of false testimony or selective invocation, but

8    beyond that it's up to her and her lawyer to decide what to do,

9    not me.

10            MS. KRASINKSI:  Right.  Yes, your Honor.

11            THE COURT:  All right.  Anything else?  Okay.  See you

12    tomorrow.

13            THE CLERK:  All rise.

14        (WHEREUPON, the proceedings adjourned at 4:27 p.m.)

15

16

17

18

19

20

21

22

23

24

25

100

1                          C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13   Date: ___5/6/22              /s/ *Brenda K. Hancock*
                                  Brenda K. Hancock, RMR, CRR
14                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 12

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 8, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   1:21-cr-88-1-PB
              v.                  *   October 14, 2021
                                  *   9:09 a.m.
COREY DONOVAN                     *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 3
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

| | |
|---|---|
| For the Government: | Anna Z. Krasinski, AUSA<br>Charles L. Rombeau, AUSA<br>United States Attorney's Office |
| For the Defendant: | Matthew G. Stachowske, Esq.<br>Stachowske Law PLLC |
| Court Reporter: | Liza W. Dubois, RMR, CRR<br>Official Court Reporter<br>United States District Court<br>55 Pleasant Street<br>Concord, New Hampshire 03301<br>(603)225-1442 |

```
1                    I N D E X

2


3
     Witness                Direct   Cross   Redirect   Recross
4

5   John Forte

6      By Ms. Krasinski        5              93
       By Mr. Stachowske              65
7

8   Mattheu Kelsch

9      By Ms. Krasinski       96

10

11  Kelley Finnigan

12     By the Court          131

13

     Corey Donovan
14
       By Mr. Stachowske     162
15

16

17  Exhibits                        For ID              In Evd

18  Government's Exhibit 200                              34

19  Government's Exhibit 200a                             35

20  Government's Exhibit 200b                             35

21  Government's Exhibit 201                              34

22  Government's Exhibit 201a                             37

23  Government's Exhibit 201b                             37

24  Government's Exhibit 202                              34

25  Government's Exhibit 202a                             37
```

Exhibits Continued

| | |
|---|---|
| Government's Exhibit 202b | 37 |
| Government's Exhibit 203 | 34 |
| Government's Exhibit 203a | 37 |
| Government's Exhibit 203b | 37 |
| Government's Exhibit 204 | 34 |
| Government's Exhibit 204a | 37 |
| Government's Exhibit 204b | 37 |
| Government's Exhibit 205 | 34 |
| Government's Exhibit 205a | 37 |
| Government's Exhibit 206 | 38 |
| Government's Exhibit 206a | 39 |
| Government's Exhibit 207 | 38 |
| Government's Exhibit 209 | 34 |
| Government's Exhibit 209a | 37 |
| Government's Exhibit 209b | 37 |
| Government's Exhibit 500 | 107 |
| Government's Exhibit 501 | 107 |
| Government's Exhibit 501a | 107 |
| Government's Exhibit 501b | 108 |
| Government's Exhibit 501c | 108 |
| Government's Exhibit 502 | 108 |
| Government's Exhibit 502a | 108 |
| Government's Exhibit 502b | 108 |
| Government's Exhibit 502c | 108 |

<u>Exhibits Continued</u>

Government's Exhibit 502d                                    108

Government's Exhibit 502e                                    108

Government's Exhibit 502f                                    120

Government's Exhibit 502m                                    121

Government's Exhibit 502p                                    122

5

```
1                    P R O C E E D I N G S
2              THE CLERK:  Court is in session and has for
3    consideration jury trial day three, United States of America
4    vs. Corey Donovan, criminal case number 21-cr-88-1-PB.
5              THE COURT:  Good morning, members of the jury.  I'm
6    happy to report that we're on schedule, so we'll try to stick
7    to that and keep to my word about when we finish the case.
8              The government can call its next witness.
9              MS. KRASINSKI:  United States calls Special Agent
10   Forte.
11             JOHN FORTE, having been first duly sworn, testified
12   as follows:
13             THE CLERK:  Thank you.  Would you please be seated.
14             Please state your full name and spell your last name
15   for the record.
16             THE WITNESS:  John Forte, F-o-r-t-e.
17                      DIRECT EXAMINATION
18   BY MS. KRASINSKI:
19        Q.   Agent Forte, are you employed?
20        A.   I am.
21        Q.   Where?
22        A.   I am employed as a special agent with the Bureau of
23   Alcohol, Tobacco, Firearms, and Explosives, commonly known as
24   ATF.
25        Q.   How long have you worked for ATF?
```

```
 1          A.    Over 19 years.

 2          Q.    And what are your responsibilities at ATF?

 3          A.    The majority of the cases that I do involve illegal

 4   possession of firearms and explosives.

 5          Q.    And are you assigned to a particular location?

 6          A.    I am, to the Manchester, New Hampshire, field

 7   office.

 8          Q.    And how much of your career have you spent in the

 9   Manchester field office?

10          A.    18 of my 19 years.

11          Q.    Where was the first year?

12          A.    I was assigned to the city of Boston, where I spent

13   most of that first year at the academy.

14          Q.    Which brings me to my next question.  Can you

15   generally tell us about the training you received to become a

16   special agent?

17          A.    It's approximately three to three and a half months

18   for your first school, which is called CITP, or Criminal

19   Investigator Training Program, and that is run by the Federal

20   Law Enforcement Training Center down in Brunswick, Georgia.

21                And then you have to, once you complete that, go to

22   ATF add-on school which, again, roughly another three to three

23   and a half -- it's somewhere around seven months total.  And at

24   the time, that ATF add-on was called the New Professional

25   Training.
```

1      Q.    And do you have any specialty assignments?

2      A.    I have a few.  Initially I was a vault custodian for

3  approximately 15 years.  I am currently a firearms instructor

4  and then I also am an interstate nexus expert.

5      Q.    And can you very briefly describe to us what it

6  means to be a firearms instructor and what it means to be a

7  nexus examiner?

8      A.    So firearms instructors for ATF qualify the agents

9  four times a year.  Due to the small geographic nature of the

10  Boston Field Division, which is New England, there is an FIC,

11  firearms instructor coordinator, for the field division and he

12  will actually run the majority of the ranges.  I will qualify

13  somebody that misses one of those ranges or something to that

14  effect, but in larger geographic areas lots of times the

15  firearm instructor from that office will end up qualifying

16  everybody in that office.

17      Q.    And nexus examining?

18      A.    Nexus is proving that the firearms have traveled in

19  interstate or in foreign commerce, coming in from outside the

20  country of the United States into the United States.

21      Q.    Now, can you tell us how you got involved in the

22  investigation that brings us here today?

23      A.    I received information and obtained a search warrant

24  for the residence of Corey Donovan, the property which is owned

25  by his mother and his sister.

8

1     Q.    At the time that you received this information that
2  led you to get a warrant, were you familiar with Corey Donovan?
3     A.    I was.
4     Q.    And at that time, did you know that he was
5  prohibited from possessing firearms by virtue of a felony
6  conviction?
7     A.    I was.
8     Q.    When did you get the warrant?
9     A.    I obtained the warrant on March 24th, 2021.
10    Q.    And when was the warrant executed?
11    A.    March 26th, 2021.
12    Q.    Can you walk us through March 26th, 2021?  How did
13 the search happen?
14    A.    So at the initiation of the warrant, I was part of a
15 team of agents from my office plus some of the ATF special
16 deputies that were assigned to secure the residence which is
17 occupied by Vivian Hodgdon and Shanah Hodgdon, which is Corey's
18 mother and sister, to make sure that nobody from the residence
19 interfered with the Special Response Team's clearing of the
20 garage apartment and the barn workshop.
21    Q.    And when you were doing that, did you encounter
22 anyone at the residence?
23    A.    I did --
24    Q.    Who --
25    A.    -- yeah.

1      Q.    Who did you see?

2      A.    Vivian Hodgdon, which is Corey's mother, she came

3  out of the residence to see what was going on.

4            We were also -- when we were in position and right

5  before SRT initiated, it came over the radio that there was an

6  individual -- they could see a male individual inside the

7  residence that was on a couch and so we knew that there was a

8  male inside.  We didn't know what male that was.

9            So I asked Vivian when she came out and she said no,

10 it was Micah Donovan, which is Corey's brother.  We were not

11 aware Micah was at the residence.

12     Q.    And which residence was he in on the couch?

13     A.    Vivian and Shanah's -- the main house of the

14 property.

15     Q.    And was anyone in the garage apartment?

16     A.    No.

17     Q.    Was anyone in the barn?

18     A.    No.

19     Q.    Okay.  So you go, you're at the main house, you

20 interact with the defendant's mom and brother.  Without telling

21 me what anyone said, did you talk to any of them?

22     A.    Yes.

23     Q.    And then what happened?

24     A.    And then I -- I worked -- I was assigned to, you

25 know, handle the rest -- as the case agent, you are responsible

1    for kind of going back and forth and answering questions for

2    the search teams and whatnot.  So I kind of began that role of

3    looking at the initial locations and I'm, you know, working

4    through my supervisor to answer any of her questions and

5    concerns about people and what's on the property and as well as

6    trying to get the search team set up to start their locations

7    and begin the -- executing the actual search portion of the

8    search warrant.

9         Q.    And so sort of going back and forth, were you in the

10   apartment, the garage apartment that's Corey Donovan's?

11        A.    Yes, in and out of it multiple times.

12        Q.    And were you in and out of the sort of barn

13   workshop?

14        A.    Yes.

15        Q.    And just kind of going back and forth between the

16   two?

17        A.    Correct.

18        Q.    And then at some point during that did you decide

19   that you needed to get an additional warrant?

20        A.    I did.

21        Q.    So I guess before we get into that, what did the

22   warrant you have in the morning, what did it cover?

23        A.    So it covered -- due to the nature of the property,

24   knowing that the information that we had, we were -- we knew we

25   could only get a warrant to search the garage apartment that

1    Corey Donovan and his girlfriend, Kelley Finnigan, occupied as

2    well as that barn and workshop that was towards the rear of the

3    property.

4            And because of that limitedness, we had discussed

5    getting access to vehicles on the property, which is normally

6    what we do, but it was requested that we get there and find out

7    if there was -- see something else, a registration and be able

8    to run a plate to determine if the vehicle belonged to Corey

9    Donovan.

10        Q.    Did the initial warrant cover any cars?

11        A.    It covered the Toyota Matrix that Corey Donovan had

12    been operating recently.

13        Q.    So when you get to the property, is this Toyota

14    Matrix that is covered in the initial warrant, was it there?

15        A.    It was not.

16        Q.    Presumably somewhere with Corey Donovan elsewhere?

17        A.    Presumably, yes.

18        Q.    So there are all these other cars on the property.

19    You decide to get a warrant.  Why?

20        A.    I was notified by the search team members that there

21    was an ammo can, so it's like a military-style metal ammunition

22    can, and I was notified that that was sitting in a vehicle that

23    was nonfunctional, it appeared, at the time.  It had no

24    windows.

25            And so I -- I looked at that, okay, I noted next to

1   that there was a second vehicle, which was an older model Ford

2   Expedition, and the license -- we ran the license plate on that

3   and it had come back to Corey Donovan, but it had been expired

4   for a while.

5         Then there was a third vehicle right there.  And

6   those vehicles, too, are really close to that barn workshop,

7   one, two, three, right next to each other in the row.  That

8   third vehicle is a small black pickup truck, I believe it was a

9   Ford Ranger, had no visible license plates, and the VIN number

10   through the windshield, it couldn't be read.  It was like some

11   sort of rot or something to that effect, so we couldn't really

12   read it effectively, so we didn't really know who the vehicle

13   belonged to.

14         So I -- those three vehicles, plus -- and I knew --

15   I had seen while we were walking around over at the barn that

16   Corey's Jeep was there that I was familiar with.  So when I

17   walked up to that Jeep, the passenger side door was open.  So I

18   looked into the Jeep from the passenger side door and in the

19   center console I could see one round with what looked like

20   additional rounds next to it.

21         By that time we had already searched or were still

22   in the process of searching the barn, so I had seen bandoliers

23   of ammunition in that barn workshop.  So it looked like that

24   round was in a bandolier.  And so I could see that.

25         So I'm -- I then contacted the U.S. Attorney's

1    Office, explained what was going on with the search warrant at

2    that time, and I asked for a search warrant for those four

3    vehicles.  And we also determined we should probably add the

4    Matrix to that since it wasn't on the property.

5        Q.    So I want to break that down a bit.

6              First, can we look at Government's Exhibit 310,

7    which has already been admitted into evidence.

8              You were talking about seeing three vehicles really

9    close to the barn.  Is this what you're talking about?

10       A.    Yes.

11       Q.    And you mentioned that one of these was registered

12   to Corey Donovan although it had expired.  Which vehicle?

13       A.    The middle one, the white Ford Expedition.

14       Q.    And did you make any observations about the vehicle

15   with the ammo can other than the ammo can itself?

16       A.    I noted that it was not -- it appeared

17   nonfunctional.  I'm not sure, you know, whether the engine was

18   working or not, but it definitely didn't have front wheels.  I

19   believe it had rear wheels.  You can see it's got the orange

20   writing on it.  Well, the rear wheels, if I remember correctly,

21   had a -- had been spray-painted orange and roughly the same

22   type of wheels with spray-painted orange spray paint were on

23   the front of Vivian's car out front.  And it's the same exact

24   model as this car.  So I can assume maybe they purchased it for

25   parts for her car.

14

1      Q.   So just so that I'm clear, this Hyundai that's to,

2  in this picture, the right of the truck that's registered, was

3  registered to Corey Donovan, that's the same make and model of

4  Corey Donovan's mom's car?

5      A.   I believe so.  I can't tell you if the years match,

6  but I believe they were the same make and model.

7      Q.   And if I understood you correctly, it appeared to

8  you that some of the parts from the Hyundai that we see here in

9  Government's Exhibit 310 had been put on mom's car?

10     A.   Yeah, the wheels --

11     Q.   Okay.

12     A.   -- or at least the rims because they were

13 spray-painted orange as the ones were on the rear of that

14 vehicle.

15     Q.   Now, you said that you could see an ammunition can

16 in the Hyundai.

17          And I'm just going to pick up Government's

18 Exhibit 109.  Is this the ammunition can --

19     A.   Yes.

20     Q.   -- that you saw in that Hyundai?

21     A.   That is correct, yes.

22     Q.   Had you wanted to, could you have reached in and

23 grabbed it?

24     A.   Yes.

25     Q.   Now, let's go to the observations you talked about

15

1    in the Jeep.

2        You mentioned that you could see a round of

3    ammunition from the vantage point of the open passenger side

4    door, correct?

5        A.    Correct.

6        Q.    Do you remember whether or not you looked in through

7    the driver's side?

8        A.    I don't remember ever looking through the driver's

9    side on the vehicle.

10        Q.    Now, there was some discussion about this yesterday,

11    so can we take a look at Defense Exhibit 1, please.

12        What angle was this image taken from?

13        A.    That's from the driver's side.

14        Q.    Now, can -- is this where you saw the ammo from?

15        A.    No.

16        Q.    So were you standing on the other side where we see

17    the open door?

18        A.    Correct.

19        Q.    Can you see ammo from this side?

20        A.    I cannot.

21        Q.    But you could -- could you see it from the other

22    side?

23        A.    Yes.

24        Q.    Now, you mentioned you contacted the U.S. Attorney's

25    Office.  Walk us through the process of obtaining the warrant

16

1    once you did that.

2         A.    So basically when that happens, in this particular

3    case I contacted the United States Attorney's Office.  We

4    discussed what I had seen at the -- at the location and the

5    different cars and the reasons why we were looking to obtain

6    the warrant for those cars.  And they took that information,

7    they compiled -- wrote it out for me and sent it back to me for

8    full review.

9         Q.    And you said "we discussed."  Just to be clear, was

10   that me and you?

11        A.    No.

12        Q.    It was a different AUSA?

13        A.    That is correct.

14        Q.    Okay.  And so then what happened?

15        A.    So then a while later, I -- I'm sorry.

16              So I reviewed it quickly and then I said it was

17   fine.  And we ended up having to wait for the judge to sign off

18   for it, so we ended up waiting a bit for that to happen.

19        Q.    What did you do while you're waiting?

20        A.    Unfortunately, at that point we were done.  It was

21   done by the time I said it was okay and we just waited.

22   There's nothing you can do.  You just have to wait until the

23   judge has time to review it and call you and have you swear to

24   it and -- there's nothing you can do.

25        Q.    Now, when you look back at the affidavit that was

1    submitted for the warrant, it says in describing the Jeep that

2    you could see the ammo through the clear window of the Jeep.

3    Can you tell us that about that?

4        A.    So in my discussion about what we were looking to

5    search and what I was seeing, I explained that I was -- that

6    the door to the Jeep was open, the passenger side door to the

7    Jeep was open, that I did not know how that occurred.  I would

8    have assumed that it was done by the ATF Special Response Team

9    when they did the clearing because they would not -- it's

10   commonly a tactical practice to not just move past a vehicle

11   without clearing it as they would move back towards the barn

12   and securing the garage apartment.  And that was my assumption,

13   that they had opened it.  But they were already off scene, so I

14   could not ask them if that was the case.

15           And I stated -- I advised them that, you know, the

16   door's open, I can see the ammo, but if the door had been

17   closed, I would still be able to see it through the window,

18   through the -- you know, it's a soft top, so it's got like that

19   plastic window that I'd still be able to see it through that.

20           THE COURT:  When you say explained, this was you

21   explained to the Assistant U.S. Attorney who was drafting the

22   affidavit for you?

23           THE WITNESS:  That is correct.

24           THE COURT:  Okay.

25       Q.    And so when it says you could see it through the

```
 1   clear window, it should have said open door?
 2        A.   Yes.
 3        Q.   But either way, you could see ammo from standing
 4   outside the car?
 5        A.   Yes.
 6        Q.   And one last question about that.
 7             The affidavit also says that there was a green
 8   military-style ammunition can on the seat.
 9             And, I mean, we can -- let's pull up Government's
10   Exhibit 311, please.  Thank you very much.
11             Can you explain that to us?
12        A.   So due to the vehicle, whatever it was being used
13   for, whether it was racing or demolition derby or whatever, all
14   the other seats seemed to have been removed and all that's left
15   is the driver's seat.  So when I explained it, I explained that
16   it was sitting where the passenger seat -- front passenger seat
17   should be.
18        Q.   And -- but it was there, where the passenger seat
19   should be?
20        A.   That's correct.
21        Q.   Okay.  So you submit the affidavit, the application.
22   What happens?  You wait.  Then what?
23        A.   And then once we swore to it, then I was -- we were
24   cleared to search.  So at that point we then searched those
25   three vehicles and then the Jeep as well.
```

1    Q.    So walk us through your role in the search after you

2    were granted a warrant to search the vehicles.

3    A.    I believe I assisted -- I started on the black Ford

4    Ranger in the back.  I started there and then Detective

5    Campbell called me and told me, hey, I found a shotgun in the

6    Jeep.

7         So then I responded up to the front, towards the

8    front of the residence where the Jeep was, and I looked inside

9    and saw where the Jeep was located, where the shotgun was

10   located in the Jeep, and then they were photographing it and

11   then they were going to remove it.

12        And I was standing on the passenger side of the Jeep

13   and I thought, well, that's where the barrel is facing, I don't

14   know whether it's loaded or whether the safety's on, so I'm

15   going to step away.  So I ended up stepping away and letting

16   them remove it and clear it.

17   Q.    Ultimately, was there anything found in the Ford

18   Expedition that was registered to Corey Donovan?

19   A.    No.

20   Q.    What about the car that you started searching, the

21   black truck?

22   A.    No, none that I'm aware of.

23   Q.    But the gun was found in Corey Donovan's Jeep?

24   A.    Correct.  The shotgun, yes.

25   Q.    And the ammunition, where was that found -- excuse

1    me -- the ammo can?

2        A.    The ammo can was inside that -- that Hyundai that's

3    in the image here.

4        Q.    Now, I want to talk about some of the items that

5    were found in various places across the property, so I'm going

6    to take a minute and get a few exhibits for you that have

7    previously been admitted.

8            Those are going to be 100a, the barrel, and 109b.

9            May I approach the witness, your Honor?

10            THE COURT:  Yes.

11        Q.    Now, the barrel, Government's Exhibit 100a, do you

12    recall where that was seized from?

13        A.    That was seized from the barn workshop.  It was

14    laying in the open firearms case.

15        Q.    And what about Government's Exhibit 109b, the bag of

16    kind of accessories?

17        A.    That was inside the metal ammunition can that was

18    inside the Hyundai that we've spoken about that was right

19    outside the door there.

20        Q.    Now, can you give us a little detail about the items

21    that are actually in that bag, 109b?

22        A.    Sure.  The bag contains a few items here.  This

23    large black piece is a large cheek rest, so that goes on the

24    top of the stock and you lean your cheek on it, against the

25    stock.

1             There's an allen wrench in here.  There's also a

2     choke wrench.

3             And then you have this yellow plastic device.  From

4     the back side, you can kind of see that one of them is in there

5     that's to hold the choke tubes which goes into the buckshot and

6     birdshot barrel.  Choke tubes are a way for you to adjust the

7     pattern of the birdshot and the buckshot that comes out of the

8     barrel.

9             And there's, it looks, two choke tubes here and then

10    I believe there's one installed on the barrel already.

11            THE COURT:  Could you explain in a little more

12    detail for me what a choke tube is?

13            THE WITNESS:  Sure.

14            THE COURT:  I'm not clear about that.

15            THE WITNESS:  Sure.  This wrench that's here -- I'll

16    take it out.

17            So this wrench, let me show you here, can be used --

18    it's probably going to be hard to see, but there is these

19    smaller tubes that are the choke tubes that are small in

20    diameter and they actually fit inside the front portion of this

21    barrel.

22            And so this is the smooth barrel that doesn't have

23    any rifling and so the -- depending on which choke tube, it

24    adjusts the pattern of the spray --

25            THE COURT:  So it chokes the dispersion pattern of

22

```
 1    the birdshot by going in the end of the barrel.

 2              THE WITNESS:  That is correct.

 3              THE COURT:  Okay.

 4              THE WITNESS:  And they are removable and

 5    replaceable.

 6         Q.   Those choke tubes and that choke wrench, do they fit

 7    that particular barrel in your hands?  Do the choke tubes from

 8    109b go with Government's Exhibit 100a?

 9         A.   Yeah, that's correct.  I have done it before.  I'm

10    just double-checking it now.

11              Yeah, it fits and you can move and screw and unscrew

12    the choke tubes out of the barrel.  It takes a little bit

13    there.  Obviously for safety reasons they want them to be

14    secured in there and sit tight and not move around, so they --

15    as well as they want it flush or just under the edge of the

16    barrel.

17         Q.   And so for the record, what you've just done is

18    you've taken the choke tube wrench out of the bag marked

19    Government's 109b and you've used it to place it in the barrel

20    at 109a to actually manipulate the choke in the barrel that's

21    marked Government's Exhibit 109 -- or, excuse me, 100a?

22         A.   That's correct.

23         Q.   Now, are there any markings on that barrel?

24         A.   There are.

25         Q.   And what are those?
```

1          A.    On the left side of the barrel, it says chambered

2    for two-and-three-quarter and three-inch shells,

3    20-gauge-26-inch Accu-Choke.

4          Q.    And does it identify -- actually, what's -- what is

5    Accu-Choke?

6          A.    That's Mossberg's choke system.  That's their name

7    that they've provided the system for being able to remove and

8    interchange, really, replace those choke tubes.

9          Q.    And are there any markings that identify where that

10    barrel's from?

11          A.    On the right side of the barrel here it says:

12          Warning:  Before use, read owner's manual for safe

13    operation; free from 1001 Industrial Boulevard, Eagle Pass,

14    Texas, USA, 78852.

15          Q.    Eagle Pass, Texas.  Does that mean anything to you?

16          A.    It does.  So Mossberg has a subsidiary company

17    called Maverick Arms where they make additional firearms and

18    weapons there.  The address for Maverick Arms is 1001

19    Industrial Boulevard in Eagle Pass, Texas.

20          Q.    Now, I'm going to get and hold up Government's

21    Exhibit 111, the firearm.  And just give me one second.

22          Will the barrel that you have up with you,

23    Government's 100a, will that fit on this shotgun?

24          A.    Yes.

25          Q.    And, actually, I can take those from you,

24

```
 1    Agent Cook -- Agent Forte.  Excuse me.
 2         A.    Uh-huh.
 3         Q.    Thank you.
 4               Now, the shotgun that was taken from Corey Donovan's
 5    Jeep, did you submit that for fingerprint analysis?
 6         A.    I did.
 7         Q.    And were any fingerprints found on the shotgun?
 8         A.    There were not.
 9         Q.    Is that typical?
10         A.    It is, especially with the synthetic-type stocks,
11    the non-wood ones.  Firearms are obviously made for you to be
12    able to keep hold of while you're shooting them and they don't
13    slip out of our hand easily.  So a lot of the areas of which
14    you touch on the firearm have some kind of checkering or a
15    rougher-type surface and those are not conducive to
16    fingerprints.
17         Q.    So you weren't surprised that there weren't any
18    fingerprints on the gun?
19         A.    No.
20         Q.    Now, I want to talk about paperwork related to this
21    Mossberg shotgun.
22               During the search, was there any paperwork found
23    related to it?
24         A.    There was the manual found in the ammunition can,
25    but we did not locate any receipts.
```

25

```
 1          Q.    Any bills of sale?

 2          A.    None.

 3          Q.    Any paperwork that indicated ownership of the

 4    shotgun?

 5          A.    No.

 6          Q.    What would you have done if someone had found that

 7    during the search?

 8          A.    We would have seized it.

 9          Q.    Now, I want to talk about another item found in the

10    ammunition can, and that is the firearm cleaning kit,

11    Government's Exhibit 109d.

12                What's the brand that was in the ammunition can?

13          A.    The brand of the --

14          Q.    The brand of the oils.

15          A.    It's Hoppe's.

16          Q.    Is that the only brand of gun cleaning oils out on

17    the market?

18          A.    No.

19          Q.    How many different brands are there?

20          A.    I couldn't -- there's a number of them.  There's

21    companies coming out -- there's always somebody coming out with

22    something new.  But, yeah, there's a large amount of them, yes.

23          Q.    And do the bottles look different for different

24    companies?

25          A.    Yes.
```

```
 1        Q.    Different colors?

 2        A.    Absolutely.

 3        Q.    Different branding?

 4        A.    Yup.  Shape, sizes, yup.

 5        Q.    You own a firearm; is that right?

 6        A.    Yes.

 7        Q.    Do you clean your firearm?

 8        A.    I do.

 9        Q.    About how many times a year do you clean your

10   firearm?

11        A.    Four.

12        Q.    And do you buy gun cleaning kits?

13        A.    Sometimes, yeah.

14        Q.    How long would one gun cleaning kit last you?

15        A.    Probably a couple years.

16        Q.    Thank you.

17              Now, yesterday there was some testimony that the

18   defendant's compound bows were in sort of the barn workshop,

19   and I just wanted to ask, what is a compound bow?

20        A.    So, basically, I'm -- I -- I don't -- I don't have

21   any myself, but my understanding of a compound bow is it uses

22   like a pulley system in order to make the draw -- though maybe

23   the draw weight or how much force it takes for you to pull back

24   that bow may be the same as something that is not a compound

25   bow, but the force that it exerts, that it would shoot the
```

27

```
1    arrow at, is higher than it would be with maybe a regular bow
2    of the same size.
3         Q.   Now, is there any federal law that makes it illegal
4    for someone who's been convicted of a felony to have a compound
5    bow?
6         A.   No.
7         Q.   So under federal law, that's fine?
8         A.   Yes.
9         Q.   All right.  There was testimony yesterday that
10   Mr. Donovan was open and honest with his probation officer
11   about his possession of knives, so I wanted to ask you about
12   that.
13            Is there any federal law that prohibits someone
14   who's been convicted of a felony of possessing knives?
15        A.   Not that I'm aware of.
16        Q.   So under federal law, possessing knives by a felon,
17   that's fine?
18        A.   Yes.
19        Q.   Okay.  Now, I want to go back to one other item
20   found during the search.
21            Are you aware that there was security -- a security
22   camera set up by Corey Donovan's garage apartment?
23        A.   I was.
24        Q.   Can you tell us about that?
25        A.   It is a common commercially available that you could
```

28

1    purchase at a retail store type of security camera system.

2    Though it may have been able to take more than two cameras at a

3    time to record, this one only had two cameras attached to it at

4    the time.

5        Q.   And was the footage recorded on that seized during

6    the search?

7        A.   It was.

8        Q.   And have you reviewed the footage?

9        A.   Yes.

10       Q.   Have you reviewed all of the footage?

11       A.   No.

12       Q.   You said no and you're shaking your head.  Why?

13       A.   So each camera has at least 1,500 hours of video on

14   there.  So if you combine that, it's well over 3,000 hours.

15       Q.   Anyone helping you review the footage?

16       A.   No.

17       Q.   Just you?

18       A.   Yes.

19       Q.   So let's take a look at Government's Exhibit 300,

20   please.  And can you see sort of the garage apartment in the

21   background there?

22       A.   Yes.

23       Q.   Can you tell us where one of the cameras was?

24       A.   So there was one that was mounted on the rear of the

25   garage apartment on the -- you can see that it -- the first

1  floor extends out a little farther than the second floor.  So

2  it was mounted to the gable end of the second floor.  And you

3  can't really see it because that first pine tree to the right

4  of the Jeep is covering it, but it would -- it was mounted

5  there and it gave you a view of where the Jeep is parked and a

6  little bit more to the -- to the right of that driveway and it

7  was pretty much facing down that rear driveway towards the barn

8  workshop.

9       Q.   And could you see where the Jeep is parked right now

10  from that -- the angle the camera was pointed?

11       A.   Yes.

12       Q.   Now, you were just talking about the kind of gable

13  of the second story, so I'm going to draw on this what I think

14  you're kind of talking to -- about.  Is that sort of the gable

15  that you were talking about?

16       A.   Yes.

17       Q.   And so the security camera, if I understand you

18  correctly, was somewhere around where I've -- I'm trying to

19  mark that X?

20       A.   Yes.  Possibly a little lower than that, but that

21  general area, yeah.

22       Q.   Okay.  Thank you.

23            And where was the other camera pointed?

24       A.   So the other camera was pointed towards the rear of

25  the residence as well, but that particular one was located --

30

1    if you were on Route 4A looking at the property and looking at

2    that garage apartment, there was a tree that was on the -- to

3    the right of the house and maybe halfway down -- not the house,

4    I'm sorry -- of the garage apartment and possibly halfway down

5    the length of it.  And it was mounted in that tree.

6         Q.    And the footage from where these cameras were

7    mounted, does it show the entire Donovan property?

8         A.    It does not.

9         Q.    Does it show, for example, all of the areas around

10   the shop?

11        A.    No.  You can just barely make the shop out in the

12   distance.

13        Q.    Does it show what's going on inside any buildings?

14        A.    No.

15        Q.    And are there parts of the property that aren't --

16   that you can't see from the footage?

17        A.    The majority of the property you can't see from the

18   footage.

19        Q.    And was the security footage running all the time?

20        A.    No.  There -- when you look at it and you first

21   started examining it, I noticed that there are dates in there

22   from the year 2020, so I actually kind of pushed those aside

23   and concentrated on what was in 2021.

24             And I noted that it starts approximately, for the

25   2021 dates, on January 22nd and then it goes to February 19th.

31

 1    And then there's a break, it stops, and it picks up again on

 2    March 8th and runs to the day of the search warrant.

 3         Q.    So, for example, if something happened on

 4    February 20th, that wouldn't have been captured by the security

 5    cameras?

 6         A.    Yeah, but I just need to qualify that.  We examined

 7    the DVR.  Its time stamp is noted to be exactly four hours,

 8    51 minutes and three seconds ahead of Eastern Standard Time.

 9             So it's possible sometimes when you're looking at it

10    it's saying one date, but it's actually like the day before

11    because the DVR time is five hours ahead of the real time,

12    approximately.

13         Q.    And in at least what you've seen, any idea, have you

14    seen how this shotgun gets into the Jeep?

15         A.    I did not.

16         Q.    Was the Jeep always parked here in this spot visible

17    from the security camera?

18         A.    No.

19         Q.    Now, you said you kind of focused your review on

20    2021.  And more particularly, did you focus your review on sort

21    of the 24 to 48 hours leading up to the search?

22         A.    I did.

23         Q.    And we'll sort of go in more detail in a minute, but

24    can you kind of give us the general and sort of broad strokes

25    of what happened in relation to this Jeep in the 24 hours or so

1    before the warrant?

2        A.    So I noted that like right around on -- so the

3    search warrant's March 26th.  So I noticed on March 25th,

4    around 2:00, 2:30 in the afternoon or so, Corey Donovan does

5    show up.  He's there with another unknown male.  It appears

6    like he, Corey, may replace the battery in the Jeep.

7            Then at that point he backs the Jeep up and drives

8    it down to the barn workshop area, he's there for approximately

9    seven minutes, and then the Jeep drives back down the driveway

10   and heads out towards Route 4.  It's gone for approximately an

11   hour and then the Jeep returns with Corey Donovan driving it

12   and he parks it roughly in -- where you see it here in this

13   picture.

14           He exits the Jeep.  A while later, so right around

15   the -- so then that -- I mean, that puts us right around 3:30,

16   4:00, so somewhere in the four o'clock hour, he and Kelley

17   Finnigan and their dogs take the Jeep out again with Corey

18   driving and exits out towards Route 4A and comes back, I think

19   it's less than an hour, and then it's parked where it's found

20   the next day.  It's not moved again after that.

21           And Mr. Donovan is seen in and out of that Jeep

22   throughout what is through the rest of that night till

23   approximately 9:30 at night, where he and Ms. Finnigan leave in

24   the Toyota Matrix and do not return again.

25           So -- and we execute the warrant the next morning

1    and they aren't there.  So they never came back that night that

2    I can see on the video.

3        Q.    And for purposes of trial, are you aware that the

4    government is not seeking to introduce all 3,000 hours of the

5    video?

6        A.    I am aware.

7        Q.    And in preparation for trial, have you reviewed

8    Government's Exhibits 200, 201, 202, 203, 204, 205, and 209?

9        A.    I have.

10       Q.    And, generally, was it one long video?

11       A.    No, the -- I'm not sure if it's the way the DVR does

12   it or if it's the way the software they use to extract the

13   information on the DVR, but it usually breaks it down into

14   15-minute chunks.

15           I did find during the examination when I -- or not

16   the examination, but while I was reviewing it that there are

17   times where those chunks are smaller and sometimes when they're

18   longer, they'll either be like a half an hour or even

19   45 minutes I think maybe even one of them was.

20       Q.    And the exhibits we just talked about, 200, 201,

21   202, 203, 204, 205, and 209, are those all sort of those

22   approximate 15-minute chunks?

23       A.    Correct.

24       Q.    And, generally, what's the time range of those

25   exhibits?  What do they span?

1    A.    From March 25th, 2020 (sic) from approximately 2:30

2  to 9:30 at night.

3    Q.    And have these clips been -- or have these exhibits,

4  these sort of 15-minute chunks, been altered, changed, edited

5  in any way?

6    A.    No.

7    Q.    Are they all the same as you reviewed them when you

8  reviewed those 15-minute increments from the DVR footage?

9    A.    Yes.

10         MS. KRASINSKI:  Your Honor, I'd move to introduce

11  Government's Exhibits 200, 201, 202, 203, 204, 205, and 209.

12         THE COURT:  Is there objection?

13         MR. STACHOWSKE:  If I could have one second, your

14  Honor?

15         THE COURT:  Yes.

16         MR. STACHOWSKE:  No objection, your Honor.

17         THE COURT:  They'll be admitted.

18         (Government's Exhibits 200, 201, 202, 203,

19         204, 205, and 209 admitted.)

20    Q.    Now, are you also aware that the government does not

21  intend to have the jury sit here and watch each of those

22  15-minute increment videos?

23    A.    I am aware.

24    Q.    And so in preparation for your trial testimony

25  today, have you watched clips that have been made from those

1    sort of approximate 15-minute segments?

2        A.    Yes.

3        Q.    And so we'll sort of just go through this formal

4    process for each one.

5              Have you reviewed the clips identified as 200a and

6    200b?

7        A.    Yes.

8        Q.    And are those shorter clips taken from Government's

9    Exhibit 200?

10       A.    Yes.

11       Q.    Other than being sort of shorter clips of that, have

12   they been altered or changed in any way?

13       A.    No.

14             MS. KRASINSKI:  Your Honor, I'd move to strike the

15   ID on Government's Exhibits 200a and 200b.

16             MR. STACHOWSKE:  No objection.

17             THE COURT:  They'll be admitted.

18         (Government's Exhibits 200a and 200b admitted.)

19       Q.    Similarly, have you reviewed Government's Exhibits

20   201a and 201b?

21       A.    Yes.

22       Q.    And are those shorter clips from the approximate

23   15-minute video at Government's Exhibit 201?

24       A.    Yes.

25       Q.    Excuse me, 202.

1          A.   Yes.  Sorry.

2          Q.   Other than being the shorter clips of that, have

3     they been altered, changed in any way?

4          A.   No.

5               MS. KRASINSKI:  Your Honor, I'd move to strike the

6     ID -- I think I went back and forth between 202 and 201 there,

7     so I apologize.

8               Let me -- let me just consult with defense counsel

9     really quickly.  I'll see if I can do this all at once.

10              THE COURT:  While they're doing that, members of the

11    jury, I need to take a very short restroom break.  I apologize.

12    So I'm going to ask you to leave the courtroom, everybody else

13    remain here, use the restroom, and we'll bring you right back

14    in to get going.  Okay?

15              THE CLERK:  All rise.

16          (Recess taken from 9:58 a.m. until 10:01 a.m.)

17              THE CLERK:  Please be seated.  Court is in session.

18              THE COURT:  All right.  Go ahead.

19              MS. KRASINSKI:  Your Honor, thank you.

20          Q.   So the other clips that have been made, are those

21    Exhibits 201a, 201b, 202a, 202b, 203a, 203b, 204a, 204b, 205a,

22    and 209a and 209b?

23          A.   Yes.

24          Q.   And are those all shorter segments of sort of the

25    approximate 15-minute videos that have already been introduced

1    into evidence?

2        A.    Yes.

3        Q.    And other than being shortened, have they been

4    altered or changed in any way?

5        A.    No.

6            MS. KRASINSKI:  Your Honor, I would move to admit or

7    strike the ID of Government's Exhibits 201a, 201b, 202a, 202b,

8    203a, 203b, 204a, 204b, 205a, 209a, and 209b.

9            THE COURT:  Any objection?

10           MR. STACHOWSKE:  No objection, your Honor.

11           THE COURT:  They'll be admitted.

12           (Government's Exhibits 201a, 201b, 202a,

13           202b, 203a, 203b, 204a, 204b, 205a, 209a,

14           and 209b admitted.)

15           THE COURT:  Let me just give you some general

16   guidance about this.

17           So if I'm understanding what the prosecutor's doing,

18   she's introduced into evidence some 15-minute blocks of

19   recordings and then some excerpts within those 15-minute

20   blocks.

21           When you are given a chance to deliberate, you'll

22   have access to the exhibits.  You can look at anything you

23   want, but don't feel that you have to look at something if it

24   isn't played in court.  Okay?

25           So if you -- if they never -- neither side ever

1   shows anything from these 15-minute blocks, you don't have to

2   look at those because they know that's important and if there's

3   something important there, they're going to display it for you

4   here in court.  Okay?

5           Go ahead.

6           MS. KRASINSKI:  Thank you, your Honor.

7       Q.   And I'd also -- are there also videos identified at

8   Government's Exhibits 206 and 207.  And are those also

9   15-minute blocks of security camera footage from the Donovan

10  residence?

11      A.   Yes.

12      Q.   And have those been altered or changed in any way

13  since you reviewed those?

14      A.   No.

15          MS. KRASINSKI:  I'd move to admit Government's

16  Exhibits 206 and 207.

17          MR. STACHOWSKE:  No objection, your Honor.

18          THE COURT:  They'll be admitted.

19        (Government's Exhibits 206 and 207 admitted.)

20      Q.   And there's one clip that has -- is identified as

21  Government's 206a.  Is that a short clip from what has been

22  admitted as Government's Exhibit 206?

23      A.   Yes.

24      Q.   And has that been altered or changed in any way?

25      A.   No.

```
 1                   MS. KRASINSKI:  Your Honor, I'd move to strike the
 2    ID on Government's Exhibit 206a.
 3                   MR. STACHOWSKE:  No objection.
 4                   THE COURT:  It'll be admitted.
 5                      (Government's Exhibit 206a admitted.)
 6         Q.    Okay.  Let's watch some of these clips in
 7    chronological order.
 8                   And so, again, can you sort of remind us of the
 9    general time frame when the Jeep -- there was activity related
10    to the Jeep the day before the search?
11         A.    Approximately from 2:30 p.m. on March 25th, 2021, to
12    approximately 9:30 p.m.
13         Q.    So let's take a look at Government's Exhibit 209b,
14    please.
15                   And as we're watching, can you orient us a little
16    bit to what we're seeing?
17                          (Video recording played.)
18         A.    Sure.  So this is one of the -- this is the camera
19    that is located mounted onto the back of Corey Donovan's garage
20    apartment.
21                   MS. KRASINSKI:  Actually, let's pause for just one
22    second.  Thank you.
23         Q.    Please keep orienting us, Agent Forte.
24         A.    Sure.  So you can see the Jeep there is on the left,
25    Corey Donovan's at the rear of the Jeep right now, and this is
```

 1    Kelley Finnigan who's walking from the right side of the

 2    screen.

 3              And then straight ahead down that -- that driveway

 4    is where the barn and workshop is.  It's very difficult to see,

 5    can't really make too much out of it.  At night you can see a

 6    light on back there or if the roll-up door is open you might be

 7    able to see movement back there.  But other than that, you

 8    can't see anything else.

 9        Q.    So I'm just going to -- is that the direction, the

10    arrow that I've just drawn, to the barn workshop?

11        A.    That's correct.

12        Q.    And is the arrow that I've drawn right there the

13    direction off the property?

14        A.    Yes, towards Route 4A, yes.

15        Q.    And what I've circled, was is that?

16        A.    That's the Jeep Wrangler.

17        Q.    And is there any individual there as well?

18        A.    Yeah.  Corey Donovan is standing there.

19        Q.    How do you know that's Corey Donovan?

20        A.    I'm familiar with him and I've watched many hours of

21    this video footage.

22        Q.    And I've made another circle.  Can you tell me

23    what's inside that?

24        A.    That's Kelley Finnigan.

25        Q.    And, again, how do you know that's Kelley Finnigan?

1          A.    I'm familiar with Kelley Finnigan from the

2     investigation as well as I've watched many hours of the video.

3          Q.    Let's watch this for a little bit longer and as we

4     watch, will you tell us what is happening?

5                         (Video recording played.)

6          A.    Mr. Donovan's at the rear of the Jeep Wrangler.

7          Q.    Does he appear to be doing anything?

8          A.    Yup.  He appears to be working inside the back of

9     the Jeep Wrangler.

10         Q.    Now, can you tell exactly what he's doing?

11         A.    No.

12         Q.    You can just kind of see the location and that he's

13    reaching in and out of the Jeep?

14         A.    Correct.

15         Q.    Okay.  Now, are you aware that this clip is

16    approximately 12 minutes long?

17         A.    Yes.

18               MS. KRASINSKI:  Okay.  So let's pause here.  And can

19    we fast-forward and watch, say, the last 30 seconds of this

20    clip?

21                         (Video recording played.)

22         Q.    What's he doing?

23         A.    Still working at the back of the Jeep.

24         Q.    And for the portion of this clip that we skipped,

25    what was happening in that?

1          A.    He's working inside the Jeep there, the rear.

2          Q.    So for this whole approximately 12-minute clip, he's

3    there working by the back of that Jeep?

4          A.    Correct.

5                MS. KRASINSKI:  All right.  Let's turn to the clip

6    at Government's Exhibit 200a.

7                      (Video recording played.)

8          Q.    What are we seeing?

9          A.    This is the Jeep pulling back into the residence.

10         Q.    Is this -- you had mentioned earlier that Corey

11   Donovan had replaced the battery in the Jeep, took it up to the

12   workshop, appeared to leave the property.  Where in all of this

13   is that?

14         A.    This is actually the trip that he and Kelley took

15   with the dogs later on which happens -- starts in the four

16   o'clock hour, I believe, and then they arrive back before 5:30.

17         Q.    And so is this them arriving back before 5:30?

18         A.    Correct.

19         Q.    So is this the second time in this sort of span of

20   time that you were able to see Corey Donovan drive the Jeep?

21         A.    Yes.

22               MS. KRASINSKI:  Okay.  Let's continue, please.

23                      (Video recording played.)

24         Q.    And what's happening?

25         A.    So he has lifted the plastic rear window up and

43

 1    opened the rear tailgate there to get one of the dogs out of

 2    the back.

 3         Q.    And you mentioned this is him and Kelley coming

 4    back.  Is she in the Jeep?

 5         A.    She will exit from the passenger seat in a bit.

 6         Q.    So if we pause here and fast-forward to the very

 7    end, will she exit the Jeep?

 8         A.    Yes.  There she is coming out of the Jeep now.

 9         Q.    After this clip, does anyone drive the Jeep for the

10    rest of the night?

11         A.    No, it stays where it is.

12         Q.    Anyone drive the Jeep before -- again before it is

13    searched the next day by agents?

14         A.    No.

15         Q.    And you've just said that Ms. Finnigan got out of

16    the car.  Did you ever see her go back into the Jeep after

17    this?

18         A.    She may grab a bag or something like that, but not

19    for an extended period of time.

20         Q.    Let's switch to Exhibit 203b.

21              Now, as we're watching, can you tell us what we're

22    looking at?

23         A.    That is Corey Donovan standing at the back of the

24    Jeep and he's working back inside the rear of the Jeep.

25         Q.    How do you know that's Corey Donovan?

44

```
 1          A.    Well, so, I've -- in watching the footage, I've
 2   watched it from when it was daytime through dusk into the night
 3   and he's also wearing the same clothing from earlier.
 4          Q.    Now, does it appear that there's a motorcycle in
 5   front of that Jeep now?
 6          A.    There is.
 7          Q.    Tell us where that came from.
 8          A.    That is Micah Donovan's, which is Corey's brother.
 9          Q.    And as you watch the video, can you distinguish
10   between the two of them?
11          A.    You can.
12          Q.    How?
13          A.    When -- so I was familiar with Micah, but I never
14   met him before until the day of the search warrant.  And he had
15   a short Mohawk that he had highlighted red.  So it's very easy
16   to -- and even in this footage -- to be able to distinguish
17   between the two of them due to that haircut.
18          Q.    And so what does it appear to you that Mr. Donovan
19   is doing?
20          A.    I'm not sure.  He's just pulling -- it looks like he
21   removed something from the back of the Jeep and seems to be
22   working on it.
23                MS. KRASINSKI:  Let's pause here and --
24                THE COURT:  Do we have a date and time on this?  Can
25   you just get to it?
```

45

```
 1                THE WITNESS:  Yeah, it's approximately in the 8:00

 2   to, I would say, 9:15 window, somewhere in there.

 3   Unfortunately, I can't give you -- it didn't have the time

 4   stamp on it.

 5                THE COURT:  All right.  Just had the date on it?

 6                THE WITNESS:  Oh, March 25th of 2021.

 7        Q.   All of these clips that we're watching, are these

 8   all March 25th, 2021?

 9        A.   That is correct.

10                MS. KRASINSKI:  And let's fast-forward and watch,

11   let's say, the last ten or so seconds of this clip.

12                          (Video recording played.)

13        Q.   And I guess we can see now that the motorcycle is no

14   longer there.

15        A.   That is correct.

16        Q.   So what happened?

17        A.   It drove down the driveway towards the barn workshop

18   by Micah Donovan.

19        Q.   At any point in this does Micah Donovan go in the

20   Jeep?

21        A.   No.

22        Q.   And what is Corey Donovan doing?

23        A.   He's working inside the driver's door of the Jeep.

24                          (Video recording played

25                MS. KRASINSKI:  Let's turn to Government's
```

```
 1   Exhibit 204a.
 2                        (Video recording played.)
 3        Q.    Can you tell us what we're watching here?
 4        A.    So that's Corey Donovan.  He's inside the Jeep.
 5   That's his flashlight moving around inside there, looking --
 6   he's in the Jeep through the driver's door.
 7        Q.    And so the light that we see shining in the Jeep,
 8   that's -- that's actually inside the Jeep?
 9        A.    That is correct.  It's -- well, it's a flashlight
10   being used inside the Jeep.
11        Q.    How do you know that?
12        A.    You can see it moving around.
13        Q.    And as we continue to watch, will Corey Donovan get
14   out of the Jeep?
15        A.    He will, out of the driver's side door.
16                        (Video recording played.)
17        Q.    Do you have any idea what he was doing in there?
18        A.    No.
19        Q.    Did he just get out of the Jeep?
20        A.    He did.
21              THE COURT:  Is there an approximate time on this
22   one?
23              THE WITNESS:  It's that same time frame on those
24   clips when he's working in there between 8:00 and 9:15 or so.
25              THE COURT:  Is this after the clip that -- timewise
```

```
 1   from the one we just saw?
 2            THE WITNESS:  Unfortunately, I can't tell you
 3   because the -- the clip -- the time frame's not on the stamp.
 4       Q.   If you were to look at the title, does each
 5   15-minute increment have a file type?
 6       A.   It does.  It like starts with the channel number,
 7   which is basically which camera number, as well as it gives you
 8   the date and then it gives you that -- it'll start with that
 9   one time and then a 15 -- you know, most of the time it's
10   15 minutes later.
11       Q.   And if you're -- if you were to look at these file
12   titles, would you be able to tell us --
13       A.   I would.
14       Q.   -- in chronological order?
15       A.   Roughly, yeah.
16       Q.   I'm going to hand you the -- a document that -- the
17   government's exhibit list which includes those file titles.
18   Take a minute, look at that, look at the file titles for sort
19   of these 200 exhibits, and after you've had a chance to look at
20   that, let me know.
21       A.   Okay.  I'm sorry.  Which clip are we on now?
22       Q.   So right now we are looking at 204a.
23            So is -- after you look at the file titles for 203
24   and 204, does that help refresh your memory about which clip --
25   the chronological order of the clips?
```

1      A.    Yes.

2      Q.    And what's the order?

3      A.    So they run -- the first ones you see during the day

4   are that approximate five o'clock period of the return, about

5   5:23 or so.

6           And then the other clips -- sorry, I have to do

7   the -- the clips have the DVR time on it, which then you have

8   to do the math to take off the other time.

9           So -- and, I'm sorry, you said you were in 204a?

10     Q.    204a.

11     A.    So 204a, which is actually -- so that's in the --

12  that clip is roughly in the just before nine o'clock to just

13  before 9:15 time frame.

14     Q.    And when you're saying doing the math, is that

15  because, as you said, the time stamp is I think you said

16  approximately four to five hours fast?

17     A.    Correct.  It's approximately five hours -- the DVR

18  time is approximately five hours ahead of what we believe is

19  the real time.

20     Q.    So we just watched Mr. Donovan shining his

21  flashlight in the Jeep and get out of the Jeep and let's watch

22  one more clip.

23           MS. KRASINSKI:  Let's look at 204b, please.

24                    (Video recording played.)

25     Q.    And who do you see?

1          A.    Corey Donovan.  He's back inside the passenger side

2     there of the Jeep.

3          Q.    And what does it looks like he's doing?

4          A.    He's removing items out of there.  It looks like

5     he's got a pack or a bag or something and now he's into the

6     back of the Jeep again.

7          Q.    Now, does he continue to sort of take items out of

8     the Jeep during this clip?

9          A.    He does.

10          MS. KRASINSKI:  Let's fast-forward and watch the

11     last 20 seconds of this clip.

12                          (Video recording played.)

13          MS. KRASINSKI:  And let's pause right there.

14          Q.    What do you see?

15          A.    Some type of -- it looks like an ammunition can

16     similar to what is -- was located in the Hyundai.

17          Q.    Does it look like that it has a sticker on the side?

18          A.    It may.  It has some kind of markings.  Sometimes

19     ammo cans are marked with the caliber on the side.

20          Q.    Does this ammo can, Exhibit 109, have a sticker on

21     the side?

22          A.    It does.

23          Q.    Can you say whether or not what he's carrying is

24     this ammo can?

25          A.    I cannot.

50

1      Q.    No, but does it look like an ammo can to you?

2      A.    Yes.

3      Q.    In total, after you reviewed all of these 15-minute

4   clips, how much time on March 25th, 2021, did Corey Donovan

5   spend tinkering around in that Jeep either with a flashlight or

6   in the day in the back?

7      A.    Excluding the time that he's working under the hood

8   changing what I believe is the battery, it's approximately just

9   over half an hour.

10     Q.    So about half an hour kind of tinkering around in

11   that Jeep.  How much time do you think he spent changing the

12   battery?

13     A.    15, 20 minutes maybe.

14     Q.    And how much time was he driving the Jeep?

15     A.    That's just over two hours.

16     Q.    And to be fair, we don't know what happens once the

17   Jeep leaves, right?  We don't know if he's driving around for

18   two hours.

19     A.    Correct.

20     Q.    But he drove it off the property?

21     A.    He drives it out of view down the driveway towards

22   4A, presumably taking it for a drive.

23     Q.    In all of the video footage you've seen, have you

24   ever seen video footage of Kelley Finnigan tinkering around in

25   that Jeep the way we just watched Corey Donovan do?

51

```
 1         A.    No.
 2         Q.    Now, after this, you mentioned before that Corey
 3   Donovan and Kelley Finnigan leave in the Toyota Matrix, right?
 4         A.    Correct.
 5         Q.    Now, after this, is there video of someone else near
 6   the Jeep?
 7         A.    There is.
 8         Q.    Who is that?
 9         A.    Micah Donovan.
10         Q.    And have you watched all that video?
11         A.    Yes.
12         Q.    And was that admitted into evidence here, the jury
13   can review it?
14         A.    Yes.
15         Q.    In your review of it, does Micah Donovan ever
16   actually go in the Jeep?
17         A.    No.
18         Q.    Did you ever see video footage of anyone other than
19   Corey Donovan tinkering around in this Jeep like we just saw?
20         A.    No.
21         Q.    Who was the last person to drive the Jeep before
22   officers found that shotgun in it on March 26th, 2021?
23         A.    Corey Donovan.
24         Q.    All right.  Who was the last person to be in the
25   Jeep before law enforcement officers found that shotgun in the
```

```
 1   Jeep on March 26th, 2021?

 2        A.    Corey Donovan.

 3              MS. KRASINSKI:  Nothing further, your Honor.

 4              THE COURT:  All right.  This is probably a good time

 5   for our midmorning break.  We'll break for about 15 minutes and

 6   then have cross-examination.

 7              THE CLERK:  All rise.

 8                        (Jury excused.)

 9              THE CLERK:  Please be seated.

10              THE COURT:  So where are we on the girlfriend?  Is

11   she going to be coming today?  Are we doing hearings?  What are

12   you --

13              MR. STACHOWSKE:  She's here presently, your Honor.

14   She's been here for -- since first thing this morning.

15              She does have three thumb drives.  Both myself and

16   the government have been in email contact with Attorney Kennedy

17   and she does intend to be here.

18              I asked him if it would be permissible for me to

19   review the videos in advance of him arriving and he opted not

20   for me to take the videos and look at them and I have not

21   talked to her.

22              THE COURT:  Do we know whether she's going to assert

23   her Fifth Amendment privilege or not?

24              MR. STACHOWSKE:  I have not asked her.  I know

25   Attorney Kennedy has told her to.
```

53

```
1              THE COURT:  When is he going to be here?

2              MR. ROMBEAU:  I can speak to that, your Honor, since

3    I -- just received an email from him about four minutes ago

4    saying he's heading up, on his way, and he expects to be here

5    in the next 15 to 20 minutes.  So --

6              THE COURT:  Okay.  How long do you anticipate you're

7    going to be on cross with the agent?

8              MR. STACHOWSKE:  Half-hour.

9              THE COURT:  All right.  And what's your next

10   witness?

11             MR. ROMBEAU:  We have one other witness, that's

12   Agent Kelsch, and that will be information seized from Kelley

13   Finnigan's cell phone.

14             THE COURT:  And how long do you anticipate your

15   direct to be?

16             MS. KRASINSKI:  25 minutes.

17             THE COURT:  Okay.  So it's conceivable we could rest

18   by the lunch break, right?

19             MS. KRASINSKI:  I think that's fair, your Honor.

20             THE COURT:  Okay.  If you -- we're going to need to

21   do something with Ms. Finnigan.  You don't know what's on these

22   tapes, so you can't tell me whether you're going to want to put

23   them into evidence or not, right, whether they're admissible or

24   not, whether you can lay a foundation for their admission.  Any

25   of that stuff you don't know yet.
```

54

```
1              MR. STACHOWSKE:  I don't, your Honor.
2              And, full disclosure, apparently my client's been
3    speaking last night, the night before, and I strongly suspect
4    that should she testify or should my client testify that the
5    government intends to play those audios as well.  So there's
6    discovery issues.  Not necessarily issues, but additional
7    discovery that we wanted to disclose to the Court.
8              THE COURT:  I don't understand what's being said.
9              MR. STACHOWSKE:  Well, I just want to make sure that
10   the Court's aware that that's additional discovery that likely
11   the government will try and introduce.  I'm sure they can speak
12   for themselves.
13             THE COURT:  You mean the government has additional
14   tapes and things?
15             MR. ROMBEAU:  That's right, your Honor, certainly
16   things that we would expect to impeach the defendant with
17   should he testify.  They've been provided to Attorney
18   Stachowske.
19             THE COURT:  Right.  Well, I assume for the
20   defendant, if he testifies, there are potential use of prior
21   convictions, things like that to impeach.  Have you produced
22   all of that to Mr. Stachowske so that he's had the opportunity
23   to move in limine if he thought that there was a basis to
24   prohibit that?
25             MR. ROMBEAU:  We have, your Honor, yes.
```

55

1          THE COURT:  Okay.  So that's already been -- so

2     there's no discovery that you have -- are holding back and not

3     giving to Mr. Stachowske about impeachment material; is that

4     what you're --

5          MR. ROMBEAU:  That is correct, your Honor.  All the

6     calls that we've received from the jail we've forwarded on to

7     Attorney Stachowske.  And they are voluminous.  The defendant

8     is quite a talker.  And -- but we have provided all those.  So

9     everything's been pushed out.

10          THE COURT:  All right.  We also -- so we -- and do

11     you still, Mr. Stachowske, intend to press your argument with

12     respect to the statement against interest issue that we had

13     talked about with the -- Ms. Finnigan?

14          MR. STACHOWSKE:  I would -- yes, I would use --

15          THE COURT:  So we have to potentially resolve that

16     issue.

17          MR. STACHOWSKE:  Yes.  I would need to see the video

18     and I rely upon that in my motion.

19          THE COURT:  There was DNA found on the shotgun.  Are

20     you intending to inquire about the DNA on the shotgun?

21          MR. STACHOWSKE:  No, your Honor.

22          THE COURT:  You're not.  Okay.  So I don't have to

23     think about door opening and statements against interest -- I

24     mean, excuse me -- consciousness of guilt issues because I'm

25     not going to let the government do that for the purpose of

```
 1   opening the door and you're not going to open the door.  So

 2   because the door's not open, we won't get into that

 3   consciousness of guilt issue.  Is that fair to say?

 4                MR. STACHOWSKE:  Correct, your Honor.

 5                MR. ROMBEAU:  That's agreeable to us, your Honor.

 6                THE COURT:  Yeah.  Unless something changes.  I

 7   mean, if he opens the door to it and, you know, I -- all bets

 8   are off if he takes the witness stand and testifies because

 9   that dramatically broadens the scope of what you can

10   legitimately do for impeachment purposes.

11                I'm just saying if he does not testify and you do

12   not inquire about DNA, the defendant will not, and not make any

13   argument about DNA and I can take that off my list of many

14   legal issues that have been preventing me from sleeping the

15   last several nights.

16                We have some issues with respect to jury

17   instructions.  I will have instructions for you later today

18   that do not address the unanimity issue.  Is the government

19   still pressing its argument that you are entitled to an

20   instruction that there is not a need for unanimity?

21                MS. KRASINSKI:  So when I look at *Leahy*, you know,

22   the -- which is -- which is a First Circuit case, 473 F.3d 401,

23   you know, my understanding was that there was just no

24   instruction at all on the -- the issue was did the Court err in

25   failing to say you have to unanimously find the defendant
```

1    possessed, you know, one of these items.  And so I think it

2    would be incorrect to include an instruction that requires the

3    jury to find unanimity as it relates to the item possessed.

4           THE COURT:  Have you read *United States against*

5    *Newell* and *United States against Lopez-Cotto*, which are

6    First Circuit opinions that address this issue?

7           MS. KRASINSKI:  I -- no.  The cases I'm familiar

8    with I cited, which are *Leahy* and --

9           THE COURT:  Well, why don't you read over the

10   lunchtime break *United States against Newell*, reported at

11   658 F.3d 1, and *United States against Lopez-Cotto*, which are

12   reported -- is reported at 884 F.3d, and reread *United States*

13   *against Verrecchia*, reported at 196 F.3d 294.  I believe you

14   cited that with your supplemental jury instruction.

15          Cases that cite *Verrecchia* -- the *Newell* case does I

16   think quite formidable and careful analysis of the issues

17   raised in *Verrecchia*.

18          And the concern I have, which is the concern that

19   Judge Torruella analyzes and makes clear, at least in my mind,

20   is that while it is true that the possession of a specific

21   firearm is not an element of the offense, that there may be a

22   need for an instruction on unanimity in cases in which like

23   this one you have a gun and ammunition in a car, ammunition in

24   another car, ammunition in a separate residence.

25          And *Newell* specifically analyzes that and says that

 1   could be a real problem if you don't require unanimity because

 2   while the crime can be committed by any of those, they are

 3   completely separate incidents.

 4           So to make it clear, suppose somebody possesses a

 5   gun on day one and someone -- and that person possesses a

 6   different gun ten days later and they're joined in the same

 7   indictment, all right?  In that case, you would clearly agree

 8   the jury would have to unanimously agree as to which of those,

 9   because that would be outrageous if six people thought it was

10   on this day and this gun and six people -- and what *Newell*

11   analyzes and says that's the same problem when you have

12   ammunition and guns in entirely different locations.

13           And Judge Torruella even talks about a gun in a barn

14   and a gun in a car next to the barn and says, oh, in that kind

15   of case, you should -- you might well have to give a unanimity

16   instruction.

17           So I think you're wrong, I think you'll agree with

18   me when you read these cases, and I think you will ask

19   yourself, do I really want to create appellate risk on an issue

20   like that in this particular case.  Do you think there is any

21   practical risk that five jurors will think he possessed the gun

22   and ammunition in a car and seven jurors will think he

23   possessed it but they won't agree about that?

24           It's either going to -- the fact -- if you think

25   about the case, you will realize, because you're a skilled

1    prosecutor, that's not what's going to happen.  He'll either be

2    acquitted or convicted.  It's not going to be based on some

3    kind of a split jury.

4           So you want an instruction to avoid an issue that

5    you shouldn't even be concerned about, but when you read

6    *Newell*, you'll see if you insist upon that and I were to give

7    it, you would be inviting me to do something that would create

8    substantial risk of reversal for an unnecessary issue.

9           So you do your analysis and tell me if you want to

10   push it.  If you want to push it, then we're going to have to

11   get into some detailed discussion of these particular cases.

12   But --

13          MS. KRASINSKI:  Judge, I've been wrong once or twice

14   before and it's bound to happen again.  So I'll happily --

15          THE COURT:  When I'm up at 4:30 in the morning

16   reading these cases, I -- I wish I didn't have to do it, but

17   I'm going to do what the law requires.  Okay?

18          So you tell me whether you want to press this

19   argument or not.  I think you're wrong.  I'm inclined to not

20   give an instruction that says you don't have to be unanimous.

21   Whether I give a separate instruction about what you must be

22   unanimous about, someone has to propose that to me.

23          MS. KRASINSKI:  Yes, your Honor.

24          THE COURT:  And so one way to do it would be to say

25   something like you have heard evidence that a firearm and

1    ammunition was found in one location, additional ammunition was

2    found in another location, and additional ammunition was found

3    in a third location.  In order to find the defendant guilty,

4    you must find -- unanimously agree that the defendant possessed

5    the firearm or ammunition at at least one of these locations

6    and you must unanimously agree on which one.

7                If you do that -- because nobody -- nobody would

8    suggest, oh, you have to unanimously agree about which shotgun

9    shell within the bandolier he possessed.  That would be absurd.

10   But there's a good reason, given *Newell*, and Judge Torruella

11   has emphasized and this is -- one of the leading cases, if you

12   read them all, one of the leading cases is one of mine.  It's a

13   case that Judge Selya wrote dealing with credit cards.  What's

14   the name of the case?

15                THE LAW CLERK:  *Lee.*

16                THE COURT:  *Lee.*  Read *United States against Lee.*

17   That's me.  That was my decision in *Lee* that was taken up on

18   appeal.

19                So these are hard issues, determining what a unit of

20   prosecution is, and they -- when a prosecutor brings an

21   indictment that charges like this, they need to be carefully

22   assessing that issue from the very beginning.  And I don't have

23   time to do the research on this.  I mean, you made me do it,

24   so, you know, we've done it, but, you know, that's the kind of

25   thing that you need to be thinking about in advance.

```
 1              So I might be wrong.  I've been wrong before, too.
 2    But I think I'm right.  I think you're wrong.  You read those
 3    cases and if you want to press it, then we'll talk about it
 4    more.
 5              MS. KRASINSKI:  Got it, your Honor.
 6              THE COURT:  All right.  And the last issue, I want
 7    to read the current version of the constructive possession
 8    instruction I'm proposing to give.  It's still subject to
 9    further revision, but it's based on the First Circuit's
10    decision in United States against Tanco-Baez, a very thoughtful
11    decision by Judge Barron that's reported at 942 F.3d 7 and to a
12    lesser extent on a decision, United States against Wright,
13    reported at 968 F.3d 1393.
14              So here's what I'm currently thinking of giving.
15    And I'm reviewing this with you because this is the key issue
16    in the case.  Right?  Everybody knows this.
17              Possess.  In the context of this case, the term
18    possess means to exercise authority, dominion, or control over
19    a firearm or ammunition.  It is not necessarily the same as
20    legal ownership.  The law recognizes different kinds of
21    possession.
22              Possession includes both actual and constructive
23    possession.  A person -- a person who has direct physical
24    control of a firearm or ammunition on or around his person is
25    then in actual possession of the firearm or ammunition.  A
```

1    person who is not in actual possession but who has both the

2    power and the intention at a given time of exercising dominion

3    or control over a firearm or ammunition, directly or through

4    others, is in constructive possession of the firearm or

5    ammunition.

6            Constructive possession may be inferred from

7    circumstances such as the defendant's control over the area

8    where the firearm or ammunition is found.

9            Although constructive possession may be proved

10   either through direct or circumstantial evidence, mere presence

11   or association with another who possessed the firearm or

12   ammunition is sufficient to establish constructive possession.

13           Whenever I use the term possession in these

14   instructions, I mean both actual and constructive possession.

15           I'm essentially quoting from Judge Barron's decision

16   there.  I'm also instructing on sole possession and joint

17   possession and in a similar way explain when I use the term

18   possession, I mean both sole possession and joint possession,

19   whether actual or constructive.

20           So you can have sole actual possession, sole

21   constructive possession.  You can have joint actual possession,

22   joint constructive possession.  Any one of those is possession

23   as I'm defining it to be in this case.  All right?

24           So if you don't like any of that instruction, you're

25   going to have to show me because I've actually pulled the --

1    you know, the *Tanco-Baez* case is a 2019 First Circuit case.  If

2    that is wrong, if you think the First Circuit is wrong on that

3    point, you need to tell me why because I think it's right.  And

4    it's somewhat different from what the instruction the

5    government is proposing, but it is, I think, a very close

6    phrasing of what the First Circuit is telling me they think

7    constructive possession means.  Okay?

8              Yeah, did you want to say something, Mr. Donovan?

9              THE DEFENDANT:  Yes, your Honor.  Did you say mere

10   presence or proximity is insufficient, like there must be some

11   showing of dominion, control some words and gesture --

12             THE COURT:  Yes.  Let me read -- I'll read that

13   portion to you again.

14             THE DEFENDANT:  Thank you, sir.

15             THE COURT:  Mere presence or association with

16   another who possessed the firearm or ammunition is insufficient

17   to establish constructive possession.

18             THE DEFENDANT:  Thank you, your Honor.

19             THE COURT:  That's right out of the case.

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  But so is the language about

22   inferring -- that you can infer constructive possession from

23   circumstances and so is the language that you can infer

24   constructive possession from the defendant's control over the

25   area where the firearm or ammunition is found.

```
 1                 THE DEFENDANT:  I -- I agree with your assessment.
 2                 THE COURT:  Okay.  All right.
 3                 THE DEFENDANT:  Thank you, sir.
 4                 THE COURT:  Yeah.
 5                 And I know Mr. Stachowske -- no lawyer wants a
 6      client to ever speak.  All right?  So I -- you are going to
 7      do -- Mr. Donovan, one thing that's clear to me is you are
 8      going to do what you are going to do.  So I -- as long as you
 9      treat me respectfully and you obey the rules, I'm going to try
10      to hear you out on things.
11                 THE DEFENDANT:  Thank you, your Honor.
12                 THE COURT:  But I would urge you to consult with
13      your lawyer because he knows more than you.  Okay?  But at the
14      end of the day, if you want to say something outside of the
15      presence of the jury to me and you're respectful and obey the
16      rules, I'll try to listen to it.  Okay?
17                 THE DEFENDANT:  I appreciate it greatly.
18                 THE COURT:  All right.  So I've got to take a short
19      break and then we'll come back.
20                 THE CLERK:  All rise.
21            (Recess taken from 10:45 a.m. until 11:03 a.m.)
22                 MR. STACHOWSKE:  Mr. Kennedy is here, your Honor.
23                 THE COURT:  Okay.  We'll get to him as soon as we
24      break for lunch.
25                 THE CLERK:  Please be seated.  Court is in session.
```

65

```
1              THE COURT:  All right.  Cross-examination.
2                         CROSS-EXAMINATION
3  BY MR. STACHOWSKE:
4       Q.    Good afternoon, Agent Forte.
5       A.    Good afternoon.
6       Q.    As you've -- you're aware, as you've sat through all
7  the testimony thus far, yesterday's testimony and today's
8  testimony, correct?
9       A.    Yes.
10      Q.    All right.  And you sat through your colleague Agent
11  Cook's testimony?
12      A.    Yes.
13      Q.    And I assume you agree with everything that he
14  testified to yesterday?
15      A.    With the exception of the barrel that was on the
16  shotgun.
17      Q.    And what about that?
18      A.    The barrel that was on the shotgun is the slug
19  barrel which is the one that's rifled.
20      Q.    All right.  It's safe to say that mistakes were made
21  on the date of the search, correct?
22      A.    Are you referring to my affidavit --
23      Q.    Yes.
24      A.    -- those mistakes?  Yes.
25      Q.    All right.  And, in fact, you've testified already
```

1    and acknowledged that there was a search that was authorized of

2    the barn -- of what we'll call the barn and the apartment or

3    garage, as I've called it, correct?

4         A.    Yeah, it's -- I've tried to refer to it always as

5    garage apartment and barn workshop because it gets confusing.

6         Q.    I will try, as much as I can, to be continuous with

7    that, to follow suit.

8              And then there was an extension granted to the

9    search warrant at your request to allow for you and your agents

10   to search the vehicles that were on the property?

11        A.    Yes.

12        Q.    All right.  What time did the search start that

13   morning?

14        A.    6:00 a.m.

15        Q.    All right.  And approximately what time did the end

16   of the initial search conclude?

17        A.    It's probably going to be somewhere around 10:00 to

18   10:00 -- somewhere between 10:00 and 11:00 they're done and

19   we're just waiting for that second warrant.

20        Q.    All right.  And what time did you report, if you

21   remember, the additional facts, the subsequent developments as

22   you call it in your affidavit --

23        A.    Uh-huh.

24        Q.    -- or the additional facts that you included to

25   substantiate the extension of the warrant, correct?

67

1          A.    Correct.

2          Q.    All right.  And those -- those subsequent

3    developments, can we agree that those subsequent developments

4    are with respect to the Grand -- the green Jeep Wrangler, one?

5          A.    Okay.

6          Q.    Two, the blue Hyundai?

7          A.    Correct.

8          Q.    Okay.  Three, the white Ford Expedition?

9          A.    Uh-huh.

10         Q.    I need a verbal answer, yes or no.

11         A.    Oh, yes.

12         Q.    It becomes conversational.

13         A.    Yup.

14         Q.    And then, fourth, the dark Ford Ranger truck?

15         A.    Yes.

16         Q.    All right.  Those are the only four areas that you

17   sought additional authority to search in, correct?

18         A.    No, we also added the -- the Toyota Matrix because

19   it wasn't on the property at the time.

20         Q.    Well, that was part of the initial search warrant,

21   but it wasn't on the property, correct?

22         A.    It wasn't, but we did add, I think, maybe another

23   line or another paragraph regarding that.  It wasn't on the

24   property, so that way we would request that we could extend the

25   search of that vehicle to this second warrant.

1　　　　Q.　　All right.  I think you testified earlier that you

2　contacted the U.S. Attorney's Office and reported seeing a

3　shotgun shell in the Jeep.

4　　　　A.　　Uh-huh.

5　　　　Q.　　I need a verbal answer.

6　　　　A.　　Oh, yes.

7　　　　Q.　　I told you it was going to be conversational.

8　　　　A.　　Yes.

9　　　　Q.　　But you also said on direct examination that it's --

10　quote, unquote, you reported seeing a shotgun shell consistent

11　with the shells observed in the barn.

12　　　　　　Did you say that earlier?

13　　　　A.　　I mean, no, I think I said the bandolier, that the

14　bandolier, like you could see like the black coloring of the

15　elastic of the bandolier.  So you could see like the shell, you

16　know, the front, and then what would be the end of it.  It

17　looked like there were additional shells, but I could see at

18　least the one shell and it appeared to be like a bandolier.

19　And so we had seen the bandoliers already previously in the

20　barn that were in the open gun case.

21　　　　Q.　　You would agree that every small piece of evidence

22　is important when seeking an additional -- when seeking a

23　warrant, correct?

24　　　　A.　　Sure.  We -- you know, we put stuff into a -- when

25　we do an affidavit, as always, we put the details in there as

1    best we can, but it's not -- there's a paragraph in there

2    where we always say not everything we know is placed in there.

3    Just -- it's a requirement of probable cause to get to that

4    level.

5        Q.    Okay.  You said there was nothing you could do once

6    you saw an error in this -- the extension -- the affidavit in

7    support of the extension warrant.

8        A.    No, I said there's -- after you've asked for the

9    warrant and submitted it off and you're waiting for the judge

10   to call you back, there's nothing you can do then.  You just

11   have to wait until you -- the judge gets back to you and then

12   you -- in this particular case, it's telephonic, so the judge

13   calls you and you swear to it over the phone.

14       Q.    So it's your testimony that you swore to the

15   validity of the affidavit, waited for the judge to grant the

16   warrant, and then realized the mistake in the affidavit?

17       A.    No.  What I'm saying is I gave the information to

18   the U.S. Attorney's Office.  I think you asked me earlier maybe

19   about a time for that.  That happened somewhere in the 8:30 to

20   nine o'clock range.  We're waiting a little bit just to make

21   sure as we're there to make sure there's nothing else that we

22   need to add to the warrant.  At that point we go, okay,

23   we're -- that's all we've seen so far, so we're going to finish

24   up and going to get this other warrant.

25           So I had the conversation with the United States

1    Attorney's Office and explained everything that I had stated

2    earlier and we were then waiting for a written version of it.

3    I get that written version, I think it's probably in somewhere

4    in that 10:00 to 11:00 hour, and I read it very quickly and I

5    said, okay, it's fine, and then I had to wait.

6              I was under the impression that the magistrate judge

7    was available very shortly there afterwards and would be

8    calling us -- or calling myself, I should say -- and that

9    didn't happen.  I didn't receive the phone call for at least

10   another two hours.

11        Q.    The affidavit in support of the search warrant for

12   this extension that we're talking about indicates that you

13   gave a telephonic attestation, you swore to the affidavit at

14   1:19 p.m. on that day, March 26th; is that correct?

15        A.    Yes, that's correct.

16        Q.    So the affidavit's correct?

17        A.    What --

18        Q.    The affidavit and what I just said is correct?

19        A.    Well, when you say testation, I don't think I state

20   in the affidavit.  I think they stamp it with the time.

21        Q.    Did you telephonically attest to the affidavit?

22        A.    At approximately 1:19, yes, I would say I did.

23        Q.    Okay.  And you call in to the Court?

24        A.    No, the -- her Honor calls me.

25        Q.    Okay.  So you speak with her, you're on the phone

1   with her?

2        A.    Correct.

3        Q.    All right.  So you ask for the warrant -- you

4   provide the information to the government.  I point in this

5   direction.  I don't mean them specifically.

6        A.    Sure.

7        Q.    But you're speaking to an AUSA, an attorney; you're

8   giving them information at approximately 8:30, 9:00 a.m.?

9        A.    Uh-huh.

10       Q.    Correct?

11       A.    Yes.

12       Q.    Between 10:00 and 11:00 a.m., you're waiting for the

13   warrant to be drafted for your additional review, correct?

14       A.    Correct.

15       Q.    All right.  You hastily reviewed it that day?

16       A.    Correct.

17       Q.    Missed your mistake, plural?

18       A.    Yes.

19       Q.    And at 1:19, you take a call from the magistrate

20   judge and attest to the validity of these two pages of

21   additional facts in support of search of the four vehicles,

22   correct?

23       A.    Correct.

24       Q.    All right.  Subsequent to that -- I don't know if

25   I'm displaying for everybody or the Court, but I want this just

```
 1    for the Court.  I've -- I'm --
 2            THE COURT:  Okay.  Now you're getting just the Court
 3    and the witness.
 4            MR. STACHOWSKE:  Okay.
 5        Q.   Sir, I'm going to scroll through this.  This would
 6    be the first page of approximately four pages, well, four pages
 7    that I am going to seek to discuss with you.
 8            Do you recognize what I'm showing you?  I'll go back
 9    to the first part.
10        A.   Yes.
11        Q.   And how do you recognize --
12        A.   Yes.
13        Q.   -- it?
14        A.   It's a report that I wrote.
15        Q.   All right.  And whose signature is on it?
16        A.   Mine.
17            MR. STACHOWSKE:  I would -- I have not submitted
18    this to the clerk.  I would ask that I be allowed to email this
19    to the clerk momentarily and have this marked as Defendant's
20    Exhibit D.
21            THE CLERK:  C.
22            MR. STACHOWSKE:  C.
23            THE COURT:  It'll be marked as C for identification.
24            MR. STACHOWSKE:  And move to strike the ID.
25            MS. KRASINSKI:  Objection, your Honor.  Hearsay.
```

```
 1                    THE COURT:  Yeah, the report ordinarily doesn't come
 2      in.  You might be able to use -- you might be able to impeach
 3      him.  I'm not sure what you want to do, but --
 4                    MR. STACHOWSKE:  I do intend to impeach him.
 5                    THE COURT:  Yeah, so you can -- if you think there's
 6      an inconsistency, then you can just ask him about the
 7      inconsistency without introducing the report.
 8                    MR. STACHOWSKE:  Thank you, your Honor.
 9           Q.    Agent Forte, as with most of your work as an agent,
10      you conduct administrative reporting, correct?
11           A.    Yes.  In the work I do, yes.
12           Q.    So you've got the fieldwork and then at some point
13      following your fieldwork you've got to go back to the office
14      and record what, in fact, took place on that day in the field,
15      right?
16           A.    That's correct.
17           Q.    And why is that important?
18           A.    You need to document what happens in the
19      investigations.
20           Q.    And where do those reports go?
21           A.    It's kept at the office and then it's an online
22      system as well.
23           Q.    Do you submit those reports to the U.S. Attorney's
24      Office --
25           A.    Oh.
```

74

1    Q.    -- in the course of proceeding against a defendant?

2    A.    Yes.

3    Q.    All right.  And they review it for determination of

4    a prosecution, correct?

5    A.    That is correct.

6    Q.    And if a prosecution's brought, like in this case,

7    your reports then are submitted to defense counsel such as

8    myself, right?

9    A.    Correct.

10    Q.    So all the people are relying upon your reporting?

11    A.    Correct.

12    Q.    And this report is the search warrant that you

13    performed on March 26th, 2021.  Am I correct?

14    A.    Yes.

15    Q.    All right.  And on this search warrant -- on this

16    report, your signature is on here having -- looks like

17    April 13th, 2021.  Am I correct?

18    A.    Correct.

19    Q.    All right.  And then there's an authorized

20    individual, a Ms. Cahill, who's a resident agent that's signed

21    the next day.

22          Just briefly, is she some sort of supervisor?

23    A.    She is my direct supervisor.

24    Q.    Okay.  So you put your signature on this report

25    after you wrote it and reviewed it and verified its accuracy,

75

1  correct?

2      A.    Correct.

3      Q.    And at Bates stamp number 178 of your report, page 3

4  of 4, paragraph 9, you memorialize the events of that day with

5  respect to -- strike that.

6          With respect -- in paragraph 9, you report on the

7  facts that substantiated the extension to the search warrant,

8  correct?

9      A.    Yes.

10     Q.    Right.  And at least in your reporting you wrote, a

11 green Jeep Wrangler with New Hampshire registration, yada,

12 yada, registered to Donovan, Special Agent Forte observed a

13 shotgun shell visible in a plain view in the open center

14 console of the vehicle.

15         That's consistent with what you wrote in the

16 affidavit, is it not?

17     A.    I believe so.

18     Q.    All right.  And you've since acknowledged that

19 that's incorrect?

20     A.    What -- no, I've acknowledged what in the affidavit

21 that I was -- it says through the window was incorrect.

22     Q.    So the statement itself is inaccurate?

23     A.    Of which, of the affidavit or this report?

24     Q.    The affidavit.

25     A.    The affidavit, yes, that's incorrect.

1      Q.    Because you don't write about the -- seeing it

2  through the driver's side door, do you?

3      A.    I didn't see it through the driver's side door.

4      Q.    But you didn't make that correction here on the

5  affidavit, did you?

6      A.    You -- you can't correct the affidavit after --

7  after it's been signed.  I didn't realize the error was there

8  until a couple of weeks ago.

9      Q.    Okay.  And without discussing anything further, did

10  you report the mistake to the U.S. Attorney's Office at any

11  time prior to the defense raising the issue?

12      A.    No.  I didn't realize it was an issue or that the

13  mistake was there.

14      Q.    Paragraph 9 further discusses the blue Hyundai in

15  your reporting, correct?

16      A.    Correct.

17      Q.    All right.

18      A.    Correct.

19      Q.    And at least in your reporting you go on to state

20  SA Forte -- well, I'll read the relevant portion.

21            Inside the vehicle in plain view I observed a green

22  military-style ammunition can -- which you've testified to and

23  we've all heard about, correct --

24      A.    Correct.

25      Q.    -- where the front passenger seat should be located.

1          SA Forte later noted that only the hood of the

2     vehicle was blue and the rest of the vehicle was gray.

3          Did I read that correctly?

4     A.    Yes.

5     Q.    All right.

6          SA Forte further noted that the affidavit indicated

7     that the military-style ammunition can was on the seat rather

8     than where the seat should be mounted.

9          Did I read that correctly?

10     A.    You did.

11     Q.    Okay.  And that is not corrected in the affidavit

12     either, am I right?

13     A.    No, it says -- yes, as it states there.

14     Q.    All right.

15     A.    Yeah.

16     Q.    Did you bring that issue to the government's

17     attention?

18     A.    Via the report, yes, which gets turned over.

19     Q.    All right.  Why did you bring the Hyundai issue to

20     the attention -- help me understand how you identified the

21     issue with the Hyundai and not the Jeep.

22     A.    I apologize.  I don't remember what exhibit number

23     it is, but the photo that we show the ammo can and then there's

24     another photo with the ammo can's contents on the hood.  That,

25     combined with a picture that I had sent to the U.S. Attorney's

1    Office on scene of the Hyundai, I realized, oh, wait, it's two

2    different colors.  So then I went back and looked at the

3    affidavit for that and I said, oh, okay, well, that's what I

4    ought to just report it in my report.

5          If it I notice it's an error when I -- like in this

6    case with the affidavit, if I -- if I know it's there, I will

7    address it in my report and say, hey, I noted I said this, but,

8    you know, in review, I made a mistake, and I'll bring their

9    attention to it right away.

10          As you said, they are relying on my reports for

11    accuracy and in order to do a prosecution.

12    Q.    Thank you.

13          Officer or Agent Cook, with whom you agreed -- with

14    whom you agree with, testified yesterday that video evidence is

15    taken in connection with evidence that is found during the

16    seizure, correct?

17    A.    So our normal course of business is to do a pre and

18    a post video and then take the pictures.  I get -- personally

19    when I do it, if I'm the videographer or the photographer, I --

20    pre, post videos, I do overalls of the structure outside,

21    overalls of the inside.  It kind of depends on the individual

22    how they do it.  It's not a set way.

23    Q.    In this case, it was Agent Martin who was taking the

24    photos, am I right?

25    A.    Correct.

1      Q.    So he was responsible for photographing the entire

2  scene?

3      A.    No, he was responsible for doing the photos and the

4  video to the barn workshop and then it was extended that

5  Special Agent Cook, since he took over the doing -- documenting

6  the four vehicles, then Special Agent Martin was just

7  continuing his role as a photographer.

8      Q.    Okay.  So Special Agent Martin took all the

9  photographs on scene, am I right?

10     A.    Of the -- of the barn workshop and the vehicles --

11     Q.    Okay.

12     A.    -- yes.

13     Q.    Does ATF have a policy or procedure with respect to

14  the vantage point from which the photographs are taken?

15     A.    No.

16     Q.    All right.  Would you agree with me -- you've

17  reviewed all the discovery in this case in preparation for your

18  testimony, correct?

19     A.    I have.

20     Q.    All right.  Would you agree with me for the most

21  part that the evidence is photographed from the vantage in

22  which it was located and found?

23     A.    I'd say so.  I mean, sometimes you have to -- you

24  know, you may have -- if something's blocking it, argument's

25  sake, maybe there's a curtain blocking it and somebody may pull

1    back the curtain so that you can take a photo of it and stuff

2    like that.

3        Q.    All right.  Well, you've seen the photographs that

4    I've -- that we've put up previously.  Let me see if I can get

5    to that.

6            That's not it either.

7            We've seen the Jeep photographs.  I'm not going to

8    belabor the point by trying to pull up the photos.  The jury's

9    seen the photos.

10           You've got two Jeep -- two photos of the Jeep where

11   one photo was taken prior to the camouflage gloves being

12   removed and then after the search warrant's granted, the gloves

13   are moved and you can see the bandolier of shells in the center

14   console of the Jeep.  Do you remember those photos?

15       A.    Yes.

16       Q.    All right.  And that -- those -- both of those

17   photos were taken from the same vantage point, correct?

18       A.    Correct.

19       Q.    And that was from the driver's side vantage point?

20       A.    That's correct.

21       Q.    And yet your testimony is that you saw the shells

22   and the testimony that you gave to the Court in support of the

23   extension of the search warrant is that you saw the shell,

24   singular?

25       A.    Singular.  You could kind of see the rest of them,

1   like -- or not the rest of them, like one to either side, but

2   not completely.  So it -- I could clearly see the one shell.

3        Q.   Okay.  And you saw that one shell from the passenger

4   side of the vehicle, right?

5        A.   That is correct.

6        Q.   All right.  And that passenger side door had been

7   opened previously by the SRT team that cleared the property?

8        A.   That is correct.

9        Q.   All right.  Do you know why the photograph wasn't

10  taken from the vantage point that demonstrates the shotgun

11  shell that you saw?

12       A.   No, I do not.

13       Q.   Do you think it's important -- do you think it would

14  have been important to take that photograph, considering that

15  it's your testimony that it was observed in plain view?

16       A.   I would have very much appreciated if that photo had

17  been taken.

18       Q.   And we don't have that photo, do we?

19       A.   We do not.

20       Q.   So we're relying solely upon your testimony for

21  that --

22       A.   You are.

23       Q.   -- that fact.  All right.

24            You spent a fair amount of time going through the,

25  what, 300 -- 3,000 hours of -- I'll call it deer cam footage.

1      A.    I would call it -- yeah.  I don't know, whatever you

2   want to call it, but to me it's a security video system, you

3   know.

4      Q.    Okay.

5      A.    That's what it's intended to be for.  But --

6      Q.    And that -- so when you were on scene searching the

7   property, you identified a camera that we've -- that you've

8   discussed on direct examination, correct?

9      A.    Correct.

10      Q.    All right.  And that camera was seized as a result

11   of the search?

12      A.    Yes.

13      Q.    All right.  And since then --

14      A.    Well, I'm sorry.  I should correct that.  The DVR

15   was seized.  The cameras were left.

16      Q.    Fair enough.

17            And how many hours of that footage have you

18   personally watched?

19      A.    You know, it's probably closer to a hundred hours

20   that I've sat there and watched it minute for minute, but then

21   there's probably even more that I've scrubbed through or just

22   clicked through, just trying to see if there was anything else

23   we could find.

24      Q.    And in all of that time, did you ever see -- out of

25   the exhibits that have been provided, did you ever see my

```
1    client possessing a firearm?
2         A.    Last night I did find a clip.  Unfortunately --
3              MR. STACHOWSKE:  Your Honor --
4              THE COURT:  Stop.
5              Members of the jury, could you just step out for a
6    minute?
7                        (Jury excused.)
8              THE COURT:  Has the government got some clip of him
9    holding a gun?
10             MS. KRASINSKI:  Strapped to his back, and Agent
11   Forte found it last night.  It was disclosed this morning.
12             THE COURT:  So you knew that there was going to be
13   talk about this gun?
14             MR. STACHOWSKE:  I did not know they were going to
15   be talking about this gun.  I specifically just asked him in
16   all the material that's been presented here.
17             THE COURT:  Did you know that they had given you
18   this morning a clip from this camera system showing your client
19   with a gun?
20             MR. STACHOWSKE:  They have not provided it to me is
21   my knowledge.
22             MS. KRASINSKI:  It is on the --
23             THE COURT:  Okay.  Did you just give him like a -- a
24   big -- thumb drive and say, here's a thumb drive, but you
25   didn't tell him that there's a picture in there of a guy
```

84

```
 1   holding a gun, of the defendant holding a gun?
 2            MS. KRASINSKI:  As I understand it from Ms. Shedd,
 3   who handed him the thumb drive, that she provided him the thumb
 4   drive.  I think it contains the three jail calls from last
 5   night --
 6            THE COURT:  No, did somebody tell him --
 7            MS. KRASINSKI:  -- a video clip --
 8            THE COURT:  -- I've given you some stuff and you
 9   ought to know there's a picture in there of him hold --
10   carrying a gun?
11            MS. KRASINSKI:  So my understanding was that the
12   conversation was there are clips from the video footage and --
13            MR. STACHOWSKE:  The government's --
14            THE COURT:  Wait.  One at a time.
15            Finish what you're saying.
16            MS. KRASINSKI:  And because they were found last
17   night and they weren't on our exhibit list, I specifically
18   did not ask Agent Forte about them or try to introduce them
19   because --
20            THE COURT:  Okay.
21            MS. KRASINSKI:  -- you know, we found it late in the
22   game.
23            THE COURT:  I understand you're not -- it's late in
24   the process, you can't say it's the particular gun probably
25   that he's charged with possessing here.  Whether you could
```

1    prove him guilty of possessing another gun other than the one

2    you've identified in the indictment is a question in my mind,

3    but the better practice would be you knew that there was -- in

4    the material that you were giving him was a clip showing

5    Mr. Donovan carrying a gun.  You should have told him that.

6    It's not Ms. Shedd's responsibility.

7                    MS. KRASINSKI:  I understand --

8                    THE COURT:  She's a paralegal.

9                    MS. KRASINSKI:  -- it's not her responsibility.

10                   THE COURT:  You're the lawyer.  You should tell him

11    those kinds of things.  Now, I'm not -- I'm just saying that's

12    the better practice.  All right?

13                   Ordinarily lawyers don't ask questions that they

14    don't know the answers to.  You tried to cabin your question

15    in a very narrow way, but it was done in a way that I -- I'm

16    not -- I don't believe that the agent is blurting out something

17    nonresponsive to your question.  He's trying to answer your

18    question and he doesn't necessarily know what you've been told

19    and haven't been told.  So it's just a matter of like no one

20    here is kind of exercising best practices, but nobody's trying

21    to do anything that's intentionally problematic.

22                   So we stopped him before he said something other

23    than he said there's a clip.  I'm happy to tell the jury to

24    disregard his answer to that question and allow you to rephrase

25    your question again and say in the discovery that was produced

1    to me prior to trial, including all of those clips, did you see

2    any of them in which the defendant is carrying a gun.  And I

3    assume his answer to that is no.

4                    MS. KRASINSKI:  To be clear, it was in the discovery

5    that was provided well --

6                    THE COURT:  The 3,000 hours of tape.

7                    MS. KRASINSKI:  Right.

8                    THE COURT:  Right.  That nobody would look at.

9    Okay?

10                   MS. KRASINSKI:  Right.

11                   THE COURT:  Nobody would look at that.

12                   So I -- I am going to treat this as -- I want the

13   jury to hear that in answer on the discovery material that was

14   produced, you did not prior to this trial see any clip -- any

15   clip of the defendant holding a gun.  All right?

16                   That can -- that can make your point and then you

17   can argue from that to the jury that at no -- at no point did

18   Agent Forte reviewing these -- any of these tapes see the

19   defendant holding a gun prior to the start of this trial.

20   That'll be literally true.

21                   MS. KRASINSKI:  Yes.

22                   THE COURT:  And the evidence of him seeing a gun

23   after the start of this trial is -- it's too bad.  You should

24   have done your work before the trial.  So you didn't do it, and

25   then you just have to live with that.

87

 1          MS. KRASINSKI:  And that's why I did not bring it up

 2  in his direct examination.

 3          THE COURT:  I know.  But you see the problem, that

 4  we get -- the agent has to try to answer questions truthfully

 5  and he doesn't necessarily know what you guys are doing.

 6  That's -- that's an important fact.  And, you know, that it's

 7  hidden somewhere in 3,000 hours of tape is -- you know, I --

 8  I -- that's just not the way I want things to be done.

 9          I'm not -- I'm not -- I want to be clear.  There's

10  no prosecutorial misconduct here.  You haven't acted

11  unprofessionally or violated any rule or anything else.  This

12  is about what I'm saying is a best practice.  The best

13  practice, what I expect the prosecutors in my court to follow,

14  is you don't charge somebody in this building, in my

15  experience, unless you believe you have overwhelming evidence

16  of their guilt.  Right?

17          So you've got nothing to hide, you disclose

18  everything, you make it all crystal clear to the other side,

19  and then you go out and convict the defendant because you have

20  overwhelming evidence of their guilt.  That's -- that's not

21  what is legally required, but that is the best practice to

22  follow.  Okay?  That's all I'm saying.

23          And I don't -- I'm not being critical of you.  I

24  have a really high regard for you.  I respect your integrity.

25  But I do feel a need to protect Mr. Donovan here by striking

```
 1    that last statement and by allowing counsel to properly phrase

 2    a question to which I expect the agent to give a -- this

 3    answer.

 4              And if I'm wrong about this, Agent, tell me.  If you

 5    are asked the question, prior to the start of this trial, did

 6    you review any of that videotape and in any of the videotape

 7    that you reviewed, did you see any image of Mr. Donovan

 8    carrying a gun --

 9              THE WITNESS:  Not that I could say was a firearm

10    because of the image quality.

11              THE COURT:  Okay.  Well, I -- I don't want -- that

12    would be then inviting the jury to speculate.  So you're saying

13    I saw things which could be a gun, but I can't say they are a

14    gun, right?

15              THE WITNESS:  Yeah.

16              THE COURT:  Yeah.  And if we hadn't gotten into the

17    problem of you starting to talk about a gun that he didn't know

18    about, I wouldn't be -- maybe the best way to do it is to just

19    stipulate -- maybe we'll do it in terms of I'll give an

20    instruction to the jury.  I instruct you that prior to the

21    start of this trial that the -- the -- now, is this true, that

22    the government didn't know about the gun image that this --

23    until the start of the trial?

24              MS. KRASINSKI:  That's correct.  We literally found

25    it at maybe eleven o'clock last night, maybe 10:00.  It was --
```

```
 1   that's when it was found.

 2               THE COURT:  Okay.

 3               MS. KRASINSKI:  So we did not know --

 4               THE COURT:  And, you know, who knows what else is in

 5   there that's inculpatory of Mr. Donovan for 3,000 hours of

 6   tape.  But, you know, you didn't get -- you know, one of those

 7   other things, like not analyzing the DNA, that doesn't get

 8   done.  And that's -- these things happen.

 9               I'm trying to make sure I give a fair trial to

10   Mr. Donovan.  That's what my primary concern is at this moment.

11   And I want to dispel any thought in the jurors' minds that

12   there's evidence that they're not seeing of Mr. Donovan

13   carrying a gun.  Okay?  Because it's not proper for them to

14   hear that kind of evidence because it wasn't disclosed, in my

15   mind, in a way that is fair to Mr. Donovan.  And so I'm just

16   going to err on the side of caution here.

17               And I don't want to put you in a position where you

18   have to compromise the truth of any statement you make, so I

19   think I'll just do it as I'll instruct the jury to disregard

20   the last statement and instruct the jury that there is -- there

21   will be no evidence in this case to suggest that there is

22   videotape of the defendant holding a gun.  Because I'm not

23   going to allow it.  So that will be a literally true statement

24   and I think that will dispel any potential inference that the

25   jury might draw from that question.
```

90

```
1              Is that satisfactory to you, Mr. Stachowske?

2              MR. STACHOWSKE:  Yes, your Honor.  Thank you.

3              THE COURT:  Okay.

4              MR. ROMBEAU:  Your Honor, just since it ties a

5    little bit to what we talked about earlier, if the defendant

6    testifies, we may seek --

7              THE COURT:  Right.  Look, if -- if the defendant's

8    girlfriend testifies, I expect detailed cross-examination:  Are

9    you saying the entire time that you had all this firearm, he

10   never picked up a shell, he never held a gun, he never did

11   any -- that's all completely fair game.  Okay?  But I don't

12   want to -- I'm going to instruct the jury that there will be no

13   evidence here of videotape of him holding a gun.

14             Now, if -- if there is impeachment, someone takes

15   the stand and denies that he ever held a gun, then that could

16   open the door to showing the -- because, you know, that -- the

17   defense now knows about it and that would be fair impeachment.

18             So -- and I'll just say you have -- so I'll modify

19   what I'm saying:  You will -- you have not heard any evidence

20   in this case of the defendant holding a gun and you can't

21   speculate about that based on the evidence that's been

22   presented.

23             So that leaves you flexibility, depending upon what

24   happens on -- if the -- if the defendant testifies and lies,

25   it's fair game.  If the defendant's girlfriend testifies and
```

91

 1    lies, those things are fair game.  Okay?  People have to tell

 2    the truth when they're testifying here.  Okay?

 3                 MR. ROMBEAU:  Thank you, your Honor.

 4                 THE COURT:  All right.  Let's bring the jury back

 5    in.

 6                      (With the jury present.)

 7                 THE CLERK:  Please be seated.  Court is in session.

 8                 THE COURT:  So, members of the jury, the witness

 9    started to make a reference to a clip.  I'm instructing you to

10    disregard that last answer in its entirety and I'm -- I'm

11    telling you that you have not seen or heard any evidence of any

12    clip showing the defendant holding a firearm.  And you can't

13    speculate about that based on the evidence, so just disregard

14    that answer and don't do any speculation about whether there's

15    some kind of evidence of the defendant holding a firearm

16    because you haven't heard it and you know I've told you that

17    you have to base your verdict on what you hear here in court.

18                 So disregard that answer and don't gauge any kind of

19    speculation about it, whether there's a clip of the defendant

20    holding a gun.  All right?

21                 Go ahead, Counsel.

22                 MR. STACHOWSKE:  Thank you, your Honor.

23         Q.   Agent Forte, picking up where we left off, I believe

24    you testified, quote, unquote, that the gun was found in Corey

25    Donovan's Jeep.

1          You agree with me that a more correct and accurate

2    statement is that the Jeep is titled to Mr. Donovan, correct?

3          A.   Yes.  It's registered to him, yes.  I don't know --

4    I've never viewed the title itself.

5          Q.   All right.  But that Ms. Finnigan lives on the

6    property?

7          A.   She does.

8          Q.   All right.  And that in your observation in watching

9    these videos, Ms. Finnigan spends considerable amount of time

10   and is the companion of Mr. Donovan, correct?

11         A.   Yes.

12         Q.   She spends considerable amount of time with him and

13   is his companion, right?

14         A.   I guess so.  Like I said, I haven't watched all of

15   that, but I see her a lot in the video around there, yes.

16         Q.   Yeah.  You've also said that there's no fingerprint

17   analysis for this firearm, right?

18         A.   That is correct.

19         Q.   You have no evidence whatsoever of the ownership of

20   this firearm, do you?

21         A.   We knew who the original purchaser was and then we

22   recovered it out of the Jeep.

23         Q.   And, finally, you have no idea how the gun got in

24   the Jeep?

25         A.   I don't know how it got in the Jeep, no.

1  Q.   Okay.  And you're the lead investigator on this

2  entire investigation, correct?

3  A.   Yes.

4  Q.   And it was your case to bring to the U.S. Attorney's

5  Office, correct?

6  A.   That is correct.

7  Q.   And in doing so, as the lead investigator, you,

8  again, have no idea how that gun was put in the Jeep?

9  A.   I do not.

10  MR. STACHOWSKE:  Okay.  Thank you.

11  THE COURT:  Thank you.  Any redirect?

12  REDIRECT EXAMINATION

13  BY MS. KRASINSKI:

14  Q.   Attorney Stachowske asked you if we're relying

15  solely on your testimony that ammunition was visible from

16  outside the vehicle.  Right?

17  A.   I believe so, yes.

18  Q.   And you are, is it fair to say, the only person who

19  has testified that from the passenger side, you could see

20  ammunition from outside the Jeep, right?

21  A.   Yes.

22  Q.   But that's not the only testimony that ammunition

23  was visible from outside the Jeep, correct?

24  A.   Correct.

25  Q.   Agent Cook, in fact, testified that before the

94

```
 1    search, he could see ammunition from the driver's side,
 2    correct?
 3            A.    Correct.
 4            Q.    So it's not only your testimony, fair?
 5            A.    Fair.
 6            Q.    Now, just sort of going back to the Jeep, the Jeep
 7    is registered to Corey Donovan?
 8            A.    It is registered to Corey Donovan, yes.
 9            Q.    In all the video you've watched, who drives the
10    Jeep?
11            A.    Corey Donovan.
12            Q.    Have you ever seen Kelley Finnigan drive the Jeep?
13            A.    No, I have not.
14            Q.    Have you ever seen her in the Jeep without Corey
15    Donovan there?
16            A.    Maybe briefly, if she's waiting for him.  There may
17    have been a brief moment where he walked away from the Jeep but
18    they were leaving shortly there afterwards that she might have
19    been alone in the Jeep for, you know, maybe a minute, maybe
20    two, if that.
21            Q.    So, generally, when she's at the Jeep, Corey
22    Donovan's there, too?
23            A.    Yes.
24            Q.    Have you ever -- you've never seen her drive it?
25            A.    I have not.
```

```
 1        Q.    Have you seen Corey Donovan drive it without Kelley

 2   Finnigan?

 3        A.    I have.

 4        Q.    Have you seen Corey Donovan access it without Kelley

 5   Finnigan around?

 6        A.    Yes.

 7        Q.    Have you seen Corey Donovan get in the Jeep with a

 8   flashlight looking around in there without Kelley Finnigan

 9   around?

10        A.    I have.

11        Q.    But not the opposite, right?

12        A.    Correct.

13              MS. KRASINSKI:  No further questions.

14              THE COURT:  All right.  Thank you, sir.  You can

15   step down.

16                        (Witness excused.)

17              THE COURT:  Call your next witness, please.

18              MS. KRASINSKI:  The United States calls Agent

19   Kelsch.

20              THE COURT:  Come on up here, sir.  Stand by this

21   witness stand and raise your right hand.

22              **MATTHEU KELSCH**, having been first duly sworn,

23   testified as follows:

24              THE CLERK:  Thank you.  You may be seated.

25              THE WITNESS:   Thank you.
```

```
 1                THE CLERK:  Can you please state your full name and
 2    spell your last name for the record.
 3                THE WITNESS:  Yes.  Your Honor, should I remove this
 4    or keep it on?
 5                THE COURT:  Yes, you can take it off.
 6                THE WITNESS:  Thank you, your Honor.
 7                My full name is Mattheu Kelsch.  I'll spell both
 8    because the first is a little different.  It's M-a-t-t-h-e-u
 9    and the last name is Kelsch, K-e-l-s-c-h.
10                         DIRECT EXAMINATION
11    BY MS. KRASINSKI:
12         Q.   Agent Kelsch, where do you work?
13         A.   I'm employed as a special agent with the Bureau of
14    Alcohol, Tobacco, Firearms, and Explosives or more commonly
15    known as the ATF.
16         Q.   How long have you been with ATF?
17         A.   I've been with ATF for approximately 20 years.
18         Q.   And what do you do with ATF?
19         A.   I am a special agent, so normally work regular
20    investigations in regards to firearms, arson, explosives
21    violations, but in the past few years I have been placed in a
22    specific role.
23         Q.   And what is that?
24         A.   So for the past approximately five years, I've been
25    working as a computer forensic examiner for ATF.
```

1      Q.     And tell us what that means.

2      A.     So during the course of our investigations, we run

3   into different devices, mobile devices, computers and such.

4   Some agents have a collateral duty to work on these types of

5   devices.  I've been assigned in a full-time capacity to spend

6   the majority of my time working on the analysis of these types

7   of devices.

8      Q.     And have you received training to fulfill that role?

9      A.     Yes, I have.

10     Q.     Can you generally describe that to us, please?

11     A.     Yes.  In 2012 I began the process of becoming a

12   certified examiner with ATF.  There are a number of courses

13   that we're required to take, but it culminates in a

14   certification process where you take specific tests and are

15   graded on the tests.  Upon the completion of that, you become a

16   certified examiner.

17          In moving on through the years, I became assigned

18   recently, or in the past five years, to work over with the

19   Federal Bureau of Investigation or the FBI.  They have

20   something that's called the New England Regional Computer

21   Forensics Lab located in Chelsea, Massachusetts.  It's a lab

22   that has both federal, local, and state officers working in it.

23          Prior to transfer to that particular lab, I went

24   through an additional certification process.  It was a 13-week

25   process that included classes and at the culmination of classes

98

```
 1    a certification practical and exam and culminated in a course
 2    on testimony as well.
 3              THE COURT:  Wait a second.  Wait a second.  I can
 4    see when my reporter is stressed.  And when you start talking
 5    as fast you are, as good as she is, it can get -- it's hard for
 6    her.  So if you can just slow it down --
 7              THE WITNESS:  I apologize, your Honor.
 8              THE COURT:  -- just a tad.
 9              THE WITNESS:  I will certainly slow down.  Thank
10    you.
11        Q.    And what's your current role there?
12        A.    So currently I serve as the deputy director for the
13    lab.  We call it the RCFL.
14        Q.    And even though you're the deputy director, do you
15    still assist in processing digital evidence?
16        A.    Yes.  The direct position is a collateral duty, so I
17    spend half of my time in that position and half of my time
18    working on forensic examinations.
19        Q.    Have you become familiar with something called
20    GrayKey?
21        A.    Yes, I am.
22        Q.    What is that?
23        A.    GrayKey is a particular tool that is used for the
24    unlocking and extraction of devices, primarily Apple devices.
25        Q.    And, generally, how does it work?
```

1  A.   The specifics of the function of the device are not

2  shared with us.  It's proprietary information that the company

3  Grayshift keeps to themselves, but the device is basically used

4  by taking a -- a mobile device such as an iPhone, attaching it

5  to the device.  It uses certain software techniques to either

6  extract the data from the device or to unlock the device and

7  give us its passcode.

8  Q.   And then can it also be used to extract data from a

9  phone once you're able to identify the passcode?

10  A.   Yes, it's able to extract data with or without the

11  passcode, depending on the state of the device.

12  Q.   And approximately how many phones have you used

13  GrayKey to extract the data from?

14  A.   Myself personally, I would say I have done over

15  probably 50 phones myself, but I've used the device in the past

16  where I would send it to other examiners to have them use the

17  GrayKey device as well.  So if I were to include those, I'd say

18  a few hundred.

19  Q.   And is it a tool that law enforcement commonly use

20  for this purpose?

21  A.   Yes, it is.

22  Q.   Have you found it to be reliable for extracting data

23  from a cell phone?

24  A.   Yes, I have.

25  Q.   Now, once GrayKey is used to extract data from a

1    phone, how do you then sort of take that next step of looking

2    at the data?

3        A.    Sure.  So when GrayKey extracts the data from the

4    phone -- and there's different types of extractions, but when

5    it gets that data off the phone, it's not in a way that we can

6    just look at it.  It's kind of in a folder structure that

7    wouldn't be easy to look through.  So we'll take that

8    extraction information and place it into another tool to

9    actually look at the data and analyze it.

10       Q.    And what's that tool called?

11       A.    What we commonly use is a tool called Cellebrite.

12       Q.    And have you been trained in using Cellebrite?

13       A.    Yes, I have.

14       Q.    And have you used it frequently?

15       A.    Yes, I have.

16       Q.    Can you estimate how many times?

17       A.    So, basically, Cellebrite's used with every mobile

18   device that we handle, so it's hundreds of devices at this

19   point.

20       Q.    And a tool that's commonly used by law enforcement?

21       A.    Yes, very much so.

22       Q.    Have you found it to be reliable in analyzing or

23   reviewing data that has been extracted from a cell phone?

24       A.    Yes, I have.

25       Q.    Now, shifting gears a little bit, how did you become

101

1    involved in the investigation that brings us here today?

2         A.    So we'll regularly receive a service request from an

3    agency and those requests will be assigned to an examiner.  It

4    just so happens in this particular case this service request

5    came in from our ATF New Hampshire office and I ended up being

6    the examiner being assigned to work this particular case.

7         Q.    And was that to extract data from an iPhone XR?

8         A.    That's correct, yes.

9         Q.    If I just refer to it as an iPhone, will you know

10   what I'm talking about?

11        A.    Yes, I would.

12        Q.    Okay.  So when did you receive this particular

13   iPhone?

14        A.    This particular iPhone was taken into the custody of

15   the RCFL on April 2nd of this year.

16        Q.    And was an extraction performed?

17        A.    Yes, it was.

18        Q.    And what tool was used for the extraction?

19        A.    The GrayKey tool was used on the particular device.

20        Q.    And are there different types of extractions?

21        A.    Yes, there are.

22        Q.    And what are those?

23        A.    So depending on the state of the device, there's

24   different extractions and each extraction allows for a

25   different amount of information.

1           When it comes to an iPhone, there's really only two

2    types of extractions.  There's a logical extraction, which is

3    kind of best defined as what you would see on the phone if

4    you're looking at it.  So the device will take off the data

5    that you can see, text messages, photos, other things like

6    that.

7           The next level when it comes to an extraction is

8    something called a file system extraction.  And during a file

9    system extraction, the device takes the entire file system, so

10   all the files and everything, all the data that's on the

11   device, including data that you as a regular user cannot see.

12          The third type of extraction is a physical

13   extraction and that's where we actually get a copy of the bit

14   for bit data, every little one and zero that's on a device, and

15   that also includes data that may be deleted.  In the case of

16   iPhones, we're not able to get a physical extraction, so a file

17   system extraction would be the best type of extraction that

18   could be performed.

19       Q.    And was data recovered from -- was an extraction

20   successful on this iPhone?

21       A.    Yes, we were able to get a full file system

22   extraction on this particular iPhone.

23       Q.    And was that using GrayKey?

24       A.    Yes, it was.

25       Q.    And after that, was the data from this iPhone then

1    put into the Cellebrite UFED reader that you discussed earlier?

2        A.    Yes, it was.

3        Q.    And what do you do with the phone, the physical

4    phone, once the data's extracted and you've got the data from

5    the phone in this Cellebrite reader?

6        A.    So any data that's extracted from the phone is the

7    original data, the data that I explained before where you

8    couldn't actually look at it, that's saved onto some sort of

9    media, either a Blu-Ray or USB.  And the derivative data,

10   whatever analytical data we get from Cellebrite, is created

11   into what's called a Cellebrite reader report, and that's a --

12   a system that Cellebrite's created where you can look at data

13   and you can bookmark it and view it in certain ways and create

14   other reports.  That's also saved onto some sort of media, be

15   it a Blu-Ray or USB.

16           At the end of my work, all of that is returned to

17   the originating agency to include whatever original devices

18   were supplied to us as well.

19       Q.    And do you understand that for purposes of trial the

20   government has elected to introduce only a portion of the

21   iPhone extraction?

22       A.    Yes, I'm aware of that.

23       Q.    If we were to have the whole iPhone extraction

24   printed out and here, what would that look like?

25       A.    The average extraction, because of the amount of

1    data that's on there, would be tens of thousands of pages if it

2    was actually printed out.

3        Q.    And in preparation for your testimony today, did you

4    review the evidence identified in Government's Exhibits 500,

5    501, and 502?

6        A.    Yes, I did.

7        Q.    Are each of those exhibits reports containing

8    information received from the iPhone through this extraction

9    process?

10        A.    Yes, they are.

11        Q.    So let's go one at a time.

12            Can we show for the witness only Government's

13    Exhibit 500.

14            Do you recognize that?

15        A.    Yes, I do.

16        Q.    What is it?

17        A.    So we talked about the system Cellebrite before and

18    that's a system that allows us to analyze the data.  This is a

19    subreport, so we have the full report from Cellebrite.  This is

20    a subreport that would include some basic device information on

21    the particular device in question.

22        Q.    And is it an accurate report from this iPhone

23    extraction?

24        A.    Yes, it is.

25            MS. KRASINSKI:  Your Honor, I'd move to strike the

```
 1    ID on Government's Exhibit 500.

 2              THE COURT:  Any objection?

 3              MR. STACHOWSKE:  Your Honor, could I have a second

 4    with the government?

 5              THE COURT:  Yes.

 6                   (Discussion between counsel.)

 7              THE COURT:  Any objection, Mr. Stachowske?

 8              MR. STACHOWSKE:  Your Honor, I -- if I could make

 9    a -- a speaking response here.

10              No objection with respect to my client while

11    preserving the owner of the cell phone's right to object to the

12    seizure or the search -- we have no standing to make an

13    objection at this time with respect to the seizure and search

14    of Ms. Finnigan's phone.

15              THE COURT:  Let me just -- so in terms of you're

16    just saying we can't make a Fourth Amendment challenge to the

17    search and seizure of the phone.  I agree with you on that.

18    And you're just noting you're not waiving any objection she

19    might have to the lawfulness of the search or seizure of the

20    phone.

21              MR. STACHOWSKE:  Thank you.

22              THE COURT:  But in terms of the admissibility of it

23    into evidence, you are not interposing an objection.  Do I have

24    that right?

25              MR. STACHOWSKE:  That's correct, your Honor.
```

1                    THE COURT:  Okay.  So it can be admitted.

2                    MS. KRASINKSI:  And before we go through all of

3       these, so I'll move to strike the ID on this one.  Let's --

4       before we --

5                    THE COURT:  Wait a minute.  One of the monitors --

6                    THE CLERK:  I'll see --

7                    THE COURT:  Okay.  Thank you.

8                    MS. KRASINSKI:  And, your Honor, I'm going to go

9       through the formal process of admitting all of these before we

10      sort of go into detail on them.

11                   THE COURT:  Well, have you reviewed with him what

12      they are?  Maybe can we speed this along?  Is it just the same

13      issue and no other objection or do you have --

14                   MR. STACHOWSKE:  No other.

15                   THE COURT:  -- selective objections?

16                   MR. STACHOWSKE:  No other objection.

17                   THE COURT:  They'll all be admitted by agreement.

18      Just read the numbers so we know what they are.

19                   MS. KRASINSKI:  All right.  So that's Government's

20      Exhibit 500, 501, 501a, 501b --

21                   MR. STACHOWSKE:  I will note my earlier --

22                   THE COURT:  Right, the earlier Fourth Amendment

23      issue that's her issue.  Is there another previously raised

24      objection that I've ruled on?

25                   MR. STACHOWSKE:  The -- yes, with respect to -- not

1    necessarily duplicative, but excessive number of photos.

2              THE COURT:  Oh, this is about the number of images

3    you want to show?

4              MR. STACHOWSKE:  Yes.

5              THE COURT:  All right.  So I will -- you -- your

6    right to object when you believe the displays have become

7    cumulative is preserved.  So when you get to that point, you

8    tell me, Judge, I think it's cumulative now.  I'll either agree

9    or disagree and we'll go along from there.  Okay.

10             MR. STACHOWSKE:  Thank you, your Honor.

11             THE COURT:  You're not asserting any other objection

12   other than cumulative?

13             MR. STACHOWSKE:  No, I'm merely pointing out.  I'm

14   sure the government will use proper judgment.

15             THE COURT:  Okay.  So just read them in and I can

16   strike the exhibits if I determine later that they're

17   cumulative.

18             MS. KRASINSKI:  Okay.  So 500, 501, 501a, 501b,

19   501c, 502, 502a, 502b, 502c, 502d, 502e.

20             MR. STACHOWSKE:  I think we're at cumulative, your

21   Honor.

22             THE COURT:  All right.  Well, let's go with those so

23   far and then we'll see if I'll allow additional ones.  Okay?

24   Those will be admitted.

25             (Government's Exhibit 500, 501, 501a,

1            501b, 501c, 502, 502a, 502b, 502c, 502d

2            and 502e admitted.)

3            THE COURT:  All right.  And you have a right to try

4    to get others in, but let's see where we are.

5            MS. KRASINSKI:  We said A through E.

6            THE COURT:  E, 502e.

7       Q.   All right.  Let's look at Government's Exhibit 500.

8            In investigations like this, is there a way for law

9    enforcement to determine the user of a phone?

10      A.   Yes, there's a number of ways.

11      Q.   And how do you do that?

12      A.   So when we extract the information from the device

13   and also physically on the device there may be information.

14   There's a number of areas we look.

15           The first would be the IMEI, which is basically a

16   term for a digital serial number on the device.  That would be

17   found physically on the device, but also in extraction that

18   would tie that device back to a particular person through a

19   service provider, whatever telephone provider you may be using.

20           Additionally, there are other areas in the phone

21   that may lead us back to the owner.  Commonly on an iPhone,

22   each iPhone is required to be registered with an Apple ID or an

23   email address.  So we look towards that email address.

24           When you set up your iPhone, you are allowed to put

25   a user name into that iPhone.  We'll often look at that user

```
 1    name as well.

 2              And there is also a further area, it's called the

 3    MSISDN, and that's basically a name for what is the telephone

 4    number associated with that particular device.  And we could go

 5    back with that and -- to a -- to a telephone provider and see

 6    who was subscribing to that number.

 7         Q.    And when you extract data from, say, an iPhone, is

 8    there an -- oftentimes a device name associated with it?

 9         A.    Yes, I just mentioned that.

10         Q.    Yeah, right.  Excuse me.  And what's the device name

11    on this phone?

12         A.    Sure.  I apologize.  I'm sure it's hard to see on

13    here.

14         Q.    I think we can enlarge that.

15         A.    Thank you.

16              So here we see the device name, so that's the name

17    that the user has given to the device.  And here we see it's

18    Kelley's iPhone.

19         Q.    And what's the Apple ID associated with this phone?

20         A.    So if we look more up towards the top, I believe

21    it's the fourth line down -- so if we look at the fourth line

22    down from the top, we see the Apple ID and --

23              THE COURT:  It looks like you had it up there.

24              THE WITNESS:  Would you like me to wait?

25              THE COURT:  Go ahead.
```

110

 1                THE WITNESS:  All right.  And so it's a Kelley Fin,

 2    K-e-l-l-e-y, F-i-n, at iCloud.com.

 3        Q.    And if we turn to the second page of this briefly,

 4    there is sort of a list of user accounts.  What's that mean?

 5        A.    Yes.  So every mobile device usually has different

 6    accounts that a user may subscribe to.  Common accounts would

 7    be Facebook or Instagram, but it can be any number of accounts.

 8    And on this particular page of the report it gives a listing of

 9    some of the accounts that are on the device and the user name

10    that was used to -- to sign in to the account.

11        Q.    And let's just look at one, the one associated with

12    number 17.

13                Can we enlarge that, please?

14                And can you tell us about that?

15        A.    Yes.  If we look at row 17, that is for the

16    account for Gmail, which is a common email application,

17    and the login for that account would be the email of

18    kelley.finnigan@gmail.com.  That's K-e-l-l-e-y, dot, Finnigan,

19    F-i-n-n-i-g-a-n.

20        Q.    Now -- so everything we know about the user of this

21    phone, at least according to this, relates to Kelley Finnigan;

22    is that fair?

23        A.    That would be correct, yes.

24        Q.    When you're looking at communications from a phone

25    to another person, are there ways for law enforcement to

1　determine who the phone's user is communicating with?

2　　　A.　Yes.　So when someone's communicating, be it in a

3　text message or a chat message, the phone is saving, obviously,

4　the information from each of those parties.　The way it comes

5　up with a name for that is it -- it will use the contact book,

6　so your contacts, so the people that you have normally entered

7　into your phone.　You'll give a name and a phone number and

8　it's using that to match it to the actual phone number that the

9　device is communicating with.

10　　　Q.　And so who inputs the name and the number?

11　　　A.　It would be the user.

12　　　Q.　So if we've got a name associated with a phone

13　number, we might want to do additional -- look at additional

14　things to make sure that the name goes with that number; is

15　that fair?

16　　　A.　It would be, yes.

17　　　Q.　And what are other things that you could look at?

18　　　A.　So as far as that -- it's some of the things I

19　mentioned before.　You could take that phone number and you

20　could go back to a subscriber and find out who actually

21　belonged to that telephone number.

22　　　Q.　Could you also look at the content -- the contents

23　of the communications themselves?

24　　　A.　Yes.　Obviously, depending on the content, there

25　could be names given within the actual structure of the

112

1    conversation.

2        Q.    Or is it possible a user would take a selfie or

3    another way to identify themselves?

4        A.    Yes, often within texts or chats you can transfer

5    photographs, which will oftentimes have either one of the

6    participants within a conversation.

7        Q.    And I just used the term selfie.  What does that

8    mean?

9        A.    Selfie is a basically a picture taken of yourself.

10       Q.    Let's look at Government's Exhibit 501, please.

11             What is this report?

12       A.    Well, this particular report is showing a

13   conversation between two participants.  The participants are

14   listed at the top.

15       Q.    And who are the listed participants?

16       A.    So listed on the top is a phone number, which is

17   hard to read at this vantage point, thank you, of

18   (978) 221-7763 and under it we see the name of Corey and that

19   would have been taken by Cellebrite from the contacts list

20   within this particular device.

21       Q.    So -- and that would have been input, presumably, by

22   the user?

23       A.    That's correct yes.

24       Q.    So presumably by Kelley Finnigan?

25       A.    You would assume that, yes.

113

1       Q.   Okay.  And Exhibit 501, is this all the texts

2  between the person identified as Corey and the user of this

3  phone?

4       A.   This is the -- the entire chat conversation between

5  the two.

6       Q.   Now, you can see from the first page that there are

7  black boxes.

8       A.   Yes.

9       Q.   Is that how it appears when you look at it in the

10  UFED reader initially?

11       A.   No.  There's been some information redacted from

12  this report.

13       Q.   Now, the green sort of conversation bubbles, who

14  would be sending those, the person identified as Corey or the

15  iPhone's user?

16       A.   So on the right-hand side with the green bubble

17  would be the user.

18       Q.   And on the left-hand side with the blue bubbles?

19       A.   So on the left-hand side in the blue bubble it would

20  be the participant and, in this particular case, it's with a

21  participant by the name of Corey.

22       Q.   Now, we're not going to look at every single text

23  message.  We're just going to do two sort of quick things.  And

24  the first is look at some user attribution stuff related to the

25  person identified as Corey and then look at some references to

114

1    the Jeep.

2              So, Ms. Shedd, can you please turn to page 252 of

3    this document.

4              And what does the user of this phone say in the

5    unredacted text message at the top?

6        A.    So if we look at this message here, and this is on

7    October 18th of 2020, it says:  Corey, call ASAP.  Worried

8    about you.

9        Q.    And if we turn to page 260 of this document and we

10   enlarge that top green conversation bubble at the top, what's

11   the content of that?

12       A.    So this would be an outgoing message sent on

13   October 26th of 2020 which reads:  I love you, Corey VLK

14   Donovan.

15             MS. KRASINSKI:  Now, can we turn to page 5 of this

16   report, please.

17       Q.    And do these appear to be images sent back and forth

18   between the parties?

19       A.    Yes.  So these would be images that were embedded

20   within the chat conversation.

21       Q.    And if you look at the images in the bottom green

22   conversation bubble, is that the image that's included as

23   Government's 501b?

24       A.    Yes, it is.

25             MS. KRASINSKI:  And let's just pull up 501b.

115

1      Q.    Is that that same image?

2      A.    Yes, it is.

3      Q.    And the last user attribution for this, if we could

4  turn to page 10 of this report, does it appear that the user of

5  the phone identified as Corey sent a photograph to the iPhone?

6      A.    Yes, that would be correct, on August 2nd of 2020.

7      Q.    And if we look at Government's Exhibit 501c, is that

8  the same image?

9      A.    Yes, it is.

10     Q.    Does that appear to be a selfie to you?

11     A.    It does, yes.

12     Q.    So moving away from sort of user attribution of the

13  two people in this conversation, let's look at three references

14  to the Jeep made throughout these conversations.

15            First, can we turn to page 193 of this report and

16  can we enlarge the top blue conversation bubble.

17            Who is this communication from?

18     A.    This is from the user identified as Corey.

19     Q.    And the date?

20     A.    On September 9th of 2020.

21     Q.    And what is the content?

22     A.    It states:  I'm coming in the Jeep.

23            MS. KRASINSKI:  And let's turn to page 202 of this

24  report, and can we enlarge the blue conversation bubble?

25     Q.    Who is this communication from?

116

```
 1        A.    Once again, this is from the user Corey.

 2        Q.    And the date?

 3        A.    On September 12th of 2020.

 4        Q.    And what does the text message say?

 5        A.    It reads:  I'm leaving now.  Had to try to fix Jeep.

 6              MS. KRASINSKI:  And, finally, let's turn to page 230

 7    of this report and let's start with the top blue conversation

 8    bubble.

 9        Q.    What's the date of that?

10        A.    This is from October 5th of 2020.

11        Q.    And who is it from?

12        A.    This is from the user Corey once again.

13        Q.    And what is the text of that?

14        A.    It states:  I'm a little behind.  Trying to fix Jeep

15    steering.

16        Q.    Okay.  Let's move to some images that were found on

17    this cell phone.

18              Let's turn to Government's Exhibit 502.

19              Now, can you tell us about this extraction report?

20        A.    Yes.  So this is a -- a subreport.  So basically

21    it's not the full extraction report; it's a number of images

22    that have been bookmarked and then placed into one report.

23        Q.    Approximately -- I mean, does the full extraction

24    report contain thousands of images?

25        A.    Yes, it does.
```

117

1        Q.    And so this is just a select few?

2        A.    Yes, it is.

3        Q.    And what's the information that we learn about

4   images associated with images that you can see here?

5        A.    In this particular report, it allows you to see the

6   name of the image.  So that's where it says path.  It lists

7   what the image number is and then it gives some basic data on

8   when that image was created.

9        Q.    And let's look at the image associated with number

10  5, the top of the second page of this report.

11             Looking at this, what can you tell us about this

12  image?

13       A.    So this particular image is saved on the device as

14  image number IMG_8144.

15             So when you have a -- your device and you're taking

16  photos, it starts on a number and it increments consecutively

17  on that number.

18             So that's the number of this particular photograph

19  and this one was created on October 11th of 2020.

20       Q.    And if we look at Government's Exhibit 502d, is that

21  a larger version of that same image?

22       A.    Yes, it is.

23       Q.    Now, do you have collateral duty of serving on the

24  SRT team?

25       A.    Yes.  We have a specialized response team more

1    commonly known as a SWAT team that I do serve on, yes.

2        Q.    And as part of that, were you actually at a search

3    in Wilmot, New Hampshire, on March 26th of 2021, this year?

4        A.    Yes, I did participate in that search.

5        Q.    Did you happen to see a Jeep there?

6        A.    Yes, there was.

7        Q.    What do you remember about it?

8        A.    When we entered the property, there was two

9    structures that we were assigned to secure.  The first, I don't

10   have the specific term for it, but it was kind of like a

11   detached garage with a small living space in it, and then

12   rearward of that there was a much larger bay or garage or barn

13   in the area of the first unit, the first garage that had the

14   living area in it.  So if that particular unit was on my

15   right-hand side, on the left there was a Jeep Wrangler parked

16   in a small clearing.

17       Q.    And if we go back to Government's Exhibit 502d, does

18   that appear to be a green Jeep?

19       A.    Yes, it does.

20       Q.    Like the one you saw on the property that day?

21       A.    Yes.

22       Q.    And if we look at -- back at -- back at 502 and we

23   look at the information associated with number 4 on that

24   report, what -- what did we learn about the image associated

25   with number 4 on this?

1       A.   So number 4 here, it would be image number IMG_8058

2   and that particular image was created on September 30th of

3   2020.

4       Q.   And if we look at Government's Exhibit 502c, is that

5   the image associated with the information we just looked at?

6       A.   Yes, it is.

7       Q.   In sort of the top left of the screen above the

8   male's elbow, do you see anything dangling down?

9       A.   Yeah, I see some sort of -- type of camouflage in

10   that portion of the photograph.

11       Q.   If we go back to Government's Exhibit 502 and we

12   look at the information associated with number 7, what does

13   that information tell us?

14       A.   This would be image IMG_8060, created on

15   September 30th of 2020.

16           MS. KRASINSKI:  And I'd like to show for the witness

17   only Government's Exhibit 502f.

18       Q.   Is that the image associated with what we just

19   looked at?

20       A.   Yes, it is.

21       Q.   Has it been altered or changed in any way?

22       A.   No, it has not.

23           MS. KRASINSKI:  Your Honor, I'd move to strike the

24   ID on 502f.  This is the last image related to the Jeep that I

25   intend to show the jury.

```
 1              THE COURT:  All right.  The defendant objects on
 2    cumulativeness grounds.
 3              I analyze it under Rule 403 and determine that the
 4    cumulative nature does not substantially outweigh the probative
 5    value and, accordingly, I overrule the defendant's objection
 6    and it will be admitted.
 7                   (Government's Exhibit 502f admitted.)
 8              MS. KRASINSKI:  So let's go ahead and display --
 9              THE COURT:  Let me just -- unless you are going to
10    wrap up within the next two minutes, we need to take a lunch
11    break.
12              MS. KRASINSKI:  There are two other images after
13    this that I intend to seek to admit and that's it.
14              THE COURT:  All right.  Try to get that done and
15    then we'll take a lunch break.
16              MS. KRASINSKI:  Yes, your Honor.
17         Q.   And you were just talking about sort of the
18    camouflage that you just saw.  Is this a better view of this?
19         A.   Yes, it is.  There's camouflage in the area of a --
20    in the Jeep Wrangler where there would be a roll bar.
21         Q.   Now, moving away from the Jeep, I just want to look
22    at two additional images from a different location.
23              If we look back at 502 and we turn to page 4 of this
24    report, let's call forward the information associated with
25    number 15.
```

121

```
 1        A.   So this is image underscore IMG_ -- I'm sorry --

 2   image IMG_7425 with a created date of August 29th, 2020.

 3        Q.   And for the witness only, if we look at Government's

 4   Exhibit 502m, do you recognize that photo?

 5        A.   Yes, I do.

 6        Q.   Is it associated with the information you just

 7   talked about?

 8        A.   Yes, it's the same image.

 9             MS. KRASINSKI:  Your Honor, I'd move to strike the

10   ID on Government's Exhibit 502m.

11             MR. STACHOWSKE:  No objection, your Honor.

12             THE COURT:  Same cumulativeness objection?

13             MR. STACHOWSKE:  It's a different -- I'm not saying

14   it's cumulative.  It's -- I don't see how it's relevant.

15             THE COURT:  All right.  Relevance objection is

16   overruled.  It'll be admitted.

17                 (Government's Exhibit 502m admitted.)

18             MS. KRASINSKI:  And may I display it to the jury,

19   your Honor?

20             THE COURT:  Yes.

21        Q.   So is this the image we were just talking about?

22        A.   Yes, it is.

23        Q.   And, finally, if we go back to page 4 of Exhibit 502

24   and call forward the image -- the information associated with

25   image 19, what can you tell us about that?
```

1          A.     This is image IMG_7424 with a created date of

2    August 29th, 2020.

3               MS. KRASINKSI:  And if we display for the witness

4    only Government's Exhibit 502p.

5               THE COURT:  Same relevance objection?

6               MR. STACHOWSKE:  Same objection.

7               THE COURT:  Same ruling.  Overruled.  It'll be

8    admitted and can be displayed.

9                    (Government's Exhibit 502p admitted.)

10          Q.     Is that the image that's associated with the

11   information you just talked about?

12          A.     Yes, it is.

13              MS. KRASINSKI:  Thank you.  I have no further

14   questions, your Honor.

15              THE COURT:  All right.  Unless -- do you have any

16   significant examination at all?

17              MR. STACHOWSKE:  I've got no examination, your

18   Honor.

19              THE COURT:  Thank you, sir.  You can step down.

20              THE WITNESS:  Thank you, your Honor.

21                        (Witness excused.)

22               THE COURT:  Does the government rest?

23              MS. KRASINSKI:  No, your Honor.  We have two

24   stipulations to read into the record.

25              THE COURT:  All right.  Well, subject to reading

123

```
 1    those stipulations, does the government rest?
 2              MS. KRASINSKI:  Yes, your Honor.
 3              THE COURT:  All right.  So we'll read stipulations
 4    into the record after lunch.
 5              I have some work to do with the parties, so you --
 6    other than the stipulations, which you'll hear after lunch,
 7    there may be defense evidence, there may not be.  Remember, the
 8    defendant doesn't have any duty to put on any evidence, call
 9    any witnesses, has a right not to testify.  Can't infer
10    anything about that.
11              I need to do some work, though, before I determine
12    whether there will be any evidence.  If there is any evidence,
13    we'll take it this afternoon and we'll have closing arguments
14    and jury instructions tomorrow morning.  Okay?
15              Now, I don't know how long this is going to take me
16    and I've got to give the reporter a chance to rest.  And so I'm
17    going to tell you that we -- let's see.  So it's 12:30, 1:30 --
18    I won't need you until two o'clock.  It might even be a little
19    longer than that, depending upon what happens.
20              So you're free to go and do whatever you want, but,
21    you know, just be back here before -- where's my -- we're
22    letting them go out into the community, right?
23              THE CLERK:  We are, yes.
24              THE COURT:  Okay.  So just -- go out and get some
25    lunch and be back here by 2:00 and I'll try to get to you as
```

124

```
 1    soon as I can.  But I do think we're on schedule to have
 2    closing arguments and charge tomorrow morning.  Okay?
 3              So have a nice lunch break and we'll see you at
 4    2:00.
 5              THE CLERK:  All rise.
 6                   (Jury excused for lunch recess.)
 7              THE CLERK:  Be seated.
 8              THE COURT:  Let me do the judgment as a matter of
 9    law first.
10              So you have a motion for judgment as a matter of
11    law.  You argue the evidence is insufficient to permit a
12    reasonable jury to conclude that the -- all of the elements of
13    the charge have been proved against your client beyond a
14    reasonable doubt and, accordingly, I should grant judgment for
15    the defendant now.
16              In my view, viewing the evidence in the light most
17    favorable to the government, as I must at this stage of the
18    proceeding, there's sufficient evidence, assuming the
19    stipulations are read, to satisfy all of the elements of the
20    offense and, accordingly, I deny your motion.
21              Did you want to make a motion on any other ground
22    other than that?
23              MR. STACHOWSKE:  No, your Honor.  Thank you.
24              THE COURT:  All right.  So, Mr. Stachowske, your
25    current intention is to call -- I'm sorry I can't remember her
```

125

```
 1   name.
 2               MR. STACHOWSKE:  Kelley Finnigan.
 3               THE COURT:  Finnigan.  You want to call her as a
 4   witness in front of the jury, right?
 5               MR. STACHOWSKE:  Yes, I do, your Honor.
 6               THE COURT:  All right.  So, Mr. Kennedy, you've been
 7   appointed to represent Ms. Finnigan.  What is her current
 8   intention with regard to testifying?
 9               MR. KENNEDY:  She's going to take her Fifth
10   Amendment right and not testify.
11               THE COURT:  All right.  And so if I bring her in
12   here and put her on the witness stand outside of the presence
13   of the jury and ask her, is it your intention to claim your
14   Fifth Amendment privilege and not answer any questions
15   concerning this matter, your belief is she'll say yes and I am
16   invoking my privilege?
17               MR. KENNEDY:  Yes.
18               THE COURT:  Okay.  Well, then, why don't we do that
19   so that your client can be completely satisfied that, in fact,
20   that is what her intention is.
21               There was some discussion about whether it was you
22   advising her or whether she was going to invoke.  I'm sorry to
23   have to bring you through -- here today, but once we get -- if
24   she gets on the stand and she tells me she's going to invoke
25   her privilege, I will respect that and excuse her and discharge
```

126

1    you.

2              So I think we ought to try to do that now, if my

3    reporter can go for a couple more minutes.

4              So are you ready, Mr. Kennedy, if I put her on the

5    stand and find out --

6              MR. KENNEDY:  Yes.  There's one other issue.

7              THE COURT:  Okay.

8              MR. KENNEDY:  She was subpoenaed, one, to bring some

9    flash drives --

10             THE COURT:  Yes.

11             MR. KENNEDY:  -- which she has brought.  I don't

12   know how that plays into anything.

13             THE COURT:  So she's prepared to produce those

14   without waiving any privilege she has.  There's a -- as you

15   know, you're an experienced defense lawyer, you would know

16   this, there may be a limited Fifth Amendment privilege against

17   the act of production, but I don't find she would be waiving it

18   by simply turning those over.

19             Are you going to be asserting an objection to her

20   even producing those today?

21             MR. KENNEDY:  I --

22             THE COURT:  I'm not going to require her to testify

23   chain of custody or authentication or anything else because

24   that would implicate her privilege potentially.  But just

25   physically handing them over to the defense, do you have some

127

1  Fifth Amendment argument that you should not be required to

2  turn those over?

3         MR. KENNEDY:  Research that I did on that didn't

4  really find a lot that would help me.

5         THE COURT:  Yeah.  I haven't had to deal with this

6  for a while, so I'm going by memory.  But, generally speaking,

7  a witness does not have a Fifth Amendment privilege except

8  against the act of production so that the act of producing

9  could be deemed an admission.

10         So, for example, if you're subpoenaed to bring a gun

11  to court and the gun is incriminating against your client and

12  your client has to produce the gun, the act of producing it is

13  evidence that she's in possession of it and that is, in a way,

14  a testimonial act that I have the gun that is responsive to the

15  subpoena.

16         And this data is years old so it may have changed,

17  but my recollection is there may be a Fifth Amendment privilege

18  against the act of production by an individual under certain

19  circumstances.

20         Here I'm not aware that there's anything

21  incriminating about the act of production, but if, for example,

22  the -- the, you know, there's child pornography on there and

23  you subpoena her to bring them and she brings them and produces

24  them and she were to be subsequently prosecuted for child

25  pornography possession, showing that she physically has them

128

```
 1  and produces them in response to subpoena is testimonial and
 2  you can resist production on that ground.
 3          I'm not aware of anything like that.  Do you -- so I
 4  just want to know what your position is and then we can explore
 5  that.
 6          MR. KENNEDY:  Yeah.  Well, I guess it's -- my
 7  understanding of the video which I have not seen is basically
 8  Mr. Donovan's son opening up a Christmas present.  That's --
 9          THE COURT:  Yeah, he's already told me he thinks
10  there's something on there which references a gun being hers.
11  I don't know --
12          MR. KENNEDY:  It's actually a statement by him
13  saying something to the effect of, no, you're not getting a
14  gun, Kelley's getting another gun.
15          THE COURT:  Yeah, Kelley's getting a gun.
16          MR. KENNEDY:  Shotgun.
17          THE COURT:  His statement.
18          MR. KENNEDY:  Right, not something my client said.
19          THE COURT:  Yeah.  I mean, I can't advise you or
20  her.  I just need to know, are you asserting a privilege
21  against having to produce those thumb drives in addition to any
22  testimonial privilege that you're asserting?
23          MR. KENNEDY:  No.
24          THE COURT:  No.  Okay.  So you can physically hand
25  those over to Mr. Stachowske.  Whether they can come into
```

```
 1    evidence or not, there still needs to be -- that's a different
 2    thing that doesn't concern you.
 3              MR. KENNEDY:  Right.
 4              THE COURT:  But I do think, given that there was
 5    some uncertainty about whether, in fact, your client does
 6    intend to invoke her Fifth Amendment rights in response to
 7    answering questions about this matter, I think it's appropriate
 8    for me to bring her in, swear her in, and I will ask her a few
 9    preliminary questions so that I can satisfy myself that,
10    indeed, she is intending to invoke her Fifth Amendment right.
11              If I determine that she is, I think she has a
12    legitimate basis on which to invoke it, I will simply dismiss
13    her.  I won't require her to assert that in front of the jury.
14    Is that acceptable to you?
15              MR. KENNEDY:  That's acceptable to us.  The only
16    thing I would ask is she would then like to watch the trial.
17              THE COURT:  If she's excused, if she's not going to
18    be a witness for either party, then I have no objection to her
19    remaining in the courtroom.  So -- unless the parties do.
20              Does anybody have some objection.
21              MR. STACHOWSKE:  No objection.
22              THE DEFENDANT:  No, your Honor.
23              THE COURT:  Okay.  Good.  So let's bring her in
24    right now.
25              MR. KENNEDY:  Let me talk to her.
```

130

1          THE COURT:  Take the time you need and when you're

2   ready, just bring her in.  Okay?

3          Okay.  So while we're doing that, Mr. Donovan, let

4   me -- there's one other thing that remains, and that is you

5   have a right to testify on your own behalf.  You do not have to

6   testify if you don't want to testify.  Of course I've explained

7   to the jury and to you your constitutional right to remain

8   silent.  If you exercise that right, the jury's been instructed

9   they can't hold that against you in any way.

10          You also have a right to testify if you want to

11  testify.  Many of the decisions that are made in the course of

12  a trial are made by your lawyer in consultation with you.  This

13  is one of those decisions that of course you should consult

14  with your lawyer on and you should listen to what your lawyer

15  says, but the decision ultimately to testify or not to testify

16  is yours and yours alone.  No one can deny you that right.

17          So your lawyer can't stop you.  It's up to you.

18  I've had some defendants after a conviction where I've had this

19  exchange with them then say, oh, I thought I was -- still

20  thought I was being pressured by my lawyer not to testify.

21          I just want to make clear you do -- you make that

22  decision, not your lawyer, and when you -- we resolve this

23  issue with Ms. Finnigan, the only thing that will be left is

24  for you to decide should I testify or should I not.  And when

25  we're done with that, I need to have your answer as to whether

131

```
 1    you're going to testify or not so I can plan what I'm going to

 2    do with the jury.  Okay?

 3                THE DEFENDANT:  Thank you.

 4                THE COURT:  So, Ms. Finnigan, come right up here.

 5    Stand by the witness stand and raise your right hand.

 6                KELLEY FINNIGAN, having been first duly sworn,

 7    testified as follows:

 8                THE CLERK:  Thank you.  You may be seated.

 9                Can you state your full name and spell your last

10    name for the record.

11                THE WITNESS:  Kelley Finnigan, F-i-n-n-i-g-a-n.

12                THE CLERK:  Thank you.

13                THE COURT:  So, Ms. Finnigan, I just want to ask you

14    a few questions here.

15                Mr. Kennedy has been appointed to represent you.

16    He's informed me that it is your intention to invoke your Fifth

17    Amendment right to remain silent and not answer any questions

18    about the subject matter that's involved in this case, that is,

19    the charge against your boyfriend of possession of a firearm

20    and ammunition by a convicted felon.

21                The defense has indicated that they would intend to

22    call you and ask you questions about that, particularly

23    focusing on issues like ownership and use of the firearm and

24    the ammunition by you, by your boyfriend, and other information

25    about that particular charge.
```

Case: 23-1328 Case: 23-1328 Document: 00118054127 Document: 514 Page: 514 Date Filed: 09/20/2023 Date Filed: 09/20/2023 Entry ID: 6592810

132

```
 1              And what I understand from talking to your lawyer is

 2    that if you were asked questions about that, your intention is

 3    to invoke your Fifth Amendment right and not to answer any

 4    questions about that subject matter.  Is that right?

 5              THE WITNESS:  Correct.

 6              THE COURT:  Okay.  So -- so that we're clear then,

 7    you intend to broadly invoke your Fifth Amendment privilege as

 8    to any subject matter involved in this case.  Is that right?

 9              THE WITNESS:  Correct.

10              THE COURT:  All right.  Does counsel need to do

11    anything further or is that sufficient?

12              THE DEFENDANT:  That's fine.

13              MR. STACHOWSKE:  Your Honor, the defense is

14    satisfied.

15              THE COURT:  All right.

16              Al right.  Thank you, ma'am.  I appreciate it.

17              Now, you will not be a witness in this case because

18    I respect your right to remain silent and invoke your right to

19    remain silent.

20              So because you're not going to be a witness, you

21    won't be subject to the sequestration order, so you can sit in

22    the case, trial, and watch it if you want, but you won't be

23    able to be called.

24              And, of course, you have to observe the normal

25    decorum of any witness.  I don't want any theatrics or acting
```

133

```
 1    out or anything like that.  You just sit and watch.
 2              Do you understand?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Okay.  Great.
 5              So you're excused, Mr. Kennedy.  The witness will
 6    not be called during the course of the trial.
 7              And you can step down, ma'am.
 8                        (Witness excused.)
 9              MR. KENNEDY:  Thank you very much, your Honor.
10              THE COURT:  All right.  So the only other thing is I
11    need to know whether it is your intention to testify.  The
12    jury's coming back at 2:00.  If we -- if you are going to
13    testify, I need to know because I've got to plan for that.
14              So is it -- you've now heard everything -- the
15    defense is not going to call any other witnesses, I believe,
16    right?
17              MR. STACHOWSKE:  We're not going to call any other
18    witnesses.  I do want to review the -- this tape to see if we
19    have --
20              THE COURT:  Right.  You can do that over the
21    break --
22              MR. STACHOWSKE:  Yes.
23              THE COURT:  -- but subject to trying to produce
24    that, you're not going to produce any other evidence, call any
25    other witnesses?
```

134

```
 1              MR. STACHOWSKE:  No, your Honor.

 2              THE COURT:  All right.  So now's the time to tell

 3    me.  Are you intending to testify?

 4              THE DEFENDANT:  No.

 5              THE COURT:  No.  All right.  So he's --

 6              THE DEFENDANT:  Sorry.

 7              THE COURT:  That's all right.  You're waiving your

 8    right to testify and you stand by the presumption of innocence

 9    and argue that the government's evidence is insufficient to

10    support -- establish your guilt.

11              THE DEFENDANT:  (Nods head.)

12              THE COURT:  Right?

13              THE DEFENDANT:  Yes, sir.

14              THE COURT:  Okay.  Perfect.

15              So the defense will rest when we come back after we

16    read the stipulations.  Okay.

17              I think we have some unresolved issues about jury

18    instructions and I have given you a draft of those instructions

19    and I will ask you to come back -- let's see.  It's 12:30 --

20    come back at 1:30 with any proposals to modify the

21    instructions, to supplement the instructions.  If you think I

22    need to give the instruction in a different way, you need to

23    tell me how you think I should do it.  If you think I should

24    give some instruction that I'm not giving, you should come

25    forward and propose it.  If you think there's something I'm
```

135

1  giving an instruction on that I shouldn't, you should be

2  prepared to tell me.

3          And so we'll come back at 1:30 and -- without the

4  jury.  I'll do that.  Then we will convene the jury, read the

5  stipulations, and -- and tell the jury to come back tomorrow

6  morning at nine o'clock for closing arguments and charge.

7  Okay?

8          I haven't looked at the stipulations, so you'll see

9  in those instructions I might not have the stipulation exactly

10  the way you want it.  So just pay careful attention to that.

11  And otherwise I'll see you back here at 1:30 with your comments

12  on the instructions.  Okay?

13          THE CLERK:  All rise.

14          THE COURT:  All right.

15       (Recess taken from 12:40 p.m. until 2:00 p.m.)

16          THE COURT:  So we'll go on the record first without

17  the jury, address that issue, then we'll bring the jury in,

18  read the stipulations, the government will rest, the defense

19  will rest.

20          The defense is deemed to have renewed their

21  objection and my ruling on that stands.  I'll make that clear

22  on the record so nobody needs to renew any objections.  And

23  then I will instruct the jury that we're finished for the day,

24  they should come back at nine o'clock for closing arguments and

25  jury instructions.  Is that okay?

```
 1              THE CLERK:  Is this the -- the document you showed
 2    Forte earlier?
 3              MS. KRASINSKI:  No.
 4              MR. ROMBEAU:  No.
 5              THE CLERK:  That's a different one.  Okay.
 6              THE COURT:  Okay.
 7              MR. STACHOWSKE:  Are we on, your Honor?
 8              THE COURT:  Yes, sir.
 9              MR. STACHOWSKE:  One final issue before my client
10    rests.
11              THE COURT:  Yeah.
12              MR. STACHOWSKE:  Knowing how vocal -- how active he
13    is in his own case --
14              THE COURT:  Yeah.
15              MR. STACHOWSKE:  -- over my strong recommendation
16    against this, he would like to admit a drug test video that
17    this Court has seen where Mr. Donovan says at the end, this'll
18    be good for court.
19              THE COURT:  Yeah.  This is something that the
20    government was once considering presenting --
21              MR. STACHOWSKE:  Correct.
22              THE COURT:  -- but had decided not to present.
23              MR. STACHOWSKE:  I'm vehemently opposed to it.
24              THE COURT:  I mean, it -- yeah, it seems very
25    damaging to him on the face of it.  It looks -- you know, but
```

137

```
 1    he's -- but I -- so this is the kind of issue that a -- where
 2    there's a conflict between a client and a defendant, ordinarily
 3    the -- excuse me -- a client and a lawyer, the lawyer really
 4    makes the final decision after consulting with the client.
 5              And --
 6              MR. STACHOWSKE:  And I --
 7              THE COURT:  And there are certain kinds of issues,
 8    as we know, that the defendant has the ultimate authority,
 9    plead guilty or not, plead not guilty by reason of insanity or
10    not, testify or not.  There are a limited subset of things that
11    you make the final decision.
12              This is the kind of thing that falls in the category
13    that the lawyer ordinarily should make the final decision and
14    I'm worried that if I -- if I disregard your lawyer's
15    recommendation that I'll be interfering with your right to
16    effective assistance of counsel.
17              His judgment about what's in your interest is
18    consistent with what I think is in your interest.  On the other
19    hand, I always -- I want to try to give a defendant the ability
20    to do whatever they want to do, even -- like I -- I believe in
21    general that on many things people have the constitutional
22    right to be wrong, like they can make mistakes and have to bear
23    the consequence of them.  But I'm torn here.
24              What is government's position about the -- whether
25    to -- are you going to object if this is admitted?
```

```
 1              MR. ROMBEAU:  We would object on hearsay grounds,
 2    your Honor.
 3              THE COURT:  Okay.  And, technically, it -- it is
 4    hearsay.
 5              Let's -- do you have a transcript of the exact
 6    language that is used there?
 7              MR. ROMBEAU:  From the recorded call, no, we -- or
 8    the recording we sent Probation Officer Merna.
 9              THE COURT:  All right.  Can you play that for me one
10    time before I -- I rule on it?
11              We're not on the record yet, are we?
12              THE COURT REPORTER:  We are.
13              THE COURT:  We are on the record.  Okay.  Good.
14              MR. ROMBEAU:  For the record, this was marked
15    initially by the government for identification purposes as
16    Exhibit 400.
17              THE COURT:  Okay.
18                   (Video recording played.)
19              THE COURT:  I've watched the clip, but could you
20    restart it, just so I see the whole thing?
21              MS. KRASINSKI:  You've seen the clip, but this is
22    the full video which is what Mr. Donovan has asked --
23              THE COURT:  All right.
24                   (Video recording played.)
25              THE COURT:  Did I miss -- I where was the part about
```

Case: 23-1328 Case: 23-1328 Document: 00118054127 Document: 721 Page: 521 Date Filed: 09/20/2023 Date Filed: 09/20/2023 Page 521 of 1007 Entry ID: 6592810

139

```
 1    that'll be good in court?

 2              THE DEFENDANT:  Right at the end, your Honor.  I was

 3    talking about -- sorry.

 4              THE COURT:  Yeah, I didn't see it.  I must have --

 5              THE DEFENDANT:  It's right at the end where she's

 6    saying that we're running out of time to be able to send --

 7              THE COURT:  Can you play back the last minute of it?

 8              THE DEFENDANT:  It's having to do with the test

 9    results themselves.

10              THE COURT:  I understand that's going to be your

11    position, yeah.  I just want to -- I want to see it.

12                         (Video recording played.)

13              THE COURT:  Yeah, I agree with you it's ambiguous as

14    to what that means and you're looking right at the test at the

15    time that you're saying that'll be good in court.

16              It's not clear to me what -- why a test result would

17    come into court, but --

18              THE DEFENDANT:  Supervised release violation, sir.

19              THE COURT:  Oh, okay.  Supervised release.  Okay.

20    That makes sense.

21              All right.  Thanks.

22              So let me summarize where we are, where I understand

23    we are.

24              Mr. Stachowske has made a request or he has relayed

25    a request from his client that the Court admit an excerpt of a
```

1   videotape made by the defendant.  It appears to be his

2   girlfriend operating the camera, I may be wrong on that, but --

3   in which the defendant goes about doing a drug test and in the

4   course of that drug test makes a statement to his girlfriend,

5   Ms. Finnigan, in which he, the defendant, refers to her

6   shotgun, your shotgun, directing it to her.

7           To the extent this has any relevance to the case, it

8   appears to be relevant or at least the defendant is offering it

9   to try to support a claim that the shotgun he's charged with

10  possessing was, in fact, Ms. Finnigan's shotgun.  Right?

11  That's why you want it in.

12          Do I have that right, Mr. Donovan?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Okay.  Defense counsel has informed me

15  that he is relaying the request at Mr. Donovan's direction, but

16  that he strongly objects to his client's proposal to admit it

17  because he believes it's not in his client's interest to do so.

18          The government has objected on the grounds that it

19  is hearsay.  I think we should deal with the hearsay objection

20  first because if it is inadmissible hearsay, then it doesn't

21  come in whether counsel for the defense wants it in or not.  So

22  let's deal with that issue first.

23          It does appear that the statement that Mr. Donovan

24  wants the jury to hear is a statement of historical fact that

25  is admitted for the truth of the matter, which is that the

141

1    shotgun -- that a shotgun is hers, that is, Ms. Finnigan's

2    shotgun -- that he makes reference to a shotgun that he claims

3    is her shotgun.  We don't know whether it's the same shotgun

4    that he's charged with possessing, but we -- that's what he

5    wants the jury to believe.  But the statement that's made for

6    the truth is his statement that she has a shotgun.

7            Is that how you understand -- is that how the

8    government understands that statement?

9            MR. ROMBEAU:  Yes, your Honor.  Certainly the key

10   focus of this, that's the main --

11           THE COURT:  There's nothing else in the statement

12   that's at all relevant or admissible.

13           MR. ROMBEAU:  I guess an argument could be made that

14   the statement about losing livestock is sort of an attempt at

15   sort of nullification, you know, we need the shotgun to protect

16   our stuff.  But really it's about the gun and ownership.

17           THE COURT:  It's not relevant for -- I would never

18   admit it for any other purpose than that.  Okay?  But that's

19   for a truth -- that's a truth statement, right?

20           MR. ROMBEAU:  Yes, your Honor.

21           THE COURT:  Okay.  So -- and is it a statement of an

22   out-of-court declarant admitted for the truth, therefore, it

23   qualifies as hearsay?

24           MR. ROMBEAU:  Yes.  In our view, yes.

25           THE COURT:  In order, therefore, for it to be

1   admissible, it must come within an exception to the hearsay
2   rule, right?

3           MR. ROMBEAU:  That's right, your Honor.

4           THE COURT:  You say there's no qualifying exception
5   to the hearsay rule.

6           MR. ROMBEAU:  Not that we're aware of, your Honor.

7           THE COURT:  Okay.  I am not aware of an exception to
8   the hearsay rule either.  So I'll turn to Mr. Stachowske and
9   say make the best argument you can on behalf of your client
10  that this is admissible under an exception to the hearsay rule.

11          MR. STACHOWSKE:  Your Honor, the statement was --
12  the statement that we just presented to the Court was made on
13  or about April 6th, shortly after the March 26th seizure.  It's
14  close in time to the events at hand.  It's, therefore,
15  inherently more reliable.

16          As a result of that, it's a then existing mental,
17  emotional, or physical condition, a statement of the
18  declarant's then existing state of mind such as motive, intent,
19  or plan or emotional, sensory, or physically condition,
20  including a stated memory or belief to prove the fact
21  remembered or believed unless it relates to the validity the
22  terms of declarant's will.

23          So it's a then existing statement.  It's, again,
24  close in time in proximity, so it additionally would qualify as
25  a present sense impression upon learning that his property had

143

```
1   been searched and seized and in the aftermath of learning of
2   that seizure, he made this statement close in time as evidenced
3   by the video when he is discussing those recent events.
4               THE COURT:  All right.
5               MR. STACHOWSKE:  Additionally, your Honor referred
6   to it as a -- a historical record.
7               THE COURT:  Yeah.  All right.  So I think you've
8   identified the best -- you've done the best that you can, but
9   it plainly doesn't qualify as a present sense impression, it
10  doesn't qualify as an excited utterance, and it doesn't qualify
11  as a state -- a statement of then existing mental, emotional,
12  or physical condition.
13              To the extent it's admitted to show what Mr. Donovan
14  believed at the time as opposed to what is really true --
15              MR. STACHOWSKE:  State of mind.
16              THE COURT:  -- it's not -- it's not relevant.  It's
17  only relevant at all to the extent that it -- it is offered for
18  the proposition that, in fact, Ms. Finnigan owns a shotgun, not
19  that Mr. Donovan believed he owned -- she owned a shotgun.  So
20  I don't believe it qualifies under that exception to the
21  hearsay rule.
22              I don't think it's -- it is instead not -- and it
23  also doesn't meet the requirements under the residual exception
24  to the hearsay rule.  It's not made under circumstances that
25  make it especially reliable.  To the contrary, it's made for
```

144

```
 1  the -- at least in part for the purpose of proving something to
 2  the Court after a time in which Mr. Donovan has been charged
 3  with possession of that shotgun and so he has a strong motive
 4  to falsify.
 5           Had he not been charged or --
 6           MR. STACHOWSKE:  He had not been charged by --
 7           THE COURT:  Okay.  So he was up on a supervised
 8  release violation?
 9           THE DEFENDANT:  No.
10           MR. STACHOWSKE:  Not at that point either.
11           THE DEFENDANT:  No, your Honor.  I was --
12           THE COURT:  Nothing had happened at --
13           THE DEFENDANT:  No.  I was free and trying to
14  maintain contact with Tim.  And I -- you know, I just -- I sent
15  him numerous messages and I tried to maintain contact and say,
16  hey, what's going on, look, this is -- this is the situation.
17           THE COURT:  So it's after the search and seizure of
18  the shotgun but before any charges were actually brought.
19           MR. STACHOWSKE:  Yes, your Honor.
20           THE DEFENDANT:  Yes, your Honor.
21           THE COURT:  Okay.  So I think there's -- that -- I
22  take your point that then the argument that its strong motive
23  to fabricate is a little less clearly established, but there's
24  nothing about it in those circumstances that suggest to me that
25  it meets the requirements of the residual exception to the
```

 1   hearsay rule either.  So I find there's no exception to the

 2   hearsay rule that this statement qualifies under and it would

 3   not be admitted, even if Mr. Stachowske had been advocating for

 4   its admission.  So I don't need to decide whether this

 5   statement should be admitted or whether I should consider it

 6   for admissibility over Mr. Stachowske's objection simply

 7   because Mr. Donovan wants me to do it.

 8          I do believe this is an issue that ultimately has to

 9   be done -- an argument that Mr. Stachowske has to evaluate and

10   decide whether to present to the Court.  He's consulted with

11   his client.  He has a difference of opinion with his -- his

12   client on this issue.  I happen to agree with Mr. Stachowske

13   that it's more damaging than helpful but in any event, I don't

14   have to formally decide the question.  But if I did, I would

15   say that this is a decision for Mr. Stachowske.

16          But you have made your point clear and preserved it.

17   So if you were convicted later on, you can cite my failure to

18   admit this as error and you can argue that Mr. Stachowske's

19   failure to agree with you on it supports a claim of ineffective

20   assistance of counsel.

21          So I -- I fully expect if you are convicted that you

22   will take an appeal, and if you lose the appeal, you will seek

23   relief under Section 2255.

24          So I strongly suspect we'll be seeing this issue

25   again at some point, but I'm merely ruling now that it is

```
 1    inadmissible hearsay and, therefore, shouldn't come in in any
 2    event and even if it somehow was admissible as an exception to
 3    the hearsay rule, in my view, it's Mr. Stachowske who should
 4    make the decision, not you, on its admissibility and he would
 5    not admit it.
 6              And if I'm wrong about either or both of those
 7    things, the Court of Appeals will correct me or you'll have a
 8    chance to argue ineffective assistance in the event that you're
 9    convicted, so your objections are preserved.
10              I also note that this is not a self-authenticating
11    document.  There would have to be someone who would be prepared
12    to testify to authenticate this document, that this -- this
13    video.  The government has not asserted, and I appreciate the
14    fact that the government hasn't asserted, an authentication
15    objection because I'd probably find some way to give the
16    defendant additional time to authenticate it because we're not
17    really -- no one's really doubting that this is what it
18    purports to be.
19              So even though technically there's no witness being
20    proffered to authenticate the document, that isn't the reason
21    why we're not admitting it.  We're not -- I'm not admitting it
22    because it's inadmissible hearsay, first, and even if it were
23    not, because Mr. Stachowske is saying he would not admit that
24    on Mr. Donovan's behalf.
25              Have I made myself clear on that?  Does anybody want
```

147

```
 1    me to make any additional findings or ruling on that particular
 2    issue?
 3              MR. ROMBEAU:  Not for the government, your Honor.
 4              THE DEFENDANT:  I guess, your Honor.  Thank you --
 5    thank you, sir.
 6              THE COURT:  Okay.  Now, I am not sure I know exactly
 7    when the court reporter came in.  I will note that we had an
 8    off-the-record conference with counsel and Mr. Donovan present
 9    to review my proposed instruction.
10              The government proposed some minor changes to the
11    instructions which I have agreed to make.  Mr. Stachowske made
12    inquiries, which I have answered, about the instructions and I
13    will make those changes and give the instructions.
14              I've advised the parties that in order to preserve
15    any objection for purposes of appeal, they must object at the
16    appropriate time after I give the instruction before I send the
17    jury out to deliberate.  If they don't, they may waive their
18    right to challenge the instruction at a later stage in the
19    proceeding.
20              And if they do object, they need to tell me
21    specifically what's wrong and what I could do to correct it.
22    If they want to propose an alternative instruction, they need
23    to have the language there for me to evaluate.  Otherwise, they
24    may lose their right to challenge the instruction.  So that's
25    how I dealt with the jury instruction issue.
```

148

1          We had one other issue.  I'm not sure how much of

2    this or if any of it was on the record, but Mr. Stachowske has

3    asked to admit a stipulation regarding a statement that

4    Ms. Finnigan made to law enforcement in which she suggested

5    that the shotgun seized during the search was her shotgun.

6    I've asked the parties to make a proffer as to what the

7    contents of that stipulation would be if I were to admit it and

8    they have agreed to mark for the record a portion of a law

9    enforcement report that describes what that conversation was

10   that Mr. Stachowske wants to put into evidence.

11         He has argued that it's admissible as a statement

12   against interest.  I analyzed that question in a preliminary

13   way yesterday, directed the parties to provide supplemental

14   briefs.  I've reviewed those supplemental briefs.  The parties

15   have nothing to add.  Based on my review of those supplemental

16   briefs, I believe my initial impression is correct and that

17   this state -- statement does not qualify as a statement against

18   interest.  Although the declarant is unavailable, it otherwise

19   does not qualify for reasons I've stated on the record and as

20   are fully developed in the government's brief, which I

21   incorporate by reference.  And for that reason, I'm denying

22   Mr. Stachowske's request.

23         Ms. Finnigan has invoked her Fifth Amendment right

24   and will not testify.  The defendant has informed the Court

25   that he has been advised of his right to testify, that it is

```
1    his decision whether to testify or not, and that he has elected
2    not to testify.
3            It's my understanding that the defense has no
4    additional evidence and is prepared to rest once the
5    government's stipulations are read and it rests.
6            Is that right, Mr. Stachowske?  Is that right?
7            MR. STACHOWSKE:  If I could have a second, your
8    Honor.
9            THE COURT:  Yeah.
10            THE DEFENDANT:  Yes, your Honor.  I'm not quite
11   understanding the -- I know there's a Christmas video that she
12   had attempted to bring us and there's something going on.  I --
13   I guess I don't quite understand what's going on with --
14            THE COURT:  Right.  I did not hear from
15   Mr. Stachowske that he was seeking to introduce that one as
16   well, so that -- I agree with you that came up when
17   Ms. Finnigan was here.  She was subpoenaed to bring a --
18   certain videos.
19            I -- I guess what I'll do is I'll ask your lawyer
20   first.
21            Are you, Mr. Stachowske, intending to introduce some
22   or all of the video that was produced by Ms. Finnigan?  So let
23   me get your position on that first and then we'll address
24   whether, in fact, it's admissible.
25            MR. STACHOWSKE:  So, your Honor, for the record, I
```

150

1    received the videos -- the --

2              THE COURT:  Wait.  Wait.  Turn your microphone on.

3              MR. STACHOWSKE:  Oh, I'm sorry.

4              THE COURT:  You can keep it off while you're

5    speaking to him.  That's good.

6              MR. STACHOWSKE:  I received the thumb drives this

7    afternoon when Ms. Finnigan arrived at the courthouse.  I have

8    attempted to play them.  She provided me three copies at my

9    request and none of those copies will play on my device.

10             Since we have reconvened, I have had not had the

11   opportunity to ask the government whether or not they could

12   play it on their device.  I am reluctant to do so because I

13   don't know what the video is going to show and whether or not

14   it would be something that would be harmful.

15             THE COURT:  Yeah.  You would want to review it first

16   before you would want to be turning it over to the government,

17   right?

18             MR. STACHOWSKE:  I -- I would.  And I ran after

19   Ms. Finnigan, Mr. Kennedy -- Attorney Kennedy.  Attorney

20   Kennedy had already left.  Ms. Finnigan indicated that the

21   original is on my client's laptop back at his house, or his

22   phone, and that she will try and download it for me, quote

23   unquote, ASAP.

24             THE COURT:  So you -- you don't have a current means

25   to play the videos that you were given; is that what you're

151

1    telling me?

2              MR. STACHOWSKE:  As we speak, I'm looking -- I just

3    received an email from her at 2:22.  I'm -- I apologize for the

4    delay.

5              THE COURT:  All right.  Here's -- here's what we'll

6    do.

7              I will -- I will give you a chance overnight to find

8    some way to view those videos.  All right?  And then I will

9    inquire in the morning what you want me to do.  But keep in

10   mind there are a number of problems here.  Okay?

11             The first is, again, those are not

12   self-authenticating documents.  You ordinarily need to have

13   some witness who's prepared to say this is what it purports to

14   be.  So Ms. Finnigan or maybe the defendant's son or somebody

15   like that could say, I was there on Christmas Day and this

16   is -- this is what happened.  So there's an authentication

17   issue.

18             Then there may be a hearsay issue.  If it's more

19   like the same kind of thing where the defendant says something

20   like your shotgun, Ms. Finnigan, that would fall -- that would

21   suffer from the same deficiency as the last one does.

22             Until I hear what is actually said, I can't tell

23   whether it comes within an exception to the hearsay rule or

24   not.

25             So there's an authentication problem, there's a

152

1   potential hearsay problem, there's a potential relevance

2   problem.  I don't know -- until I know the content, I couldn't

3   know whether it's objectionable or not.

4           I recognize that you're in a bit of a bind, but this

5   just underscores something.  Mr. Donovan had made a tactical

6   decision, and I understand why he made it.  He pushed to try

7   this case as soon as he possibly could because he thought he

8   could catch the government flatfooted.  And to some respect he

9   did catch the government flatfooted because they never analyzed

10  the DNA that would have been potentially crucial in the case.

11          So that's a tactical decision, a good one you made,

12  and there are some benefits to that and there is some risk to

13  it.  The risk to it is you've put your lawyer in an almost

14  impossible position where you're -- he's getting evidence

15  thrown at him on the morning of the last day of trial.  And,

16  you know, you can -- you don't have to say anything; that will

17  come later.  If you get convicted, you can accuse him of

18  ineffective assistance.  But you can't eat your cake and have

19  it, too.  If you push to get everybody to trial immediately so

20  you can try to catch the government flatfooted, to the extent

21  that harms you, well, that's tough.  That's your choice.

22          And, you know, I -- but I will -- again, I'm trying

23  to give you every opportunity to have a fair trial and so I'm

24  giving Mr. Stachowske one last chance overnight and we'll see

25  what comes up in the morning.

```
1                 Did you want to say something else?

2                 THE DEFENDANT:  Oh, yes, your Honor.  I mean, it's

3      the key piece of evidence.  I thought Kelley was going to

4      testify, but apparently she's been intimidated out of it.  So

5      that's okay.  I'm not mad at her.  I understand.

6                 THE COURT:  Yeah.

7                 THE DEFENDANT:  And, you know, I -- and I wasn't

8      trying to push the government to trial for any reason.  I

9      wanted a speedy trial and just -- the case just wasn't worked

10     on during the whole time.  Nothing -- no -- nothing was done.

11     This isn't the first time --

12                THE COURT:  All right.  Well, we'll debate the

13     Speedy Trial Act thing later.  I've got it -- we've preserved

14     that whole argument for you.

15                THE DEFENDANT:  I might have to take the stand then,

16     your Honor.  I mean, I thought it was -- I thought we could

17     produce some kind of --

18                THE COURT:  All right.  So if you want to take the

19     stand, you can take the stand.  But you -- and you get to make

20     that decision.  But I hope you've consulted with your lawyer.

21                THE DEFENDANT:  Or at least an allocution statement.

22     I mean, something.

23                THE COURT:  You can't make an allocution statement.

24     You can testify, in which case you'll be fully subject to

25     cross-examination.
```

154

```
1              THE DEFENDANT:  Uh-huh.
2              THE COURT:  And I don't know what you are going to
3    say, but -- and don't -- please do not make statements that
4    might damage yourself here because they'll be recorded and they
5    can be used against you.
6              THE DEFENDANT:  Yes.
7              THE COURT:  You -- you have to be fully aware of
8    the risks you would be taking by testifying and balance those
9    against the risks you would take by not testifying.
10             Now, I -- if you are going to testify, I want to
11   know now so we can put you on today so that we can have the
12   closing arguments in trial tomorrow.
13             I don't think this evidence that you want to come in
14   is going to end up coming in.  That's my sense.  We'll see what
15   it says.  But if -- and if you want to testify, now is the
16   time to do it.  But you need to carefully consider what your
17   lawyer -- whatever advice he's giving you.  Apparently he's
18   advising you not to testify and there are good reasons why that
19   is so, because all of this evidence will be asked about; have
20   you ever touched that gun, have you ever -- who drilled those
21   holes in that barrel, where'd that ammunition come from, are
22   you telling me she bought all that ammo, does she wear that
23   camo suit to go out there and shoot -- shoot people with her
24   shotgun.
25             You know, that stuff is all fair game, as well as
```

155

```
 1   potentially things in your criminal past that would be
 2   admissible for convictions for impeachment purposes.  I don't
 3   know if there are any of those.  But there are real potential
 4   consequences for you.  The government gets to basically use you
 5   to rehearse its entire case again in front of the jury.  And so
 6   you need to think through what you want to do.
 7           And I -- I don't want you to make an impulsive
 8   choice.  You've already told me you didn't want to testify.
 9   But are you -- are you changing your mind and telling me you
10   want to testify?
11           THE DEFENDANT:  I mean, I -- I feel like somebody
12   needs to speak for me, sir.
13           THE COURT:  Okay.
14           THE DEFENDANT:  I don't understand what the
15   impeachment -- what my criminal history would have to do with
16   this case, why we should go into that.  But if we want to go
17   into that, then I think we should go into the whole life story,
18   my whole life story.  I mean, if that's what we want to do.
19           THE COURT:  Yeah.  I don't know -- I don't know what
20   your criminal record is.  I don't know --
21           THE DEFENDANT:  I robbed a bank of number of years
22   ago and they've just been trying to -- they tried to kill me
23   two years ago.  We should show that video.  They brought up the
24   Andover incident --
25           THE COURT:  Okay.  Well, let's not get -- let's not
```

```
1    get distracted here.  I've got a jury waiting.

2             I just -- are you telling me, Judge, I have

3    reconsidered my decision and I would like to testify, yes or

4    no?

5             THE DEFENDANT:  Yes.

6             THE COURT:  Yes.

7             THE DEFENDANT:  Yes.

8             THE COURT:  Okay.  All right.

9             Does the government have some reason why I think

10   the -- why they think the defendant should be precluded from

11   testifying?

12            MR. ROMBEAU:  No, your Honor.  We'd just ask --

13   based on defendant's earlier decision, we did not bring certain

14   materials with us.

15            THE COURT:  You can cross-examine him tomorrow

16   morning and we'll go from there.

17            MR. ROMBEAU:  Okay.

18            THE COURT:  He'll take his direct now and we'll go

19   to the -- yes, Mr. Stachowske?

20            MR. STACHOWSKE:  Just a procedural question, your

21   Honor.

22            Am I anticipated to ask his questions or are we

23   going to allow him to give a narrative testimony?

24            THE COURT:  You can ask him -- you should ask him

25   questions and you can ask him, what is the first thing you want
```

```
 1    to tell the jury; what do you want to say next.

 2                MR. STACHOWSKE:  Okay.

 3                THE COURT:  And you -- obviously you have ethical

 4    responsibilities to him and ethical responsibilities as an

 5    officer of the court.  I do not know what he is going to say.

 6    I can't, therefore, tell you what your ethical responsibilities

 7    are.  You are going to have to figure that out.

 8                MR. STACHOWSKE:  Yes, sir.

 9                THE COURT:  But I do think he should be given, if he

10    wants to do this, an opportunity to testify.

11                I -- I will give you a short break to have one last

12    consultation with him about that and then if he still wants to

13    testify, we'll bring the jury back in, we'll read the

14    stipulations, the government will rest.

15                You'll put him on, he'll give his testimony, we'll

16    then break for the day and we'll do cross-examination starting

17    at nine o'clock tomorrow.

18                We'll finish cross and redirect and then we'll have

19    closing arguments and charge.

20                MR. STACHOWSKE:  Thank you.

21                THE COURT:  All right.

22                THE DEFENDANT:  Thank you, sir.

23                THE COURT:  Okay.  So let's take a -- a short five,

24    ten-minute break and you talk to him one more time.  And if he

25    still wants to testify, I'll let him testify.  Okay?
```

```
 1                   All right.  Let's take a short break.

 2                   THE COURT:  This is off the record.

 3                        (Off-the-record discussion.)

 4             (Recess taken from 2:38 p.m. until 3:15 p.m.)

 5                        (With the jury present.)

 6                   THE CLERK:  Please be seated.  Court is in session.

 7                   THE COURT:  All right.  I apologize for the delay.

 8      Let me just lay out the game plan for you.

 9                   The government has a few stipulations to read to

10      you.  The government will then rest its case.

11                   The defendant -- defendant has one witness.  The

12      defendant himself is going to testify.

13                   So as soon as we finish with the government's case,

14      the defense case will begin and the defense case will end with

15      the defendant's testimony.  We'll hear the direct --

16      defendant's direct testimony today.  When we finish that that,

17      we'll adjourn, come back at nine o'clock, we'll hear the cross

18      and redirect.

19                   And then if there is any government rebuttal case,

20      it'll be short, we'll hear that, then we'll go right into

21      closing arguments and charge.  Okay?

22                   So that's the game plan.  You might get out a little

23      early today, we certainly won't keep you past 4:30, have you

24      come back at nine o'clock and you'll have the case to be

25      deliberating on tomorrow as I hoped that we would.
```

159

```
 1              All right.  So the government has some stipulations.
 2    Would you like to read those to the jury?
 3              MR. ROMBEAU:  We would, your Honor.  Thank you.
 4              THE COURT:  I'm sorry.  Do you need a monitor?  Are
 5    they going to be shown?  Are you going to be showing anything?
 6              MR. ROMBEAU:  I have it up on the screen.
 7              THE COURT:  All right.  Then the clerk will have to
 8    turn that monitor on again.
 9              THE CLERK:  Thank you.
10              There you go.
11              MR. ROMBEAU:  I'll read the first stipulation
12    between the parties into the record, your Honor.  This has been
13    marked and admitted between the parties as Government's Exhibit
14    700.
15              And it provides:  The United States of America, by
16    John J. Farley, Acting United States Attorney for the District
17    of New Hampshire, through the undersigned Assistant
18    United States Attorneys, defendant Corey Donovan, and
19    defendant's counsel, Matthew Stachowske, enter into the
20    following stipulation of fact.
21              It provides:  There's no dispute among the parties
22    that on November 4, 2007, defendant, Corey Donovan, was
23    convicted of a felony punishable by imprisonment for a term
24    exceeding one year.
25              There is also no dispute among the parties that from
```

Case: 23-1328 Case: 23-1328 Document: 00118054127 Document: 74 Page: 542 Date Filed: 09/20/2023 Date Filed: 06/13/2023 Page: 162 of 191 Entry ID: 6592810

160

1   November 4, 2007, to the present, including during March of

2   2021, defendant, Corey Donovan, knew that he had previously

3   been convicted in a court of a felony punishable by

4   imprisonment for a term exceeding one year.

5          Finally, there is no dispute among the parties that

6   defendant, Corey Donovan, has not been pardoned for this

7   offense and has not had his firearms rights restored.

8          And it's signed by counsel for the government, the

9   defendant, and Attorney Stachowske.

10          I'll turn the next one over to Ms. Krasinski.

11          MS. KRASINSKI:  This stipulation is marked

12   Government's Exhibit 701 and it reads:  The United States of

13   America, by John J. Farley, acting United States Attorney for

14   the District of New Hampshire, through the undersigned

15   Assistant United States Attorneys, defendant, Corey Donovan,

16   and defendant's counsel, Matthew Stachowske, enter into the

17   following stipulation of fact:

18          One, there is no dispute among the parties that the

19   Mossberg model 500 20-gauge shotgun bearing serial number

20   V1051663 traveled in interstate or foreign commerce before

21   March of 2021.  There is no dispute among the parties that this

22   weapon meets the federal definition of firearm.  That is, it is

23   a weapon that will, or is designed to, or may readily be

24   converted to expel a projectile by the action of an explosive.

25          There's no dispute among the parties that the

1 following ammunition, four rounds of Brenneke 20-gauge shotgun

2 ammunition, 71 rounds of Federal 20-gauge shotgun ammunition,

3 48 rounds of Federal 28-gauge shotgun ammunition, eight rounds

4 of Huntego 20-gauge shotgun ammunition, and four rounds of

5 Remington 12-gauge shotgun ammunition traveled in interstate or

6 foreign commerce before March of 2021.

7          There is no dispute among the parties that these

8 rounds of ammunition meet the federal definition of ammunition;

9 that is, ammunition or cartridge cases, primers, bullets, or

10 propellant powder designed for use in any firearm.

11          THE COURT:  All right.  Is that all the

12 stipulations?

13          MS. KRASINSKI:  Yup.  And the stipulations are

14 signed by myself, my colleague, the defendant, and defense

15 counsel.

16          THE COURT:  All right.  Members of the jury, you've

17 just heard some stipulations read.  Stipulations are agreements

18 by the parties that certain facts are true and they may be

19 accepted by you as true without any additional evidence on the

20 point.  All right?

21          With that, does the government rest?

22          MR. ROMBEAU:  We do, your Honor.

23          THE COURT:  All right.  And, Mr. Stachowske, the

24 only evidence that you're -- that the government -- the defense

25 is presenting is your client's testimony; is that right?

162

```
 1              MR. STACHOWSKE:  Yes, your Honor.

 2              THE COURT:  All right.  So I will ask Mr. Donovan,

 3  if you could stand, rise, raise your right hand.  The clerk

 4  will administer an oath.

 5              THE CLERK:  Thank you.

 6              COREY DONOVAN, having been first duly sworn,

 7  testified as follows:

 8              THE CLERK:  Thank you.

 9              THE WITNESS:  Thank you.

10              THE CLERK:  Would you please state your name and

11  spell your full name --

12              THE DEFENDANT:  Corey --

13              THE CLERK:  -- for the record.

14              THE DEFENDANT:  Corey Donovan, C-o-r-e-y,

15  D-o-n-o-v-a-n.

16                      DIRECT EXAMINATION

17  BY MR. STACHOWSKE:

18       Q.    Good morning or good afternoon, Mr. Donovan.

19       A.    Hi, Matt.

20       Q.    You're here today and have been the last --

21  yesterday as well in a criminal case where you're charged with

22  possession of a Mossberg shotgun that's here before us and a

23  whole grouping of ammunition.

24              What's the first thing you'd like to tell the jury

25  with respect to that?
```

163

```
1          A.    Well, if it was my shotgun, I probably wouldn't have
2     gone out and bought 28-gauge the first time around on accident.
3     So ...
4          Q.    All right.  There's been some stipulations that were
5     read into the evidence just before your testimony.  You
6     obviously signed those, so you stipulated that you're a
7     convicted felon, correct?
8          A.    Yes, I did.
9          Q.    All right.  And you've stipulated that the
10    ammunition falls within the purview of federal law and that
11    it's part of the interstate commerce, correct?
12         A.    Correct.
13         Q.    All right.  What, in fact, do you -- well, strike
14    that.
15               You're familiar with the term possession?
16         A.    I am.
17         Q.    All right.  So you're charged with possession of a
18    firearm and the ammunition?
19         A.    (Nods head.)
20         Q.    What can you tell the jury about -- strike that.
21               Did you possess the firearm or the ammunition in
22    this case?
23         A.    No.  No, I did not, and I had no intention to
24    possess the firearm and the ammunition.
25               In my understanding, it's not illegal -- and, I
```

164

```
1    mean, that's up to the judge -- it's not illegal for me to be
2    around firearms and ammunition.  It's illegal for me to go
3    hands-on.  You can't take everybody else around me's rights.
4                MR. ROMBEAU:  Objection, relevance.
5                THE COURT:  Pardon.  What?
6                MR. ROMBEAU:  I said objection, relevance, your
7    Honor.
8                THE COURT:  Overruled.
9                THE WITNESS:  You can't take everybody around me's
10   firearms rights just because I did a bad thing years ago, you
11   know.  And it's my day-to-day that -- yeah, it's unsecured
12   sometimes.  I see it.  Yeah, I have knowledge it's on the
13   property.  I've never hid that.
14        Q.    Corey, I'm going to step forward a little bit --
15        A.    Yeah.
16        Q.    -- if I could approach the witness.
17              While I'm here, I just want you to slow down.
18        A.    All right.
19        Q.    I know you're nervous.
20        A.    Well --
21        Q.    Right?  You're nervous?
22        A.    A little bit.
23        Q.    Okay.
24              THE COURT:  Yeah.  And just a reminder on this,
25   Mr. Donovan.  I am allowing your lawyer to ask some very broad
```

Case: 23-1328 Case: 23-1328 Document: 00118054127 Page: 547 Date Filed: 09/20/2023 Date Filed: 09/20/2023 Entry ID: 6592810

165

```
 1    questions.

 2              THE WITNESS:  Yes.

 3              THE COURT:  But I want you to testify to facts, not

 4    just sort of statements about what your rights are and things

 5    like that.  So try to --

 6              THE WITNESS:  Okay.

 7              THE COURT:  -- focus on the facts and the lawyers'

 8    specific questions about, say, it appears to me there have been

 9    stipulations on the other elements other than the knowing

10    possession element here.

11              So, Counsel, why don't you ask your client as to

12    the firearm and the ammunition, what he wants to tell us about

13    the -- his involvement, if any, with the shotgun and the

14    ammunition.

15              MR. STACHOWSKE:  I couldn't have said it better

16    myself, your Honor.

17              THE WITNESS:  Okay.

18              So --

19              THE COURT:  Let's start with the shotgun.  Why don't

20    you tell us what involvement, if any, you've had with that

21    shotgun.

22              THE WITNESS:  I had no physical involvement with it

23    at all.  My girlfriend purchased it back in -- around

24    Christmastime.  And, you know, the box, actually, we put my

25    son's Christmas presents in and he got swords for Christmas.
```

166

```
 1              And he thought he got a shotgun.  And he starts
 2    opening it up and I says, no, you didn't get a shotgun.  Kelley
 3    got a shotgun.  Because Kelley's a good girl.  You's not a good
 4    girl.
 5              And, you know, like, yeah, I know there's a shotgun.
 6    Other than that, you know, I know that usually it's locked up,
 7    there's a case for it.  And, you know, it's my personal
 8    responsibility to -- even if it's not locked up just not to
 9    handle it.
10         Q.   Did you ever have any intention to handle this
11    firearm?
12         A.   No, I did not.
13         Q.   Did you ever have any intention to handle the
14    ammunition?
15         A.   No, I did not.
16         Q.   Did you ever handle the shotgun?
17         A.   No, I -- it's been -- everything's been
18    fingerprinted.  Everything.
19         Q.   Did you ever handle the ammunition?
20         A.   No.
21         Q.   All right.  There's going to be an opportunity for
22    you to be cross-examined and there's going to be a lot of
23    questions asked of you pertaining to the shotgun itself.  Do
24    you know how the shotgun -- for example, the shotgun barrel's
25    got some what appears to be holes drilled in them.  Do you have
```

167

1    any idea how that occurred?

2        A.    I don't.

3        Q.    All right.  Where was the shotgun kept so as to keep

4    you from it?

5        A.    I know -- so usually Kelley kept it in the case in

6    one of the vehicles.  So -- because then it's not actually in

7    my house.  It's just another layer of security in case the

8    parole officer comes by or whatever.

9        Q.    So there's been -- well, the -- the shotgun was

10   found strapped to the roll bar in the Jeep.  Do you know how

11   it -- how it came to be that it was in that -- found in that

12   location?

13       A.    Yeah.  So the Jeep had sat since -- the registration

14   expired in October and it sat right there in front of where the

15   Ranger is and has basically been another shed in the yard all

16   winter long.

17             And, you know, you guys seen the garage.  It's

18   pretty messy.  Most of that stuff's not even mine.  It's all my

19   mom and sister's stuff from their lives out back, you know.

20   There my brother's stuff in there and everything.

21             But I get -- you know, from talking to her, she said

22   she started keeping it in there because it was simpler than

23   traipsing all around and climbing over my piles of debris.

24       Q.    Okay.  The government has through its questioning

25   and through the testimony alleged that the firearm and the

168

1    ammunition were found in proximity to areas that you, they

2    believe, would frequent.  Is that true?

3        A.    I mean, yes.  Yeah, it's areas I would frequent.

4    I'm not going to sit here and lie to you and say, oh, I never

5    saw it, I never been around it.  That just -- that would be a

6    lie.

7        Q.    Okay.  So say more about that for the jury.

8        A.    So like more about what the areas where it was found

9    or -- I didn't notice it when I drove the Jeep.  I didn't

10   notice it stuffed in the roll bar like that.  I guess she

11   started putting it like that when she went to the rabbits,

12   she'd move it around.  It was just easier to get to.

13              THE COURT:  Just slow down.  You're going a little

14   too fast.

15              THE WITNESS:  Okay.  It would just be easier to get

16   to, like if she seen a fisher cat or a lynx.  There's a big

17   lynx that comes on the property.  There's a fisher cat that's

18   killed a bunch of chickens and stuff.

19              And it was just an oversight, you know.  I didn't

20   feel the need or, really, the right to tell her what she can or

21   can't do with her gun.  I don't -- I don't have that control.

22   If I did, then I would actually be exercising control; take it

23   out of here, take it -- no.  Hell, no.  You know, like please

24   don't keep it in the house.  That's about as far as I can go

25   with it.

169

```
 1        Q.    Was the firearm ever kept in your mother's house?

 2        A.    Briefly, yes.  Yes, it was.  That was -- that was

 3   one thing that she had done.  She put it over at Mama's house

 4   because then it wouldn't be in the back garage.  But my mom has

 5   a domestic violence conviction, so technically she would have

 6   been a convicted person.  So like, oh, well, don't keep it in

 7   Mama's house.  You know, if it's in the shop, well, then it's

 8   in the shop.

 9            So, really, like keep it in a vehicle that's not

10   being driven because then, you know, it's like -- it just

11   seemed like a safe thing to do for -- so I didn't end up in

12   this situation.

13        Q.    Did you -- well, strike that.

14            You lived on the property owned -- the property is

15   owned by your mother, correct?

16        A.    Correct.

17        Q.    All right.  So you lived on the property with your

18   mother, Kelley, and, what, sometimes Shanah, your sister?

19        A.    My sister lives with my mom full time.  Sometimes my

20   brother comes and stays with us when him and his girlfriend are

21   fighting.

22        Q.    Am I correct in what I'm hearing from you that you

23   and your family members and Kelley made a concerted effort,

24   conscious effort, to keep the firearm from you?

25        A.    Yes.  Yeah.
```

170

1    Q.   Say more about that.  What did -- what efforts did

2  the family make, including you, to keep the firearm --

3    A.   I think the effort I just don't handle it.  If Mama

4  sees it -- had seen it unsecured, she'd say something to Kelley

5  about it, hey, why is that left open.  You know, like that's --

6  that's about the extent of it.

7       It's not left around all the time.  She only shot it

8  three times, literally like three times, you know, and then she

9  was -- she went and -- you know, I drove her to Walmart when

10 she bought the 28-gauge.  Yes, I was in the car then, too.  And

11 she comes out, she's got some bandoliers and she starts putting

12 her shells in the bandoliers.  And I look and I'm like, how do

13 I tell her she just bought the wrong ammo, you know.

14      And I was like, are you sure you got the right

15 stuff?  She's like yeah.  And then I just kind of had to tell

16 her like, no, you got the wrong ammo and they're probably not

17 going to -- you probably can't go return it, so --

18   Q.   What's your understanding as to why Ms. Finnigan

19 wanted this firearm?

20   A.   Well, some people come over and they said they were

21 moving to Tennessee and they had it for sale.  And they owed us

22 a couple dollars and she says, well, yeah, I'll get -- I'll buy

23 it.  At that time I had already bought myself a crossbow for

24 Christmas, so she was like, I'm going to get a shotgun.

25      And, you know, there's literally -- she's scared of

171

1    the fisher cat.  The fisher cat, it climbed over the fence and

2    it would kill a duck, eat it in front of the other ducks, and

3    then climb over the fence and then just come back in two days.

4            And she was scared.  She'd see it up in the tree

5    staring at her and, you know, she was legitimately scared of

6    the fisher cat.

7            She's from the Manchester.  She's not used to the

8    country, you know.  I actually -- I -- I'll chase it out with

9    sword.  I chased a bear out of the yard with a sword and

10   everything.  Like I'm not going to go running for Kelley's gun

11   if there's a bear in the yard.  I got -- I usually got a bully

12   knife or something.  Like I'm not -- I'm not scared, but, you

13   know, she's scared of animals.  She's a city girl.

14       Q.    Is Wil -- how do I pronounce it, Wilmot?

15       A.    Wilmot yeah.

16       Q.    Is Wilmot a rural area?

17       A.    I've got about four neighbors in a square mile, so

18   yeah.  And you guys have seen the property map.

19       Q.    Are there predators on the property?

20       A.    Coyotes, fisher cat, bears come through, moose come

21   through sometimes.  It sounds like an excavator knocking down a

22   tree.

23            Lynx, I got pictures of a lynx paw print this big

24   with my hand next to it.  And he'll follow me through the

25   wetlands.  And he -- you know, I don't think he's going to

172

```
 1   attack me.  He's just curious.  But he'll follow me and I'll
 2   hear something and I never see what it is and will loop back
 3   around and I'll find the tracks.  And it's a lynx.  It's not a
 4   bobcat.  I know the difference.  It's big.  He's a big boy or
 5   girl.
 6        Q.   Officer Forte has testified and you've heard him
 7   testify that there's an image from your camera, your video
 8   surveillance camera there, that he believes shows you carrying
 9   an ammo can.  Is that --
10        A.   Yeah.  That's another ammo can.  There's a bunch of
11   ammo cans with different stuff.  There's also images in
12   discovery with -- I've got two ammo cans full of tree-climbing
13   spikes with the bit that you put on your screwdriver to drive
14   them in because they kind of go around and around.  It's an
15   offset bit type thing.
16             And that one actually has a code reader in it and a
17   soldering iron and what was the other thing that was in there?
18   It's a code reader, a soldering iron, and I think a heat gun
19   maybe?  There was something to do with electrical stuff, for
20   doing electrical connectors.
21             And I left -- if you all see, I don't know if you
22   all caught it, but at that point we got in the car and left.
23   So it was definitely not the same ammo can that was out in the
24   Hyundai, just in case you all were wondering.
25        Q.   That's what I was driving at.  So --
```

173

1      A.    You can buy them at Walmart for like 13 bucks.  It

2  keeps water out of stuff.

3            MR. STACHOWSKE:  Your Honor, may I approach the

4  evidence?

5            THE COURT:  Yes, you may.  Yes.

6      Q.    This is the ammo can that -- this is the ammo can

7  that was found in the Hyundai?

8      A.    Yup.

9      Q.    Is this the same ammo can that you were --

10 reportedly seen on the video camera?

11     A.    No, I've got three of them.  It's not the same exact

12 one.  And the gun cleaning kit -- I'll put it right out there.

13 The gun cleaning kit is something that they gave back to me.

14 And when she got a gun, it was kicking around.  I said, here,

15 put this in with the gun stuff.

16            The same thing with the scope.  Same thing with --

17 the AK mag, I actually found that up on a -- I think it was a

18 burnt curtain -- sorry -- girts or purlins.  You know, a steel

19 building, the horizontal structure supports.  There was one up

20 there.  I was climbing up there to put a chain fall up and I'm

21 like, there's an AK magazine here.  What the hell.

22            And I gave that to her, too, and I said, put that

23 with the gun stuff.  Like I went through a concerted effort to

24 try and put stuff where it could at least be said that, you

25 know, well, I didn't have access to it, I'm not trying to

174

1   possess it, I'm not trying to do anything with it.

2       Q.   All right.  Mr. Donovan, the evidence has

3   demonstrated that a bandolier of shells was found in the center

4   console of the Jeep.  Do you know how those got there?

5       A.   No, I didn't -- I didn't notice the shells.  I

6   didn't notice the gun.  If I had seen it up on the roll bar,

7   you guys see it was kind of like tucked in and strapped up

8   there.  I would have said something to her about it like, hey,

9   can you please do something else with that.

10      Q.   But since you referenced that, the camouflage

11  netting that has been demonstrated as being hung on the roll

12  bar, how long has that camouflage been there?

13      A.   Over two years it's been there.  You know, it's not

14  as big now, but it used to stretch out all the way over the

15  roll bar and it just sit tight and make a cool little tonneau

16  cover looking thing when you got the soft top off.  Kind of

17  looks cool.

18      Q.   And do you have any knowledge as to how the

19  shotgun -- I think I've asked you this already, but how it

20  ended up --

21      A.   I have no personal knowledge.  I mean, and I -- I --

22  Kelley's not taking the stand -- that's not on Kelley, but

23  she's -- for her own personal reasons, she's not taking the

24  stand --

25           MR. ROMBEAU:  Object.  Objection, your Honor.

175

1          THE COURT:  Yes.  Don't discuss that.  Go on to the
2   next subject.
3          THE WITNESS:  Okay.
4          No, I don't know how exactly -- personally know how
5   exactly it got there.
6      Q.   Okay.
7      A.   No.  As far as the -- do you want to bring up the
8   images of the center console?
9      Q.   Well, let me ask you this.
10         You've testified to knowing of the firearm's
11   existence.  How many times have you been in -- if ever -- have
12   you been in proximity to the firearm?
13     A.   I mean, in proximity, around it, seen it, I don't
14   know, at least a dozen times.  I mean, I'm not going to -- I
15   see it.  I see it around the property sometimes.  It's not --
16     Q.   All right.
17     A.   It's not a secret.
18     Q.   Did you have any intention to ever use it?
19     A.   No.
20     Q.   Why not?
21     A.   Well, because then I'd be possibly sitting in a
22   situation like this, you know.  I don't -- I don't want to be
23   in jail.  I don't want to be in court situations taking up
24   everybody's time.
25         But at the same -- you know, on the same level, like

1    I live in the forest, you know.  I can't tell my girlfriend she

2    can't have a gun.  So ...

3        Q.    Mr. Donovan, that is the crux of the case.  So as

4    you sit here before the jury, explain more for them as to how

5    it is that you had no intention to ever use that firearm.

6        A.    What do you mean by explain to them how I had no

7    intention?  Oh, I mean -- oh, like with hunting?  I went out --

8    I have a crossbow, I have a couple of compound bows.  I have a

9    crossbow license, a current New Hampshire hunting license.  You

10   know, you can get a special crossbow license to get a deer

11   during archery season, I mean during firearms season, with your

12   crossbow.  Like I've gone out of my way to make sure I do

13   everything like legally, you know.

14            No, I didn't tell my PO that Kelley had a shotgun.

15   It's not my real place to tell him that.  She's only met him

16   twice and once very briefly.  Yeah, it's not my -- it's not my

17   spot to tell him that.  Why, so he can get all huffy about it?

18   I don't handle it.  It's not a problem.  Or it shouldn't be.

19       Q.    And you've heard Officer Merna testify with his

20   opinion that he agrees that Kelley could lawfully possess a

21   firearm, correct?

22       A.    Correct.

23       Q.    All right.

24       A.    You know, Tim -- Tim takes issue with me having

25   knives of a certain size.  I'm allowed to have knives.  I'm

 1   going to have machetes.  Like I'm going to cut brush, I'm going

 2   to have the tools that I need, and we can argue about it later.

 3         But, you know, I got paintball guns, there's pellet

 4   guns.  There's all kinds of stuff they didn't take.  You know,

 5   they didn't get my crossbow.  I still got that.

 6      Q.   Okay.

 7      A.   That's got a light on it and a bipod and a scope and

 8   a laser sight and everything.

 9      Q.   What else would you like to tell the jury, if

10   anything?

11      A.   I'd like to be able to tell the jury why the ATF

12   ended up at my house in the beginning.

13         THE COURT:  I don't -- I don't know what his answers

14   to these questions would be.  Why don't I -- if I -- members of

15   the jury, I'm sorry to have to do this, but I want to excuse

16   you for just a minute.  It'll be very, very quick.  I need to

17   hear what his answer's going to be and the easiest way to do

18   that is to have you step out.

19         THE CLERK:  All rise.

20              (Jury excused.)

21         THE CLERK:  Please be seated.

22         THE COURT:  All right.  So, Mr. Donovan, what did

23   you want to say about the ATF coming to your house?

24         THE WITNESS:  Yeah, I'd like the jury to know the

25   full extent of the circumstances where -- in regards to why

1　they initiated an armed invasion of my mom's property.  I think

2　they should know that a dope fiend that had her own problems

3　made up a complete lie, said I had a camouflage hunting rifle,

4　pistols, and a machine gun.  I can't -- he disagrees, I'm sure,

5　but I think that's all untrue and the fact that there was a gun

6　there is an irrelevancy, you know.  They were there on false

7　pretenses.

8　　　　　And like there was no -- I mean, I won't get into

9　corroboration and all that, but, you know, they were there on

10　false pretenses, your Honor.

11　　　　　THE COURT:  All right.

12　　　　　THE WITNESS:  If they can be in anybody's house

13　pretty much in this state under false -- you're going to find a

14　gun.

15　　　　　THE COURT:  All right.  I understand that.

16　　　　　Are there other subjects that you want to cover with

17　the jury that we haven't covered other than that one?

18　　　　　THE WITNESS:  I guess no.  I guess that's about it,

19　sir.

20　　　　　THE COURT:  Okay.  The government, I assume, objects

21　to that.

22　　　　　MR. ROMBEAU:  It doesn't appear there's anything

23　that he has personal knowledge of, your Honor, that I think he

24　could testify to.  So if he's going to testify to things that

25　he read in an affidavit, I think that would be hearsay.

```
1              THE COURT:  All right.  So --

2              MR. STACHOWSKE:  Well --

3              THE COURT:  You do object is what I --

4              MR. ROMBEAU:  Yes.  I'm sorry, your Honor.  Yes.

5              THE COURT:  Okay.  So you object.

6              You would -- I -- it doesn't strike me that it is

7    relevant to the proceedings at all.

8              I understand -- believe me, I understand

9    Mr. Donovan's personal frustration about it, but that has to

10   deal with the lawfulness of the search, which is something we

11   have to explore in accordance with the law that is available to

12   me and I have done that to the extent I -- and if I'm wrong,

13   the Court of Appeals will correct me.  But it doesn't -- it

14   can't affect the jury's decision-making here.

15             So there's a relevance problem and there's also a

16   basis of knowledge problem.  He has to have personal knowledge

17   of the facts that he's testifying to.  He would just be talking

18   about having read the affidavit and having heard that, you

19   know, that person is a liar and that she's the informant and

20   all that kind of stuff.

21             So I agree -- I understand your frustration.  I get

22   it.  I really get that part of your case.

23             THE WITNESS:  Uh-huh.

24             THE COURT:  But it just -- it just can't come into

25   court because it isn't relevant --
```

```
 1              THE WITNESS:  Okay.  I respect that.  I respect

 2     that, your Honor.

 3              THE COURT:  So did -- I think he's pretty much

 4     covered the main points that he wants to cover.  So perhaps as

 5     a way to wind up is -- and it's up to him and you if you want

 6     to do this, but it is -- it would be fair game for you to ask

 7     him, if you decide it's in his interest, as a kind of

 8     summation, just to finish up, Mr. Donovan, you're charged with

 9     possessing a Mossberg shotgun.  Did you ever possess that

10     shotgun, either actually or constructively; you're charged with

11     possessing the following ammunition, did you ever possess that

12     ammunition actually or constructively.  I assume your answer

13     will be no, no, no, and that makes it unequivocal, clear to the

14     jury that's your position and then the jury can evaluate it

15     after cross-examination.

16              Is that okay with you?

17              THE WITNESS:  That's okay with me, your Honor.

18     Thank you very much.

19              THE COURT:  Okay.  Let's bring the jury back in.

20     We'll get those last questions and then we'll go from there.

21                   (With the jury present.)

22              THE CLERK:  All rise for the jury.

23              Please be seated.

24              THE COURT:  Mr. Stachowske, you have some concluding

25     questions for the -- the defendant and then we'll wrap up for
```

181

```
 1    the day.

 2            MR. STACHOWSKE:  Thank you, your Honor.

 3        Q.    Mr. Donovan, you're here today, you're charged with

 4    possession of a Mossberg shotgun.  Have you ever directly or

 5    constructively possessed -- actually or constructively

 6    possessed the shotgun?

 7        A.    No, I have never hands-on physically possessed this

 8    shotgun or intended to exercise the right to dominion and

 9    control.  I've never hands-on or intended to have access to

10    this.  Oh, it's there, so maybe I'll go pick -- no.  Nope.

11        Q.    All right.  Mr. Donovan, same question with respect

12    to the various ammunition.  I'm not going to belabor the point

13    by going through the -- the various names.  You've got

14    20-caliber and 28-caliber shotgun shells.  Did you ever have --

15    did you ever actually or constructively possess any of the

16    ammunition alleged in this case?

17        A.    No, I didn't.  And, again, like I think you all

18    would agree, if I was going to go out and buy ammunition, I'd

19    know what caliber to buy the first time around.

20            THE COURT:  All right.  Thank you.

21            So, members of the jury, that concludes the direct

22    examination.  As I said, I'm going to have cross-examination at

23    nine o'clock tomorrow to be followed immediately -- if there --

24    redirect and if there is a rebuttal case, it'll be very brief

25    to be followed by closing arguments and jury instructions.
```

1          So you're free to go for the day.  Keep my general

2    instructions in mind.  We have one more day and you'll be --

3    have the case to deliberate and I thank you for your patience.

4    I apologize for the wait.  And we'll get to you at nine o'clock

5    tomorrow and get this case to you during the day so you can do

6    your deliberations tomorrow.

7          Thank you.  You're excused for the day.

8          THE CLERK:  All rise.

9          THE DEFENDANT:  Thank you all.  Have a good night.

10                    (Jury excused.)

11          THE COURT:  Yeah, if the marshal -- can you take him

12   back to his seat?  Thanks.

13          Okay.  So cross at 9:00.  I'm hopeful that you can

14   be focused and I'm hopeful that, you know, an hour or less of

15   cross-examination should be more than sufficient to make your

16   points.  I really think in fairness to this jury I do not want

17   them to delay beyond Friday getting the case.  Okay?

18          So I expect that your -- and will require that your

19   closing arguments be an hour or less.  I expect them to be

20   less, particularly the defense closing will be substantially

21   less.  It's a simple denial.  That's what it is.

22          So I'm hopeful that we can at the very least get

23   both closing arguments in before lunch and, if possible, my

24   instructions.  If not, I'll hope to instruct right after lunch.

25          So in terms of a rebuttal case, I'm not barring you

183

1    from offering rebuttal testimony, but I think much of it can be

2    done by simply confronting the defendant with the materials

3    that you would want.

4           Like I don't know what -- if you're going to try to

5    use this tape of him you think carrying a gun, you can play

6    that for him; isn't that you carrying a gun and, you know,

7    that -- that seems to me to be fair game.

8           I do not know anything about the defendant's

9    criminal record.  Are you going to be trying to use any

10   criminal convictions to impeach?

11          MR. ROMBEAU:  I expect so, your Honor, as it relates

12   to his 2007 conviction, because it involved the use of a

13   firearm, a long gun, in furtherance of a crime of violence,

14   and --

15          THE COURT:  But what -- you are -- are you

16   impeaching his credibility through that because there's a --

17   what I would not allow is the use of convictions for propensity

18   purposes.  The convictions have to be admissible for

19   impeachment purposes.

20          Now, he has not -- for example, he's not said, I

21   don't know anything about firearms; you know, that he denied --

22   I've never possessed a firearm in my life.  Then that

23   conviction might be -- and I'll sit over here so you can see

24   me, Mr. Donovan.

25          Do you see what I mean?

184

```
 1              So you need to think that through carefully and
 2    be -- look at the actual rule for impeachment with a prior
 3    conviction and make sure that it is a kind of impeachment that
 4    is legitimate so that we don't waste time.
 5              And you should lay out for Mr. Stachowske tomorrow
 6    morning before you start any convictions that you think you can
 7    use to impeach and if there's objection, I need to hear about
 8    it so I don't just have you kind of blundering into it.
 9              I -- my understanding would be ordinarily the
10    conviction has to meet the requirements in the 600 series for
11    impeachment of a witness and you have to be careful that you
12    don't use it for a purpose that would be improper propensity
13    evidence.  And we have to be careful that the evidence doesn't
14    have prejudicial effect that substantially outweighs any
15    probative value.  So we have to -- you have to think that
16    through and I want you to do that carefully before you try to
17    do it.
18              So keep it focused.  I mean, there's obviously a lot
19    you could do to go through every piece of evidence in the case
20    and some of that you certainly will want to do to get his
21    specific responses.  And, you know, I'm hopeful you can do it
22    in an hour.  Okay?  And then a brief redirect, if necessary.
23              And what -- what we can do is we'll take a break
24    after your cross and if there's going to be a redirect, we'll
25    take the jury out after your cross is completed, bring them
```

185

```
 1    back in for any redirect and back out again after that redirect
 2    so that Mr. Donovan can be up at the witness stand and it
 3    doesn't look like he's being, you know, escorted by the
 4    marshals.  And then we'll go right into the closing arguments.
 5    So we'll try to get the closings in in the morning.
 6              Is there any -- anything else either of you need
 7    from me?
 8              MR. ROMBEAU:  No, your Honor.  I expect we're going
 9    to probably want to confer with the Court prior to --
10              THE COURT:  I'll be here by 8:30 --
11              MR. ROMBEAU:  Yes.
12              THE COURT:  -- so let me know.
13              MR. ROMBEAU:  I know there are at least a few I'll
14    call them buckets of sensitive information and I'll preview
15    them for Attorney Stachowske to see if there will be
16    objections, but just off the top of my head, the 2019 incident;
17    we may or may not decide to get into; the DNA issues, we may --
18              THE COURT:  I don't know the 2019 incident except in
19    very general terms.  What is that?
20              MR. ROMBEAU:  It is where firearms were found in his
21    green Jeep and he was charged in connection with those and
22    ultimately acquitted because they were his girlfriend's
23    firearms.  And I think, just very briefly, I'd perceive at
24    least theoretically at this point, and we may decide not to use
25    it, but it's relevant if he's coming in and saying, I'm very
```

186

```
1    careful about firearms and staying away from them after he was
2    charged in 2019 with conduct that related to firearms being
3    found belonging to a girlfriend in his Jeep.
4             And so that there are, at least as we've talked
5    about theoretically before he actually testified, some very
6    unique circumstances that overlap with the conduct here as to
7    why it may not be credible, his contention on the stand that he
8    didn't know there was a gun in his car or was careless in that
9    way about there being a gun and ammunition in his car.  So ...
10            THE COURT:  Yeah, I think you're going to have to be
11   careful about that because I -- you're going to have to clearly
12   demonstrate to me that there's some permissible ground to go
13   into that conviction.
14            As I understand Mr. Donovan's --
15            THE DEFENDANT:  Acquittal, your Honor.
16            THE COURT:  -- defense, it is straightforward.  It
17   is, first and foremost, I never physically possessed the guns
18   or the ammunition; second, I didn't own the guns and the
19   ammunition, they were owned and controlled by my girlfriend;
20   third, my girlfriend had a right to have guns and ammunition in
21   my house and I am not charged with possession of them merely
22   because they were in my living quarters or in my workshop or in
23   a car that I owned; and on top of that, he said I didn't know
24   the shotgun was in my Jeep is what he's saying; I didn't know
25   the ammunition was in the center console of my Jeep.
```

1    Those seem to be the most fruitful areas for

2 examination.  I mean, it's -- you've demonstrated that he was

3 in and out of the Jeep a lot in the day before the Jeep was

4 searched and those -- that gun was in there during that time.

5    And, you know, whether the jury finds credible his

6 claim that, gee whiz, I just didn't know there was a shotgun

7 tied to the camo in the back and I didn't know there were

8 shotgun shells in the center console that -- you know, where my

9 gloves are sitting on top of them, you know, that's -- that

10 should be the -- the basic facts speak for themselves.

11    They -- the 2019 incident, I'm not sure that it

12 says much because he will readily admit -- I think he readily

13 admits, yeah, I saw -- I knew she had the gun; I knew she had

14 shotgun ammunition; I knew there was shotgun ammunition in the

15 places where it was; yes, I did go to those places.

16    I expect he'll probably say, yeah, I was there; I

17 was by that bench; yeah, it's true, I did work in that general

18 area; yeah, that is my scope, it was -- I told her she should

19 keep it with the rest of the stuff because I can't have a

20 firearm, so she can use that to the extent she wants to.

21    That -- I think that's -- that's what he's saying.

22 Whether a jury believes that and finds that a defense is -- but

23 it's very straightforward and it -- you can go and rehearse all

24 of the elements of your case and this is often what happens

25 when a defendant testifies.

188

1          95 percent of your case he's not going to disagree

2     with.  So you can reinforce that 95 percent with him:  Yeah, I

3     agree that's where it was; yes, my -- the barrel was right

4     there; yes, the shot -- the scope was on top of it; yes, the --

5     that is the gun cleaning kit that I got from those people and I

6     gave it to her because I couldn't have a gun and she would use

7     it to clean.  That's his -- that's going to be what he's going

8     to say.

9          He's going to admit virtually all of the evidence, I

10    expect, that you have elicited and he just has a different spin

11    on it.  And whether that spin is one the jury buys, you have to

12    trust the jury's common sense and he has to trust his version

13    of what he thinks the jury's common sense is and they'll

14    decide.

15         I mean, there really isn't -- the only difference is

16    when he claims what he knew and didn't know and what he did

17    and didn't do and whether the gun being in his Jeep for a

18    substantial period of time where he controlled that Jeep is

19    a -- sufficient to justify constructive possession and

20    inference of knowing instructive possession of the firearm is

21    going to be quintessentially an issue for the jury.  He wanted

22    his chance and I gave it to him and, you know, we'll see what

23    the jury does.

24         But I don't want to go off on elaborate,

25    problematic, you know, flights into other matters and I --

189

1    frankly, I don't see how it's really even necessary.

2            But, you know, you'll make your decisions and you'll

3    try to do whatever you think you should do to protect the

4    government's interest here.  But just have it thought through

5    if you have a theory of its relevance, particularly things that

6    are -- might be construed as other bad acts.  That's something

7    I tend to be very careful about, not allowing things to be

8    admitted to for propensity purposes.  Okay?

9            All right.  So we'll convene at 9:00.  We'll see

10   what happens with the cross, take a break, do any redirect,

11   take a break, hear any rebuttal case, do closing arguments, do

12   jury instructions, and let them deliberate.

13           Thank you.  We'll see you tomorrow.

14           THE CLERK:  All rise.

15           THE DEFENDANT:  Thank you, your Honor.  You have a

16   good night.

17           THE COURT:  You, too.

18           (Proceedings concluded at 4:00 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 5/9/2022          /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR

# Exhibit 13

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    UNITED STATES OF AMERICA        *
                                     *
5                                    *  No. 1:21-cr-00088-PB-1
              v.                     *  October 15, 2021
6                                    *  8:47 a.m.
                                     *
7    COREY DONOVAN,                  *
                                     *
8                    Defendant.      *

9    * * * * * * * * * * * * * * * * *

10

                     DAY FOUR OF JURY TRIAL
11            BEFORE THE HONORABLE PAUL J. BARBADORO

12

13   APPEARANCES:

14

     For the Government:      Anna Z. Krasinski, AUSA
15                            Charles L. Rombeau, AUSA
                              United States Attorney's Office
16

17   For the Defendant:       Matthew G. Stachowske, eSQ.
                              Stachowske Law PLLC
18

19

20   Court Reporter:          Brenda K. Hancock, RMR, CRR
                              Official Court Reporter
21                            United States District Court
                              55 Pleasant Street
22                            Concord, NH 03301
                              (603) 225-1454
23

24

25

2

I N D E X

WITNESSES:              DIRECT      CROSS     REDIRECT      RECROSS

COREY DONOVAN
(RESUMED)
By Mr. Stachowske                               57
By Mr. Rombeau                       17                        71


REBUTTAL WITNESS:

JOHN FORTE
By Ms. Krasinski          76


                                                    Page
Closing Argument by Mr. Rombeau................78
Closing Argument by Mr. Stachowske.............98
Rebuttal Closing Argument by Ms. Krasinski....104


Jury Charge....................................106
Verdict........................................127

E X H I B I T S

Government's                        In Evd.
904...................................39
905...................................45
907...................................46
901, 902 & 908.......................53

Defendant's
E....................................60
F....................................64
G....................................70

```
 1                    P R O C E E D I N G S

 2            THE COURT:  All right.  I want to start as close to

 3       9:00 as we can, so let's get going, and then, when the

 4       defendant's brought in, I'll explain to him what's happened.

 5            So, the defendant had to be COVID tested.  He's in the

 6       holding cell.  It's 10 minutes of 9:00.  We have a busy day.  I

 7       don't want to delay the jury, so I'm going to start, and then

 8       I'll summarize what I've done for him when he gets here.

 9            Okay.  Someone wanted to see me about something.  What

10       did you want to talk to me about?

11            MR. ROMBEAU:  I think, as we anticipate the topics

12       we're going to cover on cross today, your Honor, there's only

13       one maybe bucket of materials that defendant has indicated a

14       potential objection to, and that is there are three video clips

15       of the defendant on the property that we intend to show him and

16       cross-examine him about that were not part of the government's

17       case in chief but that were included in the discovery, and

18       specifically the three videos that we showed him yesterday

19       before he decided to make the decision to testify.  So, he is

20       certainly on notice of these specific videos.

21            And then there's one related image, a close-up of him

22       standing on the roof of the garage where there's no dispute

23       that it's him.  I don't believe we showed him that particular

24       image, but, at least from our standpoint, that's not really --

25       it's just a still clip of him standing there from sort of a
```

1    visual authentication standpoint.

2          So, we intended to cross-examine him about those.

3    Obviously, there is an authentication issue.  If he's not going

4    to admit that's him or recognizes those videos, then we would

5    do it as a brief rebuttal case in playing them through Special

6    Agent Forte.

7          THE COURT:  Let's talk about what they show.  Go

8    through and tell me what each thing shows, why you're doing it.

9          MR. ROMBEAU:  So, the first clip is from the very

10   early morning hours of March 10th.  We can even pull them up so

11   the Court can see.  This has been marked for identification

12   purposes as 901, and it shows the defendant walking with what

13   appears to be some sort of -- it appears to show him walking

14   with another individual carrying some sort of weapon with

15   another item strapped at his back walking down the path there.

16         Certainly -- we can stop that one, Ms. Shedd.

17         It's just a few-second clip.  And then 902.

18         THE COURT:  Well, let's stop there.  What does that

19   show in your mind?

20         MR. ROMBEAU:  In our mind, your Honor, that shows a

21   couple of things relevant to the issues at trial here.  It

22   shows him possessing what we would argue appears to be the gun

23   in this case strapped to his back.  I believe it's the crossbow

24   that he's holding.  I don't think I would argue that the item

25   he's clearly --

1          THE COURT:  It looks to me like the crossbow.  People

2    who have crossbows also carry containers on their back that

3    hold arrows.  You think that's a weapon and not a container?

4          MR. ROMBEAU:  Right.  And he could certainly argue

5    that.  And we're not -- I think this is -- like with all this

6    video, your Honor, I'm not saying there's only one clear

7    interpretation of that.

8          And then there's -- the companion clip of this is a

9    little while later, when he's walking back to the apartment at

10   902.  Again, it's sort of strapped to him.  And so, the related

11   part of this I think is that he -- his use and control of the

12   barn workshop, where some of the contraband was found, is one

13   of the central issues in the case, and I think this is at least

14   relevant to that.  I'm not going to suggest that I think

15   it's --

16         THE COURT:  It's pretty clearly the crossbow he has in

17   his hands coming back the second time, so the inference would

18   be that what he was pointing the first time was a crossbow.  He

19   has something behind his back.

20         MR. ROMBEAU:  Yes.

21         THE COURT:  Are you going to have somebody on rebuttal

22   say, I can tell you what that is.  That's a rifle?

23         MS. KRASINKSI:  Agent Forte would testify that, upon

24   his viewing of that, he believes that to be the shotgun before

25   the new foregrip was added, so with the original foregrip.

```
1    Right now the shotgun has a foregrip with a light on it, and

2    Agent Forte believes that to be the rifle, or the shotgun,

3    excuse me, before that new foregrip was added.

4           THE COURT:  So, you are going to offer him as a

5    rebuttal witness if he denies that that's the shotgun?  He has

6    sufficient expertise and familiarity that he can opine that

7    that is?  Because I can't tell that that's a rifle.  I can't

8    say that it's not.

9           MR. FORTE:  At one point, too, your Honor, you can see

10   the scope on it, too, when the other individual is walking

11   behind him.

12          THE COURT:  Okay.  Well, you can point out where that

13   is in rebuttal, if he denies it.

14          You can certainly -- it certainly seems there is a

15   sufficient basis on which to play that and question him about

16   it, and then, depending upon what his answer is, you can

17   consider whether to call a brief rebuttal witness.  If you do,

18   it will be limited solely to this, okay, unless I authorize any

19   additional matters?

20          MR. ROMBEAU:  Absolutely, your Honor.  And then there

21   are --

22          THE COURT:  Do you want to say something, Mr.

23   Stachowske?

24          MR. STACHOWSKE:  To the extent that the video, to the

25   extent that what I just heard is that the shotgun did not have
```

1   the flashlight on it, and, given the fact that the gun was

2   found with a flashlight on it, I'm curious as to when this

3   video was taken, and I think the only way we can confirm that

4   is by, when you close it out, you see the date and time on it.

5           THE COURT:  I think he said March 10th.

6           MR. ROMBEAU:  That's right.

7               (The defendant entered the courtroom)

8           THE COURT:  Come on in and have a seat.

9           MR. STACHOWSKE:  That was my question with respect to

10  that.

11          THE COURT:  Let me just bring Mr. Donovan up to speed.

12  He's been brought in.

13          We're almost at 9:00.  We're going to have a busy day.

14  I couldn't wait, so I had to start.  So, all we did was start

15  talking about potential questioning that the government's going

16  to do of you that the government wanted to make me aware of in

17  the case I had any particular concerns about it, and he showed

18  the first video clip, was what appears to be you going out with

19  someone with a crossbow, something on your back, and he showed

20  me the you-going-out clip and coming-back clip, and that's all

21  we've done so far.  Yes.  Did you want to say something?

22          THE DEFENDANT:  Yes.  Yes, your Honor.  I had

23  specifically asked for all the photos so I could review it.

24  But these are things I still have on the property that I would

25  have been able to present and say, Hey, well, look, you know,

1　this is a high-powered pellet gun.  You don't shoot arrows up

2　in the air to knock a porcupine down.  I tried that once, and

3　you end up with an arrow in the front yard.

4　　　　　THE COURT:  You'll get a chance to explain that.

5　　　　　THE DEFENDANT:  Okay.

6　　　　　THE COURT:  You're apparently telling me that's your

7　pellet gun on the back.

8　　　　　THE DEFENDANT:  They're still at the house, but I

9　haven't been afforded the ability to even see any of this

10　stuff.

11　　　　　THE COURT:  Well, that's because you made a decision

12　to testify in, like, a minute after telling me you weren't

13　going to testify.

14　　　　　THE DEFENDANT:  Yeah, yeah, yeah.

15　　　　　THE COURT:  So, if you had planned this out and you

16　wanted the pellet guns and they're there, we would have gotten

17　them for you.

18　　　　　THE DEFENDANT:  I know.  I didn't know.  I had been

19　asking specifically for under 13 -- 16(a)(1)(E)(iii) for all my

20　camera footage and all my -- and it was, you know, it's like --

21　　　　　THE COURT:  I understand.  You preserve any argument

22　you have about that.

23　　　　　THE DEFENDANT:  Yes.  Thank you, sir.

24　　　　　THE COURT:  He did show you the clip yesterday.

25　That's what -- I told him to, so I think he did.

1          THE DEFENDANT:  Okay.

2          THE COURT:  All right.  Go ahead.

3          MR. ROMBEAU:  Thank you, your Honor.  So, there are

4    those two short clips.  Again, if the defendant is not going to

5    authenticate them, then I'm probably not going to be able to

6    show them to the jury.

7          THE COURT:  He's not going to deny that's him, if it's

8    him.  He's going to tell you it's his pellet gun on the back,

9    and that's not a prohibited firearm.

10          MR. ROMBEAU:  For sure.  And then we had the image --

11          Ms. Shedd, which number is that, just the still image?

12    Is that 903?

13          MS. SHEDD:  903.

14          MR. ROMBEAU:  It should be coming up in just a minute.

15    It's 903.  It is not appearing.  There we go.

16          So, again, this is just a still clip, from our

17    standpoint, relevant to confirm the defendant's use of the

18    property, his --

19          THE COURT:  Well, just to save time, you can ask him,

20    You go on that property a lot.  You get on the roof of the

21    property.  You've been on the roof of the property looking out

22    at night one time, right?  And he'll say, Yes, Yes, Yes, and we

23    don't need to have the image, so we can skip over that.  If he

24    says, No, then you can go with what you want.

25          MR. ROMBEAU:  And then the last one, your Honor, is

1    what we've marked for identification purposes as Exhibit 908.

2         Is this the clip, Ms. Shedd, or do we need to move to

3    about 8:25 in?

4         So, this is a clip we showed the defendant yesterday

5    from March 9th of him and another individual going to a vehicle

6    in which they remove the what we would argue, and, again, I

7    understand the defendant may have a different interpretation,

8    but the black gun box that is later found in the workshop.

9    This clip runs for about not more than a minute.  That's the

10   black gun box there.  And, again, from our standpoint, the

11   relevance of this is the defendant has testified the gun and

12   the gun box belong to Ms. Finnegan, and I think he clearly

13   would admit this individual carrying the gun box on March 9th

14   is not Ms. Finnegan.

15        THE COURT:  Well, that does appear to be a gun box,

16   and it is visually similar in appearance to the gun box we have

17   here.  The defendant can provide his explanation, when

18   questioned on it, and if you need a brief rebuttal witness if

19   he denies it's a gun box or something, I assume the agent can

20   offer opinion testimony on it, and we'll go from there.  Okay?

21        MR. ROMBEAU:  And then I think there were a couple

22   other photos from the execution of the search warrant we were

23   going to use, your Honor, I don't think those are controversial

24   at all, involving a couple of photos from inside the residence

25   related to Ms. Finnegan, and then a photo of two deer that the

1    defendant had in the barn on or about March 9th.

2         Can we pull that up, please, Ms. Shedd?  Is it

3    possible to rotate it?

4         Again, the defendant's custody and control and access

5    to the workshop where some of the contraband was found is

6    really one of the essential --

7         THE COURT:  You can always ask him, Are those your

8    deer, you shot them, used an arrow, whatever he's going to say.

9         THE DEFENDANT:  No.

10        THE COURT:  No?  You don't have to tell me now, if you

11   don't want to, Mr. Donovan.

12        THE DEFENDANT:  I'll tell you.  No.  Those are the

13   roadkill deer that I got the night that I picked --

14        MR. STACHOWSKE:  We know.  Sit down, please.

15        THE COURT:  Those are roadkill.  Okay.  Good.

16        MR. ROMBEAU:  And I don't dispute that either, your

17   Honor.  We're not suggesting that he shot or did anything.

18   It's really about the access and use of the space is what we

19   intend to --

20        THE COURT:  Yeah, that's fair game.  Okay.

21        MR. ROMBEAU:  I think that's --

22        THE COURT:  You're not doing anything with prior

23   convictions.  That's what I was most concerned about.

24        MR. ROMBEAU:  No, we are not, your Honor.  We do not

25   intend to get into the 2019 incident beyond what we already did

1    about the return of the items.  We do intend to question about

2    the DNA refusal, but I don't believe -- again, the defendant

3    can have his explanations for that and everything, but the

4    questioning itself --

5           THE COURT:  A philosophical explanation:  You already

6    had my DNA, there's no need for you to do this, this is a

7    needless intrusion, and that's why I said no, not because it

8    would reveal anything bad about me.  Okay, I get that.  That's

9    fair game.

10          Yes, Counsel.

11          MR. STACHOWSKE:  Thank you, your Honor.  Just for

12   simplicity sake, would the Court please note my objection when

13   the evidence is submitted?

14          THE COURT:  The DNA you want to be -- the questioning

15   on DNA?  Is that what you want --

16          MR. STACHOWSKE:  I don't think he's going to talk

17   about that.  Am I correct?

18          THE COURT:  He said he is.

19          MR. STACHOWSKE:  Oh, you just said you did?

20          MR. ROMBEAU:  Yes.

21          MR. STACHOWSKE:  Okay.  Note my objection to anything

22   we've discussed today as to relevance and to --

23          THE COURT:  All right.  I need to rule, so I need to

24   know the grounds.  So, to the extent you're objecting on

25   relevance grounds, your objection is overruled.  With respect

1    to the DNA, you haven't given me a memorandum on this, but I

2    did do some preliminary research several days ago and directed

3    the Clerk to provide you with copies of cases.  Did the Clerk

4    do that?

5              MR. STACHOWSKE:  I did get those, your Honor.

6              THE COURT:  All right.  So, I just want to be clear.

7              MR. STACHOWSKE:  Yes.

8              THE COURT:  And I never got any developed research or

9    argument, but my preliminary work suggests to me that, under

10   these circumstances as I understand them to be, which is that

11   the defendant was issued a lawful order from the Magistrate

12   Judge to submit to a DNA test and refused to do that, under

13   those circumstances there's neither a Fifth Amendment right

14   against self-incrimination implicated nor a Fourth Amendment

15   right to protection against unreasonable searches and seizures,

16   and in a case like that, where a defendant is subject to a

17   lawful order to submit to DNA testing and does not, it's an

18   appropriate subject of inquiry, because there is an argument

19   that the resistance is consciousness of guilt rather than a

20   philosophical agreement.  He can present his philosophical

21   agreement, the government can argue consciousness of guilt, the

22   jury will decide which, if any, of those inferences is the

23   appropriate one.  Your objection on that score is preserved, to

24   the extent you have one.

25              As to the other matters, they are minimally relevant,

14

1    and as to what he says in response I will deal with it.  But do

2    you have other objections?

3              MR. STACHOWSKE:  As to the former evidence that was

4    submitted or that will be submitted that was discussed today,

5    not the DNA, the former evidence, relevance and the timeliness

6    of the disclosures.

7              THE COURT:  All right.  So that these were --

8              MR. STACHOWSKE:  Late disclosures.

9              THE COURT:  -- late disclosures.  All right.  Is there

10   some local rule that requires that other than that they should

11   have been -- but they aren't being introduced until

12   cross-examination of your client, and they can't really know

13   what exhibits they're going to need on cross until the client

14   testifies.  So, I don't believe they have violated our local

15   disclosure rules, but your arguments are preserved with respect

16   to that.

17             So, to be clear, you do not need to object during the

18   cross on those grounds.  Any other grounds, any other issues

19   you need to object to preserve your right to objection.  But I

20   understand your arguments.  I don't find them persuasive.  Your

21   objections are noted and overruled.

22             MR. STACHOWSKE:  One final issue, your Honor, and I'll

23   sit down.  My name is referenced -- in the course of my client

24   refusing to comply with the DNA request one or more reports are

25   generated where my name is mentioned as being counsel who has

1    recommended that he agree to the DNA testing.  I would ask that

2    he --

3              THE COURT:  Don't make any reference to that.

4              MR. ROMBEAU:  We're not going to be using any reports,

5    just questioning him about the exchange on that, your Honor.

6              THE COURT:  If you do get into reports don't mention

7    the counsel's name and suggesting he was advising him what to

8    do.

9              MR. ROMBEAU:  We just have one issue we wanted to

10   raise, your Honor.  In our view, it would be improper for the

11   defendant to be volunteering any information about another

12   witness invoking her Fifth Amendment right, and we would just

13   ask the Court instruct Mr. Donovan --

14             THE COURT:  Yeah.  Don't mention your girlfriend

15   invoking her Fifth Amendment right.  I don't want to have any

16   discussion about that during the questioning.  Okay?

17             THE DEFENDANT:  Yes, your Honor.  Thank you.

18             THE COURT:  All right.  Has he gotten a negative test?

19   So, he's good to go?  All right.  We can bring the jury in.

20             MR. ROMBEAU:  Do you want to move him up first, your

21   Honor?

22             THE COURT:  Oh, yeah.  When you're done talking to

23   your attorney, I'm going to have you come up to the witness

24   stand, but if you need to talk to him a little bit, go ahead.

25             THE DEFENDANT:  Thank you, your Honor.

```
 1                    (Witness retook the stand)

 2              THE DEFENDANT:  Your Honor, thank you for everything.

 3    I respect you.

 4              THE COURT:  Hey, you do your stuff, I do mine.  As

 5    long as we do it in accordance with the rules, I have no

 6    problem with it.

 7              THE DEFENDANT:  Thank you.

 8              THE CLERK:  All rise for the jury.

 9                    (The jury entered the courtroom)

10              THE CLERK:  Please be seated.  Court is in session and

11    has for consideration jury trial day four, United States of

12    America versus Corey Donovan, criminal case number

13    21-cr-88-1-PB.

14              THE COURT:  All right.  Good morning.  We'll finish

15    with the cross-examination of Mr. Donovan, take any additional

16    evidence, and try to get into the closing arguments this

17    morning, members of the jury.

18              Mr. Donovan, you understand you're still under oath?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  All right.  Go ahead, and you can do your

21    cross.

22              MR. ROMBEAU:  Thank you, your Honor.

23              **COREY DONOVAN**, having been previously duly sworn by

24    the Clerk, was further examined and testified as follows:

25
```

1                          CROSS-EXAMINATION

2    BY MR. ROMBEAU:

3    Q.   Good morning, Mr. Donovan.

4    A.   Good morning, Charlie.

5    Q.   I want to start off just by covering some basics that I

6    think you went through with Attorney Stachowske yesterday.  You

7    are 38 years old, correct?

8    A.   Yes, sir.

9    Q.   Soon to be 39?

10   A.   Yes.

11   Q.   Are you about six feet tall?

12   A.   Yes.

13   Q.   About 200 pounds, give or take?

14   A.   Yes.

15   Q.   We've heard a lot of testimony, the jury's heard a lot of

16   testimony over the last few days about the Wilmot, New

17   Hampshire property.  That's owned by your mom and sister,

18   correct?

19   A.   Correct.

20   Q.   And there are three main structures there, right?

21   A.   Yes.

22   Q.   There's the two-bedroom house where your mom and sister

23   live?

24   A.   Yes.

25   Q.   The garage apartment where you live?

1    A.   Yes.

2    Q.   And the large warehouse or barn kind of in the back of the

3    property?

4    A.   Correct.

5    Q.   Okay.  And you call that the "shop;" is that right?

6    A.   Yes.

7    Q.   Okay.  And Kelley Finnegan moved in with you at some point

8    in the summer or fall of 2020; is that right?

9    A.   August.

10    Q.   August of 2020?

11    A.   Yes.

12    Q.   Okay.  She was your new girlfriend at the time?

13    A.   Yes.

14    Q.   And, speaking of Kelley, is she 23 years old?

15    A.   Yes.

16    Q.   And she's what, about 5'1" in height?

17    A.   Yes.

18    Q.   And living with you guys are a couple of German Shepherds?

19    A.   Yes.

20    Q.   One full grown?

21    A.   Well, Jack doesn't live with us anymore.  We were

22    housesitting him.  It's our dog Hunter's dad, and we were just

23    kind of taking care of him for a while.

24    Q.   Got it.  So, just the younger one, Hunter, now?

25    A.   Yeah.

1    Q.   And is Hunter yet full grown?

2    A.   He's a big boy now, yeah.

3    Q.   You covered some of this with Attorney Stachowske

4    yesterday and in some stipulations, but just so the record is

5    clear on this, you admit that you are a felon, right?

6    A.   Yes.

7    Q.   And you admit that you knew that you were a felon?

8    A.   Yes.

9    Q.   And you knew that you could not possess firearms?

10   A.   Yes.

11   Q.   And that you could not possess ammunition either, right?

12   A.   Yes.

13   Q.   And Ms. Finnegan, who you've been living with since August

14   of 2020, knew all that too, right?

15   A.   I mean, I can say yes, but you'd have to ask her what she

16   knows.  But, yes.

17   Q.   She met with your federal probation officer I think at

18   least twice you said yesterday, right?

19   A.   Yes.

20   Q.   And she knew it was, from living with you, that you could

21   not be -- or you could not keep firearms in the residence, I

22   think you testified to yesterday.  Right?

23   A.   Well, I mean, even that would be, it would be a gray area,

24   you know.  As long as I don't handle them, but you'd have to

25   ask her.

1    Q.    Sure.  But you testified yesterday, didn't you, that you

2    wouldn't allow the firearm to be kept in the residence

3    because --

4    A.    I asked that it not be kept in the residence or my mom's

5    residence, yeah.

6    Q.    And that's because you knew you were a felon and you

7    couldn't possess firearms?

8    A.    Legal liabilities and potentially sitting here and having

9    to go through all this.

10    Q.    And in that vein, right, I mean, you testified yesterday

11    it was important to you to never handle the firearm, right?

12    A.    Correct.

13    Q.    And it was important to you to never handle the

14    ammunition, right?

15    A.    Yes.

16    Q.    And that's why you had Kelley keep it locked up outside

17    the apartment where you lived?

18    A.    Yes.

19    Q.    Because you didn't want to be sitting in a situation like

20    this, right?

21    A.    Yes.

22    Q.    And you also testified yesterday that you never mentioned

23    the issue of Kelley's gun to your probation officer, Officer

24    Merna, right?

25    A.    No.

1   Q.   And that was because he could get huffy about things, I

2   think you said?

3   A.   That's exactly what I said.

4   Q.   Okay.  Let me talk a little bit about your jeep, Mr.

5   Donovan.  There's no dispute in this case, right, that that

6   1987 green Jeep Wrangler is yours, right?

7   A.   It belongs to me, yes.

8   Q.   And you've had it for a number of years?

9   A.   Yeah.  Momma gave it to me a couple of years ago, yeah.

10  Q.   Was that back in 2018 or earlier?

11  A.   2018.

12  Q.   And Tim Merna testified that he met with you by it.

13  That's correct, right?  Sorry.  The shield can sometimes makes

14  the sound travel funny, and I move around.  But your probation

15  officer, Mr. Merna, testified that at least on one, maybe two

16  occasions he met with you at that green Jeep in your property;

17  is that right?

18  A.   Yes.

19  Q.   Okay.  An older vehicle, we'll say.  It's over 30 years

20  old now.  It takes a lot of work to keep it up, right?

21  A.   It's an '87.  I'm currently doing -- you've all seen the

22  chassis.  I've got 46s and a 460 I'm fixing to put it on.

23        MR. ROMBEAU:  And, Ms. Shedd, can I ask you to pull up

24  Exhibit 301, that same evidence, please.

25  Q.   And, Mr. Donovan, on the screen I've put up Exhibit 301

1   for you.  That's a picture of the registration for the Jeep,

2   right?

3   A.   It's my Jeep.  Other people do move it around sometimes,

4   but it's my Jeep.

5   Q.   Right.  And you're the only one who registered it, right?

6   A.   Correct.

7   Q.   And I think you testified you did that in February of this

8   year, right?

9   A.   Too many junk vehicles sitting in the yard, you know.

10  Yeah, put a tag on it.

11  Q.   Well, let's talk a little bit about the evidence the jury

12  heard about your use of the Jeep on the day before the search

13  warrant.  You changed the battery in the Jeep maybe midday on

14  March 25th; is that right?

15  A.   It had been sitting pretty much all winter since the

16  registration had expired, and, yeah, I started getting it going

17  again.

18  Q.   Okay.  And then, after you put the battery in you drove it

19  back up to the workshop at some point; is that right?

20  A.   Yes.

21  Q.   And you ended up driving it off the property by yourself

22  for a couple of hours or so?

23  A.   I went to go help somebody with some siding, the guy that

24  shows up in the video at one point.

25  Q.   And then you came back with the Jeep on the property.  I

1    don't think we've played any clips of the video.

2    A.    At some time I also left.  I went and took care of some

3    horses, and I think Kelley and I went to a store real quick,

4    down to the gas station, yeah.

5    Q.    Right.  So, we saw a number of video clips yesterday of

6    you driving the Jeep with Kelley by the Jeep.  You don't

7    dispute at all that that's you in those clips, do you?

8    A.    No.

9    Q.    And, speaking of the video, you installed those cameras on

10   the property, right?

11   A.    Yeah.  I had hoped to catch different animals and stuff

12   coming through.

13   Q.    And they ran continuously at all hours; they weren't just

14   motion detected, right?

15   A.    No.  It was continuous feed.  There's another one, too,

16   that you don't see.  It shows the rest of it over towards

17   Momma's house where the chickens are and stuff.

18   Q.    And you would agree with me, sir, that the jury did not

19   see any evidence yesterday of anyone other than you driving the

20   Jeep, right?

21   A.    Yeah.  Correct.

22         MR. ROMBEAU:  And there was a video clip, Exhibit

23   204a.  Could we pull that one up briefly?

24         THE COURT:  Sorry.  We need the monitor turned on.

25         MR. ROMBEAU:  Sorry.

24

1   Q.   Mr. Donovan, this is Exhibit 204a.  You remember seeing

2   this in court yesterday, right?

3   A.   Yes.

4   Q.   And that was you with the flashlight in the Jeep on the

5   evening of March 25th, right?

6   A.   I'm not sure if this is me or my brother.  At some point

7   there's a video of my brother around the Jeep, too, so I don't

8   know yet which one this is.

9   Q.   Well, right.  And we watched both those videos yesterday?

10   A.   I don't think we watched the one with my brother where he

11   went and got a flashlight out of the Jeep, no.

12   Q.   Okay.  And so, if I represent to you this is the video we

13   did watch yesterday, this is the one --

14   A.   In a minute I'll be able to tell you, yeah.

15   Q.   Okay.  And while we let that play, Mr. Donovan, just to be

16   efficient with our time here, you do admit that you were in the

17   Jeep that evening with the flashlight, right?

18   A.   Yes.  I'm not going to lie to you.

19        MR. ROMBEAU:  I think that's sufficient.  We can stop

20   that.  Thank you.  Do we have the ability to pull up

21   Defendant's Exhibit A, please?

22   Q.   Mr. Donovan, I'm showing you your Exhibit A in this case.

23   That's how you left the inside of the Jeep on March 25th,

24   right, after you were done inside?

25   A.   Yeah.  You can see on the driver's seat the gloves I had

25

```
1    been using myself on the driver's seat.

2    Q.    So, those black gloves are your gloves, right?

3    A.    Yeah.

4    Q.    And the camouflage gloves are your gloves, too?

5    A.    I mean, they're gloves.  There's probably 200 -- I won't

6    say 200.  There's probably 60 pairs of gloves on the property,

7    but, yeah.  Everybody uses everybody's gloves.

8    Q.    And you heard Special Agent Cook's testimony that those

9    were men's large-sized gloves?

10   A.    Yeah.  You see that these ones don't even match, I mean,

11   left and right.

12   Q.    It looks like a large bottle of Orange Crush.  That's your

13   soda, right?

14   A.    Kelley likes orange soda.

15   Q.    Okay.  You would agree with me it's pointed towards the

16   driver's seat, correct?

17   A.    Yeah, I agree with that.  Again, it's everybody's soda.

18   I'm not going to --

19   Q.    We see the gearshift there.  The Jeep is a stick shift,

20   right?

21   A.    Yeah.

22   Q.    Manual transmission?

23   A.    Mm-hmm.

24          MR. ROMBEAU:  Okay.  Can we pull up Government's

25   Exhibit 303, please.
```

26

1    Q.   You're familiar with this exhibit, aren't you, Mr.

2    Donovan?

3    A.   Yes, I am.

4    Q.   Okay.  And you don't dispute, sir, do you, that the

5    ammunition was found in the center console?

6    A.   Can we put them side by side real quick, please?

7    Q.   Sure, if we're able to do that.

8    A.   All right.  Yeah, I'd like to --

9    Q.   Your attorney will have a chance to ask you questions on

10   redirect.

11   A.   All right.

12   Q.   My question to you, sir, is you see the bandolier of

13   ammunition there in Exhibit 303, right?

14   A.   I do.

15   Q.   And the actual bandolier I think is Exhibit 112?

16   A.   Can you -- thank you.

17   Q.   This bandolier, right, this is Exhibit 112 that's been

18   admitted in evidence?

19   A.   Can you hold that up so we can see how big around that is?

20   Yeah.

21   Q.   So, you do not dispute that this was recovered from your

22   green Jeep Wrangler, right?

23   A.   It appears to be, yeah.  I don't know whether or not for

24   real if it was in that center console before that or not.

25   Q.   And that's right, because it's your claim here that you

1    did not know it was there, right?

2    A.    Correct.  Right.

3    Q.    And you've seen --

4         MR. ROMBEAU:  Could we pull up Exhibit 302, please?

5    Just make it full, if possible.

6    Q.    You've seen this photo before, right, Mr. Donovan?

7    A.    Yes, I have.

8    Q.    And this is the roll bar from inside your Jeep, right?

9    A.    Correct.

10   Q.    Okay.  And you don't dispute that the firearm at issue in

11   this case, the Mossberg shotgun, was found attached to the roll

12   bar, do you?

13   A.    You can see it.

14   Q.    Okay.

15   A.    Well, you can see it if you look real hard.

16   Q.    Right.  Why don't we talk about that a little bit.  I know

17   Detective Campbell testified about that, but what I've circled

18   on the screen there, that's the scope of the gun, right?

19   A.    Correct.

20   Q.    And, as we look at the screen, to the left of that is the

21   barrel, correct?

22   A.    Correct.

23   Q.    Okay.  And so, you don't dispute that the gun was in your

24   Jeep where it was recovered on March 26th, right?

25   A.    Well, I can't dispute or not.  I don't know if it was

1  there or not other than talking to somebody afterwards, I mean,

2  like, yeah, oops.  But if you want to call it hearsay evidence

3  or whatever, yeah, I do know now that it was in my Jeep.

4  Q.  Right.  And I understand there's a difference between now

5  and then.

6  A.  I'm going to admit, yes, it was in the Jeep.

7  Q.  Right.  And it is your claim that you did not know it was

8  in the Jeep until later, right?

9  A.  Correct.

10  Q.  Okay.  And so, the gun in this condition in this position

11  on March 26th, you did not know it was there?

12  A.  I didn't notice it.  I don't look up at the roll bar.  I

13  mean, even when you look at the video you can see I'm looking

14  around for stuff.  There's no interior light.

15  Q.  And you would agree with me, sir, that the headrest on the

16  right part of the screen here, that's the driver's seat

17  headrest?

18  A.  Yes.

19  Q.  And when you drive the vehicle the roll bar is essentially

20  a few inches back and directly above your head, right?

21  A.  Mm-hmm.

22  Q.  Okay.  That's a yes, sir?

23  A.  Yes.  Yes, sir.

24  Q.  While we're on the subject, why don't we talk about the

25  gun.  Before I get to that, you're pretty knowledgeable about

1  guns, right?

2  A.   I mean, a little bit.  Like -- I know a little bit about

3  guns, yeah.

4  Q.   You don't have to be shy about it, Mr. Donovan.

5  A.   Yeah.  I mean, I'm not a gun expert.  I haven't -- I know

6  a little bit about guns.

7  Q.   But Kelley didn't know anything, right?

8  A.   Minimal.

9  Q.   Right.  I think, what did you say yesterday, she didn't

10 even know the caliber of the shotgun, right?

11 A.   Yeah.

12 Q.   And that she bought, I think you said, 12 gauge, when she

13 needed 20 gauge for this?

14 A.   She bought 28 gauge.  I guess that's all they had at

15 Walmart when she went in.  She said, Well, it had a 20 on it.

16 I didn't know.

17 Q.   But you knew that difference, right?

18 A.   Yeah.

19 Q.   I think you said immediately when you saw it you knew she

20 got the wrong thing?

21 A.   Yeah.  She's in the passenger seat, she's starting to put

22 shells in her belt, and I'm like, Stop.

23 Q.   And I think you testified, sir, right, that she had only

24 ever fired it three times; is that right?

25 A.   I think so.  I don't even know if she ever even cleaned

1   it, Charlie, to be honest.  Like, if you examine the cleaning

2   kit and the gun, I don't know.  Again, you'd have to ask her.

3   Q.   I'm here to ask you questions, Mr. Donovan.

4   A.   Okay.

5   Q.   We'll cover what we can cover, right?

6   A.   Okay.

7   Q.   And so, she had only ever fired it three times, and those

8   are the three spent casings that were found in the barn in the

9   gun box, right?

10  A.   I assume so, yeah.

11  Q.   And do I understand right you're claiming she bought it as

12  a Christmas present for herself?

13  A.   Mm-hmm.  I bought myself a crossbow.

14  Q.   And I think you said it came in a cardboard gun box?

15  A.   Correct.

16  Q.   So, it was new?

17  A.   Correct.

18  Q.   Okay.  Again, you said you're not a firearm expert, but

19  you would agree this was mostly designed as a hunting weapon,

20  right?

21  A.   I mean, it's a shotgun.  Yes.

22  Q.   I'll pull it out, just so that we can be clear what we're

23  talking about.  I'll just keep it back here.  So, Exhibit 111,

24  right?  So, this is the shotgun, right?

25  A.   Yeah.

1   Q.   Okay.  And I think -- I mean, you said you had seen it

2   maybe a dozen or so times on the property, right?

3   A.   Correct.  Don't break it, Charlie.

4   Q.   I'm concerned about the court's technology.

5             And you knew, sir, right, that this firearm had two

6   different barrels that came with it?

7   A.   I mean, yeah, I know.

8   Q.   And that's because you can use different kinds of barrels

9   with different kinds of ammunition, right?

10   A.   We've covered that.

11   Q.   Okay.  The smooth barrel is used for the birdshot, right?

12   A.   We've covered all that.  Yeah.

13   Q.   I'm just asking you if you -- you knew that prior to this,

14   prior to hearing it in court yesterday, right?

15   A.   I mean, I didn't know which barrel was smooth or not.  I

16   don't.

17   Q.   But you do know that the barrels can be swapped out with a

18   little tool, and it takes a little bit of knowledge to do and

19   things like that, right?

20   A.   There is a manual that goes with it, yeah.

21   Q.   Yeah.  I want to ask you a few questions about the

22   Hyundai, for lack of a better term, the junker car.

23   A.   Parts car.

24   Q.   Right.  The parts car.  That's what you call it?  Okay.

25             MR. ROMBEAU:  Ms. Shedd, can I ask you to pull up --

1    could we pull up photograph 310, Exhibit 310, please.

2    Q.   And so, this for -- and I don't mean this in any negative

3    way, Mr. Donovan, but this is almost like a mini little

4    junkyard you had going on back by the barn; is that fair to

5    say?

6    A.   Yeah.  It drives Momma nuts.

7    Q.   Okay.  And were all three of these vehicles yours?

8    A.   No.  The Ranger's my mom's, the Expedition is mine, and I

9    crashed Momma's car driving home from bringing Kelley to work

10   one day, and she actually paid $300 for the parts car.

11   Q.   Okay.  And it wasn't registered at all to anyone, though,

12   right?

13   A.   No.  We bought it on Facebook.  It was 300 bucks, and it

14   had the whole front clip I needed.

15   Q.   And you would agreed with me that it was not drivable in

16   the condition it was depicted here?

17   A.   No.  The engine runs and everything.  Like, it's got a

18   good drivetrain.  You throw tires on and it would move, yeah.

19   Q.   And this is back on the portion of the property right by

20   the shop?

21   A.   Right out in front of the shop, yeah, between the shop and

22   where the little pond is.

23   Q.   And that's back by where -- is that back right by where

24   the horses are, too?

25   A.   No.  The horses are on the other side.  This is more --

1    directly across this way from, this is where the rabbits and

2    the ducks are.

3    Q.   And I won't go back through everything that was found

4    inside the ammo can there, but if we could just pull up

5    Government's Exhibit 315.

6            I believe you testified yesterday, sir, that the gun

7    cleaning kit that I've circled on the screen here was your

8    original gun cleaning kit.  Correct?

9    A.   Well, it's the one the cops gave back to me, yeah.  It

10   wasn't in that box or anything --

11   Q.   And that's the one -- I'm sorry.  I didn't mean to

12   interrupt, sir.  That's the one that was seized from your Jeep

13   back in 2019, right?

14   A.   Correct.

15   Q.   And you just said that was the one that was returned to

16   you in 2020?

17   A.   Yes.

18   Q.   Okay.  By Officer Hubbard, who testified that he gave you

19   back that and some other personal items of yours?

20   A.   Yeah.  We'll just leave it at that, yeah.

21   Q.   Okay.  And you don't dispute, sir, that the manual to the

22   shotgun, I think you referenced it a few minutes ago, was

23   recovered from inside this ammo box?

24   A.   I guess, yeah.

25   Q.   Okay.  And I just want to make sure we're clear on this

1    for the jury, sir.  I know you said you didn't know the gun and

2    the ammunition were in the Jeep.  Is it your testimony that you

3    also didn't know that this ammunition was in the junker car?

4    A.    I mean, that's where I thought she usually actually put

5    the gun the gun case, too.  It was usually in there just

6    sitting in the car, yeah.

7    Q.    There was no gun case in the junker car, though, right?

8    A.    No.

9    Q.    Okay.  So, again, I just want to make sure it's clear to

10   the jury what you claim to have known and not known.

11   A.    Yeah.

12   Q.    Is it your testimony that you knew that this ammunition

13   was -- and these other materials were in the ammo box in the

14   Hyundai?

15   A.    Yes.

16   Q.    But you just didn't know about the ammo and the shotgun in

17   the Jeep?

18   A.    I didn't know that the case was open sitting in the garage

19   either, but, yeah.

20   Q.    Well, it's a perfect transition.  I think you just said

21   "garage," but it's really the workshop, right?

22   A.    Yeah.

23   Q.    Okay.  So, why don't we talk about the barn workshop area.

24   We heard quite a bit of testimony about it and saw some video

25   and image and everything from yesterday.  It's really quite the

```
 1   workspace, isn't it?

 2   A.   Yeah.

 3   Q.   I mean --

 4   A.   About half's used for storage for my mom and my sister's

 5   stuff, and we've got a bunch of woodworking stuff that's

 6   sitting over in the corner, and then I kind of take up the

 7   front section with all my clutter and mess.

 8   Q.   I would dare say, Mr. Donovan, some of the agents even

 9   seemed a little jealous of that as a workspace.

10   A.   Yeah.

11   Q.   You don't have to agree with that, sir.  It's not really a

12   question.  I'm sorry.

13          It did have heated floors, right?

14   A.   Yes.

15   Q.   It was a nice space, had a bunch of tools?

16   A.   Yes.

17          MR. ROMBEAU:  Why don't we pull up Exhibit 502m,

18   please, "m" as in "Mary."

19   Q.   This has already been admitted into evidence, sir, but

20   that's you working in the shop, right?

21   A.   Correct.

22   Q.   Okay.

23   A.   Correct.

24   Q.   And is that a board planer you're using?

25   A.   A joiner.  It does one side at a time.
```

1    Q.   Okay.  And there are other power tools in there, too,

2    right?

3    A.   Yes.

4    Q.   For lack of a better term, essentially you're a pretty

5    handy guy, right?

6    A.   Yes.

7    Q.   You like to tinker with things?

8    A.   Yes.

9    Q.   Like your 1987 Jeep Wrangler?

10   A.   Yes.  Yeah, I do all kinds of cool stuff.  I like being

11   useful.

12   Q.   For sure.  And while we have this on the screen, sir, we

13   see you in camouflage there, and we did in some other photos.

14   Like any good hunter, you've got a lot of camo, right?

15   A.   I don't usually dress like this.  I wear camo pants and

16   Dri-Fits.  That's how I dress.

17   Q.   While we're on this topic, it's fair to say you're a good

18   country boy who loves hunting, right?

19   A.   Yes.

20   Q.   And you own several compound bows, I think you said, on

21   the property?

22   A.   A couple of compound bows.  My sister's got another bow

23   that you all didn't get, and I've got a crossbow.

24   Q.   Right.  And a couple of those bows were kept in this, in

25   the shop, right?

1    A.    I think there might have been two out there, yeah.

2    There's a smaller bow for, like, Momma or Kelley or my son, and

3    then there's a bigger left-handed one that was stripped down to

4    bare, and then my actual bow was in the house, my house.

5    Q.    I just want to be sure, when you told Probation Officer

6    Merna that he took -- excuse me.  Let me strike that, and I'll

7    rephrase.

8           When you told him that you had bows, are you referring

9    to sort of collectively everyone's bows or your bows

10   specifically?

11   A.    Well, my bows.  I mean, I got bows.  I got a compound bow,

12   I got a crossbow, we have a left-handed bow that nobody really

13   uses because we're not left-handed, but it's there in case

14   anybody comes over.

15   Q.    And the crossbow was not seized on March 26?

16   A.    It was with me.  I carry it everywhere in case I see a

17   coyote.  It's coyote season all year long.  And porcupines.  I

18   kill porcupines every time I see them.  They're a nuisance and

19   they're a veterinarian bill.

20   Q.    And on that particular day, March 26, you were signing up

21   for a crossbow hunting license, right?

22   A.    The actual permit, yeah.  Yup.  I wasn't on the property

23   at all on March 26th.

24   Q.    Right.

25   A.    Okay.

1   Q.   As I understand it, you had to come to Fish and Game in

2   Concord to sign up, right?

3   A.   Correct.

4   Q.   And, for lack of a better term, it's fair to say, sir,

5   you're an avid hunter, right?  You enjoy it?

6   A.   Yeah.  I enjoy being outside, period.

7   Q.   And you had some deer stands up on the property?

8   A.   Yeah.  I've got three deer stands.

9   Q.   And those were yours?

10  A.   Yup.  Two climbers and a stationary one.  It's two-pallets

11  big.  It's nice.

12  Q.   And speaking of deer, sir, you would use the shop to

13  process them after they were killed, right?

14  A.   I actually haven't killed any deer at all in the last

15  couple of years.  I had two deer that were roadkill deer,

16  though.  They were fresh.

17  Q.   Sure.  Why don't we talk about those.

18       MR. ROMBEAU:  So, just for the witness, Mr. Negron,

19  can we show him what's been marked for identification purposes

20  as Government's Exhibit 904.

21       THE COURT:  Counsel, is there any objection to the

22  admission of this exhibit --

23       THE DEFENDANT:  I don't care.

24       THE COURT:  -- subject to previous objections that

25  you've already raised?

39

```
1              MR. STACHOWSKE:  No objection.

2              THE COURT:  So, it's admitted.

3         (Government's Exhibit No. 904 admitted into evidence)

4    Q.   So, we have in front of you what's now been admitted as

5    Exhibit 904, Mr. Donovan, and these are, I think you said, a

6    couple of deer that you picked up from a roadside kill in early

7    March of 2021; is that right?

8    A.   Correct.

9    Q.   And you brought them into your workshop?

10   A.   Correct.

11   Q.   You've got them hung up there from the ceiling?

12   A.   Yes.

13   Q.   And they're draining out at this point; is that right?

14   A.   Yeah.  They're actually packed with snow and tied to cool

15   them down quicker, yeah.

16   Q.   And this is all a pretty involved process, right?  These

17   are not small animals, are they?

18   A.   Yeah.  It was some hours long, yeah.

19   Q.   And you take the hide off and you skin them, right?

20   A.   Momma and Shanah actually ended up skinning them.  I

21   gutted them and hung them, and then my mom and my sister

22   skinned them and processed them.

23   Q.   But these were your deer, though, right, that we're

24   looking at here?

25   A.   I mean, they're everybody's deer.  I got them, but they're
```

1    everybody's deer.  Do you know how much of that my dog ended up

2    eating?

3    Q.    And you butcher the meat for eating?

4    A.    Yeah.

5    Q.    And while we have this up, sir, I don't think we -- in the

6    earlier photos of the shop we didn't quite get this broad a

7    view of the work area.  This is what you were talking about as

8    sort of your work area, right?

9    A.    More -- the whole front section but more over towards --

10   so as you see it, that would be -- as you come in, that would

11   be this wall.  More over here in front of the big door.  We've

12   got a 16-foot, 12-foot rollup.  But, yeah.

13   Q.    But this is your work area?

14   A.    Yeah.

15   Q.    And even, sir, in the foreground of this photo there

16   appears to be a box.  That's your --

17   A.    Crossbow.

18   Q.    -- crossbow box?

19   A.    Crossbow case, yeah.

20   Q.    And we can see on sort of the back table some of your

21   tools there, right?

22   A.    Well, some of the stuff's mine, some of the stuff's

23   Momma's.  Some of the stuff's -- actually, most of the stuff in

24   the garage is Momma's.  But, yeah, tools.  I have access to

25   them.

1    Q.    You're the tinkerer, right?

2    A.    I mean, yeah.  Everybody goes in the garage, but yeah.

3    Q.    And you would agree with me, sir, there's a drill just to

4    the left of the deer on the left, right?

5    A.    Small drill press?

6    Q.    Yeah.

7    A.    Yeah.

8    Q.    Okay.  Why don't we talk a little bit about the evidence

9    that was seized from the workshop on March 26th.  We can start

10   with the gun box.  You've seen this before, right, Mr. Donovan?

11   A.    Correct.

12   Q.    And this -- I just want to make sure I'm referring to it

13   by the right exhibit number so the record is clear.  This is

14   Exhibit 100 that's been admitted in evidence in the case.

15         That's what you understood to be Kelley's gun box for

16   the shotgun, right?

17   A.    Correct.

18   Q.    But the gun didn't come in that, right?  It came in a box,

19   I think you said, like a cardboard box?

20   A.    Yeah.

21   Q.    And could we pull up photo 308, please?  And you saw this

22   photo during the government's case in chief, Mr. Donovan, and

23   the video of sort of the pre-search that was taken by Special

24   Agent Martin.  You don't dispute, sir, do you, that this is the

25   state of affairs as they were found on the morning of March

1   26th in the workshop?

2   A.   Yes, I don't dispute that.

3   Q.   And as part of, as covered in the government's case in

4   chief, on that open gun box was your scope from before,

5   correct?

6   A.   I mean, I don't see it anywhere there.  I mean, I see it

7   nowhere there.

8   Q.   Okay.

9   A.   It's possible.

10  Q.   Okay.  And you heard the testimony from I believe it was

11  Agent Cook that the scope was in the middle of the barrel under

12  one of the bandoliers, but you don't dispute that in principle,

13  do you, sir?

14  A.   I actually dispute anything Agent Cook says, because he

15  tried to say that knife didn't end up in my bedroom.

16  Q.   I'm sorry.  I didn't catch that.

17  A.   I said I actually dispute anything Agent Cook says,

18  because that knife right there nine minutes later ended up in

19  my upstairs bedroom, taken a picture of.  So, I dispute

20  anything Agent Cook says.

21  Q.   Just so we're clear, this is your knife in the gun box?

22  A.   No, I'm not saying it's my knife.  I'm saying that knife

23  right there got put with other knives you see.  There's rainbow

24  ones and stuff that are Kelley's got put with all these other

25  knives in my upstairs bedroom nine minutes later.  But he said,

43

1    Oh, no, there must be two knives.  They only took one.

2    Q.   I just want to be sure this is clear.

3    A.   Yeah, yeah.  No --

4    Q.   I just want to make sure your testimony is clear for the

5    jury, sir --

6    A.   Yeah, yeah.

7    Q.   -- that this was tampered with or planted by ATF.  Is that

8    your testimony, sir?

9    A.   I'm saying that ATF took that knife right there that's in

10   that gun box and who knows what else from there and moved it

11   around, and it's photographically proven, yeah.  Yup.

12   Q.   Okay.  But you weren't there on the day of the search,

13   right?

14   A.   No.

15   Q.   And you do not dispute, do you, that the scope that was

16   recovered during the search is the same scope that had been

17   seized from your Jeep in 2019, do you?

18   A.   No, I don't.  And if the scope were to actually be

19   examined in addition to the Cronus paintball gun, you will see

20   that the scope mounting rings have been filed and modified so

21   it actually fits on the brown and black Cronus paintball gun

22   that was modified to shoot blowgun darts.

23   Q.   That's not my question, sir.

24   A.   Okay.  So, the scope --

25             THE COURT:  Wait, wait.  Stop.  Okay.  It's hard to do

```
 1    when you get going.

 2              THE DEFENDANT:  Yeah.

 3              THE COURT:  But let him ask his question, and then you

 4    let him give his answer so there's only one speaker at a time.

 5              THE DEFENDANT:  Sorry about that.

 6              THE COURT:  The reporter can't take down two people

 7    together.  So, if you hear him talking, just stop.

 8              If you hear Mr. Donovan talking you stop.

 9              And you can object if you think he's doing things he

10    shouldn't do.

11              Okay?  All right.  Go ahead.

12    Q.   Again, just so we're clear, that was your scope that was

13    seized in 2019?

14    A.   Yes.

15    Q.   And returned to you in 2020?

16    A.   Yes.

17    Q.   And it's found in your workshop, right?

18    A.   It was found somewhere, yes.  Yup.

19    Q.   And, again, sir, I understand your prior testimony that

20    you did not know or you claim that you did not know the gun and

21    ammunition were in your Jeep.  In this instance you did know

22    that the gun box was in your workshop, right?

23    A.   I mean, I didn't know it was there right there and then,

24    but it's been around, yeah.  It's been around.  It's been open.

25    The gun's been left out.  Like, yeah.
```

1    Q.   And so, it was no surprise to you, sir, then, that all
2    these, the gun box, the ammunition and such was found in your
3    workshop here, was it?
4    A.   Well, I mean -- yeah, a little bit surprised, but not
5    really, no.
6    Q.   Okay.  Why don't we talk a little bit about -- I'll ask
7    you a couple of questions about Ms. Finnegan.  She lived in the
8    apartment with you, right?
9    A.   Yes.
10   Q.   And she was a pretty clean roommate; fair to say?
11   A.   I mean, yeah.  I'm pretty messy, but it drives her nuts.
12   Q.   Sure.
13          MR. ROMBEAU:  For the witness only, could we show
14   exhibit marked for ID purposes only 905.
15   Q.   Do you recognize, sir -- you do recognize, sir, don't you,
16   what's on the screen in front of you?
17   A.   Yes.
18   Q.   And that's Kelley's -- a picture of Kelley's closet?
19   A.   Yes.
20          MR. ROMBEAU:  Your Honor, I move to strike the ID and
21   publish 905 to the jury.
22          THE COURT:  Prior objections are reserved on relevancy
23   and lateness of disclosure.  They're overruled, and I'll admit
24   it.
25          (Government's Exhibit No. 905 admitted into evidence)

1    Q.   And she kept her -- you would agree with me, sir, she kept

2    her closet pretty organized, right?

3    A.   Yes.

4         MR. ROMBEAU:  Could we zoom in on just sort of the

5    middle part of the closet there?

6    Q.   This is all her stuff organized neatly in its place,

7    right?

8    A.   Correct.

9         MR. ROMBEAU:  For the witness only, could we show

10   what's been marked as Exhibit 907, please.

11   Q.   And do you recognize what's on the screen in front of you

12   here, Mr. Donovan?

13   A.   Yes.

14   Q.   And what is it?

15   A.   It's a little corner stand where Kelley has, like, more of

16   her girl stuff on.

17   Q.   Okay.  Is this a true and accurate depiction of the state

18   of her little stand there?

19   A.   Yes.

20        MR. ROMBEAU:  Your Honor, move to strike the ID.

21        THE COURT:  Same rulings on the prior objections.

22   Overruled.  It will be admitted.

23      (Government's Exhibit No. 907 admitted into evidence)

24        MR. ROMBEAU:  Okay.

25   Q.   And, again, sir, you'd agree with me that this is a pretty

1   organized state of affairs for her bracelets, jewelry and other

2   items, right?

3   A.   Correct.

4   Q.   And just so we're clear, though, sir, it's your testimony

5   that Kelley left the gun box out in the workshop in the

6   condition we saw?

7          MR. ROMBEAU:  If we could pull up Exhibit 308 again,

8   please.

9   Q.   I'm sorry.  I'll ask it again.  It's your testimony, sir,

10   that Kelley left the gun box out in this condition, right?

11   A.   I mean, again, I don't know if it was in that condition or

12   not.  I didn't see it.  I don't know if it was closed when they

13   found it and they opened it.  I can't tell you that.

14   Q.   Well, again, sir --

15   A.   If you close it, and things will move around, definitely.

16   You can't keep anything inside one of those without moving

17   around.  But, yeah.  Yup.

18   Q.   I mean, sir, you saw the video that was admitted into

19   evidence of ATF entering before any search was done, and the

20   box was found open like this, right?

21   A.   Well, how long after that video -- how long was that video

22   taken after the SRT Team went in there and did whatever they

23   were doing?  Like an hour, two hours?

24   Q.   Sir --

25   A.   I don't know.

1      THE COURT:  Wait, wait, wait.

2  A.   You're asking me to speculate.

3  Q.   Okay.  You were in the barn on March 25th, right?

4  A.   At some point I'm sure, yeah.

5  Q.   We talked about you drove the Jeep up there for a while

6  and then came back?

7  A.   How long did I go back to take care of the horses?  I

8  don't remember.  But, yeah, I went back there at some point

9  every day.  Every day I go out back.  Kelley's been really

10 taking care of the animals most of the time now.  But, yeah.

11 Q.   And you heard the agent's testimony, right, sir, that the

12 gun box was located in one of the sort of cleared areas where a

13 path had been made?

14 A.   One of the neat and orderly areas?  Yeah.

15 Q.   And I just want to make sure this is clear to the jury,

16 sir --

17 A.   Yeah, yeah, yeah.

18 Q.   -- of what you claim the state of affairs with the gun box

19 was.

20 A.   I can't claim anything about the state of the affairs of

21 the gun box, Charlie.  I wasn't there.

22 Q.   You made no observation --

23      THE COURT:  Wait, wait, wait.  Okay.

24      Let me see if I've got your position.  Your position

25 is you do not know what position the gun box was in.

1          THE DEFENDANT:  No.  No, your Honor.

2          THE COURT:  Fair to say that you didn't leave it in

3    that position?

4          THE DEFENDANT:  No.

5          THE COURT:  You didn't see it in that position?

6          THE DEFENDANT:  No.

7          THE COURT:  Okay.  Let's go from there.

8          MR. ROMBEAU:  Okay.

9    Q.   And it's your testimony, sir, right, that Kelley left the

10   20 gauge bandolier of ammunition in the center console of your

11   Jeep?

12   A.   No, it's not my testimony to that.  It's that I don't know

13   if she put it there or the ATF put it there.  I don't know.

14   Q.   Sir, I'm just trying to make sure this is clear.

15   A.   I have no personal knowledge, Charlie.  I've talked to the

16   person afterwards, yeah, but I have no personal knowledge.

17   Q.   You had seen all this ammunition before, right?

18   A.   What do you mean?  I've seen it all in a pile?  Charlie, I

19   know there was a gun on the property.  I know there was

20   ammunition on the property.  Sometimes it wasn't locked up,

21   like, but I don't handle it.  My prints are on nothing,

22   nothing.

23   Q.   And you said you saw it at least a dozen times over the

24   several months that Kelley had the gun, right?

25   A.   Correct.

1   Q.   And you did testify, sir, that it was your understanding

2   it was usually locked up, right?

3   A.   Correct.

4   Q.   And you would agree with me, sir, there was no gun safe in

5   the apartment, right?

6   A.   There was no gun safe in the apartment?

7   Q.   Yeah.

8   A.   You mean like a big wall safe?

9   Q.   I'm just asking was there any gun safe of any kind in the

10   apartment?

11   A.   I have a small safe in the closet about this big, a

12   SentrySafe, but, no, nothing you could put something like that

13   in.  Actually, I've got a bow case you could put something like

14   that in, and there's another case where the pellet gun is

15   that's very similar to that, too.  Yeah.

16   Q.   But that's not where it was kept, right?

17   A.   It's not.

18   Q.   My question to you, sir, was there was no gun safe in your

19   apartment, correct?

20   A.   In my apartment, no, not usually.  Sometimes that did end

21   up out in the garage in the apartment, yeah.

22   Q.   And there was no gun safe in the workshop either, right?

23   A.   No gun safe in the -- I mean, apparently he said he found

24   that one in the workshop.  What kind of gun safe do you mean?

25   Do you mean a big steel, locking thing?  Is that what you're

1    referring to?

2    Q.   Sir, anything in which a firearm could be secured to keep

3    you from having access to it.

4    A.   Okay.  There's that box, there's a couple of other boxes

5    similar to that, there's a big bow box, and there's numerous

6    closets.  I mean --

7    Q.   So, but you would agree with me, sir, this box as depicted

8    in 308 is not locked, right?

9    A.   No, it's not.

10   Q.   And there was no lock found on --

11   A.   Did they look for locks, Charlie?  Because there's locks

12   all over the property.

13   Q.   Again, Mr. Donovan I'm not here to argue --

14   A.   I know, I know, I know.

15        THE COURT:  All right.  Wait.  I'm trying to let you

16   both do your jobs here, but let me just remind you once again

17   one person at a time.

18        And, Mr. Donovan --

19        THE DEFENDANT:  I'm sorry.

20        THE COURT:  -- why don't you listen to the question

21   that's being asked and just answer that question, because I

22   think we're starting to get into like you're just having a

23   conversation back and forth.  His job is to ask questions, your

24   job is to answer.  Your lawyer can ask follow-up questions, but

25   listen to his question, answer that and let's just kind of one

52

1   at a time.  All right?

2   Q.   Mr. Donovan, I believe you testified yesterday, right,

3   that Ms. Finnegan got the gun because she was scared of fisher

4   cats, lynx and coyotes and such?

5   A.   Correct.

6   Q.   And if I understand you correctly, the gun was supposed to

7   be stored in the workshop, right?

8   A.   It was supposed to be stored really in one of the vehicles

9   out in the back, because I go in the workshop.  I'll put it in

10  one of the cars that isn't being used.

11  Q.   And the cars along with the workshop are some 50-plus

12  yards away from the garage apartment, right?

13  A.   Correct.

14  Q.   And the gun was ultimately recovered, as you know, from a

15  vehicle that you took off the premises on multiple occasions on

16  March 25th, right?

17  A.   Correct.

18  Q.   I want to ask you about a few additional video clips here

19  as we wind up in the next few minutes.  We had an opportunity

20  to view a few clips with you yesterday, right, outside the

21  presence of the jury?

22  A.   Yeah.  This is the first time, but, yeah.

23  Q.   And you don't dispute, sir, in those clips that they

24  depict you on your property, do you?

25  A.   No.

1    Q.    Okay.  And that they were captured from the camera you had

2    installed and set up to record that we talked about a few

3    minutes ago?

4    A.    Correct.

5    Q.    Okay.

6           MR. ROMBEAU:  Your Honor, I'll just do this in bulk to

7    save time.  The government would move to strike the ID and show

8    the witness Exhibits 901, 902 and 908.

9           THE COURT:  The previously expressed objections are

10   preserved and overruled.  They can be admitted.

11   (Government's Exhibit Nos. 901, 902 and 908 admitted into

12   evidence)

13          MR. ROMBEAU:  Let's pull up 901 first, please,

14   Ms. Shedd.

15   Q.    Mr. Donovan --

16          MR. ROMBEAU:  We can stop it, Ms. Shedd.  That's

17   sufficient for purposes of today.

18   Q.    This is a video of you and another individual from the

19   very early morning hours of March 10th, right?

20   A.    Correct.

21   Q.    Okay.  And you appear to be holding the crossbow; is that

22   right?

23   A.    Correct.

24   Q.    And you have something else strapped to your back, don't

25   you, sir?

54

1    A.    Yup.

2    Q.    And I understand, sir, it is your contention that is not

3    the weapon here, correct?

4    A.    No, it's not.

5    Q.    Okay.

6    A.    Well, you can't really see, but if you can see it's a

7    pellet gun.  It's a high-powered pellet gun, because you don't

8    shoot arrows up.  You knock a porcupine out of the tree with a

9    pellet to the head and then stick it in the ground.

10         MR. ROMBEAU:  And can we pull up 902, please.

11   Q.    You would agree with me, sir, this is you walking back to

12   the garage apartment area again with an item strapped to your

13   back?

14   A.    Mm-hmm.

15   Q.    Okay.  And, again, I understand you do not admit that that

16   is the firearm --

17   A.    No, it's not.

18   Q.    -- in this case?  Okay.

19         MR. ROMBEAU:  Why don't we pull up 908, please, and I

20   think we need to jump to about 8 minutes and 25 seconds in on

21   this.

22   Q.    This is a video of you and another individual from the day

23   before, on March 9th, correct, sir?

24   A.    I mean, I assume so, yeah.

25   Q.    Okay.  And that's your mom's vehicle, is it?

1    A.   Correct.

2    Q.   Okay.  And we'll give this just a few seconds to play,

3    sir, and I'll ask you a couple of questions about it.

4                        (Pause)

5    Q.   Sir, you would agree with me that the individual with you

6    is carrying the black gun box?

7    A.   No, I wouldn't agree that that's the same one.

8    Q.   Okay.

9    A.   No.

10   Q.   You would agree it is a black gun box?

11   A.   It is a black gun box, yeah.

12   Q.   And you would agree with me that that is not Ms. Finnegan

13   carrying the box, right?

14   A.   It's also not me either.

15   Q.   Well, I asked you a few moments ago --

16   A.   No, it's not Ms. Finnegan.  No.

17   Q.   But that is you with the other individual, right?

18   A.   Correct.

19   Q.   I recognize you were not the one carrying the box --

20   A.   Correct.

21   Q.   -- for sure.  It was an unclear question from me.

22   A.   Yeah.

23          MR. ROMBEAU:  We can take that down.  Thank you,

24   Ms. Shedd.

25   Q.   Sir, again, just so this is clear for the jury, you claim

1    to have never touched the shotgun, correct?

2    A.    Correct.

3    Q.    You claim to have never touched any of the ammunition in

4    this case, right?

5    A.    Correct.

6    Q.    Not the ammunition from the Jeep?

7    A.    No.

8    Q.    Not the ammunition from the workshop?

9    A.    No.

10   Q.    And not the ammunition from the junker car?

11   A.    No.

12   Q.    Now, you're aware, sir, that prior to trial the government

13   went to the Magistrate Judge here and got a search warrant to

14   get a DNA sample with you in connection with this case, right?

15   A.    Yes.

16   Q.    You're aware of that, right?  And Special Agent Forte came

17   to collect the sample from you, correct?

18   A.    Correct.

19   Q.    And you refused?

20   A.    Correct.

21   Q.    And he came back the next day, and you refused again,

22   correct?

23   A.    Absolutely.

24   Q.    Okay.  And just so we're clear on this, did you allow

25   Special Agent Forte to take the Court-authorized DNA swab to

1  test for in this case?

2  A.   No, I didn't, and we'll explain why.

3  Q.   And you do know, sir, from the discovery in this case that

4  DNA was found on the gun here, correct?

5  A.   Yes.

6  Q.   Okay.

7  A.   Well, I actually don't know.  I've been told that now,

8  but, yes.  Yeah.

9  Q.   But you decided that you didn't need to follow the court

10  order to allow that testing to take place?

11  A.   Because my DNA is on file.

12  Q.   Just so we're clear, so it's your testimony --

13  A.   Yes, I refused to give Agent Forte two brand new samples

14  of my DNA to go compare.

15  Q.   Even after it had been ordered by a judge?

16  A.   Yeah, because I don't trust him, and we'll go into why.

17          MR. ROMBEAU:  Nothing further, your Honor.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  All right.  Thank you.

20          Redirect.

21          MR. STACHOWSKE:  Permission to proceed, your Honor?

22          THE COURT:  Go ahead.

23                    REDIRECT EXAMINATION

24  BY MR. STACHOWSKE:

25  Q.   All right.  Mr. Donovan, can you explain for the Court --

```
 1   explain for the jury, excuse me -- why you refused to undergo

 2   this DNA testing?

 3   A.   Well, it's multifaceted.  For one, my DNA is on file, so

 4   if you have a sample, compare it to my DNA on file.  And

 5   because I was asked to now provide two fresh samples -- when

 6   they take your DNA, they come, as far as I know, and I've had

 7   my DNA taken, they come with one sample, and when I can see

 8   that evidence is being moved around in my case to try and make

 9   a square peg fit in a round hole, why would I give you two

10   brand new samples?  I'm on file.  This one came from your

11   mouth, this one came from the shotgun?  That's what I'm

12   thinking.  Like, if you've got the DNA off the gun and you've

13   got my DNA on file, match it up.  Don't come ask me for two

14   fresh samples.  That's just ludicrous.

15   Q.   Did you explain your position to Agent Forte?

16   A.   I explained it precisely.  At first I told him I wanted to

17   talk to you, and the second day I told him exactly that.  I

18   said, I don't trust you.  And they never came back in.  And I

19   actually said, you know, if his Honor would explain to me why

20   they need two fresh samples and can't match whatever they took

21   off the gun to my DNA on file, then I would provide a sample.

22   I told you that, right?

23             THE COURT:  He can't testify.

24             THE DEFENDANT:  Okay, yeah.

25             MR. STACHOWSKE:  I'm sorry, Vinny.  What number is it
```

1    or letter?

2            THE CLERK:  E.

3    Q.   I'm going to show you -- I'm going to give you very

4    specific instructions.  I don't want you just to --

5    A.   You don't want me to go on.

6    Q.   Answer my question, okay?

7    A.   All right.

8    Q.   I'm going to show you what's been marked as Defendant's E.

9    I don't want you to say anything more until I ask you.  Do you

10   recognize this document?

11   A.   Yes.

12   Q.   Do you recognize what's depicted in that document?

13   A.   Yes.

14   Q.   Specifically how do you recognize it?  Don't tell me what

15   it is.  I just want you to tell me how you recognize it.

16   A.   Because I've handled it.

17   Q.   Okay.  Do you know who took this photo?

18   A.   I don't know who took this photo specifically.

19   Q.   Do you know when it was taken?

20   A.   I think it was taken last night or this morning or -- I

21   says, well, look -- yes, I think.

22   Q.   Do you know who owns the item depicted in that photo?

23   A.   Yeah.

24   Q.   And who is it?

25   A.   It's my sister.

```
 1              MR. STACHOWSKE:  Okay.  I move to strike the ID.
 2              THE COURT:  Is there an objection?
 3              MR. ROMBEAU:  No, your Honor.
 4              THE COURT:  The ID will be stricken.  It will be
 5    admitted as Defense Exhibit E.  It can be shown to the jury.
 6    You can put it on the document camera.  That's probably the
 7    easiest way to do it.
 8              (Defendant's Exhibit E admitted into evidence)
 9              MR. STACHOWSKE:  It's been a while since I used the
10    ELMO.
11              THE COURT:  You just have to -- if you want to shrink
12    it, you can do that.  There you go.
13              MR. STACHOWSKE:  Thank you.
14              Thank you, Charlie.
15    Q.    All right, sir.  What do we see here in this photograph?
16    A.    A high-powered pellet gun.
17    Q.    You had mentioned there being a pellet gun, that you were
18    holding a pellet gun or some type of item in the earlier --
19    A.    Yeah.  Yeah.  I'm the one who put the scope on it and
20    everything and dialed it in for her.  Yeah, I use it.  I have
21    access to it.  Yup.
22    Q.    Tell the jury how you use this item, if at all.
23    A.    I mean, I use it for target shooting, but you shoot a
24    porcupine in the head and knock 'em out of the tree, knock 'em
25    silly, and then you kill 'em.  I mean, some people might take
```

 1  offense to that, but it's a $500 vet bill when they smack your

 2  horse in the face.

 3  Q.   How do you load such a pellet gun?

 4  A.   Down here at the bottom you crank it.  There is a magazine

 5  you can put them in, or you put the pellets in manually one at

 6  a time.

 7  Q.   So, this is pump loaded, a pump action?

 8  A.   Yeah.

 9  Q.   It's not CO2?

10  A.   No, it's not CO2.

11  Q.   And this is a pellet gun that you can buy at I'm assuming

12  Walmart, or where can you buy it?

13  A.   Probably anywhere.  Walmart, Amazon, numerous places.

14  It's a pellet gun.

15  Q.   And you're not precluded from handling this --

16  A.   No.

17  Q.   -- item, are you?

18  A.   No, I'm not.

19  Q.   Is it your testimony that you were carrying this over your

20  shoulder in those videos that we just saw?

21  A.   Yes.

22  Q.   Sir, is there anything else that you'd like to tell the

23  jury today?

24  A.   Yes.  I would like to bring the two contrasting pictures

25  back up of the center console of the Jeep.

1    Q.   Okay.

2    A.   I've got a couple of things I want to address.

3             MR. STACHOWSKE:  With the Court's permission?

4             THE COURT:  Yes.  Go ahead.  So, maybe the government

5    had those up before.  Can you just identify the exhibit number

6    so we can do it quickly?

7             MR. STACHOWSKE:  Sure.

8             THE DEFENDANT:  I'll try and make this quick for you

9    all.

10            MR. STACHOWSKE:  I've got 303.

11            MR. ROMBEAU:  Defendant's Exhibit A and Government's

12   Exhibit 303.

13            THE COURT:  Maybe you can bring those up like you did

14   before, Ms. Shedd.  There we go.

15   A.   All right.  So, first off, it wasn't just a camouflage

16   glove that was removed supposedly from there.  If you look,

17   there's another glove under that, and there's a white trash

18   bag, and then do you see how the shells are positioned?  Well,

19   when you look over where the camouflage gloves are, over here,

20   you can clearly see this area, right?  How did that get put

21   there and pinned into position by the shells?  Did they just

22   magically do that on their own?

23   Q.   For the record, you're pointing to --

24   A.   I'm pointing to a gray piece of rubber.  I mean, I know

25   what that is.  That's a rubber cell phone holder to hold your

63

1   cell phone on your motorcycle handlebars or whatever.

2   Q.   Okay.  Stop for a second.  Just for the record, that's

3   depicted in Government's Exhibit 303, correct?

4   A.   Correct.

5   Q.   All right.  I'm sorry to interrupt.  Go ahead.

6   A.   All right.  And then all this stuff supposedly in here,

7   those shells were supposedly in there too like that, right?

8   You can see it.  We don't got to beat a dead horse.

9   Q.   Do you have any --

10  A.   Yeah.  I'd like to show up the Hyundai, the one round that

11  went from the gun case that they testified, the single 28 gauge

12  round that was in the gun case separate from the bandolier that

13  then appeared on the floor of the Hyundai and then got

14  inventoried as belonging in the ammo can.  It just went

15  (indicating).  We take a picture of it in here on the floor for

16  probable cause, and then it showed up somewhere else again.

17  Remember he held up the bag with the single shell in it and

18  said it came from the gun case?

19          THE COURT:  All right.  You mean one of the

20  prosecutors did?

21          THE WITNESS:  The agent that was -- the first one, the

22  tall guy.

23          THE COURT:  So, maybe I'd ask the government if you

24  can quickly identify what it is he's talking about.  Have you

25  got it?

64

1        MR. STACHOWSKE:  I have it.

2        THE COURT:  Is it an exhibit?

3        MR. STACHOWSKE:  It's not an exhibit yet.

4        THE COURT:  Show it to the government and see if they

5    object, and we'll do it that way, if it's easier.

6        Is there objection to using that?

7        MR. ROMBEAU:  No, your Honor.

8        THE COURT:  So, it will be marked as the next defense

9    exhibit and can be admitted.

10       MR. STACHOWSKE:  Thank you, your Honor.

11       (Defendant's Exhibit F admitted into evidence)

12   A.   That's one of the pictures we'll use, too, yeah.

13   Q.   I just wanted to -- you asked for a specific picture.  I

14   need to pull the specific photo up I just showed the

15   government.

16   A.   The next one up.  Yup.

17   Q.   Okay.  Is that the image you'd like to see?

18   A.   That --

19   Q.   Just answer that question.

20   A.   Yes, yes.

21       MR. STACHOWSKE:  That's marked as a full exhibit.  F,

22   you said?

23       THE COURT:  Defendant's F.

24   Q.   Go ahead, sir.

25   A.   Okay.  So, the testimony we heard was that there was a

1    bandolier with 23 shells and a single shell found in the long

2    gun case in the garage, and the inventory for that claims just

3    that 23 shells were found there.  Then there's a picture of

4    this shell on the floor of the Hyundai.  I don't know if this

5    was taken previous or after the search warrant, or if this was

6    in probable cause to get the search warrant.  But then this

7    shell gets inventoried as, oh, it was in the -- for numerical

8    purposes it was in the ammo can.  It's nowhere in the

9    inventory.  So, it's gone here to here to here (indicating).

10   It's clear.  That's the point I'd like to make about that.

11          And then, if we could show the picture of the ammo can

12   on the floor of the Hyundai and then the picture through the

13   back window of the Hyundai -- and, oh, the picture of the ammo

14   can when that was all in, that was all nice and neat, wasn't

15   it?  Like, it wasn't all jammed in there.  It was all nice and

16   neat.

17   Q.   All right.  So, you want the picture of the --

18   A.   Ammo can on the floor through the driver's window and then

19   the picture just previous to that through the back window of

20   the Hyundai.

21          MR. STACHOWSKE:  I'm sorry.  I was not aware of this

22   prior to.

23          THE COURT:  That's okay.

24          THE JUROR:  Your Honor?

25          THE COURT:  I'm sorry.

1         THE JUROR:  I know that we're in a rush and

2    everything, but can we take like a two-minute break?

3         THE COURT:  No, I get it.  Believe me, I get it.  So,

4    yes.  What we're going to do is we're going to take a short

5    break and come back and finish this, because before we do

6    closing arguments we have to kind of set up the room, and that

7    may take us a little longer.  So, let's try to do a five-minute

8    break now, come back, we will finish this, and then we'll take

9    a little bit longer break, but then we'll get right into the

10   closings.  Okay?

11        THE DEFENDANT:  I'll try to wrap this up for you.

12        THE CLERK:  All rise.

13             (The jury exited the courtroom)

14        THE COURT:  Mr. Donovan, you can go back to your

15   lawyer for a couple of minutes, and while you're there, if

16   there are any other specific things you want him to do, tell

17   him now so that he can line them up and be ready to go.

18        THE DEFENDANT:  Thank you, your Honor.

19        THE COURT:  All right.  So, we'll take a five-minute

20   break, come right back and finish this up.  Okay?

21        (Recess taken from 10:12 a.m. to 10:19 a.m.)

22        THE CLERK:  All rise.

23        THE COURT:  We've got to get Mr. Donovan back to the

24   jury box.

25        MR. STACHOWSKE:  Could we have just a moment, please?

```
1              THE COURT:  Yeah, go ahead.

2              MR. STACHOWSKE:  Thank you.

3              THE COURT:  Mr. Stachowske, one thing I want to remind

4   you and your client of is that this isn't an opportunity for

5   Mr. Donovan to make a closing argument.  So, he's got to be --

6   and you can give suggestions to your lawyer for the closing,

7   but what you have to do here is testify about facts.

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  So, just don't bring stuff up to want to

10  make an argument.  He'll ask you about areas and ask you about

11  facts about those things, things that you know.  You were right

12  with some of the prosecutor's questions, where he was kind of

13  asking what was in Ms. Finnegan's mind or something, you didn't

14  have personal knowledge, and you were smart and you said that.

15  I'd like you to keep that same thing in mind when you're

16  testifying.

17             THE DEFENDANT:  Keep it real quick, your Honor.

18             THE COURT:  All right.

19             THE DEFENDANT:  Two different things to compare and

20  just show, and that's it.

21             THE COURT:  Okay.  Good.

22             THE DEFENDANT:  Thank you.

23             THE COURT:  We can bring the jury in.

24             MR. STACHOWSKE:  He told me what he needs.  I still

25  need to prep it to get it to Vincent.
```

1          THE COURT:  Oh, okay.  Yeah.  Well, we're bringing the

2   jury in, so just take your time.  Do what you need to do to set

3   it up.

4          THE CLERK:  All rise for the jury.

5              (The jury entered the courtroom)

6          THE CLERK:  Please be seated.  Court is in session.

7          THE COURT:  Go ahead, Counsel.

8          MR. STACHOWSKE:  With the Court's permission?

9          THE COURT:  Go ahead.

10   BY MR. STACHOWSKE:

11   Q.   All right.  Mr. Donovan, you wanted to discuss these

12   side-by-side photos of the Hyundai.

13   A.   Yeah.

14   Q.   We've got -- wait for the question, okay?  For the record,

15   I'm showing to you what's been --

16          THE COURT:  Wait.  We've got to get the -- did it come

17   on?

18          THE JUROR:  It's on now.

19          THE COURT:  Okay, good.  All right.

20          MS. KRASINKSI:  Your Honor, just for the record, 312

21   is not in evidence yet, but we agree to its admission.

22          THE COURT:  All right.  The ID will be stricken on

23   312.  It will be admitted.

24      (Government's Exhibit No. 312 admitted into evidence)

25   Q.   All right.  I'm showing you Government's Exhibits 311 and

1   312.  You wanted to tell something to the jury about these

2   photos.

3   A.    Yes.  I don't know if it's just the angle or not, but in

4   the first report the ammo can was on the seat, and then in the

5   second report it was on the floor.  And this picture through

6   the rear hatch, that was taken before the other one, the one

7   from the rear, and it just -- it just appears, so I don't know

8   if it was -- I don't know.  I'm not going to speculate.

9           I just want to point that out to you guys.

10          THE COURT:  All right.  What else?

11  Q.    What else do we have?

12  A.    Well, this is the knife that apparently didn't travel from

13  the back garage to the upstairs bedroom in nine minutes.

14  Q.    Okay.  Let me close out of this.  My apologies.

15          So, you wanted to discuss this photo?

16  A.    That one and then that one.  Go down one.  Yup.

17  Q.    Okay.

18  A.    The same knife.  And then pull up the inventory of all the

19  other knives and the paintball gun and everything that was

20  taken and the bows.

21  Q.    Take your time.

22  A.    You can see that it's an identical knife, and I can show

23  you they took multiples of everything.  They didn't just --

24  we'll just pull up the other --

25  Q.    Do you have personal knowledge as to the existence of this

```
 1    knife?  Do you know this knife?
 2    A.    Yes.
 3    Q.    How do you know this knife?
 4    A.    I bought that at the Dollar Tree for Kelley.  I think it
 5    was at the Dollar Tree.
 6    Q.    Okay.  How many knives similar to this do you -- how many
 7    knives do you have that look like this?
 8    A.    One.  There's only one just like that.
 9    Q.    Okay.  And that's your point, correct?
10    A.    That's my point.
11    Q.    You also wanted me to show the jury --
12    A.    Yup.  Scroll down.
13          THE COURT:  I haven't seen this one yet.  Has this
14    been admitted?
15          MR. STACHOWSKE:  This has not been admitted.
16          THE COURT:  All right.  Let's mark it as the
17    defendant's next exhibit.  Is there an objection?
18          MR. ROMBEAU:  No, your Honor.
19          THE COURT:  All right.  It will be admitted as a full
20    exhibit, the next defense exhibit.
21      (Defendant's Exhibit G admitted into evidence)
22          MR. STACHOWSKE:  How do I clear the screen?
23    Q.    Mr. Donovan, you want --
24    A.    You see there's one, there's one of those knives.  They
25    took -- you see there's multiples of the machete, the purple
```

1   machete.  The other one -- some of that stuff's mine, some of

2   the stuff's Kelley's.  It is what it is.  There's one, and

3   there's multiples of the machetes.  If they had found two they

4   would both be on the table.  So, it's just dirty pool.  It's

5   not cool.  We come up here to tell the truth, you know?

6          And really that's the crux of it, and that's where I'd

7   like to leave it with you all and let them do their thing, and

8   then you guys can render your decision, please.

9          THE COURT:  All right.  Does the defense rest?

10          MR. ROMBEAU:  Your Honor, may I have very brief

11   recross on this new --

12          THE COURT:  Just on the new things that came in on

13   redirect, okay?  So, very limited.

14          MR. ROMBEAU:  I'll be extremely brief.

15                      RECROSS EXAMINATION

16   BY MR. ROMBEAU:

17   Q.   Mr. Donovan, your attorney just showed you a photograph of

18   a table's worth of blades, compound bows and such that were

19   seized by your probation officer, correct?

20   A.   Yes, Charlie.

21   Q.   And that's because you are prohibited from having those

22   items, right?

23   A.   I don't agree with that, no.  It's not illegal, and me and

24   Tim have butted heads over that the entire time.  I have a

25   hunting license.  I live on a farm.  I'm going to have blades.

1   I'm not going to have guns.

2   Q.   I understand that, sir, but you're prohibited by order of

3   the court from having those things, right?

4   A.   No.   The actual court order reads dangerous weapons,

5   indicated example, anything that was designed or specifically

6   modified for the purpose of causing injury to a person.

7   Nunchucks and tasers is the indicated examples, because they

8   have no legitimate uses.

9   Q.   And you defied that court order just like you defied the

10  court order for your DNA sample, right?

11  A.   Defied the court order?  I read the law and the rules as

12  they are.

13           MR. ROMBEAU:  Nothing further, your Honor.  Thank you.

14           THE DEFENDANT:  Thank you.

15           THE COURT:  All right.  Thank you.  Sir, just stay

16  right there.

17           Does the defense rest?

18           MR. STACHOWSKE:  That one photo, I want to make sure

19  the ID is stricken off of the pellet gun.

20           THE COURT:  The pellet gun photo, that's admitted as

21  an exhibit.

22           THE CLERK:  Exhibit E.

23           MR. ROMBEAU:  No objection.

24           MR. STACHOWSKE:  Yes, we rest.

25           THE COURT:  Okay.  So, members of the jury, we're

```
 1    going to get to closing arguments.  I've been informed that --

 2    the government has a right to put on a rebuttal case.  They're

 3    only going to call one witness and ask a couple of questions,

 4    so we're going to take a break for a minute, and we'll

 5    reconvene, we'll do the rebuttal case, and then we'll do the

 6    closing arguments.  Okay?  So, I'd ask to excuse you for just a

 7    minute or two, and don't go anywhere.  We'll bring you right

 8    back in.

 9              THE CLERK:  All rise.

10                  (The jury exited the courtroom)

11              THE COURT:  You can head back, Mr. Donovan.

12                  (Witness stepped down)

13              THE COURT:  And then setting up for the closings we've

14    got to move that back in?

15              THE CLERK:  Yeah.

16              THE COURT:  Is it possible you could do that now,

17    Vinny --

18              THE CLERK:  Yeah.

19              THE COURT:  -- before we bring the jury back in?

20    Okay.  Good.

21              THE DEFENDANT:  Your Honor, could I run out and just

22    use the bathroom real quick?

23              THE COURT:  Is it okay with you guys?  Can you take

24    him back to use the bathroom?  Yeah, we'll wait till he comes

25    back.  So, yeah, go ahead and do that.
```

```
 1           So, we'll probably do the rebuttal case and go right

 2    into the closings, all right, if we can get that set up?  My

 3    plan is to try to do the closings and the charge before lunch.

 4    We might go till 12:30, if my court reporter can make it.

 5           MR. ROMBEAU:  I can't imagine the closing arguments

 6    are going to be that long, your Honor.

 7           THE COURT:  I don't think so, but -- you're going to

 8    call Agent Forte?

 9           MS. KRASINKSI:  Yes, your Honor.  I think it might be

10    closer to four questions.

11           THE COURT:  That's all right.  Lawyers learn early in

12    their careers never to say, "One more question."

13           Mr. Stachowske, I just want to remind you I will let

14    you cross him, but the cross is going to be limited to the

15    scope of the direct, okay?

16           MR. STACHOWSKE:  Do you mind if I run out?

17           THE COURT:  Yeah, yeah, go ahead.

18                          (Pause)

19           THE DEFENDANT:  Your Honor, I told Kelley last night

20    about them hacking her phone and everything and without a

21    warrant.  How would she go about addressing that?  What would

22    be the proper avenue for her to address that?

23           THE COURT:  I can't give you advice about that or her,

24    because I can't give legal advice.  So, she may have to consult

25    with an attorney.  If she has -- I don't know how -- they
```

1   seized her phone in the search warrant?

2           THE DEFENDANT:  Yes.

3           THE COURT:  If she contends that they've done

4   something unlawful, she can pursue a claim.

5           THE DEFENDANT:  Civil, a civil matter?

6           THE COURT:  The details of that is beyond me, and I

7   can't really --

8           THE DEFENDANT:  Would it be a civil matter?

9           THE COURT:  It would be a civil matter, yes.  It

10  wouldn't be in this particular case.

11          THE DEFENDANT:  Right.  Okay.  Thank you, your Honor.

12          THE COURT:  All right.  We can bring the jury in.

13          THE CLERK:  All rise for the jury.

14               (The jury entered the courtroom)

15          THE CLERK:  Please be seated.  Court is in session.

16          THE COURT:  All right.  Sorry for the musical chairs.

17  Here's the plan:  Brief rebuttal case, one witness, some

18  questions from the government, maybe some questions from the

19  defense, a couple of minutes, government's going to rest its

20  rebuttal case, we'll do the closings, there will be a

21  government closing first, then a defense closing and then a

22  brief government rebuttal.  I'm going to try to go right into

23  those closings.  If time permits, I will instruct you on the

24  law prior to lunch.  For your sakes it's probably better if I

25  can do that, but it depends on how long the closings go.  So,

 1   I'll either instruct before lunch or immediately after lunch.

 2   We've ordered lunch for you, you'll have your lunch in, and

 3   you'll be free to begin your deliberations once I've given you

 4   instructions.

 5           All right.  You have a rebuttal witness.  Go ahead and

 6   call that witness.

 7           MS. KRASINKSI:  Your Honor, the government calls

 8   Special Agent Forte.

 9           THE COURT:  All right.  I'll just remind him he's

10   still under oath.

11           THE CLERK:  Okay.  Thank you.

12           THE COURT:  Special Agent, you understand you're still

13   under oath?

14           THE WITNESS:  I understand, your Honor.  Thank you.

15           THE COURT:  Okay.

16           **JOHN FORTE,** having been previously duly sworn, was

17   further examined and testified as follows:

18                   <u>REBUTTAL DIRECT EXAMINATION</u>

19   <u>BY MS. KRASINKSI:</u>

20   Q.   Agent Forte, we heard a lot about evidence being moved

21   around, and I just want to very briefly ask you about the

22   disappearing ammo can.

23           MS. KRASINSKI:  Can we look at Government's Exhibit

24   312, please?

25   Q.   And this is the Hyundai the ammo can was in?

1    A.    Correct.

2          MS. KRASINSKI:  Ms. Shedd, can we please zoom in?

3    Q.    Tell me what you see.

4    A.    You can just see the edge of the ammo can sitting there.

5    Q.    Is that the edge of the ammo can?

6    A.    It is.

7    Q.    Now, I'm showing you Defense Exhibit E, the pellet gun.

8    Does that have a strap?

9    A.    It does not appear to have a strap.

10   Q.    Government's Exhibit 11, the shotgun found in Corey

11   Donovan's Jeep, does this have a strap?

12   A.    It does.

13         MS. KRASINKSI:  No further questions.

14         THE COURT:  All right.  Cross-examination?  Any cross?

15         MR. STACHOWSKE:  No cross, your Honor.

16         THE COURT:  Thank you, sir.  You can step down.

17         THE WITNESS:  Thank you.

18              (Witness stepped down)

19         THE COURT:  Does the government rest its rebuttal

20   case?

21         MS. KRASINKSI:  Yes, your Honor.

22         THE COURT:  All right.  We have now completed all of

23   the evidence in the case, members of the jury, so we'll move on

24   to closing arguments.  As I said, government first, then the

25   defense, government has an opportunity for a brief rebuttal.

1    What the lawyers say during their closing statements is not

2    evidence.  Only what you heard from the witnesses testifying,

3    the exhibits that you've seen and any stipulations that the

4    parties have agreed to, that's the evidence in the case, and

5    what they say is designed to help you interpret the evidence,

6    but it's not itself evidence.

7          So, with that, the government can go ahead.

8                        CLOSING ARGUMENT

9    BY MR. ROMBEAU:  Good morning.  I want to start at the same

10   place my colleague, Ms. Krasinski, did on Wednesday, and that

11   is Corey Donovan cannot have a gun.  Corey Donovan cannot have

12   a gun.  He cannot have ammunition for a gun.  This whole case

13   comes down to whether the government has proved that Mr.

14   Donovan possessed the 20 gauge shotgun or any of the rounds of

15   ammunition of all assorted caliber that you heard about in this

16   case.

17         Now, after we're all finished speaking here with you,

18   Judge Barbadoro is going to instruct you on the elements of the

19   offense that you'll need to agree on that the government has

20   proven, and there are four things here, and I'm going to use

21   them just briefly as a bit of framework for where I want to

22   start, and that's in part because several things are not in

23   dispute in this case, and I want to touch on them briefly.  And

24   when I say "elements," the Court is going to -- those are just

25   things that have to be proven, that the government has to

 1   prove, because it's our burden.

 2          And so the government in this case is required to

 3   prove that the defendant was a felon at the time of the

 4   offense, meaning he had previously been convicted of a crime

 5   punishable by more than one year in prison, and that the

 6   defendant knew he was a felon; and obviously there's a

 7   stipulation in this case, and you heard the defendant's

 8   testimony acknowledging those facts as well, so that issue is

 9   not in dispute.

10          The government is also required to prove that the

11   weapon at issue, the shotgun, was, in fact, a firearm under

12   federal law, and that the ammunition was ammunition as defined

13   under federal law, and also that at some point they had

14   traveled in interstate commerce, meaning from one state to

15   another.  And there's a stipulation here that addresses all

16   those elements, so, again, that's not really in dispute.  So,

17   in your deliberations you shouldn't have to spend very much

18   time on those, but since they're in the Court's instruction, I

19   wanted to make sure we talked about it so you're not wondering

20   what the heck that is all about when it comes up.

21          So, the final element the Court is going to instruct

22   you on is what this case is all about, as you know from

23   listening for the last few days, and that is whether the

24   government has proved that the defendant possessed the firearm

25   and ammunition, and, obviously, from the testimony you've heard

1   there's been no evidence that the firearm or ammunition were --

2   other than in the rebuttal case briefly -- that this firearm

3   and this ammunition was recovered from the defendant's person.

4   All right?  So, this case really comes down to what the Court's

5   going to instruct you on, which is constructive possession, and

6   that means, as the Court will explain to you, there's actual

7   possession, things I have in my pockets, and constructive

8   possession, things that belong to me that I have control over

9   that maybe aren't directly on my person.

10          And the specific instruction, because it's going to

11  guide some of the things I want to talk to you about, is that a

12  person who is not in actual possession but who has both the

13  power and the intention at a given time of exercising dominion

14  or control over a firearm or ammunition directly or through

15  others is in constructive possession of the firearm or

16  ammunition.  Constructive possession may be inferred from

17  circumstances such as the defendant's control over the area

18  where the firearm or ammunition is found, and it will go on to

19  say that mere presence or association with another who

20  possessed a firearm is insufficient.

21          But the key language I want to focus on there and the

22  evidence I want to highlight with you is that control over the

23  area where the firearm is found, and that's really what this

24  case is going to be about.  It's control, access and the time

25  frame in which all that happened.

1          So, before I get into the locations I want to talk to

2     you a little bit about the charged evidence, and, as we know,

3     that comes from three locations, right?  There's the Jeep,

4     there's -- and, Ms. Shedd, can we pull up Exhibit 304, please.

5          There's first and foremost the shotgun, right?  You've

6     seen it.  It's been handled by witnesses.  It's Exhibit 111.

7     This Mossberg 20 gauge shotgun was found in Mr. Donovan's green

8     Jeep.  The six rounds of ammunition that were inside the gun

9     have been charged.  The four rounds of ammunition that are on

10    the gun that you can see in Exhibit 304 here that were in the

11    little sleeve on the butt of the gun are charged, and the 20

12    rounds of ammunition in the console that were in the bandolier

13    that you've seen several times, those are all charged items

14    here that were recovered from Mr. Donovan's Jeep.  So, that's

15    location one, the Jeep.  There's the firearm and ammunition.

16         Location two, the Hyundai or the junker car that we

17    talked about today, where there was numerous rounds of

18    ammunition recovered from this ammunition can that was located

19    where the seat would ordinarily be in a car.

20         Can we pull up Exhibit 315, please, Ms. Shedd.

21         I'm not going to open this up, because I'm sure I'll

22    make a mess of all this, but, as it's displayed in Exhibit 315

23    that you've seen a few times, there were rounds of -- 24 rounds

24    of 28 gauge ammunition, one round of 12 gauge ammunition and

25    the two boxes of the 20 gauge ammunition, and I believe the

1    testimony was one was in an unopened box, the other was

2    ammunition that had spilled out and was put in a bag.  That's

3    why you see the open box in 315.  But it was 50 rounds in total

4    of the 20 gauge ammunition recovered from the Hyundai.

5          And then the third location, of course, is Mr.

6    Donovan's shop, right, the ammunition that was found in this

7    open gun box case that's marked as Exhibit 100 in the case?

8          And can we pull up Exhibit 308, please, Ms. Shedd.

9          The charged ammunition in this case includes the

10   bandolier of 23 rounds of 28 gauge ammunition, the one loose

11   round of 28 gauge ammunition, three rounds of 12 gauge

12   ammunition and the three rounds of spent 20 gauge ammunition.

13   So, if I've carried my 1 in this and all the math, it's 135

14   rounds of ammunition that's strewn across those three

15   locations, as identified in the indictment which will be

16   provided to you.

17         So, we talked about the locations, and in this case,

18   as you know, the meat of it comes down to the evidence that

19   each location is tied to Mr. Donovan.  And so, I'll start with

20   the Jeep, right?  The Jeep first and foremost we've heard

21   throughout the trial is Mr. Donovan's Jeep, right?  You heard

22   Officer Hubbard testify he's seen Mr. Donovan drive the Jeep I

23   think he said approximately 20 times over the last year; he's

24   seen the Jeep and he's only ever seen Mr. Donovan driving it.

25         You've seen photos of Mr. Donovan driving it.  Could

1    we pull up Exhibit 501b, please?  The upper right photo there,

2    Mr. Donovan driving the Jeep.  The bottom left photo in Exhibit

3    501b, Mr. Donovan driving the Jeep.

4            Could we pull up 502f, please?

5            Again, Mr. Donovan driving the Jeep.  The only

6    evidence you've seen in this case of anyone driving the Jeep is

7    Mr. Donovan.  It was his Jeep.  You saw the registration for

8    the Jeep, right?  Exhibit 301.

9            Could we pull that up, please, Ms. Shedd.

10           It's Mr. Donovan's registration to the Jeep.  It's not

11   registered to anyone else.  It's registered to Corey Donovan.

12   You saw numerous videos during Special Agent Forte's testimony

13   yesterday in which you actually saw Mr. Donovan driving the

14   Jeep the day before the search warrant was executed.  You heard

15   testimony that he was tinkering in it that day, that he changed

16   the battery, that he was working on it, that he took it out for

17   several hours by himself.  This was his Jeep.  You heard and

18   saw at some point later on he took Kelley out for a little

19   while on the early evening of March 25th, and, again, who drove

20   the Jeep?  Mr. Donovan.  Kelley got out of the passenger side.

21           And, finally, you saw clips of him with a flashlight

22   later that evening in the Jeep for, as Special Agent Forte

23   testified, almost half an hour.  Flashlight in the Jeep.  It's

24   not a large Jeep, ladies and gentlemen.  It's essentially a

25   two-seater with a mini trunk area that can accommodate a couple

84

1    of additional people.  It's not much larger on the inside than

2    the witness stand.

3            Again, there's -- and you heard from Probation Officer

4    Merna that he met with Mr. Donovan at the Jeep while it was

5    parked on the property, that he knew Mr. Donovan to tinker on

6    the Jeep, and there's no evidence that this Jeep was driven by

7    or handled by anyone other than Mr. Donovan.  And sure, yes,

8    there's some testimony, I believe, that his brother may have

9    been outside the Jeep or near the Jeep that night before the

10   search warrant, but, again, there's no evidence that he was

11   ever in the Jeep or otherwise had access to it.  The Jeep was

12   Corey Donovan's.

13           The barn or workshop location also had clear and

14   direct connections to the defendant.  It was Corey's shop,

15   right?  You heard him say today he loves working on things.

16   And where do you work on things?  In a workshop, right?

17           Let's pull up Exhibit 502m, please, as in Mary.

18           Mr. Donovan working at the shop.  And, of course, the

19   white refrigerator you see behind him here in 502m is the exact

20   white refrigerator, the two-part, the top and the bottom, that

21   we see later and that I showed you a few moments ago when the

22   gun box is found, right?

23           Can we go back, Ms. Shedd, please, and pull up Exhibit

24   308, please.

25           Again, that's the white refrigerator, right?  Same

1    location in the shop.  It was Mr. Donovan's shop.  How else do

2    we know that?  Well, as he testified today, he was an avid

3    hunter, right?  He loves camouflage, he's got -- he showed you

4    his table of other weapons he had, his crossbow and such, and,

5    even if he didn't hunt the deer, he told you he collected a

6    couple of roadkill deer that he was excited to bring back to

7    the shop.

8          Can we pull up Exhibit 904, please?  Thank you.

9          Mr. Donovan told you he brought these deer back.  He

10   strung them up.  These were a tremendous amount of work.  The

11   only evidence you've heard in this case is Mr. Donovan was

12   doing the work in the shop.  He's the one who's tinkering.

13   He's the one who's doing these things.  You heard Special Agent

14   Cook describe this as a man cave.  Probation Officer Merna

15   talked about being in there several times and only ever

16   interacting with Mr. Donovan there.  Again, there's no evidence

17   that anyone other than Mr. Donovan was using, accessing,

18   controlling this space.

19          Third location, of course, again, the junker car, is

20   up by Mr. Donovan's workshop, as he testified to.  In many ways

21   it's sort of an abandoned mini junkyard, I think he described

22   it on cross-examination today, that is, it appears, some

23   aggravation to his mother, but that he keeps it up on his

24   property.  And, again, the connections to the defendant from

25   that location -- the vehicle's not registered to anyone, but

1    the particular items in the vehicle in this ammo box do connect

2    to Mr. Donovan, don't they?  Right?

3           His gun-cleaning kit.  He told you, he acknowledged

4    that's the same stuff, that's his gun-cleaning kit that he got

5    back in 2020 was in that ammo can.

6           So, there's the stuff that's seized, and there are

7    these three locations they're seized from.

8           But the connections really go deeper than that here,

9    don't they?  Right?  The evidence from each of the three

10   locations is all connected to the evidence from the other two

11   locations, right?  And let me tell you what I mean by that.

12   So, let's start with the Mossberg shotgun, right?  Spread

13   around three locations, right?  The gun is in Mr. Donovan's

14   Jeep.  The workshop has the gun case, and it has the companion

15   barrel, right, the companion barrel that goes with this

16   shotgun?  You heard Special Agent Forte testify to that.  It

17   also has the forearm slide that you heard from Mr. Kwiatkowski

18   came with the gun when it was purchased.  You heard about --

19   well, before I move on to the junker, if you had an extra

20   barrel for a gun that you needed to do a little tinkering in

21   order to attach and swap out with the barrel that's on there,

22   where would you keep it?  In your workshop, right, where you

23   could actually work on it and you can do that project?

24           And then, finally, the Hyundai, the manual and

25   accessories for the shotgun, the Mossberg manual -- let's see

1    if I can pull it out for you.  The Mossberg manual, the manual,

2    owner's manual that goes to this shotgun that was found in the

3    Jeep and with the barrel that was found in the barn workshop

4    was found in the ammo can.  So, the same gun has its parts

5    strewn in three different locations, right?

6         In addition, I should note Special Agent Forte talked

7    about the choke tube and other accessories, I think it was the

8    cheek holder, that were also found in that ammo can.  So, the

9    Mossberg connected to all three locations.  I touched on them

10   briefly, but Mr. Donovan's scope and cleaning supplies were in

11   different locations, right?  Again, Officer Hubbard testified,

12   I returned that scope with the evidence marking from Andover PD

13   to Mr. Donovan.  It had been seized from his Jeep in 2019,

14   returned to him in 2020, and found in this gun box on March 26

15   of 2021.  It's obviously the same scope.  That's not in dispute

16   here.  And Mr. Donovan admitted it is the same cleaning kit

17   that was found in the ammo can in the Hyundai.  Again, those

18   were Mr. Donovan's items that he got at the same point in June

19   2020, when they were returned to him, in two different

20   locations tied to the evidence here.

21        And think about the ammunition, too, right?  There are

22   multiple caliber gauges of the ammunition here, and those have

23   commonalities too, don't they?  Right?  So, we have the 20

24   gauge shotgun, there are the 20-round bandolier inside the

25   center console of the Jeep, the ten rounds that were in and on

1    the gun, so in the Jeep, there are the two boxes of 20 gauge

2    ammunition totalling 50 rounds in the junker, and then the

3    three spent casings in the gun box.  So, again, 20 gauge

4    ammunition all three locations.  12 gauge ammunition was found

5    in two locations.  There was the one round in the ammo case,

6    and then there were the three rounds recovered from the gun

7    case in the barn.  28 gauge ammunition was found in two

8    locations.  There were the 24 rounds found inside the junker

9    inside the ammo can and 23 rounds in the bandolier found inside

10   the gun case along with the one loose round.  So, 28 gauge

11   ammunition in two of the three locations.

12        And, of course, bandoliers, right?  Bandoliers,

13   similar bandoliers were found in all three locations.

14   Ammunition was in a bandolier in the Jeep, there were

15   bandoliers in the barn, in the gun case, and there were

16   bandoliers in the junker inside the ammo can.

17        Don't all those overlaps tie the firearm and

18   ammunition together?  Said another way, aren't these all pieces

19   to the same puzzle?

20        Now, obviously I've chosen to focus on the

21   government's evidence there, and you did hear testimony from

22   Mr. Donovan, and I want to talk about that, too.  As the Court

23   will instruct you, it is the government's burden of proof in

24   this and in every criminal case, and Mr. Donovan does not have

25   any burden.  His testimony is part of the evidence in the case,

1    and you must analyze it as you will analyze all of the evidence

2    in the case.  And he's asking you to credit his testimony here,

3    and it's fair game for you to question whether what he told you

4    on the stand yesterday and today makes any sense at all.

5         And I won't rehash everything Mr. Donovan said, since

6    it was the most recent part of this trial, but there are a

7    couple of claims he made that I want to highlight to you and

8    give some framework for your discussions and deliberations, and

9    that is Mr. Donovan testified that he knew about the gun

10   generally, right, but that it was Kelley's, and he was adamant

11   he did not know the gun and the ammunition were in the Jeep

12   when he was driving around the day before.  It wasn't totally

13   clear to me in questioning today whether he was saying he knew

14   or didn't know the ammunition was in the barn and in the

15   Hyundai, but, generally speaking, it was he said -- he thought

16   Kelley -- it's Kelley's job to store the stuff wherever it was

17   going to be and everything.

18        Now, does any of that add up based on the evidence

19   you've seen and heard in this case?  There are a few reasons I

20   want to talk about why I don't think it does.  At least I'll

21   suggest to you why it does not.

22        So, again, let's start with talking about the

23   locations.  The Jeep.  The gun is recovered inches from where

24   the driver's head would be in driving that vehicle, right?

25   This is not a 9 millimeter gun tucked under a passenger seat

1    that someone wouldn't notice, right?  This is at least 3 feet

2    in length, has substantial weight, has additional items

3    attached to it.

4          You heard Detective Campbell testify when he came in

5    the Jeep to look for it and he looked up at the roll bar he

6    noticed it immediately.  The scope was right there.  There was

7    the bright orange clip, right, you could see in the photo?

8          Can we pull that up, actually, Ms. Shedd?  It is

9    Exhibit 303, please, I believe.  I'm sorry.  It's 302.  My

10   apologies.

11         Right?  That bright orange clip.  That's still on the

12   strap, right, bright orange clip?  You can see it there.

13         Mr. Donovan would have you believe in his testimony

14   that he was in that vehicle for hours on March 25th and did not

15   notice a thing that Detective Campbell said he noticed

16   immediately.  He also noticed the orientation of the firearm,

17   right?  It's pointing out the passenger window, right?  I would

18   suggest to you, if you're going to keep a gun in your car, are

19   you going to point it at your own head, or are you going to

20   point it out the passenger window, right?  This gun belonged to

21   the driver of that vehicle, and that driver was Corey Donovan.

22         There was a lot of talk about the ammunition inside

23   the center console, right?  It was under Mr. Donovan's gloves.

24         Can we go back to the exhibit we just had up, Ms.

25   Shedd, 303, please?

1    Mr. Donovan acknowledged that those were his gloves in

2    his testimony, and you heard testimony from the agents that the

3    center console was found open with the gloves on top.

4    Again, ladies and gentlemen, Exhibit 112, the

5    bandolier.  This is not a piece of gum that you're going to not

6    notice in your car or a small thing of mints or maybe some

7    sunglasses you left behind.  This takes up about half of the

8    center console.  It was substantial, it was visible, and Mr.

9    Donovan's claims that he did not know it was in there I would

10   suggest to you are simply not credible.

11   What about the location in the shop, right?  Again,

12   we've already touched on this, so I won't belabor the point,

13   but it was Mr. Donovan's shop.  It was a man cave, right?  It's

14   where he kept his bows.  It's where he had his tools.  It's

15   where he worked on projects.  The idea that this gun case left

16   open with ammunition in and out was not visible and known to

17   him when he's in that space the day before I would suggest to

18   you is simply not credible.

19   And, again, the junker out by the workshop, right?

20   The ammo can is just left out on the floor, and Mr. Donovan

21   suggested he seemed to know it was kept there, because that's

22   where he wanted Kelley to keep it and everything, but it was

23   also not clear, because there was a suggestion maybe that ATF

24   had planted evidence or that they had moved things and

25   everything.  So, again, is the defense here that Kelley was

1  careless or that ATF planted the evidence?

2       Now, let's talk about the firearm, firearm itself a

3  little bit, the firearm itself.  Is that consistent with this

4  explanation that it was Kelley's gun and not Mr. Donovan's?

5  So, you heard him testify Kelley's not a gun person, doesn't

6  know anything about guns, really.  Mr. Donovan, he's demur

7  about it, but he acknowledges that he does know things about

8  guns, and he's handy and a tinkerer, and he certainly knows a

9  lot about hunting, right?

10      But think back to a couple of things that you heard

11  about this firearm.  Mr. Kwiatkowski testified he bought that

12  gun new.  It did not look like this, right?  It did not have

13  this scope, did not have this strap, did not have this

14  flashlight forearm, did not have this ammunition sleeve, and it

15  did not have these holes drilled in, right?  Remember Mr.

16  Kwiatkowski's testimony?  It was brief, but he said he bought

17  that gun new, he'd never fired it, put it in his storage unit.

18      And you heard Mr. Donovan testify today that gun, when

19  Kelley bought it at Christmas or bought it for herself at

20  Christmas, whenever it was, was new, it was in the box.  So,

21  think about that.  So, if it's new and in the box -- Mr.

22  Kwiatkowski says it's new and in the box when Kelley gets it,

23  and it comes to look like this by March 26th, who had the

24  workshop, right?  Mr. Donovan.  Who had the drill?

25      Can we pull up 904, please?  Ms. Shedd, could I ask

1    you to zoom to the left side of the deer with the green

2    wrapping on it?

3           The drill press right there to the right of the tail

4    that's hanging upside down, right?  Who had the handiness to

5    make the modifications to a weapon like this, right?  You heard

6    testimony these are aftermarket, right?  The gun doesn't come

7    like this.  Who do you know to have had scopes before?  Mr.

8    Donovan.  Is this the shotgun of a beginner, of someone who

9    doesn't know what they're doing, who's only fired it three

10   times, or is this the gun of a gun guy, a hunter, someone who

11   also puts tactical lights on his crossbow that you heard about

12   today, right?  Same thing.  Tactical light, being able to see

13   where you're shooting.

14          THE COURT:  Do you have an objection, Counsel?

15          MR. STACHOWSKE:  I do, your Honor.

16          THE COURT:  Basis?

17          MR. STACHOWSKE:  Other bad acts.  I think we're

18   encroaching on that.

19          THE COURT:  All right.  I'll hear you briefly.

20   (SIDEBAR CONFERENCE AS FOLLOWS):

21          MR. STACHOWSKE:  I just want to preserve the record.

22   It's mention of the scope and being a gun guy, and the closing

23   argument is discussing characteristics that are synonymous with

24   prior bad acts and his possession of this gun.  So, for those

25   reasons.

1          THE COURT:  All right.  I don't understand that to be

2     true.  There's nothing unlawful about possession of the scope

3     or possession of a crossbow or having a crossbow with lights on

4     it.  All right.  Thank you.

5          MR. STACHOWSKE:  Thank you.

6     (END OF SIDEBAR CONFERENCE)

7          MR. ROMBEAU:  Next I want to turn to the explanations

8     you've received about how the gun and ammunition may or may not

9     have been stored on Mr. Donovan's property.  So, he said he had

10    seen the gun a dozen-or-so times, right, and that it was

11    usually locked up, right?  He also testified that he knew he

12    couldn't have guns, and Kelley knew he couldn't have guns or

13    weapons, and that it was important to him he didn't want to get

14    jammed up.  I don't know if that was the exact wording he used,

15    but it's certainly the sentiment, right?  He didn't want to get

16    jammed up on a misunderstanding, right?  And yet he never

17    raised it with his probation officer, Mr. Merna, because I

18    think he said Tim could get huffy, right?  "Huffy" was his

19    word.  He didn't want to front the issue because his officer

20    could get huffy.

21          Does that make any sense to you?  Does Mr. Donovan

22    strike you as a kind of shrinking violet who would shy away

23    from a discussion over access to a firearm?  And yet, also, if

24    we are to credit his testimony that there were attempts to be

25    very careful, that the stuff was to be segregated from Mr.

1   Donovan, from his access and use and control because it was

2   Kelley's, does that jibe with what you know about where the

3   stuff was found?  It's everywhere.  It's in his Jeep, it's in

4   his workshop, it's in the junker, and yet he claims not to have

5   known where any of it was in the vehicle at any point.

6          Can we pull up Exhibit 308 again, please?  Again,

7   think about this testimony of the location of the ammunition

8   and the gun box within the barn.  You heard the testimony from

9   the agents.  There were very few areas you could actually walk

10  and access.  This was one of them.  They found this almost

11  immediately.  For someone who's in the barn this suggestion

12  that Mr. Donovan didn't know this was there in his barn again I

13  would suggest to you is not credible.

14         By the way, let's contrast this image, 308, with what

15  we do know about how Ms. Finnegan kept her other stuff, right?

16  So, the suggestion is this is how Ms. Finnegan may have left

17  it, right?  It's her gun, her ammunition, I never touched it,

18  this is how she left it.  Let's pull up Exhibit 905, please.

19  Think of the organization and the effort that goes into this.

20  Everything is in its place.  Things have been sorted.

21         Can you pull up 907, please.  Again -- sorry.  I moved

22  too quickly for you, Ms. Shedd.  I can move on.  They have the

23  photo and can see.

24         It's everything in its place, right?  Does that look

25  like the same person who left the gun box in that shape, who

1    maintained ammunition everywhere, hidden in an open -- or put

2    in a console and then stuffed in an ammo box in a broken-down

3    beater car?  Or is that, Exhibit 308, in the ways you've seen

4    the other evidence was collected?  Does that seem like the way

5    someone who's a junkster or a hoarder or has a lot of stuff,

6    like Mr. Donovan -- again, I'm paraphrasing -- the way he found

7    or the way he kept his stuff?  Of course it was Mr. Donovan's

8    and not Ms. Finnegans for all those reasons.

9           Now, as I wrap up here, I do want to touch briefly on

10   something that came up today, and that is the defendant was

11   adamant, right?  He said several times, I never touched any of

12   that stuff, right, never touched the ammunition, never touched

13   the firearm?  And yet, as you know, and, again, he readily

14   admits this, he refused to provide a court-ordered DNA sample

15   in this case, right?  Folks, if you never touched an item you

16   would have no reason to defy the court order, would you?  And I

17   know there's been this explanation that it's on file or

18   something like that.  I mean, it was ordered by the Court, and

19   he said, I'm not following it, right?  And you heard him at the

20   end there, right?  He says, I have my own interpretation of

21   things.  I don't follow orders that I don't think are good ones

22   or should apply to me.  Right?  That was the message.

23          Added all up, all those things, as you analyze

24   Mr. Donovan's testimony and whether or not you should credit

25   his assertions that he did not know he was driving around with

1    a gun inches behind his head, that he did not know this

2    ammunition was in spaces that he had control of, that he had

3    constant access to and that he ultimately had possession of, I

4    would suggest to you his testimony should not be credited for

5    those reasons.

6          And I'll end with this, ladies and gentlemen:  You've

7    seen and heard all of the evidence in this case.  All of it

8    points to one reasonable conclusion.  These were all Corey

9    Donovan's.  It was his gun and his ammunition in the Jeep, it

10    was his ammunition in the workshop, and it was his ammunition

11    stored in the junker car.  He knew where they were, because

12    they were his.

13          When Corey Donovan possessed that gun and all that

14    ammunition on March 26th he committed a crime.  You should find

15    him guilty beyond a reasonable doubt of the sole charge in the

16    indictment, that he was a felon in possession of a firearm and

17    ammunition.  Thank you.

18          THE COURT:  Thank you, Counsel.

19          Mr. Stachowske.

20          MR. STACHOWSKE:  Thank you, your Honor.

21          THE JUROR:  Your Honor?

22          THE COURT:  Yes.

23          THE JUROR:  Could we do a brief restroom break?

24          THE COURT:  Gotcha.  We'll take a quick one.  It's

25    actually pretty good, because after we do these I've got, like,

1   25 minutes of instructions.  So, we'll take the break now and

2   then just plow right through.  Okay?

3              THE CLERK:  All rise.

4         (Recess taken from 11:18 a.m. to 11:23 a.m.)

5                  (The jury entered the courtroom)

6              THE COURT:  Go ahead, Mr. Stachowske.

7              MR. STACHOWSKE:  Thank you, your Honor.

8                      CLOSING ARGUMENT

9   BY MR. STACHOWSKE:  We're almost done.  I'm excited for you.

10  This is going to be soon your opportunity to deliberate.  I'm

11  fascinated with the process myself, and I'm excited for you.

12  You're going to be given an opportunity here to determine my

13  client's fate, and we take that very seriously.  So, on his

14  behalf, thank you for that.

15         I am somewhat surprised in both openings and now in

16  closings that the government has, in my opinion, neglected to

17  focus sufficient attention on constructive possession, because

18  that's the issue in this case.  The defendant's charged with

19  possession, a felon in possession of a firearm and ammunition.

20  Now, he stipulated that he's a felon, he stipulated that the

21  firearm and ammunition are all subject to interstate commerce,

22  and the only remaining question is possession.

23         Now, you're going to hear in a minute there is a legal

24  distinction between actual possession and constructive

25  possession.  There's no evidence, credible evidence, that he

1    was ever in actual possession of any of these items.  You've

2    seen some grainy footage today that's been quickly dismissed

3    away as being an air gun, and the government's made no further

4    mention of it.  So, for all intents and purposes it's our

5    position that the government has no proof of actual possession,

6    so we're left, again, with constructive possession.

7         Now, what is constructive possession?  I perceive it

8    as a legal fiction, but constructive possession is when you

9    have possession of something and you're not actually possessing

10   it, it's not in your hands.

11        Now, I've placed on the mean wall before you and next

12   to some of you three pens.  You're in proximity to those pens,

13   but do you have any intention to possess those?  Are you in

14   possession of those pens?  That's the question that I'm asking

15   you to consider today, and I'm hoping that it's consistent with

16   the Court's instructions.  I say that, because what the judge

17   instructs you on the law is the law, not what I say.

18        But mere proximity to the firearms and the ammunition

19   is not sufficient.  The government needs to prove beyond a

20   reasonable doubt that my client had the power, which is

21   essentially the access to and the ability to, and the intention

22   to control these items before you that we spent an inordinate

23   amount of time discussing.  No one's refuting what these items

24   are, but the question is did he have constructive possession of

25   them?  And I argue to you that the government has failed to

1     prove beyond a reasonable doubt that he did so.

2             Again, you're in proximity to each one of these three

3     pens.  Mere proximity is insufficient.  Do you have the

4     intention to possess those pens?  As you sit here today, I

5     don't know.  So, we have to go off of what's called

6     circumstantial evidence, and that's the actions of my client.

7             Now, the government's done back flips trying to place

8     my client in proximity to the firearm and the ammunition, but

9     there's three other people, at least, that have been identified

10    that occupy the property, including Kelley Finnegan, and it's

11    my client's contention that it was her intention to possess the

12    firearm.  That's the only evidence we've heard from the

13    government or the defense, and that's the evidence that you're

14    to consider.  Is it credible evidence that Kelley Finnegan

15    possessed the firearm?  Because it was clearly on the property,

16    no one's denying that, but who had the intention to possess it?

17            Now, my client acknowledged that he's a convicted

18    felon, and he took the stand.

19            I'll pause for a moment and say since the moment you

20    get out of law school and thereafter in practicing law you

21    become very cautious and protective.  Everywhere you see legal

22    issues.  And, typically, no matter what, I have my client not

23    take the stand, but that's one of their absolute rights, and

24    this client decided to take the stand.  Now, he's a character.

25    There's no doubt about that.  He's quite entertaining, but I

1    propose to you that he's credible, and the one person who's

2    testified in this trial outside of my client that knows Mr.

3    Donovan is his probation officer, Officer Tim Merna.  He was

4    the gentleman with the all-one-length hair, and he agreed that

5    he found over the last three years that my client was credible.

6    He's visited the property at least 10 to 12 times, and he's

7    always found Mr. Donovan to be honest with him and up front

8    with him, so Mr. Merna tried to respect him.

9         There's no evidence that my client ever hid anything

10    from anybody, from you, from this Court.  He's an open book, if

11    that's not obvious already.  He's talked about his view on the

12    ATF or the government moving items.  You didn't hear me talk

13    about that.  That's his position.  He talked about his

14    ownership of crossbows.  He's a licensed crossbow owner.

15    There's no preclusion against that.  And he uses crossbows to

16    hunt animals.  I'm opposed to him hunting porcupines, but,

17    nevertheless, that's him.  There's nothing illegal or wrong

18    with that.  Some of you might have a view, take a negative view

19    towards seeing the deer strung up, but that's not an element of

20    the case.  He comes from a rural area, he's a hunter, he's a

21    country boy, he likes to wear his camouflage, but it doesn't

22    make him a criminal.

23         With respect to the DNA, it's already on file.  He's

24    opposed to the government having his DNA.  Do I agree with him?

25    That's not in evidence.  But he decided and elected not to

1    cooperate with the Magistrate Judge's order, and that's what's

2    in evidence.  You take that information and process it and do

3    with it what you will, but I propose to you it's not evidence

4    of guilt but, rather, evidence that he doesn't trust the

5    government.

6         There's already DNA on file for him, and in his view,

7    after having reviewed the evidence in discovery, you heard him

8    testify he thinks that the ATF planted evidence and moved items

9    around.  He made physical gestures on the stand.  So, when

10   Agent Forte came back to the jail recently and asked him to

11   give another DNA sample he was not going to do it.  He doesn't

12   trust the government.  Again, not an element of the crime, and

13   I propose to you it should not be considered as evidence of

14   criminal activity.

15        So, again, I circle back to the element that I propose

16   to you is the focus of this case, his intention, did he have

17   the intention, and I propose to you that he didn't.  The

18   circumstantial evidence is not sufficient.  It can't prove

19   beyond a reasonable doubt.  There's no evidence of a guilty

20   mind a/k/a intention.

21        Of course there's historical evidence of him driving

22   the Jeep.  He's very proud.  You could tell in his tone.  He

23   was very proud that his mother had provided him this Jeep, and

24   he takes care of it.  He's proud of that.  He tinkers on it.

25   But he testified he never saw the shotgun strapped to that roll

1    bar, and neither did the government, neither did the ATF.

2    Otherwise, we can presume that they would have included that

3    piece of evidence in their search warrant.  Recall that was one

4    of their mistakes in conducting the search warrant.  I propose

5    to you that they absolutely would have included in the search

6    warrant a statement that they had observed the shotgun, had it

7    been visible.

8            There's historical photos of my client and his

9    girlfriend Kelley Finnegan driving the Jeep on a summer day

10   with the top off.  You can see the camouflage hanging down.

11   The camouflage has been there presumably for some time, and

12   there's no evidence to pinpoint who or when that shotgun was

13   added to that roll bar, and that's the government's burden, to

14   prove these things to you, not the defendant.  The connections

15   don't go any deeper than him being on the property.

16           The scope and the cleaning supplies?  He's already

17   acknowledged that.  There's no refuting that.  Those items were

18   his, he took them back, and they were found on the property.

19   So what that they were found in an ammo can?  Kelley Finnegan

20   lives on the property.  She's the one that's using the gun.  Of

21   course she's going to take the cleaning supplies.  I propose to

22   you that Corey didn't need the cleaning supplies, so she took

23   them and put them in the ammo can.  There's no evidence to

24   refute that.  There's no evidence at all on that issue.

25           He testified that he didn't know the gun and the ammo

104

1   were in the Jeep the day before.  There's no indication, again,

2   when and who put those items in the Jeep.

3       I promised myself I'd keep this short, because it's a

4   very narrow issue.  I would just ask that you take your

5   individual life experiences and have, not a heated, but a

6   spirited, is the word I was looking for, conversation.  Speak

7   up, discuss this, debate this, as the judge is going to

8   instruct you to before you reach a decision, and use your

9   collective wisdom, which I know you will, in reaching the right

10  conclusion.

11      I ask you to find my client not guilty.  Thank you.

12      THE COURT:  Thank you.  Is there a rebuttal?

13      MS. KRASINKSI:  Yes, your Honor.

14              REBUTTAL CLOSING ARGUMENT

15  BY MS. KRASINSKI:  Corey Donovan told you he is so careful to

16  make sure there is no mistake, that there won't be any mistake

17  that confuses this gun for his.  He is so careful that he

18  refused to do the one thing that could show that he never

19  touched that gun.  He refused to take the DNA test twice, to

20  give his DNA sample twice.  You know what that's evidence of?

21  Consciousness of guilt.  He knows his DNA is on that gun, and

22  so he refused to give a sample.  That's why he refused to

23  submit to the court order.

24      The claim is he's open and honest with his probation

25  officer.  His probation officer told you that, if they had a

1    conversation about Kelley having a gun, that would be fine.

2    He's so open and honest with his probation officer that he

3    never mentioned it, not once.

4         He wants you to believe that this is Kelley Finnegan's

5    gun for personal protection.  They live out in this rural

6    property.  There are lynxes, there are coyotes.  But I've been

7    thinking about this.  Let's say she takes the dog out at night,

8    right?  She leaves the apartment, the garage apartment, she

9    takes the dog out, they walk in the driveway between the garage

10   apartment and the barn.  She's out with the dog, and here comes

11   a coyote, here comes a lynx.  Hold on a second, lynx, I've just

12   got to run to the Jeep, I've got to open the door, I've got to

13   unhook my shotgun, I've got to pull it out of the camo.  Just

14   wait a second.  Let me come back up to where you're at.  Does

15   that make sense?  That doesn't make sense.  This is not her gun

16   for protection.  That's not practical.  It doesn't make sense.

17        And this is not some newbie's gun.  This gun is fully

18   dressed, the scope and a light, just the same way Corey Donovan

19   likes to dress up his other weapons.  It's not illegal for him

20   to dress up his crossbow with a light and a scope, but who is

21   the one who likes to put lights and scopes on their weapons?

22   Corey Donovan.

23        And the video of Mr. Donovan walking with something

24   strapped to his back, he sat there and he told you that's not

25   the shotgun, that's a pellet gun.  You have seen the picture of

1    what he claimed that that was.  That does not have a strap.

2    There is only one thing that you have seen, that you have heard

3    about that can be slung over your shoulders, and it's this

4    shotgun.

5        He's not allowed to have a gun, but he kept that gun

6    in his Jeep, and he kept ammo in the center console, and he

7    kept ammo in what he called the "parts car," the car that he

8    was using after he crashed his mom's car, swapped stuff out,

9    and he kept that gun case in his shop, and he sat here and he

10   told you, It's not mine.  It's not believable that he didn't

11   know the gun was in the Jeep when someone else who's never been

12   in that Jeep before saw it within five seconds.

13       Don't believe his story.  That's Corey Donovan's gun.

14   It's Corey Donovan's ammo.  Find him guilty.

15       Thank you for your time.

16       THE COURT:  Thank you, Counsel.

17                        JURY CHARGE

18       THE COURT:  I'm going to instruct you on the law here.

19   You don't need to take notes, because I'm going to give you a

20   set of written instructions that you'll have with you in the

21   jury deliberation room, and there are headings in these

22   instructions for particular topic matters, like what is a

23   firearm.  You just look and see the heading, look down, and

24   I'll have a definition of what a firearm is, what ammunition

25   is, what the word "knowing" means.  All of the information you

1   need about the law will be in these written instructions.

2          I'm going to apologize, though.  I'm going to read

3   them to you, because I have to convey the law to you very

4   precisely.  So, please bear with me as I read through these

5   instructions.

6          At this stage of the trial it is my duty to instruct

7   you on the principles of law that you must apply in deciding

8   this case.  It is your duty to follow these instructions during

9   your deliberations.  You should not single out any one

10  instruction, but, instead, apply these instructions as a whole

11  to the evidence in the case.

12         You are the sole and exclusive judges of the facts.

13  You must weigh the evidence that has been presented

14  impartially, without bias, without prejudice, without sympathy.

15  You must determine what the facts are, what the truth is, based

16  upon the evidence presented in the case.  You will decide the

17  case by applying the law as I give it to you in these

18  instructions to the facts as you find them to be from the

19  evidence.

20         It is your duty to apply the law exactly as I give it

21  to you.  You must not be influenced by any personal likes or

22  dislikes, prejudices or sympathy.  That means that you must

23  decide the case solely on the evidence before you and according

24  to the law.

25         Now, you must not infer from these instructions or

1    anything that I have said or done during the course of the

2    trial that I have any opinion as to what your verdict should

3    be.  That is a matter entirely for you to decide.

4         In determining what the facts are, what the truth is,

5    you must necessarily assess the credibility of each witness and

6    determine what weight you will give to each witness's

7    testimony.  By "credibility" I mean the believability or

8    truthfulness of a witness.  You should carefully scrutinize all

9    the testimony given, the circumstances under which each witness

10   has testified and every matter in evidence which tends to show

11   whether a witness is worthy of belief or not worthy of belief.

12        In making that determination, you may consider a

13   number of factors, including the witness's ability to see, hear

14   or know the things about which the witness has testified, the

15   quality of the witness's memory, the witness's manner while

16   testifying, whether the witness had an interest in the outcome

17   of the case or any motive, bias or prejudice, whether the

18   witness's testimony was either supported or contradicted by

19   other evidence in the case, and how reasonable the witness's

20   testimony was when considered in light of other evidence which

21   you believe.  After assessing the credibility of each witness,

22   you will assign to the testimony of each witness both under

23   direct and cross-examination such weight as you deem proper.

24        You are not required to believe the testimony of a

25   witness simply because that witness was under oath.  You may

1   believe or disbelieve all or part of the testimony of any

2   witness.  It is within your province to determine what

3   testimony is worthy of belief and what testimony may not be

4   worthy of belief.

5         You should consider the testimony of a law enforcement

6   officer in the same way as the testimony of any other witness

7   in the case.  In evaluating the credibility of a law

8   enforcement officer, you should use the same tests that you

9   apply to the testimony of any other witness.  In no event

10  should you give the testimony of a law enforcement officer any

11  more credibility or any less credibility because that witness

12  is a law enforcement officer.

13        The testimony of a witness may be discredited or, as

14  we sometimes say, impeached by showing that the witness

15  previously made statements that are different than or

16  inconsistent with his or her testimony here in court.  You must

17  decide what weight, if any, should be given to the testimony of

18  a witness who has made prior inconsistent or contradictory

19  statements.  In making that determination, you may consider

20  whether the witness purposely made a false statement or whether

21  it was an innocent mistake, whether the inconsistency concerns

22  an important fact, or whether it had to do with a small detail,

23  whether the witness had an explanation for the inconsistency

24  and whether the explanation appealed to your common sense.

25        If a person is shown to have knowingly testified

1    falsely about any important matter, you obviously have a right

2    to distrust the testimony of that person concerning other

3    matters.  You may reject all of the testimony of that witness

4    or give it such weight as you may think it deserves.

5        The weight of the evidence is not necessarily

6    determined by the number of witnesses testifying on either

7    side.  You will consider all of the facts and circumstances in

8    evidence to determine which witnesses are worthy of belief.

9    You may find that the testimony of a small number of witnesses

10   on a particular issue is more credible than the testimony of a

11   greater number of witnesses on the other side of that issue.

12   It is not the number of witnesses or the quantity of testimony

13   that is important but the quality of the evidence that has been

14   produced that is important.

15       The fact that the prosecution is brought in the name

16   of the United States of America entitles the government to no

17   greater consideration than that given to any other party in

18   litigation.  By the same token, the government is entitled to

19   no less consideration.  All parties, whether the government or

20   individuals, stand as equals at the bar of justice.

21       There are two types of evidence that you may properly

22   use in deciding whether a defendant is guilty or not guilty.

23   Direct evidence is the testimony of a witness about what that

24   witness has seen, heard, or observed or what the witness knows

25   based on personal knowledge.  Direct evidence also includes any

1    exhibits that have been admitted into evidence and any

2    stipulations that have been agreed to by the lawyers.

3          During the course of the trial you were told that the

4    government and the defendant agreed or stipulated to certain

5    facts.  That simply means that both sides accept those facts to

6    be true.  Because there is no disagreement regarding those

7    facts, there was no need for either side to introduce evidence

8    relating to them.  You should accept as true the facts to which

9    the government and the defendant have stipulated, and you may

10   give those facts such weight as you deem proper.

11         Circumstantial evidence is indirect evidence that is

12   introduced to establish a fact by implication.  In other words,

13   by examining direct evidence you may be able to draw certain

14   inferences by reason and common sense that another fact exists,

15   even though that other fact has not been proven directly.  Such

16   reasonable inferences constitute circumstantial evidence.  The

17   law makes no distinction between the weight to be given to

18   either direct or circumstantial evidence.  It's up to you to

19   decide how to weigh the evidence in this case.

20         The evidence in this case consists of the sworn

21   testimony of witnesses, both on direct and cross-examination,

22   regardless of who may have called the witness, the exhibits

23   that have been received into evidence, regardless of who may

24   have produced them, and any facts to which the lawyers have

25   agreed or stipulated.

 1          Certain things are not evidence and cannot be

 2     considered by you as evidence.  Arguments, statements and

 3     questions by lawyers are not evidence.  Questions asked by

 4     lawyers and what the lawyers have said in their opening

 5     statements, closing arguments and at other times during the

 6     trial are intended to help you interpret the evidence, but they

 7     are not evidence.  If the facts as you remember them differ

 8     from the way the lawyers have stated them, your memory

 9     controls.

10          Objections by the lawyers are not evidence.  Lawyers

11     have a duty to object when they believe a question is improper

12     under the *Rules of Evidence*.  I must rule on those objections,

13     and I have not intended to indicate in any way by my rulings or

14     by what I have said what the verdict should be in this case.

15     You should not be influenced by the lawyers' objections or by

16     my rulings on objections.

17          Testimony that has been excluded or stricken or that I

18     have instructed you to disregard is not evidence and must not

19     be considered in any way in your deliberations.

20          The indictment is not evidence.  This case, like most

21     criminal cases, began with an indictment.  You will have that

22     indictment before you during the course of your deliberations.

23     That indictment was returned by a grand jury, which heard only

24     the government's side of the case.  The fact that this

25     defendant has been indicted by a grand jury is not evidence of

1    his guilt.  The indictment is simply an accusation.  Therefore,

2    you must not consider the indictment in this case as any

3    evidence of the guilt of this defendant, nor should you draw

4    any inference from the fact that an indictment has been

5    returned against him.  The indictment is the means by which the

6    government's allegations and charges are brought before this

7    court.  You must decide whether the defendant is guilty or not

8    guilty of those charges, and the indictment is not evidence.

9         Anything you may have seen or heard outside of this

10   courtroom when the Court is not in session is not evidence.

11   You must decide the case solely on the evidence received at the

12   trial.

13        A defendant, although accused, begins a trial with a

14   clean slate, no evidence against him.  The law permits nothing

15   but the admissible evidence presented before you to be

16   considered in support of the charges against him.  The law

17   presumes every defendant to be innocent until proven guilty

18   beyond a reasonable doubt.  The burden of proof rests entirely

19   on the government.  A defendant does not have to prove his

20   innocence.  A defendant enters the courtroom and is presumed to

21   be innocent unless and until the government convinces you

22   beyond a reasonable doubt that he is guilty of each essential

23   element of the offense charged in the indictment.  That

24   presumption means that you are to regard the defendant in this

25   case as innocent unless the government proves beyond a

1  reasonable doubt that he is guilty.  The presumption of

2  innocence alone is sufficient to acquit the defendant, unless

3  you are satisfied beyond a reasonable doubt, after careful and

4  impartial consideration of all the evidence in the case, that

5  he is guilty of the charge set forth in the indictment.

6       The burden is always on the government to prove guilt

7  beyond a reasonable doubt.  That burden of proof never shifts

8  to the defendant to demonstrate his innocence.  The law does

9  not impose upon a defendant in a criminal case the obligation

10  to call any witnesses or produce any evidence.

11       If, after careful and impartial consideration of all

12  the evidence in the case, you have a reasonable doubt as to

13  whether the defendant is guilty of a crime charged in the

14  indictment, you must find him not guilty on that charge.  The

15  defendant has pleaded not guilty to the charge in the

16  indictment.  That plea puts in issue all of the essential

17  elements of the offense as described in these instructions and

18  imposes on the government the burden of establishing each of

19  those elements by proof beyond a reasonable doubt.

20       The jury must never find a defendant guilty based on a

21  mere suspicion, conjecture or guess.  Likewise, the jury must

22  never find a defendant guilty because it thinks he might be

23  guilty or that he is probably guilty.

24       Before you may return a verdict as to any crime

25  charged in the indictment, you must unanimously conclude beyond

1    a reasonable doubt that the defendant committed each of the

2    essential elements of that offense.

3         You will see that the indictment charges that the

4    defendant -- excuse me -- the offense at issue was committed on

5    or about a certain date.  Evidence need not establish with

6    certainty the exact date of an alleged offense.  It is

7    sufficient if the evidence establishes beyond a reasonable

8    doubt that the offense charged was committed on dates

9    reasonably near the dates alleged, that is, the dates

10   reasonably close in time to the dates on which the offense is

11   alleged to have occurred.

12        Now I want to talk to you about the specific charge

13   here.  The indictment alleges that on or about March 26, 2021,

14   in the District of New Hampshire, the defendant, Corey Donovan,

15   knowing that he had been convicted of a crime punishable by

16   imprisonment for a term exceeding one year, did knowingly

17   possess in and affecting interstate commerce the following

18   firearm and ammunition:  a Mossberg model 500 20 gauge shotgun

19   bearing serial number V1051663, four rounds of Brenneke 20

20   gauge shotgun ammunition, 71 rounds of Federal 20 gauge shotgun

21   ammunition, 48 rounds of Federal 28 gauge shotgun ammunition,

22   eight rounds of Huntego 20 gauge shotgun ammunition, four

23   rounds of Remington 12 gauge shotgun ammunition, all in

24   violation of Title 18, United States Code, Section 922(g)(1).

25        It is a crime under federal law for a convicted felon

116

1    to knowingly possess a firearm that was connected with

2    interstate commerce.

3         Now let me tell you more about the essential elements.

4         To carry its burden of proof with regard to the crime

5    charged in Count One of the indictment, the government must

6    prove each of the following essential elements beyond a

7    reasonable doubt:

8         First, that the defendant has been convicted in any

9    court of a crime punishable by imprisonment for a term

10    exceeding one year.

11         The parties have stipulated that on November 4, 2007

12    the defendant was convicted of a crime punishable by

13    imprisonment for more than a year.

14         Second, that the defendant knew that his conviction

15    was punishable by a term of imprisonment for more than a year.

16         The parties have stipulated that from November 4, 2007

17    until the present, including during March of 2021, the

18    defendant knew that his prior conviction was punishable by

19    imprisonment for more than a year.

20         Third, on or about the date alleged in the indictment

21    the defendant knowingly possessed the firearm described in the

22    indictment or any of the ammunition described in the

23    indictment.

24         And, fourth, that the firearm or ammunition the

25    defendant knowingly possessed was connected with interstate or

117

1    foreign commerce.

2         The parties have stipulated that the firearm and

3    ammunition described in the indictment were connected with

4    interstate or foreign commerce.

5         I'll tell you more about some of these specific terms,

6    starting with knowingly.

7         The defendant acted knowingly if he was conscious and

8    aware of his actions, realized that what he was doing --

9    realized what he was doing or what was happening around him and

10   did not act because of ignorance, mistake or accident.  Intent

11   or knowledge may not ordinarily be proven directly, because

12   there is no way of directly scrutinizing the workings of the

13   human mind.  In determining what defendant knew or intended at

14   a particular time, you may consider any statements made or acts

15   done or omitted by the defendant and all the other facts and

16   circumstances received in evidence that may aid in your

17   determination of defendant's knowledge or intent.  You may

18   infer, but certainly are not required to infer, that a person

19   intends the natural and probable consequences of acts knowingly

20   done or knowingly omitted.

21        It is entirely up to you, however, to decide what

22   facts are proven by the evidence received during this trial.

23   The government does not have to prove that the defendant knew

24   that his conduct was illegal.

25        Possess.  In the context of this case the term

1    "possess" means to exercise authority, dominion or control over

2    a firearm or ammunition.  It is not necessarily the same as

3    legal ownership.  The law recognizes different kinds of

4    possession.  Possession includes both actual and constructive

5    possession.  A person who has direct physical control of a

6    firearm or ammunition on or around his person is then in actual

7    possession of the firearm or ammunition.  A person who is not

8    in actual possession but who has both the power and the

9    intention at a given time of exercising dominion and control

10    over a firearm or ammunition directly or through others is in

11    constructive possession of the firearm or ammunition.

12          Constructive possession may be inferred from

13    circumstances such as the defendant's control over the area

14    where the firearm or ammunition is found.  Although

15    constructive possession may be proved either through direct or

16    circumstantial evidence, mere presence or association with

17    another who possessed the firearm or ammunition is insufficient

18    to establish constructive possession.

19          Whenever I use the term "possession" in these

20    instructions I mean both actual and constructive possession.

21          Possession also includes both sole and joint

22    possession.  If one person alone has actual or constructive

23    possession, possession is sole.  If two or more persons share

24    actual or constructive possession, possession is joint.

25          Whenever I use the word "possession" in these

1      instructions, I mean joint as well as sole possession.

2           The indictment alleges that the defendant possessed a

3      firearm and multiple rounds of ammunition.  The government is

4      not required to prove that the defendant possessed the firearm

5      and each round of ammunition identified in the indictment.  You

6      may find that the government has met its burden on possession

7      if you find that the defendant knowingly possessed the firearm

8      or any of the rounds of ammunition charged in the indictment.

9           So, this isn't in the written instructions, but I want

10     to leave no doubt about this.  You don't have to find that the

11     defendant possessed every round of ammunition and the firearm.

12     The government has the burden of proving possession of the

13     firearm or any of the rounds of ammunition.  All right?

14          Firearm.  The term "firearm" means any weapon which

15     will or is designed or may readily be converted to expel a

16     projectile by the action of an explosive.  The parties have

17     agreed or stipulated that the firearm described in the

18     indictment meets the definition of "firearm."  Because there is

19     no dispute about this element, you may accept it as true.

20          Now, this isn't in the written instruction, but I want

21     to make sure that you understand this as well.  You've heard

22     some testimony today about a pellet gun.  A pellet gun is not a

23     firearm.  It doesn't explode a projectile; it doesn't use

24     explosive means to expel a projectile.  So, the testimony about

25     the defendant possessing the pellet gun, if that's what you

1    find he possessed, that is not a firearm.  All right?  I just

2    want to leave no doubt about that.

3          Ammunition.  The term "ammunition" means ammunition

4    designed for use in a firearm.  The parties have stipulated

5    that each round of ammunition described in the indictment meets

6    the definition of "ammunition."  Because there is no dispute

7    about this element, you may accept it as true.

8          Interstate commerce.  To prove that the firearm and

9    ammunition described in the indictment was in or affecting

10   commerce, the government must prove at any time after it was

11   manufactured the firearm or ammunition moved from one state to

12   another.  The parties have agreed or stipulated that the

13   firearm and all of the ammunition described in the indictment

14   traveled in interstate or foreign commerce prior to March 26,

15   2021.  Because there is no dispute about this element, you may

16   accept it as true.

17         The principles of law set forth in these instructions

18   are intended to guide you in reaching a fair and just result in

19   this case, which is important to all of the parties.  You are

20   to exercise your judgment and common sense without prejudice,

21   without sympathy, but with honesty and understanding.  You

22   should be conscientious in your determination of a just result

23   in this case, because that is your highest duty as officers of

24   the court.

25         Remember also that the question before you can never

1    be will the government win or lose this case.  The government

2    always wins when justice is done, regardless of whether the

3    jury's verdict is guilty or not guilty.  Your duty is to see

4    that justice is done.

5         When you have considered and weighed all of the

6    evidence, you must make one of the following findings with

7    respect to the crime charged in the indictment:  If you have a

8    reasonable doubt as to whether the government has proved any

9    one or more of the essential elements of the crime charged, you

10   must find the defendant not guilty with regard to that crime.

11   If you find that the government has proved beyond a reasonable

12   doubt all of the essential elements of the crime charged, you

13   may find the defendant guilty with regard to that crime.

14        In reaching an impartial verdict in this case, you

15   must not speculate as to the punishment the law provides for

16   the crimes with which the defendant is charged or -- the crime

17   with which the defendant is charged.  The punishment provided

18   by law for the offense charged in the indictment is exclusively

19   my responsibility.  You should not consider it, nor should it

20   affect or color your deliberations in any way.

21        When you retire you should select -- elect one member

22   of the jury as your foreperson.  That individual will act very

23   much like the chairperson of a committee, seeing to it that the

24   deliberations are conducted in an orderly fashion and that each

25   juror has a full and fair opportunity to express his or her

1    views, positions and arguments on the evidence and on the law.

2         The verdict with regard to each offense charged, and

3    here there's only one offense, with regard to the offense

4    charged in the indictment must represent the considered

5    judgment of each juror.  In order to return a verdict, each

6    juror must agree to it.  Your verdict as to the count charged

7    in the indictment, regardless of whether it is guilty or not

8    guilty, must be unanimous.

9         It is your duty as jurors to consult with one another

10   and to deliberate with a view to reaching an agreement, if you

11   can do so without violence to individual judgment.  Each of you

12   must decide the case for yourself, but do so only after an

13   impartial consideration of the evidence in the case with your

14   fellow jurors.  In the course of your deliberations do not

15   hesitate to reexamine your own views and to change your

16   position, if you become convinced it is erroneous, but do not

17   surrender your honest conviction as to the weight or effect of

18   the evidence solely based upon the opinion of your fellow

19   jurors or merely for the purpose of returning a verdict.

20        Remember, you are not partisans, you're judges, judges

21   of the facts.  Your sole interest is to seek the truth from the

22   evidence in the case.

23        If during your deliberations it becomes necessary to

24   communicate with me, you may do so only in writing, signed by

25   the foreperson or by one or more members of the jury.  Give

1   that note to the Court Security Officer, and he or she will

2   bring it to my attention. I will then respond as promptly as

3   possible, either in writing or by meeting with you in the

4   courtroom. I will always first show the attorneys your

5   question and my response before I answer your question. No

6   member of the jury should ever attempt to communicate with me

7   except by a signed writing, and I will communicate with you on

8   anything concerning the case either in writing or orally in the

9   courtroom.

10       Remember, you are not to tell anyone, including me,

11   how the jury stands numerically or otherwise on the matters you

12   are deciding until after you have reached a unanimous verdict

13   or have been discharged. In other words, if the jury is split,

14   say, eight to four on some issue, the existence of that split

15   or that number on one side or the other must not be disclosed

16   to anyone, including me.

17       If we recess during your deliberations, follow all of

18   the instructions that I have given you concerning your conduct

19   during the trial. In particular, do not discuss the case with

20   anyone other than your fellow jurors in the jury room with

21   everyone present.

22       At the risk of being repetitive, let me say that

23   nothing said in these instructions is intended to suggest in

24   any way what your verdict should be. The verdict is

25   exclusively your duty and responsibility.

1          After you have reached a verdict, your foreperson will

2    fill in the verdict form that has been given to you, sign and

3    date it and notify the Court Security Officer.  You will then

4    be returned to the courtroom.

5          Does counsel need to see me with respect to any

6    additional charges?

7          MR. ROMBEAU:  No, your Honor.

8          MR. STACHOWSKE:  No, your Honor.

9          THE COURT:  All right.  Thank you.  I will say to you,

10   you will have the jury instructions, a copy of the indictment,

11   the verdict form, which is quite simple and straightforward,

12   that should be completed after you have reached your verdict by

13   the foreperson and placed in an envelope.

14          I'm going to ask the Case Manager to swear the Court

15   Security Officer.

16        (The Court Security Officer was duly sworn by the Clerk)

17          THE COURT:  Now, some of you may have counted and

18   realized there are more than 12 of you there.  It's only 12 of

19   you that get to deliberate, and so I think we have three

20   alternates.  Do we?

21          THE CLERK:  We do, your Honor.

22          THE COURT:  Would you identify the alternates for me?

23          THE CLERK:  ████████████, ████████████ and ████████

24   ████████.

25          THE COURT:  I don't know.  Is it that corner?

1          THE CLERK:  13, 14 and 15.

2          THE COURT:  Okay.  So, I want to thank you for your

3    service.  You are not going to be able to deliberate with the

4    other jurors, and that, I'm sure, is frustrating for you.  We

5    really need to do this, especially in a time of COVID in case

6    we lose a juror.  I also cannot release you from your oath yet,

7    so there's a lunch waiting for you.  You can say goodbye to the

8    other jurors, you can pick up your lunch, but you can't stay

9    with them and have lunch, and you can't -- you need to keep my

10   instructions in mind, because if something were to happen to

11   one of the jurors during deliberation I might need to call you

12   back and instruct the jury to begin the deliberation again.

13   So, do not -- keep my instructions in a mind and follow them.

14   As soon as a verdict is reached the clerk will call you up and

15   release you from your responsibilities as a juror.  At that

16   point you're free to do anything you want about the case.  And,

17   again, thank you for your service, and I'm sure at this point

18   you want to participate in the deliberations.  I just regret

19   that you can't.  So, thank you, folks.

20          All right.  Is there anything else I need to do before

21   we send the jury out?  And I would suggest you probably sit

22   down and enjoy your lunch first before you start getting into

23   the details of it, you know, let people eat for a few minutes.

24   But that's up to you.  You decide what you want to do, but we

25   are ready to begin deliberations, so the case is now yours.

```
 1            THE CLERK:  All rise.

 2                  (The jury exited the courtroom)

 3            THE CLERK:  I just have to go over the exhibits with

 4   the parties.

 5            THE COURT:  Yeah, go over the exhibits.  I also have

 6   made a couple of -- there are a couple of mistakes in here that

 7   I changed, so I'm going to have my assistant type that up.  So,

 8   I'll give you revised instructions, and verdict form you've

 9   got.  You'll go over the exhibits with them.  There is a

10   redaction that had to be made in the indictment as to one item

11   of ammunition, I believe.  Make sure that the indictment that

12   goes to them has the redaction in it.

13            THE CLERK:  Yes.  I received it.

14            THE COURT:  Otherwise we're good.  So, you can run out

15   for 45 minutes and get lunch, but otherwise be back in the

16   court and make sure we have contact info for you.

17            MR. ROMBEAU:  Thank you, your Honor.

18            MS. KRASINKSI:  Thank you.

19            THE CLERK:  All rise for the Honorable Court.

20            (Recess taken from 12:18 p.m. to 2:51 p.m.)

21            THE CLERK:  This Court is back in session.  Please be

22   seated.

23            The Court Security Officer's bringing them in.

24                        (Pause)

25            THE COURT SECURITY OFFICER:  All rise for the jury.
```

```
 1                    (The jury entered the courtroom)

 2             THE CLERK:  Please be seated.

 3             Has the jury reached a verdict?

 4             THE FOREPERSON:  We have.

 5             THE CLERK:  Thank you.  Please pass it to me.  Thank

 6     you.

 7             (Verdict form provided to the Court by the Clerk)

 8             THE CLERK:  Will the defendant please stand.  In the

 9     matter of the United States of America versus Corey Donovan,

10     criminal case number 21-cr-88-1, the jury finds as follows:

11             Count One.  With regard to the crime described in

12     Count One of the indictment, Possession of a

13     Firearm/Ammunition, by a Prohibited Person, 18 U.S.C. Section

14     922(g)(1), we, the jury, find the defendant guilty.

15             Signed October 15th, 2021 by the foreperson.

16             THE COURT:  All right.  Mr. Stachowske, do you wish to

17     have the jury polled?

18             THE DEFENDANT:  I don't know what that means.

19             THE COURT:  So, polling is we can ask individually, I

20     can ask each juror individually to verify that that is, in

21     fact, their verdict.  I'm happy to do that, if you would like

22     me to, Mr. Donovan.  Do you want me to do that?

23             THE DEFENDANT:  I don't see the need for it, your

24     Honor, I guess.

25             THE COURT:  All right.  So, you waive your right to be
```

1    polled.  They followed my instructions.  I've been doing this

2    for 29 years.  I've never had an issue with polling, but you're

3    waiving your right to polling.  I appreciate that.

4         THE DEFENDANT:  Yes, your Honor.

5         THE COURT:  So, members of the jury, I want to thank

6    you on behalf of the parties for your service here.  I know

7    it's a sacrifice, particularly in COVID.  Having to sit here

8    all day wearing these masks is terrible, and I appreciate your

9    service.

10         If you could stick around for just a few minutes, I

11   have a couple of things to do with the defendant, and then I'd

12   like to come in and just thank you individually, so if you

13   could just wait back in the jury deliberation room.

14         You are now released from all of my instructions.  Go

15   back onto social media, talk about it, read about it, do

16   anything you want to do.  You're completely back to being

17   ordinary citizens now.

18         So, again, thank you for your service on behalf of the

19   parties, and you are discharged.

20         THE CLERK:  All rise.

21              (The jury exited the courtroom)

22         THE COURT:  All right.  Be seated.  So, the defendant

23   is currently in custody.  I see no reason to change his custody

24   status.  Sentencing is scheduled for January 31st at 10:00 a.m.

25         Now, Mr. Donovan, you want to pursue the Speedy Trial

1      Act issue.

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  And part of that motion kind of puts you

4      at odds with Mr. Stachowske.  I think the best thing to do, if

5      you are agreeable, is let's discharge Mr. Stachowske as your

6      lawyer today.  I'll appoint a new lawyer for you to handle the

7      sentencing, to work with you on that Speedy Trial Act motion,

8      and potentially to handle your appeal.  Does that make sense to

9      you?

10             THE DEFENDANT:  Yes, it does, your Honor.  Thank you.

11             THE COURT:  All right.  So, Mr. Stachowske, you're

12     going to be discharged from this point on as counsel, but I

13     need you to get your file together and be ready to transfer it

14     to new counsel as soon as possible.  Okay?

15             MR. STACHOWSKE:  Yes, your Honor.

16             THE COURT:  And so, the Clerk will appoint new counsel

17     for you.  He or she will be in touch with you.  As I said, I've

18     preserved your right to argue your Speedy Trial Act motion.

19             THE DEFENDANT:  Thank you.

20             THE COURT:  So, the first thing to do is to raise that

21     with your new lawyer.  I can't guaranty your new lawyer will

22     back it, because he or she has to make their own decision, but

23     I'm willing, if he or she won't do it, I'll let you do that on

24     your own, okay?  But it's better, if they're willing to do it,

25     to press it for you.

```
1              THE DEFENDANT:  Yes.

2              THE COURT:  Do you understand what I'm saying?

3              THE DEFENDANT:  Thank you, your Honor.

4              THE COURT:  All right.  So, that will be the next

5    step; a new lawyer will contact you.  You then should talk

6    about that motion, and, once your new lawyer has gotten on

7    board, I'll set up a conference call with the prosecutors.  You

8    don't have to answer the Speedy Trial Act motion until new

9    counsel gets on board, because they may want to, like, amend it

10   or do something to it.  So, we'll get new counsel on board,

11   we'll set a status conference and establish a schedule for

12   briefing on the Speedy Trial Act motion.  Either a new one will

13   be filed by counsel, or that one that he filed will be filed,

14   and you'll file a response to it.  I'll then get your briefing,

15   rule on that motion, and if a new trial would be ordered we

16   would do that.  Otherwise, we would go forward with the

17   sentencing, and your appeal rights would be preserved at that

18   point.  Do you understand?

19             THE DEFENDANT:  Yes, your Honor.  Thank you.

20             THE COURT:  Okay.  Anything else from you,

21   Mr. Stachowske?

22             MR. STACHOWSKE:  No, your Honor.

23             THE COURT:  Anything else from the government?

24             MR. ROMBEAU:  No, your Honor.

25             THE COURT:  Okay, good.  Thank you.  That concludes
```

1    the proceedings today.

2          THE CLERK:  All rise.

3       (WHEREUPON, the proceedings adjourned at 2:57 p.m.)

4

5                    C E R T I F I C A T E

6

7

8          I, Brenda K. Hancock, RMR, CRR and Official Court

9    Reporter of the United States District Court, do hereby certify

10   that the foregoing transcript constitutes, to the best of my

11   skill and ability, a true and accurate transcription of the

12   within proceedings.

13

14

15

16

17   Date:    5/6/22          /s/ Brenda K. Hancock
                             Brenda K. Hancock, RMR, CRR
18                           Official Court Reporter

19

20

21

22

23

24

25

# Exhibit 14

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

|                             |   |                              |
|-----------------------------|---|------------------------------|
| UNITED STATES OF AMERICA    | : | Criminal Case No. 21-cr-88-PB |
|                             | : | No. 07-cr-130-PB             |
| v.                          | : |                              |
|                             | : |                              |
| COREY DONOVAN               | : |                              |
| _____ | : |                              |

## UNITED STATES' CONSOLIDATED SENTENCING MEMORANDUM

The United States of America, by Jane E. Young, United States Attorney for the District of New Hampshire, submits this memorandum in connection with the consolidated sentencing of Corey Donovan scheduled for November 28, 2022. As set forth herein, the Government recommends the Court impose a total sentence of 120 months, consisting of consecutive terms of (a) 110 months for his conviction at the October 2021 trial in Case No. 21-cr-88-PB, and (b) 10 months for his concomitant supervised release violation in Case No. 07-cr-130-PB.

## I.    INTRODUCTION

In October 2021, Corey Donovan was convicted of the prohibited possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) following a 3-day jury trial. The United States Probation Office determined the total offense level applicable to this conduct to be 28 in its Presentence Report ("PSR"), after applying enhancements for his possession of three "firearms" (including two silencers), the fact that a firearm was stolen, and defendant's obstruction of justice at trial. Defendant has a lengthy criminal history, accruing 9 criminal history points, and therefore falls in Criminal History Category IV. PSR ¶¶ 52-54. As outlined in the PSR, defendant faces a Guidelines Sentencing Range of 110-120 months of imprisonment. *Id.* ¶¶ 95-96.

Defendant faces additional sentencing exposure pursuant to the pending petition for violations of supervised release in Case No. 07-cr-130, arising out of misconduct related to—but only partially overlapping with—his recent conviction. A November 17, 2022 Final Revocation Report identified six separate violations, the most serious of which is a Grade B violation. *See* U.S.S.G. § 7B1.1(a)(2) & n.5 (noting violations of 18 U.S.C. § 922(g) "generally" are Grade B violations). As set forth in greater detail below, in the Government's view, the defendant falls in Criminal History Category IV in connection with the 2007 case. Therefore defendant's Guidelines Sentencing Range should be 12-18 months of imprisonment on the revocation. *See* U.S.S.G. § 7B1.4.

## II.    FACTUAL BACKGROUND

In March 2021, defendant was on supervised release following a lengthy sentence for bank robbery and related firearm charges. At the time, he was residing in an apartment over a garage on a large property in Wilmot, New Hampshire. His mother and sister lived in the main house on the property, which also had a large warehouse building, and he shared the apartment with his then-girlfriend, Kelley Finnegan.

On or about March 11, 2021, investigators arrested Caitlin Fillion on her own federal charges in connection with her illegal possession of a firearm in a December 2020 incident in Somersworth, NH. She waived *Miranda* rights and consented to an interview with law enforcement. During that interview, after discussing at length the incident that led to her own arrest, Ms. Fillion additionally volunteered that she and her boyfriend had just visited the defendant's Wilmot residence in the days prior to her federal arrest. As recounted in ATF Special Agent John Forte's later affidavit, Ms. Fillion reported that she and/or her boyfriend had seen Donovan with a hunting rifle with camouflage, a two-tone pistol, a silver-colored revolver,

and a suspected large machinegun in a black case. According to Ms. Fillion, the defendant appeared under the influence of methamphetamine and exhibited erratic and other paranoid behavior.

Following the initial information from Ms. Fillion, ATF agents contacted defendant's supervising officer, Tim Merna, who was familiar with the defendant's residence and the family property in Wilmot. Agents additionally analyzed information from Ms. Fillion's phone, which confirmed certain aspects of her story, including location information confirming she had been at the defendant's property. Agent Forte additionally confirmed the defendant's interactions with law enforcement, including an exchange, on March 9, 2021, when Grantham Police were called after concerns were raised about blood and fur on the exterior of defendant's Toyota.[1]

On March 24, 2021, Agent Forte applied for and obtained a federal search warrant authorizing the search and seizure of evidence from the defendant's garage apartment, the warehouse building, and a Toyota Matrix. *See* 21-mj-79-01-AJ. Agents executed the first search warrant on March 26, 2021. Because of the defendant's criminal history, the unique property, and information that the defendant may be using methamphetamine, a Special Response Team ("SRT") assisted agents before executing the warrant. As the Court may recall from the September 24, 2021 suppression hearing, the SRT cleared the property prior to the agents entering to conduct the search. In so doing, the SRT opened the passenger door to a Green Jeep Wrangler to ensure no one was inside. At the time of the execution, neither the defendant nor the Toyota Matrix were located on the property.

Agents did not find any of the firearms described by Ms. Fillion. From the defendant's garage apartment, agents recovered one round of spent .357 ammunition, a substantial cache of

---

[1]    Defendant would later acknowledge the Grantham Police interaction, and Tilton Police interaction the day earlier, at the suppression hearing. *See* Sept. 24, 2021 Motion Hearing Transcript at 18:17-20:20, Dkt. No. 66.

knives and other blade-based weapons, drug paraphernalia, and a small quantity of suspected

methamphetamine. In the warehouse building, agents recovered a 2-gauge shotgun barrel, 23

rounds of Federal 28-gauge ammunition, 3 rounds of Remington 12-gauge ammunition, 3 spent

rounds of 20-gauge ammunition, a center point long gun scope, a suspected fore-end for a pump

shotgun, and two homemade silencers, as confirmed by a later ATF analysis.

      In addition, agents observed several vehicles on the property, including a green Jeep

Wrangler registered to the defendant and parked near his garage apartment. According to

Donovan's mother, the Jeep belonged to the defendant, who had driven the vehicle as recently as

the day before (March 25, 2021).  While on site, Special Agent Forte was able to peer inside

through the open passenger-side door and observed a shotgun shell visible in plain view in the

open center console of the vehicle.  Agents did not immediately search the additional vehicles;

instead, they waited until a supplemental search warrant was authorized a few hours later.

      A federal warrant authorizing the search of the vehicles was authorized later on March

26, 2021.  *See* 21-mj-85-01-AJ.  When agents executed the warrant on the Jeep, they found a

loaded Mossberg, Model 500, 20-gauge shotgun, bearing serial number V1051663, with an

aftermarket flashlight fore-end, sling, and shoulder stock ammunition holder, attached to the

Jeep's roll bar.  Six rounds of 20-gauge ammunition (2 rounds Brenneke and 4 rounds Federal)

were in the shotgun, and four additional rounds of 20-gauge ammunition were in the shoulder

stock ammunition holder (1 round Federal, 1 round Huntego, and 2 round Brenneke).  An

additional twenty rounds of 20-gauge ammunition (14 rounds of Federal and 6 rounds of

Huntego) were in a nylon bandolier found in the center console.  Also in the jeep were a metal

military-style ammunition can which contained an empty AK variant magazine, a firearms

cleaning kit, a manual for a Mossberg shotgun, Mossberg shotgun accessories, a shotgun shell

bandolier, and seventy-five rounds of shotgun ammunition (50 rounds of 20-gauge Federal, 1 round of 12-gauge Remington, and 24 rounds of 28-gauge Federal).

In addition to the firearms and ammunition, over 20 other weapons were seized the day of the search, including knives and bows. Officer Merna submitted a petition for violation of supervised release on March 30, 2021, and defendant was arrested shortly thereafter and detained pending a final revocation hearing. *See* Photograph of Seized Weapons, Exh. 1. The petition alleged that the defendant violated supervised release condition 1, that he not commit another federal, state, or local crime, by possessing and using methamphetamine. *Petition for Warrant or Summons for Offender Under Supervision*, 07-cr-130, violation 1; *see also* Admission/Denial Report dated Jan. 21, 2021, Exh. 2. The petition also alleged that the defendant possessed a firearm, crossbow, three compound bows, and fifteen edge-weapons, in violation of condition 10, which requires that the defendant not own, possess, or access to a dangerous weapon. *Petition for Warrant or Summons for Offender Under Supervision*, 07-cr-130, violations 4-6; *see also* Firearm & Dangerous Weapons Prohibition, Exh. 3.[2]

On May 17, 2021 a federal grand jury charged the defendant in a one-count indictment with possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. §922(g)(1). Dkt. No. 1. After defendant unsuccessfully moved to suppress the evidence against him, trial proceeded with jury selection on October 5, 2021 and evidence beginning the following week on October 13, 2021. The defendant testified on his own behalf but called no other witnesses. During his testimony, the defendant admitted to being aware of the firearm and

---

[2]    Though the petition alleges six violations, the Government intends to proceed on only three of those violations – violation 1, 5, and 6. There is sufficient evidence from the trial testimony and the verdict for the Court to find that the defendant committed the violations alleged in violations 5 and 6 by a preponderance of the evidence. *United States v Torres-Santana*, 991 F.3d 257, 263 (1st Cir. 2021) ("A court may revoke a term of supervised release if it conducts a revocation hearing and finds by a preponderance of the evidence that the defendant violated a condition of supervised release."). Evidence related to violation 1 will include the defendant's written admission to drug use.

the ammunition, but claimed they belonged to Ms. Finnegan.  *See* October 14, 2021 Trial

Transcript – Day 3, at 165:19-166:9, Dkt. No. 73.  He also admitted ownership of a crossbow, "a

couple of" compound bows, as well as knives and machetes.  October 14, 2021 Trial Transcript –

Day 3, at 176:9-13, Dkt. No. 74; *id.* at 176:24-177:5, *id.* at 170:23-24.  The defendant admitted

that USPO Merna had "tak[en] issue with me having knives of a certain size," and testified that

he would possess those items regardless of his probation officer's position and would "argue

about it later."  October 14, 2021 Trial Transcript – Day 3, at 176:24-155:5, Dkt. No. 74.  On

October 15, the jury returned a verdict of guilty.

## III.  <u>THE APPLICABLE GUIDELINES</u>

The draft Presentence Report initially determined that the Defendant was an Armed

Career Criminal under 18 U.S.C. § 924(e), and therefore subject to a Guidelines Range of 188 to

235 months and a 15-year mandatory minimum sentence.  Dkt. No. 56 at ¶ 95.  The Government

filed a written objection, noting that the U.S. Attorney's Office has repeatedly taken the position

that violations of New Hampshire's burglary statute, N.H. Rev. Stat. Ann. § 635:1, no longer

qualify as violent felonies within the meaning of 18 U.S.C. § 924(e) following *Johnson v. United*

*States*, 135 S. Ct. 2551 (2015).  The defendant therefore fell short of the number of convictions

required under § 924(e).

The Probation Office agreed with the Government's objection and revised its analysis in

the final PSR.  The final PSR calculated defendant's Guidelines as follows:  the violation carries

an offense level of 22 pursuant to U.S.S.G. § 2K2.1(a)(3) because defendant had previously

committed a crime of violence and possessed two homemade silencers in violation of 26 U.S.C.

§ 5845(a).  PSR ¶ 26.  He received a two-point enhancement under U.S.S.G. § 2K2.1(b)(1)(A)

due to the presence of a total of three "firearms" under 18 U.S.C. § 921(a)(3).  *Id.* ¶ 27.  An

additional two points was added under U.S.S.G. § 2K2.1(b)(4) because the Mossberg shotgun was stolen before it was found in defendant's possession. *Id.* ¶ 28. Finally, the defendant receives two additional points under U.S.S.G. § 3C1.1 for obstructing justice. *Id.* ¶ 31.

Defendant falls in Criminal History Category IV based on the accrual of nine criminal history points. *Id.* ¶ 54. Under the Guidelines, he would face a range of 110-137 months, but which is modified to 100-120 months to reflect the 10-year statutory maximum for the violation of 18 U.S.C. § 922(g). *Id.* ¶ 96.

The Government concurs in those calculations and defendant has not raised any objections. Therefore the Government respectfully requests the Court adopt the Guidelines analysis contained in the final PSR.

A November 17, 2022 Final Revocation Report identified six separate violations, the most serious of which is a Grade B violation. *See* U.S.S.G. § 7B1.1(a)(2) & n.5 (noting violations of 18 U.S.C. § 922(g) "generally" are Grade B violations). The Report, however, determined that the defendant falls in Criminal History Category VI. The Government objects to this criminal history category. While defendant was a Criminal History Category VI at the time of the original sentencing in the 2007 case, a subsequent ruling by Judge McAuliffe at a previous supervised release revocation hearing led to a retroactive change. *See* Def.'s Objection to Criminal History Category Calculation, Dkt. No. 156 in 1:07-cr-00130-SM. Though the docket does not appear to reflect this, the Government's recollection is that the Court orally granted the motion at that hearing. Using a criminal history category of IV, the defendant would face a range of 12-18 months under the Guidelines for the revocation. *See* U.S.S.G. § 7B1.4.

## IV.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

A total combined sentence of 120 months is supported by the factors contained in 18 U.S.C. § 3553(a). That statute provides that the Court, in determining the particular sentence to be imposed, "shall consider":

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)    any pertinent policy statement [issued by the Sentencing Commission];

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

As set forth below, a sentence of imprisonment of 120 months, effectively the bottom of the anticipated applicable Guidelines range, is appropriate here given the seriousness of the offense conduct, the history and characteristics of the defendant, the need for both general and

specific deterrence, the need for just punishment, and the need to protect the public from further crimes of the defendant.

### 1.       Seriousness of the Offense.

Defendant's conduct here is extremely serious.  He possessed a stolen Mossberg shotgun and a substantial array of assorted ammunition, much of which was not compatible with the recovered firearm.  The firearm itself was strapped into defendant's Jeep under camouflaged material so that he could bring it anywhere with him without risking detection.  Finally, the stolen firearm had undergone several after-market modifications, including having holes drilled in the barrel and the addition of a tactical light.  The ammunition was recovered not only from defendant's Jeep, but also his workshop, where the box for the shotgun and an extra barrel were located, along with two homemade firearm silencers fashioned out of oil filters.  The seriousness of defendant's offense is further reflected in the 10-year statutory maximum penalty that attaches to the violation of § 922(g)(1), a Class C felony.   Such serious conduct merits a significant sentence of imprisonment to reflect the seriousness of the offense

### 2.       History and Characteristics of Defendant.

The defendant's history and characteristics similarly inform the Government's view that a lengthy sentence of imprisonment is warranted.  To be sure, defendant faced a challenging and damaging childhood of instability and abuse.  PSR ¶ 67.  And while he has struggled at times with addiction issues, the defendant does "not believe there is anything wrong with 'recreational' use of methamphetamine" or that his use has been problematic.  PSR ¶ 85.

Having just turned 40 years old, defendant has spent the better part of the last two decades incarcerated has a result of a lengthy criminal history.  His early 20s brought near constant interaction with law enforcement and, most prominently, he was the lead player in an

armed bank robbery in February 2007 with five compatriots where he brandished a loaded rifle at the bank tellers and escaped via snowmobile.  PSR ¶ 50.  The resulting federal sentence of 154 months saw him incarcerated until 2018.

Defendant's supervised release was previously revoked in 2020, and he was barely six months into his latest term of supervised release when he began using methamphetamine again. Notably, he has expressed a contempt for the supervision process and the prohibition against his possession of weapons.  For example, he testified at trial that Officer Merna could get "huffy" about things and that he wasn't going to let that stand in the way of having what he wanted:

> You know, Tim—Tim takes issue with me having knives of a certain size.  I'm allowed to have knives.  I'm going to have machetes.  Like I'm going to cut brush, I'm going to have the tools that I need, and we can argue about it later.  But, you know, I got paintball guns, there's pellet guns.  There's all kinds of stuff they didn't take.  You know, the didn't get my crossbow.  It got that. . . . That's got a light on it and a bipod and a scope and a laser sight and everything.

October 14, 2021 Trial Transcript – Day 3, at 176:24-177:8, Dkt. No. 74.   Defendant's history and characteristics support a significant sentence.

### 3. Specific and General Deterrence, Promoting Respect for the Law, and Providing a Just Punishment.

The Government addresses the separately articulated § 3553(a) factors of deterrence, promoting respect for the law, and providing a just punishment in concert. Here, a sentence of 120 months would "afford adequate deterrence to criminal conduct" both generally and specifically.  18 U.S.C. § 3553(a)(2)(B).  First, it would send a strong message to convicted felons who think they can possess stolen firearms.  When a previously convicted felon possesses a stolen firearm, for whatever purpose, he breaks the law.  When he does so under the circumstances the defendant did, that crime warrants a sentence that should make other convicted felons take note.

Defendant, too, needs to receive this message.  Defendant has not accepted responsibility for his actions here.  Months after having been convicted by a unanimous jury at trial, defendant still does not get it.  He now stands before the Court at 40 years old facing the prospect of another lengthy federal sentence.  He thus far has proven unable to break from the cycle of crime that has marked his entire adult life.  A sentence of 120 months would send a strong message that this is defendant's last chance to live a productive and law-abiding life.

A lengthy sentence, including a portion of which that is specifically attributable to his violation of supervised release, would also provide a just punishment for the defendant and promote respect for the law.  *See United States v. Flores-Quiñones*, 985 F.3d 128, 132, 134-35 (1st Cir. 2021) (upholding sentence of sixty months' imprisonment on a felon-in-possession offense to be served consecutively to an upward variant supervised release violation for the same conduct).  The defendant's supervised release violations have escalated from drug use to firearm and weapon possession, and his testimony demonstrates that he flagrantly disregarded his probation officer's directions not to possess certain weapons.  In short, the defendant's conduct was dangerous, deliberate, and had the potential to place the probation officer in a perilous situation.

### 4.  Protecting the Public from the Defendant

Finally, a sentence of 120 months, while lengthy, will serve to "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  As referenced above, defendant quickly found himself involved in serious criminal conduct following his release from a lengthy period of incarceration.  The proposed sentence would protect the public from further crimes of this defendant.

## VI.    CONCLUSION

The Government respectfully requests the Court impose a total sentence of 120 months' imprisonment, consisting of consecutive terms of (a) 110 months in Case No. 21-cr-88-PB, and (b) 10 months for his supervised release violation in Case No. 07-cr-130-PB.   The Government additionally recommends a term of 3 years' supervised release in Case 21-cr-88-PB, with no further supervision in the 2007 case.  Such a sentence is reasonable, appropriate and not greater than necessary to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated: November 18, 2022

By: /s/ Charles L. Rombeau
Charles L. Rombeau

By: /s/ Anna Z. Krasinski
Anna Z. Krasinski
Assistant United States Attorneys
53 Pleasant Street, 4th Floor
Concord, NH  03301
(603) 225-1552

# Exhibit 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| UNITED STATES OF AMERICA | * |
| | * |
| v. | *1:21-cr-00088-PB |
| | * |
| | * |
| COREY DONOVAN | * |
| | * |

## DEFENDANT'S SENTENCING MEMORANDUM, OBJECTION TO PSR, AND MOTION FOR A VARIANCE

### I.    Introduction

In sentencing Mr. Donovan, this Court will have to resolve several contested issues with the most significant issue involving two motor oil filter cans excluded as evidence at trial that are not even part of the indictment. Now this Court will have to decide whether: 1) the offense of conviction "involved" the two motor oil filter cans; 2) whether those two cans were "firearm silencers" under the applicable guideline definition; and 3) whether the defendant had a purpose to have the two motor oil filter cans function as firearm silencers. The resolution of these contested issues will make a difference between whether Mr. Donovan is facing an advisory guideline range of under two years or, instead, he is facing an advisory guideline range of almost a decade in prison. This is because the answer to these questions determines whether the base offense level in this case is 6 or 22. The variance in the base offense level reflects a congressional intent that convicted felons who possess shotguns for sporting purposes are not as deserving of a lengthy sentence as convicted felons who possess firearms for criminal activity and/or possess highly lethal firearms such as machineguns, handguns or sawed-off shotguns.[1]

---

[1] Unlike sporting shotguns of the length possessed pursuant to this conviction, Congress has found that sawed-off shotguns (shotguns having a barrel length less than 18 inches) are inherently dangerous and generally lacking usefulness except for violent and criminal purposes. *U.S. v. Fortes*, 141 F.3d 1, 6 (1st Cir. 1998).

Contrary to what is in the PSR, Mr. Donovan submits that the base offense level is 6 because he is eligible for the sporting purpose reduction and none of the enumerated exceptions to this reduction apply. The PSR appears to find Mr. Donovan ineligible for the sporting purpose exception by labeling the oil filter cans as firearm silencers, as described in 26 U.S.C. § 5845(a). As there is no evidence that oil filter cans were involved in the instant offense, that they were in fact firearm silencers and that Mr. Donovan had an intent that they function as firearm silencers, the sporting purpose reduction applies.

This motion will also outline other defense objections to the PSR including its suggestion that this Court make an additional a two-level increase to the offense level by classifying the above-mentioned motor oil filter cans as firearms resulting in a finding that Mr. Donovan possessed three firearms pursuant to USSG § 2K2.1(b)(1)(A).

Finally, the defendant takes issue with the PSR's Criminal History Computation as it counts one conviction that is over 20 years old and another conviction that has recently been reversed by the N.H. Supreme Court.

This memorandum will show that the correct base offense level is 6, that there is a two-level increase to that base level for attempted obstruction of justice, a two-level increase for possessing a stolen shotgun, and a criminal history category of III. These findings result in an offense level of 10 and a corresponding advisory guideline range of 10-16 months.

Should this Court reject the defendant's guideline analysis set forth above, Mr. Donovan's personal history and characteristics justify a variance from the guideline range of 110 months to 120 set forth in the PSR and proposed by the government memorandum. *See* Doc. 86: 1-2.

## II.    Procedural and Factual History of Case

After pre-trial litigation challenging the affidavit in support of the search of his property, Mr. Donovan went to trial on one count of Possession of a Firearm/Ammunition by a Prohibited Person contrary to 18 U.S.C. §§ 922(g)(1).  *See* Doc. 1.  The allegations were based on evidence seized pursuant to a search warrant for Mr. Donovan's property in rural Wilmot, New Hampshire on March 26, 2021.  *See* Doc. 12.  Specifically, Mr. Donovan was charged with possessing a Mossberg shotgun and ammunition for that shotgun that were found during the search of his property and the vehicles on his property.  Doc. 1.

Prior to trial, Mr. Donovan filed several motions in limine including a Rule 404(b) motion asking this Court to exclude certain uncharged misconduct including evidence related to two motor oil filter cans found during the search of the defendant's property.  Doc. 36: 4.  In a ruling excluding the alleged silencers as evidence at trial, this Court observed that "there are all kinds of things that can qualify" as silencers including "a bag full of water."  Doc. 70: 44-45.

The contested issue at trial was whether Mr. Donovan constructively possessed the Mossberg shotgun and ammunition.  While the defendant denied ownership and possession of the subject shotgun at trial, the government's successful trial theory was that Mr. Donovan was an avid hunter and the ammunition and other hunting related items in his barn established the defendant's constructive possession of the firearm and ammunition due to his interest in hunting:

> "…he was an avid hunter, right? He loves camouflage, he's got -- he showed you his table of other weapons he had, his crossbow and such, and, even if he didn't hunt the deer, he told you he collected a couple of roadkill deer that he was excited to bring back to the shop."  Doc. 65:85

The government continued to link the three-foot-long shotgun[2] to the defendant by arguing that it was more likely a shotgun modified to be used by an avid hunter such as the defendant:

---

[2] *See* Doc. 68: 90 (Transcript of government closing describing the Mossberg shotgun as "at least 3 feet in length.")

Is this the shotgun of a beginner, of someone who doesn't know what they're doing, who's only fired it three times, or is this the gun of a gun guy, a hunter, someone who also puts tactical lights on his crossbow that you heard about today, right? Same thing. Tactical light, being able to see where you're shooting.

Doc.65: 93.

The jury trial ended on October 15, 2021, with a verdict of guilty.

The defendant filed a post-conviction motion to dismiss alleging a *Brady*[3] violation.

Doc. 77.  The government filed an objection and this Court has not ruled on the matter as of the filing of this pleading.

### III.    Offense Level and Sporting Purpose Reduction

Mr. Donovan begins his analysis of the applicable sentencing guideline range for the facts in his case with a discussion of the sporting purpose reduction.  The reason it is important to analyze this issue first is that the sporting purpose reduction is not a departure or adjustment but is instead determinative of the offense level.  Pursuant to USSG § 2K2.1(b)(2), if Mr. Donovan possessed the shotgun and ammunition solely for lawful sporting purposes, and he was not subject to subsections (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5) of USSG § 2K2.1, the base offense level is set at level 6.

The defendant's research suggests that there are two parts of the analysis regarding the sporting purposes reduction.  The first part of the analysis is to determine if any of the excludable subsections apply.  *Id*.  If none of the excludable subsections apply, the second part of the analysis is whether Mr. Donovan intended to use the shotgun and ammunition solely for sporting purposes.

The PSR does not specifically address the sporting purpose reduction but it can be inferred that the PSR does not support this reduction because it calculated the defendant's

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

offense level using USSG §2K2.1 (a)(3), a section of USSG §2K2.1 that would disqualify or exclude the defendant from receiving the sporting purpose reduction. *See* PSR at ¶ 26. Section (a)(3) states:

> (3) [The base offense level is] 22, if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine; or (ii) firearm that is described in 26 U.S.C. § 5845(a); and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense.
>
> *Id.*

The PSR specifically relies on USSG §2K2.1(a)(3)(A)(ii)(the offense involved a firearm that is described in 26 U.S.C. § 5845(a)) and USSG §2K2.1(a)(3)(B)(the defendant committed any part of the instant offense subsequent to sustaining a felony conviction for a crime of violence.) *Id*. The defendant does not contest that he has sustained a felony conviction for a crime of violence prior to the instant offense[4] but he does contest that the instant offense involved a firearm within the definition of 26 U.S.C. § 5845(a) as stated below:

> (a) Firearm.--The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; **(7) any silencer (as defined in section 921 of title 18, United States Code)**; and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon. (Emphasis added.)

As the government clearly stated that the Mossberg shotgun that is the subject of the indictment was 3 feet long,[5] it does not fit the definition of "firearm" that precludes the sporting

---

[4] *See* Defendant's conviction for Conspiracy to Commit Bank Robbery at ¶ 50 of PSR.
[5] *See* Doc. 68: 90

purpose exception as defined in 26 U.S.C. § 5845(a)). It therefore appears that the government and the PSR attempt to disqualify Mr. Donovan from the sporting purpose reduction by claiming that this offense involved a silencer pursuant to 26 U.S.C. § 5845(a)(7). *Id.* The indictment does not allege that the offense involved a silencer, and by inference, the jury did not make a finding that the offense involved a silencer.

The First Circuit has recognized that determining whether a homemade device meets the legal definition of a silencer is more problematic than determining if a device specifically manufactured as a silencer:

> In the ordinary criminal case, the device charged as a silencer is one manufactured for use with a firearm and is easily connected (*e.g.,* by threading one onto the other); and the possessor knows perfectly well the intended function of the device. (Citations omitted) ). But where, as here, the device was created for a different use-to silence an airgun-and requires some modification or adaptation to fit a firearm, problems arise in two different dimensions: its capability for use as a silencer and, separately, the defendant's knowledge, purpose or both with respect to the device.

*U.S. v. Crooker*, 608 F.3d 94, 96–97 (1st Cit. 2010)

The *Crooker* court found that, to establish that an item is a silencer, the government must prove that the person who possessed the device had specific intent that that device operates as a silencer on a firearm. *Id*. *Crooker* also found that it was not sufficient to establish that a device is a silencer with proof it was <u>capable</u> of being a being adapted to be a silence for a firearm.

*Crooker* referenced *United States v. Klebig* as support for its finding that the element of intent was important in the analysis of whether an item is a homemade silencer. *See* 600 F.3d 700, 704 (7th Cir. 2009). One of the issues in *Klebig* was whether the defendant <u>intended</u> to use the oil filter that was found taped to a gun as a silencer or simply as a "flash suppressor" - a use that the court noted does *not* require registration under 26 U.S.C. § 5845(a)(7). *Id.*

In Klebig's bedroom closet, officers found a "rifle with an oil filter taped to the end of the barrel." They additionally found on Klebig's bedroom floor "another oil filter with what

appeared to be a bullet hole shot out on one end." Id. at 705. The Government produced an expert who testified about silencers and flash suppressors and "opined that the oil filter taped to the long rifle found in Klebig's bedroom closet functioned as a silencer." The expert testified that he had "seen oil filters employed for this purpose twenty or thirty times in his career. He tested the long rifle with the oil filter against a similar long rifle without a filter and noted that, on average, the oil filter reduced the rifle report by approximately six decibels." Id. at 708.

On direct, Klebig testified that he was an "avid hunter" and he had been "experimenting with oil filters" to see if they would "suppress the flash of his shotgun." When questioned about his reason for possessing the modified oil filters, he testified that he "intended to hunt for a trouble-some raccoon on his mother's property at night (raccoons are nocturnal) and did not want to draw the attention of passing motorists." Id. at 709.

The Klebig court reversed based on the prosecution's reference to inadmissible character evidence and the prosecutor's improper demonstration with the alleged silencer during closing argument. Id. 722.  What is significant about Klebig for the purpose of Mr. Donovan's case is that court found that the prosecution's misconduct was not harmless because the prosecution did not have a strong case as to the defendant's intent to use the filter as a silencer.  Id.

It is significant that the Klebig court found that the prosecution did not have a strong case even when the oil filters were actually attached to the shotgun.  By contrast, the alleged silencers in Mr. Donovan's case were not attached to the shotgun and there is no evidence that the alleged silencers were compatible with the shotgun.  In fact, the oil filters and the shotgun were found on different locations on the property.   Like the Klebig case, there is no evidence that Mr. Donovan had a purpose to use the oil filters as silencers.

Additionally, ATF testing of the oil filters was only effectuated on *one* of the filters, was tested on a firearm of a different make and model (not on the Mossberg rifle) and demonstrated a decibel reduction of only 4.02 decibels, calling into question whether such a device could be considered a "silencer."[6] [7]

During his trial, Mr. Donovan was frequently characterized as an avid hunter.  Doc. 65:85. Mr. Donovan, at the time of his arrest, was the holder of valid, State-issued hunting licenses, and was, at one point during the ATF investigation, witnessed carrying deer carcasses (legally obtained) on the roof of his vehicle. Like *Klebig,* Mr. Donovan was an "avid hunter" who owned a long rifle for a sporting purpose – hunting. The government seeks to create an inference that one illegal act (a felon in the possession of a firearm) equates to another illegal act (possessing "silencers").

As there is no evidence that crime of conviction involved a firearm silencer and that the defendant had a purpose that the oil filter cans act as firearm silencers, the next step in the analysis on this issue of whether Mr. Donovan is entitled to the sporting purpose reduction.  The test for this reduction is whether the defendant "possessed all ammunition and firearms solely for lawful sporting purposes or collection and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition."  USSG § 2K2.1(b)(2).

As it was central to the government's case that the shotgun and ammunition belonged to the defendant because he was an "avid hunter" the government cannot change course at sentencing and make a contrary argument.  There is also ample other evidence supporting the use

---

[6] *See United States v. Salas,* (lab concluded that devices constituted silencers because they reduced decibels by 17.82 and 14.55 decibels, respectively); *United States v. Williams* (finding device was, in fact, a "silencer" because its use resulted in a sound value reduction of 26.8 decibels); *United States v. Brown,* "Decibel reduction levels approximating 9.3 decibels have been held to be sufficient to meet the definition of silencer."
[7] The second oil filter, "Exhibit 32" was <u>not</u> tested, presumably because there was no method of applying it to the firearm without further modification.

of the shotgun for sporting purposes including the defendant's possession of other hunting weapons such as the crossbows and the defendant's hunting licenses. (See Exhibit 1).

## IV.    Two Level Increase for Having Three Firearms

The PSR states that "[t]he offense involved three firearms, including a Mossberg Shotgun and two firearm silencers, which meet the definition of a firearm under 18 U.S.C § 921(a)(3) …the offense level is therefore increased two levels, pursuant to USSG §§2K2.1(b)(1)(A) and comment (n.1)."  PSR at ¶ 27.

As this proposed two-level increase is premised on a finding that the two oil filter cans are involved in the offense, that the two cans were in fact silencers consistent with the applicable definition and that the defendant had a purpose that they be used as silencers in the instant offense, the same legal analysis discussed does not support this two-level increase.

## V.    Two Level Increase for Obstruction of Justice

The PSR adds two additional offense levels based on a finding that Mr. Donovan obstructed justice.  *See* PSR at ¶ 31.  Mr. Donovan objects to the factual basis of this finding.

## VI.    Two Level Increase for Stolen Firearm

The PSR adds two additional levels because there is evidence that the firearm was stolen. PSR at 28.  Mr. Donovan does not dispute that there is evidence that the firearm is stolen.  While Mr. Donovan is aware that this specific offense characteristic does not require that he knew that the shotgun was stolen, he wants the record to reflect that he was not aware that the shotgun was stolen as he feels this fact is relevant determining an appropriate sentence.

## VII.    Criminal History Computation

The PSR finds that the total criminal history score is nine. PSR at ¶ 52-54.  Part of the basis of this computation includes two points based on a finding that Mr. Donovan committed

the instant offense while subject to a term of supervised release under Docket No.:

1:07CR00130-01-SM <u>and</u> a suspended term of imprisonment under Docket No.: 2019-S-584.

PSR at ¶ 53. While the defendant does not dispute the two points that were added because he

committed the instant offense while subject to a term of supervised release,[8] he objects to using

Docket No.: 2019-S-584 because that case was reversed and remanded to the Merrimack County

Superior Court on August 12, 2022.[9]

     The PSR also assigns one point to the overall criminal history computation for the

defendant's 2019 Merrimack County Superior Court conviction for felony possession of a

controlled drug, Methamphetamine. PSR at ¶ 51.  Again, this conviction was reversed on August

12, 2022.  *See State v. Donovan*, 2022 WL 3330490, at *1 (N.H., 2022).

     The PSR also recounts the law enforcement version of what happened during their

contact with Mr. Donovan on June 19, 2019.  PSR at ¶ 51.  This Court should not give any

weight to the police version of what happened on June 19, 2019 for several reasons.  The State of

New Hampshire charged Mr. Donovan with nine charges related to his June 19, 2019 arrest in

Andover.  *Id*.  Eight of the nine charges against Mr. Donovan resulted in either a dismissal or an

acquittal.  The remaining charge resulted in a reversal that found that the police conducted an

illegal search.

---

[8] The PSR asserts that there is a basis for adding these two points because the defendant was subject to a term of supervised released under Docket No.: 1:07CR00130-01-SM *and* his being subject to a suspended term of imprisonment under Merrimack County Superior Court Docket No.: 2019-S-584.  PSR at ¶ 53.  As the defendant will explained further in this section, the defendant's conviction in the Merrimack County Superior Court was reversed and remanded on August 12, 2022.  *See State v. Donovan*, 2022 WL 3330490, at *4 (N.H., 2022).  Despite this reversal, the defendant concedes that there is a basis for adding the two points based on a finding that the offense was committed while he was on federal supervised release as described above. For the purposes of accuracy, this Court should strike the language in ¶ 53 that the defendant was subject to a "suspended term of imprisonment under Docket No.: 2019-S-584." *Id.*
[9] *Id*.

If the events of March 19, 2019 have any relevance at sentencing, it is as mitigating evidence.  On June 22, 2022, Mr. Donovan filed a civil complaint in this Court.  *See* Exhibit 2 (Docket No. 1:22-cv-00215-JL Doc. 1).  In this civil complaint, Mr. Donovan relies on police reports, body worn camera footage and medical records to establish that on June 19, 2019, he was the victim of unjustified excessive force that resulted in his sustaining numerous physical injuries.  *Id*. at 29-30.  The PSR statement that, "The defendant was transported to the hospital," minimizes those injuries and its traumatic impact on the defendant.  PSR at ¶ 51.  As Mr. Donovan asserts in his civil complaint, due to the police misconduct that occurred on June 19, 2019, he "will continue to endure PTSD, extreme anxiety/panic, depression, paranoia, changes in personality, loss of memory, humiliation, indignity, embarrassment, harm to his reputation, apprehension about his future safety and a fear of police." *Supra* at 23.

The PSR's criminal history calculation assigns three points for a 20-year-old burglary conviction in Belknap County Superior Court that occurred when Mr. Donovan was 18 years old.  PSR at ¶ 42.  The PSR apparently counts this conviction because Mr. Donovan was incarcerated pursuant to probation violation in 2007, which was 14 ½ years before the commencement of the instant offense.  *See* USSG, § 4A1.2(e)(1) (Applicable time 15-year time period for using convictions includes a sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.)  *Id.*  On June 6, 2006, the court imposed the suspended sentence originally imposed and deferred that sentence.  *Id*.  On August 25, 2006, apparently pursuant to a motion to impose, the state court added a term of probation.  *Id*.  The period of incarceration that is the basis for adding three points to the criminal history calculation was added a year later pursuant to a probation violation.  While the defendant does not have an actual copy of the 2001 Belknap County

Superior Court sentence, the summary of the chronology of the sentence in the PSR suggests that the subject term of imprisonment was an illegal re-sentencing under applicable N.H. jurisprudecence. *See State v. Rothe*, 142 N.H. 483, 485 (1997)(A term of probation imposed after the imposition of the original sentence violates the defendant's due process rights under the N.H. Constitution and is contrary to RSA 651:21.)

This conviction makes a difference to the overall criminal history calculation and would result in the Category III instead of a Category IV calculation. This issue was raised in litigated in the Belknap County Superior court in 2009 and again in this Court in 2020. During litigation involving a violation of conditions of release on Docket No.: 1:07CR00130-01-SM, Mr. Donovan filed a motion challenging the use of the 2001 burglary in his original sentence in that matter for the same reasons as discussed above. *See* Docket No.: 1:07CR00130-01-SM, Doc. 156. Attached to that motion was an Order from the Belknap County Superior Court vacating the 2007 sentence that ordered that the defendant serve 2-4 years for the 2007 probation violation. *See* Exhibit 3. *The* government filed a response to the defendant's 2020 motion stating that "[a] defendant may not use the revocation of supervised release to challenge of his criminal history score." *See* Docket No.: 1:07CR00130-01-SM, Doc. 160.

Counsel for Mr. Donovan could not find a transcript of the 2020 hearing and could therefore not determine the resolution of the use of the 2001 burglary sentence at the 2020 hearing on the defendant's violation of his conditions of release. The defendant requests that this Court not count the 2001 Burglary or, in the alternative, find that counting the sentence "substantially over-represent[] the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." USSG §4A1.3(b)(1).

**VIII. Defendant's Personal History and Characteristics as Justification for Variance**

As this Court is well aware, this Court is not bound by the sentencing guidelines and may not mechanically presume they determine a reasonable sentencing range. Instead, after determining the guideline range, the Court should consider the §3553(a) factors and make an individualized assessment of the facts before imposing a sentence which is "sufficient, but not greater than necessary," to achieve the purposes of underlying the sentencing statute. *United States v. Booker*, 543 U.S. 220, 269-62 (2005); *Gall v. United States*, 552 U.S. 38, 49-50, (2007); *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).

The most pertinent §3553(a) factor is Mr. Donovan's history of mental and physical health issues. Should this Court reject the defendant's guideline analysis set forth above, Mr. Donovan's personal history and characteristics justify a variance from the guideline range of 110 months to 120 set forth in the PSR. *See* PSR at ¶ 96. These characteristics include the fact that the defendant suffers from both PTSD and multiple sclerosis. PSR at ¶¶ 72-79.

While it is not an excuse for the commission of this offense, being a sportsman, being outdoors, being around animals and helping others brings a great deal of comfort and pleasure. This is reflected in the letters of support attached to this memorandum. *See* Exhibit 4. One neighbor described how Mr. Donovan repeatedly helped him on his vegetable farm, but also recused turtles:

> He is a hard-working guy with a big heart like the time he rescued a nest of turtle eggs from my garden that I was considering just tilling under. He researched how to take care of them, hatched them out in his house then released them back to the wild.

Another letter of supports describes how Mr. Donovan helped a woman in Barnstead move objects. A third letter describes how Mr. Donovan not only helped his mother on her farm and horse but helped another neighbor with her rescue horses when she was hospitalized.

Respectfully submitted,
Corey Donovan
By counsel

Dated:  November 21, 2022          /s/ Donna J. Brown _____
                                    Donna J. Brown
                                    NH Bar ID 387
                                    Wadleigh, Starr & Peters, PLLC
                                    95 Market St.
                                    Manchester, NH  03101
                                    (603) 669-4140
                                    dbrown@wadleighlaw.com


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the within Motion was e-filed to AUSA Anna Krasinski on this 21st day of November 2022.

                                    /s/ Donna J. Brown ____
                                    Donna J. Brown

# Exhibit 16

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Case No. 21-cr-88-PB |
|  | : | No. 07-cr-130-PB |
| v. | : |  |
|  | : |  |
| COREY DONOVAN | : |  |
| _____ | : |  |

## UNITED STATES' SENTENCING REPLY BRIEF

The United States of America, by Jane E. Young, United States Attorney for the District of New Hampshire, submits this brief memorandum in response to the sentencing filing of Defendant Corey Donovan. *See* Dkt. No. 87. Some eleven months after the draft Presentence Report was issued and more than a month after the Report was finalized, defendant raises a number of objections for the first time as to both the Guidelines applicable to his offense and his criminal history score. As set forth below, the Court should reject these arguments and impose a combined sentence consistent with the Government's recommendation of 120 months.

### A. Defendant's Objections to the PSR Are Untimely

A party's objections to a draft Presentence Report are generally due within 14 days. *See* Fed. R. Crim. P. 32(f)(1). The time limits embedded in Rule 32 "serve a threefold purpose: they promote focused and informed resolution of disputed sentencing issues, fairness for both the government and the defendant, and efficiency in judicial administration." *United States v. Martinez-Vargas*, 321 F.3d 245, 249 (1st Cir. 2003). The Court may consider an untimely objection at any time before sentencing is imposed "for good cause." Fed. R. Crim. P. 32(i)(1)(D). It does not appear the First Circuit has expanded on meaning of "good cause" in this context, but at least one sister District Court has explained it as consisting "either of a valid reason for the delay or a showing that the matter being challenged would result in the defendant

receiving a sentence that 'is simply wrong, with no basis in fact.'" *United States v. Hne*, 103 F. Supp. 2d 483, 485 (D.R.I. 2000) (citation omitted); *see also United States v. Martinez-Vargas*, 321 F.3d 245, 251 (1st Cir. 2003) ("A claim of 'writer's block' hardly constitutes good cause.").

Current counsel for defendant was appointed by the Court on March 8, 2022.   In correspondence with the government on March 9, 2022, counsel referred to an interest in filing a response or objection to the Draft PSR, but for whatever reason decided not to.  The Final PSR issued on October 17, 2022, and Defendant still did not attempt to raise any objections. Defendant filed a motion to continue sentencing on October 20 (Dkt. No. 83), and still defendant raised no objections until his filing on November 21.  Defendant has proffered no explanation for failing to previously object, and does not contend there is no basis in fact for the applicable Guidelines.  Defendant therefore cannot show good cause, and the PSR objections should be rejected as untimely.

### B.  Defendant's Request for the Sporting Level Reduction

Even if the Court considers defendant's untimely PSR objections, defendant's arguments still fail on the merits.  First, defendant's sentencing memorandum takes aim at the PSR's calculation of the base offense level applicable to his offense by advocating that he should benefit from the sporting purpose reduction under U.S.S.G. § 2K2.1(b)(2).  Defendant's argument fails for the simple reason that defendant carries a conviction for a crime of violence— namely his conspiracy to commit armed bank robbery.  *See* PSR ¶ 26.  Indeed, defendant "does not contest that he has sustained a felony conviction for a crime of violence prior to the instant offense." Dkt. No. 87 at 5.  This admission ends the matter regardless of any determination on the silencer issue.  Because he has committed a crime of violence, defendant's minimum offense level would be dictated by § 2K2.1(a)(4), and he is barred by the explicit criteria of the sporting

purpose reduction.  *See* U.S.S.G. § 2K2.1(b)(2) (stating the sporting reduction does not apply to defendants subject to, inter alia, subsection (a)(4)).

### C.  Defendant's Objection to the Inclusion of the Silencers

The defendant additionally objects to the PSR's reliance on the two silencers recovered from the defendant's workshop in two respects.  Dkt. No. 87 at 6-7.  First, defendant appears to argue that the silencers should not impact his guidelines because they were not charged in the indictment.  *Id.* at 6.  The silencers' omission from the charging document is not determinative of the issue.  "When determining the number of firearms involved in an offense, [the Court should] consider all relevant conduct attributable to the defendant."  *United States v. Ilarraza*, 963 F.3d 1, 10 (1st Cir. 2020).   The First Circuit's decision in *United States v. Holmes*, 429 Fed. App'x 7 (1st Cir. 2011) provides the relevant framework.  There, the Court affirmed application of the enhancement for three firearms even though the defendant was charged with, and convicted of, possessing solely ammunition.  As the *Holmes* Court explained:

> Holmes' possession of firearms can be considered relevant conduct, and the enhancement in U.S.S.G. § 2K2.1(b)(1)(A) may be applied, if 1) U.S.S.G. § 3D1.2(d) would require a sentencing court to group any possession of firearms with his possession of ammunition, had Holmes been charged additionally with possessing the three guns in question, and 2) his possession of those three guns was part of the same course of conduct or common scheme or plan as his possession of the shotgun ammunition.

429 Fed. App'x at 9.  So, too, here.  Had defendant been charged with possessing the silencers, § 3D1.2(d) would require the grouping of that conduct with the count of conviction.  In addition, the silencers were part of the same course of conduct and were recovered in an area with some of the charged ammunition and accessories to the charged firearm.  The silencers are therefore properly accounted for as part of defendant's relevant conduct.

Second, defendant, while not appearing to contest the ATF Lab's determination that the two homemade silencers were, in fact, firearm silencers, argues that the government has not proved he had the knowledge or purpose that the silencers be used as silencers. Dkt. No. 87 at 6-7. In so arguing, defendant relies heavily on *United States v. Crooker*, where the First Circuit overturned a conviction for transporting a silencer in interstate commerce where the silencer was for a compressed air gun rather than a firearm. 608 F.3d 94 (1st Cir. 2010). Defendant's reliance on *Crooker* is misplaced in two meaningful ways. First, in *Crooker*, the there was no dispute that the silencer was made for an airgun and required modification in order to be used on a firearm. *Id.* at 96. In contrast, here, the ATF concluded that the silencers had specific modifications for *firearm* silencing:

> Based upon the modifications made to the [filter], it is now designed to function as a firearm silencer containing an expansion chamber, a ported inner tube, and a filtering element that functions as baffling material. These features aid in capturing, cooling, diverting, diffusing, and slowing the hot gases created by burning propellant powder.

*See* ATF Report, Sept. 27, 2021, attached as Exhibit 4, at 3. There is therefore sufficient evidence to conclude defendant has the knowledge and purpose that the silencers by silencers.

Second, in *Crooker*, the government had the burden of proving the silencer was, in fact, a silencer beyond a reasonable doubt because it was the count of conviction. 608 F.3d at 95. In contrast here, the silencers are at issue only for two sentencing enhancements and the government need only establish the enhancement by a preponderance of the evidence. *See, e.g.*, *United States v. Cates*, 897 F.3d 349, 354 (1st Cir. 2018) ("[T]he government bears the burden of proving sentence-enhancing factors by a preponderance of the evidence."). The silencers were designed for use on firearms and did, in fact, reduce the sound created during a test fire. Ex. 4 at 3. They were found in defendant's workshop along with other materials (the extra barrel and the

gun box) for the firearm that he was convicted of possessing, along with additional ammunition that he was convicted of possessing.  The government has met its burden by a preponderance here, and the Court should treat the two silencers as "silencers" for purposes of the base offense level under U.S.S.G. § 2K2.1(a)(3) as well as the two-point enhancement under § 2K2.1(b)(1)(A).

### D.  Defendant's Objection to the Obstruction Enhancement

Defendant additionally objects, without explanation, to the two-point enhancement applied by the PSR for his obstruction of justice under U.S.S.G. § 3C1.1.  Here, the defendant attempted to convince his girlfriend to testify falsely at trial that the firearm belonged to her. PSR ¶ 19.[1]  Witness tampering is among the conduct covered by § 3C1.1.  *See* U.S.S.G. § 3C1.1 at n. 4(A).  When that effort failed, he testified himself at trial that Ms. Finnegan bought the firearm for herself around Christmastime because "she's a good girl."  Oct. 14, 2021 Trial Testimony, Day 3, Dkt. No. 73, at 165:23-166:4.  Such testimony, which is inherently inconsistent with the jury's finding of guilt, necessarily implicates a finding of perjury, and is also covered by § 3C1.1.  *See* U.S.S.G. § 3C1.1 at n. 4(B).

### E.  Defendant's Objection to His Criminal History Calculation

Defendant additionally raises multiple objections to his criminal history score of 9 points and placement in Criminal History Category IV.  PSR ¶ 54.

First, defendant appears to argue that he should not be subject to the two-point enhancement under U.S.S.G. § 4A1.1(d) because one of the two offenses for which he was allegedly on supervision at the time in 2021 has since been reversed by the New Hampshire Supreme Court.  As defendant appears to concede, however, the application of § 4A1.1(d)

---

[1]    In additional, defendant failed to comply with a Court-ordered warrant for his DNA sample.  PSR ¶ 18.

requires only "any criminal justice sentence," and there is no dispute that defendant was on federal supervised release at the time.

Defendant additionally argues that his January 2020 conviction for possession of methamphetamine was overturned on appeal in August 2022 by the New Hampshire Supreme Court. PSR ¶ 51; Dkt. No. 87 at 10. Where a conviction is overturned on appeal, it should not count as a "prior sentence" for purposes of U.S.S.G. § 4A1.1. *See* U.S.S.G. § 4A1.2 note 6 (do not count convictions that "have been ruled constitutionally invalid"). Therefore, in the event the Court allows the objection, the government concurs that the 1 point from PSR ¶ 51 should no longer be counted as a result of the recent New Hampshire Supreme Court decision.

Finally, defendant objects to the three points arising out of his April 2001 conviction for burglary. PSR ¶ 42. The precise machinations of the sentence and subsequent revocations are not clear other than that a revocation sentence entered in 2007 appears to have been unlawful. But it appears from defendant's docket, that he attaches as Exhibit 3, that defendant was in custody *after* March 26, 2006. The date of the charged offense here is March 26, 2021. He therefore was incarcerated within 15 years of his commission of the instant offense as contemplated by U.S.S.G. § 4A1.3, the sentence should still now count.

### F. Defendant's Request for a Variance

The government briefly responds to defendant's stated basis for a variance. To be sure, defendant has his supporters and has made connections following his release from a lengthy federal sentence in late 2018. After his acquittal in January 2020 following charges of firearm possession in the very same green Jeep involved in this case, defendant was offered a new lease on life. Instead, he quickly squandered this opportunity by again using methamphetamine and again engaging in the possession of firearms. He mistook the apparent leniency of his

supervising officer regarding assorted blades and crossbows as an invitation to escalate and

further violate the law by possessing a stolen firearm and assorted ammunition.  His record

reflects that of an individual who is not amenable to the restrictions that the Court has required

and will continue to require in order to ensure the safety of the community and members of the

Probation Office.  A significant sentence of imprisonment of 120 months is reasonable,

appropriate and not greater than necessary to achieve the purposes of sentencing under 18 U.S.C.

§ 3553(a).

                                        Respectfully submitted,

                                        JANE E. YOUNG
                                        United States Attorney

Dated: November 23, 2022

                                        By: /s/ Charles L. Rombeau
                                        Charles L. Rombeau

                                        By: /s/ Anna Z. Krasinski
                                        Anna Z. Krasinski
                                        Assistant United States Attorneys
                                        53 Pleasant Street, 4th Floor
                                        Concord, NH  03301
                                        (603) 225-1552

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Technology Crimi...**
**Report of Technical Examination**

**GOVERNMENT EXHIBIT 4**
21-cr-88; 07-cr-130

**244 Needy Road**
**Martinsburg, WV 25401**

**Phone: 304-616-4300**
**Fax: 304-616-4301**

| | |
|---|---|
| **To:** | **Date:** 9/27/2021 |
| Special Agent John Forte | **UI#:** 762095-21-0046 |
| Bureau of Alcohol, Tobacco, Firearms and Explosives | **RE:** Donovan, Corey |
| 1750 Elm Street, Suite 301 | |
| Manchester, New Hampshire 03104 | **FTCB#:** 2021-750-GSS 317790 |

| | |
|---|---|
| **Date Exhibits Received:** 9/17/2021 | **Type of Examination Requested:** |
| **Delivered By:** FedEx 7748 1661 0433 | Test, Examination, Classification |

**Exhibits:**

31. One cylindrical metal device, no manufacturer's markings or serial number (suspected firearm silencer).
32. One cylindrical metal device, no manufacturer's markings or serial number (suspected firearm silencer).

**Pertinent Authority:**

Title 28 of the United States Code (U.S.C.) provides the Bureau of Alcohol, Tobacco Firearms and Explosives (ATF) the authority to investigate criminal and regulatory violations of Federal firearms law at the direction of the Attorney General. Under the corresponding Federal regulation at 28 C.F.R. 0.130 the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms, in relevant part, under 18 U.S.C. Chapter 44 (Gun Control Act) and 26 U.S.C. Chapter 53 (National Firearms Act). Pursuant to the aforementioned statutory and regulatory authority, the ATF Firearms and Ammunition Technology Division (FATD) provides expert technical support on firearms and ammunition to federal, state and local law enforcement agencies regarding the Gun Control Act and the National Firearms Act.

The amended **Gun Control Act of 1968** (GCA), 18 U.S.C. § 921(a)(3), defines "**firearm**" to include the following:

"*...any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive... [and] ...the frame or receiver of any such weapon....*"

Further, 18 U.S.C. § 921(a)(24), defines the term "**firearm silencer**" **and** "**firearm muffler**" as:

"*…any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.*"

**Pertinent Authority (cont.):**

The **National Firearms Act** (NFA) 26 U.S.C. § 5845(a) defines "**firearm**" to include:

"*...(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in 18 U.S.C. § 921); and (8) a destructive device.  The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the ...[Attorney General] ...finds by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and is not likely to be used as a weapon.*"

Further, the NFA, 26 U.S.C. § 5842, "**Identification of firearms,**" states:

"*... (a) Identification of firearms other than destructive devices. - Each manufacturer and importer and anyone making a firearm shall identify each firearm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and such other identification as the ...[Attorney General] ... may by regulations prescribe. (b) Firearms without serial number. - Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) of this section shall identify the firearm with a serial number assigned by the ... [Attorney General] ... and any other information the ...[latter] ... may by regulations prescribe.*"

**Findings:**

**Exhibit 31** is a modified Fram, model PH8A oil filter, which measures approximately 6-1/4 inches in length and approximately 3-1/2 inches at its major diameter. The oil filter has been modified from its original manufactured design by the creation of a centrally located hole which perforates the entire longitudinal axis of the Exhibit ending in an opening of approximately 1/4 inch in diameter at the forward end of the device. The housing surrounding the hole is pushed outward, indicating that the hole was likely made with a drill, but it was malformed from the inside out, as if by the result of a bullet strike. Additionally, Exhibit 31 has an improvised adapter bolted to the rear which facilities attaching Exhibit 31 to a portable firearm.

During my examination, I observed the following markings applied to the exterior of Exhibit 31:

- **FRAM**
- **EXRTA GUARD**
- **OIL FILTER**
- **PH8A**

My examination revealed that Exhibit 31 does not have a serial number or marks of identification associated with the NFA maker or manufacturer.

**Findings (cont.):**

As received, Exhibit 31 is a device for silencing, muffling, or diminishing the report of a portable firearm; therefore, Exhibit 31 is a *firearm silencer* or *firearm muffler* as defined.

As modified, Exhibit 31 is no longer designed to function as an automotive oil filter. Based upon the modifications made to the Exhibit, it is now designed to function as a firearm silencer containing an expansion chamber, a ported inner tube, and a filtering element that functions as baffling material. These features aid in capturing, cooling, diverting, diffusing, and slowing the hot gases created by burning propellant powder.

The adapter connected to Exhibit 31 has a 3/8-inch by 3/4-inch section removed. This is likely to accommodate a firearm equipped with a front sight; however, no such firearm was included with the evidence. Further, an internal sleeve is present within the threaded portion of the adapter and the sleeve is likely intended to prevent the gases from escaping through the opening. The presence of the opening in the adapter, regardless of the internal sleeve, will likely result in a reduced effectiveness of the device.

I conducted sound comparison testing of Exhibit 31 at the ATF test facility located in Martinsburg, West Virginia, on September 27, 2021, utilizing commercially available, CCI brand, .22LR caliber ammunition. I conducted this testing to determine the effectiveness of Exhibit 31 in diminishing the sound levels of a portable firearm.

For this sound-comparison testing, I utilized reference firearm #4876, a Ruger model 22/45 (S/N 220-78000) housed in the NFC. I fired #4876 with and without Exhibit 31 attached and compared the average sound-pressure level results of each firing. This test was conducted in the presence of a Bruel & Kjaer, NEXUS Acoustic Conditioning Amplifier.

I followed the standard operating procedures established by ATF for conducting the testing. During this procedure, a pre and post self-test calibration verification procedure was automatically conducted. The instrument passed both the pre and post self-test calibration verifications. The results of the testing are as follows:

NFC #4876 without Exhibit 31 attached      (5-shot average)      156.02 decibels
NFC #4876 with Exhibit 31 attached         (5-shot average)      152.00 decibels

The sound reduction recorded was <u>4.02 decibels</u>. The test results establish that Exhibit 31 is capable of diminishing the sound report of a portable firearm.

**Exhibit 32** is a modified Fram, model PH7317 oil filter, which measures approximately 3-3/8 inches in length and approximately 2-3/4 inches at its major diameter. The oil filter has been modified from its original manufactured design by the creation of a centrally located hole which perforates the entire longitudinal axis of the Exhibit ending in an opening of approximately 1/4 inch in diameter at the forward end of the device. The housing surrounding the hole is unaffected with clean edges, indicating that the hole was likely made with a drill.

**Findings (cont.):**

During my examination, I observed the following markings applied to the exterior of Exhibit 32:

- **OIL FILTER**
- **FRAM**
- **EXRTA GUARD**
- **PH8A**

My examination revealed that Exhibit 32 does not have a serial number or marks of identification associated with the NFA maker or manufacturer.

As received, Exhibit 32 is a device for silencing, muffling, or diminishing the report of a portable firearm; therefore, Exhibit 32 is a *firearm silencer* or *firearm muffler* as defined.

As modified, Exhibit 32 is no longer designed to function as an automotive oil filter. Based upon the modifications made to the Exhibit, it is now designed to function as a firearm silencer containing an expansion chamber, a ported inner tube, and a filtering element that functions as baffling material. These features aid in capturing, cooling, diverting, diffusing, and slowing the hot gases created by burning propellant powder.

The interior and exterior holes are not lined up and testing the exhibit with live ammunition would likely result in damage. In the interest of safety, and in order to preserve the integrity of the evidence, I did not test the Exhibit.

**Conclusions:**

**Exhibit 31** is a device for silencing, muffling, or diminishing the report of a portable firearm; therefore, Exhibit 31 is a "**firearm silencer**" or "**firearm muffler**" as defined in 18 U.S.C. § 921(a)(24).

Exhibit 31, being a firearm silencer or firearm muffler, is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(C).

Being a firearm silencer or firearm muffler, Exhibit 31 is a "**firearm**" as defined in 26 U.S.C. § 5845(a)(7).

Exhibit 31 bears no NFA manufacturer's marks of identification or serial number as required by 26 U.S.C. § 5842.

**Exhibit 32** is a device for silencing, muffling, or diminishing the report of a portable firearm; therefore, Exhibit 32 is a "**firearm silencer**" or "**firearm muffler**" as defined in 18 U.S.C. § 921(a)(24).

Exhibit 32, being a firearm silencer or firearm muffler, is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(C).

Being a firearm silencer or firearm muffler, Exhibit 32 is a "**firearm**" as defined in 26 U.S.C. § 5845(a)(7).

<u>**Conclusions (cont.):**</u>

Exhibit 32 bears no NFA manufacturer's marks of identification or serial number as required by 26 U.S.C. § 5842.

Examined by:

_____
Gregory S. Stimmel, Chief
Firearms Technology Criminal Branch

Technical Review By:

_____
Michael C. Powell
Firearms Technology Specialist

Attachment:    Seven pages bearing photos.

**This Firearms Technology Criminal Branch report is provided in response to your request for assistance. Please be aware that these documents may constitute "taxpayer return information" that is subject to the strict disclosure limitations provided in 26 U.S.C. § 6103. Exceptions to the non-disclosure provisions that permit the disclosure internally within ATF are set forth in 26 U.S.C. § 6103(h)(2)(C) and (o)(1). Any further disclosure of these reports is strictly limited and must be reviewed and approved by the Office of Chief Counsel prior to any information dissemination. Failure to adhere to the disclosure limitations provided in 26 U.S.C. 6103 could result in civil and/or criminal liability.**

Case: 23-1328    Document: 00118054127    Page: 746    Date Filed: 09/20/2023    Entry ID: 6592810



Case: 23-1328     Document: 00118054127     Page: 747     Date Filed: 09/20/2023     Entry ID: 6592810



Exhibit 31



Exhibit 31 showing the adapter and internal sleeve

Case: 23-1328   Document: 00118054127   Page: 749   Date Filed: 09/20/2023   Entry ID: 6592810



Exhibit 31 internal photo

Case: 23-1328 Document: 00118054127 Page: 750 Date Filed: 09/20/2023 Entry ID: 6592810



Exhibit 32



Case: 23-1328    Document: 00118054127    Page: 752    Date Filed: 09/20/2023    Entry ID: 6592810



Exhibit 32 internal photo

# Exhibit 17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                          *
UNITED STATES OF AMERICA                  *
                                          *   1:21-cr-88-1-PB
              v.                          *   1:07-cr-130-01-SM
                                          *   January 3, 2023
COREY DONOVAN                             *   9:45 a.m.
                                          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF SENTENCING AND FINAL REVOCATION HEARING
MORNING SESSION AND AFTERNOON SESSION PART I
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:         Charles L. Rombeau, AUSA
                            Anna Z. Krasinski, AUSA
                            United States Attorney's Office


For the Defendant:          Donna J. Brown, Esq.
                            Wadleigh Starr & Peters PLLC


Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603)225-1442

```
 1                        I N D E X

 2

 3

 4     WITNESS:               Direct   Cross   Redirect   Recross

 5

 6     RALPH DEMICCO
         By Ms. Brown            85              105
 7       By Ms. Krasinski                100

 8     GREGORY STIMMEL
         By Ms. Krasinski       108              136
 9       By Ms. Brown                   129

10

11     CYNTHIA WALLACE
         By Mr. Rombeau         136
12       By Ms. Brown                   147

13

14

15     EXHIBITS:                        FOR ID          IN EVD.

16     Government's Exhibit 4A                            114

17     Government's Exhibit 4B                            114

18     Government's Exhibit 9                             114

19     Government's Exhibit 10                            114

20     Defendant's Exhibit J                              129

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  This court is in session and has for

 3    consideration sentencing in criminal matter 21-cr-88-01-PB and

 4    a final revocation hearing in 07-cr-130-01-SM, United States of

 5    America vs. Corey Donovan.

 6              THE COURT:  All right.  I'm wearing a mask.  My wife

 7    has COVID.  I have no symptoms.  I've tested negative.  Anybody

 8    who wants to wear a mask, feel free to do so.  Anybody that

 9    wants to leave other than the participants, feel free to do so.

10    But under our guidelines, I'm supposed to continue proceedings

11    and I -- you know, I tested negative this morning and I'll

12    continue to test every day until my wife tests negative.

13              I apologize for the delay.  I'm a retired judge and

14    my clerks don't schedule hearings for me before ten o'clock

15    ordinarily.  I assumed this was at ten o'clock, but apparently

16    a different clerk scheduled this before 9:00 and that's why I'm

17    late.  I apologize.

18              Okay.  So the way I want to handle this is I want to

19    deal first with the revocation, then deal with the sentencing.

20    Unless -- somebody remind me.  Unless the defendant has

21    admitted guilt of the charges in the revocation, I want to deal

22    with that first; then I'll move into the sentencing and deal

23    with the combined sentencing on both the revocation and the

24    sentencing on the criminal charge.

25              And then I've got these pending motions that if we
```

4

 1    have time I'll try to deal with.

 2              All right.  So let's start with the revocation.

 3    Is -- is -- what's the defendant's intention here?  Is the

 4    defendant intending to admit to the charges or are you asking

 5    for a hearing on the charges?

 6              MS. BROWN:  He is not admitting to the charges.  He

 7    puts the government to its proof.

 8              The only thing I would add, just in terms of the

 9    timing of things, the defendant feels that if he were

10    successful on his motion to dismiss or motion for a new hearing

11    on *Brady* that that could affect the outcome of the --

12              THE COURT:  Well, if I find there's merit in that,

13    I'll reconsider --

14              MS. BROWN:  Okay.

15              THE COURT:  -- whether I -- you know, I'll readjust

16    the sentencing, but I'm comfortable with the order I'm going to

17    see.

18              Now, I assume neither you nor your client want to

19    just waste my time on facts that are not in dispute, right?  So

20    why don't you tell me what you think is in dispute in these

21    issues so we can focus the evidence on that.

22              MS. BROWN:  Well, I think -- if I can have a moment.

23    Let me just.

24              THE COURT:  I mean, most of the things I don't think

25    are in dispute, so I don't really want to waste my time hearing

1   evidence on undisputed points.

2          MS. BROWN:  Thank you, your Honor.

3          The thing that Mr. Donovan disputes is whether

4   the I would say nonfirearm weapons constitute a violation

5   and --

6          THE COURT:  Yeah, that's a legal issue.  I -- I

7   don't want to hear testimony.  If we get --

8          MS. BROWN:  No.

9          THE COURT:  You know, three hours later, what have I

10  learned?  Nothing other than what's in the report already.

11         There's a legal issue, that's fine, we can argue

12  about whether the crossbows and knives and things like that are

13  dangerous weapons.  But that's a pure legal issue.

14         I want to know what do I need to hear evidence on --

15  and I understand the burden is on the government and you can

16  insist on making me go through the process of hearing

17  undisputed evidence, but I -- I don't want to do that because

18  there's a clear outline in the report of certain facts.  I

19  don't think any of those facts are really in dispute.  What the

20  legal significance of the facts are is something we can argue

21  about.

22         But -- so help me better understand what really is

23  factually in dispute about the revocation matters.

24         MS. BROWN:  I don't think the facts are in dispute.

25  And by facts, I mean the evidence that was presented at trial.

6

```
 1    Obviously, Mr. Donovan hasn't pled guilty to the underlying
 2    crime and --
 3            THE COURT:  Well, so, for example, let's go through
 4    the --
 5            MS. BROWN:  Okay.
 6            THE COURT:  I mean, let's anchor this in what the
 7    actual charges are.
 8            There's an allegation that your client, on or about
 9    January 19th, illegally possessed and used methamphetamine and
10    that was based on, according to the report, the defendant's
11    verbal and written admissions to the probation officer on
12    January 21.
13            Do you want a hearing on that?
14            MS. BROWN:  No, your Honor, he does not dispute --
15            THE COURT:  All right.
16            MS. BROWN:  -- that.
17            THE COURT:  So he agrees he's guilty of that charge.
18            MS. BROWN:  He -- yes, he agrees.  Yes.
19            THE COURT:  Okay.  So let's go on to 2.
20            The charge is on or about February 11, 2021, the
21    defendant failed to remain in his home as previously directed
22    by the probation officer the day prior nor did the defendant
23    return the probation officer's multiple attempts to contact him
24    by telephone or by speaking with a family member until
25    February 16th.
```

1          Does your client dispute any of the facts that

2    support that charge?

3          MS. BROWN:  Hold on one moment.

4          MS. KRASINSKI:  Your Honor, I might be able to

5    streamline this.  The government, based on the trial testimony,

6    was intending to proceed on violations number 1, 5, and 6, 6

7    being --

8          THE COURT:  So you're going to abandon 2, 3 and 4?

9          MS. KRASINSKI:  Yes, your Honor.

10         THE COURT:  Okay.  So 2, 3, and 4 the government's

11   going to abandon.  Those charges are dismissed by agreement.

12         Count -- so Count 1, the defendant does not need

13   evidence on.  He agrees that the facts as pleaded are not

14   contested by him, right?

15         MS. BROWN:  Correct.

16         THE COURT:  Okay.  So we're now on to 5 and 6,

17   right?

18         5 alleges that on or about March 26, 2021, in

19   Wilmot, the defendant possessed three compound hunting bows and

20   15 edged weapons to include swords, machetes, and a variety of

21   knives which were discovered during a home inspection conducted

22   by the probation officer following the execution of a search

23   warrant conducted by federal, state, and local enforcement

24   earlier in the -- that day.  And then the evidence supporting

25   the charges is set forth.

8

1          What was observed was observed.  You don't disagree

2    about that.  You just disagree about what the significance of

3    what was observed is.  Is that right?

4          MS. BROWN:  Right.  Definitely -- those items were

5    seized.

6          THE COURT:  Okay.  Great.  So we don't need to have

7    an evidentiary hearing on that point.  We need legal argument

8    about it.

9          MS. BROWN:  Correct.

10          THE COURT:  Okay.  And then, finally, Count 6 is on

11   or about March 26th, the defendant committed the crime of felon

12   in possession of a dangerous weapon.  On that charge, we don't

13   need -- your client pleaded not guilty, testified, asserts his

14   innocence of that charge.  I fully understand that.

15          I have the trial testimony.  The trial testimony is

16   sufficient to support the charge, was found beyond a reasonable

17   doubt true by a jury.  I'm satisfied the facts supporting are

18   true by a preponderance of the evidence.  I don't need to hear

19   additional evidence on that unless you think we do.

20          Do I need to hear additional evidence on that

21   matter?

22          MS. BROWN:  No, your Honor.  I agree with the law

23   that if a jury has made a finding that that definitely is a

24   higher standard and would meet the -- the standard here.  Just

25   the only qualification is that if the *Brady* motion had merit,

```
 1    then -- then we'd have to revisit this issue.

 2              THE COURT:  Right.

 3              MS. BROWN:  But other than that, we don't need any

 4    evidence.

 5              THE COURT:  Okay.  So here is my take on this then.

 6              My take on this is that your client does not want to

 7    admit his guilt of any of the charges, which is fine with me,

 8    but he is not contesting the factual basis for Count 1, the

 9    factual basis for Count -- the edged weapons, crossbows, is --

10    what number is that?

11              MS. KRASINSKI:  5, your Honor.

12              THE COURT:  5.  He's not contesting the factual

13    basis.  He's arguing that it's legally insufficient.  And he's

14    not -- he's reserving his view of innocence as to Count 6, but

15    acknowledges the fact that I've already heard evidence on that

16    and he's not -- you're not intending to present any additional

17    evidence.

18              Is that a fair statement of where you are with

19    respect to these violations?

20              MS. BROWN:  Yes.

21              THE COURT:  Okay.  So, Mr. Donovan, you've heard --

22    I know you're a very intelligent guy, I know from interacting

23    with you, and you've been listening carefully.  Do you feel

24    you've understood what your lawyer and I have been saying about

25    these particular charges?
```

1          THE DEFENDANT:  Yes.  The only thing is Count 1, I

2    did admit to use.

3          THE COURT:  Okay.

4          THE DEFENDANT:  I just contest the other two things.

5          THE COURT:  Yeah.  And you -- but you don't ask --

6    you're not asking to have evidence put on.  You accept the

7    factual proffers.  You argue about the legal significance of

8    those.  Is that fair to say?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Okay.  Good.  All right.

11          So here's what I -- I'd propose to do is I'll hear

12    argument about the dangerous weapon issue and after hearing

13    that, based on the facts as set forth in the -- the supervised

14    release report which are not factually contested for purposes

15    of this proceeding, unless I agree with you on Count 5 that

16    those don't qualify as dangerous weapons, I propose to find him

17    guilty of Counts 1, 5, and 6 without taking any additional

18    testimony.

19          If you want any additional testimony on those

20    counts, certainly I'll hear it, or if you want to challenge the

21    facts as set forth in the report that support those counts,

22    I'll certainly put the government to its burden.

23          But apart from the -- the legal issue about

24    dangerous weapon, I -- I think we have a factual record that's

25    sufficient to support findings of guilt with respect to 1, 5,

1    and 6, subject to the legal argument.

2            And, of course, if I granted a motion to dismiss

3    the -- or a motion for a new trial on the charges, that would

4    vacate the sentence.  So the sentence would be vacated at that

5    point and it would become a nullity.

6            All right?  Is that acceptable to you?

7            MS. BROWN:  May I have a moment?

8            THE COURT:  Yeah.

9            MS. BROWN:  Thank you for allowing me a moment, your

10   Honor.

11            THE COURT:  Is that acceptable to you and your

12   client?

13            MS. BROWN:  Yes.

14            THE COURT:  Okay.  Good.  So why don't we move on

15   and -- you can be seated.

16            Why don't we move on and I'll hear the government's

17   argument as to why these -- these weapons are dangerous weapons

18   sufficient to support a violation as charged in Count 5, then

19   I'll hear the defendant's response and I'll rule on that

20   particular issue.  Okay?

21            MS. KRASINSKI:  Your Honor, as I'm sure you read in

22   the violation report, the probation officer has had a number of

23   discussions about the dangerous and -- the dangerous weapons

24   prohibition.

25            Specifically, on -- beginning on page 6 of the

1  report, it goes into detail about how the probation officer

2  recognized that given where he lives, you know, he might need a

3  modest pocket knife or something like that, you know, given the

4  property and the livestock.

5        If you look at the items that were seized, however,

6  the seized items greatly, greatly go far beyond any -- any, you

7  know, modest pocket knife that he might need on his property.

8  They include very long blade weapons, sort of edgy, showy

9  knives.  I mean, there are a lot of very significant long,

10  sharp knives.  There are machetes.

11        THE COURT:  Just for the -- the benefit of the

12  record, do you have photographs of the particular items that

13  we're talking about?

14        MS. KRASINSKI:  Yes, your Honor.  Government's

15  Exhibit 1 shows all of the items that were seized.

16        THE COURT:  Have you got an extra copy of that?

17        THE CLERK:  It's right to your left on the screen if

18  you want.

19        THE COURT:  Oh, okay.  All right.  So those are

20  the -- those are the weapons that you're arguing are dangerous

21  weapons under the -- under the terms of the -- conditions of

22  supervised release imposed by Judge McAuliffe.

23        MS. KRASINSKI:  They are, your Honor.  And I think

24  there's sort of a broader issue here, which is as I understand

25  it, and I hope Officer Merna will correct me if I'm

1    misrepresenting this, but my understanding of the conversations

2    ultimately were that Mr. Donovan expressed that he was going to

3    do what he wanted, despite Mr. Merna telling him on multiple

4    occasions not to possess some of these knives.

5             THE COURT:  Well, what does the -- what does the

6    report say about Mr. Merna's communications with the defendant

7    about dangerous weapons?

8             MS. KRASINSKI:  So on page 6, it talks about the

9    probation officer recognizing the defendant's need for a

10   utility or modest pocket knife and that he may need to possess

11   wood-splitting tools to maintain the property.

12            He also talked about ways that even if he had some,

13   you know, items that could be construed as a dangerous weapon,

14   a knife, that there are circumstances where he can't have that

15   item, even if he could have it on his property.  For example,

16   having it in his vehicle during late evening hours, having them

17   for recreational purposes wouldn't be appropriate whereas if

18   it's something, you know --

19            THE COURT:  What are we referring to now?

20            MS. KRASINSKI:  I'm looking at page 6 of the

21   violation report, paragraph 3.

22            THE COURT:  All right.

23            MS. KRASINSKI:  And it's talking about this initial

24   June 22nd, 2020, discussion on the topic of possessing

25   dangerous weapons.

14

1          The report goes on to note that on subsequent

2   occasions, the probation officer reported his concerns about

3   the defendant possessing dangerous weapons when the defendant

4   had them away from his residence.

5          So, for example, on September 20th, 2020, the

6   defendant -- officers reported that the defendant had a large

7   machete on his belt and --

8          THE COURT:  I'm sorry.  I've got to find this actual

9   report.  I've got so many things here --

10          MS. KRASINSKI:  Sure.

11          THE COURT:  -- that I'm looking at.

12          All right.  Page -- what paragraph of the report?

13          MS. KRASINSKI:  The last paragraph of page 6.

14          THE COURT:  All right.  Sorry to ask you this -- oh,

15   okay.  I'm good.  Never mind.  I've got it.

16          MS. KRASINSKI:  So the Belmont Police encountered

17   the defendant in his car parked alongside the road and officers

18   observed a large machete in his belt and a bow and several

19   arrows in the back seat of the vehicle.

20          So, again, just that alone exceeds sort of the

21   initial discussion that Officer Merna had with the defendant

22   about --

23          THE COURT:  When we say repeated his concerns, did

24   that -- did he tell him that that was in violation of the terms

25   of his supervised release?

1           MS. KRASINSKI:  My understanding is yes, your Honor,

2    and Officer Merna, sitting here, just confirmed that for me.

3           THE COURT:  Okay.  Did Officer Merna ever see any of

4    the items in Exhibit 1 on the defendant's property prior to

5    conducting that search?

6           MS. KRASINSKI:  No, your Honor.

7           On September 30th, Officer Merna spoke to the

8    defendant about his interaction with the Belmont Police

9    Department and according to the report, the defendant explained

10   that he possessed the machete -- excuse me.

11          The probation officer explains that possessing those

12   items in that way was not permissible.

13          THE COURT:  Okay.  All right.  So he never saw them,

14   but prior -- but that they were unacceptable for him to

15   possess?

16          MS. KRASINSKI:  That's correct, your Honor.

17          THE COURT:  Okay.

18          MS. KRASINSKI:  And then if we go down to the fourth

19   paragraph on page 7 of the violation report, it explains that

20   in February, the probation officer told the defendant that he

21   had observed in plain view a medium to large survival-style

22   knife that was sticking out of a backpack that was on the

23   defendant's living room floor.  And the probation officer,

24   during that encounter, also reminded the defendant that he was

25   prohibited from possessing items like that, that medium to

```
 1    large style survival knife.

 2               THE COURT:  Okay.

 3               MS. KRASINSKI:  And I think that's it in terms of --

 4               THE COURT:  Okay.  What -- do you want to draw my

 5    attention to any case law or other sources supporting your

 6    position that the possession of these items were dangerous

 7    weapons that would be prohibited by the terms of his supervised

 8    release?

 9               MS. KRASINSKI:  I don't, your Honor.  I mean, I

10    guess it seems when you look at some of these weapons, you

11    know, just by plainly looking at them, some of these are not

12    weapons that you would use for maintaining a rural property.

13    They're -- and so I -- I mean, I would argue that it's plain

14    from viewing these items that especially some of these knives

15    are inherently dangerous weapons.

16               I think I do want to just raise one thing, Judge,

17    because the government has a broader concern here that if the

18    defendant believed that he was in compliance with his terms of

19    supervised release and if he believed his probation officer was

20    wrong about whether or not he could possess knives, the way to

21    do -- the way to address it would have been to bring it to the

22    Court long before the search occurred and do it in a way where

23    he simply laid out the issue:  I want to possess these knives;

24    my probation officer keeps telling me no; can we figure out

25    what the bounds of this are so that I can do this in a way
```

1    that's compliant with my terms of supervised release.

2            And the fact that he just ignored his officer's

3    repeated admonishments not to possess items like this is

4    something that gives the government concern.

5            THE COURT:  All right.  Have you said what you want

6    to say?

7            MS. KRASINSKI:  Yes.  Thank you.

8            THE COURT:  All right.  I'll hear from the defense.

9    What do you want to say?

10           MS. BROWN:  Thank you, your Honor.

11           I would just ask the photograph that's up there now,

12   it's a little overexpanded beyond the frame because I wanted to

13   look at -- so I see the two --

14           THE COURT:  Keep shrinking it down.

15           MS. BROWN:  There we go, yeah.  I specifically -- on

16   the bottom right there, there is --

17           THE COURT:  The machetes?

18           MS. BROWN:  Machete, but if you look really close on

19   it, it has a saw blade edge on one side.  And I -- I certainly

20   think that there's an inference that that would be of some use

21   of clearing brush, clearing overgrowth, on an extremely rural

22   property where Mr. Donovan lived.

23           There was also a -- yeah, and Mr. Donovan was

24   pointing out to me that this has been used like -- you know, it

25   like it's been used and that that, I think, is a more -- a

1    better inference in terms of what its intended use was.

2         Obviously, bows -- strike that.

3         I think the big issue here is that lots of things

4    can be potentially deadly or dangerous that don't fit the

5    definition of dangerous weapon.  Common one is an automobile,

6    and lots of automobiles on this property.

7         And these sometimes -- I mean, these types of items

8    can be used on a very rural property.  There was testimony that

9    there was actually a farm, there were horses.  I think there

10   was testimony at trial that one of the things that Mr. Donovan

11   tried to do was keep especially the horses, his mother's

12   horses, safe from a lot of wildlife that was in the area.

13        And so the -- these weapons, I mean, to the -- you

14   know, what's the difference between one of these weapons and a

15   butcher knife that you use to, you know, cut a turkey open or

16   other things.  I mean, they are knives, and the question is is

17   a sporting knife or a decorative knife, for that matter,

18   automatically a dangerous weapon.

19        And I -- and I think that -- the other thing I want

20   to add, just give me a moment here -- the other thing I would

21   add, too, is the government relies on the fact that the

22   probation officer made these warnings and they put it on the

23   defendant to come to court to do something about it.  I mean,

24   it -- it's just as easy to argue that the probation officer

25   could have come to court, that if he really felt that this was

19

1  a violation, he could have filed a probation violation and said

2  the defendant is violating the conditions of his supervised

3  release; I, probation officer, feel that these weapons

4  constitute that.  So the probation officer could have just as

5  easy, and probably more easily, brought this matter to court --

6           THE COURT:  So are you arguing that if a defendant

7  commits a violation and the probation officers are aware of it

8  and doesn't bring it forward as a charge that it can no longer

9  be determined to be a violation?

10           MS. BROWN:  Nope, not arguing that.

11           THE COURT:  That's a weird kind of argument.

12           MS. BROWN:  Yeah.  I'm not arguing that.  I'm

13  arguing it's going to intent.  If you're having this ongoing --

14  you know, like, I'm looking at it from the perspective of

15  Mr. Donovan.

16           So if he's having this ongoing discussion about he

17  thinks these are okay, his probation officer doesn't think

18  they're okay, they have this kind of ongoing discussion but

19  then the probation officer never does anything about it, then

20  an average person who's being supervised could think, okay, I

21  guess he thinks he's wrong or he doesn't think it's going to

22  hold up in court or he doesn't think he's going to get a

23  probation violation or a supervised release violation out of

24  this, that that is -- the fact that there are these warnings

25  and nothing is done about it, I'm not saying that that means

20

1    that they can't bring a charge within the applicable

2    limitations, but a person could presume that maybe they won

3    this conversation; maybe they convinced the probation officer

4    that these are --

5             THE COURT:  Yeah, that's not what's reflected in the

6    report, though.  It's -- what's reflected in the report is the

7    probation officer telling the defendant that those are

8    prohibited.  Not that, oh, now you've persuaded me, I guess you

9    can use it.  I haven't heard any suggestion that that was

10   actually what was said.

11            MS. BROWN:  Right.  But they -- but what -- and I --

12   but I'm saying the fact that a probation violation or the

13   probation officer didn't file anything I think is relevant to

14   the intent here of whether these had a purpose to cause bodily

15   injury.

16            So I -- I just -- I -- I'm making this argument in

17   response to what the government said, which is it was on my

18   client to say if -- you know, if he was in a discussion with

19   his probation officer about this and he had some different

20   understanding about whether these were violating the rules,

21   that it was on my client to come to court, I would say that the

22   other argument can be made --

23            THE COURT:  Okay.

24            MS. BROWN:  -- that the --

25            THE COURT:  Yeah, I hear you on that.

```
 1                    MS. BROWN:  Okay.

 2                    THE COURT:  Okay.  Do you have any case law that you

 3      wanted to bring to my attention on this particular issue?

 4                    MS. BROWN:  I don't, your Honor.

 5                    THE COURT:  Okay.  Anything else you want to say?

 6                    MS. BROWN:  No, thank you.

 7                    THE COURT:  Yeah.  Something else?

 8                    MS. KRASINSKI:  Your Honor, I just -- we know what

 9      the defendant thought about this because he testified about it

10      in his direct testimony.  And, specifically, the defendant

11      said, and I'm reading from the transcript of day three here

12      beginning at page 176:

13                    You know, Tim; Tim takes issue with me having knives

14      of a certain size.  I'm allowed to have knives.  I'm going to

15      have machetes, like I'm going to cut brush.  I'm going to have

16      the tools that I need and we can argue about it later.

17                    And so I -- to be -- there's no indication that the

18      defendant thought that he was allowed to have them.  Based on

19      his own testimony, he was aware that his probation officer

20      directed him not to have them and he was determined to have

21      them anyway.

22                    And the only other thing I would say is that the

23      guidelines themselves have a definition of dangerous weapon.

24                    THE COURT:  Yeah, I've got it.

25                    MS. KRASINSKI:  Okay.
```

22

```
1              THE COURT:  I've just got it in front of me.
2    Anything else you want to bring to my attention?
3              MS. KRASINSKI:  No, your Honor.
4              THE COURT:  All right.  So we're done on this
5    particular issue.  Anything else from anyone else on this
6    particular issue?  Okay.
7              Yeah, so it seems pretty clear to me that these
8    items do qualify as dangerous weapons, the defendant's
9    prohibition on possessing them applies with full force in this
10   particular case, and it definitely was a violation of the terms
11   of his supervised release.
12             I understand that -- the defense point that
13   Mr. Merna didn't proceed immediately with violations and our
14   officers use discretion in trying to develop a working
15   relationship with defendants and don't often violate them
16   initially upon the first exposure to something like this, but
17   it definitely is a dangerous weapon under the appropriate
18   definition.
19             So under 1B1.1 of the sentencing guidelines, the
20   definition of dangerous weapon, the application note 1
21   subsection E says a dangerous weapon means an instrument
22   capable of inflicting death or serious bodily injury, among
23   other things.
24             Multiple cases have addressed this particular issue
25   when it comes to things like knives and even one with respect
```

1    to bows.  I find a very helpful case is *United States against*

2    *Laclaire*, which is reported at 2017, Westlaw 959217, a court --

3    a case from the -- the district court for the District of South

4    Dakota.

5            And I'll just read some of the Court's analysis

6    because I think it makes clear what the problem is here.

7            Quoting now:  This Court overrules Laclaire's

8    objection.  First, the knife was a -- the five-inch fixed

9    blade -- excuse me.  The knife with a five-inch fixed blade

10   constitutes a dangerous weapon as that term is typically

11   understood under federal law, citing to the guideline I've just

12   raised, as well as 18 U.S.C. Section 930(g)(2), explaining that

13   for purposes of 930, a dangerous weapon means a weapon, device,

14   or instrument that is used for or is readily capable of causing

15   death or serious bodily injury except that such term does not

16   include a pocket knife with a blade less than two and a half

17   inches in length.  Second, multiple courts have concluded that

18   a knife can constitute a dangerous weapon under the terms of

19   the defendant's supervised release.

20           Addressing the defendant's point which I take as

21   legitimate that is every single possible knife that is in a

22   defendant's hand a dangerous weapon?  And I think, no, those

23   have to be interpreted in a commonsensical way.  A good example

24   is what the Court did in -- the Fifth Circuit did in

25   *United States and Garcia-Mejia*, reported at 394 F.3d 396 at

1   page 398.  The parenthetical from *Laclaire* describes it this
2   way:  Explaining that a condition of supervised release
3   prohibiting the possession of a dangerous weapon would not
4   prevent the defendant from using a steak knife at a restaurant
5   to eat his meal, but would prevent the defendant from carrying
6   the steak knife in his pocket for protection.
7           So certainly the defendant can have a knife to cut
8   his meat at dinner and he might be able to have some knives
9   with connection with the operation of his property, the control
10  of his property.  But it does not -- and multiple courts just
11  I -- the *Laclaire* case cites to many of them that talk about
12  knives being dangerous weapons sufficient to support a
13  violation of a supervised release term.
14          There is even a case involving -- this one would --
15  is -- is close to Mr. Donovan's situation because it involved a
16  defendant who had -- had used -- let's see if I can find it --
17  had used a 75 adjustable Fast Flite graphite bow to kill a
18  500-pound bear and he was charged with -- he was a felon in
19  possession and he made a number of arguments like -- one of
20  which was that:  Gallagher asserts that his -- his condition is
21  not reasonably related to the nature and circumstances of the
22  offense for which he was convicted.
23          He notes that his conviction for being a felon in
24  possession of ammunition did not involve the use of a bow,
25  arrow, or crossbow.  Gallagher also contends that condition 17,

1    that's the dangerous weapon condition, is unrelated to his

2    personal history or characteristics.  He contends that there is

3    no evidence on the record that he was ever -- he has ever used

4    a bow and arrow to harm another human being.  He argues that

5    the condition 17 involves a greater deprivation of liberty than

6    is reasonably necessary for the purposes set forth in the

7    guidelines.

8            And the Ninth Circuit rejected that argument in

9    Mr. Gallagher's case and determined that, no, indeed, a

10   prohibition on crossbows, even for somebody who goes out

11   hunting for bear with them, is a -- is a violation of the

12   condition.

13           So I -- I understand this is -- you know,

14   New Hampshire is a state where people live in a variety of

15   conditions.  People live in urban areas, people live in rural

16   areas.  I know Mr. Donovan has expressed the concern in the

17   past that he lives in a very rural area where there are fisher

18   cats and I presume bear and he's out in the woods a lot.  I

19   understand all of that.  But that does not excuse the fact that

20   these -- the possession of these weapons clearly qualify under

21   the dangerous weapon exception.

22           And, you know, when you're out on supervised release

23   again, you might be able to get the Court to grant certain

24   specific exceptions in certain specific contexts, but without

25   granting exceptions, the possession of the vast majority of

1   these things depicted in Exhibit 1 clearly qualify as dangerous

2   weapons.

3          And I will say, and the probation officer should

4   note this, any -- when the defendant is out on supervised

5   release again, any possession of crossbows, machetes, long

6   bladed knives, I want to know about it immediately because I

7   think there's a very substantial risk of the misuse of these

8   dangerous weapons.

9          So perhaps in advance certain conditions and

10  exceptions can be identified, but they need to be clearly

11  spelled out.  Without exceptions being granted, none of these

12  things are remotely permissible under the dangerous weapon

13  prohibition and the judge who's supervising Mr. Donovan needs

14  to know about it immediately.  All right?

15         So I do believe that these items do qualify as

16  dangerous weapons.  The facts supporting the allegations are

17  otherwise undisputed.  I accept them.  On the basis of those

18  facts, as well as the other facts with respect to the other

19  charges set forth in the violation report which are undisputed,

20  I do find the defendant to have violated conditions 1, 5, and 6

21  of the terms of his supervised release and find him guilty of

22  those particular charges.  The other charges will be dismissed

23  on motion of the government by agreement.

24         All right.  So that concludes the findings.  I'm

25  prepared to move on to the sentencing now.

1          Is the defendant ready to -- I'll ask defense

2    counsel.  Is your client ready to be sentenced on the -- the

3    criminal charge and the supervised release violation subject,

4    of course, to your arguments on the motion to dismiss.

5          MS. BROWN:  Yes, your Honor, but my understanding is

6    that both parties have witnesses that we want to present.

7          So that with that understanding --

8          THE COURT:  Well, what do the witnesses bear on?

9    Because if they bear on the motion to dismiss, I'll talk to you

10   about that.  What are they --

11         MS. BROWN:  No.

12         THE COURT:  -- what do you each want to testify

13   about.

14         MS. BROWN:  So as you can see from the pleadings,

15   just the sentencing pleadings, not the motions to dismiss,

16   there's a significant issue regarding --

17         THE COURT:  Oh, on the silencer issue?

18         MS. BROWN:  Yes.

19         THE COURT:  Okay.  So you want to present evidence

20   on the silencer issue.

21         MS. BROWN:  Correct.  Yes.

22         THE COURT:  Well, the way to go into that is to go

23   into the sentencing -- let's first make clear evidentiary

24   witnesses at sentencing are the exception rather than the rule.

25   I've sentenced more than 3,000, probably between 3- and 5,000

28

 1    people to prison.  I've probably held 10 evidentiary hearings.
 2    It has to be on a significant issue.
 3           Here, it's my understanding that there is an issue
 4    about whether the -- the modified oil filters are silencers
 5    and, therefore, the kinds of things that can constitute a
 6    weapon under the guidelines for purposes of determining the
 7    defendant's base offense level as well as his -- his additional
 8    points for possession of more than one -- in this case, three,
 9    I guess -- firearms, and that's a potentially consequential
10    issue.
11           So the way we want to go through that, in my view,
12    is proceed in the ordinary course with the sentencing.  When we
13    get to the point if you have objections, specify what the
14    specific objections are, explain that you need to produce
15    evidence on that.  The defendant -- government wants to produce
16    evidence in response to your contention and we'll -- we'll go
17    forward.
18           Is that acceptable to you?
19           MS. BROWN:  It is, your Honor.
20           THE COURT:  Okay.  All right.  So let's move on to
21    the sentencing.
22           So, Mr. Donovan, I want to make sure you've read
23    some of the relevant documents here.  The presentence report
24    for you -- this is on your -- this is the presentence report.
25    That report is dated December 20th.  It was revised on

1  October 17th -- December 20th, 2021; it was revised on

2  October 17th, 2022 and 12/22/2022.

3          Have you read that report?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Have you discussed it with your

6  attorney?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Do you feel you understand it?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Okay.  Let me also deal with the

11  supervised release report here, make sure that you have read

12  that.  I have a violation report for you on that and that

13  report appears to be dated 11/17/2022.

14          Did you read that report as well?

15          THE DEFENDANT:  I don't know if I've read that one,

16  but I'm comfortable with it, sir.

17          THE COURT:  Well, I want to be sure.  Let me ask

18  counsel.

19          So you -- this is the violation report on the

20  supervised release charge.  Did you ever provide that to your

21  client?

22          MS. BROWN:  Does it have a docket number on it?

23          THE COURT:  No, mine don't have a docket number.  I

24  can show it to you.  Let's have the --

25          MS. BROWN:  We actually had pulled it -- okay.  I

1   had actually pulled it up when we were discussing some of the

2   issues because it has the attachments --

3           THE DEFENDANT:  Yeah.

4           THE COURT:  Yeah.

5           MS. BROWN:  -- on there.

6           So I was reviewing that with Mr. Donovan on this --

7           THE COURT:  All right.

8           MS. BROWN:  -- when we were discussing the issues

9   earlier.

10          THE COURT:  Right.  It's pretty clear to me you are

11  familiar with those facts based on what we've said up to this

12  point, but if you want to take a break and read it, I'm fine

13  with that.

14          THE DEFENDANT:  I'm fine, your Honor.

15          THE COURT:  Okay.  All right.

16          MS. BROWN:  I would just put on the record I've sent

17  a lot of documents to Mr. Donovan, his prior two attorneys have

18  sent documents.  So I probably sent it to him, but I'm not a

19  hundred percent sure.  I have sent to him many documents --

20  most of the documents that are relevant to this hearing today,

21  I would say documents where there was a contested issue at this

22  hearing today.

23          THE COURT:  Sure.

24          MS. BROWN:  So I can't say a hundred percent one way

25  or the other, but we did review the issues.

1          THE COURT:  Yeah.  I mean, I know from working with

2     Mr. Donovan over a long period of time, among -- on the scale

3     of defendants be aware of facts bearing on their case, he's one

4     of the more aware defendants of exactly what's going on in his

5     case day-to-day.  So I don't have any doubt that he fully

6     understands the situation that he's dealing with here and the

7     relevant facts as set forth in that report.

8          All right.  So does the government dispute any of

9     the facts or legal conclusions contained in the -- in the

10    presentence report?

11         MR. ROMBEAU:  Your Honor, there's just one issue the

12    government raised with the probation officer this morning, or

13    at least attempted to raise last week, and that is the

14    sustaining of an objection by the defendant in the final

15    revised report.  And this relates to paragraph 42 of the PSR

16    which in the initial PSR affixed three points to the defendant

17    for a burglary committed in 2001.

18         Defendant, in their objections filed in November,

19    objected to those three points on the basis that a probation

20    term imposed in 2006 was improper.  The government believes

21    those three points and we raised this with the probation

22    office.  My understanding is they agree with us that the three

23    points should still count because a valid term of --

24         THE COURT:  Okay.  I misunderstood what was going on

25    here.

1          So the -- the current report suggests that the

2  defendant has a criminal history category of III.  Do you

3  dispute that?

4          MR. ROMBEAU:  We do, your Honor.  We believe he

5  should be a IV.

6          THE COURT:  All right.  And did you object to that?

7  I didn't -- I guess I was just very confused about the

8  probation officer did conclude -- kind of accepted, I thought,

9  the defendant's position on that and the current report in

10  front of me says Criminal History Category III.

11          MR. ROMBEAU:  Yes, your Honor.  In reviewing it last

12  week --

13          THE COURT:  And you think, in acquiescing to the

14  defense position, the probation officer is mistaken.

15          MR. ROMBEAU:  Yes, your Honor.

16          THE COURT:  Okay.  I'm -- I'm wicked confused now.

17  So --

18          MR. ROMBEAU:  So let me see if I can put it as

19  simply as I can.

20          So part of the problem we have here --

21          THE COURT:  I thought you were -- I -- again, I may

22  have misread this.  I spent most of the day yesterday preparing

23  for this hearing and I -- I thought it was you guys that were

24  suggesting that it was not countable in the report.  Did I

25  misunderstand that?

33

 1          MR. ROMBEAU:  So in our reply brief, your Honor,

 2   that we filed -- so, again, the timing of this got very jumbled

 3   because defendant did not object to the PSR.  They filed

 4   their -- their sentencing --

 5          THE COURT:  Right.

 6          MR. ROMBEAU:  -- brief with objections the week

 7   before sentencing was originally scheduled.  The government

 8   quickly filed a reply brief on November 23rd in which it

 9   addressed these issues and we did say as it relates to this

10   precise issue in paragraph 42 that the points should still

11   apply because the defendant was in custody within 15 years of

12   the instant offense here.

13          THE COURT:  Okay.  I'm confusing this with your

14   position on the crime of violence issue.  I thought you were

15   saying a burglary isn't a crime of violence and --

16          MR. ROMBEAU:  So, yeah, I'll speak to that, your

17   Honor.

18          So, initially, when the first PSR came out in

19   September of 2021, the probation office determined Mr. Donovan

20   was subject to the Armed Career Criminal Act 15-year mandatory

21   minimum.

22          The government at the time filed an objection to

23   that, noting that our office has repeatedly taken the position

24   that New Hampshire burglary does not count as a crime of

25   violence and, therefore, could not be a qualifying ACCA --

```
 1                THE COURT:  All right.  I'm sorry.  I mixed those

 2      two things up because they both involved the burglary

 3      conviction.  I now understand your position, which I just

 4      didn't grasp, and so we're going to have to -- you're going to

 5      have to explain it to me in greater detail.

 6                I thought the defense -- and I didn't pay much

 7      attention to this because I thought the issue had been

 8      resolved, mistakenly.

 9                The defense took the position, I thought, that the

10      burglary conviction had been somehow addressed, vacated, in the

11      superior court and that, therefore, it shouldn't count.  Is

12      that -- let me see if I -- let me first understand the defense

13      position and then I'll understand -- I'll ask the probation

14      office to tell me their position and then you can tell me your

15      position because I didn't pay attention to this because I

16      thought it had been resolved.

17                So your position as to why the burglary conviction

18      should not count.

19                MS. BROWN:  Yeah, and I would -- I -- I spent a lot

20      of time on this in the sentencing memorandum because it's a

21      little bit confusing, but the bottom line is that it's -- it's

22      a time line issue, that this fell without -- this -- this

23      didn't count because it was vacated.

24                So my understanding, and Mr. --

25                THE COURT:  What happened in -- I -- I read Judge
```

1    McGuire -- I couldn't understand what she was saying, so -- and

2    I didn't -- again, I looked at it and said, wow, this doesn't

3    make any sense to me, but I don't think it's an issue anymore,

4    so I'm not going to pay attention to it.

5            MS. BROWN:  Yeah.  And it took me a long time to

6    figure it out myself, your Honor, so it is kind of confusing.

7            But as I understood it --

8            THE COURT:  Walk me through the sequence --

9            MS. BROWN:  Yeah.

10           THE COURT:  -- of his being charged, convicted and

11   then other judges -- like five other judges were involved in

12   it --

13           MS. BROWN:  Right.

14           THE COURT:  -- and then she got it and she said what

15   the other judges did was wrong and --

16           MS. BROWN:  Yeah.

17           THE COURT:  -- I don't understand any of it.

18           MS. BROWN:  So the Reader's Digest version is he

19   originally did not get probation.  He got, like, a big, long

20   suspended sentence.  He got time-served -- he got two charges;

21   one is he got some committed time and the other he got a long

22   suspended time.  Had it --

23           THE COURT:  On -- on the burglary.

24           MS. BROWN:  On the burglary.

25           He had several probation violations.  At some point

```
 1    the sentencing judge, and it might have been another judge

 2    other than Judge McGuire --

 3                THE COURT:  It was not Judge McGuire.

 4                MS. BROWN:  Yeah.  A sentencing judge says, okay,

 5    I'm going to -- instead of sending you to jail or whatever, I'm

 6    going to now give you probation, many years down the road after

 7    his original -- so basically they're changing his sentence.

 8                THE COURT:  But wait a minute.  He was convicted of

 9    the burglary charge --

10                MS. BROWN:  Correct.

11                THE COURT:  -- right?

12                MS. BROWN:  Right.

13                THE COURT:  So he got convicted, right?

14                MS. BROWN:  Right.  Yup.

15                THE COURT:  And then the sentence he initially got

16    was not incarcerative; it was --

17                MS. BROWN:  It was -- it was two charges.  He did

18    get incarcerated.  He didn't get probation.  So there was --

19                THE COURT:  So he got sentenced to prison on the --

20    I didn't think the state had probation anymore.

21                MS. BROWN:  They -- they do, your Honor.  And

22    what -- what became a big issue here is under all the due

23    process concerns and the statute -- there's a statute that the

24    judge many years down the road said, now I'm putting you on

25    probation --
```

```
 1                    THE COURT:  Wait.  Geez.
 2                    MS. BROWN:  And so what --
 3                    THE COURT:  I wish I had -- I wish I had understood
 4     this as an issue yesterday because I would have taught myself
 5     what I needed to --
 6                    MS. BROWN:  Yeah, and, as I said, it took me a long
 7     time to unravel it, too.
 8                    THE COURT:  But wait, wait.
 9                    He got convicted.  Tell me exactly what his sentence
10     was on the burglary charge.
11                    MS. BROWN:  I'll have to look that up.
12                    THE COURT:  If you know, you can --
13                    MR. ROMBEAU:  I do, your Honor.
14                    MS. BROWN:  Two to four, stand committed on one and
15     two to four suspended on the other.
16                    THE COURT:  So there were two burglary charges.
17                    MS. BROWN:  The one he finished his sentence, he
18     served his time, and then he had this other one hanging over
19     his head for a while.  He would get --
20                    THE COURT:  The second -- the second burglary was --
21                    MS. BROWN:  Was a suspended sentence.
22                    THE COURT:  -- what was the sentence?  A suspended
23     sentence?
24                    MS. BROWN:  Correct.
25                    THE COURT:  All right.  And they usually say
```

1    something like suspended for two years blah, blah, blah.

2         MS. BROWN:  Don't do this, don't do that --

3         THE COURT:  Right.

4         MS. BROWN:  -- all that, yeah.

5         THE COURT:  And they can be called forward and they

6    can be sentenced --

7         MS. BROWN:  Yeah, there's a call-forward period.

8         So within that call-forward period, he had -- he had

9    multiple probation -- he had multiple -- it's not really a

10   probation violation, it's a motion to impose.

11        THE COURT:  Right.  It's not a -- see, he's not on

12   probation on a suspended sentence.  He's on a suspended

13   sentence.

14        MS. BROWN:  Yes.  Correct.

15        THE COURT:  Okay.  So he got a stand committed

16   sentence on the first -- if he got stand -- and, again, I've

17   been out of the state system for over 30 years, so --

18        MS. BROWN:  Uh-huh.

19        THE COURT:  -- my knowledge of state law is not

20   great.

21        I understood if you get a stand committed sentence,

22   there's no parole left.  You do -- you do the time and you --

23   you get out.  Right?

24        MS. BROWN:  Correct.

25        THE COURT:  And you don't get probation on the

1    conviction where you get stand committed time, you -- and here

2    it was a stand committed sentence and a suspended sentence and

3    then something happened that led someone to try to call forward

4    the suspended sentence.

5              MS. BROWN:  Right.  Correct.

6              THE COURT:  Okay.

7              MS. BROWN:  And at that point, the -- that judge

8    said, I'm -- I'm resentencing you basically; now I'm adding

9    probation to this suspended sentence.

10             THE COURT:  Right.

11             MS. BROWN:  During that --

12             THE COURT:  Did he get time on the suspended

13   sentence?

14             THE DEFENDANT:  12 months.

15             MS. BROWN:  Yes, he did.

16             THE COURT:  So he got 12 months.

17             MS. BROWN:  He got time and probation after --

18             THE COURT:  And that's what he --

19             MS. BROWN:  -- he got out.

20             THE COURT:  And that's what McGuire said you can't

21   do --

22             MS. BROWN:  Exactly.

23             THE COURT:  -- you can't add the probation on there.

24             MS. BROWN:  And a case had come down from the

25   New Hampshire Supreme Court in that period of time with very

1    similar facts.  So he went -- so Mr. Donovan went back to court

2    with his state court attorney -- it might have been even your

3    federal attorney who went to state court --

4            THE COURT:  But don't you -- the remedy for that is

5    to vacate the probation term that was not improperly imposed --

6            MS. BROWN:  Correct.

7            THE COURT:  -- right?

8            MS. BROWN:  Yes.

9            THE COURT:  But you said that Judge McGuire vacated

10   the conviction?

11           MS. BROWN:  Well, you have the order.  I mean,

12   that's what -- I think she vacated the sentence.  Because I

13   think the conviction is still there; it's that the --

14           THE COURT:  All right.  So --

15           MS. BROWN:  -- sentence -- yeah.

16           THE COURT:  And you're saying even though there's a

17   conviction, it's not countable because why?

18           MS. BROWN:  It's not countable for criminal history

19   category.

20           THE COURT:  Yeah.  Why?

21           MS. BROWN:  Because that sentence was vacated as not

22   being a legal sentence.

23           THE COURT:  He already served the 12 months.

24           MS. BROWN:  He did serve the 12 months --

25           THE COURT:  And you say that she vacated -- that

1    there was no sentence that would be imposed at all on that

2    charge, so it wiped out the 12 months he had already served?

3                MS. BROWN:  Well, it's the stand committed time

4    that's putting him into the next level of criminal history

5    category.  And if that stand committed time --

6                THE COURT:  Right.  But that -- but that had already

7    been fully served by the time Judge McGuire did what she did.

8                MS. BROWN:  But it was vacated.

9                THE COURT:  All right.  Let me get the -- again,

10   sorry I didn't pay attention to this because I mistakenly

11   thought it had been settled.  But let me -- I'll get your memo

12   out and I'll look at the actual order which, again, I read, but

13   I didn't understand what she was doing and why she was doing

14   it.  So let me -- let me try and figure it out.

15               Okay.  So what she's vacating is Judge Fitzgerald's

16   September 25th, 2007, sentence, right?  That's what she says on

17   page 3 of her order.

18               MS. BROWN:  Correct.  And I think that sentence was

19   imposed pursuant -- I think that sentence was imposed pursuant

20   to --

21               THE COURT:  Right, but what was --

22               MS. BROWN:  -- probation violation.

23               THE COURT:  So -- but the sentence that she vacated

24   was the September 25th, 2007, sentence charge -- finding the

25   defendant chargeable on a probation violation and sentenced him

```
 1    to two and a half to six years stand committed.

 2              And that was what was vacated.  You agree?

 3              MS. BROWN:  Yes, your Honor.  Also, your Honor, I

 4    was not planning on arguing this issue today either.  I thought

 5    it had been resolved.  So I'm trying to pull up all the

 6    documents.  I at one point spent a lot of time on this and

 7    pulled --

 8              THE COURT:  Well, just consult with Mr. Donovan,

 9    because --

10              MS. BROWN:  Yes.

11              THE COURT:  -- he -- he knows more than all of us --

12              MS. BROWN:  Yes, he does.

13              THE COURT:  -- about what he actually did.

14              MS. BROWN:  He actually won the motion himself.

15              THE DEFENDANT:  Your Honor, I rewrote to the Court

16    for clarification and we don't have the order here, but she

17    reclarified that the sentence of probation itself was illegal,

18    that that sentencing was illegal.

19              And in regards to that, the sentence was changed to

20    a one-year stand committed sentence, 12 months, so it's my

21    belief that even if it didn't get vacated when the probation

22    did, it's only a year; they can only count it for 10 years.

23              THE COURT:  Okay.  But let me -- let me go back.

24              THE DEFENDANT:  Because it's a sentence of less than

25    one year and one month.
```

1          THE COURT:  Let's talk -- let's go step-by-step of

2    what she says.

3          On page 1 she says:  Defendant was sentenced by

4    Judge McHugh on July 3rd, 2001, to two to four years of

5    New Hampshire State Prison all suspended and consecutive to a

6    two- to four-year stand committed sentence.  This latter

7    sentence is not relevant to the present issue.

8          I don't know how that is not relevant to the --

9    okay.

10          On February 3rd, Judge Smukler granted the state's

11    motion to impose defendant's sentence.

12          I -- I don't know which sentence she's referring to.

13          On January 21st, 2006, Judge Houran sentenced the

14    defendant to two to four years, all deferred for six months.

15          On August 25th, Holman, another judge, granted

16    another motion to impose and sentenced the defendant to two to

17    four years, all suspended.  The suspension was conditioned on

18    the defendant serving 12 months in the House of Corrections.

19    The Court added two years of probation to the defendant's

20    sentence upon release from incarceration.

21          Oh, I see.  Okay.

22          What she's -- so let's go back.  I'm now

23    understanding it, I think.

24          On page 1, defendant was sentenced by McHugh on

25    January -- July 3rd, 2001, to two to four years, New Hampshire

1    State Prison, all suspended, and consecutive to a two-to-four

2    stand committed sentence.  And she's saying this latter

3    sentence, the stand committed sentence, is not relevant to the

4    present issue.  So what is relevant is the suspended sentence.

5            So then on February 3rd, Smukler granted the state's

6    motion to impose the suspended sentence.

7            On January -- June 21st, Houran sentenced the

8    defendant to two to four years, all deferred for six months.

9            Can somebody explain to me what a deferred sentence

10   is?  What is -- and I don't know under New Hampshire state law

11   what a deferred sentence is.

12           MS. BROWN:  So it's not statutorily defined, but the

13   New Hampshire Supreme Court has determined -- so it's a

14   sentence which basically flips the burden on the defendant.  So

15   he's not going to jail that day.  The Court imposes the

16   sentence, but says we're going to defer it for a year from now.

17   If you're of good behavior, I'm going to suspend it; but if

18   you're not --

19           THE COURT:  Okay.  It's not a suspended sentence --

20           MS. BROWN:  Not a suspended sentence.

21           THE COURT:  -- it's actually imposed, but with the

22   kind of understanding that if six months goes by you,

23   defendant, can convince me to --

24           MS. BROWN:  Exactly.

25           THE COURT:  -- not to impose it.  Is that right?

1          MS. BROWN:  Yes.  And the Court has found that all

2    the same sort of *Moody v. Cunningham* due process protections

3    apply to deferred sentences, so the defendant -- you know,

4    there has to be a hearing and all of that.

5          THE COURT:  But the defendant has the burden of

6    getting relief from the sentence.

7          MS. BROWN:  Correct.

8          THE COURT:  Okay.

9          On August 25th, Holman granted another motion to

10   impose and sentenced the defendant to two to four years, all

11   suspended.

12         So is that in response to the deferral?  Like in

13   June, Houran sentenced him, two to four years deferred for six

14   months.  Then a couple months later, Holman granted another

15   position to impose and sentenced the defendant to two to

16   four years, all suspended.

17         So he basically is modifying Judge Smukler's

18   sentence?  Is that --

19         MS. BROWN:  Modifying it in two ways.

20         THE COURT:  Or Judge Houran's sentence.

21         MS. BROWN:  Yeah.  So we're talking about the

22   August 25th, 2006.

23         THE COURT:  Yes.

24         MS. BROWN:  So he -- Judge Holman modified that in

25   two ways; one is he imposed it, but then resuspended it.  So

1    he's not going to jail on that day.  And then he added a

2    condition, and this, I think, is the important part on this

3    August 25th, 2006, he added two years of probation to the

4    sentence effective --

5              THE COURT:  Well, that's not, to me, the most

6    important thing.  The most important thing is so what I

7    understand happened is he got his sentence, but it was this

8    strange conception of deferral by Judge Houran on June 21st,

9    right?  And then in August Holman came back; Holman said, okay,

10   that sentence which was deferred, I'm changing it.

11             MS. BROWN:  Actually, yeah, and he changed it to

12   both a combination of --

13             THE COURT:  Can we just -- can we just follow along

14   with me?

15             MS. BROWN:  Okay.

16             THE COURT:  He changed it, right?  He said, that

17   deferred sentence, I'm changing it; and then what I'm -- I'm

18   going to tell you what I'm changing it to.  The change was that

19   it was two to four years suspended on the condition that the

20   defendant serve 12 months of the -- at the House of Correction

21   and he added two years of probation on to that.  Is that right?

22             MS. BROWN:  Correct.

23             THE COURT:  Do you agree?

24             MS. BROWN:  Yes.

25             THE COURT:  Okay.  All right.  And then on

1    December 25th (sic), 2007, Judge Fitzgerald found the defendant

2    chargeable on a probation violation.  That's on the probation

3    term that Judge Holman added to the sentence of August 25th,

4    right, added by the sentence of August 25th.

5                    MS. BROWN:  (Nods head.)

6                    THE COURT:  And so Fitzgerald found in violation on

7    the probation term and gave him two and a half to six.

8                    So that's after he's served the 12 months at the

9    House of Corrections, right?

10                   THE DEFENDANT:  Yes.

11                   THE COURT:  So what happened here was -- and, boy,

12   is this -- goodness gracious.  It's just so strange.

13                   So the defendant got -- had two burglary

14   convictions, right?  He got a stand committed sentence on one

15   of them, right?  On the second one he got two -- originally got

16   two to four suspended, right?

17                   MS. BROWN:  (Nods head.)

18                   THE COURT:  Then there was an attempt to bring it

19   forward and he got a -- the -- the effort was to impose the two

20   to four and Smukler said, yeah, you get your two to four.

21                   Then on June 21st, Houran came in and said, you get

22   your two to four, but it's deferred for six months.

23                   And then Holman came in and said, I'm modifying that

24   sentence and that sentence is going to be two to four suspended

25   rather than deferred with 12 months House of Correction and two

48

1   years of probation.

2           And then Fitzgerald charged the probation violation

3   and sentenced him to two and a half to six years stand

4   committed.  Right?

5           THE DEFENDANT:  (Nods head.)

6           THE COURT:  And then McGuire vacated Judge

7   Fitzgerald's sentence.  Right?

8           MS. BROWN:  Yes.

9           THE COURT:  So what was not vacated was -- Judge

10  Holman's sentence, which was not vacated, was -- that included

11  the 12 months in the House of Correction.

12          What she did say, though, was Judge Holman gave an

13  illegal probation term to that sentence.  Right?

14          THE DEFENDANT:  (Nods head.)

15          THE COURT:  So the bottom line is she says Holman

16  gave an illegal probation term; therefore, Fitzgerald's attempt

17  to sentence him on that suspended sentence or that probation

18  term is vacated.

19          What does that leave in place?  It leaves in place

20  the conviction on the second burglary and the 12-month

21  sentence.  What's not left in place is the probation period.

22  Does anybody disagree with that?

23          THE DEFENDANT:  (Shakes head.)

24          MR. ROMBEAU:  No, your Honor, we agree.

25          THE COURT:  Okay.  I now understand this crazy,

1    crazy case.

2            Okay.  But I don't understand what -- why it

3    matters.  I -- I just -- I just now figured out what happened.

4    Now you tell me why having 12 months is -- is not a sufficient

5    amount of time in prison to justify three points for the second

6    burglary.  That's your position, right?

7            MS. BROWN:  I think that's when we get back to the

8    10-year period.  I don't think it comes within -- and I -- I

9    would actually defer to the government.  I don't want to spend

10   a lot of time guessing what their argument is on this.

11           THE COURT:  Okay.  Well, let me -- you guys have a

12   seat.  Let me hear the government.

13           Now, the probation office says that doesn't count.

14   Why don't you tell me why you think that doesn't count and then

15   I'll hear from the government.

16           THE PROBATION OFFICER:  Your Honor, I'm sorry.  I

17   made a mistake in my revised presentence report, but -- so two

18   things here.  There was -- to counsel's argument, I think

19   there's two arguments.  One of them is the criminal history

20   points that would be assigned to the -- to this specific case.

21           So in my initial presentence report, I used this

22   burglary as one of the sentences which he was under, which

23   would have given him the extra point for being under a criminal

24   justice sentence.

25           THE COURT:  Wait, wait.  Okay.  Oh, gosh.

 1              Okay.  Let me ask the government.  Which paragraph

 2    are you objecting to?

 3              MR. ROMBEAU:  This all comes under paragraph 42,

 4    your Honor.

 5              THE COURT:  Okay.  Two counts and sentenced on

 6    4/25/2001, pled guilty; sentenced to two to four on one, right?

 7              MR. ROMBEAU:  Yes.

 8              THE COURT:  And then sentenced two to four

 9    suspended.  And then there were all the modifications and

10    machinations that -- and the issue is you think he should get

11    three points for that and you think he should get zero points

12    for that.

13              THE PROBATION OFFICER:  I agree with counsel.  So

14    what I was trying to explain is I do think that he gets the

15    three points for the criminal history.  I do agree with defense

16    counsel that it does not -- because the probation was vacated,

17    I do believe that -- or I do agree with her argument that it

18    does not -- he was not under a criminal justice sentence in

19    this case.  So, therefore, it's not one of the cases that would

20    add the --

21              THE COURT:  Okay.  I don't even know what you're

22    saying.  So I -- I -- I need to -- so she -- you agree he gets

23    three points?

24              THE PROBATION OFFICER:  Correct.

25              THE COURT:  Okay.  And you think he gets three

1  points?

2         MR. ROMBEAU:  We do, your Honor, yes.

3         THE COURT:  And what is your legal argument for why

4  you get three points?

5         MR. ROMBEAU:  So I think the key here is that the

6  second burglary was consecutive to Count One.

7         THE COURT:  Yes.

8         MR. ROMBEAU:  And under 4A1.2, if prior sentences

9  are imposed consecutively, we use the aggregate sentence of

10  imprisonment and that gets us within the 15-year time period

11  here.  This extra 12 months that he served in 2006 --

12         THE COURT:  Okay.  So there's a timing problem.  The

13  potential timing problem is this conviction is too old to

14  count.

15         MR. ROMBEAU:  Yes.

16         THE COURT:  Is that what you're telling me?  Okay.

17         MR. ROMBEAU:  And --

18         THE COURT:  And you say, we overcome that problem

19  because of the second sentence.

20         MR. ROMBEAU:  That's right, because the 12 months is

21  imposed within the 15 years on -- consecutive to the --

22         THE COURT:  Okay.

23         MR. ROMBEAU:  -- original sentence, yes.

24         THE COURT:  Okay.  So to the extent there's a timing

25  problem, the government's answer to that is the 12-month

1   consecutive sentence which still stands post-McGuire is

2   still -- that conviction is still valid, that sentence was

3   imposed, that was imposed within the period of time to be

4   countable, and that then gives him the three points.  Is that

5   what you're saying?

6               MR. ROMBEAU:  Yes, your Honor.  Yes.

7               THE COURT:  All right.  Do you -- so on the timing

8   issue only, as we've now explained the situation, do you agree

9   or disagree?

10              MS. BROWN:  I disagree, your Honor.

11              THE COURT:  All right.  Why?

12              MS. BROWN:  So I've -- I've pulled up 4A1.2,

13  which -- and I'm looking at paragraph (e), which is applicable

14  time period.

15              THE COURT:  Can I just interrupt you for one second?

16              Probation Officer, you agree with what the

17  prosecutor just said?

18              THE PROBATION OFFICER:  I do.

19              THE COURT:  Okay.  Good.

20              So let's turn now to 4A1 --

21              MS. BROWN:  So 4A1.2(e), applicable time period.

22              And so that first paragraph talks about a sentence

23  of one year and a month that was imposed within 15 years.

24              So I think we are all in agreement now that the --

25              THE COURT:  Wait a second.  Let me just read it.

1          MS. BROWN:  Yeah.

2          THE COURT:  Okay.  So you agree that the -- the one

3   year was not a year and a month, right?  That was a year.  Just

4   work with me.  Do you agree or disagree with that?

5          MR. ROMBEAU:  We agree, your Honor.

6          THE COURT:  Okay.  You're saying but that doesn't

7   matter because what you're focussed on is the second sentence,

8   also count any prior sentence of imprisonment exceeding one

9   year and one month whenever imposed that resulted in the

10  defendant being incarcerated during any part of the 15-year

11  period.  Is that what you're saying is the crucial sentence?

12         MR. ROMBEAU:  That's right, your Honor.  And what I

13  referenced earlier was under 4A1.2(a)(2) is where we get into

14  the importance of it being consecutive so that in our view, the

15  12 months is -- is consecutive to the two to four.

16         THE COURT:  Right.

17         MR. ROMBEAU:  So it's all one sentence that then

18  falls within the 15 years.

19         THE COURT:  All right.  So let's read that.

20         4A1.2(a)(2) says:  If the defendant has multiple

21  prior sentences, determine whether those sentences are counted

22  separately or treated as a single sentence.  Prior sentences

23  are always counted separately if the sentences were imposed for

24  offenses that were separated by an intervening arrest, i.e.,

25  the defendant is arrested for the first offense prior to

54

1    committing the second offense.  If there is no intervening

2    arrest, prior sentences are counted separately unless the

3    sentences resulted from offenses contained in the same charging

4    instrument or the sentences were imposed on the same day.

5         Those sentences, the -- the sentence on the two

6    burglary charges was imposed on the same day but the 12 months

7    came much later, right?

8         MR. ROMBEAU:  That's correct, your Honor.  Yes.

9         THE COURT:  Okay.  So why do you think this, under

10   this definition, that prior conviction should count?

11        MR. ROMBEAU:  So if we get to the next paragraph

12   from where your Honor was reading, and it says for purposes of

13   applying 4A1.1(a), (b), and (c), if prior sentences are treated

14   as a single sentence, which they are here, use the longest

15   sentence of imprisonment if concurrent sentences were imposed,

16   which is not applicable, but the last sentence --

17        THE COURT:  Yeah, but that -- you're not dealing

18   with -- you say assuming that they are a single sentence, we

19   win.  Well, that's assuming the disputed point, I think.  I

20   mean, I'm asking you to focus on the -- again, I didn't study

21   this.  You know, I spent all day yesterday working on this case

22   and I just didn't understand this particular issue, so I may be

23   wrong about it.

24        But it says if there is no intervening arrest, prior

25   sentences are counted separately unless -- because there was no

1    intervening arrest here, was there, or was there?  I mean, what

2    does it mean, intervening arrest?  What does the sentence mean

3    when a sentence is suspended and then partially imposed?

4              MR. ROMBEAU:  So the -- the original sentence, your

5    Honor, was imposed on both burglaries on July 3rd of 2001.  So

6    he was sentenced the same day on the two burglaries, the first

7    getting the two to four --

8              THE COURT:  Right.

9              MR. ROMBEAU:  -- and then on number two, getting --

10              THE COURT:  But the sentence that ultimately got him

11    within the time period is the 12 months --

12              MR. ROMBEAU:  So I --

13              THE COURT:  -- right?

14              So there has to be some provision in here that says

15    what happens if a defendant gets sentenced for two crimes on

16    the same day and then years later, that -- the second sentence

17    that hasn't been fully discharged yet results in a violation

18    that causes the -- the suspended sentence to be imposed?

19              MR. ROMBEAU:  Correct.  So I'm following your Honor,

20    so if the Court views it as the imposition in 2006 of the

21    suspended sentence as a new sentencing, then -- then I would

22    agree that we would -- we would not get the three points here

23    because then it would be -- it would be -- a 12-month sentence

24    would be outside the applicable 10 years.

25              But because it's -- he's sentenced in that matter

1    from 2001, I mean, that's the case he's -- he's sentenced in.

2    So it was -- the original sentence was two to four years,

3    suspended for 10 years, and the Court coming in to impose that

4    sentence I think makes it akin to a probation violation, where

5    someone gets incarcerated years after their original time and

6    we use that to kind of bleed into the more recent time period.

7              THE COURT:  So let me just get -- in terms of the

8    15-year period, right, the first sentence where he got

9    sentenced on both would not be countable because it was outside

10   the 15-year period unless the fact that he got the second

11   sentence imposed within the 15-year period then brings that --

12   that crime within the 15-year period and justifies a

13   three-point adjustment.  Do you agree with that?

14             MR. ROMBEAU:  Yes.  I'm sorry, your Honor.

15             THE PROBATION OFFICER:  Yes.

16             THE COURT:  So this -- let's forget the first

17   burglary conviction here.  What matters for counting is the

18   second.  And you're saying to me that the second conviction is

19   countable because it was originally suspended and ultimately

20   imposed within the 15-year period.  And where a sentence is

21   suspended and then imposed within the 15-year period, it's

22   deemed to be within the 15-year period.  That's your position,

23   right?

24             THE PROBATION OFFICER:  If it was served, yes.

25             THE COURT:  Yes.

1          THE PROBATION OFFICER:  If he served part of that

2    sentence within the 15-year period, it would be countable.

3          THE COURT:  So, for example, if somebody gets a

4    20-year sentence, 22 years before the issue -- the -- they

5    issue, the conviction on the later crime --

6          THE PROBATION OFFICER:  Uh-huh.

7          THE COURT:  -- even though the sentence was 22 years

8    before and more than 15, it would still be decountable,

9    notwithstanding the 15-year period, because he's in prison

10   serving it until that time.

11         THE PROBATION OFFICER:  Right.  And I think that the

12   important part on this case, though, is that the sentence on

13   Count Two was imposed to be run consecutive to Count One.  And

14   so I think that's also super important for the calculation of

15   the guidelines and the time line, time frame.

16         THE COURT:  Well, it was.  I'm not sure it's super

17   important.  I'm not sure it's determinative.  But assuming that

18   it is, it's undisputed that it was imposed consecutively.

19         THE PROBATION OFFICER:  Right.  But I think to

20   counsel's --

21         THE COURT:  Let me ask a hypothetical question to

22   you.  Like I said, let's take my hypothetical.

23         30 years ago a defendant gets sentenced to 20 years

24   of imprisonment.  He serves that 20 years of imprisonment.  Now

25   we're -- he gets out 10 years before the crime of conviction

58

```
 1   and his sentencing on the crime of conviction.

 2            THE PROBATION OFFICER:  Uh-huh.

 3            THE COURT:  The sentence in that is 30 years old.

 4   But it counts, doesn't it?

 5            THE PROBATION OFFICER:  Yes.

 6            THE COURT:  Do you agree?

 7            MR. ROMBEAU:  Yes, your Honor.  That would be within

 8   15 years.

 9            THE COURT:  Right.  He's still serving some portion

10   of that sentence within 15 years of the count -- the -- is it

11   the crime of conviction or the sentence -- sentencing date that

12   matters for the 15-year period?

13            MR. ROMBEAU:  The crime of conviction, the date of

14   the offense.

15            THE COURT:  All right.  So the date of the offense

16   is within 15 years of -- while at a time when he's still

17   serving that sentence.

18            MR. ROMBEAU:  Yes.

19            THE COURT:  Okay.

20            MR. ROMBEAU:  And that would count, yes.

21            THE COURT:  Right.  So why is it -- why do I even

22   need to think about the first sentence and the consecutive to

23   it and all that?  The point is he got sentenced more than

24   15 years out on that crime, but within 15 years he's still

25   serving a sentence on that crime.  It counts for that reason.
```

1          MR. ROMBEAU:  That's our view, yes, your Honor.

2          THE COURT:  You don't think that works.

3          THE PROBATION OFFICER:  I agree with you.  I think

4     that counsel is -- defense counsel is trying to say because the

5     second sentence was less than 12 years -- less than 12 months

6     and a day, then it would be within the 10-year time frame and I

7     think that's why I'm -- I am relying --

8          THE COURT:  Okay.

9          THE PROBATION OFFICER:  -- on consecutive language.

10         THE COURT:  Again, this defendant's facing a very

11    long sentence.  This, in my mind, is a silly issue because I

12    have to deal with the reality of the defendant.  He has the

13    convictions he has.  Whether I count them for purposes of his

14    guideline range or I treat them as a variance upward or

15    downward because of it, it is all going to wash out and not a

16    matter.

17         That's why I don't, frankly, like to engage in these

18    lengthy hypertechnical arguments that take -- it distracts

19    from -- you know, this defendant is facing a decade or more in

20    prison.  We ought to be focusing on the things that really

21    matter.  But I'll do what the law requires me to do.

22         So I understand your point now to be if the ultimate

23    sentence on that crime is less than 13 months, then it can only

24    be counted as if it's within 10.

25         THE PROBATION OFFICER:  Correct.

```
 1                    THE COURT:  And it's not within 10.

 2                    THE PROBATION OFFICER:  Correct.

 3                    THE COURT:  And so you're saying because that

 4    sentence is only a 12-month rather than a 13-month sentence, it

 5    only counts within the 15-year rule rather than the 10-year

 6    rule because it was imposed consecutively to the other

 7    sentence, which brings the collective time served to more than

 8    a year.

 9                    THE PROBATION OFFICER:  That's correct.

10                    THE COURT:  Okay.  And what is the provision that

11    you rely on that says when you are sentenced on multiple -- for

12    multiple counts and one is imposed consecutively to the other,

13    a count -- the total amount of time served on both?

14                    THE PROBATION OFFICER:  Sure.  I'm relying on

15    4A1.2(a)(2) which is the language that says:  If prior

16    sentences are treated as a single sentence, which is what I

17    believe this is, use the longest sentence of imprisonment.  If

18    concurrent sentences were imposed -- which is not relevant

19    here, but if consecutive sentences were imposed, which is the

20    instant matter, then you use the aggregate sentence of

21    imprisonment.

22                    So that's me -- my understanding is I would

23    aggregate Count One and Count Two.

24                    THE COURT:  Okay.  But you both are assuming that

25    these two should be treated as a single sentence, so you need
```

```
 1   to explain to me why you think that is.

 2              MR. ROMBEAU:  From the government's standpoint, your

 3   Honor, it appears from paragraph 42 that these were charged in

 4   separate docket numbers.  So I'm not going to say that these

 5   were in the same charging instrument --

 6              THE COURT:  Right.  So it would be (b), right --

 7              MR. ROMBEAU:  That's correct.

 8              THE COURT:  -- the sentences were imposed on the

 9   same day.

10              MR. ROMBEAU:  Which is July 3rd, 2001.

11              THE COURT:  Yeah.  And what I understand the defense

12   to be saying is for purposes of counting here, the sentence

13   that was imposed was imposed on a different day and, therefore,

14   they shouldn't be treated as the same.  If she's wrong about

15   that, then you guys are both right.

16              So that -- why don't you respond to that argument.

17   And then you've got this other issue about -- I don't know what

18   the term is because I -- you know, these things really don't

19   affect how I sentence people, but we have to technically do it.

20              But so respond to the argument I think the defendant

21   would be making, and if I'm misreading you tell me --

22              MS. BROWN:  Uh-uh.

23              THE COURT:  -- your argument, the defense argument

24   is that for purposes of 4A1.2(a)(2), these two sentences should

25   not be treated as part of the same sentence because although
```

62

1    the original sentence was imposed on the same day, the term of

2    incarceration that comes -- that is needed to get this within

3    the 15-year period was a period of incarceration of 12 months

4    rather than 13 months and that sentence was not imposed on the

5    same day as the other incarcerative sentence.

6            Now, the response to that that one would make is,

7    Judge, what matters is the original deferred sentence,

8    suspended sentence, was imposed on the same day and the one

9    year is simply a continuation of that and, therefore, they

10   should count as the same sentence.

11           I think that's the legal issue that, you know, you

12   say yes, she says no.  But that's --

13           THE PROBATION OFFICER:  That's my -- my position.

14           THE COURT:  Okay.  Okay.  All right.  So we've got

15   the argument, we got one argument; we got the counterargument.

16   The one argument is -- your argument is but, Judge, the two

17   sentences were imposed on the same day and that somebody later

18   gets determined -- like if this had been a sentence of

19   probation and a violation and he went back to prison, you would

20   clearly treat it as the same sentence, the two crimes were

21   sentenced on the same day, and you asked was the incarcerative

22   period part of the original sentence, it was because there was

23   a term of probation, there was a violation.

24           Should that work the same way with respect to a

25   suspended sentence?

1          MR. ROMBEAU:  And that's the analogy I would make,

2     your Honor, because it -- at the end of the day, it's being

3     punished for the original burglary.

4          THE COURT:  Okay.

5          MR. ROMBEAU:  And -- and because the period of

6     incarceration on that sentence which is imposed in this

7     '01 case in 2006, it is -- is akin to a probation violation.

8     And so he is, therefore, incarcerated on the '01 conviction

9     into 2006, which would then make it fall within the time

10    period.

11         And I think -- I respect the Court wants to disagree

12    with us.  That's fine.  But I think that our analogy would be

13    to a probation violation that were he sentenced to three years,

14    got out --

15         THE COURT:  And you don't have any case law or

16    commentary or anything that you can draw my attention to?

17         MS. KRASINSKI:  Your Honor, I am pulling this up

18    right now.  I have found an Eastern District of New York case.

19    It's called *United States vs. Morales*, 232 F.R.D. 116.  I'm not

20    sure why I'm not seeing a Westlaw citation right here.  It's a

21    December 2005 case.

22         And in that case the Court holds that in determining

23    whether or not criminal history points apply, and specifically

24    whether the defendant's prior sentence of one-year imprisonment

25    imposed following revocation of probation was inside or outside

64

1    the 10-year limitation period for inclusion in criminal history

2    calculation, the date of the original sentence is the date that

3    you used, not the date of resentencing following probation

4    revocation.

5            THE COURT:  See, that's -- that's the example I just

6    gave, which I agree with that judge.  That's what I was just

7    saying.

8            The only interesting twist on this is this was not a

9    probation violation.  It was a suspended sentence that was

10   partially reimposed.  That's -- that's what I think happened.

11   And does -- should there be a different rule for that and I --

12   I don't see a good principled reason why there should be a

13   different rule for that, but nobody has anything more on point

14   for me on that.

15           MS. KRASINSKI:  I'm not seeing anything else --

16           THE COURT:  Okay.  All right.  Anything else the

17   defense wants to say on this particular issue?

18           MS. BROWN:  Yes, your Honor.

19           Something that's very interesting here, counting the

20   12 months that Mr. Donovan did on the subsequent sentence in

21   2006, counting that as a consecutive sentence is it really

22   takes a lot of back flips because he'd already served his first

23   sentence.  He was done with that prison sentence when this was

24   imposed.

25           So this isn't a case of somebody, you know, having a

1    probation violation and then going back in.  He was --

2            THE COURT:  Was the original consecutive -- was the

3    original suspended sentence consecutive to the original stand

4    committed sentence?

5            MS. KRASINSKI:  Yes.

6            THE COURT:  The judge specifically in the judgment

7    said this suspended sentence is consecutive to the original

8    imposed sentence.  So --

9            MS. BROWN:  (Nods head.)

10            THE COURT:  -- I understand your point, but that was

11    what the sentence was.  It was imposed as a consecutive

12    suspended sentence.

13            MS. BROWN:  Right.  But our argument is he was

14    basically resentenced many years down the road and that's what

15    resulted in the 12 months.  And so to treat that as an

16    aggregate sentence of the time he did in prison and then the

17    time that was imposed in 2006, I don't think fits the spirit

18    and meaning of the rule we were just talking about.

19            So that's why we agree this is a very unique

20    situation under very unique New Hampshire law in terms of this

21    sentence getting changed and modified three or four different

22    times and then to -- I mean, when the judge sent him to prison,

23    I mean, prison, to the county jail for 12 months, the words

24    consecutive weren't anywhere because there was nothing to make

25    it consecutive to.  He'd already done the other sentence.

1          So that's what makes this, I think, distinguishable
2    from a situation of probation violation that sort of gets
3    someone captured within the time period.  And I think there's a
4    very unique -- I mean, you've stated a very unique procedural
5    history to that burglary charge that was originally a suspended
6    sentence.
7          THE COURT:  All right.  Thank you.
8          So I feel sorry for the Court of Appeals that is
9    going to have to try to understand what this particular issue
10   is.  I -- I will do the best I can to summarize what I think
11   the issue is here and how I resolve it.  But the bottom line
12   is -- well, there are two points that I would make.
13         First, it's not clear to me what the answer is, but
14   it seems to me the better answer is the one the government is
15   arguing now, that it does count, and -- but I want to make
16   clear my ultimate sentence here is not going to be affected by
17   how I resolve this particular issue.  Whether the defendant's a
18   III or a IV is -- if he's a IV, it's because in part of a very
19   old sentence being counted and if he's a III, it's not counting
20   a very significant crime that he committed.
21         You know, the -- the real world of judging by trial
22   judges is -- it's not this artificial kind of like it's a
23   chemical formula where you -- you have to get the ingredients
24   right and the right temperature.  I mean, this is a technical
25   issue that is important to probation officers and -- for

1    somebody that has to determine what to do with somebody's life,

2    I would take it into account either way and it would produce

3    the same sentence in my mind.

4            But having said all that, because I have to

5    accurately determine the guideline range, I will explain the

6    situation.  But I need to do one other thing.

7            You said you agree with the government on one thing,

8    but you agree with the defendant on the other thing.  I'm not

9    sure what it is you agree with the defendant on and why that

10   matters here.

11           THE PROBATION OFFICER:  It does not.

12           THE COURT:  Okay.  Okay.  Good.  All right.  Because

13   I was completely lost on that one.

14           All right.  So let me see if I can explain the

15   situation.

16           This issue arises and concerns whether the

17   defendant, in paragraph 42, should be assigned three criminal

18   history points for the convictions referenced in paragraph 42.

19           The probation office report in front of me assigns

20   zero points for those convictions, presumably because the

21   probation officer initially felt that the convictions were too

22   old to be countable.

23           The government has objected to that determination

24   and argues that the convictions are not too old to be countable

25   for reasons that I will explain.

68

1          The probation office now agrees with the government

2    on that position and so agrees that that paragraph should be

3    amended to reflect a three-point adjustment.

4          Now, the general rule here is, as I understand it --

5    and if I've got it wrong, somebody will tell me -- is that for

6    this type of conviction, it is countable only if the sentence,

7    and that means the period of time being served on the sentence,

8    is within a 15-year period of the commission of the crime of

9    conviction.

10          The problem here is that paragraph 42 deals with two

11    burglary convictions.  One of those convictions resulted in an

12    immediate two-to-four stand committed sentence that the

13    defendant was serving and completed in the early 2000s, well

14    before 15 -- well prior to 15 years before the commission of

15    the crime of conviction.  And so that two-year sentence would

16    not count unless it is combined with the sentence the defendant

17    served on the second count.

18          The original sentence on the second count, which

19    occurred on the same day, was a sentence of two to four years,

20    suspended for 10 years.  In -- under New Hampshire law, a

21    suspended sentence can be called forth by the Court -- by -- on

22    motion of the prosecution under certain circumstances within

23    the period specified.  That sentence was imposed consecutive to

24    the stand committed sentence.

25          Now, those two sentences were more than -- imposed

1    more than 15 years before the defendant committed the crime of

2    conviction, so they don't count unless the defendant was

3    serving the sentence with one -- one or both of those sentences

4    within 15 years and the government and now the prosecutor argue

5    that the defendant was, in fact, serving that second sentence

6    within the 15-year period.

7              Why does the -- why do they say that?  The -- they

8    rely on the materials that are referenced in Judge McGuire's

9    order that are attached to the defense -- defendant's

10   sentencing memorandum and this involves some very convoluted

11   sentencing procedures.  I've tried to make sense of them.  I

12   hope I've interpreted it correctly.  But I haven't had a lot of

13   time to think about it, so I -- I hope I've got it right.

14             But let me find that.  Goodness gracious.

15             Okay.  I'm referring to state superior court Judge

16   McGuire's ruling of April 14th, 2009, which is Exhibit 3 to the

17   defendant's memorandum where she describes the procedural

18   history.

19             And as I now understand that procedural history,

20   what happened here was the original sentence was -- the second

21   burglary conviction sentence was imposed consecutive to the

22   first and was suspended for 10 years, a two-to-four-year

23   sentence.  Then there were a series of superior court judge

24   rulings that addressed the second sentence.

25             On February 3rd, 2006, after the first burglary

1   conviction had been presumably completely served, the Court

2   granted the state's motion to impose the suspended sentence.

3   That then was modified by Judge Houran, another superior court

4   judge, on June 21st, 2006, which changed that sentence to two

5   to four years deferred, which is a -- a process in

6   New Hampshire, according to defense counsel, that I don't --

7   I'm not familiar with in which a sentence can be -- the

8   imposition of a sentence can be deferred and the defendant,

9   within the deferral time, can come forward and try to persuade

10   the Court to further modify the sentence.

11        In any event, on October 25th, 2006, another judge,

12   Judge Holman, granted the motion to impose and sentenced the

13   defendant to two to four years in prison all suspended and

14   conditioned the suspension on the defendant serving 12 months

15   in the House of Correction; Judge Holman added two years of

16   probation to the defendant's sentence.

17        Then on September 25th, 2007, after the 12 months

18   had been served, Judge Fitzgerald found the defendant

19   chargeable for a probation violation on the probation term

20   imposed by Judge Holman and sentenced the defendant to two and

21   a half to six years stand committed.

22        That sentence was challenged by the defendant and

23   Judge McGuire agreed with the defendant's position that Judge

24   Fitzgerald had illegally sentenced him to prison on the -- the

25   probation violation that was added by Judge Holman's sentence

 1   and so she vacated Judge Fitzgerald's sentence for the

 2   probation violation.

 3          Where that leaves us is we have two convictions for

 4   burglary imposed on the same date, one for two-to-four and one

 5   that was imposed for two-to-four suspended.  We have various

 6   things occurring to that sentence, but the ultimate sentence

 7   was the service of the 12-month sentence with no probation to

 8   follow.

 9          That 12-month sentence was imposed within the

10   15-year period.  The government and the probation office argue

11   that it's countable.  The defendant argues that it's not

12   countable because that sentence was less than 13 months and

13   under the sentencing guidelines, a sentence of 13 months is

14   required to change the counting period from 10 years to

15   15 years and if we don't change it from 10 to 15 years, that

16   one-year period would not be countable.

17          That turns on whether there -- the sentences should

18   be treated as separate sentences or as a single sentence under

19   the guideline provision that we've been discussing.  In my

20   view, the better reading of that provision is that they should

21   be treated as a single sentence imposed on the same day that

22   was ultimately being served within the 15-year period.

23          And when you count the 12 months plus the two years,

24   you get to more than 13 months and so you use a 15-year

25   relation back period rather than a 10-year relation back

72

1    period.  The defendant's sentence is within the 15-year

2    relation back period and, therefore, it counts, he should get

3    three points.

4              I don't have case law.  I haven't studied the issue.

5    I've tried to make as much sense of it as I can.  I think the

6    government has the better argument here.  And so I am going to

7    impose it, but I make clear I'm not going to -- it's not going

8    to affect my ultimate sentence.

9              That requires an amendment -- or we're doing it as

10   the judgment should reflect that I do not agree with the

11   probation report on that particular paragraph and that there

12   should be a three-point added.  That increases the defendant's

13   criminal history level from III to IV and makes corresponding

14   changes which produces what as a guideline range?

15             THE PROBATION OFFICER:  110 to 120 months.

16             THE COURT:  Okay.  The defendant's objection on that

17   is noted.

18             What other objections do you have to the -- well,

19   see, does the government have any other objections to the --

20             MR. ROMBEAU:  No, your Honor.  That was the

21   government's only objection.

22             THE COURT:  Okay.  So the defendant has an objection

23   regarding the oil filters and whether they are appropriately

24   treated as a silencer.

25             You make two arguments with respect to that.  One,

1    the government says, does not turn on whether the silencers --

2    whether the oil filters are silencers or not.

3              Are you still -- and I -- I'll try to reconstruct

4    the --

5              MS. BROWN:  Yeah, I -- I think there's sort of three

6    variants, but two are very closely related.

7              I think the -- the one issue is whether there were

8    three firearms or not.  And, obviously, there's the Moss --

9              THE COURT:  Yeah, but there's -- I want to deal with

10   the other issue --

11             MS. BROWN:  Okay.  Great.

12             THE COURT:  -- which is much more consequential.

13             MS. BROWN:  Okay.

14             THE COURT:  The issue is -- you say the sporting

15   level reduction should be considered and if the sporting level

16   reduction should be considered, that substantially reduces the

17   defendant's total offense level as recommended in the report.

18             And the government makes a very succinct and clear

19   argument that says whatever you're saying about the oil filters

20   doesn't have any bearing on that particular issue because the

21   defendant's criminal record renders him ineligible for the

22   sporting enhancement -- that reduction.

23             Have I got the government's position right on that?

24             MR. ROMBEAU:  That's correct, your Honor.

25             THE COURT:  Could you just state it very briefly for

74

1   the defense so they can respond to it?

2          MR. ROMBEAU:  Yes.  So the sporting level reduction

3   provides that if the defendant, other than a defendant subject

4   to subsection (a)(1), (a)(2), (a)(3), (a)(4) or (a)(5) of the

5   guideline possessed the ammunition and firearms solely for

6   lawful sporting purposes or collection, and then it goes and

7   provides other criteria, it would be reduced to an offense

8   level 6.

9          The problem for the defendant here is that he is

10  subject to one of those disqualifying subsections.  That is, at

11  a minimum, (a)(4), because he has as part of his criminal

12  history a crime of violence for committing the armed bank

13  robbery.

14         So separate and apart from whether or not he

15  possessed a silencer, which --

16         THE COURT:  A defendant -- so your position is under

17  the guidelines, a defendant who has a prior conviction for a

18  crime of violence, which includes armed robbery beyond any

19  question --

20         MR. ROMBEAU:  Yes.

21         THE COURT:  -- renders a defendant subsequently

22  convicted of being a felon in possession of a firearm with

23  the -- being unable to claim the sporting credit.

24         MR. ROMBEAU:  That's correct, yes.

25         THE COURT:  That's your position.

1          What's wrong with that analysis?  That seemed

2   correct to me at the time.  You tell me what's wrong with it.

3   Take the time to consult with your client.

4          MS. BROWN:  Yes.

5          (Discussion between defendant and counsel.)

6          MS. BROWN:  Your Honor, first of all, not to get

7   into a lot, we stand by the position in our sentencing

8   memorandum and objection.

9          As I understand the government's argument, both in

10  their pleading and today, is that the defendant's request for a

11  sporting purpose reduction is frivolous and that it -- there's

12  no basis for it whatsoever.  I think it's important to explain

13  to the Court why we made this argument and the history behind

14  that.

15         When I was preparing for sentencing, it was

16  Mr. Donovan who said, what about the sporting purpose

17  reduction?  And I -- I have never dealt with this before.  Most

18  of the cases I have dealt with involving firearms have involved

19  drugs and handguns and there wasn't even anything close to a

20  sporting purpose.

21         So I started researching it.  But the reason I

22  started researching it is that Mr. Donovan told me and -- that

23  his lawyer told him, his previous lawyer told him, that the

24  government said that that may apply in this case.  And so

25  that's why I think that's problematic.  What Mr. Donovan said

1   he was told is that he pled guilty, he could argue the sporting

2   reduction application at sentencing.  So, for me, that meant

3   that the government thought that there was an applicability to

4   the sporting purpose application.

5          I stand by the pleading that I filed.  I won't just

6   repeat it.  I think it's there and it's preserved.  We read

7   that differently and it was based on what Mr. Donovan told me

8   about prior plea discussions, that that was something that he

9   was potentially eligible for.

10          THE COURT:  Okay.  But this isn't a -- I mean, we're

11   not litigating an ineffective assistance of counsel claim at

12   the present time.  You're saying you're, like, faulting his

13   defense lawyer for giving him improper advice.  He didn't end

14   up pleading guilty anyways.  He went to trial.  So I'm not sure

15   how that matters.

16          But let me ask the government.  Can you just

17   identify the specific provision in 2K2.1(a)(4)(B) or (A) that

18   justifies -- that excludes someone with a crime of violence

19   conviction.

20          MR. ROMBEAU:  Right.  And, again, so this is

21   separate and apart from any determination on the silencer

22   issue --

23          THE COURT:  Right.

24          MR. ROMBEAU:  -- but under (4)(A) it says:  If the

25   defendant -- that applies if the defendant committed any part

1   of the instant offense subsequent to sustaining one felony

2   conviction of either a crime of violence or a controlled --

3               THE COURT:  Right.

4               MR. ROMBEAU:  -- substance offense.

5               THE COURT:  So it's 2K2.1(a)(4)(A).

6               MR. ROMBEAU:  Yes, your Honor.  Yes.

7               THE COURT:  Okay.  And then you make the point that

8   under 2K2.1(b)(2) makes clear that the sporting reduction

9   doesn't apply if the defendants are subject to subsection

10  (a)(4).

11              MR. ROMBEAU:  Among others, yes, your Honor.

12              THE COURT:  Okay.  All right.  Good.

13              So I understand, Counsel, why you made the argument,

14  but I do agree with the government that that argument is

15  legally faulty and the defendant should be given a -- a

16  break -- should not be eligible for the sporting reduction.

17              And I have -- my reporter has been working

18  diligently for a long time, so we need to take a break.  And

19  we'll break for about 15 minutes.  Okay?

20              And I am going to try and finish this.  We'll deal

21  with the motions to dismiss as well.

22              When we come back, the argument about the oil

23  filters now results is -- in, what, how many points?

24              MS. KRASINSKI:  Five, your Honor.

25              THE COURT:  Five, if it's three rather than one?

1      MS. KRASINSKI:  Yes, because it will impact whether

2  the base offense level is 22 or 20 and then also -- excuse me,

3  4 -- and then whether or not there's a two-level enhancement

4  for the number of firearms.  So, ultimately, whether or not

5  they are silencers results in a four-point swing.

6           THE COURT:  So where does the two-point come in?  So

7  let's go to paragraph 26.

8           How does the -- how does the -- how does the

9  silencer issue affect paragraph 26?

10          MS. KRASINSKI:  Because if there are two firearm

11  silencers, that -- and the Court finds them to be relevant

12  conduct, then the number of firearms involved in the instant

13  offense -- oh, I'm sorry.  You're talking about 26, the base

14  offense level.

15          THE COURT:  Yeah.

16          MS. KRASINSKI:  Firearm silencers are firearms

17  defined in 26 United States Code 5845(a) under the National

18  Firearms Act.  And because he has been convicted of a crime of

19  violence, if the relevant conduct in this case includes a

20  silencer, his base offense level will be 22.

21          If the Court finds either that these are not

22  silencers --

23          THE COURT:  Okay.  What's the guideline provision

24  that bumps it up from 20 to 22?

25          MS. KRASINKSI:  It's 2K2.1(a)(3).  And that's

1    actually the -- the base offense level that the probation

2    office uses.

3            THE COURT:  2K2.1 what?

4            MS. KRASINSKI:  (a)(3).

5            THE COURT:  (a)(3).

6            Okay.  Is -- you're -- what's the statutory

7    provision that triggers 22 rather than 20?  Is it 26 U.S.C.

8    5845(a)?

9            MS. KRASINSKI:  Yes, and that's a definition of a

10   firearm under the National Firearms Act.

11           And it reads in part:  The term firearm means,

12   subsection (7), any silencer as defined in Section 925 --

13           THE COURT:  Okay.  So it's not just a firearm; it's

14   a special firearm, like machine guns and silencers.

15           MS. KRASINSKI:  Correct, your Honor.

16           THE COURT:  Okay.  Yeah.  And that's what 5845(a) --

17           MR. ROMBEAU:  Yes.

18           MS. KRASINSKI:  Yes.

19           THE COURT:  Okay.  So it's a kind of -- the weapon

20   that was -- the gun that was actually found wouldn't qualify.

21   He would be a 20 if I just count the gun.  So the total is 2 --

22   under 2K2.1(a) and then two more as a specific offense

23   characteristic because of the number.

24           MS. KRASINSKI:  That's correct, your Honor.

25           THE COURT:  Okay.  So you're going to call

1   witnesses.  Who does the defense want to call?

2          MS. BROWN:  Your Honor, we have Ralph Demicco, who

3   used to be the owner of Riley's Gun Shop.  He's very familiar

4   with firearms, helped me understand a lot of this which I

5   didn't understand when I first started doing that.

6          He will explain issues regarding -- first of all,

7   he'll talk about commercial silencers.  I know the Court is

8   very familiar with the *Crooker* case.

9          THE COURT:  You guys don't cite my opinions on

10  silencers.  I actually have written --

11         MS. BROWN:  I've read it.

12         THE COURT:  I have written a very lengthy opinion on

13  what a silencer is that was affirmed by the First Circuit.  I

14  mean, I am very -- I cite extensively the *Crooker* case.  I was

15  surprised --

16         MS. BROWN:  Exactly.  That's how I got to the

17  *Crooker* case.

18         THE COURT:  I was very surprised that you didn't --

19  neither of you in your memorandum cited my really careful

20  analysis of what a silencer is.

21         But -- I'm just joking.

22         MS. BROWN:  I know.

23         THE COURT:  So you're going to call this witness

24  who's going to --

25         MS. BROWN:  Mr. Demicco.

1          THE COURT:  -- try to say that these were not

2   silencers?

3          MS. BROWN:  I mean, ultimately that's your decision,

4   your Honor, but he's going to talk about specific

5   characteristics of silencers.  As you know from the *Crooker*

6   case, there's a difference between a commercial silencer --

7   which is a really easy issue, we wouldn't be here arguing about

8   that; and --

9          THE COURT:  Well, it wasn't so easy.  In my case,

10  *SIG Sauer* was saying it was a -- and I'm getting the term

11  wrong, basically a muzzle --

12         MS. BROWN:  Muzzle brake.

13         THE COURT:  Muzzle brake.

14         MS. BROWN:  Which I had to look up as well.

15         THE COURT:  Which is the other -- the other argument

16  that people make about oil cans, not oil cans but oil filters,

17  but sometimes they say it's a flash suppressor, not a silencer.

18  So maybe you can have an argument that these are intended as

19  flash suppressors.

20         All right.  But let's just try to keep it quick and

21  focused.  All right?  I don't want to spend two days on -- I've

22  already spent many, many hours learning about what a silencer

23  is and isn't and I know a fair amount about it because I had to

24  teach myself all about that to get to the -- my decision in the

25  *SIG Sauer* case.

82

1          MS. KRASINSKI:  Your Honor, we can get into this

2    more in detail when Attorney Brown calls him, but the

3    disclosure letter sent by the defendant essentially says that

4    his opinion will be that these -- these firearm silencers

5    essentially wouldn't have easily or practically been adapted to

6    use on the specific Mossberg shotgun.  We don't dispute that,

7    so the government likely will object to this testimony because

8    we agree that these silencers, as they exist right now,

9    couldn't have just been put on the shotgun.  So --

10          THE COURT:  All right.

11          MS. KRASINSKI:  But we can talk about that later.

12          THE COURT:  Well, you decide whether he has anything

13    else useful to say other than that which is not a disputed

14    point and then you're going to call some expert to say what is

15    a silencer.

16          MS. KRASINSKI:  So we have the expert who analyzed

17    them and concluded that they are silencers.  There's an expert

18    who will testify that there was --

19          MR. ROMBEAU:  There was -- I want to make sure I

20    get the term correct -- smokeless powder and other materials

21    indicative of fired ammunition inside one of the filters.

22          MS. KRASINSKI:  And in our discussions with Attorney

23    Brown, she has indicated that she intends to challenge that

24    these should constitute relevant conduct at all in part based

25    on how they were stored and how they were found in the garage.

1    So Agent Forte will address a little bit of that, your Honor.

2         THE COURT:  I mean, the parties should know there

3    are a number of cases that -- where other courts have dealt

4    specifically with oil filters as silencers and have noted that

5    they do meet the definition of silencers.  There may be facts

6    specific to this case, but oil filters are a very common way in

7    which people try to make homemade silencers.  That's one of the

8    things they often do.  They don't work as well as a regular

9    silencer, but I'm -- I've got the cases.  I'll read them out

10   when we need to.

11        But this is a -- this isn't like, oh, you know, this

12   is such a weird thing, nobody would use this as a -- no, this

13   is a standard thing that people do to try to create homemade

14   silencers is they use oil filters.  But, you know, we'll -- I

15   just don't want to spend hours and hours on this.  I -- I

16   don't -- I don't know that there's that much that I can learn.

17        Now, whether it's relevant conduct, that's a legal

18   argument that these witnesses have nothing useful to tell me

19   on.  You know, that's -- but that's fine.  That's a legal

20   argument that, oh, it's a different gun, so you shouldn't --

21   it's not relevant conduct.  But that's something we can argue

22   about.

23        Okay.  We'll take a short break.  I am going to try

24   to -- we'll probably be here after lunch because I'm going to

25   try to get through the motion to dismiss as well.  Okay?

```
 1              THE CLERK:  All rise.

 2         (Recess taken from 11:38 a.m. until 12:01 p.m.)

 3              THE CLERK:  Please be seated.  This hearing is back

 4    in session.

 5              THE COURT:  All right.  So we'll next address the

 6    defendant's objection to the -- I addressed the sporting

 7    purpose objection and said that doesn't apply, so the

 8    defendant's base offense level is at least 20.

 9              If the government and the probation officer are

10    correct, it should be 22 rather than 20 because the silencer

11    issue if is as represented in the report would increase the

12    base offense level from 20 to 22.  It would also add two

13    additional points based on the number of firearms because the

14    oil filters would be treated as firearms for purposes of that

15    adjustment.  So it's a four-level adjustment.

16              The defense wants to call a witness.  I'll hear --

17    that person can come up.  Come on up here, sir.  Stand by the

18    witness stand and raise your right hand.

19              THE CLERK:  Right here, sir.

20              RALPH DEMICCO, having been first duly sworn,

21    testified as follows:

22              THE CLERK:  Thank you.  Please step up, take a seat,

23    and state your full name and spell last name into the

24    microphone, please.

25              THE WITNESS:  Ralph Demicco, D-e-m-i-c-c-o.
```

85

<u>DIRECT EXAMINATION</u>

1

2 <u>BY MS. BROWN:</u>

3     Q.   I always have to check.  Good morning or afternoon

4 now, Mr. Demicco.

5          Are you currently retired?

6     A.   I am.

7     Q.   Okay.  Before you retired, what did you do?

8     A.   I owned Riley's Sports Shop in Hooksett,

9 New Hampshire, a long-standing firearms and law enforcement

10 supply business --

11    Q.   Okay.

12    A.   -- for 40 years and seven months.

13    Q.   And as part of doing that or operating that

14 business, did you, out of necessity, become familiar with

15 firearms?  Are you familiar with firearms and how they operate?

16    A.   Oh, quite.

17    Q.   Okay.  Have you consulted with other attorneys or

18 testified in court regarding the operation of firearms?

19    A.   I have.

20    Q.   Okay.  Do you know how many times that was?

21    A.   I would -- looking back over that period of time,

22 probably four or five times in various criminal cases, a couple

23 of federal court cases.

24    Q.   And did I consult with you regarding this case?

25    A.   You did.

1       Q.    Okay.  And, specifically, what did I consult with

2  you about?

3       A.    We had talked about the Mossberg shotgun, which is

4  not in question anymore, I guess, and the presence of two FRAM

5  oil filters allegedly considered silencers.

6       Q.    Okay.  I'd like to talk about the Mossberg.

7       Now, before the hearing you heard the prosecution

8  talk about the fact that they're not alleging the silencers

9  were used for the Mossberg, but I have a couple of questions

10  about that that are related to some issues here the judge needs

11  to decide.

12       The Mossberg, one of the things we discussed was the

13  fact that there were holes drilled in it, correct?

14       A.    That is correct.

15       Q.    Okay.  Did you have an opinion as to how those holes

16  got there or drill holes I'll call them?

17       A.    They appeared to be a very amateurish effort.  They

18  were not even.  There appeared to be tool marks next to a

19  couple of the holes which indicated possibly drilled by a hand

20  drill.

21       THE COURT:  I am intrigued, if you know, is there a

22  common purpose for having holes drilled in a -- into a gun like

23  that?

24       THE WITNESS:  Yes, your Honor.  Specifically to

25  reduce recoil.  They vent the gases before the projectile

1   leaves the barrel and what that does, it relieves some of the

2   pressure and reduces recoil.

3          THE COURT:  Okay.

4          MS. BROWN:  And if I can approach the witness, your

5   Honor, I'm going to show you what is Defendant's Exhibit C and

6   B for identification at this hearing.

7      Q.   Were those the photographs that you examined in this

8   case?

9      A.   They are.

10          MR. BROWN:  Okay.  Does the government have any

11  objection to these being full exhibits?

12          MS. KRASINSKI:  No, your Honor.

13          MS. BROWN:  Okay.  In fact, it might be helpful,

14  your Honor, if I can ask that these be given to the Court.

15          THE COURT:  All right.  Do you want to show them or

16  do you want me to have them?

17          MS. BROWN:  I've given them -- or, actually, I can

18  show them; why don't I do that.

19          THE COURT:  Whatever works.

20          MS. BROWN:  Thank you.

21     Q.   Here you go.

22          So this is now Defendant's Exhibit C.  You were

23  talking about how the drill holes weren't in alignment.  Does

24  this photograph depict that?

25     A.   It certainly does.

1    Q.    Okay.  And you were also describing how some of the

2    holes had markings around them that we can see, like especially

3    the holes -- the three holes to the left.  Is that what you

4    were describing as well?

5    A.    Yes, it is.

6    Q.    Okay.  And so why were the -- those markings near

7    the drill holes important to you?

8    A.    Well, it indicated that -- it appears as though that

9    this barrel was not put in a proper fixture to drill them

10   straight and true and that that -- that mark is probably a

11   result of a slipped drill, hand drill of a sort, or an unsteady

12   fixture.  So it was pretty much amateur.

13   Q.    All right.  And were you aware that the barn or shop

14   that was searched in this case of Mr. Donovan's property had a

15   drill press?

16   A.    I am.

17   Q.    Okay.  Do the markings that are here on the barrel

18   of this shotgun look to -- or appear to have been put there

19   from a drill press?

20   A.    Not if properly set up.  I would -- I would say if

21   that -- this barrel was properly set up in a drill press, the

22   unevenness of the holes and the markings probably would not

23   exist.

24   Q.    Okay.  Now, the judge asked you a few minutes ago

25   about why someone would drill those holes and you said that

 1   would -- in the hope of preventing a recoil.

 2        A.   Correct.

 3        Q.   Are -- based on your experience of selling firearms,

 4   is there a reason why some people might want to avoid the

 5   recoil?

 6        A.   It's unpleasant to some and in a hunting situation,

 7   for example, the more recoil, the -- the more time it takes to

 8   get back on your target for a necessary second shot should that

 9   be the case.

10        Q.   Okay.  Could someone else drill -- is there another

11   word for --

12        A.   Porting.

13        Q.   Porting, p-o-r-t-i-n-g?  Okay.

14             And that's what's indicated in your report, correct?

15        A.   Correct.

16        Q.   Is there -- maybe certain people who have lesser

17   strength levels might want to do this as well to their guns to

18   create porting?

19        A.   Sure.

20        Q.   Okay.  Now, what I want to ask about in porting is

21   if a person had an intent to operate or discharge a firearm at

22   a lower decibel level, would they add porting to the gun?

23   Would they add these drill holes?

24        A.   Absolutely not.

25        Q.   Why is that?

1      A.    Because the noise is vented out those side ports

2  instantaneously prior to the projectile exiting and causing the

3  report at the muzzle end of it.

4      Q.    Okay.

5      A.    So it's very, very loud and obnoxious.

6      Q.    So it almost sounds like the opposite of a silencer.

7      A.    Absolutely.

8      Q.    It's going to make your firearm louder?

9      A.    Yes, it does.

10     Q.    Now, in addition to talking about -- well, you know,

11  even though the prosecution has agreed to this, you -- you are

12  saying that the two oil filters that you examined are not

13  compatible with this firearm, the Mossberg?

14     A.    Not at all that I could possibly see.

15     Q.    So let's -- let's shift to talk about those two

16  silencers.

17           Actually, again, if you don't mind, I can show him

18  your exhibits --

19           MS. KRASINSKI:  I have no problem.

20           MS. BROWN:  -- so we don't have duplicitous

21  exhibits.

22     Q.    So this is Government Exhibit 8, if you can look

23  through that.

24     A.    That is what I saw, yes.

25     Q.    Before you gave your opinion in this case, correct?

1          A.    Yes.

2          Q.    So we know what we're talking about, so the -- the

3    Government's Exhibit 8 consists of four photographs.  I'm going

4    to put the top photograph there.

5               Oh, there it goes.  Got it focused.

6               Could someone, in your opinion, take that firearm --

7    that -- filter, the FRAM filter, and put it on a firearm today?

8    Like if that exhibit were actually physically here, I think it

9    is, could they just put it on a firearm and use it and go out

10   and expect that it operate?

11              MS. KRASINSKI:  I'm going to object.  That is not in

12   the expert disclosure report.  The only opinion related to that

13   attached to a firearm in the report is that it can't be

14   attached to the Mossberg shotgun.

15              THE COURT:  All right.  What do you want to say?

16              MS. BROWN:  I think the reports talked about whether

17   this -- these were adaptable to that.  I -- quite honestly, I

18   didn't know until Saturday that the government was admitting

19   that the Mossberg was not compatible with the --

20              THE COURT:  I'll hear the answer for purposes of the

21   record.  I'll defer judgment as to whether I'm going to rely on

22   it in any decision I make.

23              You can answer the question.

24          Q.    So if a person were to take that FRAM oil filter as

25   it appears in the photograph behind you, could they use that as

1    a silencer as it is right now?

2         A.   Not easily.

3         Q.   Okay.  And what do you mean by that?

4         A.   The configuration of the piece of metal that

5    protrudes out of the oil filter requires an attaching

6    interface.  In this instance, most suppressors use an adapter

7    that threads into the oil filter or into the suppressor and

8    then on the exterior of threads on the firearm.

9              This does just the opposite.  It has a threaded

10   portion coming out -- I know a little bit about shop work and

11   machine shop.  I cannot imagine how that would be safely and

12   efficiently attached to any firearm.

13             Now, I know the ATF tested it, but they have very

14   sophisticated fixtures and jigs and things for doing this.  But

15   the ordinary person would not.  Very difficult to apply that

16   and secure it to a firearm to make it operate safely.

17        Q.   So you're aware that in this case the ATF did

18   testing where five shots were done on a firearm other than the

19   Mossberg, correct?

20        A.   I am.

21        Q.   Okay.  And is it your opinion that they had other

22   things to adapt that to make it a silencer or a suppressor?

23        A.   They would have had to, yes.

24        Q.   Okay.  And I just want to clarify for the record.  A

25   minute ago you used the term suppressor.  Do you use the word

1    suppressor and silencer interchangeably?

2         A.    I do.  It's probably incorrect in some applications,

3    but --

4              THE COURT:  No, a lot of people refer to them, but

5    there is, as you well know, better than I know, I'm not a gun

6    expert, people do use what are called flash suppressors which

7    are not the same thing as silencers and aren't -- flash

8    suppressors, I don't think, are special firearms under the NFT.

9    You can buy them in a regular -- as an attachment to many kinds

10   of firearms, right?

11             THE WITNESS:  Yes, your Honor.

12             THE COURT:  So there's that and then there are

13   muzzle brakes that people put on the ends of guns sometimes to

14   keep the muzzle from riding up.  But I think a lot of people do

15   as you did, use suppressor and silencer as interchangeable.

16             THE WITNESS:  Correct.

17             THE COURT:  Yeah.  Okay.

18             MS. BROWN:  Thank you for clarifying that because

19   when I -- I was new to this originally and so I just wanted to

20   make sure of that.

21        Q.    And is part of the reason why the term suppressor is

22   used is the word silencer is kind of a misnomer?

23        A.    Sound suppressor.  So it suppresses sound.

24        Q.    Okay.  Thank you.

25             THE COURT:  Yeah.  Also, silencer, people think of

94

1    like secret agents coming in to kill people.  And there are

2    other reasons why someone might want to have a silencer than to

3    be a secret agent trying to assassinate people.

4            MS. BROWN:  Right.

5            THE COURT:  It has a bad connotation, so I suspect

6    that's part of the reason.

7        Q.   And you explained that to me, that there's kind of a

8    movie connotation of silencers and then there's real life.

9        A.   The Hollywood silencer and then real life.

10       Q.   Okay.  And in terms of -- so the silencer -- the

11   FRAM oil filters that you looked at, the only way that you

12   could see that they could be used as either a suppressor,

13   silencer, is they would have to have some other adaptations

14   made to them?

15       A.   Correct.

16       Q.   Okay.  So I am assuming -- when you operated your

17   gun store, is that --

18       A.   Sure.

19       Q.   -- fair?  Okay.

20       A.   Yes.

21       Q.   Did you sell commercial silencers?

22       A.   I did.

23       Q.   Okay.  And are you familiar with the decibel level

24   that a commercial silencer would -- I guess differential,

25   what's the difference between -- using one firearm, using it

1  without a suppressor and using it with a silencer or a

2  suppressor, what's the typical decibel level variation?

3      A.   The manufacturers seem to average on 40-decibel

4  reduction in sound.

5      Q.   Okay.

6      A.   Now, that's a complex thing, because that's muzzle

7  blast.  And as I had spoken to you about, there is still the

8  sound signature out in the distance when the bullet breaks the

9  sound barrier.

10     Q.   Okay.

11     A.   But 40 decibels of sound suppression at the muzzle.

12     Q.   Okay.  And did you review the report from ATF in

13 this case as to what the decibel differential was?

14     A.   I did.

15     Q.   Okay.  And you are aware that there were five shots

16 that were conducted, correct?

17     A.   Correct.

18     Q.   Are you aware of what kind of firearm ATF used to do

19 the decibel-level testing on these two oil filters?

20     A.   Yes.

21     Q.   And what was that firearm?

22     A.   It was a Ruger 4522 semiautomatic .22 caliber pistol

23 that appears to have been modified for their use in testing

24 various silencers and/or sound suppressors.

25     Q.   I'm going to show you what's marked as Defense

1    Exhibit H for identification.  What do you recognize that to

2    be?

3        A.    A Ruger .22 caliber 4522 pistol with modifications

4    to accept various suppressors or silencers.

5            MS. BROWN:  Okay.  And do you have any objection to

6    this being published as a full exhibit?

7            MS. KRASINSKI:  No.

8        Q.    So I'm projecting this on the overhead.  When you

9    say there are modifications, can you describe them relative to

10   this photograph?

11       A.    On the forward end of the firearm, there's the

12   light-colored -- silver-colored different metal.  That part has

13   somehow been added to the original barrel, which has been cut

14   for that adapter.  I don't -- I don't know how they made this

15   or make this work, but that is an adapter that they apparently

16   have -- have fashioned so that they can test some suppressors

17   that don't have conventional threading.

18       Q.    So based on your experience in the field of selling

19   firearms, if you bought this Ruger from the factory, would it

20   look like this?

21       A.    Not at all.

22       Q.    Okay.  And what -- how would it look differently?

23       A.    Oh, it would probably have a barrel that was five

24   and a half inches longer, it would be all that blue-black

25   color, and it would have a front sight on the forward end.

1    Q.    Now, when we talked about suppressors before kind of

2  having an average of a 40-decibel differential, do -- can you

3  use the same silencer or suppressor, but use it on different

4  guns and have different decibel level changes?

5    A.    You can stick with the same caliber.  The

6  suppressors are generally made by -- you know, specifically for

7  a caliber.  You can try them on different guns.

8        And, yes, it's the choice of ammunition that will

9  determine the decibel output or the decibel reduction.

10   Q.    Okay.  Back to the oil filters, could a person have

11  another person -- a reason other than using this as a silencer

12  for using that with a firearm?

13       MS. KRASINSKI:  Your Honor, I'm going to object

14  again as to exceeding the scope of the disclosure in this case.

15       THE COURT:  I'll allow the answer, reserve judgment

16  as to whether I decide to rely on it.

17       Go ahead.  You can make the answer for the record.

18       You can answer, sir.

19       THE WITNESS:  Okay.  Thank you, your Honor.

20   A.    It would be hard to imagine this filter to be used

21  for another purpose because of the addition of the silver cap

22  on the end plus the threaded portion.  However, I think I was

23  shown Exhibit 32 --

24   Q.    Uh-huh.

25   A.    -- and that one has a very viable alternate use.

```
 1            Q.    And what would that alternate use be?

 2                  THE COURT:  Wait a minute.  I -- can you show me

 3    what the exhibits are --

 4                  MS. BROWN:  Yes.

 5                  THE COURT:  -- we're talking about?  I'm lost.

 6                  MS. BROWN:  I actually am going to use the agent's

 7    report because I think that --

 8                  MS. KRASINSKI:  The photos are marked.

 9                  MS. BROWN:  There they are.  Thank you.

10                  And for the Court, this is -- it's -- for this

11    hearing, it's Government Exhibit 4E.  I believe it's a series

12    that go with the government's expert and that has Exhibit 32 on

13    it.

14                  Is that what you were referring to?

15            A.    That is correct.

16            Q.    Okay.  And as to that exhibit, could it have other

17    purposes for use with a firearm?

18            A.    Sure could, yes.

19            Q.    Okay.  And what's that?

20            A.    Well, I have seen, and I know it's -- I've got a

21    little picture of it here -- there are commercially

22    manufactured engine oil coolers that you can apply through a

23    hole in the end of the filter that goes to a cooling agent,

24    then back into the engine crank case, and then spin the fuel

25    filter on.  So that is a viable use for the filter like that
```

1    with a hole in the end.

2              MS. KRASINSKI:  Your Honor.

3              THE COURT:  I'm not understanding that.  I mean, is

4    that -- is this something your expertise as a firearms guy or

5    just I know oil filters?  This doesn't have anything to do with

6    firearms, right?

7              THE WITNESS:  It's not a --

8              THE COURT:  Yeah.  You haven't shown that he has

9    some kind of special expertise in automobile design.  That

10   seems like an ordinary extraordinarily speculative use, in my

11   mind.

12        Q.   From your review of the materials that I sent to

13   you, was there any other firearms associated with being found

14   in Mr. Donovan's barn?  Did you compare -- make any other

15   comparisons other than the Mossberg?

16        A.   No.

17        Q.   Okay.  Have you yourself used silencers or

18   suppressors, either in target shooting or hunting or both?

19        A.   Yes.

20        Q.   I'm assuming you're using commercially available

21   ones, correct?

22        A.   Legal, yes.

23        Q.   Legal ones.  Okay.  And those are the ones you

24   described earlier that have approximately a 40-decibel --

25        A.   Approximately, yes.

1      Q.    -- difference.

2            As someone who's familiar with firearms, would

3    something that had a four-decibel difference between use and

4    nonuse be of any value to someone using a firearm?

5      A.    I wouldn't think so.

6      Q.    Why is that?

7      A.    Well, if you look at OSHA charts on sound, they --

8    they publish commercial charts for workplaces.  A whisper is

9    rated at about 30 decibels; a gunshot is rated at about 140 to

10   150 decibels.  So a four-decibel decrease, in my mind, does not

11   seem to be significant in the least.  It's -- it's just a

12   minute amount.

13           MS. BROWN:  Okay.  Great.  I don't have any

14   additional questions.  The prosecution may have some.

15           THE COURT:  Okay.  Thank you.  Cross-examination.

16           MS. KRASINSKI:  Thank you, your Honor.

17                          CROSS-EXAMINATION

18   BY MS. KRASINSKI:

19     Q.    I want to just ask you a little bit about your

20   experience with silencers generally.  I have no doubt in my

21   mind that you have a lot of experience with commercially

22   manufactured silencers, but what I'm more curious about is your

23   experience with homemade silencers.

24           Have you ever received any training in the

25   manufacture of homemade silencers?

1      A.    I have not.

2      Q.    Have you, in the -- at Riley's, did you sell

3   homemade silencers?

4      A.    Oh, no.

5      Q.    Have you ever made a homemade silencer?

6      A.    Absolutely not.

7      Q.    Have you ever shot a homemade silencer?

8      A.    No.

9      Q.    Through your work at Riley's, I'm sure you're very

10  familiar with ATF form 4473?

11     A.    Oh, absolutely.

12     Q.    And what is that?

13     A.    That is a federal form that the purchaser --

14  intended purchaser, needs to accomplish and answer the

15  questions properly before the dealer is allowed to transfer a

16  firearm to him or her.

17     Q.    And what's the purpose of that?

18     A.    That is to -- it's actually to -- to -- for the

19  person to ascertain the fitness of their character to buy the

20  firearm.  And should they have perjured themselves on that and

21  the FBI NICS check not pick it up, it becomes an instrument for

22  the prosecution to use, that they perjured themselves on a

23  form.

24     Q.    And one of the questions on the form, does it ask

25  whether or not somebody has been convicted of a felony?

1      A.    That is correct.

2      Q.    And if the person has been convicted of a felony and

3    they either check it on the form or the background checks turns

4    it up, would Riley's have sold them a firearm?

5      A.    Absolutely not.

6      Q.    And if someone were to come in to Riley's to try to

7    buy a silencer, would they also have had to fill out a 4473?

8      A.    Process is a little different.

9      Q.    Are you aware that 4473 includes a silencer as a

10    type of firearm that must be used to fill out a 4473?

11      A.    That is accomplished after the fingerprints,

12    photographs, background check is submitted to the FBI.  And

13    when it comes back approved, you then do a 4473.

14      Q.    And so you're talking about sort of the NFA approval

15    process?

16      A.    That is correct.

17      Q.    Okay.  So let's set that part aside for a minute and

18    let's -- let's just focus on -- well, actually, we can do it

19    this way.

20            Would you have sold a silencer at Riley's to someone

21    knowing that they were a convicted felon?

22      A.    Absolutely not.

23      Q.    And would you agree with me that no legitimate gun

24    shop would?

25      A.    That is correct.

1          Q.    And so if a felon wanted to acquire a silencer, they
2    couldn't walk into a legitimate gun shop and buy one?
3          A.    No.
4          Q.    They might have a few other options, right; they
5    could buy one on the black market, fair?
6          A.    I -- yes.
7          Q.    Or I'll say it differently.  They could do an
8    independent sale, fair?
9          A.    Fair.
10         Q.    Or they could make one, fair?
11         A.    Correct.
12         Q.    And would you agree with me that if someone is
13   trying to make a silencer, they might not do a good job?
14         A.    Well, I would -- based on their level of mechanical
15   experience, because there are people who are mechanically adept
16   and could turn out a very nice product.
17         Q.    So somebody might be able to turn out a nice
18   product, fair?
19         A.    Yes.
20         Q.    Somebody else might not be able to?
21         A.    Correct.
22         Q.    So it's possible that someone might try to make a
23   silencer that just happened not to be an effective -- a very
24   effective silencer?
25         A.    It would happen.

1      Q.    And I want to just briefly walk through the opinions

2    that were included in the disclosure.  And those opinions

3    include that neither of the two devices could have easily or

4    practically been adapted to be used on the Mossberg shotgun,

5    fair?

6      A.    Oh, absolutely, yup.

7      Q.    And one of the other -- the next opinion was that

8    porting a firearm is usually done when a person wants to reduce

9    the kickback of -- from shooting that firearm, fair?

10     A.    That is correct.

11     Q.    Another opinion you included was that the porting

12   and the Mossberg shotgun in this case was amateurish, fair?

13     A.    Correct.

14     Q.    And more consistent with the use of a handheld

15   drill, fail -- fair?

16     A.    Correct.

17     Q.    But I want to be very clear.  In the expert report

18   that you signed, there is no opinion in that disclosure that

19   determines whether or not either of these modified filters

20   constitute silencers.

21     A.    If it is not in there, it is not in there.

22     Q.    I -- would you like to look at it to -- before you

23   answer that question, just to make sure that the -- you know,

24   you've seen it and can fairly answer that question?

25     A.    Sure.

1          MS. KRASINSKI:  All right.  May I approach the

2     witness, your Honor?

3          THE COURT:  Yes.

4          MS. KRASINSKI:  I am showing the defendant what has

5     been marked for identification purposes as Defendant's Exhibit

6     I.

7     Q.    If you could go ahead and just read through that, I

8     would appreciate it.  And then let me know when you're done.

9     A.    I am done.

10    Q.    Thank you.

11         So is it fair that nothing in this disclosure

12    constitutes an opinion regarding whether or not those modified

13    oil filters constitute silencers?

14    A.    That is correct.

15         MS. KRASINSKI:  Thank you.  I have no further

16    questions, your Honor.

17         THE COURT:  Thank you.  Any redirect?

18                    REDIRECT EXAMINATION

19    BY MS. BROWN:

20    Q.    Just real briefly regarding the last question

21    regarding an opinion on silencers.

22         I -- did you -- I mean, is that an issue that you

23    feel is a legal determination?

24    A.    I made the comment that looking at these two

25    filters, I judged that it would be very difficult to mount them

1    to any conventional firearm that I'm aware of.

2            The first one, with the threaded flange on the end

3    of it, I have no idea how you would ever transition that to a

4    firearm.  I can't imagine, because it's not done that way.  And

5    the reason it's not done that way is that alignment is key in

6    the operation of a suppressor.  You have got to have perfect

7    alignment.  And that doesn't look like it's effective in the

8    least to me.

9            And the second one, there is no adapter for the

10   back.  It's just a threaded oil filter with a hose in it -- a

11   hole in it.

12           To my knowledge, and I've done some research on it,

13   there are no firearms out there that will actually take the

14   threading of that oil filter which is the three-quarter by -- I

15   forget what the actual nomenclature is.

16           So, essentially, if they fit the description, the

17   loose -- not loose description, but the description that the

18   ATF has or the federal law has for silencer, if the shoe fits,

19   I guess we have to wear it.

20           But based on that, you know, an oil filter by nature

21   contains three of the features that the federal law says are

22   components of silencers and that's an expansion chamber, a

23   ventilated inner liner, and baffling material that's native to

24   an oil filter.

25           MS. BROWN:  Thank you.  I have no further questions.

```
 1                THE COURT:  Yeah, thank you, sir, for coming in.

 2                But the difference is that there's a subjective

 3    component of the test.  So things can have the functional

 4    elements of a silencer, but they aren't a silencer unless under

 5    the First Circuit law they meet the subjective component as

 6    well.

 7                So I understand your point, though.  All right.

 8                THE WITNESS:  Thank you.

 9                THE COURT:  Thank you, sir.  You're excused.

10                        (Witness excused.)

11                THE COURT:  You want to call -- does the government

12    want to call its witness?

13                MS. KRASINSKI:  The government calls Gregory

14    Stimmel.

15                THE COURT:  Come on up here, sir.  Stand and raise

16    your right hand.  Oh, go get him.  Thanks.

17                THE CLERK:  Stand right up there, sir, and you can

18    turn around and raise your right hand.

19                GREGORY STIMMEL, having been first duly sworn,

20    testified as follows:

21                THE CLERK:  Thank you.  Please be seated and state

22    your full name and spell your last name into the microphone,

23    please.

24                THE WITNESS:  Gregory Stimmel, S-t-i-m-m-e-l.

25
```

DIRECT EXAMINATION

BY MS. KRASINKSI:

Q.   Good afternoon.  Are you currently employed?

A.   Yes.

Q.   And where?

A.   I work for the Bureau of Tobacco, Alcohol, Firearms, and Explosives.

Q.   Okay.  If I say ATF, will you know what I'm talking about?

A.   Yes, ma'am.

Q.   How long have you worked for the ATF?

A.   This June, it will be 15 years.

Q.   And what is your current role?

A.   Currently, I'm a branch chief within the firearms ammunition technology division.

Q.   And what does that mean?

A.   I manage the -- well, currently, I'm the chief of the field response branch for the eastern region of the United States.  I coordinate with ATF field operations any assistance they would require from firearms and ammunition technology division for ongoing operations and that type of thing.  We're just coordinating our assistance to field ops.

Q.   And before you transitioned into that role, what were you doing?

A.   I was the chief of the firearms technology criminal

1    branch.

2         Q.    And what does the firearms technology criminal

3    branch do?

4         A.    Provide written examinations for evidence that's

5    submitted by agents within the field operations.

6         Q.    And do you also serve as a firearms enforcement

7    officer?

8         A.    Yes, ma'am.

9         Q.    And tell us what that means.

10        A.    Firearms enforcement officer is the -- it's actually

11   a position that's delegated the authority from the Attorney

12   General through the director of ATF to classify firearms under

13   the NFA and GCA.

14        Q.    And have you received education, training, or

15   experience in this position and can you briefly describe that

16   to us?

17        A.    Yeah, absolutely.  The training related to the

18   firearms enforcement officer starts -- it starts day one and

19   it's immersive training, in-house training, with regard to

20   classifications, identifications, and design features of

21   firearms.  We go to armorer schools throughout the country,

22   trainings based on the construction of silencers, machine guns,

23   you know, it's -- it's pretty all-encompassing.

24        Q.    And does -- did that training include NFA firearms

25   recognition training?

1      A.    Yes, ma'am.

2      Q.    And did it also include training on basic acoustic

3  and sound impulse measurement training -- systems training?

4      A.    Yes.

5      Q.    Okay.  And have you received training about the

6  making of a silencer --

7      A.    Yes.

8      Q.    -- and what constitutes a silencer?

9      A.    Yes.

10      Q.    Can you walk us through some of your previous roles

11  with ATF in your 15-year career?

12      A.    Sure.  When I started in 2008 with ATF, I was hired

13  into the Federal Firearms Licensing Center, where I served as a

14  legal instruments examiner.  And shortly thereafter, I became a

15  section chief within the Federal Firearms Licensing Center,

16  spent a total of about four years, three and a half to four

17  years, at the Federal Firearms Licensing Center, where I

18  moved -- after which I moved to the National Firearms Act

19  branch as a specialist in NFA, a short time as a specialist in

20  the National Firearms Act branch, I moved out to field

21  operations as an industry operations investigator in the

22  Harrisburg, Pennsylvania, field office and after that I became

23  a firearms enforcement officer.

24      Q.    And have you been designated as an expert in federal

25  court on the identification, operation, and design of firearms?

1     A.    Yes, I have.

2     Q.    Do you know how many times?

3     A.    I believe it was 10 times.

4     Q.    And approximately how many of those times involved

5   silencers?

6     A.    I believe it was four.

7     Q.    And have you been designated as an expert in state

8   court in the identification, operation, and design of firearms?

9     A.    Yes, in North Carolina.

10     Q.    And did that involve a silencer?

11     A.    Yes, it did.

12     Q.    Now, over the course of your career, how many

13   suspected silencers have you examined to determine whether or

14   not they are, in fact, silencers?

15     A.    Oh, hundreds.

16     Q.    And does that include examining commercially

17   manufactured firearm silencers?

18     A.    Yes, ma'am.

19     Q.    As well as homemade firearm silencers?

20     A.    Yes, the majority were homemade silencers.

21     Q.    And so is it fair to say you have examined hundreds

22   of homemade silencers?

23     A.    Yes.

24     Q.    What's the most common type of homemade silencer

25   that you typically see?

1     A.    They vary.  We have -- you know, it's -- quite a bit

2   are some of the imported -- what are -- they're imported or

3   domestically manufactured and sold as what's -- as solvent

4   traps, but in reality that's an industry term for partially

5   complete or incomplete silencer.  Similar to this case, a lot

6   of the exhibits I've examined are the modified car oil filters.

7     Q.    Prior --

8     A.    We see those --

9     Q.    Sorry.

10     A.    I say we see those quite often.

11     Q.    Approximately how many modified car oil filters do

12   you think you've examined over the course of your career?

13     A.    Best guess would be around 40 to 50.

14          MS. KRASINSKI:  Your Honor, I would move to qualify

15   Mr. Stimmel as an expert in the identification, operation, and

16   design of firearms and specifically, in this case, silencers.

17          THE COURT:  Any objection?

18          MS. BROWN:  I don't have any objections to him

19   giving his opinions.

20          THE COURT:  All right.  Go ahead.

21     Q.    So shifting gears a little bit, how did you become

22   involved in this investigation?

23     A.    Evidence in this case was submitted to the firearms

24   technology criminal branch at the -- at the time I was the

25   chief when the item was received.  It came in as an expedite

1    and I don't know the specifics, but I assigned it to myself.

2            It was made -- I worked -- as the branch chief, I

3    was working cases as a firearms enforcement officer as well, so

4    I would pull -- pull cases.  This was just a random chance that

5    I happened to grab this one.

6        Q.    And what's your first step when you get a suspected

7    silencer?

8        A.    The first step is we grab the silencer, you know,

9    examine it and make sure the paperwork matches what's -- what's

10   in front of me, take photographs -- measurements, photographs,

11   and look for any, in this case, we know what originally is an

12   oil filter for an automobile.  So I'd look for modifications to

13   it to see if it's somehow been modified from its original

14   purpose.

15           MS. KRASINSKI:  May I approach the witness, your

16   Honor?

17           THE COURT:  Yes.

18       Q.    I'm going to hand you what's been marked for

19   purposes of sentencing as Government's Exhibit 9.

20           And, Attorney Brown, could you please correct me if

21   I'm wrong, but I believe you don't have any objection to

22   Government's Exhibit 9, 10, which is the other seized modified

23   filter, and photographs 4A through B, which are the photographs

24   that were attached to the expert report.

25           MS. BROWN:  No, I don't object to any of those.

1          MS. KRASINSKI:  May we -- for ease, can I move to

2     admit all of those at once?

3          THE COURT:  Without objection, they'll be admitted.

4          MS. KRASINSKI:  Thank you, your Honor.

5       (Government's Exhibits 4A, 4B, 9 and 10 admitted.)

6     Q.    So you can take that out of the bag and -- oh,

7     you've done that.

8          What are we looking at there?

9     A.    This is the -- an exhibit.  I believe it was, yeah,

10    Exhibit 31 that I examined during this report.

11         MS. BROWN:  The photos might be over there.  I had

12    them out.

13         MS. KRASINSKI:  Oh, okay.

14         MS. BROWN:  Yeah.

15    Q.    And I have now Government's Exhibit 4A.  Is that a

16    photograph you took of this device?

17    A.    Yes, it is.

18    Q.    So what was it initially manufactured as?

19    A.    This is -- it's an automotive oil filter produced by

20    FRAM as a model PHA8 (sic).

21    Q.    And so what's the purpose -- actually, let me just

22    say what -- you said that one of the first things you do is

23    identify modifications that have been made.  What modifications

24    did you notice on this exhibit?

25    A.    In this exhibit specifically, it has a -- like a

1  hardwire item attached to the end of it, the end which would

2  normally be open and attached to the automobile, and it has a

3  hole in the opposite end, which is manufactured -- when it's

4  manufactured is closed.

5       Q.    I'm going to show you Government's Exhibit 4B.  Do

6  those -- so on the bottom right of this image, Government's

7  Exhibit 4B, is that the hole that you were just talking about?

8       A.    Yes.

9       Q.    So that hole wouldn't be there as initially

10 manufactured?

11      A.    No, ma'am.

12      Q.    And when you looked at that hole, did you learn

13 anything about it?  Did it tell you anything about the device?

14      A.    Well, it's a major indicator that it's being used as

15 a firearm silencer.  There's no real purpose to put a hole

16 there.  You know, it's something we have seen.  So I've been

17 with ATF for 15 years and these have been a common item in that

18 entire time.

19      Q.    Now, looking at the picture on the bottom left of

20 this, can you tell us a little bit more about that?

21      A.    It's a standard hardware item.  I'm not a hundred

22 percent sure what they're called.  Usually you'll see it as a

23 stand that mounts a pipe to concrete, maybe, and a piece of

24 it's been cut off and another piece has been threaded into it

25 and the whole unit has been screwed or threaded to the -- to

 1    the open-ended base of the oil filter.

 2         Q.    And I'm going to display now Government's

 3    Exhibit 4C.  Is that a sort of close-up image of what you were

 4    just talking about?

 5         A.    Yes.

 6         Q.    Do you see the notch in that?

 7         A.    I do.

 8         Q.    Based on your training and experience, what -- what

 9    does that tell you?

10         A.    In past -- past cases and, you know, not specific to

11    this one, I've seen notches like this where they've installed

12    it on firearms that are incorporating a sight or something on a

13    front sight or something on the front of the barrel where they

14    can't accommodate a -- that won't fit in the hole effectively

15    unless you modify the -- the adapter.

16         Q.    So we've got this sort of notched out and can you

17    see that there appears to be another piece in there?

18         A.    Yes, there's an internal sleeve of softer metal

19    that's inside.

20         Q.    In your experience, would that increase or reduce

21    the effectiveness if used as a silencer?

22         A.    The notch or the sleeve?

23         Q.    Why don't you go through both.

24         A.    So the notch effectively would not -- it would

25    decrease the effectiveness because you're introducing an

1    opening into what should be a closed system, which is a

2    silencer.  You're trying with a silencer to trap the gases and

3    let them cool off slowly so they don't -- so you don't hear

4    that audible crack.  It cools off the gases inside the device.

5    When you open -- have an opening, it actually releases them

6    prematurely and it's going to decrease the effectiveness.

7        Q.    Now, I want to look a little bit at Government

8    Exhibit 4D.  Can you tell us what that is?

9        A.    That's a photo taken with a borescope, looking

10   toward the drilled end.  You know, basically coming in --

11   coming in from the end with the adapter looking toward the end

12   with the small hole.

13       Q.    And did you conduct a sound comparison test with

14   this device?

15       A.    I did.

16       Q.    What was the firearm that you used?

17       A.    I used a Ruger 2245 pistol.

18       Q.    And what kind of ammunition did you use?

19       A.    CCI .22 caliber.

20       Q.    Are there protocols in place for how you conduct the

21   test?

22       A.    Yes.

23       Q.    Can you describe those?

24       A.    So the -- the protocols are established by the

25   testing equipment manufacturer.  They provide an in-house

1  training on exactly how to do it.  They set the testing up

2  where we shoot five unsilenced shots and then we install a

3  device and shoot five more shots for a comparison and we get an

4  average decibel reading --

5       Q.   And --

6       A.   -- and reduction.

7       Q.   And did you follow those protocols when you tested

8  this device?

9       A.   Yes.  There's no -- you have to follow the protocols

10 in order for the test to be successful.  If you deviate in any

11 way, it'll abort the test.

12      Q.   So can you tell us how you went about attaching that

13 to the Ruger pistol?

14      A.   We have a series of adapters that have been made

15 in-house and it's just a threaded adapter.  I don't know what

16 the thread pitch is that matches this.  And I was able to

17 thread it onto the pistol.

18           THE COURT:  I'm sorry.  Can you tell me more about

19 that?  I'm confused.

20           THE WITNESS:  Yeah.  So we have external threads

21 here --

22           THE COURT:  Yeah.

23           THE WITNESS:  -- and have an adapter that I threaded

24 onto here.

25           THE COURT:  So you have an adapter that threads onto

```
1    this and then connects to the gun?
2              THE WITNESS:  And the pistol screws -- and it
3    threads into the pistol, yes.
4              THE COURT:  So it's got two ends with threading, one
5    to go on --
6              THE WITNESS:  Yup.
7              THE COURT:  -- the outside and then one to go on
8    the --
9              THE WITNESS:  Yes.
10             THE COURT:  -- handgun.  Okay.
11        Q.    And I guess just quickly about that, are adapters
12   commercially available?
13        A.    Absolutely.
14        Q.    Could you get one on Amazon?
15        A.    Yes.
16        Q.    For less than $10?
17        A.    Yes.
18             THE COURT:  When you say adapters, are these
19   adapters that are specifically designed to be used with
20   firearms?
21             THE WITNESS:  Yes.
22             THE COURT:  Okay.  And was the adapter that you used
23   a commercially available adapter?
24             THE WITNESS:  Not likely.  We have -- we have a
25   series from -- you know, probably over 20 years of exams where
```

1    we've built up adapters that we've used with different --

2    different thread pitches.

3              So, like I said, I don't know what the thread pitch

4    for this is.  I checked a couple in the drawer.  It -- it fit,

5    and installed it on the pistol.

6              THE COURT:  And then just to make sure I'm seeing

7    this correctly, what you've got there has the threads on the

8    outside, right?

9              THE WITNESS:  This has the threads on the outside.

10             THE COURT:  Yes.

11             THE WITNESS:  The adapter would be internally

12   threaded and screw onto this.  And the other end is internally

13   threaded for the pistol barrel.

14             THE COURT:  When you say internally threaded, there

15   aren't threads on the inside of that, are there?

16             THE WITNESS:  Not this, but the adapter.

17             THE COURT:  Right.  So --

18             THE WITNESS:  Yes.

19             THE COURT:  -- the adapter goes on top.

20             THE WITNESS:  Yeah.  The -- the adapter goes on the

21   outside.

22             THE COURT:  Right.  And then on the pistol, it -- it

23   goes on the inside.

24             THE WITNESS:  Yes.

25             THE COURT:  Okay.  That's all I was trying to

1    understand.

2            THE WITNESS:  Yes.

3        Q.    And so what were the results of that test?

4        A.    I believe there was around a 4- to 5-decibel

5    reduction.

6        Q.    Fair to say a 4.02-decibel reduction?

7        A.    Yes, I'd say that's fair.

8            THE COURT:  Which is out of a total of what?  What

9    was the -- what was the decibel level without the suppressor or

10   what you called the silencer?

11           THE WITNESS:  Our pistol, I've used it so much,

12   it's -- usually around 156.

13           THE COURT:  So it's a -- a very small reduction in

14   the decibel level.

15           THE WITNESS:  In the decibel level, but the -- the

16   decibel level is based on a logarithmic scale.  So, for

17   instance, a 10-decibel reduction means it's 10 times quieter.

18           THE COURT:  Okay.

19           THE WITNESS:  So it's a -- while 4 is not a big

20   number --

21           THE COURT:  So it's a logarithmic scale, so that

22   would be a big difference than what I was envisioning then.  I

23   understand what a logarithmic scale is.

24           Okay.  It -- yeah.  I mean, it kind of looks like

25   magnitudes of earthquakes, where a small differences in

 1   magnitude can be really quite large when you figure out what

 2   the true magnitude is.

 3              THE WITNESS:  Absolutely.

 4              THE COURT:  Is that a fair way to think of it?

 5              THE WITNESS:  Yes.  Yes, your Honor.

 6        Q.    So after examining the device and test firing,

 7   conducting the sound comparison test, did you come to a

 8   conclusion about whether or not Government's Exhibit 9 there is

 9   a firearm silencer?

10        A.    Yes.  Just based on features alone, the test aside,

11   this is a device for silencing a port.

12        Q.    And can you explain that?  Why?

13        A.    It has -- it's been modified from its original --

14   original configuration as an automotive fuel filter.  It has

15   inherently an expansion chamber within it.  Inside that

16   expansion chamber is a ported tube and between the ported tube

17   and the outside wall is a baffling -- it's a filter element

18   that acts as baffling material for the sound.  And the internal

19   tube, like I said, it's ported.  So when gas comes in, it's

20   forced outward through those ports into the baffling material

21   which slows -- slows it down and cools it, reducing the report

22   of a portable firearm.

23        Q.    And so just based on your physical examination of

24   Government's Exhibit 9, you concluded that it was, that it is,

25   a firearm silencer?

1          A.   Yes, ma'am.

2          Q.   And the sound comparison test, did they -- did those

3    results establish that that device is, in fact, capable of

4    diminishing the sound report of a portable firearm?

5          A.   Yes.

6          Q.   And I just -- I guess I should ask this.  Is there a

7    requirement that a firearm silencer be effective?

8          A.   No, there's no decibel reduction requirement for

9    classification as a -- as a silencer.

10         Q.   Does that firearm silencer have a serial number on

11   it?

12         A.   No, ma'am.

13         Q.   Does it have any marks associated with an NFA maker

14   or manufacturer?

15         A.   No.

16         Q.   And just to be clear, is -- is that, Government's

17   Exhibit 9, is it a muzzle brake?

18         A.   No.

19         Q.   Is it a flash suppressor?

20         A.   No.

21         Q.   It's a firearm silencer?

22         A.   Yes.

23         Q.   Are you familiar with the -- with a Mossberg model

24   500 shotgun?

25         A.   Yes, ma'am.

124

1      Q.   And did I show you a photograph -- actually,
2   let's -- I think it's here.
3           I'm going to show you Defendant's Exhibit B.  And
4   have you looked at that picture?
5      A.   You showed it to me this morning, yes.
6      Q.   Could you attach this firearm silencer easily to
7   this shotgun?
8      A.   No, ma'am.
9      Q.   Okay.
10     A.   From -- just from the photos.  I haven't examined
11  the firearm at all.  I mean -- but from what I'm seeing, no.
12     Q.   Does that in any way impact your conclusion that the
13  modified FRAM oil filter, Government's Exhibit 9, is a firearm
14  silencer?
15     A.   Not at all.
16     Q.   So it's a firearm silencer, just probably not for
17  that gun?
18     A.   No.  Shotgun silencers are not a common thing.
19     Q.   I'm going to hand you Government's Exhibit 10.  I'll
20  trade with you.
21          Can you take a look at that and let me know what
22  that is?
23     A.   Similar to the other exhibit, this is a modified
24  automotive oil filter originally manufactured by -- as a FRAM
25  PH7317.

1    Q.    And I guess I didn't ask you about the other one,

2    but -- so maybe I'll go back to that in a minute.

3        But is that a modified oil filter that you, in fact,

4    analyzed?

5    A.    Yes.

6    Q.    How do you know?

7    A.    The evidence tag.  My signature is on the -- on the

8    evidence transmission -- or the evidence tag.

9    Q.    And --

10    A.    Chain of custody.

11    Q.    And backtracking really quick, is the same true for

12    Government's Exhibit 9?

13    A.    Yes.  I looked at it when it was over here.  My

14    signature is on it.

15    Q.    Okay.  And so both are exhibits that you personally

16    analyzed?

17    A.    Yes, ma'am.

18        THE COURT:  Let me just make clear for the benefit

19    of my reporter, I'm going to try to finish his testimony and

20    then I'll break for lunch.  I'll come back, finish the

21    sentencing, and then do the motions.  Okay?

22    Q.    So did you identify any modifications made to

23    Government's Exhibit 10?

24    A.    Yes.  Similar to the previous exhibit, a hole has

25    been drilled through what is typically manufactured -- what is

1  manufactured as a closed end.

2      Q.   And what can you tell us about the housing kind of

3  surrounding the hole?

4      A.   This housing, it's pushed in as if it was drilled

5  from -- from the outside.

6      Q.   And did you conduct a sound comparison test on this

7  item?

8      A.   No, I did not.

9      Q.   Why not?

10     A.   The -- looking from inside out, if you centrally

11  locate a firearm, the hole is not in line.  While it will work,

12  testing it will likely cause damage to the evidence and I

13  wanted to preserve the integrity of the evidence.

14     Q.   Even without conducting a sound comparison test, did

15  you come to a conclusion about whether or not Government's

16  Exhibit 10 constitutes a firearm silencer?

17     A.   Yes, it does.

18     Q.   And can you explain that?

19     A.   Again, based on features, we've modified this device

20  from its original -- original design as an automotive oil

21  filter.  We have a hole longitudinally through the device and,

22  again, just -- just like the previous exhibit, it's made --

23  inherently has a giant -- an expansion chamber with a ported

24  tube that's surrounded by baffling material, all of which are

25  characteristics of known firearm silencer designs.

1    Q.    Any serial number on that firearm silencer?

2    A.    No, ma'am.

3    Q.    Any marks of identification associated with an NFA

4    maker or manufacturer?

5    A.    No, ma'am.

6    Q.    And could this firearm silencer be readily used with

7    the Mossberg shotgun that's identified in Government's Exhibit

8    B (sic)?

9    A.    No, not from what I'm seeing.  It could be -- could

10   be attached, but due to the size of the opening, it would have

11   catastrophic effects to use this with that firearm.

12   Q.    Does that in any way impact your opinion that

13   Government's Exhibit 10 is a firearm silencer?

14   A.    No, ma'am.

15   Q.    What would you say to someone who said, well, I

16   guess any oil filter with a hole in it -- a hole drilled in it

17   is a firearm silencer?

18   A.    Not -- it's not necessarily true.  You can have

19   holes -- holes in the sides.  I myself have tried to take an

20   oil filter off of my car where I've driven a screwdriver in the

21   side to use it as leverage.

22          In this case, the hole was intentionally made in the

23   center of the device and it's a very, very common homemade

24   silencer.  This is -- this is not something that's new or

25   innovative; it's been around probably more than 20 years.

1    Q.    I want to ask you one other thing that I missed,

2    that I forgot to ask you earlier about Government's Exhibit 9.

3    And I'm going to go back to the photographs of that -- that

4    exhibit, 4B.

5         Were these photographs taken before the test fire?

6    A.    Yes.

7    Q.    Okay.  Did you note anything about the housing

8    surrounding the hole in the oil filter that was drilled into

9    the oil filter?

10   A.    Yes, it's -- it's actually pushed outward, you know,

11   as if it was -- similar to what I've seen repeatedly where a

12   firearm is shot through it and a bullet impacts the sides.  It

13   creates a -- kind of an outpouching effect.  It's -- that's the

14   best way I can think to describe it.

15   Q.    Okay.

16   A.    It's pushed outward as if it was struck by a bullet.

17        MS. KRASINSKI:  I don't think I have any other

18   questions, your Honor.

19        THE COURT:  There was some talk -- I may have missed

20   it.  I'm sorry.

21        Was there some talk of there being powder inside one

22   of the --

23        MS. KRASINSKI:  Yes, your Honor, but there's a

24   different expert who conducted that test.

25        THE COURT:  Okay.  All right.  Thank you.

```
 1              All right.  Cross-examination.  I -- I hope we -- I

 2   need to finish this today.  I'm starting another firearms trial

 3   tomorrow.  I -- we've got to move along.  All right?  So let's

 4   try to finish this up.

 5              MS. BROWN:  Your Honor, I'm going to ask that the

 6   identification be stricken on Exhibit -- Defense Exhibit J.  I

 7   think this might move things along.

 8              THE COURT:  Any objection?

 9              MS. KRASINSKI:  No, your Honor.

10              THE COURT:  It'll be admitted.

11              (Defendant's Exhibit J admitted.)

12                        CROSS-EXAMINATION

13   BY MS. BROWN:

14       Q.   Okay.  So do you recognize that document?

15       A.   Yes, I do.

16       Q.   Okay.  And is that a document that you created?

17       A.   No.  Well, yes and no.

18       Q.   Okay.

19       A.   It's created by the -- the computer that analyzes

20   the test results.  It's basically the -- the dataset that comes

21   out.

22       Q.   Okay.

23       A.   We -- I enter things like my name and the -- the

24   exhibit number.  Everything else is created by the -- by the

25   computer, so to speak.
```

1      Q.    So this is a report created regarding the

2    examination of the two oil filters we've been talking about?

3      A.    Yes, ma'am.

4      Q.    Okay.  Great.  So since it's a full exhibit, I think

5    I'm going to put it up here so we can all be on, literally, the

6    same page.

7            So you were talking earlier about the decimal

8    differential between the Ruger that you used, silenced and

9    unsilenced, correct?

10     A.    Correct.

11     Q.    And this report documents that?

12     A.    Correct.

13     Q.    And so you did five shots, correct?

14     A.    Ten shots.

15     Q.    Oh, ten shots.  Okay.  And by averaging all of the

16   shots, you came up with an average difference of 4.02 decibels?

17     A.    The computer system did, yes.

18     Q.    Okay.  And so, for instance, if we look on this

19   chart at shot number four, unsilenced, the Ruger was

20   155.71 decibels, correct?

21     A.    Correct.

22     Q.    And with the item that you state is a silencer,

23   again on shot four, it was 154 -- 154.50, correct?

24     A.    Correct.

25     Q.    So barely over one decibel difference?

1    A.    Correct.

2    Q.    Did you do a video of the testing?

3    A.    No, ma'am.

4    Q.    Okay.  Did you do an audio of the testing?

5    A.    No, ma'am.  This is the equivalent of the audio

6    recording, what would be -- yes, those results are -- it's --

7    the audio recording of it.

8         THE COURT:  It measures them and records them --

9         THE WITNESS:  Correct.

10        THE COURT:  -- and so that's the -- what you're

11   using to do that.  Okay.

12   Q.    Well, was there any -- I guess, I mean, were there

13   any sparks, were there any -- was there any resistance on the

14   part of the Ruger in terms of having -- using this oil filter

15   on it?

16   A.    I'm not sure what you mean.

17   Q.    So there -- it operated correctly in terms of a

18   silencer; that's what you're saying?

19   A.    Yes.

20   Q.    Okay.  Now, but the way it operated was because you

21   had a special adapter at your testing laboratory, correct?

22   A.    It wasn't a special, it was just an adapter that fit

23   the thread pitch of what's installed.  The easy avenue would

24   have been to remove what was installed in the exhibit and use a

25   commercially available adapter for these fuel filters.

1    Q.    Okay.  But as I understood it, and correct me if I'm

2  wrong, there was actually two adaptations, right?  One was --

3    A.    Well, no, I'm referring to --

4        THE COURT:  One adapter with two ends.

5        THE WITNESS:  Yeah, one adapter, but I was referring

6  to what was attached to the other exhibit as an adapter --

7    Q.    Uh-huh.

8    A.    -- because it's adapting that item's use on a

9  firearm so it's -- but it's part of the exhibit.

10    Q.    Okay.

11    A.    It's not an adapter on an adapter.

12    Q.    Okay.  But when you tested Exhibit 31, which was the

13  one that was -- we were talking about before --

14    A.    Yes.

15    Q.    -- with the threading on it, you used an adapter

16  that basically had threading on two sides?

17    A.    Yes, we used an adapter to modify, or not to modify,

18  so we can test it with our test pistol because we did not have

19  the defendant's firearm that he was using.

20        When -- typically we ask for the submission of a

21  firearm with a silencer if it was found with one and then we

22  don't have to use adapters.  But because these things are not

23  being used with our test pistol, we typically have to use an

24  adapter.

25    Q.    That was my next question.

133

1    A.    Okay.

2    Q.    So in other cases, you'll get like, hey, we think

3    this might be a silencer and, here, we think this is the

4    firearm that goes together and then you can test them together

5    and see how that works, right?

6    A.    Ideally, yes.

7    Q.    Yes.  Okay.  And so in this case, no firearm was

8    submitted saying, we think this is the firearm that was used

9    with this thing that we think is a silencer?

10    A.    I did not receive one, no.

11    Q.    In fact, you didn't even receive information of

12    here's the make and model or type of firearm; you didn't

13    receive anything as to what firearm the defendant supposedly

14    used with this silencer?

15    A.    No, ma'am.

16    Q.    We heard testimony earlier that even with commercial

17    silencers, they have different capacities, depending on what

18    type of firearm it's used on, correct?  Like --

19    A.    What type of firearm, the size, make, the internals

20    of silencers, yes, there's quite a variability of

21    effectiveness.

22    Q.    And you said earlier that the Mossberg that we've

23    all been talking about, it's unusual that anyone would want to

24    use a silencer on a shotgun, correct?

25    A.    Not unusual, it's impractical for one similar to

134

1    these to be threaded onto the muzzle because you have a --

2    basically a half inch bore of shot pellets and you're just

3    going to destroy this.

4         The way to silence this would be to open the hole up

5    so it's -- the barrel, and encapsulate those ports.  That's how

6    you would silence it.

7         Q.    Okay.  Is that -- I'm sorry.  I didn't mean to

8    interrupt.

9         A.    No, that's -- that's how you -- you wouldn't -- this

10   isn't the type of silencer -- that's not the type of gun you

11   would thread something to the muzzle.

12        Q.    And there is some holes drilled on the end.  I don't

13   know if you can see that there.

14        A.    I do.

15        Q.    We've heard testimony earlier that was porting,

16   correct?

17        A.    Yes.  When you have a tube with holes in it, it's

18   referred to as porting.

19        Q.    Would you agree with the testimony of Mr. Demicco

20   that porting would actually make a firearm louder and not

21   quieter?

22        A.    It would allow the -- it depends.

23        So for the shooter, yes, it would make it louder

24   because if you're shooting the firearm that's not ported, all

25   that noise is going away from you.  When you're shooting one

1    that's ported, it's now coming away from you and out, which is

2    closer to your ears, so it's going to seem louder.

3         Q.   Okay.

4         A.   And the idea of porting, and you encapsulate that,

5    is you're trapping the gas that's shooting out the sides, which

6    would reduce the -- the decibel level.

7         Q.   And we talked about the fact that when you were

8    presented evidence in this case, unlike many other cases, you

9    were not presented either a description of the firearm or the

10   alleged -- or a firearm that was alleged to have been used with

11   these oil filters, correct?

12        A.   No, ma'am.

13        Q.   Okay.  And were you provided with any adapters that

14   you mentioned earlier, like, hey, on that workbench right next

15   to this oil filter we found this adapter, did anybody give that

16   to you?

17        A.   No.

18        Q.   Okay.  And you said that you could find them on

19   Amazon, but as far as you know, or at least what was presented

20   to you, none were found in this case?

21        A.   I wasn't -- I didn't receive any, no.

22             MS. BROWN:  Okay.  Thank you.  No further questions.

23             THE COURT:  Any redirect?

24             MS. KRASINSKI:  Briefly.

25

```
 1                      REDIRECT EXAMINATION

 2   BY MS. KRASINKSI:

 3       Q.   Attorney Brown keeps referring to these as oil

 4   filters.  Right now, are they oil filters?

 5       A.   No, ma'am.  They are firearms silencers.

 6            MS. KRASINSKI:  Nothing further, your Honor.

 7            THE COURT:  Thank you.  You can step down.

 8                      (Witness excused.)

 9            THE COURT:  Are you going to call someone else

10   quickly?

11            MR. ROMBEAU:  The government calls Cynthia Wallace,

12   your Honor.

13            THE CLERK:  Please raise your right hand.

14            CYNTHIA WALLACE, having been first duly sworn,

15   testified as follows:

16            THE CLERK:  Thank you.

17            Please be seated and state your full name and spell

18   your last name for the record, please.

19            THE WITNESS:  Cynthia L. Wallace, W-a-l-l-a-c-e.

20                      DIRECT EXAMINATION

21   BY MR. ROMBEAU:

22       Q.   Good afternoon, Ms. Wallace.  Could you start by

23   telling the Court how you're currently employed?

24       A.   I work for the Bureau of Alcohol, Tobacco, and

25   Firearms at their laboratory in Beltsville, Maryland.
```

1        Q.    And --

2        A.    -- Firearms and Explosives.  Excuse me.

3        Q.    And for shorthand today, can we refer to that as

4    ATF?

5        A.    Yes.

6        Q.    And what is your current role at ATF?

7        A.    I'm a forensic chemist.

8        Q.    And about how long have you been an ATF forensic

9    chemist?

10        A.    36 years.

11        Q.    Is your educational background in chemistry?

12        A.    Yes.  I have a BS in biochemistry.

13        Q.    And could you just sort of on a high level describe

14    for the Court what your day-to-day responsibilities are as an

15    ATF forensic chemist.

16        A.    For the entire time that I've worked at the

17    laboratory, I've worked in the explosives section and worked on

18    bombing investigations.  And so in those types of cases, I am

19    looking for explosives or explosives residues and also

20    describing other components of the device.  For example, if

21    there's a pipe used as a container, if there were switches or

22    wires, I will describe those things.

23            Also as part of -- if a suspected firearms silencer

24    comes into the laboratory, that is analyzed in our laboratory

25    by the explosives section because we're looking for propellant.

1          And then in 2016, I completed a training program in

2     fire debris analysis and since that time I also do that type of

3     analysis, looking for ignitable liquid residues in liquids or

4     in burn debris.

5          Q.    Okay.  And focusing on your experience in the

6     explosives realm, I think you referred to a propellant.  What

7     is that in general terms?

8          A.    A propellant is the substance that's in firearm

9     cartridges that creates the gas to propel the projectile.

10          Q.    And are there different kinds of propellants used in

11     firearms or firearm-related items such as silencers?

12          A.    Yes, there are.  There's -- there is -- most types

13     of propellants these days are either black powder, black powder

14     substitutes, or smokeless powder, smokeless powder being the

15     modern type of gunpowder used in modern ammunition.

16          Q.    And so let's talk about smokeless powder a bit.

17          Do you have an estimate as to how many times in your

18     career you've analyzed suspected smokeless powder from -- in

19     connection with any sort of investigation at ATF?

20          A.    I would -- don't have a great estimate, but it would

21     be thousands of times because I used to -- for 25 years I was

22     in charge of ATF, their laboratories, smokeless powder

23     database, and in that case I obtained almost 700 samples of

24     known smokeless powder, analyzed -- looked at -- analyzed them

25     all physically and chemically and learned information about the

1    manufacturers.  I've toured manufacturing facilities and I have

2    been in contact with manufacturers of the United States as

3    well.

4           I know -- I've -- have had a lot of experience

5    running smokeless powder for the database and then also

6    explosives cases, it used to be that something like 60 percent

7    of our casework was smokeless powder-related in the explosive

8    section.  So I've run many, many samples of smokeless powder.

9        Q.   You've preempted a number of questions on your

10   specific training and experience on that, which I'm happy to

11   move on --

12          THE COURT:  I think we have a pretty good idea.  Why

13   don't we just go on.

14       Q.   Have you testified in federal court regarding your

15   analysis of smokeless powder in prior cases, Ms. Wallace?

16       A.   I believe so.

17       Q.   Okay.  And have you testified, just generally, in

18   federal court as -- based on your experience as a forensic

19   chemist in analyzing materials such as we're about to discuss?

20       A.   Yes.

21          MR. ROMBEAU:  Okay.  Your Honor, we would move to

22   qualify --

23          THE COURT:  Any objection?

24          MS. BROWN:  No objection to this witness giving her

25   opinions.

```
 1                THE COURT:  All right.  Go ahead.

 2       Q.    Just very briefly, Ms. Wallace, can you tell us a

 3   little bit about the facility where you work and analyze

 4   evidence?

 5       A.    So the facility has -- is on a gated property where

 6   you have to show an ID to an armed guard to get in.  And then

 7   once you get through the -- on to the property, you have to

 8   show another ID to armed guards to get into the building.  And

 9   then inside the building, the access is controlled in different

10   locations and in different rooms, according to people's

11   responsibilities.

12                When the evidence is received, it's received by the

13   evidence room and they take it into -- they log it in and

14   record it into a vault.  And then when I'm ready for the

15   evidence, I clean and prepare my work area and -- and check out

16   the evidence from the evidence room that is given to me and I

17   take it back to my room, which was also a secure access

18   controlled location and the evidence is protected from loss or

19   deterioration or damage while it's --

20                THE COURT:  Let's do a -- to save time, Counsel, I

21   don't think we're going to have chain of custody issues.

22                MR. ROMBEAU:  Okay.

23                THE COURT:  If we do, they'll come up on cross.

24   Let's just get right to the point --

25                MR. ROMBEAU:  Okay.
```

141

1          THE COURT:  -- what is the tests that she did, what

2     are the results that she got.

3          Q.   And is that the process you followed here,

4     Ms. Wallace?

5          A.   Yes.

6          Q.   Okay.  And I'm going to show you what's been

7     admitted as Government's Exhibit 9 here.  In -- in performing

8     the analysis -- and you can take that out and let me know if --

9     when you're ready.

10         A.   I was just looking for my sticker.

11         Q.   And do you see your sticker on there?

12         A.   Yes.

13         Q.   Okay.  And when you did your analysis here, can you

14    tell us a little bit about sort of the -- how you go about

15    doing that external and internal --

16         THE COURT:  I mean, just to save time, I mean, did

17    you do it -- did you test that to see whether there was

18    smokeless powder residue inside?

19         THE WITNESS:  Yes.

20         THE COURT:  And what did you find out?

21         THE WITNESS:  Well, the first thing I did was look

22    at the outside and make sure -- remove anything that -- and

23    there did appear to be a possible particle of smokeless powder

24    on the outside.  Any particles on the outside were carefully

25    removed.  And then I tapped it over a clean piece of paper to

1    remove anything that was from the inside.  And the stuff that

2    was from the inside included some particles of suspected burned

3    smokeless powder, so I analyzed those and I identified them as

4    a double-based smokeless powder.

5            THE COURT:  So you're telling me it came from the

6    inside --

7            THE WITNESS:  Yes.

8            THE COURT:  -- of the filter, not the outside.

9            THE WITNESS:  Yes.

10            THE COURT:  We can reliably say that, right?

11            THE WITNESS:  Yes.

12            THE COURT:  And can you tell me anything about the

13    quantity of the particles?

14            THE WITNESS:  There were -- I -- I did not count

15    them.  There were a fair number.  There were partially burned

16    small particles and also some that were intact enough that I

17    could tell what the original shape of the smokeless powder had

18    been.

19            So there was a fair -- I guess I can't say.  I don't

20    have a quantity.

21            THE COURT:  What I'm trying to get a handle on

22    ultimately is I assume that you have analyzed things like this,

23    oil filters that have been used and somebody has fired -- we

24    know somebody has fired a gun through there and then looked

25    in -- inside to see what kind of smokeless powder particles you

```
 1   would find.  Have you done that at all?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Compared to those cases where you

 4   know a gun has been fired, can you tell me anything about the

 5   quantity of smokeless particles that you found in this

 6   particular examination when compared with examinations that you

 7   know were from filters where there has been a gun fired through

 8   them?

 9              THE WITNESS:  I can't say.  It would depend on the

10   type of -- the type of item that was used, it would depend on

11   the amount of -- on the type of ammunition that was used and

12   how many shots were fired.  So I can't say that --

13              THE COURT:  Yeah, I'm just --

14              THE WITNESS:  I can't put a number to it.

15              THE COURT:  This is a layperson kind of probably

16   completely misunderstanding.

17              I assume there's a fair amount of gunpowder residue

18   that comes out of a gun when a bullet's fired through it in a

19   typical case and I would think if that -- if most of that

20   residue was contained within the filter itself there would be a

21   fair amount of it and that's -- what I'm trying to figure out

22   whether my uninformed lay opinion has any bearing in reality

23   and, if so, what it -- is it possible that these particles got

24   in there from some other means such as, you know, guns are

25   being fired in the vicinity and some particles floated in the
```

1    air and went in through there.  That's what I'm trying to

2    figure out.

3            Are you able to opine that, in fact, a firearm was

4    used to discharge a bullet through that filter?

5            THE WITNESS:  I can say I found smokeless powder and

6    residue consistent with a firearm discharge inside of it.  I

7    can't say how it got in there.

8            THE COURT:  Yeah.

9            THE WITNESS:  I can say, though -- and I can't --

10   you know, part of the reason that I can't say how much might

11   have been in here is because I can't open this up and get in

12   there and see what's in there because it needs to go on and be

13   tested by somebody else after my analysis --

14           THE COURT:  Okay.

15           THE WITNESS:  -- and it also needed to be swabbed

16   for DNA so.  I was -- I just tapped it out and got out what I

17   was -- needed.  You know, so I'm not getting -- not doing a

18   thorough sampling of necessarily what was in there.

19           THE COURT:  Yeah.  I just have this really kind of

20   naive understanding that I just would think, okay, there's a

21   lot of powder in a typical bullet, it goes somewhere, comes out

22   the front end, right, and so it goes into the area and this is

23   capturing most it.

24           There's also going to be some flash and some high

25   temperature and there's probably going to be some burning.  I

145

1    pictured the inside of this, you'd open up and see this big

2    kind of black area where it shows that it's been fired and

3    that's just not right; is that what you're telling me?

4                THE WITNESS:  Well, I can't open it up.

5                THE COURT:  Oh, you haven't tried to look in it.

6                THE WITNESS:  I can't open it up because it needs to

7    be function tested after I analyze it.  I -- I can't --

8                THE COURT:  We've already done that now, though.  I

9    can take a hacksaw to it and open it right up.  I mean, it

10   could be done -- we could do that.

11               THE WITNESS:  It could be done now.

12               THE COURT:  Yeah.  Okay.

13               MR. ROMBEAU:  I just have a couple of --

14               THE COURT:  Let's just try and finish this up.

15   Okay?

16       Q.    Ms. Wallace, you referred to it as partially burned.

17   What does that mean?

18       A.    So when -- when smokeless powder burns, it burns in

19   layers.  It's designed that way.  And it burns under pressure.

20   That's how it's designed to burn.  When the pressure is

21   released, if it hasn't been consumed, then it can stop burning.

22   So then the particles will look damaged, sometimes they look

23   like a Swiss cheese appearance, sometimes they just look like

24   little melted globules of plastic.  So it'll have a burned

25   appearance to it.

1    Q.    And Judge Barbadoro's question about sort of the

2    quantity that you might expect to find, you alluded a moment

3    ago to certain materials being consumed during the fire.  Does

4    that happen to some of the smokeless powder, it gets consumed

5    during the firing of a bullet?

6    A.    Yes.

7         THE COURT:  $E=mc^2$, you know.  That's how it works.

8    Q.    And then, just briefly, Ms. Wallace, in addition to

9    the smokeless powder, did you find other materials inside this

10   particular filter that were consistent with fired ammunition?

11   A.    Yes, there was a lot of materials came from the

12   inside that included drill tailings and other things that

13   looked like they had been originally part of the filter.  And

14   there were some other particles that I analyzed, including some

15   lead metal particles, that had antimony in them and some brass

16   particles that had residue of lead and antimony on them and

17   then like a silicone particle that had -- particles -- that had

18   elements on it of lead, barium, and antimony.  And when I take

19   that together with the smokeless powder, it's indicative of

20   fired ammunition.

21   Q.    Okay.  And, again, that was going to be my last

22   question on that.

23         So based on your training and experience and

24   analysis of numerous explosives and silencers over the years,

25   is it your conclusion that all those materials you found -- I

147

1    shouldn't say all -- the materials you identified were

2    indicative of fired ammunition?

3        A.    Yes, that is my opinion.

4        Q.    And then, very briefly, did you analyze a second

5    silencer in connection with this case?

6        A.    Yes.

7        Q.    Okay.  And did you reach any conclusions in that

8    matter of whether there was smokeless powder or these other

9    materials indicative of fired --

10       A.    Yes.  So when I tapped that out, I did see other

11   drill tailings and things that looked like they were originally

12   part of the -- of the oil filter, but I did not find any

13   smokeless powder or any other particles that I considered

14   significant.

15           MR. ROMBEAU:  Thank you.  I have nothing further

16   with this witness.

17           Thank you, your Honor.

18           THE COURT:  Thank you.  Cross-examination.

19           MS. BROWN:  Thank you.  I just have a few questions.

20                     CROSS-EXAMINATION

21   BY MS. BROWN:

22       Q.    I don't know if you were here earlier when we spoke

23   with Mr. Stimmel, but one of the things he said when he's

24   tested silencers in the past is he's given an item that is

25   potentially a silencer and a firearm that there's at least some

148

1    suspicion that those had been used together.

2         Do you have -- have you had that in the past, where

3    the -- the prosecutors have given you, you know, here's this

4    potential silencer and here's the ammunition we think might

5    have been used or, you know, does that happen?

6         A.    I have not done that type of examination before.  I

7    can't say --

8         Q.    Okay.

9         A.    -- what type of ammunition may have been used.

10        Q.    Okay.  So and you also don't have any opinion as to

11   any -- the type of firearm that may or may not have been used

12   with the -- the filter you tested?

13        A.    Correct.

14        Q.    And so you -- again, implicit in your answer is you

15   don't have the opinion about the type of ammunition that was

16   used as well?

17        A.    Correct.

18        Q.    Okay.  And you were given the Mossberg shotgun, but

19   you didn't do any testing on it?

20        A.    That's correct.  I didn't open that exhibit.

21        Q.    Okay.  Was that because you were told not to or you

22   just didn't think there was anything potentially relevant?

23        A.    I -- it was -- it wasn't requested and I -- if I do

24   think an exam is relevant, I will -- I can contact the agent

25   and ask if he would like it to be added, but I didn't see

149

```
 1   that that would be relevant.
 2              MS. BROWN:  Okay.  Thank you.
 3              THE COURT:  Any redirect?
 4              MR. ROMBEAU:  No, your Honor.
 5              THE COURT:  Ma'am, I -- I do want to thank you for
 6   coming today.  I don't -- I'm under a lot of pressure to finish
 7   up today because I have to start a trial tomorrow.  I don't
 8   want you to take anything I've said as the suggestion that I
 9   don't value what you have to say.  You're a very experienced
10   chemist, devoted a long career to working in this field, and I
11   rely heavily on your testimony.  I'm just trying to get through
12   things where I know things are not in dispute.
13              This is a sentencing hearing, not a jury trial.  I'm
14   very familiar with chain of custody and how carefully you view
15   those kinds of matters and I knew the defense attorney, if she
16   had any concerns, would follow up.  That's why I'm just trying
17   to move things along.  But I do appreciate your testimony here
18   today.  Thank you.
19              THE WITNESS:  Thank you.
20              THE COURT:  You can step down.
21                       (Witness excused.)
22              THE COURT:  And we should take a break.
23              Have I heard all the evidence that I need to hear on
24   sentencing?  Right?  Okay.
25              MS. KRASINSKI:  I think so, your Honor.
```

1            THE COURT:  So we'll take a break.  It's 1:30.

2  We'll take a break till 2:15.  We'll come back and we'll do the

3  sentencing.

4            I'll -- I'll determine -- I'll hear any argument you

5  want to present in addition to what you've already done in your

6  briefs on this issue.  I'll resolve this question, determine

7  the defendant's total offense level, criminal history category,

8  hear any arguments for departures or variance, recommendations

9  on sentencing, and I'll impose the sentence.

10            If we can do that relatively quickly, I'll move

11  right into the motions.  If not, I'll take a break and then do

12  the motions.

13            When is my next sentencing?

14            THE CLERK:  3:30, Judge.

15            THE COURT:  Okay.  So we might be a little late on

16  that.  We'll get it in today, we might just have to move it a

17  little later.

18            Okay.  So we will break until 2:15.

19            THE CLERK:  All rise.

20         (Recess taken from 1:34 p.m. until 2:31 p.m.)

21            THE CLERK:  This hearing is back in session.

22            THE COURT:  All right.  I've heard the evidence.

23  I've read your briefs.

24            What else does the defendant want to say, if

25  anything, in support of your objection to the presentence

```
 1    report's determination that your client's base offense level

 2    should be 22 rather than 20 and that a two-point adjustment

 3    should be added based on number of firearms?

 4              MS. BROWN:  Thank you, your Honor.

 5              Obviously the Court heard all the facts.  I'm not

 6    going to regurgitate them, but there are a couple of arguments

 7    I do want to make in summation.

 8              And I think now the silencer issue, I think, is down

 9    to two issues, not counting the sporting purpose.  So one is

10    whether it meets the definition of silencer and the other is

11    whether it was -- and I think the applicable language here was

12    involved in this case.

13              So we know it wasn't involved in this case as a

14    silencer that was used for the Mossberg.  The government has

15    stipulated to that.  Their own witness has said that it

16    couldn't have been used for the Mossberg.

17              So how is -- how are these two alleged silencers

18    involved in Mr. Donovan's possession of the Mossberg shotgun?

19    They're not involved in it in terms of helping him use it

20    silently or surreptitiously, so how are they involved.

21              We would argue they're not.  There's no connection

22    between these alleged silencers -- assuming they're silencers,

23    I'll get to that second -- but I don't think the Court has to

24    get too deep in this because I think there's just not evidence

25    that they're involved in this case.
```

1          Then -- and so the second issue then becomes are

2   they, in fact, silencers.  And the Court mentioned before the

3   *SIG Sauer* case, which I think he mentioned at trial as well,

4   and I did read it which led me to the *Crooker* case, which I

5   think the big difference between why *SIG Sauer* isn't relevant

6   here is that was commercial silencers.  That -- but it did have

7   to do with the definition.  But the reference to *Crooker* is

8   very important and there's a couple things about *Crooker* that I

9   want to mention.

10          You know, as they said in *Crooker*, in the ordinary

11  case, if it's a -- it's a manufactured silencer and it's

12  advertised as a silencer, it's just a nonissue.  It becomes a

13  more complicated issue when it's, for lack of a better word, a

14  homemade silencer.

15          And why this is important, and I'm looking at page

16  98 of *Crooker:*  The range of physical objects that can, meaning

17  possibly, capably, or have a capacity to muffle a firearm is so

18  large and have so many alternative uses that some filtering

19  restriction is needed to prevent overbreadth and possible

20  vagueness.

21          I -- I've read some of the cases, too, on this and I

22  have one cited in my sentencing brief.  I can't remember the

23  name of it right now.  But I remember the facts of it, which

24  was the -- the firearm, I think it was found under the

25  defendant's bed, connected to the silencer.  So you have a --

1  you know, that's -- that's a much stronger case when there's

2  actually a connection.

3          So that's obviously not the case.  There's no

4  evidence at all that this was used as a silencer by Mr. Donovan

5  or there was an intention to make it, yet even in the *Crooker*

6  case, they talk about a homemade silencer could extend to a

7  soda bottle or even a potato.  And that is the problem with

8  homemade silencers.  And so the real issue comes into the

9  defendant's knowledge, purpose, or both, with respect to the

10  device.

11          I think it would be a different situation here, say,

12  if they looked at the defendant's cell phone and the defendant

13  sent a message to somebody, saying, I've been working on my

14  silencer for my Ruger today and, you know, I think I've got it

15  working.  There's nothing of that.  The -- this -- that's one

16  thing.

17          And the -- why?  Why have a silencer?  The one

18  firearm that they do have with the defendant is ported.  He

19  made it -- you know, it -- you know, if it's his, and that's

20  what the argument is, that it's his, and that's what the jury

21  found, he made it louder or someone made it louder, or he used

22  a firearm that was louder.  So there's just no evidence of an

23  intent to have a silencer, to use a silencer, or that it has

24  the capability.

25          And the fact that you'd have to buy extra pieces and

1    maybe machine and tool extra pieces, I don't think that fits

2    the language of *Crooker* and I think that's what the government

3    argued in *Crooker*; well, he has the capability of turning that

4    object into a silencer for a firearm so, therefore, the -- the

5    capability is enough.  And *Crooker* said, no, the capability is

6    not enough.

7              So for those two reasons, one, that I don't think

8    they have proven that this was a silencer or -- and, more

9    importantly, that there was an intent to use it as a silencer,

10   that it operated as a silencer, and, secondly, that the big

11   thing here is whether it was even involved in this case.  You

12   know, there's lots of things that could be illegal but have no

13   relation to -- and this is what he was convicted of, convicted

14   of possessing --

15             THE COURT:  Do you agree that if the -- let's just

16   call them oil filters for the time being --

17             MS. BROWN:  Yeah.

18             THE COURT:  -- oil filters meet the definition of

19   silencer under *Crooker,* that they count as firearms under the

20   adjustment for the number of firearms if they qualify as

21   relevant conduct.

22             MS. BROWN:  I think that if this Court -- well, I

23   guess no, your Honor.

24             So I think that there has to be a connection.  And

25   when I -- when I look at this, there has to be a connection

155

1    between the oil filter/silencer.  I mean, I think the analogy

2    is like we see all the --

3                THE COURT:  Isn't, though, the required connection

4    that they meet the definition of relevant conduct?

5                MS. BROWN:  No.  Yeah.  Oh, okay.  I understand your

6    question now.  I think it has to be more than that.  And I was

7    going to say --

8                THE COURT:  Do you have any case law support for

9    that proposition?

10               MS. BROWN:  I couldn't find cases one way or the

11   other on this, your Honor.  The cases I found, and the one I

12   cited, the defendant was actually charged with -- like that was

13   part of the --

14               THE COURT:  Did he cite *United States against*

15   *Powell*?

16               MS. BROWN:  Powell, P-o-w --

17               THE COURT:  Powell, 50 F.3d 94, First Circuit case.

18               MS. BROWN:  I don't remember, your Honor.  I --

19               THE COURT:  All right.  Let me just tell you about

20   *Powell*.  Okay?

21               The district court found at sentencing that Powell

22   possessed the guns found in the Fairlawn Estates apartment and,

23   therefore, increased Powell's offense level by one for

24   possession of the guns and by two because one of the guns had

25   an obliterated serial number and Powell challenges this finding

1    on two grounds.  First, he contends there was insufficient

2    evidence to support the findings; second, he asserts that his

3    possession of these guns was not part of the same course of

4    conductor common scheme or plan as the offense of conviction as

5    is required by 1B1.3(a)(2).

6                MS. BROWN:  What was the offense of conviction in

7    that case, your Honor?

8                THE COURT:  Felon in possession of a firearm.

9                MS. BROWN:  Okay.  Okay.

10               THE COURT:  Sounds like the right issue, right?

11               MS. BROWN:  Yeah.

12               THE COURT:  Okay.

13               MS. BROWN:  Okay.

14               THE COURT:  Although Powell's same course of conduct

15   argument has some superficial appeal, after all, the guns in

16   the Fairlawn Estates apartment did not play any role in the --

17   in Powell's possession of the 44 Humboldt Avenue -- .44 on

18   Humboldt Avenue.  It is foreclosed by circuit precedent.

19               In *United States against Sanders*, we analyzed

20   whether a defendant who had pleaded guilty to being a felon in

21   possession of a firearm and to using or carrying a firearm

22   during and in relation to a drug trafficking crime could be

23   subjected to an upward departure for possessing a weapon, used

24   to shoot his girlfriend in the head, which was not named in the

25   indictment.

1    Answering this question required us to consider the

2    scope of the same course of conduct provision in 1B1.3(a)(2)

3    because the possession of the gun used in the shooting could

4    only be taken into account at sentencing if it constituted

5    relevant conduct under 1B1.3.  In answering the question, in

6    the affirmative, we said -- now he's quoting from *Sanders:*  The

7    same course of conduct concept looks to whether the defendant

8    repeats the same type of criminal activity over time.  It does

9    not require that the acts be connected together by common

10   participants or by an overall scheme.  Here, the defendant did

11   repeat the same type of criminal activity.  He illegally

12   possessed three or four separate firearms when the victim was

13   shot.  We have no difficulty viewing the illegal possession of

14   the four weapons as all part of the same course of conduct.

15         Now back to the decision in *Powell*, what the Court

16   concludes from this:  In other words, the contemporaneous or

17   near contemporaneous possession of uncharged firearms is, in

18   this circuit, relevant conduct in the context of a felony in

19   possession prosecution.

20         In this case, Powell clearly possessed the guns at

21   the same time he possessed the .44 used in the shooting.

22   Accordingly, the district court did not err in finding the

23   possession of these weapons was part of the same course of

24   conduct as the offense of conviction.

25         It's -- that seems to be what the circuit precedent

 1    is.  Now, this was a 1995 decision.  I did a quick search.  I

 2    couldn't find any First Circuit case overruling that.  I did

 3    find a 2021 decision of the Ninth Circuit applying the same

 4    conclusion and citing Powell as still good law and, in fact, in

 5    that case, there was a 11-week spread between the possession of

 6    the first two guns and his possession of the other guns.  And

 7    even then the Court said that it was sufficient to satisfy the

 8    same course of conduct standard.

 9           So it seems to me that under First Circuit precedent

10    the government is correct that at least the three-gun

11    enhancement should apply.  What I don't -- and you can tell me

12    why not, if this is a silencer, but it seems to me that's what

13    the First Circuit precedent is and it seems logical and

14    consistent with the definition of relevant conduct.

15           MS. BROWN:  I think the thing that's really huge

16    here and the -- the facts that, at least as I understood them

17    involved the use or contemporaneous -- some sort of

18    contemporaneous possession --

19           THE COURT:  Right, contemporaneous -- definitely

20    contemporaneous possession.

21           MS. BROWN:  Right.

22           THE COURT:  He was convicted in -- Powell was

23    convicted of being a felon in possession of a firearm.  The

24    firearm that was charged was the one used in a shooting, but

25    what they did use was the other guns contemporaneously not with

1   him while he did the shooting, but in his -- in an apartment

2   contemporaneously possessed and used those guns to give a

3   number of gun enhancement.

4           MS. BROWN:  Yeah.  And we do not -- I mean, those

5   oil filters could have been there for five years, ten years.

6           THE COURT:  Right.  But if they are firearms, he

7   still was possessing them at the same time he was possessing

8   the gun that's led to his conviction.  Because, as you know,

9   possession is continuing, the crime of possession is a

10  continuing crime, that he created the firearms years ago

11  doesn't matter if he's still possessing them.

12          So his possession was contemporaneous with his

13  possession of the rifle that led to the conviction.  So that's

14  why it seems to me that at least as to the three-level

15  adjustment, First Circuit precedent would seem to require the

16  counting of these, if they qualify as firearms, as silencers.

17          The other adjustment is -- concerns 2K2.1 and that

18  uses the term -- 2K2.1(a)(3), that applies if the offense --

19  the offense involved.  What I don't know is whether the offense

20  involved can be satisfied with relevant conduct or whether that

21  does require some different test.

22          So when the government gets to its turn, I'd be

23  interested in hearing that.  You would, I assume, want to argue

24  that even if you're right about the two-level adjustment for

25  the number of firearms, this -- the provision that increases is

160

```
1  his base offense level from 20 to 22 is triggered by the

2  offense involving the firearms and the offense of conviction

3  here, you would say, did not involve, which is something

4  different from whether the possession, contemporaneous

5  possession, is relevant conduct to.

6         MS. BROWN:  Right.  And I thank you for clarifying

7  that, because I think that's -- the second thing was what I was

8  attempting to argue.  I do think there's a difference between

9  relevant conduct, which I think is a much more -- a broader --

10 it includes broader range of activity, but if you look at the

11 actual language, it says --

12        THE COURT:  Here's what cuts against that argument.

13 I'm sorry to interrupt you --

14        MS. BROWN:  That's okay.

15        THE COURT:  -- but the level adjustment, based on

16 the number, right, that comes from 2K2.1(b)(1), right?  And I

17 think that's what it is, isn't it?  It's 2K2.1(b)(1)?

18        MS. BROWN:  It uses the language the alleged

19 silencer involved in the offense.

20        THE COURT:  And then it says, if the offense

21 involved.

22        MS. BROWN:  Right.

23        THE COURT:  And this is that language that the Court

24 was interpreting in Powell.  And so it's the same term,

25 involved, for that as it is for the increase of 20 to 22, which
```

1    doesn't suggest to me that there should be a different

2    standard.

3            That's -- if you have a response to that, I'm

4    interested to know what it is.

5            MS. BROWN:  Well, I -- as I said, I haven't read

6    that case, but I think that where there's, you know, there's

7    sort of statutory construction that there's not -- you don't

8    usually interpret language to be superfluous; that -- that

9    where I think involved in this case is a separate

10   consideration.  It goes to the crime itself.

11           And there's -- you know, and I think that what's

12   very -- and this is why we brought the experts, is not only is

13   there evidence that these firearms had -- of these oil filters

14   had nothing to do with the Mossberg, they were incompatible

15   with the Mossberg.  All the -- well, I wouldn't say the last

16   expert, but both experts agreed with that, that they were

17   incompatible for use.  There was no other firearms.

18           I mean, I think what makes these silencers different

19   is that there's nothing to make them usable.  So -- and maybe

20   that kind of blurs the line between the definition and whether

21   they're involved, but I think there is a blurring of the line

22   there of whether they were usable or had capacity to be used as

23   a silencer and whether they were involved in this case.

24           The government's own expert said that it's unusual

25   that someone would use a silencer for a shotgun and --

1          THE COURT:  Oh, yeah.  I don't think there's any

2     evidence or any contention --

3          MS. BROWN:  Yeah.

4          THE COURT:  -- that these oil filters were adapted

5     for use on the shotgun as a silencer.  So that's --

6          MS. BROWN:  Yes.

7          THE COURT:  -- out.  I'm not taking that as --

8     that's not even being argued by the government at this point, I

9     think.

10          MS. BROWN:  And, as I said, I think because there's

11     this open issue as to whether they are even silencers, I think

12     these two issues kind of blur a little bit.  And -- because if

13     you have a defendant who's charged with felon in possession and

14     then he's got other firearms that are, you know, within the

15     traditional definition of firearm being, you know, a gun that

16     you point and pull a trigger, I think that that's an easier

17     issue than deciding whether incompatible potential silencers

18     that can't be used as silencers as they are but has the

19     potentiality to become silencers, I think that also goes to the

20     issue of whether they're involved in this offense and not just,

21     you know, other criminality happening contemporaneously with

22     the charged offense.

23          THE COURT:  All right.

24          MS. BROWN:  But I'd just conclude by saying we --

25     the language in *Crooker* I think is very favorable to the

1    defendant and based on *Crooker*, these are just -- they don't

2    meet the -- the necessary definition of silencers, especially

3    when you're considering alleged homemade silencers.

4              THE COURT:  So it is reasonable to assume from this

5    evidence that the oil filters were both modified from their

6    original state, right?

7              MS. BROWN:  That was the testimony, yes.

8              THE COURT:  Okay.  Is there any basis in this record

9    to conclude that they were modified for the purpose of -- any

10   other purpose than to have them function as a silencer?

11             MS. BROWN:  I don't think there is testimony one way

12   or the other.

13             THE COURT:  Okay.  Well, the experts testified that

14   it was -- they were modified to work as a silencer, but I'm

15   asking is there any other -- is the evidence susceptible to any

16   alternative interpretation.

17             I understand your point is the government can't

18   prove they intended -- he intended to use it as a silencer, but

19   I'm asking a slightly different question:  Is there any

20   evidence in the record that would support an inference that it

21   was modified for a different purpose?

22             MS. BROWN:  I don't think the defendant has to --

23             THE COURT:  The defendant has no burden of proof.

24             MS. BROWN:  Right.

25             THE COURT:  The burden of proof is entirely -- I

164

1    mean, I can recite basic law that I've been --

2                MS. BROWN:  I know that, your Honor.

3                THE COURT:  -- dealing with 30 years.  Of course.

4    No burden is on the defendant.  The defendant has the absolute

5    right to remain silent.  The defendant does not have to produce

6    any evidence.  The burden of proof here is on the government.

7                But where the government introduces evidence that

8    something has been modified in a way in which there is no other

9    reason to engage in the purposeful act of modification other

10   than to create a silencer, then I'm interested in knowing if

11   there's any other -- I'm missing something that, oh, it

12   could -- he -- you had the Riley's guy start to talk about how

13   you could do something with the oil filter that was outside of

14   his expertise.  Other than that, did you have anything else?

15               MS. BROWN:  No.  And I think that was what -- you

16   know, that there are other uses for that.  But we -- you know,

17   I don't think he gave the full explanation of that.

18               There are materials, and we could make it a full

19   exhibit, regarding that there, as the Court said, may be used

20   to disperse solvents out of a firearm like as part of the

21   cleaning process.  We did not -- you know, we didn't put

22   someone on the stand to say, oh, yeah, he was cleaning it,

23   that's why we had that.  We didn't put that on the stand.  But

24   I think --

25               THE COURT:  You have no obligation to do it.

1            MS. BROWN:  No.

2            THE COURT:  I just wanted to see if you missed -- if

3    I missed something.

4            MS. BROWN:  No.

5            THE COURT:  Like if somebody could have testified,

6    this is, you know, I did these modifications, this is what I

7    did and why I did it, but we don't have anything like that.

8    I'm not holding it against your client.  He has an absolute

9    right to remain silent.  The burden of proof is always on the

10   government.  I can recite the basic -- I would hope that the

11   Court of Appeals would understand me, that having done this for

12   my entire adult life I know what these basic requirements are,

13   so I won't repeat them.

14            Okay.  Is there anything else you want to tell me on

15   either of your two arguments?  So I understand you to make two

16   distinct arguments:  One, the government hasn't proved that

17   they're silencers and, therefore, they're not firearms, and

18   because they're not firearms, they can't be used either to

19   increase his base offense level or to include a number of

20   firearms adjustment; and, second, even if the government did

21   prove that they are silencers and they met the definition --

22   therefore, met the definition of firearm, they haven't proved

23   that the -- the oil filters are relevant conduct to the offense

24   of conviction.  You've demonstrated that the oil filters have

25   nothing to do with the shotgun and that's one of your principal

```
 1   arguments.
 2             Have I captured your sense of what the arguments are
 3   on this?
 4             MS. BROWN:  Yes, your Honor, but just with one brief
 5   addition.
 6             I -- as I read the cases, I don't think this is an
 7   issue of -- the question is not did Corey Donovan have an
 8   intent to create a silencer.  The question is --
 9             THE COURT:  Well, I -- I thought you wanted to very
10   much argue that that's an important requirement, because that's
11   what I understand Crooker to hold; that to address the
12   problem -- I thought -- the way I read Crooker and my opinion
13   in SIG Sauer, which was affirmed by the Court of Appeals, you
14   have to have more than just the component parts of a silencer
15   and that's to address the problem of the potato is a silencer
16   and the -- you know, a Coke bottle is a silencer and a pillow
17   is a silencer.  You have to have more than just the component
18   parts.  You have to have both --
19             MS. BROWN:  Yes.
20             THE COURT:  -- and you have to have the component
21   parts and you have to have the intent.
22             MS. BROWN:  Right.
23             THE COURT:  And so I -- so I want to be very clear
24   again.  I hope people read my opinion so they don't think I'm
25   an idiot.  I've already thought about these things for a long
```

```
 1   time.  I don't necessarily articulate every word because if you
 2   asked me to look at -- the range of issues you have presented
 3   to me if you consider your motions to dismiss and the various
 4   arguments are like dozens of issues, so I have to try to focus
 5   on what's important.
 6            But I very much understand Crooker to involve
 7   both --
 8            MS. BROWN:  Exactly.
 9            THE COURT:  -- a requirement that there be the
10   components of a silencer and an intent on the part of the
11   person who would be charged with possession of it.  Otherwise
12   there's a danger that the Court in Crooker was trying to
13   address.
14            So if that's what you're saying, I agree with that.
15            MS. BROWN:  Okay.  That's all I was trying to say --
16            THE COURT:  Okay.
17            MS. BROWN:  -- and that concludes my arguments and
18   that issue.
19            THE COURT:  Okay.  What does the government want to
20   say in addition to what's in your briefs?
21            MS. KRASINSKI:  Two things, your Honor.
22            I think when you look at the guidelines themselves,
23   the guidelines make a distinction for when a guideline is only
24   applicable for events involved in the count of conviction and
25   when it includes relevant conduct.
```

168

1          So if we -- if you look at -- you already noted that

2    the language in 2K2.1(a)(3) that talks about the offense

3    involved is identical to that on -- of (b)(1), when you're

4    talking about the number of firearms --

5          THE COURT:  Yeah, uses the term involved.  So --

6          MS. KRASINSKI:  And the first --

7          THE COURT:  -- I think I'm right about this.  Both

8    of the adjustments that the defendant challenges are contained

9    within 2K2.1.

10          MS. KRASINSKI:  Correct.

11          THE COURT:  The first is 2K2.1(a)(3), which produces

12    a 22 base offense level and the second is an adjustment to the

13    base offense level that's required by 2K2.1(b)(1) --

14          MS. KRASINSKI:  That's correct.

15          THE COURT:  -- right?

16          And the point I'm making is the case I cited to you,

17    *Powell*, appears to be a case that, if I'm understanding it

18    correctly, is a 2K2.1(b)(1) case and the defense made the

19    argument about the word involved isn't broad enough to

20    encompass relevant conduct.

21          But in analyzing 2K2.1(b), in *Powell*, that -- the

22    Court did apply the relevant conduct analysis and, therefore,

23    it would seem that there should be -- the same approach should

24    be used in analyzing the -- whether the offense involved

25    something under 2K2.1(a)(3).

1      So I think although *Powell* is not a 2K2.1(a)(3) case,

2   it should use the same standard that the Court in that case

3   used because it involved an interpretation of (b), which uses

4   the same word, involved.

5      MS. KRASINSKI:  So consistent with that, in 2020,

6   the First Circuit found in *United States vs. Ilarraza*, I

7   believe it's I-l-a-r-r-a-z-a, 963 F.3d 1, that when you're

8   looking at (b)(1) when you're determining the number of

9   firearms involved in the offense, the Court should -- and I'm

10  going to quote now -- consider all relevant conduct

11  attributable to the defendant.

12     And so the Court has consistently found under 2K2.1

13  where there are provisions that use this language, the offense

14  involved, that the Court should be looking at all relevant

15  conduct.  And I think that that's consistent with the

16  guidelines themselves.

17     If you look at application note 7 to guideline

18  1B1.3, it notes that there are particular guidelines that

19  expressly direct that a factor be applied -- and I'm going to

20  quote now -- only if the defendant was convicted of a

21  particular statute.

22     And there are provisions in the guideline that

23  require an elevated base offense level only upon conviction of

24  a certain thing.

25     So what's -- what jumps to my mind is 2D1.1.  And

170

1    the language in that is very different.  So, for example, if

2    you're looking at the base offense levels under 2D1.1 for the

3    death resulting enhancement, the language of the -- the

4    guideline itself says, you know, 43, if the defendant is

5    convicted under 21 U.S.C. 841(b)(1)(A) and the offense of

6    conviction establishes that death or serious bodily injury

7    resulted from the use of the substance.

8          And so I think that just further supports the

9    conclusion that -- in 2K2.1 where it uses this broader

10   language, the offense involved, that that language is meant to

11   encompass all relevant conduct rather than narrowly focusing on

12   the offense of conviction.  When the guidelines want the Court

13   to focus only on the offense of conviction, they say so.  But

14   they don't do that in 2K2.1.

15         And so if the Court finds that these are silencers,

16   then the base offense level under 2K2.1(a)(3) should apply.

17         THE COURT:  Okay.  Anything else you want to say?

18         MS. KRASINSKI:  So then the only thing I want to

19   address is sort of the intent issue.

20         I don't need to repeat all of the testimony about

21   whether or not these are firearm silencers, but when talking

22   about whether or not this -- there's this sort of separate --

23   this intent, I mean, I think we can focus on two specific

24   pieces of evidence that the Court heard.

25         The first is the forensic chemist testimony that

1    there were particles of burned smokeless powder found on the

2    inside of one of these firearm silencers.  That indicates an

3    intent to be used as a firearm silencer, not as anything else.

4            And the other thing is Mr. Stimmel's testimony that,

5    in his view, his opinion was that sort of that adapter that was

6    placed on it was intended to fit a firearm with a sight.  And,

7    again, that indicates a use -- that it's meant to be used with

8    a firearm and nothing else.

9            And so those are two specific pieces of evidence

10   that sort of go to that second piece, that it's not just that

11   these were modified by drilling a hole, but that there appears

12   to also be an intent to use them as a firearm -- as firearm

13   silencers.

14           And that can also be inferred by the surrounding

15   circumstances.  They were found in the defendant's workshop,

16   where a number of other items were found, ammunition, the

17   barrel, the sister barrel to the Mossberg rifle, the one that's

18   interchangeable with the one that was found on the rifle --

19   excuse me, on the shotgun -- and in a portion that -- of the

20   garage that the defendant -- the workshop that the defendant,

21   in his testimony, identified as his work area.

22           And specifically I'm looking at cross-examination,

23   docket number 68.  And during that testimony, the defendant was

24   talking about a photograph that had been admitted as

25   Government's Exhibit 904 at trial.  And if we can briefly look

1    at that.

2            And when talking, he talked about hanging the deer

3    and it's a long process and skinning the deer.  And he was

4    asked, but this is your work area?  And he responded, yeah.

5            And if we -- if we enlarge kind of by where this

6    ladder is, you can see what appears to me to be two what we now

7    heard testimony were firearm silencers.  And we know, again,

8    based even on the defendant's own testimony, that these deer

9    were hung in March of 2021 and so the same time frame as the

10   seizure and the search.

11           So this is the defendant's work area, other places

12   where gun and ammunition are found, it should constitute

13   relevant conduct here, your Honor.

14           THE COURT:  All right.  Thank you.

15           All right.  Just -- I want to be clear.

16           I excluded the oil filters at trial because it was a

17   jury trial, because there was a danger that the jury would

18   unfairly assume that the defendant was trying to create

19   silencers when that wasn't the issue in the case and I felt on

20   balance the danger of unfair prejudice substantially outweighed

21   probative value.

22           That ruling was not based, if I'm remembering it

23   correctly, on any conclusion that these were not silencers or

24   that they aren't relevant conduct to the charge at issue.  It

25   was while conducting a jury trial, determining in a very

1   conservative way, which is my approach with respect to Rule 403

2   issues, that we just not distract the jury and potentially have

3   them draw some kind of prejudicial inference.  It also would

4   have required substantial additional time and testimony to try

5   to establish the points that you're establishing today.

6           But it is my judgment that these are, in fact,

7   silencers, that the defendant intended to modify them to be

8   used as silencers.  Not that I think Mr. Donovan was setting

9   out to be an assassin or something like that.  I think he's --

10  my own take on him is a person that's very interested in

11  firearms and weapons of all sort and he might have just been

12  experiencing with them.  I'm not saying -- inferring that he

13  had some kind of malicious intent.

14          But to the extent you create a silencer for use as a

15  silencer and that is your intent, that you don't, in fact, use

16  it to kill somebody or something doesn't really affect the fact

17  that you have created a silencer, which is a NFT required

18  device -- subject to the NFT and is required -- is a firearm

19  and does justify the enhancement by two levels from 20 to 22.

20  And given its counting with the other two weapons justifies --

21  or, excuse me, with the -- with the shotgun, those two do

22  adjust -- justify the -- the enhancement for three to seven

23  firearms set forth in 2K2.1(b)(1).

24          So I want to be clear.  I do believe that the

25  evidence in this case demonstrates to my satisfaction that this

174

1    meets the definition -- these oil filters were modified in a

2    way that meets the definition of a silencer, that the defendant

3    intended that they be modified for the purpose of having them

4    function as silencers, and that they warrant the increase in

5    the defendant's offense level, base offense level, and the

6    two-level adjustment.

7              I -- I want to be also clear that the -- it is

8    appropriate to treat these silencers as relevant conduct for

9    purposes of sentencing.  In -- I find persuasive the

10   First Circuit's decisions in *United States vs. Powell,* reported

11   at F.3d 94, a 1995 First Circuit decision that I have already

12   quoted extensively; *United States vs. Sanders*, a decision that

13   the First Circuit relied on in *Powell*, reported at 982 F.2d 4;

14   and a Federal Appendix Decision, *United States against Holmes*

15   reported at 429 Federal Appendix 7.

16             I recognize it's a Federal Appendix decision, but

17   nevertheless, it involves a circumstance where the defendant

18   was charged with -- and convicted of possessing ammunition and

19   handguns that were contemporaneously possessed were used as

20   relevant conduct, even though the -- the handguns were not

21   directly connected to the ammunition.

22             I believe the reasoning of those cases and also the

23   Ninth Circuit more recent decision in *United States against*

24   *Parlor* reported at 2 Federal 4th, 807, which cites with

25   approval *Powell* make clear that the silencers in this case do

1  qualify as relevant conduct and do justify the increase in the

2  offense -- the defendant's base offense level from 20 to 22 and

3  justify an additional two-level adjustment based on the

4  defendant's contemporaneous possession of three to seven

5  firearms.

6  　　　　　So I agree that the probation report has this one

7  right.  The defendant's objection is noted and preserved, but

8  overruled.

9  　　　　　Does the defendant have any additional objections to

10  the guideline calculations in the report?

11  　　　　　MS. BROWN:  I don't have anything other than in my

12  motion and --

13  　　　　　THE COURT:  Is there -- now is the time to speak up.

14  If you have any additional argument that you haven't presented,

15  now's the time.  I don't think there's anything else, but

16  that's on you rather than me to bring it to my attention.

17  　　　　　MS. BROWN:  I agree with you -- hang on for a

18  minute.

19  　　　　　Your Honor, the only thing, in speaking with

20  Mr. Donovan, in reading the case law, the calculation regarding

21  the firearm being stolen does not require evidence of

22  knowledge.

23  　　　　　THE COURT:  Yeah, and he's consistently denied

24  knowing that it, in fact, was stolen and I don't -- I don't

25  believe that that provision requires knowledge.

 1              MS. BROWN:  Right.  And I did the research on that

 2    and I agree with that.

 3              THE COURT:  Yeah.

 4              MS. BROWN:  I think --

 5              THE COURT:  But I know he's consistently

 6    maintained -- there's no question it was stolen, but I don't

 7    have, at least in my mind at the moment, sufficient evidence to

 8    say that his denial is false and that he, in fact, was involved

 9    in stealing it.

10              MS. BROWN:  And I don't think the government --

11              THE COURT:  So I'm not going to be holding that

12    against him as if he was the person that stole that firearm.

13    The adjustment results from the fact that it was stolen, not

14    the fact that he stole it or knew that it was stolen.

15              MS. BROWN:  Okay.  And I -- and I'll just mention it

16    now since we're talking about it, I do think the fact that

17    there's no evidence that he stole it is relevant to the

18    ultimate sentence because, obviously, I think there would be an

19    argument that if somebody had been engaging in illegal activity

20    with stolen firearms that that would be an argument against

21    varying from the --

22              THE COURT:  Yeah, I have no -- I have no evidence

23    that I'm aware of that the defendant was intending to use these

24    weapons for some kind of special, separate illegal activity.  I

25    have no evidence that persuades me that the defendant, in fact,

1   stole this particular weapon.  Those aren't factors that are

2   going to affect my sentencing judgment.

3              MS. BROWN:  Okay.  Thank you for explaining that,

4   your Honor.

5              THE COURT:  All right.

6              Okay.  So the government has no other objections to

7   the report?

8              MR. ROMBEAU:  No, your Honor.  Thank you.

9              THE COURT:  All right.  So I adopt the findings of

10  fact and conclusions of law set forth in the report which will

11  be made a part of the record under seal.

12             I determine that the defendant's total offense level

13  is 28.  His criminal history category is IV.  The guideline

14  range now, I'd ask my probation officer, is 110 to 120; is that

15  right?

16             THE PROBATION OFFICER:  That's correct.

17             THE COURT:  All right.  The guideline range is 110

18  to 120.

19             I'll hear the government on its proposed sentencing.

20  I also want to be clear I adopt the findings of fact and

21  conclusions of law set forth in the violation report here and

22  we'll sentence simultaneously on the offense of conviction and

23  the violations that I've already found here.

24             So I need the government's recommendation on the

25  underlying offense of conviction and any additional sentence

1    that they're proposing with respect to the -- the revocation

2    report.

3            All right?  So what's the government's

4    recommendation?

5            MR. ROMBEAU:  Your Honor, the government is

6    recommending 110 months on the underlying count of conviction

7    and an additional 10 months on the supervised release violation

8    for an aggregate sentence of 120 months.

9            I'll spend a little time on it, your Honor.  I know

10   you've had a chance to read both our submissions and obviously

11   are familiar with the facts of this case and the defendant from

12   trial.  This is a defendant with a very serious criminal

13   record.  He served a lengthy prior federal sentence for an

14   armed bank robbery in which weapons were -- specifically

15   firearms -- were used.

16           It sounds like he had a bumpy road under supervision

17   here, was acquitted of similar charges in the state back in

18   2020 and, again, despite the sort of new lease on life found

19   himself back possessing a firearm again in early 2021.

20           The firearm was stolen.  Your Honor has already

21   heard lengthy arguments about the possession of the silencers

22   as well and this is a case, in our view, where it is a -- it is

23   a higher guidelines than is typically applicable, I think, for

24   a felon in possession of a firearm but the guidelines that we

25   think are appropriate here.

1          We are recommending the bottom of those guidelines

2   of the 110 months.  And, of course, you know, the range would

3   be much higher were Mr. Donovan not up against the statutory

4   cap of 120 months.  They would otherwise be, I think, 110 to

5   137 were there no such cap.

6          But 110 months, in our view, is a sufficiently

7   lengthy sentence that speaks to the defendant's history and

8   characteristics, his criminal history, his -- I would -- I

9   would say his --

10          THE COURT:  Let me -- let me ask you about this.

11   Obviously this is a smaller part of it --

12          MR. ROMBEAU:  Go ahead.

13          THE COURT:  -- but if I just look at his violations

14   and I were sentencing him just for his violations here, I

15   wonder whether a 10-month sentence is really required.

16          Look, I consider the possession of those -- the

17   crossbows and stuff to be extremely concerning, but I recognize

18   that the officer did not seek to immediately violate him when

19   he had evidence to believe that he was in possession of those

20   things.

21          Now, I recognize, you know, Mr. Donovan's a very

22   difficult guy to supervise and I assume the probation officer

23   was trying to work with him, you know.  And -- but I can --

24   those are very serious things.

25          On the other hand, I'm wondering if I were just

1    sentencing him for the first time in here, he was just in on

2    these revocations, whether I'd be thinking of maybe six months

3    rather than ten months.

4             So you want to make a case why it should be --

5             MR. ROMBEAU:  I think that's fair, your Honor.

6             THE COURT:  -- ten?

7             MR. ROMBEAU:  I would say this is his second

8    revocation.  He did have the prior one in front of Judge

9    McAuliffe where he had 12 months imposed and I don't believe

10   that involved any -- the -- I think --

11            THE COURT:  What were the violations there?  Refresh

12   my memory.

13            MR. ROMBEAU:  So he was initially charged with the

14   firearm from the Jeep from this violent incident involving

15   local police, he was acquitted on those charges in the state

16   and so those were then dropped by the government and his SR

17   violation I believe just ended up being for controlled

18   substances.

19            MS. KRASINSKI:  So, your Honor, I apologize because

20   I was the attorney there and if my recollection serves me

21   correctly, it related to failing to attend mental health

22   treatment as required and controlled substances.  But that

23   is -- that's my recollection.

24            THE COURT:  Yeah, and I don't want to diminish the

25   importance of -- I mean, in my view, Mr. Donovan has

181

1   significant mental health problems.  He has a significant

2   addiction problem.  When you start -- when you're using

3   methamphetamine with the problems that he has, it makes the

4   situation far more dangerous.  So I -- we need to not diminish

5   that.

6           On the other hand, I just am thinking if I were just

7   looking at this by itself, I'd be thinking five or six months

8   rather than ten, as you're recommending.  But --

9           MR. ROMBEAU:  And that's fair, your Honor.  We

10  understand the probation's office has recommended 24 months on

11  that violation --

12          THE COURT:  Yeah.

13          MR. ROMBEAU:  -- and I think in part reflecting some

14  of the issues you've flagged regarding the difficulty of

15  supervising Mr. Donovan, the concerns of safety for the

16  officers --

17          THE COURT:  He's a very, very difficult person to

18  supervise.  And when he does get out there, we're going to have

19  to have much more interactive supervision and much more

20  engagement with the Court.

21          I mean, I -- I'm an old person.  I might not be

22  around by then, but --

23          THE DEFENDANT:  Don't say that.

24          THE COURT:  -- you know, that's -- that's the truth,

25  you know.  And it -- it -- whoever is going to be supervising

1    him needs to work very carefully with the judge because this --

2    someone needs to set out and get him to acknowledge in writing,

3    these are the things that you can possess and these are the

4    things that you can't possess until you finish supervised

5    release.  Those kind of things have to be really spelled out

6    with absolute clarity for Mr. Donovan when he is on supervised

7    release.

8              So -- all right.  So what else do you want to say?

9              MR. ROMBEAU:  No, I think that's it, your Honor.  I

10   mean, I think at the end of the day we are asking for a

11   significant sentence from the Court.  We believe that is

12   warranted by the circumstances here involving this defendant,

13   his repeat criminal behavior, the fact that he seems undeterred

14   by a prior lengthy federal criminal sentence and, you know, at

15   this point, he's not as young a man as he was when he committed

16   this bank robbery in 2007.  At some point --

17             THE COURT:  What do you make about his physical

18   health problems, which I think the -- the defendant would want

19   me to consider?  There's a reference -- and maybe -- the

20   defense may be -- I may have misread this, but there was some

21   reference to him having a need for a liver transplant because

22   of hepatitis A; is that -- am I --

23             MS. BROWN:  You can talk.

24             THE DEFENDANT:  Your Honor, I almost did.  The last

25   time I was in the county jail, I caught Hep A there --

```
1              THE COURT:  Yeah.

2              THE DEFENDANT:  -- and I almost had to get a liver

3    transplant.

4              THE COURT:  Are you okay on that part now?

5              THE DEFENDANT:  I'm okay on that part.

6              THE COURT:  Okay.  But you still have the MS?

7              THE DEFENDANT:  Yeah.

8              THE COURT:  Yeah.

9              THE DEFENDANT:  But, I mean, I'm doing okay.

10             THE COURT:  Yeah.  Okay.  Thanks.

11             I -- I just want to be sure I didn't let that one go

12   by because if you needed something like that, I -- I'd want to

13   make it a recommendation that you get whatever you need right

14   away.

15             But the Hep A is under control sufficiently?

16             THE DEFENDANT:  It's gone.  Yeah, I beat it.

17             THE COURT:  Okay.  All right.  Good.

18             MR. ROMBEAU:  Just very briefly, your Honor.

19             Attorney Krasinski was able to find the information

20   from the 2020 revocation and it was the unlawful possession of

21   methamphetamine and marijuana which was what led to the

22   12-month revocation.

23             So I think just to the health concerns your Honor

24   raised, I think those can always be dealt with in the future,

25   as we've seen through all these motions for compassionate
```

184

1    release that we've seen the Court handle over the last few

2    years.

3              THE COURT:  Well, I would -- if I thought there were

4    a basis to reduce based on his current health condition, I'd do

5    it now.  I don't want three months from now a motion for

6    compassionate release to do something I could have addressed

7    now.

8              MR. ROMBEAU:  I guess I meant to indicate to, your

9    Honor, should his condition decline in the future.  And it

10   seems he -- by all accounts, he's able-bodied here today.  But

11   we've talked about predicting the future and that's a lot of

12   this predicting the future that -- that at least is an avenue

13   open to him in the future should his condition decline from

14   where it is today.

15             Thank you, your Honor.

16             THE COURT:  All right.  Thank you.

17             All right.  What do you want to say, Counsel, on any

18   grounds for variance or -- and what you want to say about the

19   sentence and then I'll give Mr. Donovan a chance to speak.

20             MS. BROWN:  Right.  Thank you.  I wanted to make

21   sure I had indicated he did want to speak.

22             A lot of the arguments that, especially as to the

23   sporting exception, it's almost like a residual mitigation

24   here.

25             We have -- and as the Court articulated, we don't

1  have someone who was possessing a firearm to engage in criminal

2  activity beyond the fact that he's not allowed to.  So I --

3          THE COURT:  Right.  I have no evidence of that.  So

4  I don't --

5          MS. BROWN:  Yeah.

6          THE COURT:  -- presume -- I don't just assume bad

7  things about people.  He has a prior conviction for the use of

8  a firearm in a robbery.

9          MS. BROWN:  Correct.

10         THE COURT:  That's -- that's there.

11         MS. BROWN:  Yup.

12         THE COURT:  But I also understand -- I mean, the

13 defendant lives a common lifestyle in New Hampshire, a rural

14 lifestyle, a lifestyle where being out in the physical world is

15 a part of his daily life.  I -- I fully get all -- all of that

16 and I'm not presuming that he had this shotgun for some

17 improper purpose.  I don't know.  He could have been using it

18 because he wants to hunt with it.  He isn't eligible for the

19 sporting adjustment, but I'm not saying he's trying to use it

20 to do another bank robbery.  I don't have any basis to conclude

21 that.

22         MS. BROWN:  But I do think it's mitigating, the fact

23 that he enjoys doing those things.  It's not uncommon for

24 people who suffer from PTSD to want to be out in the woods, to

25 want to be out in a field, to want to be out in nature.  And

```
 1   obviously, and this was kind of core to the government's

 2   argument at trial, he loves this stuff.

 3            THE COURT:  Yeah.

 4            MS. BROWN:  I mean, it gives him great joy and great

 5   pleasure.  And when he did the really stupid, violent thing he

 6   did when he was so young, that set a course for his life that

 7   the thing he loves more than anything in the world, he now

 8   can't do.  I mean, that was a huge punishment -- I mean, he got

 9   a huge punishment by going to prison.

10            And so, again, not as an excuse --

11            THE COURT:  I also think it's a kind of way he

12   treats his PTSD --

13            MS. BROWN:  Uh-huh.

14            THE COURT:  -- and his mental health issues.  Being

15   physical, being out in the world --

16            MS. BROWN:  Exactly.

17            THE COURT:  -- being out in nature have a positive

18   effect on him.

19            MS. BROWN:  (Nods head.)

20            THE COURT:  And I wish he hadn't engaged in this

21   criminal conduct because he's much better off if he's out there

22   in the woods.  But, you know, especially when you're being

23   supervised, you just can't live the way you want to live.

24            MS. BROWN:  Right.

25            THE COURT:  It's like you're -- you get a temporary
```

```
1   release from jail and --
2              MS. BROWN:  Yeah.
3              THE COURT:  -- he's had problem understanding that.
4              MS. BROWN:  Yeah.  And I agree with that.  That's
5   why I'm not offering it as an excuse --
6              THE COURT:  Yeah.
7              MS. BROWN:  -- but as a reason for variance.
8              And, you know, in some ways, it's almost like a drug
9   to him.  You know, like you -- you've probably sentenced lots
10  of people, you know, who get out and go back to their drugs.
11  And I think for him that, being out in nature, being a
12  sportsman, is, you know, something that's very soothing and
13  remedial for him.  And obviously the Court gets that, so I
14  won't go on about that.
15             I -- I think that that is really huge here with his
16  mental and physical health issues.
17             I think it's also something, interesting, even
18  though he wasn't following the recommendations of his probation
19  officer, he was having a conversation with him about it.  He
20  wasn't, you know, lying; he wasn't, you know, doing things.  He
21  was -- he was having that conversation.  He obviously has a
22  different view of the world in terms of his rights and whether
23  he should have a right to have those.
24             Now he knows, very clearly from this Court and from
25  the results of this, the deterrent effect of having any of
```

```
 1   those items that were in that picture is going to put him back

 2   in prison.  And I think this hearing has made that very clear.

 3            But, I mean, this offense really boils down to

 4   someone who loves hunting and, you know, couldn't stop and

 5   didn't hurt anyone in the process and that does not mean that

 6   this sentence of ten years, there are people who are -- have

 7   been selling fentanyl who got a whole lot less time than this.

 8   And I know part of that is his criminal history and his

 9   background.

10            THE COURT:  A big part of the length of the sentence

11   is this underlying robbery.  There's no question about it.

12   Huge problem.  It's why he gets -- gets so much attention from

13   law enforcement.  But it's also part of the problem that he

14   could have done a number of things to mitigate the sentence he

15   got here.

16            He -- and, you know, I understand -- I respect a

17   defendant's right to request a trial, but he got on the witness

18   stand and, in my view -- you have a different view and maybe

19   the Court of Appeals will agree with you -- he did not tell the

20   truth.  He did not accept responsibility for his crime.  And

21   that counts against him, that -- he's going to do more time

22   because of that.

23            MS. BROWN:  Exactly.  And he's --

24            THE COURT:  So those things add up, you know, and

25   that's why we're here.
```

1          MS. BROWN:  And just -- I would just call the

2     Court's attention back to the letters of support and the people

3     in the community that he has helped, including, especially, his

4     family.

5          And I think Corey has something you wanted to read

6     to the Court.

7          THE DEFENDANT:  Yes.  It's -- it will take me about

8     ten minutes.  It's a little long, your Honor, but --

9          THE COURT:  Hey, look.  This is your time.  You do

10    what you need to do.

11         THE DEFENDANT:  Thank you, sir.

12         And in reference to, real quick, the -- we do have

13    the video that I tried to show you before where we talked about

14    it was Kelley's gun.  Whether or not I had access to it is

15    another story.  It really wasn't my gun.  That's not -- I

16    didn't come in and just misrepresent that.  I could have just

17    gone what shotgun, what are you talking about, you know, and I

18    didn't do that.

19         THE COURT:  Okay.

20         THE DEFENDANT:  Your Honor, thank you for your time

21    and for giving me this opportunity to address the Court.  I

22    have the utmost respect for you and your court and when I use

23    the term the government in this statement, I am referring to

24    the prosecution and the ATF.

25         I've read the transcripts for the October 12th

1    pretrial hearing, which I was not allowed to attend, and in

2    regards to the early execution of the search, I saw where you

3    stated that you actually did the research into the issue, only

4    for my then lawyer to abandon the argument.

5            I feel I have to speak on this issue and a few

6    others to make sure my position is preserved and on the record.

7            The government has made clear their position that

8    there was no early execution.  My position is that all SRT

9    operations to seize and clear the property were commenced and

10   concluded well prior to the 6:00 a.m. start time authorized by

11   the warrant and, as such, was the same as a search with no

12   warrant, as a warrant was not live prior to 6:00 a.m.

13           The post SRT pictures start at 5:53 a.m.  Thus, all

14   SRT actions were concluded no later than 5:53 a.m.  You can

15   clearly see in picture number 2 that my door has been broken in

16   and the armored truck has already been out back and turned

17   around.

18           My position is further supported by the reports and

19   testimony of the government's witness, Mr. Richard Campbell of

20   Somersworth Police Department.  His report and testimony can be

21   accurately summarized as follows:  At approximately 4:30 a.m.,

22   there was an equipment issue at the Circle K two miles from the

23   target residence.

24           THE COURT:  Hang on just a second.

25           So, look.  Here -- she's got to -- hang on a second.

```
 1   She's got to type it.  And I appreciate you don't want to take
 2   too much of my time, but you take the time you need.  Just read
 3   a little slower.
 4              THE DEFENDANT:  Would you like me to start over?
 5              THE COURT REPORTER:  No.
 6              THE DEFENDANT:  Okay.
 7              THE COURT REPORTER:  That's okay.  Thank you.
 8              THE DEFENDANT:  He immediately left and went to
 9   33 -- do you mind if I sit down?
10              THE COURT:  Yeah, yeah.  That's fine.
11              THE DEFENDANT:  He immediately left and went to 33
12   Route 4A, Wilmot, where he entered the property and took up a
13   position on the back side of the house, looking in my mom's
14   windows, and saw a male sleeping on the couch.  This was to
15   seize the property and the occupants to keep anyone from
16   fleeing.
17              He remained in this position for about 30 to
18   35 minutes while SRT cleared 31 Route 4A, the garage apartment.
19   Then, after the SRT cleared 31, he took up a new position to
20   make sure that no one reentered 31 while the SRT proceeded out
21   back to clear the rear portion of the property to include 29,
22   the workshop.  This took about 35 to 40 minutes.  4:30 a.m.
23   plus three minutes to drive to my house, 30 minutes to clear my
24   house, and 40 minutes to clear out back, brings us to around
25   5:43 a.m.  That leaves about --
```

1          THE COURT:  Just slow down a little bit.

2          THE DEFENDANT:  Sorry.

3          THE COURT:  That's okay.

4          THE DEFENDANT:  That leaves about ten minutes extra

5   before pictures start being taken.  That makes sense.

6          The big armored ATF truck, like all government

7   vehicles, has GPS.  The location information is called a

8   breadcrumbs trail.  This documents everywhere the vehicle has

9   been, location and time.  They drove the truck out back and

10  turned it around, using it to execute the warrant.  All of this

11  is documented and has not been provided to me or defense

12  counsel.

13         Because the government has taken the position that

14  their own time-corrected metadata is wrong, that means this GPS

15  information is not cumulative.  Because satellite GPS data is

16  presumed to be above impeachment, this makes it definitive.

17  And because ATF Agent Cook lied on the stand and said SRT did

18  not start clearing the property until after 6:00 a.m., it is

19  impeachment evidence that defense could have used at trial and

20  not just a suppression issue.  Being able to address this would

21  have helped support my position that the ATF moved the other

22  evidence around in an incriminating manner.

23         Furthermore, I have not seen any search warrant

24  returns filed in this case, presumably because they would have

25  had to inform the magistrate of the unauthorized no-knock-style

1    nighttime raid where a predetermined scope of the warrant was

2    exceeded and things that were not described in the warrant,

3    such as my DVR hard drive, were taken.

4         As my security system was not authorized to be

5    taken, I object to its being sent out of the district and

6    physically disassembled and the hard drive unlocked without a

7    warrant.  That data belongs to me and they make USB thumb

8    drives that hold terabytes.  You can also fit all of the data

9    from it on an SD card the size of a fingernail.

10         The government knows that my own camera footage

11   supports my position of an early execution of the search

12   warrant and that is why it is not being provided to me.

13         The government also requested all of my calls from

14   the jail.  Come to find out, the jail was recording the

15   messages I was leaving for my lawyer and was providing these to

16   the government with the rest of my calls.  This only stopped

17   when I became aware of it and filed grievances.

18         I have all the paperwork to back this up, sir --

19         THE COURT:  Okay.

20         THE DEFENDANT:  -- just so you know, except the

21   breadcrumbs data.

22         I tried to file a motion under 41(g) to remove these

23   recordings of attorney-client correspondence from the

24   government's possession, but the clerk's office refused to file

25   it and sent the motion back.  There are at least 27 messages

1   totaling over 48 minutes of my concerns about trial strategy

2   and suppression.  This has happened to other pretrial inmates

3   while I have been there, two at least that I know of.

4           There are a few other things which I don't think the

5   Court is aware of, and I need to get them on the record,

6   please.

7           Mr. Bruce Dalpra, juror number four, he failed to

8   inform the Court during voir dire -- did I pronounce that

9   right?

10          THE COURT:  Yup.

11          THE DEFENDANT:  That he was currently under a

12  Judicial Conduct Committee review investigation for failure to

13  remain unbiased in the cases he was presiding over and had been

14  under investigation for about a year.

15          About two months after my trial, the New Hampshire

16  Supreme Court ordered him off all cases.  I don't want to talk

17  bad about the guy.  I don't -- I don't know him, but I have a

18  concern about him being able to remain unbiased in a firearm

19  case where his brother had been, quote, shot to death.

20          Officer Hubbard of Andover PD lied to the Court when

21  he claimed he helped search my Jeep in 2019.  The reports,

22  search warrant returns, and trial testimony in that case

23  established who was part of that.  He was not.  He wasn't even

24  a police officer yet.  I just want that on the record, too.  He

25  lied on the stand.

1          Apparently at some point it has been misrepresented

2    to this Court that I was under the influence during the 2019

3    incident where I was the victim of an unprovoked assault by

4    four police officers.  The only substance in my system was the

5    Adderall I was prescribed and whatever the EMTs and hospital

6    gave me.  I wasn't high or drugged up.  I was tired.

7          I had been working all day and night and was falling

8    asleep while driving home, so I pulled into a parking spot at

9    the gas station and ended up falling asleep.  You'd have to

10   watch the videos to believe what was happening -- what was done

11   to me.  When you slow down them, the whole thing is clear.  I

12   was fully compliant.

13         After they sprayed me, beat me, and tased me

14   unconscious, they used a baton on me which messed my neck up

15   really bad and then tased me a fifth time while I was

16   unconscious with my hands behind my back.  It's all clear as

17   day on the video.  I did nothing wrong.

18         Excuse me.

19         I didn't even swear at these guys and they tried

20   some 1970s style tactics, where they rough you up and then

21   claim you were resisting.  Thank God for the cameras, though.

22         I still spent a year in jail and the government

23   represents to the Court that I should for some reason be

24   thankful for that, that somehow, according to them, I was given

25   a second chance or a new lease on life?

196

1       Contrary to the government's belief, they do not

2   lease my life to me.  My life is my own.  And how is having to

3   fight for your life in the ICU when you were being fully

4   compliant and then having to go to trial to defend against lies

5   by law enforcement being given anything?  It was a very

6   straightforward case where a direct physical evidence was

7   overwhelmingly in my favor.

8       They tried to kill me, your Honor, then they all

9   lied about it and tried to make me the bad guy.  What else are

10  you trying to accomplish when you put your Taser near a man's

11  heart and tase him for the fifth time while he's unconscious

12  with his hands behind his back?

13      Honestly -- excuse me.

14      Honestly, I'm pretty fed up with the government

15  constantly lying to the Court and always trying to paint me out

16  to be some horrible, dangerous person who should be grateful

17  for any little scraps of freedom I win, because that isn't who

18  or what I am.

19      I've never pretended to be a saint, I don't obey all

20  the rules all the time, and when I was younger I did at least

21  one really stupid thing.  I don't always make the -- I don't

22  always make the best decisions.  I own up to that.  But I do

23  have a very good moral compass.  I try to always do right by

24  everyone I interact with out there in society.  I try to always

25  help anyone who needs it.

197

1          I don't take things that don't belong to me.  I

2     don't infringe on other people's freedoms.  I'm not out there

3     selling drugs, and I'm also not one of these weirdos doing the

4     funky chicken dance out in front of the local Cumbies or

5     wandering around the park throwing needles everywhere.

6          I give back to my community.  When I was in the

7     halfway house in Manchester, I volunteered 20 hours a week at

8     the homeless shelter and food pantry because I choose to, not

9     because I had to or got any benefit.

10          Now I live out in the woods and I love it.  I spend

11     about a hundred hours a week doing outdoors stuff.  Whether

12     it's on my mom's property or one of the neighbors, I'm usually

13     doing something productive all day, every day, taking care of

14     the animals, carpentry, yard work, automotive, you name it.

15          And I chase predators off on a regular basis, pretty

16     much every night.  It's especially frustrating to call home and

17     hear about the latest pet killed who disappeared.  I don't like

18     knowing Kelley's upset and crying and that if I was home, our

19     cat and chickens would still be alive.

20          The government's still upset about me having bows

21     and swords, so according to them, I have zero right to armed

22     defense from wild animals or the right to hunt.  That doesn't

23     seem right to me.  However, I respect the Court's position on

24     this.  I -- I do.

25          My sister tried to go to a gun store since this all

1    happened and the ATF hasn't approved her to buy a gun.  She's

2    not a felon.  But everyone on the property is now under

3    investigation and denied Second Amendment rights.  Her and my

4    mother had to catch porcupine with a big blanket.  Porcupines

5    carry rabies and a $500 vet bill minimum when they smack one of

6    your animals.  It's like $75 a quill.

7              The very worse allegation the government has against

8    me is constructive possession of a shotgun on a farm in a very

9    rural area for hunting or livestock protection.  If it had been

10   locked in the case like it was supposed to be, I would still

11   have been charged.

12             I am a full member of the political community.  I

13   voted in the 2020 election and was under summons for jury duty

14   when the ATF raided, so I'm not even sure if I'm truly even

15   qualified as a prohibited person under federal law.  I do admit

16   to having felony convictions on my record, but under Section

17   921(a)(20), I am considered to have my civil rights restored.

18             I have all this.

19             I feel like I have some fairly legitimate

20   constitutional issues here and if you feel the need to sentence

21   me to anything more than the two years I've already done, can

22   you please stay the remainder of my sentence so I can go home

23   and help my family.

24             If I lose all my issues, I'll come back and do the

25   rest of my time.  But I do feel like I have some really good

1    issues and have already done almost two years pretty much in

2    the hole, 21-hour lockdown, single cell.  It's been a rough

3    one, your Honor, and so very frustrating not being able to

4    present or even get the issues to support my -- or the evidence

5    to support my issues.

6            I have kids, too, sir.  I have a daughter who's

7    graduating high school this summer and a son who is 15.  I'd

8    really like to spend some more time with my kids, sir.

9            I have documentation here for all my claims.  It's

10   in your hands now, your Honor.  Thank you for listening and

11   letting me say my piece.

12           THE COURT:  All right.  Look, you've been nothing

13   but courteous in your dealings with me, so I wanted to be sure

14   you got a full opportunity to lay out your concerns and -- you

15   know, you can be seated.

16           THE DEFENDANT:  Thank you, sir.

17           THE COURT:  Yeah.  So I wanted to give you a chance

18   to set all that out.

19           I mean, I -- some of the things you said I don't

20   have the independent documentation of, some of the things

21   you've said I disagree with --

22           THE DEFENDANT:  Uh-huh.

23           THE COURT:  -- and some of the things you've said

24   can be raised, if they're not resolved today, you have the

25   appeal and then you also have a 2255 that -- for which you

1    could pursue these issues.  So it's not -- it's not over with

2    and you'll get a chance to pursue those various issues.

3            My general take on you is, as I've said before, I

4    think you're a very smart guy.  There's no question about it.

5    I think you love the outdoors.  I think you love being

6    physical.  I think you -- you want to embrace that part of your

7    life.  I also think you have significant mental health

8    problems.  You have a record, a criminal record that simply

9    can't be ignored.  You just can't escape from it.  And you

10   really don't do well under supervision of anyone.

11           And those are all real problems for me and for any

12   judge that would have to supervise you when this is all over.

13   I guess the thing to remember is, you know, I'm an old guy.

14   I -- I might not be around.  You're going to be around.  You'll

15   finish this sentence and you're going to get another chance.

16   And I hope that you will see when you get that other chance

17   that you can't approach it the same way you approached this

18   one.

19           The -- the goal -- I want to see you be successful.

20   I want to see you out in the woods doing almost everything you

21   want to be doing out there in the woods, but you've got to get

22   through the period of incarceration and the period of

23   supervised release.  And especially under supervised release,

24   you've got to work with the people that are supervising you

25   even though you don't like it.  It's like that's how your --

1    that's how you stay free.  And then once you get through that

2    supervised release term, you're as close to, you know, a free

3    man as anything.

4            You can -- there's certain things you won't be able

5    to do.  You'll never be able to possess a firearm again.  But

6    that doesn't mean you can't be out in the woods.  That means

7    you -- that doesn't mean you can't have a knife.  Those kind of

8    things, those freedoms, get added on as you get through the

9    supervised release term.  And if you don't change the approach,

10   you know, you're going to get the same result.  And that's -- I

11   -- I don't want to see that for you.

12           But my job here is to hold you accountable for what

13   you did.  I can't ignore what you did.  I can't ignore your

14   record and I can't ignore the fact that I have a different take

15   than you do on some of these other issues.

16           I respect your position.  I hope you respect mine.

17   I think you do.

18           THE DEFENDANT:  I do.

19           THE COURT:  But we have different perspectives on

20   things and I have to take into account my perspective.

21           So that all being said, I -- I am going to have to

22   hold you accountable today.  But I want you to be successful in

23   the long run and, you know, I -- I --

24           THE DEFENDANT:  I'm trying, sir.

25           THE COURT:  You can be, but it's going to take a big

1    change in your approach to things.

2            All right.  So let me read the proposed sentence.

3    So I am going to give you the low end of the range, 110 months

4    here on the criminal charge and I'm going to give you five

5    months consecutive rather than the ten the government's asking

6    for because I -- although your supervised release violations

7    are serious in my view, I -- I think your lawyer made this

8    point which is, look, we didn't try to violate you immediately

9    on those things and I think that we might have inadvertently

10   led you to some kind of belief that while we didn't think you

11   could possess them, we weren't going to do anything about it.

12   And that is -- you know, that is problematic.

13           So I'm sentencing you at the bottom of the range on

14   the criminal charge and I am sentencing you to five months

15   consecutive on the other charge for a total of 115 months.

16           On the legal issues that I have resolved against

17   you, I am sentencing you at the bottom of the range.  You've

18   preserved your rights on those other issues, but I'm trying to

19   take into account -- so, for example, I did give you the three

20   points on the burglary, but I'm not sentencing you at the top

21   of the range because I recognize that burglary, although it

22   counts, was an old burglary.  It had been a number of years

23   from the time you committed that underlying offense.

24           So I've tried to take those things into account to

25   the extent I can.

1          All right.  Let me read the proposed sentence.

2          Pursuant to the Sentencing Reform Act of 1984 and

3    having considered the sentencing factors enumerated at 18

4    U.S.C. Section 3553(a), it is the judgment of the Court that

5    the defendant, Corey Donovan, is hereby committed to the

6    custody of the Bureau of Prisons to be imprisoned for a term of

7    115 months.

8          This term consists of imprisonment -- this term of

9    imprisonment -- no, I -- 110 months and this term of

10   imprisonment shall run consecutively to a five-month term of

11   imprisonment that will be imposed on defendant's supervised

12   release violation for a total term of imprisonment on both

13   charges of 115 months.

14         So I also want to be clear on the supervised release

15   violation.  I have found the -- the supervised release charges

16   to be true and on that sentence I am imposing a consecutive

17   sentence of five months.

18         Upon release from imprisonment, the defendant shall

19   be placed on supervised release for a term of three years.

20         Within 72 hours of the release from the custody of

21   the Bureau of Prisons, the defendant shall report in -- in

22   person to the district in which the defendant is released.

23         While under supervision, the defendant must comply

24   with the standard conditions that have been adopted by the

25   Court and must comply with the mandatory and proposed special

1    conditions attached to the presentence report.

2              It is ordered that the defendant shall pay a special

3    assessment of $100.  It shall be due in full immediately.

4              The Court will waive the fine in this case as the

5    defendant does not appear to be -- to have the financial

6    ability to pay one.

7              The defendant is remanded to the custody of the

8    United States Marshal.

9              Let me ask, Ms. Brown, does your client -- your

10   client has medical problems and I want to make sure he gets

11   treatment for those medical problems.  Is there anything you're

12   requesting that I recommend regarding a place of incarceration?

13   For example, he still has family here.  Would he prefer to be

14   incarcerated as close as possible to family members in

15   New Hampshire?

16              THE DEFENDANT:  Yes.

17              MS. BROWN:  You stayed in Berlin last time, right?

18              THE DEFENDANT:  No, they shipped me all the over the

19   place, your Honor.  Last time I ended up at the penitentiary

20   the whole time.

21              THE COURT:  Yeah.  You want to be as close to people

22   in New Hampshire as you can.

23              THE DEFENDANT:  Yes.

24              THE COURT:  And I'll recommend that the defendant

25   has both physical and mental health problems and that he should

```
 1   receive treatment for both while incarcerated.  All right?

 2             MS. BROWN:  And that that would be conducive to

 3   his rehabilitation, to have his family visit, and they live in

 4   the --

 5             THE COURT:  Yeah, I want his family to be as close

 6   as possible to him, so that should be included --

 7             MS. BROWN:  Thank you, your Honor.

 8             THE COURT:  -- in the judgment.

 9             All right.  And are there -- now, all of the

10   defendant's -- your objections are all preserved.

11             THE DEFENDANT:  All those -- the other things that I

12   raised, too?

13             THE COURT:  Yeah, anything -- so some of the issues

14   you have raised are not things that I can do anything about at

15   the moment.

16             THE DEFENDANT:  Yes.

17             THE COURT:  But I certainly think to the extent you

18   have raised those issues a lot of them you have been

19   consistently raising with the Court --

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  -- so I don't know that you're waiving

22   any particular issue.  You have asserted your innocence,

23   demanded a trial, been found guilty.  You've not conceded

24   anything.  So to my understanding, any issues you might have

25   that you have raised previously are preserved.  But some of
```

1    those issues are not ripe for decision at the moment.

2              THE DEFENDANT:  I understand.

3              THE COURT:  They would only become ripe if you lost

4    your appeal and then you could raise them potentially in a

5    2255.

6              We also have certain issues that your lawyer has

7    raised for you in motions to dismiss and we're going to take

8    those up in a minute.  Okay?

9              THE DEFENDANT:  Thank you, sir.

10             THE COURT:  So any objections from the government

11   other than those previously raised?

12             MR. ROMBEAU:  No, your Honor.  Just wanted to

13   clarify.

14             The -- the supervised release term of three years,

15   is that in the new -- the '21 case and no further supervision

16   in the '07 case?  I think that's what we were recommending, to

17   let the ' 07 case die and just --

18             THE COURT:  Yeah, that's fine.

19             MR. ROMBEAU:  Thank you, your Honor.

20             THE COURT:  It's three years.  That's -- look, he

21   has trouble under supervision.  If we can -- if he can be fully

22   compliant for three years, that's the incentive he needs to get

23   through it, you know, and then he'll be done and then he won't

24   have to answer to a probation officer.  That's the goal, you

25   know.

1          Okay.  All right.  So I'll impose the sentence as

2    I've read it.

3          You have a limited right to appeal.  I'm sure your

4    lawyer will file a notice of appeal on your behalf, but you

5    have to get it done within 14 days or you'll lose your right to

6    appeal.

7          And we'll talk about the issue of the motions to

8    dismiss in a minute.  If I don't decide those today, it's my

9    view that the appeal period runs from the time I resolve those,

10   if I don't resolve them today.  But I'm not expert on appellate

11   procedure.  The defense counsel's job is to figure out -- that

12   out.

13         So you might want to file a protective notice of

14   appeal within 14 days of the entry of judgment regardless of

15   what happens there, just so he's preserved his arguments.  All

16   right?

17              MS. BROWN:  Yes.

18              THE COURT:  Now, I'll take a short break and then I

19   want to come back and do the motions to dismiss.

20              And then I have another sentencing, right?

21              THE CLERK:  Yes, Judge.

22              THE COURT:  So how -- Mr. Iacopino, how long is that

23   sentencing going to take?

24              MR. IACOPINO:  It will be done in an hour, your

25   Honor.

208

1           THE COURT:  Okay.  Maybe -- we may be here a little

2     bit late because I've got to do this motion to dismiss.  All

3     right?

4           We'll take a short break.  We'll do the motions to

5     dismiss when I come back.

6           THE CLERK:  All rise.

7                  (Recess taken at 3:44 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

209

# C E R T I F I C A T E

      I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 7/7/23        */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR

# Exhibit 18

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE
 2

 3   * * * * * * * * * * * * * * * * *
                                     *
 4   UNITED STATES OF AMERICA        *
                                     *
 5                                   *  No. 1:21-cr-00088-PB-1
                    v.               *  January 3, 2023
 6                                   *  3:57 p.m.
                                     *
 7   COREY DONOVAN,                  *
                                     *
 8                   Defendant.      *
                                     *
 9   * * * * * * * * * * * * * * * * *

10
       TRANSCRIPT OF CONTINUATION OF SENTENCING HEARING - MOTIONS
11               (AFTERNOON SESSION - PART II, 3:57 P.M.)
                  BEFORE THE HONORABLE PAUL J. BARBADORO
12

13
     APPEARANCES:
14

15   For the Government:      Charles L. Rombeau, AUSA
                              Anna Z. Krasinski, AUSA
16                            United States Attorney's Office

17   For the Defendant:       Donna J. Brown, Esq.
                              Wadleigh Starr & Peters PLLC
18
     U.S. Probation:          Jennafer McNutt
19

20
     Court Reporter:          Brenda K. Hancock, RMR, CRR
21                            Official Court Reporter
                              United States District Court
22                            55 Pleasant Street
                              Concord, NH 03301
23                            (603) 225-1454

24

25
```

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Continued proceedings at 3:57 p.m. after afternoon recess. |
| 3 | See separate transcript for proceedings held this day before |
| 4 | recess) |
| 5 | THE CLERK:  All rise for the Honorable Court.  Please |
| 6 | be seated.  This hearing is back in session. |
| 7 | THE COURT:  So, Ms. Brown, you filed two motions.  I |
| 8 | assume -- are they both new trial motions pursuant to Rule 11 |
| 9 | -- to Rule 33?  You don't say what the criminal rule basis for |
| 10 | your motions are. |
| 11 | MS. BROWN:  Correct, your Honor.  I think under -- |
| 12 | yeah, I think they're both under 33.  I think with Brady, |
| 13 | because it's newly discovered, that addresses the time issue. |
| 14 | I note there's a Bruen issue.  I was actually talking |
| 15 | with the prosecution this morning that they didn't file a |
| 16 | response on that, but, as you can see from the motion regarding |
| 17 | the legality of the statute regarding prohibition against |
| 18 | firearms, I'm very much aware this Court has already ruled on |
| 19 | that, and the First Circuit has ruled on that.  I don't know if |
| 20 | the government was making a time-based exception on that. |
| 21 | THE COURT:  Well, let's first just establish there are |
| 22 | two motions for new trial. |
| 23 | MS. BROWN:  Right. |
| 24 | THE COURT:  And I don't know whether they're both |
| 25 | captioned "New Trial."  One may be captioned "Motion to |

1    Dismiss."

2         MS. BROWN:  Well, one is -- I'm going to call it,

3    well, it's kind of a <u>Brady</u>, slash, <u>Franks</u> motion, but one of

4    the remedies is a new hearing on <u>Franks</u> so --

5         THE COURT:  But I'm trying to figure out -- I mean, I

6    need to ground it in a rule or a statute, and I'm trying to

7    make sense of it, and I think the only rule that seems to make

8    sense is Rule 33, to do it now, and whether we call it "New

9    Trial" or "Dismiss," Rule 33 does allow for the filing of a

10   motion to vacate a judgment and grant a new trial, if the

11   interests of justice so require.  I assume that that rule would

12   also allow for complete dismissal of a case in which the charge

13   could not be maintained because the interests of justice

14   requires it; but there are timing requirements for that rule,

15   and to the extent it is based on newly discovered evidence,

16   there's no question, at least in my mind, that the motion is

17   timely.

18        Your <u>Bruen</u> argument, though, is not based on newly

19   discovered evidence.  Your <u>Bruen</u> argument is based on a Supreme

20   Court decision that you believe changes the existing law, and

21   that motion I don't think can be raised now.  I think it has to

22   be raised in a 2255, because the timing rule for that is under

23   Rule 33(b), "Time to File.  Any motion for a new trial grounded

24   on newly discovered evidence must be filed within 3 years after

25   the verdict or finding of guilty.  If an appeal is pending, the

4

1    court may not grant a motion for new trial until the appellate

2    court remands the case."

3            Here there is no appeal pending, and, at least to some

4    extent your motion is based on new evidence.  To that extent,

5    it is timely, it seems to me, under the rule.  But, "*Other*

6    *Grounds*.  Any motion for a new trial grounded on any reason

7    other than newly discovered evidence must be filed within 14

8    days after the verdict or finding of guilty."  We've obviously

9    gone way beyond that.

10           That doesn't mean that your Bruen motion is barred; it

11   means you can't raise it now.  You would raise it as 2255.  So,

12   I know the defendant, because he knows enough about the

13   criminal justice system, he wants to make sure he hasn't waived

14   anything.  I don't think he would be waiving the Bruen

15   argument.  I just don't think he can raise it now.  He has to

16   wait.  If he loses on appeal, he can file a 2255, and then he

17   can raise that issue.

18           But, in any event, that issue was recently presented

19   to me in another case that you're aware of.  I ruled in that

20   case and determined in my view I do not have the power to

21   invalidate a conviction or dismiss a case charging felon in

22   possession of firearms under Bruen, because Bruen does not --

23   in my view, expressly leaves open that particular issue and

24   therefore doesn't undermine existing First Circuit precedent

25   that rejects that argument.

1          I'm not going to take the time to explain that all

2     here, but I will ask my court reporter to make a transcription

3     of the brief portion of that hearing where I explained on the

4     record my reasoning, and we will docket it in this case so that

5     people know.

6          But it's my judgment that your second motion should be

7     denied without prejudice on the ground that it's untimely, but

8     your first motion, to the extent it's based on new evidence, is

9     timely, and I am prepared to consider it now.

10         Do you want to say anything about the second motion

11    before we go back to the first one?

12         MS. BROWN:  Just that I assume that findings untimely

13    is without prejudice for him to file a post-direct --

14         THE COURT:  Yes.  I specifically -- of course, if the

15    Supreme Court or the First Circuit later conclude that Bruen

16    bars his conviction, as long as he complies with the 2255 time

17    limits, it would seem to me his appeal would be timely.  I

18    can't make any advance ruling on that, but I'm certainly not

19    intending to foreclose his ability to do that.  It would be my

20    understanding that he would be able to do it if he complied

21    with the timeliness rules for Rule 2255, which is generally one

22    year after the conviction becomes final.  But that's on you and

23    him and other people, not me, I can only say.

24         MS. BROWN:  And I don't have anything else to add on

25    that issue.

1          THE COURT:  Okay.  On that issue, okay.  So, then,

2     that motion is denied without prejudice for the reasons I've

3     described.  I'll ask my court reporter to track down the court

4     reporter that did the ruling in that case and just type up the

5     portion of it that is the actual explanation that I offered my

6     reasoning, and we'll just docket it in this case and make sure

7     we have it.

8          THE COURT REPORTER:  Which case, Judge?

9          THE COURT:  You'll find it for me, Jen.

10         MS. KRASINSKI:  It's United States versus Dumont.

11         MS. BROWN:  I have the docket number in the pleading.

12         THE COURT:  Okay.  Jen knows what it is.  She can help

13    the court reporter find it.  It's just a brief -- it will take

14    five pages or less to transcribe it.

15         Okay.  So, we're left with the first motion.  All

16    right?  The first motion appears, to me at least, to be a

17    motion based on newly discovered evidence that argues that new

18    evidence bears on the determination I made pretrial to deny

19    your client a full Franks evidentiary hearing challenging the

20    warrant that was used to justify the search of his premises,

21    right?

22         MS. BROWN:  Correct.

23         THE COURT:  And, second, there is an argument about,

24    it's escaping me at the moment, because I've had too many

25    things to do today, that is not just about the Franks hearing

1   but alleges the government engaged in some other kind of Brady

2   violation.

3       MS. BROWN:  Correct, your Honor.  And I think there's

4   a sort of overarching Brady violation that the evidence that

5   was not turned over pursuant to Brady was not only going to

6   make a difference at the Franks hearing but would have also

7   made a difference in the trial itself under a Kyles v. Whitley

8   type of argument.  It showed a general government misconduct on

9   the investigating officers, and the defendant and his attorney

10  could have challenged the overall legitimacy of the

11  investigation.  And I'm not going to repeat all that, because I

12  think I did a pretty good job of laying it all out in the

13  motion.

14      THE COURT:  I'm just trying to get the ground.  Like,

15  I know that you allege that the government did not disclose

16  certain things involving the informant that undermines the

17  credibility determination of the affiant here, the reliability

18  and credibility of the affiant's information that could affect

19  the decision about whether your client should get a full Franks

20  hearing.  That I've got.

21      MS. BROWN:  Correct.

22      THE COURT:  There are some other arguments you're

23  making, though.  I thought I made a distinct Brady analysis

24  that was not dependent on the search warrant.  Maybe I've got

25  that wrong.

1          MS. BROWN:  Yeah.  So, one of the issues was DNA.

2          THE COURT:  Oh, right.  That's the other piece.  The

3     analysis of DNA that was not available to the government at the

4     time of trial, and the results were issued, and so I understand

5     you have those two arguments.

6          MS. BROWN:  Correct.

7          THE COURT:  The DNA doesn't bear on the search warrant

8     issue.

9          MS. BROWN:  Not at all.

10         THE COURT:  Okay.  And what I want to do with you is

11     let's start with the new evidence that bears on the _Franks_

12     determination, and I want you to, with specificity, identify

13     each new piece of evidence, because I had trouble, the

14     government had trouble identifying it.  You don't think they

15     satisfactorily read your memo.  I didn't understand your memo

16     to the extent it goes beyond what you say is new stuff about

17     Ms. Fillion, but I need you to go through, that's the starting

18     point, each new piece of evidence, what specifically is it,

19     when did you get it, why is it new evidence and why does it

20     support your position, okay?  We'll do that.  Each individual

21     piece of evidence, we'll identify it and then look at them

22     collectively as well as individually to see whether that

23     justifies any relief.

24         The principal argument that I do understand is the one

25     that the government briefed.  I think I understand it.  It is

1    that there was additional information, footage, other things

2    about Ms. Fillion and the incident where she stashed the gun at

3    the Cumberland Farms that, had it been fully disclosed, would

4    have affected the decision about whether there should have been

5    a warrant issued in the case, right?  So, what is it

6    specifically that was new that you got for the first time after

7    trial, that is new and justifies the relief you're seeking

8    about Ms. Fillion and the incident at the Cumberland Farms?

9         MS. BROWN:  And I'm going to limit my arguments to

10   just the evidence and not -- there's a side issue of whether,

11   one, it is new and, two, when did the trial attorney get it

12   and --

13        THE COURT:  Well, that's what -- I need to know both

14   of those things.

15        MS. BROWN:  Okay, okay.  That's what I wanted to

16   clarify.

17        THE COURT:  I need to know what is the first piece of

18   evidence, when did it become available, why does it matter?  I

19   think I should be able to do that with respect to each piece of

20   evidence that you say is new, because if it's not new evidence

21   you can't raise it on this motion pretrial (sic).

22        MS. BROWN:  Right.

23        THE COURT:  Pre-appeal, rather.  Excuse me.  So,

24   what's the first thing you say that -- let's start with

25   Ms. Fillion, okay?  I think there is some -- I think there's

1    body cam footage that reflects an officer saying something.

2    MS. BROWN:  Before I get to that, let me talk about

3    the very first stuff that was -- so in terms of a timeline, the

4    Court may recall when I came onto the case almost a year ago

5    now Mr. Donovan had filed a *pro se* motion; I would call it a

6    *pro se* Brady motion.  I think it was at 59, document 59.  And

7    in that what he said is that from his second attorney, his

8    first attorney after his trial, not his trial attorney, he got

9    a USB port of documents.  In that he said that there were two

10    videos that -- I don't think they're body cams, they were

11    interviews, and that's what he was basing the claim on.  So,

12    that's where I started off from those videos.  I actually had a

13    really hard time finding them, and that was because, when I

14    ultimately tracked them down and looked through all of the

15    government productions, they did exist in a --

16    THE COURT:  I'm not saying this to be critical, but I

17    need you to deal with it the way I'd like you to.  That's sort

18    of a "What I did on my summer vacation" essay.  I don't want to

19    know why you did what you did.  I want to know what is the

20    first new evidence, what is it, when did you discover it, why

21    does it matter?

22    MS. BROWN:  Okay.  So, there were two videos that were

23    discovered by me when I came into the case.  They are both

24    interviews of Caitlin Fillion.  One occurs in December of 2020

25    after her arrest on multiple warrants.  Then, eventually she's

1    released, goes out into the world again, and then she gets

2    arrested again in March of 2021 within like a week or two of

3    the search that is the basis of this case.  So, there's these

4    two interviews that are done of Ms. Fillion.  Those trial

5    counsel did not have, did not review.  That's sort of the

6    genesis of the claim of those two videos that are interviews.

7    And so, that was the start of -- that there was a lot of things

8    in there --

9            THE COURT:  I remember a lot of this -- I mean, I

10   haven't gone back to look at the record, but Ms. Fillion is not

11   a new name to me.

12           MS. BROWN:  Correct.

13           THE COURT:  I heard this way back by the -- who was

14   it?  Stachowske?

15           MS. BROWN:  Yes.

16           THE COURT:  I thought I heard all about Fillion by

17   Mr. Stachowske.

18           MS. BROWN:  You did.

19           THE COURT:  But you say this 12/20 interview and this

20   3/21 interview of Ms. Fillion by police officers were not --

21   never provided to your client?

22           MS. BROWN:  Never provided to the defendant, and I'm

23   not going --

24           THE COURT:  Let's separate out -- I mean, in our

25   system of justice where people have lawyers the government

1    satisfies its production obligation by providing it to the

2    lawyer.

3            MS. BROWN:  Yeah.

4            THE COURT:  And if the lawyer doesn't share it with

5    the client in a way that is prejudicial, the lawyer may be

6    guilty of malpractice, ineffective assistance.  Are you saying

7    that it was not provided by the government to defense counsel?

8            MS. BROWN:  No, I'm not saying that.  What I'm saying

9    is --

10           THE COURT:  You, as his new lawyer, didn't become

11   aware of it, and you're saying Mr. Donovan didn't become aware

12   of it until post trial.

13           MS. BROWN:  Correct, correct.

14           THE COURT:  You are not saying that those things were

15   not provided to Mr. Stachowske.

16           MS. BROWN:  We aren't saying that.  We are saying that

17   they were not provided in a meaningful way that he would have

18   had the ability to use them at trial, because they were

19   mislabeled.

20           THE COURT:  Let me find out.  Let me ask the

21   government.  She's identified two pieces of evidence that she

22   says are newly discovered.  One is a 12/20 interview, the other

23   is a 3/21 interview.  When were those first provided to defense

24   counsel?

25           MR. ROMBEAU:  They were first provided on September

1   27th of 2021, which was the Monday.  Your Honor may recall we

2   had the suppression hearing on the Friday, I believe it was

3   September 24th, and I believe the production letter is dated

4   that day, but we got back to the office late after the hearing,

5   and they were not actually produced via our system until

6   Monday, September 27th, 2021.

7           THE COURT:  Okay.  And you say in a production that

8   was made on the 27th was one or both of these interviews?

9           MR. ROMBEAU:  Let me just double check the inventory.

10  I believe both were included, your Honor.

11          Yes, both were included on the September 27th, 2021

12  production.

13          THE COURT:  Okay.  And when you say they were

14  produced, what was produced?

15          MR. ROMBEAU:  The actual recorded interviews.

16          THE COURT:  These are audio recordings, video, video

17  and audio?

18          MR. ROMBEAU:  From our index they were technically

19  mkv-type files, which were movie-type files that had audio and

20  visual material in them.

21          THE COURT:  Okay.  And they were provided on the 27th.

22  When was the suppression hearing?

23          MR. ROMBEAU:  It was two days prior, on Friday,

24  September 24th.

25          THE COURT:  So, these were produced after the hearing

1    on the motion to suppress?

2            MR. ROMBEAU:  Yes.

3            THE COURT:  All right.  24th was the hearing.  And why

4    did you not produce them prior to the hearing on the motion to

5    suppress?

6            MR. ROMBEAU:  I don't have a good answer for that,

7    your Honor.  I think it was an oversight on our part.  I had

8    been in discussions with Attorney Stachowske that week, where

9    we had let him know about the existence of the recordings.  He

10   signed a memorandum of understanding with us I want to say on

11   the Tuesday of that week.  I saw Attorney Stachowske on the

12   Wednesday of that week, because Ms. Fillion was testifying in

13   the other trial where she was a witness, and I think, generally

14   speaking, based on the posture of the --

15           THE COURT:  Did you tell Mr. Stachowske that you had

16   interviews of Ms. Fillion prior to the suppression hearing?

17           MR. ROMBEAU:  Yes, your Honor.

18           THE COURT:  And you're saying there was a memorandum

19   of understanding in which that was somehow reduced to writing

20   or something?

21           MR. ROMBEAU:  Yes, your Honor.  And I will just refer

22   to that for your Honor so I get my dates right.  According to

23   our records, that on September 21st, 2021 at about 9:00 a.m. we

24   sent a proposed memorandum of understanding to Mr. Stachowske

25   in which we wrote at the top:  "As you are aware, the United

1    States is in possession of certain law enforcement reports,

2    cell phone records and/or audio/video recordings of witness

3    interviews (collectively, the 'sensitive materials') related to

4    your client Corey Donovan."  So, that was I think a reflection

5    of the discussion that I had had with Attorney Stachowske, that

6    we had not only the two interviews of Ms. Fillion but also a

7    cell phone dump of her private cell phone contents.

8             THE COURT:  You specifically told him you had two

9    interviews, tapes of interviews of Ms. Fillion?

10            MR. ROMBEAU:  Yes.

11            THE COURT:  Okay.  But those didn't actually get

12   produced until after the hearing, but they were produced, and

13   then there is some issue about the labeling of them?  I think

14   that Ms. Brown wants to make some argument about you concealed

15   them in a dump or something.

16            MR. ROMBEAU:  Yes, your Honor.  So, I'm trying to

17   think if the Court is asking two questions there.

18            THE COURT:  How did you label them?  That's the first

19   thing.

20            MR. ROMBEAU:  They were labeled pursuant to a two-page

21   table of records, and I'll just put it up on the screen.  If I

22   can zoom in, this is page 2.  Towards the bottom, your Honor,

23   there are the redacted names, so Ms. Fillion's name at that

24   time was redacted from the two charts.

25            THE COURT:  Right.  She was the confidential informant

1    at that time, but Stachowske knew who she was.  You just

2    weren't putting her name in any of the documents.

3          MR. ROMBEAU:  That's right, your Honor.  So, those

4    were the two dates, obviously, that Attorney Brown has referred

5    to, the interview initially when Ms. Fillion was arrested by

6    Somersworth PD in September of 2020 and then the March 11th ATF

7    interview.  And I think, if I understand the argument

8    correctly, it was put in a folder, just so I can show the top,

9    the headings.  This has Bates numbers, document type, folder

10   and then file names, and this got put in a folder with what was

11   generally referred to as the 2021 SR Violation case, which

12   included all of the evidence related to the 2021 case against

13   Mr. Donovan as opposed to the 2019 matter, which was the other

14   Jeep incident.  So, I think that is --

15         THE COURT:  Wait a minute.  You had two -- your

16   discovery indexes had two -- referred to two categories of

17   cases?  One relates to the 2019 case, which is not what we're

18   dealing with -- wasn't the offense of conviction.  This was the

19   case that got reversed, the state conviction?  Okay.  Is that

20   what you're saying, that there are two categories, one was 2019

21   and the other was --

22         MR. ROMBEAU:  As I'm seeing from attached to Attorney

23   Brown's exhibit, there only seems to have the second page

24   because I believe it actually had three.  It referred to the

25   2007 case in part because we wanted to make sure that Attorney

1  Stachowske had the offense of conviction which made Mr. Donovan

2  a prohibited person for purposes of his --

3       THE COURT:  So, one category was 2007 case, right?

4       MR. ROMBEAU:  Yes.

5       THE COURT:  And then there was a second category, 2019

6  case?

7       MR. ROMBEAU:  Yes, your Honor.

8       THE COURT:  And then there was a third category, which

9  is this SR Violation?

10      MR. ROMBEAU:  Yes, your Honor.

11      THE COURT:  All right.  And the SR violation concerns

12 not just the SR violation but all of the production that

13 concerns the facts that led to the crime of -- the charge that

14 he was going to trial on as well as the supervised release --

15      MR. ROMBEAU:  That's correct, your Honor.  You'll note

16 on there there is the photo of the Mossberg shotgun in box.

17      THE COURT:  Yeah.  So, this is not a case in which

18 there was a category called "2021 felon in possession charge."

19      MR. ROMBEAU:  That's correct.

20      THE COURT:  Everything related to the felon in

21 possession charge was all produced under the SR, 2021 SR

22 Violation, and you say he would have readily understood that;

23 all you have to do is look at it and you'll know what it is,

24 right?

25      MR. ROMBEAU:  Yes, your Honor.

1          THE COURT:  So, you're saying, We didn't conceal

2     anything, we didn't provide it prior to the suppression

3     hearing, we told him about it prior to the suppression hearing,

4     we gave it to him the weekend -- the Monday after the

5     suppression hearing, and so he had it well prior to trial.

6     Whether he told Mr. Donovan about it, ever looked at it,

7     whatever, that's on him, but it's not on you.  That's your

8     position?

9          MR. ROMBEAU:  Yes, your Honor.

10         THE COURT:  All right.  So, Ms. Brown, we got that so

11    far.  What do you want to say about that so far?

12         MS. BROWN:  I guess I take issue -- so I created a

13    file that was just document disclosure letters, and so I'm

14    looking at the first document disclosure letter from July 2nd,

15    2021, and that references the felon in possession,

16    1:21-cr-008-PB.  It does not reference the violation of

17    conditional release.  So, I take issue with the fact that up

18    until this letter the document disclosures, and I'm looking at

19    -- there is a supplemental disclosure on the 24th, and I think

20    that's the one we're talking about.  Again, that has the

21    current docket numbers.  And then, if you look on the front

22    page of that three-page document it says --

23         THE COURT:  I don't have anything in front of me, so I

24    don't know what we're talking about.

25         MS. BROWN:  Okay.

1          THE COURT:  We can set her up on the evidence

2     presentation, and she can just plug her computer in and show me

3     what it is she's talking about.

4          MS. BROWN:  I'm looking at the full letter.

5                    (Pause)

6          MS. BROWN:  So, what we were just talking about, get

7     just the date on there, the September 24th, this is the letter,

8     even though Attorney Stachowske didn't get it till the 27th.

9     So, if you look at the cover of it, it talks about the bank

10    robbery, the 2007 bank robbery, the 2019 SR Violation file and

11    the 2021 SR Violation filed.

12          But if you go back to -- let's see.  So, this was the

13    discovery letter for the initial discovery, and this is

14    referencing 1:21-cr-0088-PB, initial discovery production.  So,

15    certainly the attorney of record would see this as the

16    discovery for the pending new charge, whereas the discovery I

17    was just showing the Court, I think there's a reasonable

18    reference that, We're sending you stuff regarding either the

19    older charges, the 2007 to 2019, or the SR violation that was

20    filed -- that was pending contemporaneously.

21          THE COURT:  I don't read it that way.

22          MS. BROWN:  Okay.

23          THE COURT:  Perhaps we need to get Mr. Stachowske to

24    testify, because what the government is saying is very

25    different from what you're implying.  The government says,

1    look -- and I remember Mr. Stachowske was very concerned about

2    Caitlin Fillion.  I may be misremembering it, but I have a

3    vivid memory of this being like a huge issue on his part, and

4    that he wouldn't understand what -- and I want to be clear so

5    that Mr. Donovan understands my position on this.  I'm not in

6    any way suggesting that he's losing his right to raise it.

7    It's the question of do you raise it in a post-trial motion,

8    which is a 2255 motion, or a Rule 33 motion?  In order to be

9    raised before he takes his appeal, it has to be newly

10   discovered.  Ordinarily, what's given to your lawyer is not

11   newly discovered simply because he screwed up and didn't send

12   it to you or that he didn't read it.  In a very unusual case

13   where, like, where the government is sandbagging and trying to

14   trick somebody I might be able to say, Oh, that's effectively

15   newly discovered, but if you're making a contention of

16   intentional sandbagging this doesn't come within a mile of it.

17   So, I'm not saying you can't raise it; I'm just saying it

18   doesn't appear at all to be newly discovered.

19          MS. BROWN:  And I did talk to Attorney Stachowske.  I

20   have a memorandum that I attached as an exhibit to our motion,

21   and he said to me -- I agree, I would like to have a hearing

22   where he gets to testify, because I think he's helpful to the

23   defendant, and what he explained to me -- and, as I said, I

24   have the affidavit and I go by whatever -- not the affidavit,

25   the memorandum -- but that what he explained to me is that he

1    read it the same way I just explained it, which was, Okay, I'm

2    in the middle of getting ready for trial, I've got all this

3    stuff I've got to get ready for.  Oh, this has to do with the

4    violation of his condition of release.  I'll read that after

5    the trial is over, because I don't really need to deal with it

6    right now.

7          THE COURT:  Okay.  I have a different memory of this.

8    Like, Mr. Stachowske, my recollection, again, may be completely

9    off, because I haven't even tried to look, didn't he raise the

10    motion to dismiss pretty close to the time of the trial, like

11    really close to the time of the trial?

12          MS. BROWN:  We agree to that, yeah.

13          THE COURT:  Yeah.  And that was a huge issue, because

14    you should be raising those things earlier on.  And so, yeah,

15    it was true he was scrambling, but until he challenges the

16    motion -- challenges the search in a motion to suppress Caitlin

17    Fillion doesn't have any useful information for the trial.

18    It's only relevant with respect to his last-minute motion to

19    suppress.

20          So, you know, I think we're probably going to have to

21    get him here under oath, and somebody's going to have to

22    carefully reconstruct the timeline, and it may be that you have

23    to wait and charge him with ineffective assistance of counsel.

24    If he didn't even know that these interviews were there, it's

25    surprising to me.  If he thought it was important, he could

1   have easily understood what it was and looked at it.  The

2   problem is not that it was newly discovered.  The problem is

3   that it was he didn't do what Mr. Donovan thinks should be done

4   with it, not that it's newly discovered, and it can't really be

5   raised in a Rule 33 motion, is my understanding, unless it's

6   newly discovered in the sense that, you know, the government

7   never produced it prior to trial.  It produced it prior to the

8   guilty verdict, so it's the kind of thing that ordinarily would

9   have to be raised within 14 days of the guilty verdict in the

10  case.

11          MS. BROWN:  Sorry to interrupt, your Honor.  I think

12  it's a factual issue whether it was newly discovered, because

13  if Attorney Stachowske is going to say, The way it was labeled

14  I didn't see -- he would first of all say, I would have used

15  that.  You're right, and I agree with you, he was very --

16          THE COURT:  He was really hot about --

17          MS. BROWN:  Yes.

18          THE COURT:  -- the Caitlin Fillion stuff.

19          MS. BROWN:  Yeah, and he was very focused on that.  I

20  read all the transcripts on that, and he thought this was very

21  key to prove --

22          THE COURT:  The other is really, as I understand it, I

23  was concerned about this, too, the fact that they could have

24  gone into the -- in to do the search before they were

25  authorized to do it.  Those were the two big issues I remember

1    from -- there were other things, obviously, but those were the

2    main things that I was most concerned about and certainly Mr.

3    Stachowske was concerned about.  So, the idea that he would not

4    want to pay any attention to what Ms. Fillion said, I don't

5    know.

6         So, let's set this aside for a moment and then say,

7    okay, if this is newly discovered, what's in these interviews

8    that is so important and new that causes us to reassess the

9    whole issue about the suppression hearing?

10        MS. BROWN:  So, the critical phrase here from the

11   affidavit, which I just had open a minute ago -- was it the

12   bottom of page 4 --

13        THE DEFENDANT:  17.

14        MR. ROMBEAU:  It's paragraph 17.

15        THE COURT:  Yeah.

16        MS. BROWN:  -- where, there we go, Agent Forte uses

17   the term, so he says the "SOI."  Obviously, we know that is Ms.

18   Fillion right now.

19        THE COURT:  Previously interviewed in an unrelated

20   case, was found to provide truthful and accurate information.

21        MS. BROWN:  So, that is really key to all of this.

22        THE COURT:  Right.

23        MS. BROWN:  So, what our -- assuming this is newly

24   discovered evidence and not ineffective or --

25        THE COURT:  Yes.

1          MS. BROWN:  Yeah.  Assuming that, the recordings

2    suggest many falsehoods and also many more statements than

3    Attorney Stachowske had access to that were either false in and

4    of themselves or false by an omission, and, as you remember,

5    because I read the transcript, you said there's kind of two

6    categories here, things that are false and things that --

7          THE COURT:  Right.  When you have a <u>Franks</u> issue you

8    ask yourself a couple of questions:  What are the affirmative

9    false statements, and what statements are false or misleading

10   because they omit information, okay?  And that's the way I tend

11   to view <u>Franks</u>-type issues, so I always ask, Tell me what's

12   false, okay?  Now, you're saying that statement is false

13   because the affiant knew at the time he executed the affidavit

14   that Ms. Fillion had provided untruthful information about this

15   particular incident, right?

16         MS. BROWN:  Correct.

17         THE COURT:  To say that she provided truthful

18   information is not a false statement, because even you will

19   acknowledge she provided truthful information.

20         MS. BROWN:  Correct.

21         THE COURT:  But you're saying, when you say that

22   somebody had provided truthful information, it implies that, if

23   they provided untruthful material information, you would have

24   had to disclose that, too.

25         MS. BROWN:  Exactly.

1          THE COURT:  And that omission is misleading.  That's

2     what you would say, right?

3          MS. BROWN:  Correct.

4          THE COURT:  So, I'm asking you what did she say that

5     was untruthful that was revealed by these two interview

6     statements?

7          MS. BROWN:  So, in the interview in December of 2020,

8     the most important thing is that she was confronted about --

9     she was picked up because of an allegation she had receiving

10    stolen property, she had stolen a car or took a car and not

11    returned it, and the officer in that interview cross-examined

12    her basically, questioned her like, Okay, the evidence I have

13    here says this, and you're saying that, and it's in more detail

14    in my motion.

15         THE COURT:  The one piece that I think you and the

16    government touch on together, because the government didn't

17    understand you to say anything beyond this, was, We think what

18    the defendant is saying is that Ms. Fillion falsely reported

19    when she got the gun from her companion, and you say she said

20    different things about it outside the store on the way, before

21    you get to the store or earlier, something like that.  Can you

22    focus on that?

23         MS. BROWN:  Correct.  Right.

24         THE COURT:  And tell me what are the specific things

25    she said at different times that you think cause her statements

1    to be materially false about when she got the gun?

2         MS. BROWN:  Okay.  And just to clarify, I know this is

3    what the Court's talking about, where there's a whole bunch of

4    things regarding her credibility.

5         THE COURT:  I know, but focus on one at a time.

6         MS. BROWN:  Right.

7         THE COURT:  Again, you know, you do this for a living.

8    The only way I know how to analyze things is to analyze each

9    individual thing, look at each individual thing, then put them

10   together and analyze them collectively.  So, start with each

11   individual thing.  What is the false statement that she made

12   during those interviews?

13        MS. BROWN:  Okay.  So, the false statement that she

14   made in that interview was that she was not guilty of a crime

15   of stealing the car.  I think when you're talking about --

16        THE COURT:  Okay.  I'm focusing on what the briefing

17   that I had --

18        MS. BROWN:  Yes.

19        THE COURT:  -- dealt with, primarily the statement

20   about the gun.  So, that's what I'm asking you now.  I mean, if

21   you want to abandon any argument you have about the gun, fine,

22   but that's what the government briefed in response.

23        Didn't the government brief that issue in response?

24        MR. ROMBEAU:  Yes.

25        THE COURT:  That seems to be -- I try to focus on what

1    I think the parties are telling me are the issues, and that

2    would seem to be the principal issue:  Did she make a false

3    statement about when she transferred the gun or he transferred

4    the gun to her?

5            MS. BROWN:  I'm not abandoning any issues.  I'm afraid

6    that I will be perceived as abandoning issues if I completely

7    focus on the gun.

8            THE COURT:  We'll do one at a time until we have given

9    you an opportunity to identify each and every, and after having

10   had the opportunity to identify each and every, if you don't

11   identify something you might be deemed to have abandoned it.

12   So I'm asking you, tell me what the first statement is.  You

13   know what's in these interviews.  I've never seen them, so I

14   don't know what's in them.  What did she say that bothers you?

15           Now, keep in mind, again, I do this stuff for a

16   living.  If a witness gives a statement more than once and

17   every single time they give a statement it will not be

18   identical to the statement that they gave previously, and, in

19   fact, if it was, it would suggest fabrication.  All right?  So,

20   that there are differences in their statements -- this is the

21   thing that lawyers don't understand:  Prior inconsistent

22   statements is the least-effective form of cross-examination

23   known to man, because everyone makes inconsistent statements

24   when they repeat things more than once.  Lawyers love it.  It

25   is the easiest way to try to do something.  It is the least

1   effective.  It never works with juries, it never works with

2   judges.  It doesn't suggest evidence of fabrication except in

3   unusual circumstances.

4           But you seem to be basing your argument on an argument

5   that, because she differed, she lied, so just tell me what the

6   differences are.

7           MS. BROWN:  Your Honor, it's very hard for me to pick

8   apart pieces, okay, here, because you asked me to say, okay,

9   what's missing, and then you're saying what's false in that.

10  What happened is we identified these two videos, we initially

11  found things that were false, but they weren't false about, or

12  at least we didn't know they were false about the --

13          THE COURT:  Is there anything in her statement that

14  you say is false about the way she got the gun from the person

15  that she was with?  Is there anything in that?  If there isn't

16  I can move on to this car issue, but that was what I thought

17  was the principal issue.

18          MS. BROWN:  Yeah.  And Corey is getting -- your Honor,

19  you're trying to get me to say what's false in these videos.

20          THE COURT:  I'm trying to just understand your

21  argument; that's all I'm trying to do.  I'm not trying to trick

22  you, trap you, I genuinely am not.  I just want to know what

23  your argument is so I can evaluate it.  That's all I'm trying

24  to do.

25          THE DEFENDANT:  I think the firearm actually went in

1    kind of the minimal portion of it, the when she got the gun.

2              THE COURT:  Okay.

3              THE DEFENDANT:  But it's a minimal part.

4              MS. BROWN:  It all goes together.  And that's why I

5    can't -- go ahead.

6              THE DEFENDANT:  At one time she says he gave it to her

7    during the parking lot, at another time he's outside the store.

8    In her plea agreement she tried to pretend that she doesn't

9    even know that it was a gun until after she was in the store.

10             MS. BROWN:  But I didn't discover that in the

11   recordings that were sent on the 27th.  That's why I'm trying

12   to be precise and accurate and not misstate things, and when

13   you say what was in this 27th that was inaccurate about the

14   gun, that's --

15             THE COURT:  One thing I've learned as a judge is I

16   can't rule in someone's favor if I don't understand what

17   they're saying.

18             MS. BROWN:  And I'm trying, your Honor.  It is just --

19   I spent nine months on this motion because it's extremely

20   complicated, and I seem to have failed in articulating all the

21   evidence --

22             THE COURT:  Tell me one thing that is false in her

23   statements to the police on those two statements specifically,

24   what it is that's false, because he's liable -- you say the

25   affiant is at fault here for omitting information that she gave

1    to the police that was false, right?  Normally you can do a

2    list.  You can say, Well, she said this was false, she said

3    that was false.  I'm just asking, trying to get that list out,

4    what you think she said was false.

5         MS. BROWN:  Focusing on the gun, going back to what

6    was turned over on the 27th, but going back to what was on the

7    27th that led to more discovery, then it led to more discovery,

8    and then it led to more discovery, and it was that more

9    discovery, so like the fact that -- I can't point to something

10   in the interview from either December -- so eventually --

11        THE COURT:  Let's try it this way:  Pick anything you

12   want that you say was false about Ms. Fillion, and then we'll

13   trace it back.

14        MS. BROWN:  So, the evidence that those recordings

15   eventually led us to that there's no question and no dispute

16   were not turned over to trial counsel were recordings at the

17   Cumberland Farms.  So, some of those were recordings of the

18   police arriving, recordings of Ms. Fillion and Mr. Adjutant

19   standing outside the store, and there is a recording, and it's

20   in our exhibits where one of the officers says that he, "he"

21   being Mr. Adjutant, handed her the gun outside the Cumberland

22   Farms.  That ended up not being true when you go and watch the

23   video.  There was no way they were close enough.  You don't see

24   any action --

25        THE COURT:  So, this is something that Adjutant said

1    to an officer and the officer is reporting to another officer?

2         MS. BROWN:  As I understand the video, there's an

3    officer who talked to Fillion, not Forte, but one of the

4    officers from Somersworth reported in this body cam, you know,

5    recording, saying that Fillion said that Adjutant passed off

6    the gun outside the Cumberland Farms to her, and it was outside

7    that was important.  So, then -- so that's all at the scene.

8    Like this recording, you can see the cruiser, it's made at the

9    scene.

10         So, then they go in and get the surveillance cameras

11   from Cumberland Farms that show I think at least two or three

12   different angles, and when they go back and look at that, the

13   police, it shows that it couldn't happen, that when she was

14   saying the gun was handed to her outside she was lying.  Then

15   they go and interview --

16         THE COURT:  Where do you think the gun was handed to

17   her, inside the Cumberland Farms?

18         MS. BROWN:  My understanding is that Mr. Adjutant's

19   defense is that it was her gun all along and that there was no

20   handing off.  She was saying that to not get in trouble for

21   having a gun, because she was a felon, and that she was

22   minimizing and lying about --

23         THE COURT:  So, the government had a statement from

24   Adjutant that said he never had the gun, and that's what --

25         MS. BROWN:  I'm not saying this is easy, your Honor.

1    I tried to document it in my motion.

2         THE COURT:  But it seems so inconsequential that

3    you're talking about a statement that one police officer made

4    to another that's picked up on a body cam footage, and when

5    that officer is saying that Ms. Fillion said she got the gun

6    from Adjutant outside, and you mean from that she meant outside

7    within the range of the Cumberland Farms cameras, and the

8    Cumberland Farms cameras don't show that transfer, therefore

9    she must have been lying when she made that statement to the

10   officer that the officer talks about on the video.  That's what

11   your position is?

12        MS. BROWN:  That's what our position is, but we're not

13   saying that -- that's, like, this one little thing here.

14        THE COURT:  That's one thing with other things.

15        MS. BROWN:  Right.

16        THE COURT:  You don't just throw -- you will never

17   persuade me that this is the way to think.  So, to the way you

18   think that's what it is, the Court of Appeals will have to

19   correct me.  I do not think about things as a big mass; I think

20   about let's find every statement, let's look at each individual

21   statement, and then let's look at all the statements together,

22   see whether individually or collectively.  This is such a basic

23   way of doing analysis I can't change at this point in my life.

24   Otherwise everything is just, it's all kind of vague, general

25   impressions, and I'm not going to work that way.  My mind

1   cannot work that way, so I'm going to have to ask you to do

2   your best with my limitations, and my limitations are I need to

3   know what statements you think that she made that were false so

4   that you can support your claim that the affiant omitted

5   statements that were false.

6          Now, one of those statements, just one, I now

7   understand to be Ms. Fillion falsely claimed to some officer

8   that she got the gun from Adjutant outside the Cumberland

9   Farms, and we know that's false because the Cumberland Farms

10  cameras don't show that happening, right?  That's one.

11         MS. BROWN:  Correct.

12         THE COURT:  Okay, good.  And you say, That's newly

13  discovered evidence because we didn't get that body cam footage

14  until after the trial, relatively recently, and we have acted

15  on it, right?

16         MS. BROWN:  Correct.

17         THE COURT:  Okay.  Do you agree that that body cam

18  footage -- do you understand what her argument is on that

19  piece?

20         MR. ROMBEAU:  Somewhat, your Honor.  I think the issue

21  that I have with this is that at no point does defendant cite

22  anything Ms. Fillion actually said.

23         THE COURT:  Right.  I know it's an officer's statement

24  of what -- it's his summary statement to another officer.  All

25  right.  But do you understand that's what she's saying?

 1          MR. ROMBEAU:  Yes.

 2          THE COURT:  That's a piece of body cam footage?

 3          MR. ROMBEAU:  Yes.

 4          THE COURT:  All right.  Do you agree that that piece

 5   of body cam footage was not put to the defendants until after

 6   the trial?

 7          MR. ROMBEAU:  Yes.  Yes, I do, your Honor.

 8          THE COURT:  Okay.  And there's another piece of

 9   Cumberland Farms footage that apparently shows her and Adjutant

10   in a way that the defense says demonstrates that the statement

11   that the officers reported about is false.

12          MR. ROMBEAU:  Yes, your Honor.  I will say all the

13   evidence from the Fillion-Adjutant case was not provided --

14          THE COURT:  Well, I'm asking about the specific

15   Cumberland Farms footage was not provided.

16          MR. ROMBEAU:  Yes.

17          THE COURT:  So, that's newly discovered evidence?

18          MR. ROMBEAU:  Yes.

19          THE COURT:  You say inconsequential newly discovered

20   evidence but newly discovered evidence?

21          MR. ROMBEAU:  I absolutely agree it was not provided

22   until, I believe, summer of 2022.

23          THE COURT:  All right.  So, we've identified one

24   statement and the basis for the one statement, right?  Okay.

25   That's one.  What's the next one?  What does the defense want

1    to say is the next statement?

2    　　　MS. BROWN:  So, the other statements, your Honor, have

3    to do with the stolen car that I was talking about before.

4    　　　THE COURT:  Okay.  I know nothing about the stolen

5    car, so tell me about it.

6    　　　MS. BROWN:  So, I am -- yeah.  I am paraphrasing, I

7    don't have a transcript of that, but the first interview that

8    was in December of 2020 Ms. Fillion is being questioned about

9    -- I think the whole basis they had to arrest her is it was a

10   warrant out for her arrest for either receiving stolen property

11   or theft of stolen property that involved a car, and the

12   interview involved the, I think it's a Somersworth officer, he

13   actually, and I describe this in my motion, he has a file in

14   front of him, and he's asking her, Well, like, you're saying

15   this, and the file is saying this, and it goes back and forth.

16   　　　THE COURT:  Is this a video that you have?

17   　　　MS. BROWN:  It's on the video that was presented as an

18   exhibit in this case.

19   　　　THE COURT:  When was that interview?

20   　　　MS. BROWN:  That's December 2020.

21   　　　THE COURT:  Okay.  December -- is that the December

22   2020 video that was produced prior to the trial?

23   　　　MS. BROWN:  That was the one we were talking about

24   before the 27th, and that's what I was trying to say before.

25   That video led to other videos that were clearly not given to

1    trial counsel.

2        THE COURT:  Right.  But the false statement was made

3    during that interview.  You're talking about the car false

4    statement.

5        MS. BROWN:  Exactly.  Yes.

6        THE COURT:  What was exactly the car false statement

7    that she made?  What was the question that was asked, and what

8    was the answer that she gave?

9        MS. BROWN:  Your Honor, I cannot quote exactly.  I

10    have the recording.  It's in my motion.  If you give me a

11    minute I'll read from my motion, but I can't quote that off the

12    top of my head, especially at 5:00 at night.

13        THE DEFENDANT:  Can I paraphrase, sir?

14        THE COURT:  You can, Mr. Donovan, but I'm increasingly

15    coming to the conclusion that -- I've tried my best.  I've been

16    the whole day here.  I'm not going to be able to finish this

17    today.  I'm going to start a trial tomorrow, and then I'm going

18    on vacation for a couple of weeks.  We're not going to be able

19    to get back to this until early February, is the reality, so

20    that's why I'm trying so hard to finish today.

21        But, Ms. Brown, I don't think you're in a position to

22    really give me what I need to be able to resolve this thing

23    today.

24        MS. BROWN:  I just can't quote verbatim from a

25    transcript when --

1          THE COURT:  But that's what I need, frankly --

2          MS. BROWN:  Okay.

3          THE COURT:  -- because I need to identify statement by

4     statement by statement, the theory being this -- who was the

5     affiant here?  What's his name?

6          MR. ROMBEAU:  Special Agent Forte.

7          THE COURT:  All right.  Forte recklessly omitted the

8     following material facts:  Fact one:  Fact one is he omitted,

9     recklessly, the fact that Fillion gave a statement to an

10    officer that she got the gun from Adjutant outside of the

11    Cumberland Farms.  That evidence is newly discovered because we

12    did not learn of that until X date.  Fact two:  Fillion made

13    some kind of a false statement in the 12/20 interview.  This is

14    the statement that she made.  This is false for this reason.

15    This is why this is newly discovered evidence.  Fact three.

16    And you just go down and list each fact, the exact language, if

17    there's a quote to it, the exact language, when it was produced

18    and if there's a different date from when you say they learned

19    of it because there's some kind of plan to conceal kind of

20    thing, so I need a chart, basically --

21         MS. BROWN:  I was going to suggest I can do that

22    between now and the next hearing.

23         THE COURT:  -- each statement that you say Fillion

24    made that was false which makes the officer's statement

25    materially misleading, because you are not saying he made a

1   false statement; you're saying he omitted material facts.  So,

2   his material facts are about what he knew about Fillion.  And

3   then with respect to -- we need a chart, and the chart needs to

4   have each specific statement, the most precise language you

5   have, when it was made, when it was discovered, that is, when

6   it was produced to the defense, if you have a different date

7   for when you say the defense learned of it, that date and why

8   it is a false statement.  All right?  And then we can have the

9   government respond to each of those, and I can ask whether

10  individually or collectively that causes someone to conclude

11  that the affiant recklessly omitted material facts, and if you

12  can show that, then maybe you can get a new -- you can get a

13  Franks hearing, and if you can show that that would have

14  affected the outcome of the suppression issue, then maybe you

15  can get that motion granted and a new trial ordered.  That's

16  how that would work.  But if it's based on, Here's something

17  she said false that the government gave to Stachowske prior to

18  trial, it's not newly discovered.  That has to support a claim

19  that Stachowske screwed up.  That's an ineffective assistance

20  claim.  That's a claim that has to be raised in a 2255 post

21  appeal.  All right?  If it's newly discovered I can consider it

22  in a Rule 33 motion, and if you want me to rule now on that, I

23  can do that if it's newly discovered, if it's false statements

24  by Fillion, if it's material.

25          That you have some evidence like the officer saying

1    this on body camera, like, if this is an officer that heard it

2    third or fourth hand from somebody else, what good is that, you

3    know?  It's just one person summarizing something.  If you have

4    Fillion on tape saying something, and even if you do, that, Oh,

5    he got it right outside of Cumberland Farms but not in camera

6    range, she's lying, I mean, that isn't going to do it.

7         MS. BROWN:  I understand the argument, and I think

8    before, your Honor, what I was trying to explain and I think is

9    in my motion -- and I agree with the chart, I will do that

10   before the next hearing, but I think ultimately this has to be

11   looked at in the totality of the evidence.

12        THE COURT:  As I said, like, five times, the way you

13   analyze things as a judge is you identify each fact, you look

14   at each fact individually, and then you put it all together and

15   you look at everything collectively.  I assure you I will not

16   review things in an isolated -- I know what my job entails,

17   okay?  I know -- the phrase "totality of circumstances" is a

18   phrase that you will see in everything that I do, so I analyze

19   each individual statement; then I analyze everything together.

20   That's how I'll do it here.  But I need to know what the

21   individual statements are to determine whether collectively

22   they are sufficient to entitle you to the relief you're

23   seeking.  A hundred inconsequential statements might or might

24   not add up to a material misstatement.  It depends.  But you

25   need to know what the misstatements are before you can

1    determine whether collectively they amount to something that is

2    sufficiently material to get you back in the door on a <u>Franks</u>

3    hearing.

4        This was an issue that was aggressively litigated by

5    Mr. Stachowske prior to trial.  I don't intend to revisit it

6    unless there's a legitimate reason for me to do that, okay?  I

7    know the defendant has his arguments.  He might win them in the

8    Court of Appeals.  If he doesn't, he can come back and file a

9    2255.  So, I'm focusing on whether you've got sufficient stuff

10   that qualifies as newly discovered evidence to entitle you to a

11   hearing now as opposed to a hearing if he loses his appeal,

12   files a 2255 for ineffective assistance, and can blame it all

13   on Stachowske for not developing this adequately, or he can

14   blame it on the government for some kind of <u>Brady</u> violation.

15   Those are the standards.  You've got great expertise in raising

16   those kinds of issues, and you'll raise them if he's got them.

17   But I'm entitled to know specifically what it is that's

18   problematic so that I can analyze it.

19        MS. BROWN:  Okay.

20        THE COURT:  Why don't I give you 14 days to file a

21   supplemental brief.  Appended to that brief should be a chart.

22   The chart should identify each specific statement that you say

23   was false and should identify when the government made defense

24   counsel aware of the statement's existence, if the date the

25   defendant became aware of it is different you say when the

1    defendant was made aware of it and the reasons why it is false.

2    And then the government can file a responsive brief within 14

3    days after that, and then I will, I guess, come back and do

4    this again.  I hoped to do it today.  I tried my best to do it

5    today.  I don't think I can fairly do it today without

6    compromising the defendant's interests, and I don't want to do

7    that.

8             That does mean, though, the judgment will issue before

9    I resolve the Rule 33 motion.  To protect Mr. Donovan's

10   interest, I would urge the defendant to think about filing a

11   Notice of Appeal within 14 days even before we get to those

12   other issues.  I don't think -- because you've already filed

13   your Rule 33 newly discovered evidence motion, I don't think

14   that will bar me from ruling on the motion, because, remember,

15   what the rule says is, Rule 33 says, If an appeal is pending,

16   the court may not grant a motion for new trial until the

17   appellate court remands the case.  So, if you do file a notice

18   of appeal, one of the things you're going to have to consider

19   is whether does that deprive me of jurisdiction to act on your

20   motion?  Do you see what I'm saying?

21             MS. BROWN:  And I think I've seen this done in another

22   case.  I think that you file something, then ask that it be

23   stayed and then tell them --

24             THE COURT:  I do not have sufficient expertise on the

25   rules of appellate procedure.

```
 1                    MS. BROWN:  I'm going to check with people who do.

 2                    THE COURT:  Yeah.  I'm notifying you to all these

 3          issues, because I want Mr. Donovan to get his appeal.  I want

 4          it to be timely.  I don't want him to lose the ability to have

 5          his Rule 33 motion decided now.  I'm doing this purely to make

 6          you aware of those issues, not to suggest what the answers to

 7          the issues are.  That's on you and the other experts, because I

 8          don't file notices of appeal.  That's not my job.  I know only

 9          what my job is.

10                    So, I've identified the potential issues.  I've given

11          you a time for filing additional information.  You should do

12          whatever is necessary to ensure that Mr. Donovan's appellate

13          rights and rights to raise issues by Rule 33 are preserved.

14          Whatever that is you figure it out and do it, but make sure

15          it's done so that he has his interests fully protected.  Okay?

16                    MS. BROWN:  Great.

17                    THE COURT:  And we'll stop this hearing now at 5:00,

18          and then I'll go on and do my sentencing.

19                    Mr. Donovan, we'll see you back here.  We'll do

20          another hearing on this, and then we'll get this resolved,

21          okay?

22                    THE DEFENDANT:  Thank you, sir.  I greatly appreciate

23          it.

24                    THE COURT:  All right.  Look, I understand these are

25          important to you, and I think you're sincere in your beliefs
```

1    about things.  We may have different views about it, but I
2    think you're sincere, and so I want you to feel like I've given
3    you a fair shot.
4            THE DEFENDANT:  I don't have a bad word to say about
5    you, sir.
6            THE COURT:  All right.  Okay, thanks.  See you later.
7    It's nice to hear.  I get a lot of criticism.
8            All right.  We can call the next case.
9         (WHEREUPON, the proceedings adjourned at 4:58 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     knowledge, skill, ability and belief, a true and accurate

8     transcription of the within proceedings.

9

10

11

12

13     Date:  ___6/7/23_____      /s/ Brenda K. Hancock
                                    Brenda K. Hancock, RMR, CRR
14                                  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25