# United States Court of Appeals
## For the First Circuit

───────────

No. 23-1328

UNITED STATES OF AMERICA,

Appellee,

v.

COREY DONOVAN,

Defendant, Appellant.

───────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

───────────

Before

Barron, Chief Judge,
Thompson and Montecalvo, Circuit Judges.

───────────

Michael G. Eaton, with whom Donna J. Brown and Wadleigh, Starr
& Peters, P.L.L.C. were on brief, for appellant.
Charles L. Rombeau, Assistant United States Attorney, with
whom Jane E. Young, United States Attorney, was on brief, for
appellee.

───────────

September 13, 2024

───────────

**MONTECALVO,** <u>**Circuit Judge**</u>.     A  jury  convicted Defendant-Appellant Corey Donovan of one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and the court sentenced Donovan to 110 months' imprisonment and three years of supervised release.  Donovan appeals both the conviction and the sentence.  On the conviction, he argues that the district court erred by improperly allowing a witness, his girlfriend Kelley Finnigan, to invoke a blanket Fifth Amendment privilege and by failing to provide limiting instructions under Federal Rule of Evidence 404(b) that he requested before trial.  On the sentence, he challenges the district court's application of a mandatory sentencing enhancement based on its finding that two oil filters were sufficiently modified to be considered homemade silencers. For the following reasons, we affirm.

## I. Background

On March 26, 2021, federal agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") executed a search warrant of Donovan's residence, a large rural property in Wilmot, New Hampshire.[1] At the time of the search, there were multiple cars on the property.  Relevant to our discussion, the

---

[1] While the search warrant is not at issue on appeal, it was executed after an informant told law enforcement that Donovan was in possession of multiple guns.  When the search began, Special Agent Forte saw ammunition in one of the vehicles on the property and applied for and received a subsequent search warrant to search the vehicles on the premises.

agents searched a Jeep, which was registered to Donovan, and a broken-down Hyundai.  The agents also searched several structures on the property, including "a large barn/woodshed."

From Donovan's Jeep, agents recovered a Mossberg model 500 20-gauge shotgun strapped to the ceiling rail of the vehicle and twenty rounds of 20-gauge ammunition from the center console. In the Hyundai, the agents found a box of ammunition and a gun cleaning kit.  Finally, inside the barn, the agents found a gun case, two gauges of shotgun shells, a gun scope that had "JPM27J" written on it, and a 20-gauge shotgun barrel.  Near the gun case, the agents found two oil filters that had been modified. Noticeably, both oil filters had a hole drilled into them and one had a metal plate attached to one end.  The agents suspected these modified oil filters in Donovan's possession were homemade silencers.  The agents also recovered various weapons including knives, swords, machetes, compound bows, and crossbows throughout the property.

Five days after the search, Finnigan, who also lives on the property, called ATF Special Agent James Martin and claimed that the shotgun that was seized belonged to her.  The ATF later learned that the shotgun had been stolen from its owner, Kevin Kwiatkowski.

## II. Procedural History

As Donovan had a prior felony conviction, the government charged him with a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[2] Prior to trial, Donovan made a motion requesting that the court grant Finnigan immunity for her testimony that the gun, which was stolen from its legal owner, belonged to her. At a hearing on the motion, Donovan argued that Finnigan's testimony was exculpatory but would expose her to criminal liability and the prosecution's refusal to give her immunity amounted to witness intimidation and prevented him from mounting a defense. The district court disagreed, explaining that it did not "see any evidence that the government attempted to intimidate or harass a potential witness." And the court found that the prosecution's refusal to give Finnigan immunity did not constitute a due process violation because it did not prevent Donovan from mounting a defense and calling other witnesses who could testify about the ownership of the shotgun.

With regard to Finnigan's potential criminal liability, the district court clarified that there was "evidence that [Finnigan] ha[d] claimed the firearm as her own." The court then

---

[2] Under section 922 it is "unlawful for any person--who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[--]to . . . possess in or affecting commerce, any firearm or ammunition. . . ." 18 U.S.C. § 922(g)(1).

explained that the government and court identified "two potential crimes" that Finnigan's testimony might unveil.  First, that Finnigan was possibly "culpab[le] . . . in connection with the . . . theft of the firearm" and, alternatively, that she would be criminally culpable for "providing a weapon to [Donovan,] a convicted felon."  The court noted that the appropriate question was whether there was sufficient evidence that Finnigan would not face "criminal exposure under [either] of the[se] theories."

During that hearing, the district court also heard argument on Donovan's motions in limine.  Donovan's counsel argued that several pieces of evidence should be excluded under Federal Rule of Evidence 404(b).  First, the defense sought to exclude evidence of a prior arrest where the police seized the same gun scope that was recovered during the March 26, 2021 search.  The court allowed the prosecution to present this evidence but noted that if Donovan wanted a limiting instruction, he "should draft it in advance" and the court "would grant [the] limiting instruction."  The court clarified that it would be willing to give "a limiting instruction" but the court "le[ft] it to the defense at the time the evidence [was] offered to determine whether to request a limiting instruction."  Second, the defense sought to exclude evidence regarding Donovan's possession of non-firearm weapons.  The district court deferred its ruling on this issue but noted that, because the defendant was not charged with possession of

these other weapons, the court would be willing to "give a limiting instruction."

Before trial, Donovan filed proposed limiting instructions for the gun cleaning kit, the bows, and a video of him taking a routine drug test as part of his probation. The government also filed a response with different proposed language for the limiting instructions. Having stipulated to all other elements of the offense, the parties proceeded to trial on a single issue: whether Donovan possessed the shotgun.

During his testimony on October 13, 2021, Donovan's probation officer Timothy Merna testified that Finnigan moved in with Donovan in 2020 and Merna met Finnigan in January 2021. When Finnigan was called to the stand, the next day, the district court conducted the following colloquy:

> THE COURT: So, Ms. Finnigan, I just want to ask you a few questions here.
>
> Mr. Kennedy has been appointed to represent you. He's informed me that it is your intention to invoke your Fifth Amendment right to remain silent and not answer any questions about the subject matter that's involved in this case, that is, the charge against your boyfriend of possession of a firearm and ammunition by a convicted felon.
>
> The defense has indicated that they would intend to call you and ask you questions about that, particularly focusing on issues like ownership and use of the firearm and the ammunition by you, by your boyfriend, and other information about that particular charge.

And what I understand from talking to your lawyer is that if you were asked questions about that, your intention is to invoke your Fifth Amendment right and not to answer any questions about that subject matter. Is that right?

THE WITNESS: Correct.

THE COURT: Okay. So -- so that we're clear then, you intend to broadly invoke your Fifth Amendment privilege as to any subject matter involved in this case. Is that right?

THE WITNESS: Correct.

THE COURT: All right. Does counsel need to do anything further or is that sufficient?

THE DEFENDANT: That's fine.

MR. STACHOWSKE: Your Honor, the defense is satisfied.

On the second day of trial, the court noted that it was preparing jury instructions using its "boilerplate instructions" and had not "gotten any [instructions] from the parties that are anything other than the usual set of instructions." At that time, the government noted a proposed change to the instructions, but the defense raised no concerns. The next day, the court gave the parties an opportunity to review the draft jury instructions and return "with any proposals to modify" or "supplement the instructions." Following an off-the-record conference, the court stated on the record that "[t]he government proposed some minor changes to the instructions which [the court] agreed to make. [And

defense counsel] made inquiries, which [the court] answered, about the instructions and [the court] will make those changes and give the instructions." The court then "advised the parties that[,] in order to preserve any objection for purposes of appeal, they must object at the appropriate time after [it] give[s] the instruction before [it] send[s] the jury out to deliberate." Donovan did not object to the jury instructions during or after the reading of the instructions. The jury convicted Donovan.

In preparation for sentencing, United States Probation and Pretrial Services ("Probation") prepared a Presentencing Report ("PSR") that found that the oil filters in the barn were homemade silencers because they had been modified from their original design and could no longer function as automobile oil filters. In a Report of Technical Examination, the ATF found, and Probation later agreed, that the filters were "now designed to function as [] firearm silencer[s] containing an expansion chamber, a ported inner tube, and a filtering element that functions as baffling material." Additionally, the ATF's analysis of the filters uncovered that one contained debris, which it explained was "indicative of fired ammunition." The ATF tested one of the filters on a firearm, which was not the same make and model as the gun found in Donovan's Jeep, and found that the filter provided a decibel reduction of 4.02 decibels. Accordingly, Probation calculated a base offense level of twenty-two and a

two-level increase for possession of three firearms (the gun and two silencers) pursuant to 18 U.S.C. § 921(a)(3) and U.S.S.G. § 2K2.1(b)(1)(A) (we will explain these sections in more detail later on). (Citing 18 U.S.C § 921(a)(3) and U.S.S.G. § 2K2.1(b)(1)(A)). Donovan objected to the two-level increase.

At the sentencing hearing, the defense called firearms expert Ralph Demicco while the prosecution called two experts from the ATF who tested the oil filters: Gregory Stimmel, a branch chief within the firearms ammunition technology division, and Cynthia Wallace, a forensic chemist. After hearing testimony from the three witnesses, the court found that the oil filters were sufficiently modified to qualify as silencers and sentenced Donovan to 110 months in prison, with three years of supervised release. Donovan filed this timely appeal.

### III. Discussion

Donovan lodges three challenges on appeal. He argues that the district court erred in (1) allowing Finnigan to invoke the Fifth Amendment, (2) failing to give his requested limiting instructions, and (3) finding that there was sufficient evidence to show that the oil filters were homemade silencers for the purposes of sentencing. We consider each of these challenges in turn below and conclude that Donovan fails to establish a basis to disturb either the conviction or the sentence.

**A. Fifth Amendment**

Donovan first argues that the district court erred by allowing Finnigan to invoke a blanket Fifth Amendment privilege after Donovan subpoenaed her to testify that she owned the shotgun that Donovan was charged with possessing.  He argues the court failed to "inquire about whether [] Finnigan was invoking her Fifth Amendment right based on concerns that she would incriminate herself both as to the possession of the firearm and knowledge that it was stolen."  The government contends that this argument is forfeited, as the defense did not request additional questioning when given the opportunity or otherwise object to the district court's colloquy.  The government insists that the colloquy was sufficient for Finnigan to invoke her Fifth Amendment privilege and would hold up against plain-error review.

We generally review "favorable rulings on th[e] invocation of the Fifth Amendment privilege for abuse of discretion." United States v. Ramos, 763 F.3d 45, 53 (1st Cir. 2014).  "We will reverse a district court's determination that a witness properly invoked the privilege only when it is 'perfectly clear . . . that the answers [sought from the witness] cannot possibly incriminate [the witness].'"  United States v. Acevedo-Hernández, 898 F.3d 150, 169 (1st Cir. 2018) (first alteration in original) (quoting United States v. De La Cruz, 996

F.2d 1307, 1312 (1st Cir. 1993)).  However, our standard of review here is impacted by an issue of preservation.

The parties dispute whether Donovan properly preserved his challenge to Finnigan's blanket assertion of her Fifth Amendment privilege.  At the conclusion of the district court's questioning here, the district court asked if counsel needed "anything further" to confirm whether the colloquy was "sufficient."  The defense stated that it was "satisfied" with the court's questioning of Finnigan before she invoked her Fifth Amendment right.  The government argues this constitutes forfeiture; but during oral argument, the panel questioned whether counsel's statement rose to the level of outright waiver.  See United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018) (noting that waiver occurs when a party "intentionally relinquishe[d] or abandon[ed]" a right) (quoting United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002)); United States v. Chen, 998 F.3d 1, 9 (1st Cir. 2021) (concluding that the defendant waived any challenge to verdict form because "[n]ot only did [defendant] not object to it, . . . counsel [told the court] 'We're fine with it'" when asked if the form was acceptable); United States v. Cezaire, 939 F.3d 336, 339 (1st Cir. 2019) (concluding that the argument "was at least forfeited" where defense counsel did not object and said "okay" to the court's proposed course of action).

- 11 -

"[W]e need not decide between waiver and forfeiture because '[w]here a defendant's claim would fail even if reviewed for plain error, we have often' simply proceeded to the merits." United States v. Grullon, 996 F.3d 21, 32 (1st Cir. 2021) (second alteration in original) (quoting United States v. Brake, 904 F.3d 97, 99 (1st Cir. 2018)). We do so now. Plain-error review requires Donovan to show that "(1) an error occurred (2) which was clear or obvious . . . (3) affected [his] substantial rights [and] (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Universitas Educ., LLC v. Granderson, 98 F.4th 357, 373 (1st Cir. 2024) (second alteration in original) (quoting Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 86 (1st Cir. 2018)).[3]

Donovan argues that the district court erred by allowing Finnigan to invoke a blanket Fifth Amendment privilege based on the colloquy the district court performed. Specifically, he challenges whether the district court adequately inquired into whether Finnigan faced a sufficient possibility that she would incriminate herself. To invoke her Fifth Amendment privilege, a witness need only show that there is a "reasonable possibility"

---

[3] We acknowledge that Donovan waived plain error review in failing to argue the four prongs of plain error in his opening brief; nonetheless, we address the merits of his argument. See Universitas Educ., LLC v. Granderson, 98 F.4th 357, 373 (1st Cir. 2024); United States v. Colón-De Jesús, 85 F.4th 15, 25 (1st Cir. 2023).

- 12 -

that her testimony will expose her to potential prosecution. United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997).  The potential for prosecution must be "substantial and 'real,' and not merely trifling or imaginary."  Marchetti v. United States, 390 U.S. 39, 53 (1968) (quoting Rogers v. United States, 340 U.S. 367, 374 (1951)).

"Assessing the danger that a witness faces 'is a determination for the court, not the witness, to make, and [it] is subject to the discretion of the district court.'"  Ramos, 763 F.3d at 55 (quoting United States v. Pratt, 913 F.2d 982, 990 (1st Cir. 1990)).  In exercising this discretion, the judge must equally focus on "personal perception of the peculiarities of the case" and "the facts actually in evidence."  Id. (quoting Hoffman v. United States, 341 U.S. 479, 487 (1951).  While blanket assertions of privilege are "extremely disfavored," United States v. Cascella, 943 F.3d 1, 5-6 (1st Cir. 2019) (citation omitted), we have previously allowed blanket assertions "when the district court itself confirmed the witness's inability to offer any relevant, non-privileged testimony."  Id. at 6.  A district court can sufficiently inform itself on the nature and extent of the Fifth Amendment claim in "various ways."  Ramos, 763 F.3d at 55.  "[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might

be dangerous because injurious disclosure could result." Id. (quoting Hoffman, 341 U.S. at 486-87).

Here, Donovan argues the district court erred in allowing Finnigan's assertion because there was "no evidence that either [Donovan] or Finnigan was involved in or knew of the theft [of the firearm.]" While this is relevant to the question of whether Finnigan's testimony would have exposed her to criminal liability under 18 U.S.C. § 922(j), which criminalizes the possession of a stolen firearm, it has no effect on her possible liability under 18 U.S.C. § 922(d)(1).

Section 922(d)(1) makes it unlawful to knowingly furnish a firearm to a person who has been previously convicted of a felony. The record shows that even before the district court conducted its colloquy, the court knew that Finnigan lived with Donovan and had met Donovan's probation officer prior to the execution of the March search warrant. And while Finnegan claimed ownership of the shotgun, the shotgun was found attached to the ceiling of Donovan's Jeep. See United States v. Sylvestre, 78 F.4th 28, 36 (1st Cir. 2023), cert. denied, 144 S. Ct. 370 (2023) (noting "evidence was sufficient to establish constructive possession of a gun found in car that defendant had regular access to").

The record before us does not demonstrate that the district court made a "clear or obvious" error in finding that

there was a reasonable possibility Finnigan's testimony would have exposed her to criminal liability.  Universitas Educ., LLC, 98 F.4th at 373; see Acevedo-Hernández, 898 F.3d at 169.  Even if we accept Donovan's contention that the record was insufficient to support a finding that Finnigan's testimony would have incriminated her with respect to the possession of a stolen firearm under 18 U.S.C. § 922(j), the record demonstrates that there was a reasonable possibility that Finnigan's testimony would have exposed Finnegan to potential prosecution for knowingly selling "or otherwise dispos[ing] of" a firearm to a prohibited person under 18 U.S.C. § 922(d)(1).  When the district court made its decision, the record showed that:  Finnigan was the purported owner of the shotgun; Finnegan lived with Donovan and was his girlfriend; Donovan had been previously convicted of a felony; Finnigan likely knew of his conviction, given that she met his probation officer while Donovan was serving a sentence of supervised release; and Finnigan's shotgun was in Donovan's constructive possession because it was in his car.

On this record, there is a reasonable possibility that Finnigan's "responsive answer[s]" to questions about her ownership and possession of the shotgun and her relationship with Donovan would have resulted in an "injurious disclosure" and "'real' . . . hazard[] of incrimination," which is all the district court had to ascertain before sustaining the privilege.  Ramos, 763 F.3d at 55

- 15 -

(first quoting Hoffman, 341 U.S. at 486-87; and then quoting
Marchetti, 390 U.S. at 53).  Donovan's arguments on appeal do not
establish that the record and colloquy by the district court were
insufficient to inform the court of Finnigan's potential criminal
liability.  Thus, we observe no clear or obvious error in the
district court's proceedings and decision to permit Finnegan to
invoke her Fifth Amendment privilege.

## B. Limiting Instructions

        Donovan next argues that the district court erred in
permitting the admission, without limiting instructions, of what
he claims is prejudicial evidence of his past conduct and the other
weapons he had in his possession at the time of the search.  In
pressing this claim, Donovan assigns error to the district court's
failure to give limiting instructions both at the time the
assertedly prejudicial evidence was admitted and while the
district court was instructing the jury after the close of
evidence.  Although defense counsel sought limiting instructions
during the pretrial motion hearing and filed proposed limiting
instructions before trial, defense counsel did not object to the
court's lack of "contemporaneous limiting instructions" when the
evidence was admitted.  Donovan concedes that his counsel "did not
re-raise [his] requests during trial or lodge additional
objections to the jury instructions after they were given."  The
government argues that Donovan's challenge to the lack of limiting

- 16 -

instructions is waived because of defense counsel's failure to contemporaneously object or submit proposed instructions during trial.  Donovan nonetheless argues that his pretrial actions preserved his arguments on this issue.

As to Donovan's arguments on the lack of contemporaneous limiting instructions and the inadequacy of the jury instructions, our review here is for plain error because he failed to lodge an objection when the evidence was admitted.  See United States v. Williams, 717 F.3d 35, 42 (1st Cir. 2013) (explaining that "[w]hen a defendant does not interpose a contemporaneous objection to a limiting instruction," or the lack of an instruction, we review the unpreserved objection for plain error); United States v. Karani, 984 F.3d 163, 174 (1st Cir. 2021) (noting that we review unpreserved challenges to "[jury] instructions for plain error").  However, our review of the record shows more than a mere lack of preservation.  Rather, Donovan outright waived any ability to challenge the lack of limiting instructions.

True, Donovan made objections to certain evidence and filed proposed limiting instructions prior to trial.  But Donovan did not re-assert his objections or request or provide limiting instructions at any point during the trial, even though the district court had explained before trial that it would "leave it to the defense at the time the evidence is offered to determine whether to request a limiting instruction" because such a request

would be "a tactical choice that counsel needs to make." Thus, despite initially raising the issue, Donovan "relinquish[ed] or abandon[ed]" his request for limiting instructions when he failed to raise timely, contemporaneous objections at the time that the assertedly problematic evidence was introduced. United States v. Padilla-Galarza, 990 F.3d 60, 74 (1st Cir. 2021) (quoting Rodriguez, 311 F.3d at 437). This means that Donovan's objection to the lack of limiting instructions is waived and cannot be resurrected now on appeal. United States v. Pelletier, 666 F.3d 1, 6 (1st Cir. 2011) (concluding that a challenge to a limiting instruction was waived because "trial counsel was apprised of the proposed language[ and] declined an opportunity to provide the court with any changes, and again declined comment after the instruction was read to the jury"). We therefore do not reach the merits of this waived issue.

### C. Sentencing Enhancement

Lastly, Donovan argues that the district court erred by finding that the two oil filters were sufficiently modified to be considered homemade silencers, triggering a compulsory sentencing enhancement. We disagree. We review a sentencing judge's factual findings for clear error and legal determinations de novo. United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007). "A question [of] whether the evidence is sufficient to support a particular guideline determination is a question of law and,

therefore, engenders de novo review." Id.; see also United States v. Raiche, 50 F.4th 279, 283 (1st Cir. 2022), cert. denied, 143 S. Ct. 835 (2023).   The government must prove that a sentencing enhancement applies to a defendant by a preponderance of the evidence.   United States v. Flete-Garcia, 925 F.3d 17, 26 (1st Cir. 2019).

Section 2K2.1(b)(1)(A) of the United States Sentencing Guidelines requires that a defendant receive a two-level increase to their base offense level if there were three to seven firearms involved in the offense.  "When determining the number of firearms involved in an offense, we consider all relevant conduct attributable to the defendant."   United States v. Ilarraza, 963 F.3d 1, 10 (1st Cir. 2020).

The term "firearm" includes "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3)(C).  A "firearm muffler" or "firearm silencer," in turn, is defined as "any device for silencing, muffling, or diminishing the report of a portable firearm."  Id. § 921(a)(25).  But the statute then also defines a "firearm muffler" or "firearm silencer" to include not only any "device" that can be used as-is for "silencing, muffling, or diminishing the report of a portable firearm" that is intended to be so used.  Id.  The statute also defines a "firearm muffler" or "firearm silencer" to include "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating

- 19 -

a firearm silencer or firearm muffler" as well as "any part intended <u>only</u> for use in such assembly or fabrication." <u>Id</u>. (emphasis added).

Donovan argues that there is insufficient evidence in the record to support the court's finding by a preponderance of the evidence, <u>see</u> <u>Flete-Garcia</u>, 925 F.3d at 26, that the oil filters met the statutory definition of "firearm silencer" for the purpose of applying the 2K2.1(b)(1)(A) sentencing enhancement. Reviewing de novo, <u>see</u> <u>Ramos-Paulino</u>, 488 F.3d at 463, we disagree.

The two oil filters at issue were found on Donovan's property among ammunition, the second shotgun barrel, and other gun accessories. The oil filters were similar but had a few physical differences. The first ("Oil Filter One") was a Fram PH8A model oil filter that was 6-1/4 inches long and 3-1/2 inches in diameter. Oil Filter One "ha[d] been modified from its original manufactured design by the creation of a centrally located hole which perforate[d] the entire . . . device." Oil Filter One was further modified by the attachment of a piece of metal to the rear of the filter, which the ATF expert concluded was "an improvised adapter" that "facilitate[d] attaching [Oil Filter One] to a portable firearm." The second oil filter ("Oil Filter Two") was a Fram PH7317 model oil filter that was 3-3/8 inches long and 2-3/4 inches in diameter. Like Oil Filter One, Oil Filter Two had been modified "by the creation of a centrally located hole which

perforate[d] the entire . . . device."  However, unlike Oil Filter
One, Oil Filter Two did not have any "improvised adapter" attached
to it.

At Donovan's sentencing hearing, an ATF firearms expert
testified to having personally inspected hundreds of homemade
firearm silencers and noted that individuals commonly modify oil
filters for use as firearm silencers.  See also United States v.
Hay, 46 F.4th 746, 748 (8th Cir. 2022) (recounting that the ATF
had seen an increase in the sale of "'Inline Fuel Filters' that
are easily modified to be used as silencers").  The expert
testified that the holes that had been drilled through the middle
of Oil Filters One and Two would serve "no real purpose" were
either filter to be used as an oil filter, thus providing "a major
indicator" that they were intended, as modified, for use in
creating a firearm silencer.

The same expert testified to having prepared a report
summarizing analysis that he and other ATF agents had done on Oil
Filters One and Two.  To test Oil Filter One's potential for use
in silencing or muffling a firearm, the expert had used a threaded
adapter to attach it to the muzzle of a pistol.  While the expert
had used an adapter that was "made in-house" by the ATF, he
testified that similar adapters are available for purchase at
commercial retailers.  A comparison of shots fired by the pistol
with and without Oil Filter One attached revealed that Oil Filter

One, as modified and attached with the adapter, caused a 4.02-decibel reduction in the sound of the pistol shots -- a significant reduction on the logarithmic scale on which firearm decibels are measured. Thus, the ATF report concluded that Oil Filter One was "capable of diminishing the sound report of a portable firearm" and therefore was "a firearm silencer or firearm muffler as defined" by 18 U.S.C. § 921(a)(25).

ATF agents did not test Oil Filter Two's potential for use in silencing or muffling a firearm in the same way they had tested Oil Filter One because "[t]he interior and exterior holes [were] not lined up and testing [it] with live ammunition would likely result in damage," and the agents wanted to preserve the evidence. Nonetheless, based on the modifications that had been made to Oil Filter Two -- which included the drilled hole and the addition of "baffling material" inside the filter -- ATF agents concluded that it was "no longer designed to function as an automotive oil filter" and was "now designed to function as a firearm silencer" as defined in § 921(a)(25).

A second ATF expert who testified at Donovan's sentencing hearing explained that she had inspected Oil Filters One and Two and found that the interior of Oil Filter One contained residue of "suspected burned smokeless powder," lead particles, antimony, and brass particles, which, taken together, the expert

found indicative of ammunition having been fired into Oil Filter One.

At oral argument, the parties discussed whether the oil filters were identical. We recognize the importance of this discussion because if even one of the oil filters at issue does not qualify as a silencer, the sentencing enhancement cannot apply. See U.S.S.G. § 2K2.1(b)(1)(A). We note that Oil Filters One and Two are different models. And we acknowledge that while Oil Filter One had a metal plate attached to it -- making it a "combination of parts, designed or redesigned," which need only be "intended for use in assembling or fabricating a firearm silencer or firearm muffler" to meet the definition of a firearm silencer -- Oil Filter Two did not, meaning that it, standing alone, must be a "part intended only for use in such assembly or fabrication" to qualify as a firearm silencer. 18 U.S.C. § 921(a)(25) (emphasis added).

In contending that the evidence was insufficient to support a finding that either oil filter was a "firearm silencer" as defined by § 921(a)(25), Donovan presented the testimony of his own firearms expert. The expert testified that the oil filters, as modified, could "not easily" be used as silencers. He also testified that someone had drilled holes into the barrel of the shotgun that Donovan had been convicted of illegally possessing -- a modification which, in his opinion, was likely made to reduce recoil and would have resulted in the shotgun making

a "very, very loud and obnoxious" noise when it was fired. The defense argued that the presence of the holes in the shotgun barrel, coupled with the fact that Donovan lives on a remote property, indicated that he would not have been concerned with reducing the sound of the shotgun.

But this evidence does not undermine the ATF agent's testimony that there was "no real purpose" to adding holes to the oil filters except to use them in fabricating firearm silencers. And that testimony, when combined with the other evidence indicating that the oil filters were intended to facilitate the assembly or fabrication of a firearm silencer, suffices to support the district court's determination that a preponderance of the evidence showed each oil filter to be a "firearm silencer" within the meaning of § 921(a)(25). We therefore reject Donovan's contention that the district court erred in applying the sentencing enhancement for Donovan's possession of three to seven firearms under § 2K2.1(b)(1)(A).

### IV. Conclusion

For all these reasons, we **affirm**.